# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

Case No. 23-1158

LUIGI WARREN,
PLAINTIFF-APPELLANT,

- v. -

THE CHILDREN'S HOSPITAL CORPORATION,
DEFENDANT-APPELLEE.

Appeal from the United States District Court

for the District of Massachusetts

Case No. 1:17-cv-12472-DLC

## APPENDIX

LUIGI WARREN
PLAINTIFF-APPELLANT (PRO SE)

# Table of Contents

The Docket Sheet .................................................................................**001**

[1] Complaint ....................................................................................**009**

[17] Answer and Counterclaim ............................................................**017**

[18] Reply to Counterclaim ................................................................**024**

[33] Affidavit in Opposition to Motion to Compel Discovery ..............**029**

[39] Motion to Seal ...........................................................................**035**

[51] Motion for Summary Judgment ...................................................**038**

[53] Declaration of Ryan Dietz ..........................................................**041**

[54] Declaration of Theodore J. Folkman............................................**046**

       Ex. 1: Restated Articles of Organization ....................................**048**
       Ex. 2: Articles of Merger ..........................................................**058**

[55] Defendant's Statement of Undisputed Material Facts (SUMF).....**064**

       SUMF Ex. 1: Warren Deposition Excerpt ..................................**077**
       SUMF Ex. 2: Invention Report.....................................................**116**
       SUMF Ex. 3: The IDI Inventions Policy......................................**120**
       SUMF Ex. 4: 2011 Warren-Dietz Emails ....................................**140**
       SUMF Ex. 5: 2011 McCarthy Letter ...........................................**151**
       SUMF Ex. 6: The Moderna License Agreement (filed under seal)............**154**
       SUMF Ex. 7: The Affiliation Agreement (excerpts from exhibit) ..............**155**
       SUMF Ex. 8: The Ad Hoc Letter Agreement ................................**208**
       SUMF Ex. 9: The Children's Inventions Policy...........................**212**

[57] Exhibits to Plaintiff's Motion Opposing Summary Judgment (PMOS) ........**218**

    PMOS Ex. 1: Dietz Deposition Excerpts .......................................**218**
    PMOS Ex. 2: Warren Lab Notebook Pages.................................**235**
    PMOS Ex. 3: Dietz Invention Case Log .....................................**240**
    PMOS Ex. 4: Warren's IP Assignments.....................................**243**
    PMOS Ex. 5: 2011 Warren-Dietz Emails ...................................**250**
    PMOS Ex. 6: 2011 Warren-McCarthy Emails ............................**274**
    PMOS Ex. 7: 2011 Nixon Peabody Letter with Draft Lawsuit...................**278**
    PMOS Ex. 8: Payment Advice Received with Distributions ......................**290**
    PMOS Ex. 9: 2017 Warren-Dietz Message Exchanges............................**301**
    PMOS Ex. 10: Moderna Equity Certificates .................................**312**
    PMOS Ex. 11: Children's Guidelines on Handling Equity .......................**317**
    PMOS Ex. 12: List of BCH Board Members.................................**326**
    PMOS Ex. 13: Convelo Press Release .........................................**329**
    PMOS Ex. 14: Rossi Email re Lab Share Negotiation............................**332**
    PMOS Ex. 15: USPTO Declarations re Invention History .......................**335**

[58] Plaintiff's Statement of Material Facts Opposing Summary Judgment........**342**

[65] Full Transcript of Hearing on Motion for Summary Judgment ....................**352**

[72] Plaintiff's Motion to Amend Complaint ........................................................**441**

    Ex. 1: Proposed Amended Complaint .........................................**444**

[87] Exhibits to the Opposition to the Motion to Amend ....................................**457**

    Ex. 1: Moderna Closing Prices 12/7/18 - 5/8/20 ........................**457**
    Ex. 2: Excerpt from Plaintiff's Initial Disclosures ....................**465**
    Ex. 3: Warren Deposition Excerpt .............................................**471**

[88] Declaration of Irene Abrams with Exhibit re Moderna Stock Sales.............**476**

[91] Memorandum and Order on Motion for Summary Judgment .......................**486**

[93] Judgment ......................................................................................................**510**

[94] Notice of Appeal...........................................................................................**511**

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:17−cv−12472−DLC

Warren v. The Children's Hospital Corporation
Assigned to: Magistrate Judge Donald L. Cabell
Case in other court:  USCA − First Circuit, 23−01158
Cause: 28:1332 Diversity−Breach of Contract

Date Filed: 12/19/2017
Date Terminated: 01/20/2023
Jury Demand: None
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Pro Se Party Luigi Warren**                   represented by   **Luigi Warren**
155 Cordova St, #104
PASADENA, CA 91105
617−275−1489
Email: luigi.warren@outlook.com
PRO SE

V.

**Defendant**

**The Children's Hospital Corporation**         represented by   **Theodore J. Folkman**
Rubin & Rudman LLP
53 State Street, 15th Flr.
Boston, MA 02109
617−330−7135
Email: tfolkman@rubinrudman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrea M. Sullivan**
Ogletree Deakins Nash Smoak & Stewart,
P.C.
One Boston Place
Suite 3500
Boston, MA 02108
617−994−5700
Fax: 617−994−5701
Email: andrea.sullivan@ogletree.com
*TERMINATED: 12/21/2018*

**Christina Nicole Lindberg**
Miner Siddall LLP
Suite 650
101 Federal Street
Suite 650
Boston, MA 02110
617−202−5830
Fax: 617−202−5893
Email: clindberg@msdefenders.com
*TERMINATED: 04/13/2020*

**Mediator**

**Judge Robert B. Collings**

**Counter Claimant**

**The Children's Hospital Corporation**         represented by   **Theodore J. Folkman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

APPENDIX 001

**Andrea M. Sullivan**
(See above for address)
*TERMINATED: 12/21/2018*

V.

**Counter Defendant**

**Pro Se Party Luigi Warren**

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 12/19/2017 | 1 | COMPLAINT against The Children's Hospital Corporation, filed by Luigi Warren. (Attachments: # 1 Civil Cover Sheet, # 2 JS45)(McKillop, Matthew) (Entered: 12/19/2017) |
| 12/19/2017 | 4 | Filing fee/payment: $400.00, receipt number 1BST066019 for 1 Complaint (Coppola, Katelyn) (Entered: 12/22/2017) |
| 12/20/2017 | 2 | NOTICE of Case Assignment. Magistrate Judge Donald L. Cabell assigned to case. Plaintiff's counsel, or defendant's counsel if this case was initiated by the filing of a Notice of Removal, are directed to the Notice and Procedures regarding Consent to Proceed before the Magistrate Judge which can be downloaded here. These documents will be mailed to counsel not receiving notice electront> Pursuant to General Order 09−3, until the Court receives for filing either a consent to the Magistrate Judge's jurisdiction or the reassignment of the case to a District Judge, the initial assignment of a civil case to the Magistrate Judge is a referral to the Magistrate Judge under 28 USC 636(b) for all pretrial non−dispositive matters and Report and Recommendations, but not for the Rule 16(b) scheduling conference. (McDonagh, Christina) (Entered: 12/20/2017) |
| 12/20/2017 | 3 | Summons Issued as to The Children's Hospital Corporation. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (McKillop, Matthew) (Entered: 12/20/2017) |
| 12/27/2017 | 5 | MOTION for Leave to file electronically Pro Se by Luigi Warren.(Russo, Noreen) (Entered: 01/03/2018) |
| 01/04/2018 | 6 | NOTICE of Appearance by Theodore J. Folkman on behalf of The Children's Hospital Corporation (Folkman, Theodore) (Entered: 01/04/2018) |
| 01/05/2018 | 7 | NOTICE of Appearance by Andrea L. MacIver on behalf of The Children's Hospital Corporation (MacIver, Andrea) (Entered: 01/05/2018) |
| 01/05/2018 | 8 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 5 Motion for leave to electronically file Pro Se.<br><br>The court grants permission on the condition that the plaintiff satisfies all applicable training and other requirements for pro se litigants as stated in the CM/ECF Administrative Procedures, Page 5. The plaintiff is directed to complete the registration form accessible at https://public.mad.uscourts.gov/ecfreg.html<br><br>(Russo, Noreen) (Entered: 01/05/2018) |
| 01/05/2018 | 9 | ELECTRONIC NOTICE TO COUNSEL: Notification forms indicating whether or not a party has consented to proceed before a U.S. Magistrate Judge have not been received in the Clerk's Office. The submission of the form is mandatory. Completed forms shall be filed promptly. Additional forms can be obtained on the Court's web page at http://www.mad.uscourts.gov. (Russo, Noreen) (Entered: 01/05/2018) |

| | | |
|---|---|---|
| 01/08/2018 | 10 | Emergency MOTION for Extension of Time to February 14, 2018 to Answer the Complaint by The Children's Hospital Corporation.(Folkman, Theodore) (Entered: 01/08/2018) |
| 01/08/2018 | 11 | DECLARATION re 10 Emergency MOTION for Extension of Time to February 14, 2018 to Answer the Complaint by The Children's Hospital Corporation. (Attachments: # 1 Exhibit)(Folkman, Theodore) (Entered: 01/08/2018) |
| 01/08/2018 | 12 | CORPORATE DISCLOSURE STATEMENT by The Children's Hospital Corporation identifying Corporate Parent The Children's Medical Center Corporation, Corporate Parent The Childrens Medical Center Corp for The Children's Hospital Corporation.. (Folkman, Theodore) (Entered: 01/08/2018) |
| 01/08/2018 | 13 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 10 Motion for Extension of Time. Answer due by cob 2/14/18. (Russo, Noreen) (Entered: 01/08/2018) |
| 01/08/2018 | 14 | CONSENT by all parties to Jurisdiction by US Magistrate Judge by The Children's Hospital Corporation.. (Folkman, Theodore) (Entered: 01/08/2018) |
| 01/09/2018 | 15 | NOTICE of Scheduling Conference: Scheduling Conference set for 3/14/2018 at 10:00 AM in Courtroom 23 before Magistrate Judge Donald L. Cabell. Both parties may participate by phone and should call into 888–278–0296; Access Code: 6533617 at least 5 minutes before the hearing. Please see the attached document for full requirements. (Russo, Noreen) (Entered: 01/09/2018) |
| 01/10/2018 | 16 | SUMMONS Returned Executed The Children's Hospital Corporation served on 12/27/2017, answer due 2/14/2018. (Warren, Luigi) (Entered: 01/10/2018) |
| 02/14/2018 | 17 | ANSWER to 1 Complaint , COUNTERCLAIM against Luigi Warren by The Children's Hospital Corporation.(MacIver, Andrea) (Entered: 02/14/2018) |
| 03/07/2018 | 18 | ANSWER to Counterclaim by Luigi Warren.(Warren, Luigi) (Entered: 03/07/2018) |
| 03/09/2018 | 19 | JOINT SUBMISSION pursuant to Local Rule 16.1 by The Children's Hospital Corporation.(Folkman, Theodore) (Entered: 03/09/2018) |
| 03/09/2018 | 20 | CERTIFICATION pursuant to Local Rule 16.1 . (Folkman, Theodore) (Entered: 03/09/2018) |
| 03/12/2018 | 21 | ELECTRONIC NOTICE OF RESCHEDULING (TIME ONLY): Scheduling Conference reset for 3/14/2018 at 02:45 PM in Courtroom 23 before Magistrate Judge Donald L. Cabell. (Russo, Noreen) (Entered: 03/12/2018) |
| 03/14/2018 | 22 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Donald L. Cabell: Telephonic Scheduling Conference held on 3/14/2018. Upon review of the Joint Submission the court will adopt the dates proposed as the order of the court. With regard to the dispute regarding subjects for discovery the court will deal with it as he would any discovery dispute and informs the parties of his standing order with regard to discovery disputes. This order will be stated in the scheduling and instruction order which will issue. The court reminds the parties of the court sponsored mediation program. With regard to the ghostwriting issue, the court notes that he doesn't have a basis to take action but informs Mr. Warren that if called to court for a hearing, any one advising him will need to appear in the case. (Court Reporter: Digital Recording.) To order a copy of this Digital Recording, please go to www.mad.uscourts.gov/caseinfo/transcripts.htm#audio–recordings . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov.(Attorneys present: Folkman, Warren (Pro Se)) (Russo, Noreen) (Entered: 03/15/2018) |
| 03/15/2018 | 23 | Magistrate Judge Donald L. Cabell: ORDER entered. SCHEDULING AND INSTRUCTION ORDER. Please see attached order for full details and session requirements. (Russo, Noreen) (Entered: 03/15/2018) |
| 05/31/2018 | 24 | ELECTRONIC NOTICE of Hearing. Telephone Conference set for 6/5/2018 03:00 PM in Courtroom 23 before Magistrate Judge Donald L. Cabell. The parties should call into 888–278–0296 (Access Code: 6533617) at least 5 minutes before the hearing.(Russo, Noreen) (Entered: 05/31/2018) |

| | | |
|---|---|---|
| 06/05/2018 | 25 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Donald L. Cabell: Telephone Conference re 23 Instruction order held on 6/5/2018. The court asks the parties to work together further on the language for the protective order but if agreement cannot be reached leave is granted for a motion to be filed. (Court Reporter: Digital Recording.) To order a copy of this Digital Recording, please go to . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov.(Attorneys present: Warren (pro se) MacIver) (Russo, Noreen) (Entered: 06/06/2018) |
| 06/27/2018 | 26 | Joint MOTION for Protective Order by The Children's Hospital Corporation. (Attachments: # 1 Exhibit A)(MacIver, Andrea) (Entered: 06/27/2018) |
| 07/03/2018 | 27 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 26 Joint Motion for Protective Order (Russo, Noreen) (Entered: 07/03/2018) |
| 07/03/2018 | 28 | Magistrate Judge Donald L. Cabell: ORDER entered. AGREED PROTECTIVE ORDER (Russo, Noreen) (Entered: 07/03/2018) |
| 08/15/2018 | 29 | ELECTRONIC NOTICE of Hearing: Telephone Conference re 23 Instruction Order set for 8/16/2018 02:30 PM in Courtroom 23 before Magistrate Judge Donald L. Cabell. The parties should call into 888–278–0296 (Access Code: 6533617) at least 5 minutes before the hearing. (Russo, Noreen) (Entered: 08/15/2018) |
| 08/16/2018 | 31 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Donald L. Cabell: Telephone Conference held on 8/16/2018. (Court Reporter: Digital Recording.) To order a copy of this Digital Recording, please go to https://www.mad.uscourts.gov/caseinfo/transcripts.htm#audio–recordings . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov.(Attoren, Folkman) (Russo, Noreen) (Entered: 09/04/2018) |
| 09/04/2018 | 30 | MOTION to Compel Discovery.(Russo, Noreen) : # 1 Sealed –Non Redacted Version, # 2 Cover Letter) (Russo, Noreen). (Entered: 09/04/2018) |
| 09/14/2018 | 32 | MEMORANDUM in Opposition re 30 MOTION to Compel filed by The Children's Hospital Corporation. (MacIver, Andrea) (Entered: 09/14/2018) |
| 09/14/2018 | 33 | AFFIDAVIT in Opposition re 30 MOTION to Compel filed by The Children's Hospital Corporation. (MacIver, Andrea) (Entered: 09/14/2018) |
| 10/01/2018 | 34 | NOTICE of Change of Address by Luigi Warren (Russo, Noreen) (Entered: 10/02/2018) |
| 10/15/2018 | 35 | ELECTRONIC NOTICE of Hearing: Telephone Conference re 23 Instruction Order set for 10/25/2018 at 11:15 AM in Courtroom 23 before Magistrate Judge Donald L. Cabell. The parties should call into 888–278–0296 (Access Code: 6533617) at least 5 minutes before the hearing. (Russo, Noreen) (Entered: 10/15/2018) |
| 10/25/2018 | 36 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 30 Motion to Compel. The court finds that the licensing agreement is relevant to the plaintiff's claims and for that reason will compel the defendant to produce the agreement and any amendments thereto. The court reminds the parties of the Agreed Protective Order entered in this action on July 3, 2018. All Confidential Material shall be used solely for the purposes of prosecuting or defending this action and for no other purpose. (Russo, Noreen) (Entered: 10/25/2018) |
| 10/25/2018 | 37 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Donald L. Cabell: Telephone Conference re 23 Instruction order held on 10/25/2018. (Court Reporter: Digital Recording.) To order a copy of this Digital Recording, please go to https://www.mad.uscourts.gov/caseinfo/transcripts.htm#audio–recordings . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfanigov.(Attorneys present: Warren, Folkman, Maciver) (Russo, Noreen) (Entered: 10/25/2018) |
| 11/06/2018 | 38 | MOTION for Reconsideration re 36 Order on Motion to Compel,, by The Children's Hospital Corporation.(Folkman, Theodore) (Entered: 11/06/2018) |

| | | |
|---|---|---|
| 11/06/2018 | 39 | MOTION to Seal by The Children's Hospital Corporation.(Folkman, Theodore) (Entered: 11/06/2018) |
| 11/11/2018 | 40 | MEMORANDUM in Opposition re 38 MOTION for Reconsideration re 36 Order on Motion to Compel,, filed by Luigi Warren. (Warren, Luigi) (Entered: 11/11/2018) |
| 11/20/2018 | 41 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 39 Motion to Seal. Defendant shall submit the unredacted document to the court for in camera review. (Russo, Noreen) (Entered: 11/20/2018) |
| 11/20/2018 | 42 | Joint MOTION for Extension of Time to December 6, 2018 to Complete Discovery by The Children's Hospital Corporation.(Folkman, Theodore) (Entered: 11/20/2018) |
| 11/21/2018 | 43 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 42 Joint Motion for Extension of Time to Complete Discovery. Discovery to be completed by 12/6/2018. (Russo, Noreen) (Entered: 11/21/2018) |
| 12/14/2018 | 45 | DESIGNATION OF EXPERTS by Luigi Warren . (Warren, Luigi) (Entered: 12/14/2018) |
| 12/21/2018 | 46 | NOTICE of Withdrawal of Appearance by Andrea L. MacIver (MacIver, Andrea) (Entered: 12/21/2018) |
| 12/28/2018 | 47 | NOTICE of Change of Address or Firm Name by Theodore J. Folkman (Folkman, Theodore) (Entered: 12/28/2018) |
| 01/28/2019 | 48 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered denying 38 Motion for Reconsideration.<br><br>The defendant's motion for reconsideration is DENIED. The defendant is ordered to produce unredated copies of the licensing agreement and any amendments thereto. Again, the court reminds the parties of the Agreed Protective Order entered in this action on July 3, 2018. All Confidential Material shall be handled in accordance with the protective order and shall be used solely for the purposes of prosecuting or defending this action. (Russo, Noreen) (Entered: 01/28/2019) |
| 02/11/2019 | 49 | MOTION to Seal by The Children's Hospital Corporation.(Folkman, Theodore) (Entered: 02/11/2019) |
| 02/11/2019 | 50 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 49 Motion to Seal (Russo, Noreen) (Entered: 02/11/2019) |
| 02/15/2019 | 51 | MOTION for Summary Judgment by The Children's Hospital Corporation.(Folkman, Theodore) (Entered: 02/15/2019) |
| 02/15/2019 | 52 | MEMORANDUM in Support re 51 MOTION for Summary Judgment filed by The Children's Hospital Corporation. (Folkman, Theodore) (Entered: 02/15/2019) |
| 02/15/2019 | 53 | AFFIDAVIT of RYAN DIETZ in Support re 51 MOTION for Summary Judgment filed by The Children's Hospital Corporation. (Folkman, Theodore) (Entered: 02/15/2019) |
| 02/15/2019 | 54 | AFFIDAVIT of Theodore J. Folkman in Support re 51 MOTION for Summary Judgment filed by The Children's Hospital Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Folkman, Theodore) (Entered: 02/15/2019) |
| 02/15/2019 | 55 | Statement of Material Facts L.R. 56.1 re 51 MOTION for Summary Judgment filed by The Children's Hospital Corporation. (Attachments: # 1 SUMF Exhibit 1, # 2 SUMF Exhibit 2, # 3 SUMF Exhibit 3, # 4 SUMF Exhibit 4, # 5 SUMF Exhibit 5, # 6 SUMF Exhibit 6, # 7 SUMF Exhibit 7, # 8 SUMF Exhibit 8, # 9 SUMF Exhibit 9, # 10 SUMF Exhibit 10)(Folkman, Theodore) (Entered: 02/15/2019) |
| 03/08/2019 | 57 | MEMORANDUM in Opposition re 51 MOTION for Summary Judgment filed by Luigi Warren. (Attachments: # 1 Exhibit PMOS Exhibit 1, # 2 Exhibit PMOS Exhibit 2, # 3 Exhibit PMOS Exhibit 3, # 4 Exhibit PMOS Exhibit 4, # 5 Exhibit PMOS Exhibit 5, # 6 Exhibit PMOS Exhibit 6, # 7 Exhibit PMOS Exhibit 7, # 8 Exhibit PMOS Exhibit 8, # 9 Exhibit PMOS Exhibit 9, # 10 Exhibit PMOS Exhibit 10, # 11 Exhibit PMOS Exhibit 11, # 12 Exhibit PMOS Exhibit 12, # 13 Exhibit PMOS Exhibit 13, # 14 Exhibit PMOS Exhibit 14, # 15 Exhibit PMOS Exhibit 15)(Warren, Luigi) |

| | | |
|---|---|---|
| | | (Entered: 03/08/2019) |
| 03/08/2019 | 58 | Statement of Material Facts L.R. 56.1 re 51 MOTION for Summary Judgment filed by Luigi Warren. (Warren, Luigi) (Entered: 03/08/2019) |
| 03/22/2019 | 59 | REPLY to Response to 51 MOTION for Summary Judgment filed by The Children's Hospital Corporation. (Folkman, Theodore) (Entered: 03/22/2019) |
| 04/15/2019 | 60 | ELECTRONIC NOTICE Setting Hearing on Motion 51 MOTION for Summary Judgment : Motion Hearing set for 5/3/2019 at 11:00 AM in Courtroom 23 before Magistrate Judge Donald L. Cabell. (Russo, Noreen) (Entered: 04/15/2019) |
| 05/03/2019 | 61 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Donald L. Cabell: Motion Hearing held on 5/3/2019 re 51 MOTION for Summary Judgment filed by The Children's Hospital Corporation. The court hears argument on the motion. The court urges the parties to attend a mediation session. The plaintiff could participate remotely from California. The plaintiff to consider and contact the clerk if he wishes to proceed with mediation so that a session can be set up asap. (Court Reporter: Digital Recording.) To order a copy of this Digital Recording, please go to https://www.mad.uscourts.gov/caseinfo/transcripts.htm#audio−recordings ipt of this proceeding, contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov.(Attorneys present: Warren (Pro se), Folkman) (Russo, Noreen) (Entered: 05/03/2019) |
| 05/07/2019 | 62 | Magistrate Judge Donald L. Cabell: Electronic ORDER REFERRING CASE to Alternative Dispute Resolution. The mediation should, if possible, be scheduled to take place as soon as reasonably practicable, e.g., within the next month or so. Also, the Pro Se Plaintiff can only participate by telephone from his home in California. (Russo, Noreen) (Entered: 05/07/2019) |
| 05/07/2019 | 63 | Notice of assignment to ADR Provider. Judge Robert B. Collings appointed.(Garvin, Brendan) (Entered: 05/07/2019) |
| 05/08/2019 | 64 | ELECTRONIC NOTICE of ADR Conference Alternative Dispute Resolution Hearing set for 5/16/2019 11:30 AM in Courtroom 5 before Magistrate Judge Robert B. Collings. INSTRUCTIONS – COUNSEL ARE DIRECTED TO BE PRESENT WITH THEIR CLIENTS AND REPRESENTATIVES THEREOF WITH FULL SETTLEMENT AUTHORITY. THE PLAINTIFF CAN APPEAR BY TELEPHONE BY CALLING 1−888−675−2535 ACCESS CODE 6494892. Correspondence related to the hearing should be submitted by email to tracy_mclaughlin@mad.uscourts.gov no later than 5/13/2019 AT 2:00 PM and marked "Confidential – Not for Docketing" and is not to be served upon opposing Parties. Counsel are requested to try and accommodate this date. In the event that you believe the case is not ripe for mediation at this time, or the date poses a serious conflict, counsel are to confer with opposing counsel and FILE AN ASSENTED−TO MOTION WITH THE COURT to continue the mediation as soon as possible.(McLaughlin, Tracy) (Entered: 05/08/2019) |
| 05/10/2019 | 65 | Transcript of Motion Hearing held on May 3, 2019, before Magistrate Judge Donald L. Cabell. The Transcript may be purchased through Janice Russell at trussell31@tdsmail.com, viewed at the public terminal, or viewed through PACER after it is released. No Reporter Used. Digital Recording transcribed by Janice Russell. Redaction Request due 5/31/2019. Redacted Transcript Deadline set for 6/10/2019. Release of Transcript Restriction set for 8/8/2019. (Scalfani, Deborah) (Entered: 05/10/2019) |
| 05/10/2019 | 66 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Scalfani, Deborah) (Entered: 05/10/2019) |
| 05/16/2019 | 68 | REPORT of Alternative Dispute Resolution Provider. This case did not settle. Litigation should proceed forthwith.(McLaughlin, Tracy) (Entered: 05/16/2019) |

| | | |
|---|---|---|
| 06/19/2019 | 69 | NOTICE of Change of Address or Firm Name by Theodore J. Folkman (Folkman, Theodore) (Entered: 06/19/2019) |
| 09/30/2019 | 70 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered denying 51 Motion for Summary Judgment. The court will issue a written opinion shortly and convene a status conference thereafter. (Russo, Noreen) (Entered: 10/01/2019) |
| 10/03/2019 | 71 | NOTICE of Appearance by Christina Nicole Lindberg on behalf of The Children's Hospital Corporation (Lindberg, Christina) (Entered: 10/03/2019) |
| 03/03/2020 | 72 | First MOTION to Amend 1 Complaint by Luigi Warren. (Attachments: # 1 Exhibit Proposed Amended Complaint)(Warren, Luigi) (Entered: 03/03/2020) |
| 03/03/2020 | 73 | First MEMORANDUM in Support re 72 First MOTION to Amend 1 Complaint filed by Luigi Warren. (Warren, Luigi) (Entered: 03/03/2020) |
| 03/05/2020 | 74 | Assented to MOTION for Extension of Time to April 17, 2020 to respond to the plaintiff's Motion for Leave to File a First Amended Complaint by The Children's Hospital Corporation.(Folkman, Theodore) (Entered: 03/05/2020) |
| 03/05/2020 | 75 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 74 Assented to Motion for Extension of Time. Response to plaintiff's motion for leave to file a first amended complaint, due by cob 4/17/20. (Russo, Noreen) (Entered: 03/05/2020) |
| 03/11/2020 | 76 | NOTICE of Change of Address or Firm Name by Luigi Warren (Warren, Luigi) (Entered: 03/11/2020) |
| 04/02/2020 | 77 | NOTICE of Change of Address or Firm Name by Theodore J. Folkman (Folkman, Theodore) (Entered: 04/02/2020) |
| 04/08/2020 | 78 | MOTION to Withdraw as Attorney by The Children's Hospital Corporation.(Lindberg, Christina) (Entered: 04/08/2020) |
| 04/12/2020 | 79 | Assented to MOTION for Extension of Time to 5/18/2020 to File Response/Reply as to 72 First MOTION to Amend 1 Complaint by The Children's Hospital Corporation.(Folkman, Theodore) (Entered: 04/12/2020) |
| 04/13/2020 | 80 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 78 Motion to Withdraw as Attorney. Attorney Christina Nicole Lindberg terminated; granting 79 Motion for Extension of Time to File Response/Reply re 78 . Responses due by 5/18/2020) (Russo, Noreen) (Entered: 04/13/2020) |
| 04/18/2020 | 81 | Assented to MOTION to Seal by The Children's Hospital Corporation.(Folkman, Theodore). (Entered: 04/18/2020) |
| 04/21/2020 | 82 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered granting 81 Assented to Motion to Seal (Russo, Noreen) (Entered: 04/21/2020) |
| 04/22/2020 | 83 | *Assented–to* Letter/request (non–motion) from Theodore J. Folkman *to vacate order and deny motion without prejudice as moot.* (Folkman, Theodore) (Entered: 04/22/2020) |
| 04/23/2020 | 84 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered VACATING 82 Order on Motion to Seal. (Russo, Noreen) (Entered: 04/23/2020) |
| 04/23/2020 | 85 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered denying without prejudice at moot 81 Motion to Seal. (Russo, Noreen) (Entered: 04/23/2020) |
| 05/12/2020 | 86 | MOTION to Seal by The Children's Hospital Corporation. (Attachments: # 1 Declaration of Irene Abrams)(Folkman, Theodore) (Entered: 05/12/2020) |
| 05/18/2020 | 87 | MEMORANDUM in Opposition re 72 First MOTION to Amend 1 Complaint filed by The Children's Hospital Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Folkman, Theodore) (Entered: 05/18/2020) |
| 05/18/2020 | 88 | AFFIDAVIT of Irene Abrams in Opposition re 72 First MOTION to Amend 1 Complaint filed by The Children's Hospital Corporation. (Attachments: # 1 Exhibit 1)(Folkman, Theodore) (Entered: 05/18/2020) |

| | | |
|---|---|---|
| 05/18/2020 | 89 | NOTICE by The Children's Hospital Corporation re 86 MOTION to Seal *(Withdrawing Motion)* (Folkman, Theodore) (Entered: 05/18/2020) |
| 01/03/2023 | 90 | NOTICE of Change of Address or Firm Name by Theodore J. Folkman (Folkman, Theodore) (Entered: 01/03/2023) |
| 01/20/2023 | 91 | Magistrate Judge Donald L. Cabell: ORDER entered. MEMORANDUM AND ORDER on 51 MOTION for Summary Judgment filed by The Children's Hospital Corporation and 72 First MOTION to Amend Complaint by Luigi Warren. The court VACATES its previous order denying summary judgment (Dkt. No. 70), ALLOWS Children's motion for summary judgment (Dkt. No. 51), and DENIES Dr. Warren's motion to amend (Dkt. No. 72). (Russo, Noreen) (Entered: 01/20/2023) |
| 01/20/2023 | 92 | Magistrate Judge Donald L. Cabell: ELECTRONIC ORDER entered finding as moot 86 Motion to Seal. In light of 89 NOTICE by The Children's Hospital Corporation withdrawing the motion. (Russo, Noreen) (Entered: 01/20/2023) |
| 01/20/2023 | 93 | Magistrate Judge Donald L. Cabell: ORDER entered. JUDGMENT (Russo, Noreen) (Entered: 01/20/2023) |
| 02/14/2023 | 94 | NOTICE OF APPEAL re 91 MEMORANDUM AND ORDER, 93 JUDGMENT, by Luigi Warren NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 3/6/2023. (Warren, Luigi) **Modified on 2/15/2023 to Correct Docket Text and Add CM/ECF NextGen Document Links to the Memorandum/Order and Judgment Being Appeal. (Paine, Matthew).** (Entered: 02/14/2023) |
| 02/15/2023 | 95 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 94 Notice of Appeal. (Paine, Matthew) (Entered: 02/15/2023) |
| 02/16/2023 | 96 | USCA Case Number 23–1158 for 94 Notice of Appeal, filed by Luigi Warren. (Paine, Matthew) (Entered: 02/16/2023) |
| 02/24/2023 | 97 | TRANSCRIPT ORDER FORM by Luigi Warren before Magistrate Judge Donald L. Cabell, (Warren, Luigi) (Entered: 02/24/2023) |
| 02/27/2023 | 98 | Filing fee/payment: $ 505.00, receipt number 100002299 for 96 USCA Case Number (Barbosa, Nilsa) (Entered: 02/27/2023) |

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| LUIGI WARREN | THE CHILDREN'S HOSPITAL CORPORATION |

| (b) County of Residence of First Listed Plaintiff  SAN DIEGO, CA | County of Residence of First Listed Defendant  SUFFOLK, MA |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| LUIGI WARREN (PRO SE)<br>3535 LEBON DR, APT 4311, SAN DIEGO, CA 92122<br>(617) 275-1489 | |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☒ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☒ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original Proceeding

☐ 2  Removed from State Court

☐ 3  Remanded from Appellate Court

☐ 4  Reinstated or Reopened

☐ 5  Transferred from Another District *(specify)*

☐ 6  Multidistrict Litigation - Transfer

☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332
Brief description of cause:
Breach of Contract (Underpayment of Royalties)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ DECLARATIVE/INJUNCTIVE RELIEF

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____  DOCKET NUMBER _____

DATE
12/18/2017

SIGNATURE OF ATTORNEY OF RECORD  *(PRO SE)*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

APPENDIX 009

**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) __LUIGI WARREN v THE CHILDREN'S HOSPITAL CORPORATION__

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

   ☐   I.   410, 441, 470, 535, 830*, 835*, 891, 893, 895, R.23, REGARDLESS OF NATURE OF SUIT.

   ☑   II.   110, 130, 140, 160, 190, 196, 230, 240, 290,320,362, 370, 371, 380, 430, 440, 442, 443, 445, 446, 448, 710, 720, 740, 790, 820*, 840*,  850, 870,  871.

   ☐   III.   120, 150, 151, 152, 153, 195, 210, 220, 245, 310, 315,  330, 340, 345, 350, 355, 360, 365, 367, 368, 375, 376, 385, 400, 422, 423, 450, 460, 462, 463, 465, 480, 490, 510, 530, 540, 550, 555,  625, 690, 751, 791, 861-865,  890, 896, 899, 950.

   *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

   YES ☐     NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

   YES ☐     NO ☑

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

   YES ☐     NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

   YES ☐     NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

   YES ☑     NO ☐

   A.   If yes, in which division do all of the non-governmental parties reside?

   Eastern Division ☑          Central Division ☐          Western Division ☐

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

   Eastern Division ☐          Central Division ☐          Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)

   YES ☐     NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME __LUIGI WARREN (PRO SE)__

ADDRESS __3535 LEBON DR, APT 4311, SAN DIEGO, CA 92122__

TELEPHONE NO. __(617) 275-1489__

(CategoryForm6-2017.wpd )

APPENDIX 010

Pro Se 1 (Rev. 09/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT
### for the
District of Massachusetts

LUIGI WARREN

)
)
)
)

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

-v-

THE CHILDREN'S HOSPITAL CORPORATION

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)*  ☐ Yes  ☑ No

## COMPLAINT FOR A CIVIL CASE

### I.     The Parties to This Complaint

#### A.     The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | LUIGI WARREN |
| Street Address | 3535 LEBON DR, APT 4311 |
| City and County | SAN DIEGO (SAN DIEGO COUNTY) |
| State and Zip Code | CA 92122 |
| Telephone Number | (617) 275-1489 |
| E-mail Address | luigi.warren@outlook.com |

#### B.     The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Page 1 of 5

APPENDIX 011

Defendant No. 1

    Name                        THE CHILDREN'S HOSPITAL CORPORATION

    Job or Title *(if known)*

    Street Address               300 LONGWOOD AVENUE

    City and County              BOSTON (SUFFOLK COUNTY)

    State and Zip Code         MA 02115

    Telephone Number         (617) 355-6000

    E-mail Address *(if known)*

Defendant No. 2

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

Defendant No. 3

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

Defendant No. 4

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

APPENDIX 012

## II.   Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☐ Federal question      ☑ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.   If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

### B.   If the Basis for Jurisdiction Is Diversity of Citizenship

1.   The Plaintiff(s)

   a.   If the plaintiff is an individual

   The plaintiff, *(name)*  Luigi Warren                        , is a citizen of the State of *(name)*  California                        .

   b.   If the plaintiff is a corporation

   The plaintiff, *(name)* _____ , is incorporated under the laws of the State of *(name)* _____ ,

   and has its principal place of business in the State of *(name)*

   _____ .

   *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.   The Defendant(s)

   a.   If the defendant is an individual

   The defendant, *(name)* _____ , is a citizen of the State of *(name)* _____ . Or is a citizen of *(foreign nation)* _____ .

Page 3 of 5

APPENDIX 013

Pro Se 1 (Rev. 09/16) Complaint for a Civil Case

b.      If the defendant is a corporation

The defendant, *(name)* The Children's Hospital Corporation , is incorporated under

the laws of the State of *(name)* Massachusetts , and has its

principal place of business in the State of *(name)* Massachusetts .

Or is incorporated under the laws of *(foreign nation)* ,

and has its principal place of business in *(name)* .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.      The Amount in Controversy

The amount in controversy-the amount the plaintiff claims the defendant owes or the amount at stake-is more than $75,000, not counting interest and costs of court, because *(explain)*:

Based on statements made by the defendant's responsible licensing officer regarding the royalty income that would likely flow from an IPO or buyout involving the licensee company Moderna Therapeutics, the amount at stake in this dispute can be expected to exceed $75,000.

## III.    Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

See attached page following page 5 of this form.

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

There is an actual and genuine controversy between the parties as to the defendant's obligations regarding the distribution of revenue from the Moderna license. The defendant has already issued royalty checks to the plaintiff under its revised policy. The deleterious impact on the plaintiff's prospective royalty income only became clear recently as he was not previously notified of the tiered structure of the revised payment schedule or the fact that IDI took equity for the license. A major component of the potential damages here relates to tax consequences, and might be hard to recover after the fact given the difficulty of pursuing such claims in the courts. The defendant

APPENDIX 014

enjoys extraordinary leverage to impose its position owing to its total control over the flow of information and the one-way nature of the transaction (the plaintiff having fulfilled his end of the bargain). Plaintiff requests this court: (a) enter a declaratory judgment that the defendant is bound by the express promises in the Net Proceeds section of the IDI inventions policy; (b) enter a preliminary and permanent injunction requiring the defendant to distribute licensing proceeds in accord with these obligations in a timely and well-documented fashion; (c) enter judgment in favor of the plaintiff for costs, attorneys' fees and such other relief as the court deems just and appropriate.

## V.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.   For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:          12/18/2017

Signature of Plaintiff

Printed Name of Plaintiff    LUIGI WARREN

### B.   For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

APPENDIX 015

## STATEMENT OF CLAIM

Plaintiff invented technology during the course of his employment at the Immune Disease Institute (IDI) from November 2007 to June 2010. IDI licensed the technology to a startup, Moderna Therapeutics, in December 2010. IDI's policy governing employee inventions directed that 1/3 of Net Proceeds from licensing go to the inventors, 1/3 to the inventors' lab and 1/3 to the institution, and stipulated that the Inventors' Share of any equity taken in lieu of license fees be distributed "at the earliest opportunity" rather than being held and managed by the institution. IDI merged with defendant Boston Children's Hospital (BCH) in October 2012. Dr. Warren's first royalty check came in 2015. In exchanges with BCH initiated by the plaintiff in August 2017, he was informed for the first time that IDI accepted an equity stake in Moderna as partial consideration for the license. Overriding written statements made to the plaintiff in March 2011 by IDI's head of licensing and BCH's General Counsel, BCH went on to explain they were applying their own inventions policy to distribution of Moderna income. They have justified this reversal to the plaintiff based on wording in IDI's express policy asserting management's right to change the policy and paraphrased language from a 2009 Affiliation Agreement anticipating the 2012 merger. For equity-based income, the BCH policy increases the institutional share to 3/4, eliminates the Lab Share and reduces the Inventors' Share to 1/4. The policy leaves the management and disposition of inventors' equity at "the sole discretion of the Hospital." Thus, BCH has unilaterally and retroactively cut the plaintiff's promised share of revenue by 25%, while their abrogation of IDI's promise to distribute equity to inventors: (a) deprives plaintiff benefit of the highly preferential treatment of long-term capital gains in the Federal tax code; (b) denies him any ability to manage the liquidation of his stake based on his own needs and preferences; (c) greatly empowers the defendant in any controversy arising out of its asserted discretion in an already unequal relationship. Plaintiff alleges that the defendant is in breach of contract through its violation of the express promises made to IDI's employees regarding distribution of Net Proceeds from licensing within the IDI inventions policy.

APPENDIX 016

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LUIGI WARREN,<br><br>           Plaintiff,<br><br>vs.<br><br>THE CHILDREN'S HOSPITAL<br>CORPORATION,<br><br>           Defendant | Civ. A. No. 17-12472-DLC |

## ANSWER AND COUNTERCLAIM

The defendant, The Children's Hospital Corporation ("BCH") answers the Complaint as follows.

## PARTIES AND JURISDICTION

1.     BCH admits that the plaintiff, Luigi Warren ("Warren"), resides at 3535 Lebon Drive, Apt. 4311, San Diego, California, 92122 and that he is a citizen of California.

2.     BCH admits that it is a Massachusetts corporation whose principal office is located at 300 Longwood Avenue, Boston, Massachusetts, 02115.

3.     BCH admits that the amount in controversy, excluding interest and costs, exceeds $75,000.

## FACTS

4.     BCH admits that Warren was an inventor of technology ("the Technology") in the course of his employment at the Immune Disease Institute ("IDI"). To the extent the allegation is that Warren was the sole inventor, BCH denies the allegation. BCH is without knowledge or information sufficient to form a belief as to the truth of the allegation concerning the precise dates of Warren's employment with IDI.

APPENDIX 017

5.     BCH admits that IDI licensed the Technology to Moderna Therapeutics in December 2010.

6.     BCH admits that in 2004, IDI's corporate predecessor, the CBR Institute for Biomedical Research, Inc. ("CBRI"), adopted a written policy titled "Research and Technology Development Policy" ("the CBRI Policy") and states that that CBRI Policy speaks for itself. BCH denies Warren's characterizations of the CBRI Policy or its effects in this case.

7.     BCH admits that it merged with IDI in October 2012. Further answering, BCH states that on December 24, 2008, BCH's corporate parent and IDI entered into an Affiliation Agreement in contemplation of a merger between BCH and IDI.

8.     BCH admits that Warren received his first royalty check in 2015.

9.     BCH admits that in August 2017 it informed Warren that IDI had received equity in Moderna pursuant to the license agreement.  Further answering, BCH states that under the license agreement, in addition to other consideration, IDI received a certain number of shares of Moderna common stock subject to the terms of the license agreement. BCH is without knowledge or information sufficient to form a belief about the truth of the allegation that the August 2017 communication was the first time Warren knew that IDI had received equity in Moderna.

10.     BCH admits that it has applied the Children's Hospital Policy on Inventions and Intellectual Property dated April 21, 1992, as amended June 15, 1993 ("the 1992 Children's Hospital Policy") to distributions of royalties from Moderna. Further answering, BCH states that the Children's Hospital Policy, not the CBRI Policy, was the policy applicable to those distributions, and that the 1992 Children's Hospital Policy speaks for itself. Further answering, BCH states that in November 2017, at the request of Warren's co-inventor, Derrick Rossi, BCH

2

agreed to modify the policy applicable to future distributions to inventors in connection with the Moderna license. All of the stakeholders, with the exception of Warren, were in agreement on the change. Under the new policy, which will apply to distributions to Rossi and Warren going forward, the inventors will receive 27.5% of license revenue received. BCH denies that it has overridden a written statement by IDI's head of licensing and BCH's General Counsel.

11.     BCH admits that the provisions of the CBRI Policy and the Affiliation Agreement, among other things, support its assertion that the 1992 Children's Hospital Policy was the applicable policy.

12.     BCH denies that it "unilaterally and retroactively" cut Warren's share of revenue or abrogated any promise by IDI.

13.     BCH denies that it has breached any contract with Warren.

14.     The Complaint does not comply with Fed. R. Civ. P. 10(b), and it is therefore difficult to answer its allegations point-by-point. To the extent the Complaint makes any allegations that are not expressly admitted in this Answer, BCH denies such allegations.

<div align="center">OTHER DEFENSES</div>

15.     With each distribution that it has sent to Warren, the Hospital also sent information showing the division of licensing revenue. Warren knew at the time he received the payments that BCH was applying the 1992 Children's Hospital Policy to the Moderna license. His claim is barred by the doctrines of waiver, accord and satisfaction, and estoppel.

<div align="center">**COUNTERCLAIM**</div>

BCH asserts the following counterclaim:

<div align="center">JURISDICTION</div>

1.     The counterclaim plaintiff, BCH, is a Massachusetts corporation with its principal place of business in Massachusetts. The counterclaim defendant, Warren, is a citizen of

<div align="center">3</div>

California. The amount in controversy, exclusive of costs and interest, exceeds $75,000. This Court has jurisdiction under 28 U.S.C. § 1332(a)(1).

<p align="center">FACTS</p>

2.	Warren was an employee of IDI prior to BCH's merger with IDI in 2010.

3.	In the course of his employment with IDI, Warren was a co-inventor, with Dr. Derrick Rossi, of the Technology, which related to compositions, methods, and kits comprising synthetic, modified RNAs for changing the phenotype of a cell or cells. The work leading to the invention was done in Rossi's lab, where Warren was a postdoctoral researcher.

4.	IDI's corporate predecessor, CBRI, adopted the CBRI Policy in 2004. The adoption of the policy predates Rossi and Warren's invention of the Technology. The CBRI Policy was similar to policies adopted by many hospitals, universities, and research institutions. Such policies provide for the sharing of licensing royalties between the institution, the scientists who contributed to the invention of the licensed technology, and the relevant laboratories.

5.	The CBRI Policy was a policy CBRI adopted in order to further the public good (by encouraging the commercialization of new medical technologies), to encourage its staff's creativity and innovation, to encourage recruitment and retention, to foster scholarly pursuits and principles of academic freedom, to encourage prompt disclosure of new discoveries in order to protect its rights in its intellectual property, and for other similar purposes. The CBRI Policy expressly provided that CBRI had discretion to amend the policy from time to time.

6.	In August 2008, BCH's corporate parent, The Children's Medical Center Corporation ("CMCC"), and IDI (the successor to CBRI) entered into a non-binding Letter of Intent expressing their joint intention to merge. In December 2008, they entered into an Affiliation Agreement, again in contemplation of a merger. The Affiliation Agreement provided

<p align="center">4</p>

APPENDIX 020

that at its option, CMCC could cause IDI to merge with its affiliate, BCH, rather than with CMCC itself.

7. The effective date of the Affiliation Agreement (defined in the Agreement as the "Effective Time") was February 20, 2009. Among other things, the Affiliation Agreement provided that "All IDI Intellectual Property Rights not previously licensed as of the Effective Time shall at the Effective Time be subject to the policies and procedures established by CMCC with respect to intellectual property of CMCC and/or its affiliates, as the same may be amended from time to time."

8. As of February 20, 2009, IDI had, therefore, amended its policy and was applying the 1992 Children's Hospital Policy instead.

9. IDI licensed the technology to Moderna in an Exclusive License Agreement ("License Agreement") dated December 21, 2010. At that time, the 1992 Children's Hospital Policy had applied to IDI for nearly two years. This was consistent with BCH's policy and practice, which was to apply the policy in effect as of the date of the license agreement.

10. The patent rights licensed in the License Agreement were two provisional patent applications dated April 16, 2010 and September 28, 2010—fourteen and nineteen months, respectively, after the 1992 Children's Hospital Policy was adopted by IDI. (The License Agreement also licensed divisionals, substitutions, and continuations of those provisional applications, patents that issued from them, etc.).

11. IDI and BCH merged effective October 1, 2012. By then, Warren had left IDI, and he never became a BCH employee.

12. In or about 2017, Warren began to dispute application of the 1992 Children's Hospital Policy, asserting instead that the CBRI Policy governed the percentage of the royalties

5

from the Moderna license he should receive. Warren also asserted that the CBRI Policy required the Hospital to sell the Moderna equity it had received as part of the consideration for the license and to distribute a percentage of the proceeds to Warren.

13. Neither the 1992 Children's Hospital Policy nor the CBRI Policy entitles Warren to receive Moderna stock in kind. Rather, these policies entitle inventors to receive their share of the proceeds of equity once liquidated.

<div align="center">

Count One
Declaratory Judgment

</div>

14. An actual controversy exists between BCH and Warren about which policy governs the percentage of royalties from the Moderna license Warren is entitled to receive and about BCH's obligations with respect to the equity it received as part of the consideration for the license.

15. BCH is entitled to a declaration that the 1992 Children's Hospital Policy and policies later adopted by BCH, not the CBRI Policy, governs Warren's entitlement to a portion of the royalties paid to the BCH under the License Agreement and governs BCH's obligations with respect to the Moderna equity.

<div align="center">

DEMAND FOR RELIEF

</div>

Therefore, BCH demands judgment declaring that it has not breached a contract with Warren and that the Children's Hospital Policy or policies later adopted by BCH, not the CBRI Policy, governs Warren's entitlement to a portion of the royalties paid to the BCH under the License Agreement and governs BCH's obligations with respect to the Moderna equity. In the alternative, if the CBRI Policy governs, BCH demands judgment declaring that Warren is entitled to a percentage of the proceeds of any sale of Moderna stock but not to distribution of

APPENDIX 022

Moderna shares in kind. BCH also demands its costs and such other relief to which it may be entitled at law or in equity.

<div style="margin-left: 40%;">

Respectfully submitted,

THE CHILDREN'S HOSPITAL CORPORATION

By its attorneys:

*/s/ Theodore J. Folkman*
Theodore J. Folkman (BBO No. 647642)
Andrea L. MacIver (BBO No. 569280)
MURPHY & KING, P.C.
One Beacon St.
Boston, Mass. 02108
(617) 423-0400
tfolkman@murphyking.com
amaciver@murphyking.com

</div>

Dated:  February 14, 2018

## CERTIFICATE OF SERVICE

I certify that this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the NEF and paper copies will be sent to those indicated as non-registered participants on February 14, 2018.

<div style="margin-left: 40%;">

*/s/ Andrea L. MacIver*
Andrea L. MacIver

</div>

739341

7

APPENDIX 023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUIGI WARREN,<br><br>             Plaintiff,<br><br>vs.<br><br>THE CHILDREN'S HOSPITAL<br>CORPORATION<br><br>             Defendant | Civ. A. No. 17-12472-DLC |

## REPLY TO COUNTERCLAIM

JURISDICTION

1.      Warren admits the multiple allegations in this paragraph.

FACTS

2.      Warren admits that he was an employee of IDI prior to BCH's merger with IDI. Warren denies the allegation that BCH merged with IDI in 2010.

3.      Warren admits his co-inventorship of the "Technology" licensed to Moderna with Dr. Derrick Rossi and his employment as a postdoctoral researcher in Dr. Rossi's lab. Warren is without knowledge of the definition of "[t]he work leading to the invention" and therefore denies the remainder of the allegation.

4.      Warren admits that IDI's corporate predecessor, CBRI, adopted the CBRI Policy in 2004 and that the adoption of the CBRI policy predates the invention of the Technology. Warren is without knowledge of the policies of "many hospitals, universities, and research institutions," and therefore denies this allegation.

APPENDIX 024

5. Warren is without knowledge as to CBRI's motivation for adoption of the CBRI Policy and therefore denies this allegation.

6. Warren is without knowledge or information sufficient to form a belief about intra-party communications and agreements between IDI and BCH's corporate parent, The Children's Medical Center Corporation ("CMCC"), and therefore denies this allegation.

7. Warren is without knowledge or information sufficient to form a belief about intra-party communications and agreements regarding the affiliation of IDI with BCH in 2009 or language therein regarding the handling of IDI's intellectual property rights, and therefore denies this allegation.

8. Warren is without knowledge or information sufficient to form a belief as to whether as of February 20, 2009, IDI had amended its policy and was applying the 1992 Children's Hospital Policy, and therefore denies this allegation.

9. Warren is without knowledge or information sufficient to form a belief as to the exact date or character of the Moderna license agreement and Warren is without knowledge or information sufficient to form a belief as to whether IDI was applying the 1992 Children's Hospital Policy or what that was consistent with and therefore denies these multiple allegations.

10. Warren is without knowledge or information sufficient to form a belief about the exact IP rights licensed to Moderna by IDI and therefore denies this allegation. As to time spans between adoption of a policy and filing of patent applications, Warren states that time spans are determined by a calendar that speaks for itself and no response is required. To the extent that a response is required, the allegation is denied.

APPENDIX 025

11.     Warren admits that IDI and BCH merged effective October 1, 2012 and that by then he had left IDI, and that he never became a BCH employee.

12.     Warren admits that, in or about 2017, Warren began to dispute application of the 1992 Children's Hospital Policy, asserting that the IDI's invention policy governed the percentage of the royalties from the Moderna license he should receive. Warren denies the remainder of this allegation.

13.     Response to this allegation calls for making a legal conclusion and no response is required. To the extent a response is required, the allegation is denied.

14.     Warren admits this allegation.

15.     Response to this allegation calls for making a legal conclusion and no response is required. To the extent that a response is required, the allegation is denied.

16.     To the extent that the Counterclaim makes any allegations that are not expressly admitted in this Answer, Warren denies such allegations.

Having answered Defendant's Counterclaim, Warren raises the following affirmative defenses.

## FIRST AFFIRMATIVE DEFENSE

(Failure to State A Claim)

Defendant's Counterclaim fails to state a claim on which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

(Unclean Hands)

Defendant's Counterclaim is barred by the doctrine of unclean hands.

APPENDIX 026

## THIRD AFFIRMATIVE DEFENSE

(Unjust Enrichment)

Defendant's Counterclaim is barred since any relief would result in unjust enrichment to the Defendant.

## FOURTH AFFIRMATIVE DEFENSE

(Estoppel)

Defendant's Counterclaim is barred in whole or in part by the doctrine of estoppel.

## FIFTH AFFIRMATIVE DEFENSE

(Reservation of Rights)

Plaintiff reserves the right to assert additional affirmative defenses that may appear and prove applicable during the course of this litigation.

WHEREFORE, PREMISES CONSIDERED, Warren denies that The Children's Hospital Corporation is entitled to any recovery or relief whatsoever.

Respectfully submitted,

*/s/ Luigi Warren*

Luigi Warren (Pro Se)
3535 Lebon Dr, Apt 4311
San Diego, CA 92122
(617) 275-1489
luigi.warren@outlook.com

Dated: March 7, 2018

4

APPENDIX 027

CERTIFICATE OF SERVICE

I certify that this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the NEF and paper copies will be sent to those indicated as non-registered participants on March 7, 2018.

/s/ Luigi Warren

Luigi Warren (Pro Se)

APPENDIX 028

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUIGI WARREN, <br><br> Plaintiff, <br><br> vs. <br><br> THE CHILDREN'S HOSPITAL CORPORATION, <br><br> Defendant | Civ. A. No. 17-12472-DLC |

**DECLARATION OF ANDREA L. MACIVER IN SUPPORT OF DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL**

I, Andrea L. MacIver, depose and say as follows:

1.     I was admitted to the Illinois bar in 2011 and the Massachusetts bar in 2016 and have been continually in good standing since 2011.  I represent The Children's Hospital Corporation in this matter.

2.     Attached to this affidavit as Exhibit 1 is a true copy of a "Statement of Information" printout from the California Secretary of State's website relating to Cellular Reprogramming, Inc.

3.     Attached to this affidavit as Exhibit 2 are true copies of printouts from Cellular Reprogramming, Inc.'s website homepage, https://www.cellular-reprogramming.com/.


I declare that the foregoing is true and correct. Executed on September 14, 2018.

Andrea L. MacIver

APPENDIX 029

# Exhibit 1

APPENDIX 030

# State of California
## Secretary of State

### Statement of Information
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM

| S |
|---|

**FQ27437**

# FILED

In the office of the Secretary of State
of the State of California

**AUG-09 2017**

**1. CORPORATE NAME**
CELLULAR REPROGRAMMING, INC.

**2. CALIFORNIA CORPORATE NUMBER**
C3835731

This Space for Filing Use Only

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address.  See instructions.)

3. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.
☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 17**.

**Complete Addresses for the Following** (Do not abbreviate the name of the city.  Items 4 and 5 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 4.  STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE<br>6191 CORNERSTONE CT E SUITE 108, SAN DIEGO, CA 92121 | | | |
| 5.  STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY<br>6191 CORNERSTONE CT E SUITE 108, SAN DIEGO, CA 92121 | | | |
| 6.  MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 7.  CHIEF EXECUTIVE OFFICER/          ADDRESS<br>LUIGI  WARREN     3535 LEBON DR APT 4311, SAN DIEGO, CA 92122 | | | |
| 8.  SECRETARY                ADDRESS<br>LUIGI  WARREN     3535 LEBON DR APT 4311, SAN DIEGO, CA 92122 | | | |
| 9.  CHIEF FINANCIAL OFFICER/      ADDRESS<br>LUIGI  WARREN     3535 LEBON DR APT 4311, SAN DIEGO, CA 92122 | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director.  Attach additional pages, if necessary.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 10. NAME                ADDRESS<br>LUIGI  WARREN     3535 LEBON DR APT 4311, SAN DIEGO, CA 92122 | | | |
| 11. NAME                ADDRESS | | | |
| 12. NAME                ADDRESS | | | |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:  0

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable.  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS
LEGALZOOM.COM, INC.

| 15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL**  CITY | STATE | ZIP CODE |
|---|---|---|

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
BIOTECHNOLOGY

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 08/09/2017 | LUIGI  WARREN | CEO | APPENDIX 031 |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

| SI-200 (REV 01/2013) | Page 1 of 1 | APPROVED BY SECRETARY OF STATE |
|---|---|---|

# Exhibit 2



© 2018 Cellular Reprogramming, Inc.

# CELLULAR REPROGRAMMING, INC.

*Unlocking a world of possibilities*

## Pluripotent Stem Cells on Demand

Cellular Reprogramming, Inc. provides rapid, low-cost, footprint-free, xeno-free derivation of induced pluripotent stem cells (iPSCs) from human fibroblasts on a fee-for-service basis. We are specialists, committed to producing iPSCs in the most efficient manner possible. As a result of our focused approach, we can bring you the following key benefits:



**Technology**
We use an advanced form of mRNA reprogramming, the fastest and most productive method of converting fibroblasts to pluripotent stem cells yet devised.

**Experience**
We have already delivered hundreds of patient-specific iPSC lines to clients in academia and industry, a track record few other

APPENDIX 033

providers can claim.

Home    Technology    Service    Plaudits    License    FAQ    Contact

© 2018 Cellular Reprogramming, Inc.

Turnaround

Our typical turnaround time is 30-60 days, allowing customers to move forward with groundbreaking iPSC-based research faster than ever before.

Price Point

At $2000 per line, outsourcing iPSC derivation is finally a "no-brainer" for anyone who wants to enjoy the benefits of this breakthrough technology.

APPENDIX 034

9/13/2018

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LUIGI WARREN,

        Plaintiff,

vs.

THE CHILDREN'S HOSPITAL
CORPORATION,

        Defendant

Civ. A. No. 17-12472-DLC

### DEFENDANT'S MOTION TO IMPOUND

The defendant, The Children's Hospital Corporation ("the Hospital"), moves, pursuant to Local Rule 7.2 to impound redacted copies of the Moderna License Agreement ("the License Agreement").

The Hospital has filed a motion for limited reconsideration of the Court's October 25, 2018 order compelling the production of the License Agreement. In the motion for limited reconsideration, the Hospital requests that the Court deem sufficient the production of the License Agreement with limited redactions concerning royalty rates and other figures. The redacted royalty rates and figures are commercially sensitive and are what promoted the Hospital to object to the discovery of the License Agreement in the first place rather than producing the document under the protective order.

In order for the Court to rule on the merits of the motion, it will need to review the redacted version of the License Agreement and its amendment. The Hospital requests impoundment of these documents until the Court rules on the Hospital's motion for limited reconsideration and requests that the impounded documents be returned to the Hospital or destroyed one year after the Court's ruling.

APPENDIX 035

For the reasons stated above, the Hospital respectfully requests this Court grant its motion

to impound.

Respectfully submitted,

THE CHILDREN'S HOSPITAL
CORPORATION

By its attorneys:

/s/ Theodore J. Folkman
Theodore J. Folkman (BBO No. 647642)
Andrea L. MacIver (BBO No. 569280)
MURPHY & KING, P.C.
One Beacon St.
Boston, Mass. 02108
(617) 423-0400
tfolkman@murphyking.com
amaciver@murphyking.com

Dated: November 6, 2018

APPENDIX 036

<u>CERTIFICATE OF SERVICE</u>

I certify that this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the NEF and paper copies will be sent to those indicated as non-registered participants on November 6, 2018.

<div align="right">
/s/ Theodore J. Folkman

Theodore J. Folkman
</div>

749923

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LUIGI WARREN,<br><br>        Plaintiff,<br><br>    vs.<br><br>THE CHILDREN'S HOSPITAL<br>CORPORATION,<br><br>        Defendant | Civ. A. No. 17-12472-DLC |

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The defendant, The Children's Hospital Corporation, moves for summary judgment on all claims on the grounds that there is no genuine dispute as to any material fact and the defendant is entitled to judgment as a matter of law. The defendant is submitting a memorandum of law, a statement of undisputed material facts, and declarations in support of this motion

## REQUEST FOR HEARING

The defendant requests oral argument on this motion.

APPENDIX 038

Respectfully submitted,

THE CHILDREN'S HOSPITAL
CORPORATION

By its attorneys:


        /s/ Theodore J. Folkman
Theodore J. Folkman (BBO No. 647642)
PIERCE BAINBRIDGE BECK PRICE &
HECHT, LLP
361 Newbury Street, 5th Floor
Boston, MA 02115
(212) 484-9866
tfolkman@piercebainbridge.com

Dated: February 15, 2019

### RULE 7.1 CERTIFICATE

I certify that I corresponded by email with the plaintiff, who stated that he would not assent to this motion.

        /s/ Theodore J. Folkman
Theodore J. Folkman

## **CERTIFICATE OF SERVICE**

I, Theodore J. Folkman, hereby certify that, in accordance with Local Rule 5.2(b), the foregoing document was filed through the ECF system on February 15, 2019 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

    /s/ Theodore J. Folkman
    Theodore J. Folkman

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LUIGI WARREN,

        Plaintiff,

    vs.

THE CHILDREN'S HOSPITAL
CORPORATION,

        Defendant

Civ. A. No. 17-12472-DLC

## <u>DECLARATION OF RYAN DIETZ</u>

I, Ryan Dietz, make the following declaration.

1.      I am Senior Licensing Manager at Boston Children's Hospital's Technology and Innovation Development Office. I came to BCH from the Immune Disease Institute in 2012 when the two institutions merged. From 2002 to 2012, I was a Technology Transfer Associate and later Director of the Office of Technology Development at IDI. I make this declaration on my own personal knowledge.

2.      I understand that this lawsuit involves an invention created by Dr. Luigi Warren and Dr. Derrick Rossi while the two were employed by IDI. I had responsibility at IDI for the licensing of the intellectual property Drs. Warren and Rossi had invented.

3.      IDI, like its sister institutions, had a policy that provided for the sharing of licensing revenues with inventors. This policy applied to all inventions created by IDI scientists in the course of their work at IDI, whether or not the work was federally funded or, like the work Drs. Rossi and Warren did, funded from other sources. At the times relevant to this case, IDI's policy was embodied in the Research and Technology Policy dated October 28, 2004. I have

APPENDIX 041

reviewed Exhibit 4 to Dr. Warren's deposition, and it is a true and accurate copy of the IDI policy.

4.   Based on my many years of experience in the technology transfer field, I understand that among the reasons institutions such as IDI and BCH adopt such sharing policies is to treat their scientists and researchers fairly and equitably, which improves the relationship between the institutions and the scientists and leads to better retention, and which aligns the economic incentives of the scientists more closely with the mission of the institution, which includes doing basic research that has the aim of making scientific discoveries that others can commercialize for the benefit of the public.

5.   I am familiar with the license agreements entered into between IDI and Moderna. I have reviewed Exhibit 8 to Dr. Warren's deposition, which is a true copy of the Amended and Restated Exclusive License Agreement dated March 16, 2012 (with certain figures redacted). The license agreements were negotiated after IDI and BCH had affiliated. Because IDI adopted BCH's intellectual property policies at the time of the affiliation,[1] and because my office at IDI began working closely with BCH's technology transfer at the time of the affiliation, IDI used Children's Hospital form of a license agreement as the basis for the negotiations with Moderna. This is the reason why the license agreement has a BCH copyright notice on the bottom of each page.

6.   In 2010, Dr. Warren executed an assignment of his rights to IDI so that IDI could file a provisional patent application concerning the Warren/Rossi invention. IDI, like all peer institutions with which I am familiar, required that all employees agree to execute such assignments of invention made in the course of employment as a condition of employment.

---

[1] There was a minor exception concerning the "GSK Agreement," an unrelated intellectual property agreement that has no relationship with this case.

7.      But after Dr. Warren's departure from IDI, when IDI requested that he execute a second assignment, he balked. Dr. Warren and I corresponded on the subject by email. I have reviewed Exhibit 5 to Dr. Warren's deposition, and it is a true copy of our correspondence. As the document shows, my March 9, 2011 email to Dr. Warren cited the IDI Policy. This was incorrect, because as already noted, IDI had adopted Children's Hospital's intellectual property policies at the time of the affiliation of the two institutions. In any event, both IDI's policy and BCH's policy (which became IDI's policy at the time of the affiliation) was that inventors had an obligation to assign inventions, as a condition of their employment.

8.      After our correspondence, and after a letter from a lawyer at BCH written on IDI's behalf (Exhibit 6 to Dr. Warren's deposition is a true copy of that letter), which also incorrectly cited the IDI Policy, Dr. Warren did finally execute a second assignment of his rights.

9.      After Dr. Warrens departure from IDI, and after the merger between IDI and BCH, Dr. Rossi negotiated with BCH to modify the policy that would apply to revenue sharing for the Moderna transaction. The *ad hoc* negotiated policy was more favorable to Dr. Warren than the Hospital's ordinary policy in two ways. First, it treated him just like Dr. Rossi and provided a 50/50 split of the inventor's share; the Hospital's ordinary policy favored current Hospital employees over former employees. Second, given what all stakeholders understood about the likelihood that the license would yield very significant revenues for the Hospital, the percentage to be shared with inventors (27.5%) was more favorable for Dr. Rossi and Dr. Warren than the Hospital's ordinary policy, which provides for a higher percentage of the first $500,000 in revenue but a lower percentage of any additional revenues. I have reviewed Exhibit 17 to Dr. Warren's deposition, which is a true copy of the ad hoc policy, and Exhibit 18 to my deposition, which is a true copy of the Hospital's ordinary policy.

10.     Dr. Warren refused to approve the *ad hoc* policy proposed by Dr. Rossi and agreed to by the Hospital. The Hospital is nevertheless providing him with the benefit of that policy.

11.     The Hospital's uniform policy is to use the date of the licensing agreement as the relevant date for determining which version of its revenue sharing policy should apply to a particular invention. Thus if the Hospital amends its policy in the future to reduce the inventors' share of revenues, or to increase it, Dr. Warren and Dr. Rossi will continue to share revenues at the 27.5% rate, in the absence of an agreement of all the parties.

12.     In the event an inventor dies during the term of a license, the Hospital's uniform practice is to pay that inventor's share of revenues to his or her estate.

I declare that the foregoing is true and correct. Executed on February 11, 2019.

/s/ Ryan Dietz
Ryan Dietz

APPENDIX 044

## <u>CERTIFICATE OF SERVICE</u>

I, Theodore J. Folkman, hereby certify that, in accordance with Local Rule 5.2(b), the foregoing document was filed through the ECF system on February 15, 2019 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

<div align="right">

 /s/ Theodore J. Folkman
Theodore J. Folkman

</div>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUIGI WARREN,<br><br>                Plaintiff,<br><br>        vs.<br><br>THE CHILDREN'S HOSPITAL<br>CORPORATION,<br><br>                Defendant | Civ. A. No. 17-12472-DLC |

### DECLARATION OF THEODORE J. FOLKMAN

I, Theodore J. Folkman, make the following declaration:

1.      I was admitted to the Massachusetts bar in 2001 and have been continually in good standing since that time. I am counsel to the defendant in this action.

2.      Attached to this Declaration as Exhibit 1 is a true copy of the Restated Articles of Organization of Immune Disease Institute, Inc., which I obtained on February 10, 2019 from the website of the Secretary of the Commonwealth.

3.      Attached to this Declaration as Exhibit 2 is a true copy of the Articles of Merger between Immune Disease Institute, Inc. and The Children's Hospital Corporation, which I obtained on February 10, 2019 from the website of the Secretary of the Commonwealth.

I declare that the foregoing is true and correct. Executed on February 14, 2019.

/s/ Theodore J. Folkman
Theodore J. Folkman

APPENDIX 046

## **CERTIFICATE OF SERVICE**

I, Theodore J. Folkman, hereby certify that, in accordance with Local Rule 5.2(b), the foregoing document was filed through the ECF system on February 15, 2019 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Theodore J. Folkman
Theodore J. Folkman

# EXHIBIT 1

Examiner

Name
Approved

FEDERAL IDENTIFICATION
NO. 04-2158520

# The Commonwealth of Massachusetts
### William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

## RESTATED ARTICLES OF ORGANIZATION
(General Laws, Chapter 180, Section 7)

We, Theodore M. Cronin , *President / ~~Vice President~~,

and David R. Pokross, Jr. , *Clerk / *~~Assistant Clerk~~

of Immune Disease Institute, Inc. ,

*(Exact name of corporation)*

located at 800 Huntington Avenue, Boston, MA 02115 ,

*(Street address of corporation in Massachusetts)*

do hereby certify that the following Restatement of the Articles of Organization was duly adopted at a meeting

held on December 18 , 20 08 , by a vote of: ~~members~~,

Thirteen (13) directors, or ~~stockholders~~

☐ Being at least two-thirds of the members or directors legally qualified to vote in meetings of the corporation where there is no amendment to the Articles of Organization; OR

☐ Being at least two-thirds of its members legally qualified to vote in meetings of the corporation where there is an amendment to the Articles of Organization; OR

☑ Being at least two-thirds of its directors where there are no members pursuant to General Laws, Chapter 180, Section 3 and there is an amendment to the Articles of Organization; OR

☐ In the case of a corporation having capital stock, by the holders of at least two-thirds of the capital stock having the right to vote therein where there is an amendment to the Articles of Organization.

C ☐
P ☐
M ☐
R.A. ☐

P.C.

*Delete the inapplicable words.
**Check only one box that applies.
Note: If the space provided under any article or item on this form is insufficient, additions shall be set forth on one side only
of separate 8 1/2 x 11 sheets of paper with a left margin of at least 1 inch. Additions to more than one article may be made on
a single sheet as long as each article requiring each addition is clearly indicated.*

180res 1/28/04

# IMMUNE DISEASE INSTITUTE, INC.

## ATTACHMENT II

Purposes

The corporation is organized exclusively for charitable, educational, and scientific purposes, including:

     (a)    to support and operate for the benefit of The Children's Medical Center Corporation and its affiliates, including the Children's Hospital Corporation;

     (b)    to further scientific knowledge and public health through research in immunology and inflammation and other areas of biomedical science;

     (c)    to advance biomedical education; and

     (d)    to engage in any activity which may lawfully be conducted by a corporation organized under Massachusetts General Laws chapter 180 and exempt from tax under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

APPENDIX 050

**ARTICLE I**

The name of the corporation is:

Immune Disease Institute, Inc.

**ARTICLE II**

The purpose of the corporation is to engage in the following activities:

See page 2A attached hereto and made a part hereof.

**ARTICLE III**

A corporation may have one or more classes of members. If it does, the designation of such classes, the manner of election or appointments, the duration of membership and the qualification and rights, including voting rights, of the members of each class, may be set forth in the by-laws of the corporation or may be set forth below:

The designation, qualification and rights of members, if any, ~~shall~~ *may* be set forth in the bylaws.

**ARTICLE IV**

**Other lawful provisions, if any, for the conduct and regulation of the business and affairs of the corporation, for its voluntary dissolution, or for limiting, defining, or regulating the powers of the corporation, or of its directors or members, or of any class of members, are as follows:

See pages 4A-4C attached hereto and made a part hereof.

**If there are no provisions, state "None".
Note: The preceding four (4) articles are considered to be permanent and may ONLY be changed by filing appropriate Articles of Amendment.

APPENDIX 051

IMMUNE DISEASE INSTITUTE, INC.

## ATTACHMENT IV

Other lawful provisions for the conduct and regulation of the business and affairs of the corporation or for limiting, defining, or regulating the powers of the corporation, or of its trustees, are as follows:

(a)     Tax Exemption.  No part of the assets or net earnings of the corporation shall inure to the benefit of any member, trustee, or officer of the corporation or any individual; no substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, except to the extent permitted by Section 501(h) of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"); and the corporation shall not participate in, or intervene in (whether or not by the publication or distribution of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.  It is intended that the corporation shall be entitled to exemption from federal income tax under Section 501(a) of the Internal Revenue Code as an organization described in Section 501(c)(3) of the Internal Revenue Code and shall not be a private foundation under Section 509(a) of the Internal Revenue Code.

(b)     Amendment of the By-laws by the Member.  The member of the corporation may make, amend or repeal the by-laws of the corporation in whole or in part in accordance with the by-laws.

(c)     Exculpation; No Personal Liability.  No officer or trustee shall be personally liable to the corporation or its member for monetary damages for breach of fiduciary duty as an officer or trustee, except to the extent that the elimination of limitation of liability is not permitted under applicable law as in effect when such liability is determined.  No amendment or repeal of this provision shall deprive an officer or trustee of the benefits hereof with respect to any act or omission occurring prior to such amendment or repeal.

(d)     Powers.  The corporation shall have in furtherance of its corporate purposes all of the powers specified in Section 6 of Chapter 180 and in Sections 9 and 9A of Chapter 156B of the Massachusetts General Laws (except those provided in paragraph (m) of said Section 9) as now in force or as hereafter amended, and may carry on any operation or activity referred to in Article II to the same extent as might an individual, either alone or in a joint venture or other arrangement with others, or through a wholly or partly owned or controlled corporation; provided, however, that no such power shall be exercised in a manner inconsistent with said Chapter 180 or any other chapter of the Massachusetts General Laws or inconsistent with the exemption from federal income tax to which the corporation shall be entitled under Section 501(c)(3) of the Internal Revenue Code.

(e)     Interested Trustees, Officers, and Member.  In the absence of fraud, no contract or transaction between the corporation and one or more of its trustees or officers, or member, or between the corporation and any other corporation, partnership, association, or other organization in which one or more of its trustees or officers, or member, are trustees, directors, officers, or a member, or have a financial or other interest, shall be void or voidable solely for

11322248_8.DOC                                          - 4A -

this reason, or solely because such trustee, officer, or member is present at or participates in the meeting of the Board of Trustees or a committee thereof which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, nor shall any trustee or officer, or member, be under any liability to the corporation on account of any such contract or transaction if:

    (1)    the material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Trustees or the committee, and the Board of Trustees or the committee authorized the contract or transaction by the affirmative votes of a majority of the disinterested trustees, even though the disinterested trustees are less than a quorum; or

    (2)    the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the Board of Trustees, the committee of the Board, or otherwise by the corporation; or

    (3)    the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the member, at any meeting of the member the notice of which, or an accompanying statement, summarizes the nature of such transaction and such interest.

No interested trustee or member of this corporation may vote at any meeting at which such transaction shall be authorized, but may participate in discussion thereof, to the extent permitted by the non-conflicted trustees.

(f)    If and so long as the corporation is a private foundation (as that term is defined in Section 509 of the Internal Revenue Code), then notwithstanding any other provisions of the articles of organization or the by-laws of the corporation, the following provisions shall apply:

    (1)    the income of the corporation for each taxable year shall be distributed at such time and in such manner as not to subject the corporation to the tax on undistributed income imposed by Section 4942 of the Internal Revenue Code, and

    (2)    the corporation shall not engage in any act of self dealing (as defined in Section 4941(d) of the Internal Revenue Code), nor retain any excess business holdings (as defined in Section 4943(c) of the Internal Revenue Code), nor make any investments in such manner as to subject the corporation to tax under Section 4944 of the Internal Revenue Code, nor make any taxable expenditures (as defined in Section 4945(d) of the Internal Revenue Code).

(g) Upon the liquidation or dissolution of the corporation, after payment of all of the liabilities of the corporation or due provision therefor, all of the assets of the corporation shall, subject to Section 11A of Chapter 180 of the Massachusetts General Laws, be disposed of to The Children's Hospital Corporation, a Massachusetts non-profit corporation, so long as it is then

11322248_8.DOC

-4B-

APPENDIX 053

- 4C -

exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code, or if it is not then so exempt, to one or more organizations exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code.

(h)     <u>Successor Provisions</u>.  All references herein to provisions of the Internal Revenue Code and the Massachusetts General Laws refer to such provisions as in effect from time to time, including any successor provisions thereto.

APPENDIX 054

## ARTICLE V

The effective date of the Restated Articles of Organization of the corporation shall be the date approved and filed by the Secretary of the Commonwealth. If a *later* effective date is desired, specify such date which shall not be more than thirty days after the date of filing.

## ARTICLE VI

**The information contained in Article VI is not a permanent part of the Articles of Organization.**

a. The street address (post office boxes are not acceptable) of the principal office of the corporation *in Massachusetts* is:

800 Huntington Avenue, Boston, MA 02115

b. The name, residential address and post office address of each director and officer of the corporation is as follows:

|  | NAME | RESIDENTIAL ADDRESS | POST OFFICE ADDRESS |
|---|---|---|---|
| President: | See page 6(b) attached hereto | and made a part hereof. | |
| Treasurer: | | | |
| Clerk: | | | |
| Directors: (or officers having the powers of directors) | | | |

c. The fiscal year of the corporation shall end on the last day of the month of:   June

d. The name and business address of the resident agent, if any, of the corporation is:

N/A

**\*\*We further certify that the foregoing Restated Articles of Organization affect no amendments to the Articles of Organization of the corporation as heretofore amended, except amendments to the following articles. Briefly describe amendments below:**
Articles II, III, IV and VI are amended and restated in their entirety.

SIGNED UNDER THE PENALTIES OF PERJURY, this *20th* day of *February*, 20 09 ,

_____, \*President / \*~~Vice President~~,

_____, \*Clerk / \*~~Assistant Clerk~~.

*\*Delete the inapplicable words.*     *\*\*If there are no such amendments, state "None".*

IMMUNE DISEASE INSTITUTE, INC.

<u>ATTACHMENT VI</u>

6(b).  <u>Officers</u>

| <u>Name</u> | <u>Title</u> | <u>Address</u> |
|---|---|---|
| Theodore Cronin | President | 800 Huntington Avenue, Boston, MA 02115 |
| David Kirshner | Treasurer | 800 Huntington Avenue, Boston, MA 02115 |
| Stuart Novick | Clerk | 800 Huntington Avenue, Boston, MA 02115 |
| Rachelle Rosenbaum | Assistant Clerk | 800 Huntington Avenue, Boston, MA 02115 |

6(b).  <u>Trustees</u>

| <u>Name</u> | <u>Address</u> |
|---|---|
| Frederick Alt | 800 Huntington Avenue, Boston, MA 02115 |
| Carleen Brunelli | 800 Huntington Avenue, Boston, MA 02115 |
| Robert Carpenter | 800 Huntington Avenue, Boston, MA 02115 |
| Gary Fleisher, M.D. | 800 Huntington Avenue, Boston, MA 02115 |
| David Kirshner | 800 Huntington Avenue, Boston, MA 02115 |
| Harvey Lodish, Ph.D. | 800 Huntington Avenue, Boston, MA 02115 |
| James Mandell, M.D. | 800 Huntington Avenue, Boston, MA 02115 |
| Walt Pressey | 800 Huntington Avenue, Boston, MA 02115 |
| Enid Starr | 800 Huntington Avenue, Boston, MA 02115 |

APPENDIX 056

THE COMMONWEALTH OF MASSACHUSETTS

## RESTATED ARTICLES OF ORGANIZATION
### (General Laws, Chapter 180, Section 7)

I hereby approve the within Restated Articles of Organization and, the filing fee in the amount of $ _35_ having been paid, said articles are deemed to have been filed with me this _20_ day of _Feb_ , 20 _09_ .

Effective Date: _February 20 2009_

WILLIAM FRANCIS GALVIN
*Secretary of the Commonwealth*

1077511

### TO BE FILLED IN BY CORPORATION
**Contact information:**

Stuart J. Novick, Esq.

Children's Hospital Boston, 300 Longwood Avenue

Boston, MA 02115

Telephone: 617-355-6000

Email: stuart.novick@childrens.harvard.edu

A copy this filing will be available on-line at www.state.ma.us/sec/cor once the document is filed.

# EXHIBIT 2

APPENDIX 058



Examiner

FEDERAL IDENTIFICATION
NO. 04-2158520

FEDERAL IDENTIFICATION
NO. 04-2774441
Fee: $35.00

# The Commonwealth of Massachusetts

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

## ARTICLES OF *~~CONSOLIDATION~~ / *MERGER
(General Laws, Chapter 180, Section 10)
Domestic and Domestic Corporations

*~~Consolidation~~ / *merger of

(m) IMMUNE DISEASE INSTITUTE, INC.

042158520     1/19/1953

_____ and

(s) THE CHILDREN'S HOSPITAL CORPORATION

042774441     8/13/1982 ,

the constituent corporations, into

THE CHILDREN'S HOSPITAL CORPORATION ,

*one of the constituent corporations / *~~a new corporation.~~

The undersigned officers of each of the constituent corporations certify under the penalties of perjury as follows:

1. The agreement of *~~consolidation~~ / *merger was duly adopted in accordance and compliance with the requirements of General Laws, Chapter 180, Section 10.

2. That if any of the constituent corporations constitutes a public charity, then the resulting or surviving corporation shall be a public charity.

3. The resulting or surviving corporation shall furnish a copy of the agreement of *~~consolidation~~ / *merger to any of its members or to any person who was a stockholder or member of any constituent corporation upon written request and without charge.

4. The effective date of the *~~consolidation~~ / *merger determined pursuant to the agreement of *~~consolidation~~ / *merger shall be the date approved and filed by the Secretary of the Commonwealth. If a *later* effective date is desired, specify such date which shall not be more than *thirty days* after the date of filing:

    October 1, 2012

5. (For a merger)
(a) The following amendments to the Articles of Organization of the *surviving* corporation have been effected pursuant to the agreement of merger:

None.

C ☐
P ☐
M ☐
R.A. ☐

5

P.C.

*Delete the inapplicable word.

18010m 4/5/00

**(For a consolidation)**

(b) The purpose of the *resulting* corporation is to engage in the following activities:

Not applicable.

**(c) The resulting corporation may have one or more classes of members. If it does, the designation of such class or classes, the manner of election or appointment, the duration of membership and the qualification and rights, including voting rights, of the members of each class, may be set forth in the bylaws of the corporation or may be set forth below:

Not applicable.

**(d) Other lawful provisions, if any, for the conduct and regulation of the business and affairs of the resulting corporation, for its voluntary dissolution, or for limiting, defining, or regulating the powers of the corporation, or of its directors or members, or of any class of members, are as follows:

Not applicable.

6. The information contained in Item 6 is *not a permanent* part of the Articles of Organization of the ~~*resulting~~ / *surviving corporation.

(a) The street address of the ~~*resulting~~ / *surviving corporation in Massachusetts is: *(post office boxes are not acceptable)*

300 Longwood Avenue, Boston, MA  02115

---

*Delete the inapplicable word.          **If there are no provisions state "None".*

APPENDIX 060

(b) The name, residential address and post office address of each director and officer of the *resulting / *surviving corporation is:

| NAME | RESIDENTIAL ADDRESS | POST OFFICE ADDRESS |
|---|---|---|
| President: Sandra L. Fenwick | 300 Longwood Avenue, Boston, MA 02115 | 300 Longwood Avenue, Boston, MA 02115 |
| Treasurer: Bruce Balter | 300 Longwood Avenue, Boston, MA 02115 | 300 Longwood Avenue, Boston, MA 02115 |
| Clerk: Stuart Novick | 300 Longwood Avenue, Boston, MA 02115 | 300 Longwood Avenue, Boston, MA 02115 |
| Directors: See attached | | |

(c) The fiscal year (i.e. tax year) of the *resulting / *surviving corporation shall end on the last day of the month of:
September

(d) The name and business address of the resident agent, if any, of the *resulting / *surviving corporation is:

None.

The undersigned officers of the several constituent corporations listed herein further state under the penalties of perjury as to their respective corporations that the agreement of *consolidation / *merger has been duly executed on behalf of such corporations and duly approved by the members / stockholders / directors of such corporations in the manner required by General Laws, Chapter 180, Section 10.

**TO BE EXECUTED ON BEHALF OF EACH CONSTITUENT CORPORATION**

Frederick W. Alt _____, *President / *Vice-President

Stuart Novick _____, *Clerk / *Assistant Clerk

of   IMMUNE DISEASE INSTITUTE, INC.
*(Name of constituent corporation)*

Sandra L. Fenwick _____, *President / *Vice-President

Stuart Novick _____, *Clerk / *Assistant Clerk

of   THE CHILDREN'S HOSPITAL CORPORATION
*(Name of constituent corporation)*

*Delete the inapplicable words.

APPENDIX 061

Attachment for 6(b) of Certificate of Merger of
Immune Disease Institute, Inc.
with and into
The Children's Hospital Corporation

| Corporate Officers | Title | Address |
| --- | --- | --- |
| Stephen R. Karp | Chairman | 300 Longwood Avenue Boston, MA 02115 |
| James Mandell, MD | CEO | 300 Longwood Avenue Boston, MA 02115 |
| Sandra Fenwick | President and COO | 300 Longwood Avenue Boston, MA 02115 |
| Bruce Balter | Treasurer | 300 Longwood Avenue Boston, MA 02115 |
| Stuart Novick | Secretary | 300 Longwood Avenue Boston, MA 02115 |
| Dianne Hatfield | Assistant Secretary | 300 Longwood Avenue Boston, MA 02115 |

**Board of Trustees**

| | |
| --- | --- |
| Stephen R. Karp, Chairman | 300 Longwood Avenue, Boston, MA 02115 |
| Douglas A. Berthiaume, Vice Chair | 300 Longwood Avenue, Boston, MA 02115 |
| Allan Bufferd | 300 Longwood Avenue, Boston, MA 02115 |
| Sandra L. Fenwick, ex officio | 300 Longwood Avenue, Boston, MA 02115 |
| Gary Fleisher, MD | 300 Longwood Avenue, Boston, MA 02115 |
| William Harmon | 300 Longwood Avenue, Boston, MA 02115 |
| Winston Henderson | 300 Longwood Avenue, Boston, MA 02115 |
| Mira Irons, MD, ex officio | 300 Longwood Avenue, Boston, MA 02115 |
| James Kasser, MD, ex officio | 300 Longwood Avenue, Boston, MA 02115 |
| Harvey Lodish, PhD | 300 Longwood Avenue, Boston, MA 02115 |
| Gary Loveman | 300 Longwood Avenue, Boston, MA 02115 |
| James Mandell, MD, ex officio | 300 Longwood Avenue, Boston, MA 02115 |
| Ralph Martin | 300 Longwood Avenue, Boston, MA 02115 |
| Thomas Melendez | 300 Longwood Avenue, Boston, MA 02115 |
| Robert A. Smith | 300 Longwood Avenue, Boston, MA 02115 |
| Robert E. Smyth | 300 Longwood Avenue, Boston, MA 02115 |
| Eileen Sporing | 300 Longwood Avenue, Boston, MA 02115 |
| Alison Taunton-Rigby, PhD | 300 Longwood Avenue, Boston, MA 02115 |
| Ann Thornburg | 300 Longwood Avenue, Boston, MA 02115 |
| Marc B. Wolpow | 300 Longwood Avenue, Boston, MA 02115 |
| Gregory Young, MD, ex officio | 300 Longwood Avenue, Boston, MA 02115 |

THE COMMONWEALTH OF MASSACHUSETTS

## ARTICLES OF *CONSOLIDATION / *MERGER
(General Laws, Chapter 180, Section 10)
Domestic and Domestic Corporations

I hereby approve the within Articles of *Consolidation / *Merger and, the filing fee in the amount of $ ___35___ , having been paid, said articles are deemed to have been filed with me this __28__ day of __Sept__ , 20 _12_ .

**1181765**

*Effective date:* ___October 1, 2012___

**WILLIAM FRANCIS GALVIN**
*Secretary of the Commonwealth*

2012 SEP 28 AM 8: 53

### TO BE FILLED IN BY CORPORATION
Contact information:

Meagan Cavanaugh
_____

c/o Ropes & Gray, LLP
_____

Prudential Tower, 800 Boylston Street, Boston, MA  02199
_____

Telephone: 617.951.7830
_____

Email: meagan.cavanaugh@ropesgray.com
_____

A copy this filing will be available on-line at www.state.ma.us/sec/cor once the document is filed.

APPENDIX 063

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUIGI WARREN,<br><br>   Plaintiff,<br><br> vs.<br><br>THE CHILDREN'S HOSPITAL<br>CORPORATION,<br><br>   Defendant | Civ. A. No. 17-12472-DLC |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1, the defendant states that the following facts are undisputed.

A. Dr. Luigi Warren

1. Dr. Luigi Warren is a biologist who holds a Bachelor of Science degree in electrical engineering and computer science from the University College of London, a Bachelor of Science degree in biology from Columbia University, and a PhD in biology from Caltech, earned in 2008. (Warren Dep. at 8:15-9:4)[1].

2. While earning his PhD at Caltech, Dr. Warren worked in several labs at Caltech, and then joined Dr. Steve Quake's lab when it moved to Stanford. (*Id.* at 10:7-11:20).

3. Dr. Warren worked as a post-doctoral researcher in Dr. Derick Rossi's lab at the Immune Disease Institute (IDI) in Boston from approximately 2007 to 2010. (*Id.* at 11:21-12:10; 12:17-18).

4. IDI was an independent, Harvard-affiliated research institution. (*Id.* at 77:9-13).

---

[1] An excerpt of Dr. Luigi Warren deposition transcript, taken on November 16, 2019 is attached as SUMF Exhibit 1.

5. In 2010, Dr. Warren left IDI, after some professional differences arose between him and Dr. Rossi, relating primarily to the Rossi Lab's strategy for selecting journals in which to publish its results. (Warren Dep. 12:4-10; 50:9-53:6).

6. After his departure from Dr. Rossi's lab, Dr. Warren joined the Yakin lab at MIT (*Id.* at 12:11-13).

7. From 2010-2012, Dr. Warren worked as a self-employed consultant, consulting on cell-reprogramming and other closely related topics that he had worked on while at Dr. Rossi's lab. (*Id.* at 12:19 – 13:6).

8. In or after 2012, Dr. Warren founded Stemiotics, a company involved in cell reprogramming. (*Id.* at 19:15-23).

9. Stemiotics had licensed modified nucleotide technology from a company called Cellscript. After the company encountered difficulty in sublicensing this technology as part of its attempted sales to pharmaceutical companies, Dr Warren dissolved the company and in 2016, he started a new firm, Cellular Reprogramming, which did not rely on the technology licensed from Cellscript. (*Id.* at 19:24-21:19).

10. Dr. Warren never became an employee of Boston Children's Hospital. (*Id.* at 84:13-15).

B.   <u>Technology Transfer and Revenue Sharing, Generally.</u>

11. Ryan Dietz was a Technology Transfer Associate and later Director of the Office of Technology Development at IDI from 2002 to 2012. Dietz moved to BCH in 2012 when the two institutions merged, and Dietz is currently the Senior Licensing Manager at BCH's Technology and Innovation Development Office. (Dietz Decl. ¶ 1).

12. The work Drs. Rossi and Warren did was not federally funded (Warren Dep. 88:14-16; Dietz Decl. ¶ 3).

13. Even when work is not federally funded, many institutions have policies that provide for the sharing of royalties with inventors. IDI and Boston Children's Hospital (BCH) implemented such policies. (Dietz Decl. ¶ 3).

14. Even when not legally obligated to do so, these institutions elect to share revenues with inventors in their employ not only because they recognize it is fair and equitable, but also because it fosters relationships between the scientists and the institutions, leading to improved retention and better incentives for the scientists to make discoveries that others can commercialize for the benefit of the public. (*Id.* ¶ 4).

C.   IDI's Policy.

15. At all times relevant to this case, IDI's policy was embodied in the Research and Technology Policy dated October 28, 2004 ("the IDI Policy").  (Dietz Decl.¶ 3).

16. The IDI Policy provided that IDI would share one-third of the licensing revenue with inventors. (Warren Ex. 4 at 9)[2].

17. The IDI Policy also provided that IDI's trustees "retain the discretion to amend this policy from time to time." (*Id.* at 4).

18. The IDI Policy provided that "Equity received by IDI in lieu of a Licensing Fee shall be deemed a royalty." (*Id.* at 10).

19. The IDI Policy also provided that "equity taken as a royalty" should be distributed to inventors "at the earliest opportunity following receipt." (Id.).

20. Dr. Warren did not see the IDI Policy until long after his employment with IDI had ended. (Warren Dep. at 75:19-76:13).

---

[2] A true copy of Exhibit 4 from Dr. Luigi Warren deposition, taken on November 16, 2019 is attached as SUMF Exhibit 3.

D.        Dr. Warren and Dr. Rossi's Discovery

21. In Dr. Warren's time at the Rossi Lab, between 2007-2010, he and Dr. Rossi invented a new and important technique for "reprogramming" cells in order to induce them to become pluripotent stem cells. (Warren Dep. at 16:11-19:6).

22. At the time, there were known techniques for creating induced pluripotent stem cells. For example, Dr. Yamanaka had invented a technique that injected cells with a virus that would carry "genes associated with the embryonic state" into a cell and integrate those genes with the cell's genome, so that after a few weeks in which the cell expressed the proteins coded by those genes, the cell would "regress to [the] embryonic state." (*Id.* at 14:12-23).

23. These known techniques had problems. Techniques that modified the genome carried with them a risk of cancer. (*Id.* at 15:2-11).

24. Drs. Warren and Rossi made an important advance by using synthethic messenger RNA ("mRNA") to cause cells to express the proteins that would cause them to regress to the embryonic state. (*Id.* at 36:21-37:19).

25. The main advantage of this technique is that mRNA is short-lived, and after the cell had been reprogrammed, the scientists simply stopped injecting it into the cells. The vector that expressed the gene as a result of the synthetic mRNA was biodegradable. Thus there was no risk of cancer, as there was when the genome of the cell was altered to include the genes for producing the necessary proteins. (*Id.* at 16:4-10)

26. Drs. Warren and Rossi submitted their invention disclosure to IDI on or about May 20, 2010 (Warren Ex. 3[3]; Warren Dep. 46:23-47:15), though Dr. Rossi may have informed

---

[3] A true copy of Exhibit 3 from Dr. Luigi Warren deposition, taken on November 16, 2019 is attached as SUMF Exhibit 2.

APPENDIX 067

IDI's technology transfer office about their work to date orally in August 2008. (Warren Dep. 47:4-11).

E.    The Affiliation, the Merger, and IDI's Adoption of BCH's Policy.

27. When Dr. Warren joined the Rossi Lab, the lab was part of IDI, at that time an independent, Harvard-affiliated research institution. (Warren Dep. 77:9-13).

28. On December 24, 2008, IDI entered into an Affiliation Agreement with BCH's corporate parent, The Children's Medical Center Corp., in contemplation of an eventual merger. (Warren Ex. 15)[4].

29. The Affiliation Agreement provided:

> All IDI Intellectual Property Rights not previously licensed as of the Effective Time shall at the Effective Time be subject to the policies and procedures established by CMCC with respect to intellectual property of CMCC and/or its affiliates, as the same may be amended from time to time; provided, however, that this section shall not apply to any IDI Intellectual Property Rights subject to the GSK Agreement. [5]
> (*Id.* at 25).

30. IDI did adopt BCH's relevant policies, including its policy on sharing revenues with inventors, at the Effective Time of the Affiliation Agreement. (Dietz Decl. ¶ 5).

31. The "Effective Time" was defined to be the day on which "the Amended and Restated Articles of Organization" that IDI was to file with the Secretary of the Commonwealth were "approved and filed by the Secretary," unless the parties agreed on another date. (Warren Ex. 15 at 2).  The Amended and Restated Articles were filed and approved on February 20, 2009, which is therefore the Effective Time. (Folkman Decl. Ex. 1).

---

[4] A true copy of Exhibit 15 from Dr. Luigi Warren deposition, taken on November 16, 2019 is attached as SUMF Exhibit 7.

[5] The "GSK Agreement" was an unrelated intellectual property agreement that has no relationship with this case. (Dietz Decl. ¶ 5 n.1).

APPENDIX 068

32. The BCH policy that IDI adopted at the Effective Time, embodied in the "Children's Hospital Policy on Inventions and Intellectual Property" was dated April 21, 1992 and amended in 1993 ("the BCH Policy"). (Deitz Ex. 18 at 3)[6].

33. The BCH Policy, like the IDI Policy, provided that employees are obligated to assign their inventions to the Hospital. (*Id.* at 1, 2).

34. The BCH Policy provided that the percentage of net revenues that an inventor would receive would decrease as the total amount of net revenues the Hospital received grew. (Deitz Ex. 18 at 3).

35. The BCH Policy also provided that a significantly lower percentage of net revenues would be shared with *former* Hospital employees than with *current* Hospital employees. (*Id.*)

36. Specifically, under the BCH Policy, inventors who remain employed by the Hospital, receive 70% of the first $100,000 in net revenues, 45% of the next $400,000, and 25% of remaining net revenues. (*Id.*) Inventors who are not Hospital employees receive 35% of the first $500,000 in net revenues and only 25% of the remainder. (*Id.*)

37. The date that the Hospital uses to determine what percentage of licensing revenues it will share with inventors is the date of the license agreement. (Dietz Decl. ¶ 11).

38. IDI merged with BCH effective September 28, 2012. BCH was the surviving entity. (Folkman Decl. Ex. 2).

F.     IDI Licenses The Invention To Moderna.

39.  IDI exclusively licensed the Invention to Moderna Therapeutics, Inc. on December 21, 2010. (Warren Dep. Ex. 8)[7].

---

[6] A true copy of Exhibit 18 from Ryan Dietz deposition, taken on December 6, 2018 is attached as SUMF Exhibit 9.

[7] A true copy of Exhibit 8 from Dr. Luigi Warren deposition, taken on November 16, 2019 is filed under seal as

APPENDIX 069

40. On March 16, 2012, IDI and Moderna entered into an Amended and Restated Exclusive License Agreement. (Warren Dep. Ex. 8; Dietz Decl. ¶ 5). The license agreements were negotiated after IDI and BCH had affiliated. (Dietz Decl. ¶ 5).

41. The Amended and Restated Exclusive License Agreement provided ███████████ ████████████████████████████████████████████ ███████████████████ (Warren Ex. 8 at 18) ██████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ (*Id.* at 18-21). ████████████████████████████ (*Id.* at 22; Warren Dep. at 91:6-16).

42. In the Affiliation Agreement, BCH and IDI agreed that the Hospital's policies for licensing would apply to all intellectual property matters, and thus, the license agreement with Moderna used the Hospital's form. (Dietz Decl. ¶ 5).

G.    Dr. Warren's First And Second Assignments

43. IDI required its employees to assign inventions they made in the course of their employment as a condition of their employment (*Id.* ¶ 6).

44. Dr. Warren understood that it is standard practice for research institutions to require its scientists who are doing inventive work to assign their inventions to the institutions as a condition of employment. He understood that this was the policy of IDI, and of the other research institutions where he had previously worked, including Caltech and MIT. (Warren Dep. 83:12-85:1).  Dr. Warren also understood that it was the policy of BCH to require such assignments from employees. (*Id.* at 84:16-22).

---

SUMF Exhibit 6.

45. Before IDI filed its first application for a patent claiming the Invention, in or around April 2010, Dr. Warren assigned his rights in the Invention to IDI. (*Id.* at 68:9-18; Dietz Decl. ¶ 6).

46. In a February 2011 email correspondence, Ryan Dietz requested that Dr. Warren sign an additional assignment of the same invention.  Dietz explained to Dr. Warren that an additional provision application was being filed to account for newly available data, and that a second assignment would be required in the Patent Office filings. (Warren Ex. 5)[8]

47. Dr. Warren was reluctant to execute the assignment, and he asked for copies of the documents containing the policies of employment at IDI that required him to assign his inventions. (Warren Ex. 5).

48. Mr. Dietz responded with the requested language, indicating that inventions are the sole and exclusive property of IDI, and the employed scientist agrees to execute an assignment to the entire right, title and interest in and to all inventions. (*Id.*).

49. Dr. Warren then asked a "follow up" question regarding IDI's revenue sharing policies. Dr. Warren had recalled Dr. Rossi outlining those policies and asked Mr. Deitz for the language of those IDI policies. (*Id.*).

50. Mr. Dietz then responded detailing the licensing revenue share according to the IDI policy. (*Id.*).

51.  Although Dr. Warren asked for the IDI policy on revenue sharing, and Mr. Dietz responded by providing the details of that policy, the revenue sharing policy that was in effect was in fact the BCH policy.   (Dietz Decl. ¶¶ 5, 7).

---

[8] A true copy of Exhibit 5 from Dr. Luigi Warren deposition, taken on November 16, 2019 is attached as SUMF Exhibit 4.

APPENDIX 071

52. When Dr. Warren still would not execute the assignment, the General Counsel of BCH, Dianne McCarthy, sent a letter to Dr. Warren on IDI's behalf.  The letter similarly explained the necessity of obtaining a second assignment, and the Dr. Warren's obligation to assign. The email enclosed IDI's Research and Technology Development Policy. The letter noted that the policy also benefits inventors. (Warren Ex. 6)[9].

53. Although the BHC counsel's letter to Dr. Warren cited to the enclosed the IDI policy as the basis of IDI employees' obligation to assign inventions, the revenue sharing policy that was in effect at the time the letter was sent was in fact the BCH policy. (Dietz Decl. ¶¶ 5, 8).

54. Dr. Warren did execute the second assignment of his rights after receipt of the letter from BCH's general counsel. (Warren Dep. 72:22-73:18; Deitz Decl. ¶¶ 7-8).

H.     The Hospital Treats Dr. Warren Just As It Treats Dr. Rossi.

55. Although Dr. Warren testified that he felt that the invention was "morally [his]" on account of his key role in the idea and the laboratory work (Warren Dep. 79:10-12), he agreed that it was fair that he and Dr. Rossi should share the inventors' share of the royalties equally: "I've never tried to . . . suggest that we should have other than a 50/50 split." (*Id.* at 79:2-14).

56. The Hospital did apply a 50/50 split of the royalties between Drs. Rossi and Warren. (Dietz Decl. ¶ 9).

57. In November 2017, Dr. Rossi negotiated with the Hospital for a better deal on for inventors for the Rossi/Warren invention. (*Id.*)

---

[9] A true copy of Exhibit 6 from Dr. Luigi Warren deposition, taken on November 16, 2019 is attached as SUMF Exhibit 5.

APPENDIX 072

58. Under the Hospital's usual policy, inventors who remain employed by the Hospital, such as Dr. Rossi, receive 70% of the first $100,000 in net revenues, 45% of the next $400,000, and 25% of remaining net revenues. (Dietz Ex. 18 at 3).

59. Under the Hospital's usual policy, inventors who are not Hospital employees, such as Dr. Warren, receive 35% of the first $500,000 in net revenues and only 25% of the remainder. (*Id.*).

60. Dr. Rossi and the Hospital agreed that on this transaction, inventors should receive 27.5% of all net revenues. (Warren Ex. 17 at 1)[10].

61. Dr. Warren was the one stakeholder who refused to approve the *ad hoc* policy Dr. Rossi worked out with the Hospital. (Warren Dep. 150:12-17; Warren Ex. 17 at 2).

62. Nevertheless, the Hospital is giving Dr. Warren the benefit of the *ad hoc* policy, because it is fair that he should be treated just as his co-inventor is being treated. (Dietz Decl. ¶ 10).

63. In the event an inventor dies during the term of a license, the Hospital's uniform practice is to pay that inventor's share of revenues to his or her estate. (Deitz Decl. ¶ 12).

I.  The Moderna IPO.

64. On November 9, 2018, Moderna filed a Form S-1 with the Securities and Exchange Commission, indicating an intention to make an initial public offering of its common stock. *See* Moderna Form S-1, https://www.sec.gov/Archives/edgar/data/1682852/000119312518323562/d577473ds1.htm.[11]

---

[10] A true copy of Exhibit 17 from Dr. Luigi Warren deposition, taken on November 16, 2019 is attached as SUMF Exhibit 8.

[11] A true copy of Moderna S-1 filed with the Security and Exchange Commission, on November 9, 2018 is attached as SUMF Exhibit 10.

APPENDIX 073

65. Moderna made its IPO on December 6, 2018, raising more than $600 million in the market. *See* Corrie Driebusch & Jonathan D. Rockoff, *Moderna IPO Raises Over $600 Million in Rocky Market,* Wall Street Journal (Dec. 6, 2018), https://www.wsj.com/articles/highly-anticipated-moderna-listing-is-seen-as-test-of-new-ipos-1544092200

66. Even prior to this IPO, the Hospital's "reasonable assumption" was that its Moderna stock alone, leaving aside expected royalties, would be worth "tens of millions of dollars." (Dietz Dep. 80:9-17).

J.   Dr. Warren's Theory of Harm.

67. Dr. Warren seeks an injunction requiring the Hospital to transfer shares of Moderna stock to him but does not seek damages. (Compl., ECF 1 at 4-5).

68. Had the shares been transferred to Dr. Warren, he could not have sold the shares until December 2018, when Moderna went public, at the earliest (Warren Dep. 109:17-110:5)

69. Moderna has never paid a dividend (Moderna Form S-1, *supra*, at 81)

70. The only reason Dr. Warren claims the receipt of stock rather than the proceeds of the sale of the stock could matter to him is the difference in tax treatment he says he would have received in the two cases. Specifically, Dr. Warren maintains that had he received the shares earlier, he would have been able to sell them at a future date and pay the favorable capital gains tax rate on the gains rather than paying the tax on ordinary income. (Warren Dep. 110:6-16).

71. Dr. Warren has refused to identify his accountant, claiming that the name of his accountant is privileged.  (*Id.* at 64:13-65:3).

APPENDIX 074

- 12 -

Respectfully submitted,

THE CHILDREN'S HOSPITAL
CORPORATION

By its attorneys:

/s/ Theodore J. Folkman
Theodore J. Folkman (BBO No. 647642)
PIERCE BAINBRIDGE BECK PRICE &
HECHT LLP
361 Newbury Street, 5th Floor
Boston, MA 02115
(212) 484-9866
tfolkman@piercebainbridge.com

Dated: February 15, 2019

- 12 -

APPENDIX 075

## **CERTIFICATE OF SERVICE**

I, Theodore J. Folkman, hereby certify that, in accordance with Local Rule 5.2(b), the foregoing document was filed through the ECF system on February 15, 2019 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

 /s/ Theodore J. Folkman
Theodore J. Folkman

# SUMF EXHIBIT 1
## EXCERPT OF DR. LUIGI WARREN'S NOVEMBER 16, 2018 DEPOSITION TRANSCRIPT

Confidential - Subject to Protective Order

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - -

LUIGI WARREN,                         :     Civ. A. No.

Plaintiff,     :     17-12472-DLC

:

vs.                          :

:

THE CHILDREN'S HOSPITAL        :

CORPORATION,                          :

Defendant.      :

- - -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Friday, November 16, 2018

- - -

Videotaped deposition of LUIGI WARREN, Ph.D., held at VEDDER PRICE, P.C., 1925 Century Park East, Suite 1900, Los Angeles, California, commencing at approximately 9:14 a.m., before Rosemary Locklear, a Registered Professional Reporter, Certified Realtime Reporter and California CSR (#13969).

- - -

GOLKOW LITIGATION SERVICES

877.370.3377 ph | 971.591.5672 Fax

deps@golkow.com

Confidential -- Subject to Protective Order

Q.      Were you in any other labs at Caltech?

A.      No.

Q.      Was Dr. Quake the principal in those labs, or was it Dr. Sternberg, Dr. Fraser, and Dr. Rothenberg?

A.      Those were rotation assignments during my first year or maybe year and a half.  So the -- the principal investigators in those labs were the names you've just mentioned.

Q.      And then at some point you switched to the Quake lab at Stanford; right?

A.      Yes.  I joined the lab just as he, Steve Quake, moved to Stanford.

Q.      And that was in 2004?

A.      I believe so, yes.

Q.      And you were there until approximately 2007, when you received your degree?

A.      I was there until 2007.  I finished up I guess October, I guess, and the degrees are only awarded once per year, so the degree wasn't actually awarded until 2008.

Q.      Following your time at the Quake lab, you joined Derrick Rossi's lab; correct?

A.      That's right.

Q.      And at that time that lab was at the Immune Disease Institute.

Confidential - Subject to Protective Order

A.      Yes.

Q.      In Boston.

A.      Yes.

Q.      And we're going to, obviously, talk at greater length about your time with Dr. Rossi.  I'm just trying to establish my chronology here.

A.      Uh-huh.

Q.      You were there from approximately 2007 to 2010; correct?

A.      Yes.

Q.      Following your departure from Dr. Rossi's lab, you joined the Yanik lab at MIT?

A.      That's correct.

Q.      You were then working as a post-doctoral researcher?

A.      Yes.

Q.      And that was true at the Rossi lab as well?

A.      Yes.

Q.      From 2010 to 2012, you were a self-employed consultant?

A.      Yes.

Q.      What sort of consulting were you doing at that period?

A.      Biology, work related to reprogramming and other closely related topics.

Confidential -- Subject to Protective Order

of cell, and regressing it artificially to express or to have the phenotype or the properties of an embryonic cell, a cell such as you would find in an extremely early embryo where it's just a ball of cells that haven't decided what they're going to become.

So those cells have the potential to be directed to become any other kind of cell.  So the reprogramming process is a method of artificially redirecting a specialized cell to become an unspecialized cell, and once it becomes an unspecialized cell, then potentially you can make any other kind of cell.

And this is a process that was originally presented around 2006, 2007 in the literature by Shinya Yamanaka, a Japanese scientist, who subsequently got the Nobel Prize for this work.

And he, Yamanaka, originally, effected that process by using integrating viruses to carry genes associated with the embryonic state to -- into cells so that they integrated into the DNA of the cells and expressed these embryonic genes, and after a period of a few weeks of expression, this forced the whole gene expression network to -- to remodel to this embryonic state or regress to this embryonic state.

So, obviously, as reflected by the award of the Nobel Prize, this is a -- people saw this as a huge --

Confidential - Subject to Protective Order

hugely useful breakthrough.

A major potential problem with the breakthrough -- well, with applying it clinically to produce cells for, for example, for transplant, is that it involves modifying the genome and putting genes that are -- potentially could cause cancer into the -- into the genome. And those genes could spontaneously be reactivated or even if -- even just the fact that you have disrupted the DNA, the native sequence of the DNA, could cause dysregulation of genes and could cause cancer.

So although the technology that Yamanaka originally presented had tremendous promise and it had immediate application in producing cells for -- of different types for research -- for example, you could produce human neurons, which are normally quite difficult to get, you could take skin cells, convert them to these so-called pluripotent stem cells and then convert those to neurons and study the neurons in a dish.

So for that purpose, this problem of the integration of the -- the genes was perhaps not that big of an issue, but if you wanted to produce cells for medical application, then it would be a huge issue, because anything you put back into the patient, say, you

Confidential -- Subject to Protective Order

made a skin graft to treat a burn patient, for example, those cells, the genes might be reactivated and cause cancer.

So it was in the early days of -- after Yamanaka's publication, the entire field recognized that we needed to find ways of getting rid of those viruses and reprogramming the cells in some way that didn't modify the genome and didn't entail this risk of -- for this particular risk of oncogenesis, of being potentially cancer-forming.

And the approach that I took while I was in the Rossi lab, which was somewhat, I think, for -- out of left field for most people in the -- in the -- in this area, was to express the gene, the reprogramming genes, from synthetic messenger RNA transcripts.

So genes -- most of the -- most of the genes that the cell expresses are ultimately converted to -- to protein or express protein.  There are some that have their effect as RNA, but, mostly, most genes are associated with protein.

And DNA, which is -- is kind of the long-term storage of the genetic information of the cell, is transiently converted into short-lived messenger RNA transcripts, which, in turn, are translated to become protein.

Confidential - Subject to Protective Order

us at that point, and Derrick went to Philadelphia for the ICCR conference. So this was still fairly soon after Yamanaka's big breakthrough, which everybody was talking about at that conference.

It was the, you know, talk of the town, as it were, and there were big, you know, speeches about it, including these prominent individuals, like Yamanaka himself and other -- other top stem cell researchers, talking about reprogramming. And in some of these speeches the -- the theme was brought out, you know, number-one -- number-one thing we need to do is get rid of the viruses that are currently required for reprogramming.

And, you know, that suddenly -- I don't know if I had connected this mRNA idea to the Yamanaka stuff before that. Probably not. I don't think I was particularly aware of it, neither was -- you know, we were a hematopoesis lab, not a pluripotent stem cell lab. So we were stem cell, but not pluripotent stem cell.

But, you know, suddenly that kind of really connected with this idea that had been in my head and I -- I remember listening to a talk, big talk, like a keynote, maybe it's Yamanaka himself, maybe it was George Daley, but they were running down these ideas for

how we would get rid of the viruses.  And it was the usual suspects, you know, cell -- cell-penetrating proteins and small molecules.  And I remember having the reaction, I can think of a much better way of doing it.

Also, one of my -- one of the other post-docs in the lab, Isabel Beerman, had a friend who was also attending the conference.  His name is Han Lee.  He was out of -- I think he'd been a grad student, maybe, with Isabel at Yale, I think.  And he actually had done something with synthetic mRNA, which I hadn't.  I worked with synthetic RNA, but that's not the same thing as synthetic mRNA.

So I picked his brains and bounced the idea off him and, you know, he was kind of like, it's not a bad idea.  So -- so I came back from that conference, which was sometime I think in middle or late June, and I wrote up my notes from the conference in my notebook, and I think a few days later also wrote my idea for using synthetic mRNA to -- to make iPS.

And I actually -- I didn't initially seek Derrick's approval for this idea, but I ordered some cheap reagents, some primers, to make -- to start making some constructs related to this project.

And -- and then I think it wasn't until -- I think it was a few weeks later that I started to feel

Confidential - Subject to Protective Order

filed the first --

Q.    Provisional application.

A.    -- provisional application.  And about a year before that Derrick had -- so that would be 2009 --

Q.    Okay.

A.    -- not 2008.  2009, had said we're close, we're starting to talk to people, we need to start thinking about protecting this.

MR. FOLKMAN:  And let me ask the reporter to mark this as Exhibit 3.

(Exhibit Warren-3 was marked for identification.)

THE WITNESS:  And, of course, even -- so Derrick had already spoken to Ryan in August of 2008, resulting in the -- he had notified him of the invention or whatever.  I forget what the exact term they used is.

MR. FOLKMAN:  Sure.

THE WITNESS:  Sorry.

BY MR. FOLKMAN:

Q.    So, Dr. Warren, do you now have Exhibit 3 in front of you?

A.    Yes.

Q.    And do you see -- well, is this the Report of Invention that you were referring to?

A.    I don't think so, but let me look more closely.

Q.      Okay.

A.      (Witness reviews document.)  I think this is much later.  This is some other document much later.

Q.      Yes.  I see that this one is dated in May of 2010, if you look on Page 2.

A.      Yes.  So this may be an Report of Invention, but I know from emails from Ryan and from some notes that have been turned over to me from Ryan that he logged a conversation with Derrick that was in August 2008.  So the month after I disclosed to Derrick that -- the idea for the project and got his permission.

        So that's -- so these are different things.

Q.      Are you aware of an invention disclosure form other than this one?

A.      No.

Q.      When did you leave IDI?

A.      June of 2010.

Q.      By that time, the research on the project had been completed?

A.      My part of it had been.  I mean, we'd written the paper, we'd submitted the paper, and we'd filed the IP.

Q.      Do you remember approximately when you submitted the paper for publication?

A.      Again, I was reviewing that.  And let me -- I

Confidential -- Subject to Protective Order

this proves that in vivo these cells were pluripotent, they could give rise to these appropriately diverse lineages.

So those things were just kind of -- I mean, we just had to wait for those and, hopefully, have them in our back pocket if the reviewers came back, as they quite possibly might, and say, oh, we want to see better validation that you've really got what you say you got.

Q.      Why did you leave IDI?

A.      The proximate grievance that I had was with the submission to Cell as opposed to just Cell Stem Cell. So I had a bitter disagreement with Rossi about doing that.  And, you know, I knew it was his authority to do that, but I felt that I had standing.

And the more collegial thing would have been to, you know, work -- pay heed to my -- my desires on that front.  But these kind of conflicts often happen between somebody who owns a project and then his boss has, in a sense, hedged because he's got multiple projects.  So there's a conflict of interest, but -- or difference in how we weigh things.

So I had accepted, or didn't resign when he did that, but I was, shall we say, disgruntled.  And I thought that it was a potentially suicidal strategy and either that I would bear the brunt of that since my

Confidential -- Subject to Protective Order

whole career, basically, at this point was this was the big thing that I had done and I would have not hedged.

But, you know, I went about my business and supported these other projects while we waited to see. And, you know, Derrick was -- in fact, I remember Derrick's words were, I feel lucky about the Cell submission.  And I didn't feel lucky about the Cell submission.

And as it turned out, we came -- it came back with three reviews, one of which was quite nasty and demanded us to do all kinds of things that would take a long time and didn't really seem that justified, and the other two were -- Derrick said they were quite good reviews.  I wouldn't -- I was looking at them in the last few days.  I wouldn't say they were that -- that good.

So we resubmitted, so I think -- I think we -- we got the initial rejection back fairly quickly, actually, within about four weeks, but with these pretty nasty reviews, or at least one of them was very nasty, and -- and we resubmitted.

In fact, we were then out at Cell.  So, in a way, that was good.  Because to get published in Cell, typically, can take a year, or a year and a half, even, and they can make you jump through all kinds of hoops.

Confidential -- Subject to Protective Order

And, you know, I'm not saying that they shouldn't, but that's -- that's how it is.

And then we resubmitted to Cell Stem Cell and so there was a burst of optimism. And then a few weeks after that, we got the rejection back from Cell Stem Cell and it was evident from the rejection that we still had that same reviewer that we got lumbered with from the Cell submission.

And he was asking us to do, you know -- I think he was -- I think one of the things he asked was, you know, to get this working in -- in mouse, because in mouse you could do more rigorous proofs of pluripotency, where I've never actually worked significantly with murine-induced pluripotent stem cells, but there are things you can do in the mouse system, which are just not possible. And like you can kind of take it, demonstrate that the cells contribute over generations, and things like that.

So that would have taken a long time. In fact, we now know that this technique didn't really adapt very well to murine reprogramming. I'm not even completely convinced that -- I know that there has been publication claiming it, relatively obscure, but that would have been a Vietnam-type scenario if we'd gone down that route.

Confidential -- Subject to Protective Order

So Derrick was like -- Derrick was appropriately outraged, but said, oh, we got George Daley on our side and he's very influential, and we're really -- you know, push the editor to kind of override this reviewer.

But, in any case, when I saw that, I felt like outraged, and that's when I quit.

Q.      And so that I, as an outsider, can understand, what you're telling me, as I understand it, is that you felt that for your career, given that this was your main project, it would have been more advantageous for you to submit the article for publication in Cell Stem Cell first, rather than submitting it to Cell first.

A.      Yes.  So Cell Stem Cell had a reputation at that time, and I don't know if this is still true, they were a fairly new journal, offshoot of Cell, on the block, and I believe -- I think the -- I think it was -- I forget whether it was 2007, 2008, they had published the protein -- protein-based reprogramming, cell-penetrating protein, which one -- I think two labs came up with it about the same time, Sheng Ding was one of them.

And that work even -- I think they -- they turned it around in a couple of weeks, which is pretty extraordinary for a -- I'm not sure if that was to publication, but my recollection is that they -- that they had accepted within a couple weeks.  So they were,

person, et cetera.

A.      Yeah.

Q.      So let's leave that to the side for a minute.

A.      Okay.

Q.      Is there anybody else that you're working with in connection with this lawsuit, aside from that lawyer?

A.      On a long-term basis, no.

Q.      On any basis.

A.      I mean, there are people that I've consulted with, like accountants and tax law specialists, you know, these various services that you can just speak to a lawyer on a specific point, that kind of thing.

Q.      Okay.  And your discussions with accountants, that relates to the issues about equity that the case raises?

A.      Yes.

Q.      And can you tell me what accountants you've spoken with?

A.      I don't believe I -- I'm not going to answer that.

Q.      Okay.  So let me just -- I obviously can't make you answer anything you don't want to answer.

A.      Sure.

Q.      Is it fair to say that you believe that the name of the accountants that you've spoken with is

Confidential — Subject to Protective Order

privileged?

A.    I believe that this would be, since I'm representing myself, attorney work product.

Q.    Okay.  Will you agree with me that any issues that come up in the deposition like this where you've sort of raised a point of privilege, that rather than sort of stopping the deposition and filing motions and so forth, we can wait until the end, I can finish the deposition and then if there are any issues, I can raise them later?

Does that seem fair to you?

In other words, what I don't want to do is to say, well, we've got to stop, we've got to go see the judge.  I'd like --

A.    You mean you want to go back to these questions at the end and we'll see where we stand.

Q.    Sure.  Sure.

A.    If that's what you're saying, yes, that's okay.

Q.    Okay.  So other than accountants and the tax law specialist that you say you spoke with, was there anybody else that you've spoken with in any kind of consulting or advisory professional capacity about the lawsuit?

A.    Again, I think I'm not going to answer.  We went through this in the written discovery phase and --

Confidential -- Subject to Protective Order

Q.      Now, how do you know that it was approved by the IDI board of trustees?

In other words, is that something that you have any knowledge about?

A.      You mean apart from the fact that it says that it was?

Q.      Correct.

A.      No.

Q.      Okay.  How did you become aware of the existence of this policy?

A.      Yes.  In spring of 2011, I was contacted by Ryan Dietz, who asked me to provide follow-up assignments or additional assignments for, I think it was at least -- I think it was two new patent filings that were based on the original patent filing of, I think, April 2010, but included -- I believe the difference was that they included some of the additional data that we'd gotten from our collaborators.

And I said I would like to -- in responding, I said I would like to know, you know, exactly what your obligations to me are before I continue with this process, because I had been told by Derrick Rossi that the inventors were to share one-thirds of the licensing proceeds, but I didn't seem to have any piece of paper in my possession that, you know, put this down in

Confidential — Subject to Protective Order

writing.

And I told, in a series of emails, told Ryan that I wanted to get this clarified, what I was being promised, before I continued, having left the employ of the IDI, to, you know, continue to work with them on the prosecution of the patent, and also expressed a desire to know -- I had read -- the first I had heard of the Moderna deal was that it was mentioned in a footnote in the Cell Stem Cell publication.  So I had not heard that that deal had been done prior to that.

So I was aware of that.  And I had been in on some of the early conversations with Ryan Dietz and Derrick about commercializing the IP.  In fact, I think I may have been the one who suggested the idea of setting up this corporation, and then I'd been kind of left out progressively of the later discussions that they had.

So -- but I do remember, you know, the issue of -- in fact, again, I think I might have been the one who suggested that you could do an equity deal for the license.  And so I was curious because Derrick had said, as inventors we'll share one-third of the licensing revenue, what does that mean if it's an equity deal?  Or what does it mean if it's not licensing, but they just sell it outright?  So I wanted to know the details of

Confidential -- Subject to Protective Order

or what?

And I -- I think it was after this interaction that I got an email from I think it's Mr. Resnick, who was the external counsel for IDI, an email again said I'm bound by these policies, the IDI policies, and demanded my cooperation, and included a draft lawsuit for breach of contract and seeking injunctive and declaratory relief from -- I think it was from the -- it was written from the Superior -- I think you would call it Superior Court, State Court, not the Federal Court.

So I -- and so that kind of spelled out a case and made a number of assertions about the IDI policies, including that they were posted on the company intranet and that all IDI employees at their induction or their orientation receive a copy of these policies and are required to sign a Participation Agreement, which is included as an annex to the -- to this document.

I don't know if you've got it here, the Participation Agreement.  Yeah, Participation Agreement. And that I would -- I would be in breach of contract if I didn't sign these assignments.

And so, finally, I had in my hands a paper copy of the -- of this exact document.  I had an email saying that I'd get half of one-third of licensing proceeds, and that that is promised to me in -- in return for --

for fulfilling my duties under this Agreement, which include helping with the prosecution of the patent.

And I discussed it with my attorney I had in Boston and went over the legal points and, I mean, A, the end -- the take-away from that was, yeah, they probably have a pretty good case here.  And, also, I had got what I -- I had finally gotten what I had sought, which was to have in writing what I was going to be paid from this -- from the Moderna agreement, and -- and full context of that, not just this number hanging in the air, this 33 and a third to inventors.

So I wrote back and said, I'm satisfied the law is in your favor and I'm sending you the -- I agree to execute the -- these two follow-on Assignments.

Q.    Had you executed an Assignment before that?

A.    Yes.  In, I think, maybe July of 2010, I guess it must have been, because it couldn't have been 2009 because the -- it didn't exist at that time.

Q.    And in July --

A.    I'm a little -- yeah, I believe it was July of -- of -- I know I've turned those documents over to you, so you can see the date on it.

Q.    Sure.

That was -- just so that I'm clear, that was shortly after your departure from --

Confidential -- Subject to Protective Order

Q.      Uh-huh.

        And just so that I'm clear on the chronology, you don't -- you don't recall today the circumstances of how it is that you came to sign that first assignment, but it was sometime shortly after your departure from IDI.

A.      Was it after or before?  I'm not sure.  I seem to remember it being July, the date on it being --

Q.      July?

A.      Maybe -- maybe what happened was that it was on my desk and I took it with me at the time that I quit and then --

Q.      Sent it in.

A.      -- then sent it in.  Maybe that's what happened.

Q.      Okay.  Now, is it true that the spring of 2011 was the first time that you had ever seen any portion of the IDI policy?

A.      I don't know if that's true.

Q.      When do you think the first time is that you saw any portion of the IDI policy, Exhibit --

A.      This is --

Q.      Excuse me.

A.      I don't know if I ever saw this.  According to the draft lawsuit, this was on the IDI intranet.  So maybe I looked at it there in the two or three years

Confidential -- Subject to Protective Order

that I was at IDI.  But I have no recollection of that.

Q.      Okay.

A.      So the first time that I recall seeing this was when -- when Dianne McCarthy sent me a copy.

Q.      And you don't recall seeing it during your IDI onboarding process.

A.      As I said, I don't really recall the onboarding process, so no.

Q.      Right.

        So -- and it's the kind of thing that you can't say one way or the other?

A.      Yeah.  I certainly can't say whether I ever saw it while I was at IDI.

Q.      Okay.  Did anybody have to make any legal threats or demands in order to get you to sign that first Assignment?

A.      No.

Q.      When was it that Dr. Rossi told you that the inventors' share was one-third?

A.      That I don't know.  I've tried to recollect it with more specificity, but I can't.

Q.      Can you recall whether it was before or after you left IDI?

A.      Oh, I think it was quite early on.

Q.      Do you recall anything about the -- that

Confidential -- Subject to Protective Order

conversation? In other words, did he say anything more detailed than the inventors get a third?

A.    Not that I recall.

I do know that the thing about the inventors getting a third was something that I took as read from quite early on, but I took it on the basis of Derrick told me this, and this is Harvard, they must mean what they say.

Q.    Do you know, by the way -- well, when you say "this is Harvard," just so that everybody is clear, you mean that IDI was a Harvard-affiliated institution.

A.    Yeah. And it was on the Harvard Medical School campus and I had a Harvard email, so...

Q.    Do you recall whether Derrick told you that the inventors got a third before or after the Affiliation Agreement between IDI and Children's Hospital?

A.    I cannot be sure of that either way.

Q.    Okay.

A.    I don't -- it wasn't late, but it wasn't -- but I -- I -- I can't pinpoint it --

Q.    Okay.

A.    -- beyond that.

MR. FOLKMAN:  I'm going to ask the reporter to mark two more documents.

Why don't we mark the emails first as Number 5

know that for a fact.

Q.      Leaving aside any side deals, so to speak, that Dr. Rossi may have had with Moderna, founders' shares or whatever, do you believe fundamentally that a 50/50 split between you and Dr. Rossi in terms of the inventors' share is fair?

A.      I think it's -- yes.  I don't -- I don't really know.  I -- my impression is that agreeing to either split is -- I don't know how common that is.

So, in a certain sense, yes, morally, I feel that the invention is primarily mine, although I certainly don't deny that he had a role in it.  But I've never tried to push that point or suggest that we should have other than a 50/50 split.

Q.      In your experience working in labs where there's a principal investigator and then post-docs, is it fairly typical for principal investigators, who may not be doing the lion's share of the actual work, to receive equal shares with the other inventors?

A.      I would expect that's the case.  I don't have real no -- really no concrete insight, but just common sense would suggest that rank has its privileges.

Q.      Remind me, is this -- is this invention -- I think you said it was one of two in biology that you had been involved with that had gotten to the stage of

So part of this purpose of this is to -- it's a promise that you'll get something in return for not doing that. So that seems broadly to fulfill, you know, the basic character of a contract.

And also IDI and -- and Dianne McCarthy and IDI's lawyer and Ryan Dietz all represented to me that I had obligations. This was not as a result of the -- or arising from this document. And seems that there's -- seems reasonable that if -- if I have obligations arising from what's in this document, then the other side does.

Q.      Do you understand, having worked in other research institutions, that the standard practice is to require as a condition of employment that scientists who are doing inventive work agree to assign their inventions to the institution?

A.      I'm sure that is a standard practice, yes.

Q.      Was that the practice at Caltech?

A.      I mean, I would assume it is. I would assume that any institution like that would -- would make that a requirement.

Q.      And do you believe it was a requirement of your employment at Caltech?

A.      I have no specific knowledge of that, but I -- I would be very surprised if that wasn't the case.

Q.    How about MIT; do you believe that?

A.    Well, any of these institutions.

Q.    Well, how about IDI?

A.    Yes.

Q.    So you had a -- you had an understanding that as a condition of being employed by IDI, you were required to assign your inventions; right?

A.    I wouldn't say that I had an understanding, but I'm not surprised that the -- they have a policy which says that, and have asserted that that -- that policy creates an obligation on me and that I -- that's the extent of it, yes.

Q.    And Children's Hospital -- you never became a Children's Hospital employee; right?

A.    No.

Q.    But you understand that -- or do you understand that Children's Hospital also has a policy of requiring its scientists to assign their intellectual -- their inventions to the hospital?

A.    Yes.  Because I've read those policies, yes, both the 1992 policy and the new one, which I think was promulgated in 2015, I think.

Q.    Are you aware of any research university that does not require its scientists who are doing inventive work to assign their inventions to the institution?

Confidential -- Subject to Protective Order

A.      No.

Q.      Are you -- are you aware or do you -- do you recall whether you signed a -- something -- let me start again.

        Are you aware whether you signed a Participation Agreement when you worked at Caltech?

A.      I don't have any recollection of that.  But -- I should say, I don't know.  Because that's a long time ago.

Q.      Do you have any recollection of signing such an agreement at MIT?

A.      I don't -- I don't recall what I signed at MIT.

Q.      Do you know whether others in the Rossi lab signed Participation Agreements?

A.      The only thing I know is that in -- that I had a Request for Production of both my signed Participation Agreement and Rossi's signed Participation Agreement, and that in your responses you've told me that the -- you're unable to find these documents.  Whether that means they don't exist or never existed, I have no way of knowing.

Q.      Well, do you believe that you signed a Participation Agreement?

A.      I have no belief about it.  I just don't know.

Q.      Do you --

Confidential -- Subject to Protective Order

but it -- I would tend to assume that, yeah.  Because it's not based on any concrete knowledge, just I would assume that they would want to make sure that any inventions -- that they had at least some ability to -- to profit from those inventions.

Whether that -- whether that necessarily implies this assignment, I -- I don't know, but that's an obvious -- that's the most natural way to do it.

Q.      Do you know whether assignments are required from inventors in cases where all or any part of the funding for the research is provided by the Federal Government?

A.      I don't.

Q.      Was the Rossi lab doing work that was funded by the Federal Government?

A.      Not that I was aware of.

Q.      Do you know whether any of the projects, other than this cellular reprogramming project that you've been describing that you did work on in the early parts of your tenure at the Rossi lab, were federally funded?

A.      Not that I know of.

Q.      What was the role of the techs in the Rossi lab?

A.      Well, I think -- I think in the case of Ms. Zguro, I seem to remember she was mainly an animal tech or at least she had experience with that.  And,

Q.      Okay.

A.      All annual license fees --

Q.      You can -- yes, unless you want to read the rest out loud.

A.      No, that's okay.

Q.      Okay.  You see the use of the term "license fees" in that paragraph; right?

A.      Yes.

Q.      So you see that Paragraph 8 -- well, will you agree with me that Paragraph 8, although the numbers are redacted, that those are -- those are amounts of money and not equity?

        You see that?

A.      Yes.

Q.      License --

A.      Yes.

Q.      So why is it that you think that Paragraph 3, on Page 10 of Exhibit 4, applies to the equity that the hospital received as part of the Moderna transaction?

        Or, put another way, why do you believe that the equity that the hospital received is equity received in lieu of a licensing fee?

A.      I'm not sure I understand the question.

Q.      Well, you see that Paragraph 3, on Page 10, says that equity received by IDI in lieu of a Licensing Fee

looked at.

A.      Yeah.

Q.      So, with that in mind, I mean, is there any reason that you have to think that that equity is a license fee, other than what you've already said?

A.      Well, let's see if they define the term "licensing fee" in this document.

(Witness reviews document.)  I don't see, so far anyway, a specific definition of that, but I think that would be kind of a commonsense interpretation of that language.

Q.      Okay.

A.      In the context of this document.

Q.      All right.  Is there any provision, other than the provision on Page 10 of the IDI policy regarding distribution of equity, that you rely on when you say that the hospital was required to distribute the equity to you soon after the time that it received it from Moderna?

A.      I couldn't really answer that question without, you know, going over the text with a fine-toothed comb.

Q.      Okay.  Well, I mean, one thing we could do is, we could go off the record and you could take as much time as you need and then answer that question.

Is that fair?

Confidential -- Subject to Protective Order

A.      Sure.

Q.      Okay.

MR. FOLKMAN:  So why don't we go off the record.

VIDEO OPERATOR:  We are now going off the video record, and the time is approximately 11:35 a.m.

(Recess, 11:35-11:52 a.m.)

VIDEO OPERATOR:  We are now going back on the video record, and the time is approximately 11:52 a.m.

BY MR. FOLKMAN:

Q.      So, Dr. Warren, when we left off, the question on the table was whether there was any provision in the IDI policy, other than -- which is Exhibit 4, other than the provision that we had been talking about on Page 10, that you would rely on to support the argument that the hospital was required to deliver shares of stock to you sometime shortly after it received them from Moderna.

And we took a pause so that you could just take a look through.  So that's the question.

A.      Yeah.  So let me see if I can kind of restate or rephrase what you said.  It seems to me that what you're really asking is, is there anything that wouldn't allow us to put an interpretation on this Distribution of Equity paragraph where we could say that the language of agreement could be equivocating between equity and liquidated equity.

Confidential — Subject to Protective Order

And I don't see anything in the rest of the Agreement that argues against that, except in a negative sense that the rest of the Agreement does repeatedly refer to equity in the kind of restrictive sense.

Q.      Okay.  Okay.  Do you see on Page 4 of Exhibit 4 the very last sentence?

A.      Yes.

Q.      Could you read that one out loud, please.

A.      The Trustees retain the discretion to amend this Policy from time to time to fulfill these purposes.

Q.      Now, you said before that you didn't know, other than the fact that the document itself said so, that Exhibit 4 itself had been adopted by the IDI Board of Trustees; correct?

A.      Sorry.  Say that again.

Q.      You told us earlier that, aside from the fact that Exhibit 4 itself says approved by the IDI Board of Trustees, you didn't have any knowledge about whether the IDI Board of Trustees actually did anything to approve Exhibit 4; right?

In other words, you don't know of any meetings where that happened or any discussions among the board approving this policy.

A.      No.  I know about it because this was what was represented to me as the controlling policy by Ryan

Confidential — Subject to Protective Order

(The court reporter read the requested portion of the record.)

THE WITNESS:  Yes.  The only thing I would add to that is it's never been -- the question of whether the policies have ever been changed has obviously come up in the context of this suit, and the only thing that's ever been asserted regarding that has been this claim that the policies were changed through the language in the Affiliation Agreement.

So I guess, by implication, that suggests that a 2004 document was -- was -- was it.  Plus, that was the document they sent me.  So, in that sense, I do have reason to believe that it wasn't changed.

MR. FOLKMAN:  Okay.  So I move to strike the answer, but I'll go on.

BY MR. FOLKMAN:

Q.    Who were the trustees at the time that you were at IDI?

A.    I have no idea.

Q.    Do we agree that neither IDI nor Children's Hospital ever made distributions to you or to Derrick Rossi under the IDI policy, Exhibit 4?

A.    Yes.

Q.    I'd like to talk about the damages and remedies that you're claiming in this lawsuit.

Confidential -- Subject to Protective Order

A.      Uh-huh.

Q.      One element of what you're claiming, as I understand it, is that the percentage of the licensing revenue, the net licensing revenue, that you were entitled to under the IDI policy is higher than the percentage that you were entitled to under the policies that the hospital has actually applied and you're entitled to the difference between those two percentages.

        Are you with me?

A.      That's a somewhat strange way of putting it, since it's not a damages case, but I'm asking the judge to rule that the IDI percentage is controlling.

Q.      That's a very fair point.

        I mean, you're not claiming damages, you're claiming -- you're seeking a declaratory judgment.  But that's the essence of your point about the percentages; right?

A.      Yes.

Q.      Okay.  And thank you for correcting me about the technicality there.  You're absolutely right.

        The other main claim that you're making is that -- as I understand it, is that the hospital and IDI should have distributed -- well, that you should have received stock at or shortly after the time that IDI

Confidential -- Subject to Protective Order

additional advice.

Q.      If you had received stock -- I want to try to understand why you think you would have been better off receiving the stock --

A.      Uh-huh.

Q.      -- than receiving the proceeds.

        Do you have an understanding about whether you will have a right to elect to treat cash that you receive upon the sale of the stock as capital gains for tax purposes?

A.      I have -- I have asked about that, you know, asked financial experts, accountants, tax lawyers, and I did raise that possibility.  And I don't have a definite answer, but, generally, it seemed probably not.

Q.      You've received advice that says probably not?

A.      Yes.

Q.      Okay.  If you had received the stock at the time that IDI received the stock, what would you have done with it?

A.      Nothing.

Q.      You would have held it?

A.      That's not liquid -- it's not a liquid asset. It's a private corporation.  In any case, there would, I'm sure, been restrictions, which I would have inherited on any sale of the stock.  So it would just

Confidential -- Subject to Protective Order

have been a long-term capital asset.

Q.      And do you agree with me, then, that the stock -- if you had received a stock certificate, it probably wouldn't have been saleable?

A.      I think that's likely, yes.

Q.      And so, as I understand it, the basis of your claim that you would have been better off receiving the stock earlier rather than receiving the cash later is that you believe that you would not be entitled to capital gains treatment on cash that you received later, but you would have been entitled to capital gains treatment if you had received the stock earlier.

Is that a fair statement of your view?

A.      In terms of that direct economic injury resulting from not receiving the stock early, that's correct, yes.

Q.      And is there any other reason that you think you would have been better off receiving the stock earlier rather than receiving the cash later?

A.      I do think that receiving the stock earlier would have made it harder for the -- for the hospital to, as it were, change the rules on me.

In fact, they certainly -- if I had received the stock back in 2011, I certainly would have received it based on the 33-and-a-third rule, because even -- even

Confidential -- Subject to Protective Order

which has a different set of terms and percentages, I guess because they were perhaps in the negotiations with Rossi, that did have a significant lab percentage.  So they were partly modeling it in the negotiations with this 2015, although nobody claimed that the 2015 policy applied.

So I had several exchanges with him where I tried to get the facts of the three different policies we're talking about.  What's the basis for which policy applies?  Well, there are four, if you include the custom policy.

And -- and once I got those all lined up, all those facts lined up, I said, I'm not willing to sign this custom agreement because it means that I'm basically signing away my rights to the 33 and a third that I was promised, and I'm not sure that that's okay, and so I'm not just going to stick my signature on it.

And Dietz said -- well, in an email, I think we had -- we had a second -- we scheduled a second phone conversation and Dietz was non-committal, but he said, I'll have somebody, you know, our legal department get in touch with you and explain why this is okay, that we're -- and, in fact, we're now offering you -- excuse me -- this is actually better than okay, because we're actually in this custom agreement offering you more than

Confidential - Subject to Protective Order

STATE OF CALIFORNIA          )

COUNTY OF LOS ANGELES        )

      I, ROSEMARY LOCKLEAR, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

      LUIGI WARREN, Ph.D., the witness in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

      I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said deposition dated the_____ day of _____, 2018.

ROSEMARY LOCKLEAR, RPR, CRR, CSR 13969

# SUMF EXHIBIT 2

## EXHIBIT 3 OF DR. LUIGI WARREN'S NOVEMBER 16, 2018 DEPOSITION

APPENDIX 116

 # Immune Disease Institute

## Report of Invention

Case Number: 08-011

Title of Invention: Sustained polypeptide expression from modified RNAs and uses thereof.

Investigator(s): Name     Institute     Address     Telephone

1. Derrick Rossi, IDI, 200 Longwood, 6177138900
2. Luigi Warren, IDI, " , " 6177138903
3.

Grants, Gifts or Contracts, which supported the work leading to this invention (include all private, federal and non-federal funding):

| Sponsor | Award | Number | Time | Period |
|---|---|---|---|---|
| 1. | Start-up Funds | 1180 | 2 years | |
| 2. | HSCI Seed Grant | #SCI DP-0042-09-00 | 6 months | |
| 3. | | | | |

Lab or Department Where Developed:

Description of Invention (please type or print clearly):

1. Brief Summary

Developed an RNA-based technology for sustained polypeptide expression. Have used it to direct cell fate.

2. Background/Improvement over prior art (please include specific literature references, if known):

Our technology is uniquely capable of sustaining polypeptide expression in cells over extended time periods. No other reports of this have emerged. Further no other studies have used RNA to direct cell fate.

Immune Disease Institute

EXHIBIT Warren - 3
DATE: 1/11/14
ROSEN...

APPENDIX 117

BCH000302

 **Immune Disease Institute**

3. Detailed Description (add pages, figures, drawings, etc., as needed, as well as any relevant manuscripts or articles):

Manuscript attached.

4. Expected uses and/or commercial applications (list as many as you feel are feasible):

- kits
- Specialized cell production
- therapeutics (down the line)

First Written Disclosure: Date: [ ]   Witnessed by: [ ]
Form of disclosure (journal article, thesis, oral presentation, web posting, etc.)

First Reduction to Practice: Date: [ ]   Witnessed by: [ ]

Supporting Reports, Lab Records, Data, etc. (include dates and locations):

Extensive notebooks. Should get these from Luigi Warlen the post-doc who has worked on this.

Contacts or agreements with commercial entities (include name of person contacted):

| Inventor | | Witness | |
|---|---|---|---|
| D.J. Rossi   May 20/10 | | | |
| (Signature) | date | (Signature) | date |

Immune Disease Institute

APPENDIX 118

BCH000303

 **Immune Disease Institute**

## Three Tests for Patentability

When completing the ROI form, please keep in mind the three tests for patentability:

1. New (or novel): the invention must be demonstrably different from any existing prior art

2. Useful: the invention must be useful in ways which represent improvements over existing products and/or techniques

3. Non-obvious: the invention cannot be obvious to a person of "ordinary skill in the art"

## Instructions for Completing the Report of Invention Form

1. Identify a brief title that specifically describes the invention.

2. Include the names of all those who contributed directly to this development. Attach a list of additional probable inventors if there are more than four. Note if not at **IDI**. An inventor is defined as likely to be an inventor if they made a significant intellectual contribution to the conception of the invention. Authorship of a paper does not necessarily mean inventorship. Final determination is made by the attorney once the claims have been written. Please note the social security number and the country of citizenship are necessary to distribute the inventor's share of royalty that may result from this invention.

3. Include all of the sponsors and applicable contract/grant numbers if the invention was developed with the use of federal or non-federal research grant/contract funds. Note other institution if not at **IDI**.

4. Attach material that gives a description of the invention. Indicate how your discovery is different from what is currently available, and the uses to which it can be put. Give background and improvement over prior art and expected future use as well as commercial potential of the invention. If you have a draft article that describes the invention, fell free to use that to provide the more detailed technical information. It is helpful to know the closest equivalents that have been reported in the literature and why your discovery is not, as a result, "obvious to one skilled in the art". This last is usually the reason cited by the U.S. Patent Office to reject a patent application and if we make it clear in our patent application, considerable time and effort can be saved.

5. Record the history of the invention by giving legally important dates as requested. If a disclosure is planned in the near future, indicate when it is likely to occur. Public disclosure of the invention affects the potential patent coverage that is possible.

6. Have the inventors sign and date and obtain a witness signature.

7. Submit completed report of invention to the Office of Technology Development, Immune Disease Institute, Inc., 800 Huntington Ave., Boston, MA 02115; phone (617) 278-3463; fax (617) 278-3395.

APPENDIX 119

BCH000304

# SUMF EXHIBIT 3
## EXHIBIT 4 OF DR. LUIGI WARREN'S NOVEMBER 16, 2018 DEPOSITION



# RESEARCH AND TECHNOLOGY DEVELOPMENT POLICY

Approved by the ID I Board of Trustees
October 28, 2004



EXHIBIT 4
Warren
DATE: 11/16/18
ROSEMARY LOCKLEAR CSR #13969

## Table of Contents

|  |  | page |
|---|---|---|
| Preamble | | 3 |
| A. Purpose | | 4 |
| B. Research and Technology Development Committee | | 5 |
| | 1. Committee Membership | 5 |
| | 2. Responsibilities | 5 |
| C. Scope | | 5 |
| D. Technology Reporting and Disclosure | | 6 |
| | 1. Reporting to OTD | 6 |
| | 2. Disclosure Outside IDI | 6 |
| E. Technology Ownership: | | 6 |
| | 1. Principles | 6 |
| | 2. Process | 7 |
| F. Protecting Intellectual Property Rights | | 7 |
| G. Marketing and Commercialization | | 8 |
| H. Distribution of Net Proceeds: | | 8 |
| | 1. Net Proceeds | 8 |
| | 2. Equity | 8 |
| | 3. IDI General Fund | 9 |
| | 4. Distribution Schedule | 9 |
| | 5. Multiple Inventors | 9 |
| | 6. No Active Research Program | 10 |
| | 7. Death or Departure from IDI | 10 |
| | 8. Postponement of Distribution | 10 |
| I. General Equity Provisions: | | 10 |
| | 1. Decision to Accept Equity | 10 |
| | 2. Receipt of Equity | 10 |
| | 3. Distribution of Equity | 11 |
| | 4. Monitoring | 11 |
| | 5. Clinical or Other Sponsored Research | 11 |
| | 6. Governing or Scientific Board Membership | 11 |
| J. Conflicts of Interest Policies | | 12 |
| K. Consulting Agreements | | 13 |
| L. Other Arrangements | | 13 |
| M. Former Policies | | 13 |
| **APPENDIX** | | |
| Exhibit A - Participation Agreement | | 15 |
| Exhibit B – Standard Consulting Agreement Provisions | | 18 |

2

APPENDIX 122

# IMMUNE DISEASE INSTITUTE
# RESEARCH AND TECHNOLOGY DEVELOPMENT POLICY

## - Preamble -

The collaboration between Immune Disease Institute and its physicians and researchers is critical to IDI's successful fulfillment of its mission of providing a high level of excellence in research. Over the last several years, a variety of relationships with industry have brought new resources to the support of science that facilitates translation of knowledge from the laboratory to the bedside. These relationships have great potential to benefit the public as well as research institutions, their faculty and staff, and their industrial partners. The Trustees of Immune Disease Institute are strongly committed to the continued growth in these innovative and mutually beneficial relationships, while realizing their paramount responsibility to safeguard the principles of academic freedom and timely dissemination of information about important new scientific developments.

This policy is intended to serve as a guide for members of the IDI community in structuring their relationships with industry and other outside ventures in view of their academic responsibilities for teaching, research and patient care. In addition, the policy encourages creativity and innovation of researchers, with incentives for productivity and opportunities to gain recognition for individual accomplishments.

In addition, this policy is also meant to encourage researchers to disclose discoveries in a timely manner in order to protect the intellectual property rights of IDI, while providing for fair and equitable allocation of responsibilities and rewards among inventive researchers, IDI and other collaborators who may have contributed in whole or in part to inventions, discoveries or Technology.

Finally, the policy supports the goal of bringing to the public important new discoveries, which, through commercialization, address unmet medical needs and alleviate human suffering.

IMMUNE DISEASE INSTITUTE
RESEARCH AND TECHNOLOGY DEVELOPMENT POLICY

## A. PURPOSE

The mission of Immune Disease Institute (IDI) is to provide the highest level of excellence in medical research. To further this mission, the Trustees of IDI (the "Trustees"), who are responsible for the overall allocation of resources to accomplish this objective, have adopted this Research and Technology Development Policy (the "Policy") to:

benefit the public by facilitating commercial development and utilization of inventions, discoveries and other Technology;

encourage the creativity and innovation of current staff, and encourage the recruitment and retention of talented and innovative staff;

provide incentive to researchers to be productive and recognize individual accomplishment;

foster scholarly pursuits and principles of academic freedom;

encourage researchers to disclose discoveries in a timely manner in order to protect the intellectual property interests of IDI;

provide guidelines for negotiating, preparing and implementing contracts with outside sponsors, collaborators and licensees;

provide for equitable allocation of responsibilities and financial rewards among inventors, researchers, IDI and any other entity, which may have developed, sponsored or financed in whole or in part, such invention, discoveries or Technology; and

provide support for IDI's mission of excellence in clinical care, teaching and research.

The Trustees retain the discretion to amend this Policy from time to time to fulfill these purposes.

## B. RESEARCH AND TECHNOLOGY DEVELOPMENT COMMITTEE

1. Committee Membership. The Trustees, in consultation with the President of IDI, the Executive Vice President and the Director of the Office of Technology Development ("Director") will appoint members of the Research and Technology Development Committee (the **"Committee"**). Membership may consist of the President of IDI or designee, the Executive Vice President, the Director for Development, the Director of the Office of Technology Development (OTD); two Senior Investigators, active in research at IDI; and at least five members of the Board of Trustees. All members of the Committee shall have the right to vote on matters that come before the Committee. All members of the Committee shall serve at the pleasure of the Board of Trustees. Members of the Committee shall serve at the discretion of the Chairman of the Committee. A quorum shall consist of at least two thirds (2/3) of the membership with at least three (3) Trustees, one (1) Faculty member and either the Director or the Chairman included in that number.

The Chairman of the Committee shall be designated annually by the Chairman of the Trustees. The Director, or designee, shall be responsible for scheduling all meetings of the Committee and keeping the minutes for such meetings. The President and Chief Financial Officer of IDI shall have the right to attend all meetings, and the Director shall be responsible for notifying them of all meetings.

2. Responsibilities. The Committee shall oversee and advise the Director on the interpretation and application of this policy, and may grant exceptions to the Policy in special cases. The Chairman shall act on or recommend to the Board, as appropriate, any motions on matters that are brought to a vote in the Committee and agreed to by a majority of those present. From time to time; the Committee may recommend to the Trustees amendments and/or additions to this Policy.

## C. SCOPE

This Policy applies to any invention, discovery, data, writing, and other intellectual property, including trade or service marks, works-for-hire, know-how, computer software and biological materials, whether or not patentable, copyrightable or otherwise entitled to legal protection (collectively "Invention") made, conceived, reduced to practice or generated by a full or part-time professional staff, faculty, employee of, student, trainee, or person or entity otherwise engaged at IDI, such as consultants or agents retained by IDI (collectively **"Covered Person"**). Any Invention that (1) either has potential commercial value or is patentable, copyrightable, or otherwise entitled to legal protection, and (2) is made, conceived, reduced to practice or generated by a Covered Person while engaged in activities: (a) for which the Covered Person received financial support from or through IDI; (b) during which the Covered Person made significant use of facilities, materials, equipment, staff, information, ideas, data, computers or other resources of IDI; or (c) which are related to the employment, research or other activities conducted at IDI by the Covered Person is referred to as **"Technology"**. Ordinary use of desktop computers, library facilities or personal office space shall not be considered "significant" use for purposes of Section (b) above. Steps taken toward commercialization, such as filing a patent application or seeking other protection of intellectual property, will be interpreted as demonstrating potential commercial value.

In keeping with principles of academic tradition, IDI claims no ownership interest in scholarly publications, such as textbooks, that do not embody or disclose any Technology and were not prepared with significant use of IDI resources.

 Each Covered Person shall sign a Participation Agreement in which the Covered Person agrees to comply with this Policy. A copy of a Participation Agreement is attached as **Exhibit A.**

## D. TECHNOLOGY REPORTING AND DISCLOSURE

1. <u>Disclosure of Technology to IDI</u>. Each Covered Person who makes, conceives, reduces to practices or generates Technology (the **"Inventor"**) should promptly submit a completed Report of Invention to IDI's Office of Technology Development ("OTD") when Technology is identified. Report of Inventions are available from the OTD. If the Covered Person is a consultant engaged by an employee or staff member of IDI, then the employee or the staff member is responsible for ensuring that the Report of Invention is completed and submitted. The description of the Technology in the disclosure form should provide enough detail to determine the most appropriate steps, if any, to protect and commercialize the Technology.

2. <u>Disclosure Outside IDI</u>. If Technology is disclosed outside IDI, such as in a publication or oral presentation, by use, or by public sale, before appropriate steps are taken to protect the intellectual property rights in the Technology, such as filing a patent application, then those rights may be lost. Therefore, prior to any proposed publication of Technology or other disclosure of the Technology outside IDI, the Inventor should contact the OTD to coordinate the disclosure with steps IDI may take to protect rights in the Technology. If Technology is to be disclosed to a third party for commercial evaluation or other IDI purposes, in most cases an appropriate, signed Confidential Disclosure Agreement should be obtained from the recipient of the information. For Reports of Invention, Confidential Disclosure Agreements, and information about the appropriate use of each, contact the OTD or log on to the IDI website.

## E. TECHNOLOGY OWNERSHIP

1. Principles:

   a. All Technology is owned by IDI. When an entity other than IDI has also sponsored, financed, or otherwise participated in the invention, the Director will negotiate with the other entity to determine the percentage of the Technology owned by IDI. The Director may consult with the Committee and the Inventor.

   b. The ownership of Technology made in whole or in part in connection with activities conducted under a grant from or other agreement with the U.S. Government is subject to the retained rights of the U.S. Government.

   c. The ownership of Technology made in whole or in part in connection with activities conducted pursuant to any industrially sponsored or otherwise sponsored research agreement between IDI and the sponsor will be in accordance with this Policy.

2. Process:

    a. The Director: will make the initial determination of ownership. Decisions of the Director about whether an Invention is within the definition of Technology and other issues of ownership may be appealed to the President by an Inventor in writing within one (1) month of notification to the inventor of the Director's decision The President will convene a subcommittee of IDI consisting of the Director and the Executive Committee whose decision will be final.

    b. Subject to obligations to third parties (such as a sponsor or the Government), IDI may waive ownership and release, in whole or in part, any Technology and its related patent, copyright or other legal protection, to the Inventor. The terms of the release may include appropriate compensation to IDI for its out-of-pocket expenses associated with the Technology. IDI may also elect to retain the non-exclusive right to use any released Technology for IDI's non-commercial research.

    If IDI has not taken steps to obtain legal protection of Technology within three (3) months after the filing of a completed Report of Invention or the Effective Date of this Policy, whichever is later to occur, then the Inventor may submit a written request to the Director for the release of the Technology to the Inventor(s). Within three (3) months of receiving the request, the Director will present the request to the Committee for approval and inform the Inventor of whether or not the request is approved, and the reasons for the decision. If the request is approved, then IDI will provide appropriate documentation releasing the Technology to the Inventor(s).

## F. PROTECTING INTELLECTUAL PROPERTY RIGHTS

The Director or designee, working with the Inventor, will decide whether to seek legal protection of technology. If IDI seeks patent, copyright or other legal protection of Technology, in whole or in part, then the Inventor and IDI will work together to protect the Technology. IDI will provide professional services at its expense. The Inventor will provide technical information, documentation, and all other assistance deemed necessary by IDI, including an assignment of the Inventor's rights in the Technology to IDI. The OTD will retain Participation Agreements, invention disclosures, inventorship declarations, and assignments. IDI is not obligated to pay for professional services that are not authorized in advance by the Director.

Case 1:17-cv-12472-DLC        Immune Disease Institute        Page 150 of 188
Plaintiff's Rule 26(a)(1) Initial Disclosures
7
APPENDIX 127

## G. MARKETING AND COMMERCIALIZATION

The Director and the Inventor, working together, will decide what measures are to be taken to commercialize the Technology, taking into account the principles of academic freedom while optimizing the utility of the Technology to the public and its commercial value to IDI. This may include, but are not limited to, agreements with third parties for the development, patenting, promotion, marketing, licensing and manufacturing of Technology. Transfers of any interest in Technology to third parties are to be by license, rather than assignment, unless otherwise decided by the Director in consultation with the Committee. The license should provide IDI the right to reduce or terminate the license if the third party does not make a diligent effort to make a product developed from the Technology available to the public. If necessary, the Director will expend reasonable efforts to locate Inventors who are no longer at IDI although primary responsibility for keeping address information current will reside with the Inventor. If an Inventor is no longer employed or otherwise engaged at IDI, then the Director may independently decide what measures are to be taken to commercialize the Technology.

Only approved agreements signed by an authorized representative of IDI shall be valid and binding upon IDI. The Director or designee is authorized to negotiate agreements for the development or transfer of Technology with commercial and non-commercial third parties. The President of IDI is authorized to approve and sign Exclusive License Agreements. The Director, and, in the case of agreements for clinical research, the Director or designee, is authorized to approve and sign all other Technology development and transfer agreements.

## H. DISTRIBUTION OF NET PROCEEDS

1. Net Proceeds. The term "Net Proceeds" as used in this Policy shall mean the amount actually received by IDI from the sale, license or other commercialization of Technology owned in whole or in part, by IDI, including, but not limited to, royalties, fees, milestone payments, and Equity (as defined below), less all costs and expenses reasonably attributable to obtaining intellectual property protection and commercialization of the Technology. These costs and expenses may include, without limitation, attorney fees, and out-of-pocket administrative and other costs and expenses of contract negotiations and administration, and any out-of-pocket cost or expense of patent or copyright prosecution, litigation, marketing, licensing and/or negotiation. Research funding and contributions of equipment received by IDI from the sale, licensing or other commercialization of any Technology, shall be the property solely of IDI and shall not be included within Net proceeds.

2. Equity. The term **"Equity"** as used in this Policy shall include stocks, options, warrants and/or other financial instruments convertible to equity in an entity that has rights to Technology.

3. IDI General Fund. IDI General Fund supports initiatives generally of IDI. This fund is hereinafter referred to as the **"General Fund"**.

4. Distribution Schedule. IDI may receive Net Proceeds for the license, sale or other transfer of Technology. If the Inventor arranges to receive Equity from the company to which the Technology is transferred, the guidelines for Conflict of Interest and Commitment of the Faculty Policies on Integrity in Science of Harvard University Faculty of Medicine shall apply. The Net Proceeds actually received by IDI for its interest in Technology, excluding works for hire and trade or service marks, shall be periodically distributed by IDI as provided in the following schedule:

### Distribution Schedule

| Inventor | Inventor's Laboratory | IDI General Fund |
|----------|----------------------|------------------|
| 33 1/3% | 33 1/3% | 33 1/3% |

All distributions to Inventors shall be considered miscelaneous income and will be reported on Internal Revenue Service form 1099.

5. Multiple Inventors. In the event there are joint Inventors, distributions made to the Inventors under the Distribution Schedule shall be divided equally among the Inventors, except as may be otherwise directed by the Inventors and approved by the Director. If the Inventors' work is in different Laboratories, the distributions allocated to each of their respective Research Programs and Departments shall be in direct proportion to the amounts allocated to each Inventor.

6. No Active Research Program. If the Inventor does not have an active research program at the time of commercialization, the Inventor's Laboratory share shall be distributed to the General Fund.

7. Death or Departure from IDI. If the Inventor dies or ceases to be employed by or otherwise engaged at IDI, then IDI will distribute the Inventor's individual share (as distinguished from that of the Inventor's Laboratory) to the Inventor or the Inventor's estate. It shall be the responsibility of the Inventor or the executor or legal representative of the Inventor's estate to notify IDI's OTD in writing, as to where future payments should be sent. Under these circumstances, the Inventor's Laboratory share shall be distributed to the General Fund.

8. Postponement of Distribution. Notwithstanding all of the foregoing, the Committee may postpone distribution of Net Proceeds when extraordinary future expenses, such as an infringement suit, relating to the applicable Technology are reasonably anticipated by the Committee. In such event, the amounts received shall be segregated by IDI, and Net Proceeds will be distributed in accordance with this Policy after actual expenses have been reimbursed to IDI.

I.   **GENERAL EQUITY PROVISIONS**

1. Decision to Accept Equity. In certain cases of Technology transfer, IDI may have the opportunity to acquire Equity in the licensee's or buyer's company in exchange for IDI's interests in Technology. Decisions regarding ownership of Equity by IDI or an individual Inventor shall be guided by the policies of IDI, and the Harvard Faculty of Medicine policies concerning conflicts of interest and conflicts of commitment together with the purposes and objectives of this Policy.

   The Director will make an initial determination as to whether IDI should accept Equity for the transfer. If the Director determines that an equity transaction meets the objectives of this Policy, then the Executive Vice President will make a written recommendation to a subcommittee of the Committee, designated by the chair of the Committee, to confirm the acceptance of equity and address issues relating to equity ownership (the "Equity Subcommittee").

2. Receipt of Equity. Unless otherwise approved by the Equity Subcommittee, Equity is to be received at the time the Technology is transferred to the company, and not structured as a series of future payments linked to financing milestones or unit sales. However, IDI may accept additional shares in order to maintain IDI's relative Equity percentage interest without additional approval of the Equity Sub-Committee.

   Managers of the Equity account will not have access to any insider knowledge of publicly traded securities. The Investment Committee shall hold Equity in accounts separate from other investment accounts of IDI so that they can be monitored in accordance with this Policy.

   IDI shall disclose its Equity interest in IDI's sponsored publications or presentations regarding associated research and in other situations where the public or where IDI patients would reasonably expect a disclosure. IDI shall also report these interests in its annual report or, if the annual report would not be timely, through appropriate news releases.

3. Distribution of Equity: Equity received by IDI in lieu of a Licensing Fee shall be deemed to be a royalty. The Inventor's share of equity taken as a royalty shall be distributed to Inventors at the earliest opportunity following receipt. The Laboratory and IDI General Fund shares shall be transferred to and disposed of by the Investment Committee. The Principal Investigator of the Laboratory shall be consulted by the Investment Committee about the timing of liquidation of the Laboratory share of an equity transaction.

4. Monitoring. In all circumstances in which IDI receives Equity from a licensee or assignee of Technology, IDI shall closely monitor such relationships to materialize any real or perceived potential conflicts of interest that may arise from that relationship. The Executive Vice President is responsible for overseeing the research implications of Equity arrangements, and will periodically interview appropriate researchers regarding their work and its relationship to the company in which IDI and/or researchers hold Equity.

5. Clinical or Other Sponsored Research. If IDI plans to participate in Clinical Research (as defined by the Harvard University Faculty of Medicine's Policy on Conflicts of Interest and Commitment) sponsored or otherwise financed by a company in which either (a) IDI holds Equity and the company has a market capitalization of less than $10 billion; or (b) IDI holds an Equity interest of at least 5% in the company, regardless of the market capitalization of that company, then IDI shall give due consideration to conflict of interest and commitment concerns that may exist as a result of IDI's holdings in the company. IDI shall take appropriate action, including selling its Equity share in that company, in order to manage, reduce or eliminate conflicts of interests.

Inventors may only hold Equity during the course of Sponsored Research as defined in and to the extent provided for in Harvard University Faculty of Medicine Policy on Conflicts of Interest and Commitment and the Conflict of Interest and Related Policies for IDI and its Affiliates. If the Inventor desires to avoid Equity in order to obtain research funding from a company, the Inventor may request that IDI also avoid taking Equity through a license agreement so as to allow the sponsored research. IDI normally shall not accept Equity under such circumstances; provided, however, that IDI will require in its license or other Technology transfer agreement that the Inventor will not obtain Equity at a later date without the consent of IDI.

6. Governing or Scientific Board Membership. Without the prior consent of the Equity Subcommittee, neither IDI nor any non-faculty employee shall accept a board seat of a company or a seat on a company's Scientific Advisory Board if either (a) IDI holds Equity in the company and the company has a market capitalization of less than $10 billion; or (b) IDI holds an Equity interest of at least 5% in the company, regardless of the market capitalization of that company. No Faculty member may accept a voting seat on a Governing Board of a company if either (a) IDI holds Equity in the company and the company has a market capitalization of less than $10 billion; or (b) IDI holds an Equity interest of at least 5% in the company, regardless of the market capitalization of that company

## J. CONFLICT OF INTEREST POLICIES

1. All financial or compensation arrangements between Covered Persons and third-parties are subject to the *Conflict of Interest and Related Policies for IDI and its Affiliates* and also the *Harvard University Faculty of Medicine Policy on Conflicts of Interest and Commitment* to the extent provided for in those policies and as may be amended by the appropriate authorized governing committee or board.

2. Conflicts of Interest arising from Technology transfer to a company in which a Trustee of IDI or a member of their immediate family holds significant or controlling interest, shall be resolved according to the following guidelines:

   • assign oversight of the transaction to a committee of disinterested Trustees, and require approval by the committee or the full board before a Trustee transaction may occur;

- follow carefully the Intermediate Sanctions rebuttable presumption requirement that the Trustee fully recuse himself or herself from the deliberations and decision making;

- include within the committee's responsibilities the question of whether to sell the Technology at this time or whether to wait;

- conduct sufficient market outreach to establish whether there is a market, other than a Trustee transaction, for the Technology (for example, conduct at least the same market outreach that IDI would conduct before selling Technology in a non-Trustee transaction);

- if a Trustee transaction is under consideration, make sure that the committee or board has sufficient information to determine that the transaction will provide fair value to IDI;

- in deciding whether to enter into a Trustee transaction, factor into the decision any potential adverse publicity that might result for IDI from the fact of entering into a Trustee transaction;

- in determining the minimum amount of consideration to be received in a Trustee transaction, ensure that the consideration will be sufficient to counter criticism of the fact that the transaction is a Trustee transaction;

- if equity or debt of the acquiring entity are proposed as a part of the consideration to be received by IDI, do not accept a higher percentage of such non-cash consideration than IDI would accept in a non-Trustee transaction (non-cash consideration should be viewed from the perspective of IDI's total investment portfolio, avoiding an imprudent percentage of investment in a single non-seasoned company, and avoiding an imprudent overall percentage of high risk investments for the total portfolio) -- here again, ensuring that the mix of non-cash and cash consideration will be adequate to counter criticism of the fact that the transaction is a Trustee transaction;

- before entering into a Trustee transaction, make sure that due diligence is conducted with at least the same level of intensity and sophistication as would be conducted for a non-Trustee transaction;

- as required for the IRS rebuttable presumption, carefully document the basis for the determination concurrently with making the determination.

## K. CONSULTING AGREEMENTS

All consulting arrangements between any Covered Person and any third-party are subject to IDI review pursuant to IDI's applicable Policy on *Consulting Relationships, and Other Financial Arrangements between IDI Staff and Outside Organizations*. Consulting

arrangements between a Covered Person and a third party are subject IDI's Standard Provision's for Consulting, appended to this document as Exhibit B.

## L. OTHER ARRANGEMENTS

Should there be any conflict between this Policy and (a) the terms or conditions of a proposed or existing agreement between IDI and a sponsor, or (b) the policies of another organization to which an Inventor is obligated by agreement, joint appointment, or other affiliation, the conflict shall be resolved by the Director in consultation with the Committee.

## M. FORMER POLICIES

This Policy shall replace all existing policies regarding Technology transfer, effective upon the approval of this Policy by the Trustees. This Policy shall govern the actions, rights and responsibilities of IDI and Covered Persons regarding all Invention, and Technology, from and after the Effective Date, regardless of the date of conception or disclosure of said Invention or Technology.


APPROVED BY THE BOARD OF TRUSTEES
October 28, 2004



Immune Disease Institute

Exhibit A

IMMUNE DISEASE INSTITUTE
PARTICIPATION AGREEMENT

Name: _____

Department or Laboratory: _____

In consideration of my employment by or association with Immune Disease Institute (IDI), and/or being afforded an opportunity to work on projects being carried out by IDI, or substantive use of IDI resources, I hereby represent and agree as follows:

1. Compliance with IDI Policies. I have read and I understand the terms of IDI's "Research and Technology Development Policy" and IDI's Policy on Consulting Relationships between IDI Staff and Outside Organizations, and agree to comply with these policies, as amended by the appropriate authorized governing committee or board.

2. Compliance Pursuant to Contracts and Grants. I shall comply with every obligation of IDI that applies to me pursuant to any contract, grant or commitment relating to research or other work covered by the Research and Technology Development Policy.

3. Disclosure of Inventions. Each Invention (meaning all discoveries, concepts, ideas, processes, methods, formulas, and techniques, whether or not patentable) and further including trademarks and copyright rights conceived or reduced to practice by me solely, jointly, or with others in the course of my employment by IDI shall be promptly disclosed to IDI by me utilizing a written Report of Invention. Report of Invention forms are available from the Office of Technology Development. Such report shall be sufficiently complete in technical detail and appropriately illustrated by sketch or diagram to convey understanding of the nature, purpose, operation, and to the extent known, the physical, chemical and biological characteristics of the Invention.

4. Ownership of Inventions. Each Invention shall be the sole and exclusive property of IDI. I agree to execute an assignment to IDI or its nominee of my entire right, title and interest in and to all Inventions (to which IDI has ownership rights pursuant to the "Research and Technology Development Policy") without additional compensation. I further agree, upon request of IDI and at its expense, to execute such documents as may be necessary or desirable in applying for and obtaining patents on the Inventions in the United States and any foreign country. I further agree, whether or not I am employed by IDI, to cooperate to the extent and in the manner reasonably requested by IDI in the prosecution or defense of any claim involving a patent covering any Invention or any litigation or other claim or proceeding involving any Invention, but all expenses thereof shall be paid by IDI. All records which I shall use or prepare or come into contact with in the course of working for IDI, shall

APPENDIX 134

remain IDI's sole and exclusive property and shall be subject to the agreement; except that I may retain for my own personal use one copy of all my scientific work papers customarily retained by researchers at non-profit institutions unless prevented by contractual obligations to third parties pertaining to confidential papers or trade secrets, which obligations prevent such retention of any such papers.

5. Filing Copies of Agreements with OTD. I will file with the OTD a final copy of every consulting agreement to which I am a party or become a party (a) that is connected to work which I have done, am doing, or expect to do within the scope of my employment by, appointment with, or education at IDI or (b) for which I have made, am making, or expect to make use of facilities, materials, equipment, staff, information, ideas, data or other resources furnished by or through IDI.

6. Ownership of Notebooks and Data. I agree that all notebooks and other data generated in research and other activities associated with or funded through IDI (whether in paper, electronic or other media) shall belong to IDI. The originals of such data are to remain with IDI. In accordance with the policies of IDI and Harvard Medical School, I may obtain a copy of such data. At the request of IDI, I shall deliver promptly to IDI copies of all written, electronic, or other records describing or referencing Technology as defined in IDI's "Research and Technology Development Policy", whether or not I am still employed by or otherwise engaged at IDI.

7. No Employment Contract. I understand that this Agreement does not constitute an employment contract and that, if I am otherwise an employee of IDI, this Agreement does not constitute any representation that my employment will continue for any definite period of time nor does this Agreement affect my employment status in any other way.

8. Prior Inventions Excepted. Descriptions of all Inventions, whether or not patented, which I conceived or reduced to practice prior to my employment by IDI, are attached hereto as Schedule A, and those Inventions shall be excluded from this agreement. I represent that the absence of any Invention from Schedule A shall indicate that I own no such Invention at the time of signing the Agreement.

9. Publication or Disclosure of Confidential Matter. I agree that I will not at any time, whether or not I am employed by IDI, except as properly required in the conduct of the business of IDI, or except as authorized in writing by IDI, publish, disclose, or authorize anyone else to publish or disclose, any Invention or any other secret or confidential matter relating to any aspect of the operations or business of IDI or its related companies, business clients or associates with which my employment may in any way acquaint me. However, in all cases where not prevented by contractual agreement with third parties, I shall have an absolute right to make scientific publication of my work.

10. Limitation on Authority. I understand and agree that I am not authorized by IDI to sign, and I will not sign, any agreement or document on behalf of IDI that may commit, restrict, or otherwise affect Inventions that I create, including confidentiality agreements, license agreements, material transfer agreements, and research agreements. I shall not sign individually any document or agreement (other than one solely involving an Academic

Work) unless specifically approved or requested to do so by an authorized representative of IDI and I understand and agree that all such documents must be submitted to the OTD.

11. <u>Distribution Policy</u>. I have read and understand the Distribution of Net Proceeds mentioned in the IDI's "Research and Technology Development Policy".


Signature: _____

Date: _____


## <u>Exhibit B</u>

APPENDIX 136

The following example document, Standard Provisions for Consulting, is provided for informational purposes. Any IDI personnel who are asked to consult for an outside company, should present a copy of this document to the company and ask that it be appended to the Consulting Agreement. The provisions contained in this agreement protect the rights of the consultant and IDI and are generally accepted without any changes by the companies. Executable versions of this form may be downloaded from the IDI website or obtained from the Office of Technology Development.



## Exhibit B

### IMMUNE DISEASE INSTITUTE
### STANDARD CONSULTING AGREEMENT PROVISIONS

Attachment to Consulting Agreement between _____ and _____

1   It is the policy of The Immune Disease Institute (IDI) that these Standard Consulting Agreement Provisions ("Standard Provisions") must be attached to any written agreement ("Agreement") to provide consulting services between an employee, student, or member of the professional staff ("Consultant") of IDI and any organization ("Company") and must be signed by both parties to the Agreement. By signing these Standard Provisions, the parties to the Agreement agree to abide by these Standard Provisions, and further agree that if anything in the Agreement is inconsistent with these Standard Provisions, these Standard Provisions shall govern.

2   Nothing in the Agreement shall limit or be construed to limit the right of Consultant to use or publish information which (a) is or becomes available to the public through no breach of the Agreement by Consultant, (b) was known to Consultant before the consulting services were performed, (c) is acquired by Consultant from a third party has the legal right to disclose the information to the Consultant, or (d) Consultant is required to disclose by law, government regulation, or court order. In addition, information generated by Consultant pursuant to the Agreement shall be proprietary to the Company only if (a) such information is generated as a direct result of the performance of consulting services under the Agreement and (b) is not generated in the course of the Consultant's activities as a IDI employee.

3   Consulting services shall not involve any use of the funds, personnel, facilities, materials, or other resources of IDI, provided that Consultant may use the library and the Consultant's office.

4   Neither the name of the Consultant nor that of IDI, nor any variation thereon, nor adaptation thereof may be used in any advertising, promotional or sales literature, or other publicity without the prior written approval of the party whose name is to be used.

5   Consultant's rights, title and interest in inventions, discoveries and developments conceived or reduced to practice in the performance of Company funded consulting services made solely or jointly with Company employees or agents ("Consulting Inventions") may be assigned to the Company, so long as the provisions in Paragraph 6 below are not applicable. Consultant shall disclose to IDI's Office of Technology Development, in confidence, all Consulting Inventions which are related to Consultant's research, clinical, or educational activities at IDI in order to provide IDI an opportunity to assess, together with Company, whether the invention is subject to the provisions of Paragraph 6 below.

6   Not withstanding Paragraph 5 above, Company agrees and understands that Consultant has

a pre-existing obligation to assign to his or her employer, IDI, all of Consultant's rights in intellectual property which arise or are derived from Consultant's employment at IDI or which utilize the funds, including funding from any outside source awarded to or administered by IDI, personnel, facilities, materials, or other resources of IDI including resources provided in-kind by outside sources.  Company has no rights by reason of this Agreement in any publication, invention, discovery, improvement or other intellectual property, whether or not publishable, patentable or copyrightable that is subject to Consultant's obligations to IDI. Company also acknowledges and agrees that it will enjoy no priority or advantage as a result of the consultancy created hereunder in gaining access, whether by license or otherwise, to any proprietary information or intellectual property of IDI.

7   Consultant shall not disclose to Company any unpublished results of research performed at IDI by Consultant or any other IDI employee, student, or member of the professional staff. Other than the inventions assigned to Company pursuant to Paragraph 5 above, Company shall have no rights or interests in any other inventions, discoveries or developments owned by or assignable to IDI.

8   Nothing in the Agreement shall be construed to restrict or limit the duties Consultant is performing or may perform in the course of, or incidental to, Consultant's employment at IDI, including but not limited to research sponsored by a third party commercial entity nor shall anything in the Agreement be construed to restrict or limit Consultant's right to serve as an advisor to any hospital, or to any governmental or not-for-profit organization.

9   Each party to the Agreement acknowledges (i) that the Consultant is entering into the Agreement, and providing services to the Company, in the Consultants individual capacity and not as an employee or agent of IDI, (ii) IDI is not a party to this Agreement and has no liability or obligation hereunder, and (iii) IDI is intended as a third party beneficiary of this Agreement and certain provisions to this Agreement are for the benefit of IDI and are enforceable by IDI in its own name.

10  The Standard Provisions shall be and hereby are in force and effect for the entire term of any Agreement between Consultant and Company.

ACCEPTED:

_____      _____
Authorized Officer of Company                          Date

_____      _____
Consultant                                                         Date

# SUMF EXHIBIT 4
## EXHIBIT 5 OF DR. LUIGI WARREN'S NOVEMBER 16, 2018 DEPOSITION

APPENDIX 140

## luigi.warren@outlook.com

| | |
|---|---|
| **From:** | Ryan Dietz |
| **Sent:** | Monday, March 07, 2011 10:15 PM |
| **To:** | luigiwarren@sprint.blackberry.net |
| **Subject:** | RE: Assignment Document |

⌐ ⌐|  ⌐◻⌐�q

Luigi,

licensing revenues distributed under the IDI policy are split into thirds as described below.  Since there are 2 inventors, the Inventor's share would be split between yourself and Derrick.

Distribution Schedule

| Inventor | Inventor's Laboratory | IDI General Fund |
|---|---|---|
| 33 1/3% | 33 1/3% | 33 1/3% |

Regards,
Ryan

**From:** luigiwarren@sprint.blackberry.net [mailto:luigiwarren@sprint.blackberry.net]
**Sent:** Tuesday, March 08, 2011 1:39 PM
**To:** Ryan Dietz
**Subject:** Re: Assignment Document

Hi Ryan,

Thank you for sending the materials I requested. I will review the amended CDA. I have a follow-up question for you. Derrick Rossi once outlined to me IDI policies regarding payments to inventors on licensing royalties. Could you please send me the language specifying those policies?

Regards,

Luigi

Sent on the Sprint® Now Network from my BlackBerry®

**From:** "Ryan Dietz" <dietz@idi.harvard.edu>
**Date:** Mon, 7 Mar 2011 16:54:34 -0500
**To:** <luigiwarren@sprint.blackberry.net>
**Subject:** RE: Assignment Document

Dear Luigi,



EXHIBIT 5
Warren-5
DATE: 11/16/18
ROSEMARY LOCKLEAR CSR #13969

Attached please find a revised CDA, which I believe addresses your concern.  The language in the second paragraph is designed to ensure you're not limited in the use of information you created or properly accessed from another source.

Also attached are the previous executed assignment and the current document that requires your signature.  As you can see they include the same language.

For your information, I am also attaching the pertinent language in the IDI policy below.

Ownership of Inventions. Each Invention shall be the sole and exclusive property of IDI. I agree to execute an assignment to IDI or its nominee of my entire right, title and interest in and to all Inventions (to which IDI has ownership rights pursuant to the "Research and Technology Development Policy") without additional compensation. I further agree, upon request of IDI and at its expense, to execute such documents as may be necessary or desirable in applying for and obtaining patents on the Inventions in the United States and any for

**luigi.warren@outlook.com**

| | |
|---|---|
| **Sent:** | Monday, March 07, 2011 10:26 PM |
| **To:** | Ryan Dietz |
| **Subject:** | Re: Assignment Document |

Thanks, Ryan. Can you direct me to the document where all the policies are spelled out, or send me a copy?

Luigi

**luigi.warren@outlook.com**

| From: | Ryan Dietz |
|---|---|
| Sent: | Wednesday, March 09, 2011 8:55 PM |
| To: | luigiwarren@sprint.blackberry.net |
| Cc: | Halvorsen; Erik; McCarthy; Dianne |
| Subject: | RE: Assignment Document |

L ⅃ ⌐ ⌐ ⌐◻◆◆F

Luigi,

The IDI policies are not public documents.  Provided below are portions of the document establishing your obligation to assign the application to IDI.

There is no basis for further delays of your duties to provide the assignment.  If you would like to receive the terms of any agreements that have been completed relating to this technology, please also execute and return to me the Confidentiality Agreement.

Please note, IDI has the right to withhold amounts due to inventors if we do not receive cooperation on this matter by the date provided.  I am copying Erik Halvorsen Director of TIDO and Dianne McCarty Chief General Counsel of CHB on this email.

Regards,
Ryan


C. SCOPE
This Policy applies to any invention, discovery, data, writing, and other intellectual property, including trade or service marks, works-for-hire, know-how, computer software and biological materials, whether or not patentable, copyrightable or otherwise entitled to legal protection (collectively "Invention") made, conceived, reduced to practice or generated by a full or part-time professional staff, faculty, employee of, student, trainee, or person or entity otherwise engaged at IDI, such as consultants or agents retained by IDI (collectively **"Covered Person"**). Any Invention that (1) either has potential commercial value or is patentable, copyrightable, or otherwise entitled to legal protection, and (2) is made, conceived, reduced to practice or generated by a Covered Person while engaged in activities: (a) for which the Covered Person received financial support from or through IDI; (b) during which the Covered Person made significant use of facilities, materials, equipment, staff, information, ideas, data, computers or other resources of IDI; or (c) which are related to the employment, research or other activities conducted at IDI by the Covered Person is referred to as **"Technology"**. Ordinary use of desktop computers, library facilities or personal office space shall not be considered "significant" use for purposes of Section (b) above. Steps taken toward commercialization, such as filing a patent application or seeking other protection of intellectual property, will be interpreted as demonstrating potential commercial value.


E. TECHNOLOGY OWNERSHIP
1. Principles:
a. All Technology is owned by IDI. When an entity other than IDI has also sponsored, financed, or otherwise participated in the invention, the Direct or will negotiate with the other entity to determine the percentage of the Technology owned by IDI. The Director may consult with the Committee and the Inventor.

APPENDIX 144

4. <u>Ownership of Inventions</u>. Each Invention shall be the sole and exclusive property of IDI. I agree to execute an assignment to IDI or its nominee of my entire right, title and interest in and to all Inventions (to which IDI has ownership rights pursuant to the "Research and Technology Development Policy") without additional compensation. I further agree, upon request of IDI and at its expense, to execute such documents as may be necessary or desirable in applying for and obtaining patents on the Inventions in the United States and any foreign country. I further agree, whether or not I am employed by IDI, to cooperate to the extent and in the manner reasonably requested by IDI in the prosecution or defense of any claim involving a patent covering any Invention or any litigation or other claim or proceeding involving any Invention, but all expenses thereof shall be paid by IDI. All records which I shall use or prepare or come into contact with in the course of working for IDI, shall remain IDI's sole and exclusive property and shall be subject to the agreement; except that I may retain for my own personal use one copy of all my scientific work papers customarily retained by researchers at non-profit institutions unless prevented by contractual obligations to third parties pertaining to confidential papers or trade secrets, which obligations prevent such retention of any such papers.

**From:** luigiwarren@sprint.blackberry.net [mailto:luigiwarren@sprint.blackberry.net]
**Sent:** Tuesday, March 08, 2011 5:26 PM
**To:** Ryan Dietz
**Subject:** Re: Assignment Document

Thanks, Ryan. Can you direct me to the document where all the policies are spelled out, or send me a copy?

Luigi

Sent on the Sprint® Now Network from my BlackBerry®

**From:** "Ryan Dietz" <dietz@idi.harvard.edu>
**Date:** Tue, 8 Mar 2011 17:15:23 -0500
**To:** <luigiwarren@sprint.blackberry.net>
**Subject:** RE: Assignment Document

Luigi,

licensing revenues distributed under the IDI policy are split into thirds as described below. Since there are 2 inventors, the Inventor's share would be split between yourself and Derrick.

Distribution Schedule

| Inventor | Inventor's Laboratory | IDI General Fund |
|---|---|---|
| 33 1/3% | 33 1/3% | 33 1/3% |

Regards,
Ryan

**From:** luigiwarren@sprint.blackberry.net [mailto:luigiwarren@sprint.blackberry.net]
**Sent:** Tuesday, March 08, 2011 1:39 PM

APPENDIX 145

**To:** Ryan Dietz
**Subject:** Re: Assignment Document

Hi Ryan,

Thank you for sending the materials I requested. I will review the amended CDA. I have a follow-up question for you. Derrick Rossi once outlined to me IDI policies regarding payments to inventors on licensing royalties. Could you please send me the language specifying those policies?

Regards,

Luigi

Sent on the Sprint® Now Network from my BlackBerry®

---

**From:** "Ryan Dietz" <dietz@idi.harvard.edu>
**Date:** Mon, 7 Mar 2011 16:54:34 -0500
**To:** <luigiwarren@sprint.blackberry.net>
**Subject:** RE: Assignment Document

Dear Luigi,

Attached please find a revised CDA, which I believe addresses your concern. The language in the second paragraph is designed to ensure you're not limited in the use of information you created or properly accessed from another source.

Also attached are the previous executed assignment and the current document that requires your signature. As you can see they include the same language.

For your information, I am also attaching the pertinent language in the IDI policy below.

Ownership of Inventions. Each Invention shall be the sole and exclusive property of IDI. I agree to execute an assignment to IDI or its nominee of my entire right, title and interest in and to all Inventions (to which IDI has ownership rights pursuant to the "Research and Technology Development Policy") without additional compensation. I further agree, upon request of IDI and at its expense, to execute such documents as may be necessary or desirable in applying for and obtaining patents on the Inventions in the United States and any foreign country. I further agree, whether or not I am employed by IDI, to cooperate to the extent and in the manner reasonably requested by IDI in the prosecution or defense of any claim involving a patent covering any Invention or any litigation or other claim or proceeding involving any Invention, but all expenses thereof shall be paid by IDI. All records which I shall use or prepare or come into contact with in the course of working for IDI, shall remain IDI's sole and exclusive property and shall be subject to the agreement; except that I may retain for my own personal use one copy of all my scientific work papers customarily retained by researchers at non-profit institutions unless prevented by contractual obligations to third parties pertaining to confidential papers or trade secrets, which obligations prevent such retention of any such papers.

I look forward to receiving the executed CDA and Assignment. It is important that you return these promptly so that we may proceed with protecting the intellectual property. Further, once these are received I will provide you with additional information regarding licensing the technology. Please provide the executed CDA and Assignment document by March 21st 2011.

Regards,
Ryan

-----Original Message-----
From: luigiwarren@sprint.blackberry.net [mailto:luigiwarren@sprint.blackberry.net]
Sent: Thursday, February 24, 2011 4:55 PM
To: Ryan Dietz
Subject: Re: Assignment Document


Ryan,

I'm sorry I was delayed in getting back to you but I've been very busy
of late.  I have some questions about the draft of the CDA and the
Assignment.  In the CDA, you state in the first paragraph that it will
apply to information provided to me by IDI before the execution of the
CDA.  I don't understand what that might refer to and don't think I can
agree blindly to such a blanket designation.  In the second paragraph, I
don't understand what you are proposing, concerning information acquired
or developed by me, when you state that I will "inform IDI of that fact
at or before the date its evaluation is complete."  I also do not
understand the last sentence of the second paragraph.  Can you please
explain?

I also have some questions about the Assignment.  First, can you send me
a signed copy of the initial assignment that you refer to in your email
so that I can see how it compares with this one?  In addition, can you
send me copies of the documents containing the "policies of my
employment" with IDI that you also refer to in your email?  I will then
get back to you with my comments on this draft Assignment.

As the inventor of the Technology, I am uniquely positioned to assist
IDI in the development, refinement, etc. of the Technology.  It is also
the case that, as a matter of professional pride, I have much invested
personally in the success of the Technology.  However, it's also
important to me that I be fairly compensated for all that I have done
and am prepared to do in the future to ensure the success of the
Technology.  It is for that reason that  I asked in my prior email about
what financial return I might expect to see.  It's important that I have
some sense of what IDI is contemplating as we go forward.  Please
advise.  Thank you.

Regards,

Luigi

P.S. Please note that my address has changed. It is now: 157 Sixth St. #605, Cambridge, MA
02142.


Sent on the Sprint® Now Network from my BlackBerry®

-----Original Message-----
From: "Ryan Dietz" <dietz@idi.harvard.edu>
Date: Thu, 17 Feb 2011 13:56:55
To: <luigiwarren@sprint.blackberry.net>; <lwarren@mit.edu>
Cc: Halvorsen, Erik<Erik.Halvorsen@childrens.harvard.edu>
Subject: RE: Assignment Document

Dear Luigi,

I look forward to providing the details of the agreement.

However, I must first receive the assignment document and attached CDA executed and returned.  The CDA is necessary to protect the confidentiality of the terms of the agreement since you are no longer employed by IDI.

Please execute both the assignment document and the CDA and return to my attention as soon as possible.  As previously mentioned when we discussed the prior assignment, you remain obligated to comply with these procedural steps by the policies of your employment with IDI.

Regards,

Ryan

Ryan M. Dietz

Director, Office of Technology Development

Immune Disease Institute/Program in Cellular and Molecular Medicine at Children's Hospital Boston

CLSB - Third Floor

3 Blackfan Circle

Boston, MA  02115

t:  617.919.3048

c: 617.803.5430

email:  <mailto:dietz@idi.harvard.edu> dietz@idi.harvard.edu

From: luigiwarren@sprint.blackberry.net
[mailto:luigiwarren@sprint.blackberry.net]
Sent: Monday, February 14, 2011 10:39 AM
To: Ryan Dietz
Subject: Re: Assignment Document

I do have some initial questions. I heard that Flagship has already done a deal with you for a license to this IP. Is this correct? Was there an initial payout? Should I expect to see any $$$ from this and, if so, what are the details?

-luigi

Sent on the Sprint(r) Now Network from my BlackBerry(r)

_____

From: "Ryan Dietz" <dietz@idi.harvard.edu>

Date: Fri, 11 Feb 2011 09:28:59 -0500

To: <lwarren@mit.edu>

Subject: Assignment Document

Luigi,

I wanted to provide an update and send along the attached assignment document seeking your signature and return to IDI.

This assignment pertains to a second provisional application which was filed immediately before publication to capture additional data that supports the claims.  We did not alter inventorship or the scope of the inventive subject matter.

Attached please find the assignment document.  Please sign in the presence of one other person who also must sign and date as a witness.  Please return to me by scanned pdf or US mail to the address below.

Please let me know if you have any questions or concerns.

Regards,

Ryan

APPENDIX 149

Ryan M. Dietz

Director, Office of Technology Development

Immune Disease Institute/Program in Cellular and Molecular Medicine at Children's Hospital Boston

CLSB - Third Floor

3 Blackfan Circle

Boston, MA  02115

t:  617.919.3048

c: 617.803.5430

email:  <mailto:dietz@idi.harvard.edu> dietz@idi.harvard.edu

# SUMF EXHIBIT 5

## EXHIBIT 6 OF DR. LUIGI WARREN'S NOVEMBER 16, 2018 DEPOSITION



**Children's Hospital Boston**

**Office of General Counsel**
300 Longwood Avenue
Boston, Massachusetts 02115
*phone* 617-355-6800 | *phone* 617-355-6109 | *fax* 617-730-1952

March 22, 2011

**Via Overnight Mail**

Luigi Warren
157 Sixth St. #605
Cambridge, MA 02142

Dear Mr. Warren:

I represent Immune Disease Institute (IDI). It is my understanding that you were a full time employee at IDI from November 2007 to June 2010. During this time your position was as Research Fellow in the lab of Dr. Derrick Rossi which focused on stem cells. aging. and cell reprogramming methods.

On May 20 2010, as required under IDI policies, Dr. Rossi submitted an invention disclosure regarding "Sustained Polypeptide Expression from Modified RNAs and Uses Thereof" (the "Technology"). This invention disclosure identified you as an inventor on the Technology.

IDI filed an initial provisional application on April 16, 2010 and you signed the assignment form relating to that application on August 30, 2010. On November 5, 2010, the article "Highly efficient reprogramming to pluripotency and directed differentiation of human cells with synthetic modified mRNA" with you as first author was published in the journal Cell Stem Cell.

Since that time, IDI has filed an additional provisional patent application to ensure the intellectual property coverage included the additional data that was requested by the journal reviewers and included in that publication. Currently, IDI is filing a permanent application in the US and certain foreign countries. IDI will continue to take all actions necessary to protect this intellectual property. This activity requires your ongoing cooperation.

IDI and Dr. Rossi believe this Technology to have significant value to both the research and clinical community. IDI is obligated to both protect the technology but also to ensure that it is used to benefit the public good. IDI has been and will continue to aggressively



APPENDIX 152

pursue both goals. In furtherance of this goal, IDI has entered into an exclusive license arrangement with a company, Moderna Therapeutics, Inc., with the goal of ensuring that the Technology is effectively commercialized. I understand that you are interested in learning additional information about this licensing arrangement. IDI has informed you that upon executing a confidentiality agreement, IDI will provide you with such information.

On February 11, 2011, Mr. Ryan Dietz, Director, Office of Technology, sent to you via e-mail an assignment form pertaining to the second provisional application and requested that you sign and return the assignment form. Over the next several weeks, there has been several e-mail communications regarding the Technology, its current status, and your willingness to sign the assignment form.

I understand that on Friday, March 18, 2011, you sent Mr. Dietz an e-mail informing him that you were refusing to sign the assignment form.

Please be advised that you are obligated under the policies of IDI to cooperate to the fullest extent in patent prosecution. IDI's Research and Technology Development Policy is enclosed. This policy benefits you (and the other inventors), as well as IDI, since under these policies, the inventors receive a portion of royalties paid to IDI.

I enclose the assignment form for your execution. Should you continue to refuse to sign the document, IDI will take all legal measures available to it to protect the Technology and ensure it is effectively commercialized.

Please return the executed document to my attention no later than Monday, March 28th. If you have engaged legal counsel, please request that he/she be in direct contact with me no later than this Friday, March 25.

Best Regards,

Dianne McCarthy
Chief Counsel for Research Affairs

Enclosure

# SUMF EXHIBIT 6

## EXHIBIT 8 OF DR. LUIGI WARREN'S NOVEMBER 16, 2018 DEPOSITION

## FILED UNDER SEAL

# SUMF EXHIBIT 7
## EXHIBIT 15 OF DR. LUIGI WARREN'S NOVEMBER 16, 2018 DEPOSITION

*EXECUTION COPY*

**AFFILIATION AGREEMENT**

by and between

**THE CHILDREN'S MEDICAL CENTER CORPORATION**

and

**IMMUNE DISEASE INSTITUTE, INC.**

This Affiliation Agreement (the "Agreement") is entered into as of this 24th day of December, 2008 by and between The Children's Medical Center Corporation ("CMCC") and the Immune Disease Institute, Inc. ("IDI"), each a Massachusetts nonprofit corporation. CMCC and IDI are each sometimes referred to herein as a "Party" and, collectively, as the "Parties."

## RECITALS

WHEREAS, the Parties have discussed the possibility of effectuating a corporate affiliation between them (the "Affiliation") to further their respective charitable missions by furthering scientific knowledge and public health through research in immunology, inflammation and other areas of biomedical science, and to advance medical education in these areas;

WHEREAS, pursuant to these discussions, CMCC and IDI have entered into a non-binding Letter of Intent, dated August 14, 2008 (the "Letter of Intent"), whereby each Party agreed, subject to certain contingencies, to effect a commonality of control between them which would permit an affiliation of their respective organizations;

WHEREAS, the Parties believe that the Affiliation will facilitate the growth and attraction of research funding through synergies and interdisciplinary grant proposals; provide greater coordination of research programs, thereby increasing efficiencies in those programs; enhance IDI's access to funding and revenue sources; increase private philanthropy to IDI; and preserve and create opportunities for research and medical education in Massachusetts;

WHEREAS, the members of the Board of Trustees of IDI (the "IDI Board of Trustees") and the members of the Board of Trustees of CMCC (the "CMCC Board of Trustees") have each approved the Affiliation, and each of IDI and CMCC considers it to be in its respective best interests and in the interests of the public it serves to enter into the Affiliation on the terms, conditions and contingencies set forth herein.

NOW, THEREFORE, in consideration of the foregoing and of the mutual agreements and covenants hereinafter set forth and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

11315168_28.DOC

APPENDIX 156

1.      THE AFFILIATION.

1.1.    The Affiliation shall be effectuated subject to satisfaction of the conditions contained in Sections 5 and 6 hereof, including, without limitation, (a) naming CMCC as the sole corporate member of IDI, (b) the adoption by IDI of the Amended and Restated Articles of Organization (as defined herein) and the Amended and Restated Bylaws (as defined herein), as more fully described in Section 5.1.6 hereof, and (c) the modification of the composition of the IDI Board of Trustees, as more fully described in Section 5.1.6 hereof.

1.2.    The closing of the Affiliation (the "Closing") will take place at the offices of Ropes & Gray, LLP, One International Place, Boston, Massachusetts, 02110, no later than three (3) business days immediately following the satisfaction of all closing conditions and the receipt of all necessary Consents or Permits (as hereinafter defined) of any Governmental Authority (as hereinafter defined) whose consent is required or sought for the consummation of the Affiliation, or on such other date and place as CMCC and IDI shall mutually agree.  The date on which the Closing occurs is referred to herein as the "Closing Date." The Affiliation shall become effective at 11:59 pm on the date the Amended and Restated Articles of Organization are approved and filed by the Secretary of State of the Commonwealth of Massachusetts or such later date and time as is agreed upon by the Parties and specified in the Amended and Restated Articles of Organization.  The time at which the Affiliation shall become effective is referred to as the "Effective Time."

1.3.    At the Effective Time (a) the articles of organization of IDI ("Articles of Organization") shall, by virtue of the Affiliation and without further action by the trustees of IDI, be amended and restated in the form attached hereto as Exhibit 1.3(a) (the "Amended and Restated Articles of Organization") until thereafter changed or amended as provided therein or by applicable law; and (b) the bylaws of IDI ("Bylaws") shall, by virtue of the Affiliation and without further action by the trustees of IDI, be amended and restated in the form attached hereto Exhibit 1.3(b) (the "Amended and Restated Bylaws") until thereafter changed or amended as provided therein or by applicable law.

2.      REPRESENTATIONS AND WARRANTIES OF IDI.

Except as set forth in the corresponding section and subsection of IDI's disclosure schedule attached hereto as Schedule 2 (with such disclosures to qualify any other section and subsection for which the appropriateness of the disclosure is reasonably apparent on its face), IDI represents and warrants to CMCC as follows:

2.1.    Organization. IDI is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts.  Other than receipt of all necessary Consents or Permits, IDI has all requisite power and authority and has taken all necessary action required for the due authorization, execution, delivery and performance by IDI of this Agreement, and the entry into and consummation of the Affiliation.  IDI has no subsidiaries, affiliates, membership interest or equity interest (other than equity interests in publicly traded companies) in any entity, except as set forth on Schedule 2.1 attached hereto.  Without giving effect to the Affiliation, no individual, partnership, joint venture, corporation

2

APPENDIX 157

(including not-for-profit corporation), limited liability company, limited liability partnership, trust, unincorporated organization, or Governmental Authority or any department or agency thereof (collectively, a "Person") has any interest or expectation of interest as a member or otherwise of IDI.

2.2. Authorization; Validity; Company Action. The execution and delivery of this Agreement, the entry into and consummation of the Affiliation and the consummation of the transactions contemplated hereby have been duly and validly authorized by all requisite corporate action, including without limitation the approval of the IDI Board of Trustees, and no other corporate proceedings on the part of IDI are necessary to authorize this Agreement or the Affiliation or to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by IDI, and assuming due authorization, execution and delivery by CMCC, constitutes a valid and binding agreement of IDI, enforceable against IDI in accordance with its terms, except as may be limited by (i) bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or (ii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity). The rights, designation, powers, qualifications, limitations and restrictions of CMCC as the sole member of IDI are as stated in the Amended and Restated Articles of Organization and Amended and Restated Bylaws, which shall become effective at the Effective Time.

2.3. Governing Boards, Officers, Investments and Signatories. The IDI Board of Trustees and the IDI Board of Overseers are as set forth on Schedule 2.3(a) attached hereto, and the officers of IDI are as set forth on Schedule 2.3(b) attached hereto. A statement listing all investment and bank accounts, including but not limited to checking accounts, savings accounts, certificate of deposits, money market accounts, and brokerage accounts of IDI (collectively, the "Investments") and the approximate amount of money or value of such Investments is attached hereto as Schedule 2.3(c). The names of all authorized signatories of IDI are attached hereto as Schedule 2.3(d).

2.4. Consent and Approval; No Conflicts. The execution of this Agreement, the entry into and consummation of the Affiliation, the contemplated merger under Section 6.1.2, and the compliance of IDI with the provisions of this Agreement do not (i) conflict with or result in any breach of any provision of the Articles of Organization or Bylaws; (ii) other than as set forth on Schedule 2.4(a) attached hereto, require any consent, approval, waiver, filing with or notification to, any foreign, federal, state, local or municipal court or other judicial authority, legislative or executive body, administrative agency (including, without limitation, the National Institutes of Health), commission or other governmental or regulatory body or authority (each, a "Governmental Authority"); (iii) result in a violation or breach of or default (or gives rise to any right of termination, cancellation or acceleration) under, or require any consent, approval, waiver, filing with or notification under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, grant, agreement, Lease (as defined herein) or other instrument or obligation to which IDI is a party, except as set forth on Schedule 2.4(b); or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to IDI.

2.5. Financial Statements. Prior to the date hereof, IDI has furnished to CMCC or its representatives (i) the audited consolidated statement of financial position of IDI as of June 30,

3

APPENDIX 158

2008, (ii) the related audited consolidated statements of activities and cash flows for the year then ended (collectively the "Audited Financial Statements") and (iii) comparable unaudited statements as of September 30, 2008 and for the three months then ended (collectively, the "Unaudited Financial Statements"). The Audited Financial Statements and the Unaudited Financial Statements have been prepared in accordance with generally accepted accounting principles applied on a consistent basis during the relevant periods (except as may otherwise be noted therein), and present fairly, in all material respects, the financial position, results of operations and the cash flows (as appropriate) of IDI as of the dates, and for the periods, indicated thereon, except for the absence of footnotes and as otherwise noted therein, and subject, in the case of the Unaudited Financial Statements, to normal recurring year-end adjustments which are not material individually or in the aggregate. There are no material liabilities or obligations (absolute, accrued, contingent or otherwise) of a type that generally accepted accounting principles would require to be on the Audited Financial Statements or the Unaudited Financial Statements which are not fully reflected or reserved against in such statements, except for liabilities and obligations that may have arisen in the ordinary course of business and consistent with past practice since September 30, 2008. IDI has maintained its books and records in accordance with generally accepted accounting principles and practices applied on a consistent basis, and such books and records are, and during the periods covered by the Audited Financial Statements and Unaudited Financial Statements were, true, correct and complete in all material respects.

2.6.    Conduct of Business.  Since June 30, 2008, (a) IDI has conducted business in the ordinary course consistent with past practice, and (b) IDI has not (1) borrowed any money or mortgaged, pledged or subjected to any lien any of its assets, tangible or intangible (absolute, accrued or contingent); (2) sold, leased, assigned or transferred any of its tangible assets except in the ordinary course of business consistent with past practice; (3) suffered any change, event or development or series of changes, events or developments which is material except for investment losses and as disclosed in the Unaudited Financial Statements; (4) suffered any damage, destruction or casualty loss to its physical properties (whether or not covered by insurance) which has been or would reasonably be expected to be material; (5) been the subject of any investigation by a Governmental Authority or had litigation threatened; (6) except for fair consideration canceled or compromised any debts that are material, individually or in the aggregate, or waived or permitted to lapse any claims or rights relating to debt that is material, individually or in the aggregate, or sold, transferred or otherwise disposed of any of its properties or assets that are material individually or in the aggregate; (7) made any change in any method of accounting or accounting practice; (8) increased any salaries, wages or any employee benefits, adopted or amended any employee benefit plans, paid any bonuses or otherwise increased the compensation of any of its officers, employees or consultants, other than in the ordinary course of business and consistent with past practice; (9) granted any change of control, severance, or termination pay, or instituted any new, or modified any existing, change of control, severance, or termination pay plan or practice; (10) made any loan to or engaged in any other transaction with any officer, employee, consultant, or affiliate of IDI, other than payment of salaries and benefits to such persons in the ordinary course of business or in connection with travel or other business-related expenses and other than tuition loans pursuant to IDI's tuition loan program and housing loans pursuant to commitments in effect on September 30, 2008 and previously disclosed to CMCC and set forth on Schedule 2.6 attached hereto; (11) made or committed to make any

4

APPENDIX 159

capital expenditures individually in excess of $100,000; or (12) agreed to take any action referred to in this paragraph; except, with respect to subsections (1), (3), (10) and (11) of this section, in accordance with its fiscal year 2009 budget previously furnished to CMCC or pursuant to an existing HEFA lease facility.

2.7.    Absence of Undisclosed Liabilities.  IDI has no liabilities or obligations (whether accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due) other than (a) liabilities or obligations reserved against or otherwise disclosed in the Audited or the Unaudited Financial Statements, (b) liabilities for Actions set forth on Schedule 2.8 hereto and (c) liabilities or obligations arising since September 30, 2008 which were incurred in the ordinary course of business consistent (in amount and kind) with past practice (none of which is a liability resulting from a breach of contract, breach of warranty, tort, infringement claim, or lawsuit).

2.8.    Litigation.  Except as set forth on Schedule 2.8 attached hereto, there are no actions, suits or proceedings pending or, to the knowledge of IDI, threatened against IDI at law or in equity or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign ("Actions"). Additionally, IDI is not in default with respect to any judgment, writ, injunction, decree, rule or regulation of any court or federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.

2.9.    Intellectual Property.

2.9.1.  Schedule 2.9.1 sets forth, as of the date hereof, a complete and accurate list of all of the following IDI Intellectual Property Rights: all Patents; all registrations of Copyrights and applications therefor; and all registrations of Trademarks and service marks and applications therefore.  Except as set forth in Schedule 2.9.1.IV., IDI Intellectual Property Rights are free and clear of all mortgages, liens, security interests, leases, pledges, encumbrances, equities, claims, charges, options, written restrictions, rights of first refusal, title retention agreements or other exceptions to title which affect IDI Intellectual Property Rights or restrict the use by IDI of IDI Intellectual Property Rights in any way with the exception of Patents jointly owned with other Persons (such jointly owned Patents indicated as such in Schedule 2.9.1) and Outbound Licenses listed in Schedule 2.9.11 ("IP Liens").  "IDI Intellectual Property Rights" means all Intellectual Property Rights (as hereinafter defined) owned by, co-owned by, subject to an obligation of assignment to, or licensed to IDI, or in which IDI has any right, title or interest as of the date of this agreement.  "Intellectual Property Rights" shall mean any or all of the following and all worldwide common law and statutory rights in, arising out of, or associated therewith: (i) patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof ("Patents"); (ii) software, copyrights, copyrights registrations and applications therefor, and all other rights corresponding thereto throughout the world including moral and economic rights of authors and inventors, however denominated ("Copyrights"); (iii) industrial designs and any registrations and applications therefor; (iv) trade names, logos, common law trademarks and service marks, trademark and service mark registrations and applications therefor and all goodwill associated therewith ("Trademarks"); (v) trade secrets (including those trade secrets defined in the Uniform

5

APPENDIX 160

Trade Secrets Act and under corresponding foreign statutory and common law), inventions and discoveries, whether or not patentable, invention disclosures, business, technical and know-how information, non-public information and confidential information and rights to limit the use or disclosure thereof by any Person, including databases and data collections and all rights therein ("Trade Secrets"); and (vi) any other proprietary rights or rights similar or equivalent to any of the foregoing (as applicable).

2.9.2.   All current employees, consultants and contractors of IDI have executed a Participation Agreement substantially in IDI's standard form that, among other things, binds such employees, consultants and contractors to the terms of IDI's Research and Technology Development Policy, including an obligation to assign to IDI all Inventions, as that term is used in the Participation Agreement.  All former employees, consultants and contractors of IDI who contributed to IDI Intellectual Property Rights either have (i) executed a Participation Agreement substantially in IDI's standard form that, among other things, binds such employees, consultants and contractors to the terms of IDI's Research and Technology Development Policy, including an obligation to assign to IDI all Inventions, as that term is used in the Participation Agreement or (ii) otherwise agreed to assign all such rights to IDI.  Except as permitted under a Participation Agreement substantially in IDI's standard form, to the knowledge of IDI, there has been no disclosure by IDI or its former or current employees, consultants or contractors of any confidential or proprietary information of IDI.  A true and accurate copy of the Research and Technology Development Policy, including a true and accurate copy of IDI's form of Participation Agreement, has been furnished to CMCC.  Each inventor named on the Patents listed in Schedule 2.9.1 has executed an agreement assigning his, her or its entire right, title and interest in and to such Patents, and the inventions embodied and claimed therein, to IDI, except that in the case of Patents jointly owned with other Persons, to the knowledge of IDI, to the appropriate owners.  To the knowledge of IDI, no such inventor has any contractual or other obligation that would preclude any such assignment or otherwise conflict with the obligations of the inventor to IDI, or in the case of Patents, to the appropriate owners.

2.9.3.   There have not been in the past five years and there are no actions pending or, to IDI's knowledge, threatened with regard to the ownership of any IDI Intellectual Property Rights, and, to the knowledge of IDI, there is no valid basis for any such action.

2.9.4.   To IDI's knowledge, IDI Intellectual Property Rights collectively constitute all of the Intellectual Property Rights necessary to enable IDI to research, develop, use, offer to sell, import, commercialize or otherwise exploit products or services as currently under development by IDI.

2.9.5.   There have not been in the past five years and there are no pending claims or to IDI's knowledge claims threatened that (i) IDI, (ii) the IDI Intellectual Property Rights or (iii) the manufacture, development, use, sale, offering for sale, importing, commercialization or other exploitation of the IDI Intellectual Property Rights has infringed or is infringing any Intellectual Property Rights of any third party.  To IDI's knowledge, (i) the IDI Intellectual Property Rights and (ii) the manufacture, development, use, sale, offering for sale, importing, commercialization or other exploitation of the IDI Intellectual Property Rights, do not and will

6

APPENDIX 161

not infringe, constitute contributory infringement, inducement to infringe, misappropriation or unlawful use of Intellectual Property Rights of any third party.

2.9.6. The IDI Intellectual Property Rights listed in Schedule 2.9.1 have been duly registered and / or filed with or issued by the appropriate Governmental Entity (as hereinafter defined) in the jurisdictions indicated in Schedule 2.9.1. All such IDI Intellectual Property Rights are pending and have not been abandoned or expired and have been timely prosecuted, the representations in this sentence being to IDI's knowledge in the case of Patents jointly owned with other Persons for which such Persons have responsibility. All issued Patents, registered Trademarks and registered Copyrights within the IDI Intellectual Property Rights are in full force and effect and, to IDI's knowledge, valid and subsisting, the representations in this sentence being to IDI's knowledge in the case of issued Patents jointly owned with other Persons for which such Persons have responsibility. Patent applications included in Patents are pending with the applicable Governmental Entity, the representations in this sentence being to IDI's knowledge in the case of Patents jointly owned with other Persons for which such Persons have responsibility. All steps necessary to maintain such IDI Intellectual Property Rights including the payment when due of all maintenance fees and annuities and the filing of all necessary renewals, statements and certifications have been taken, and all necessary affidavits of continuing use have been timely filed, such representations being to IDI's knowledge in the case of Patents jointly owned with other Persons for which such Persons have responsibility. A "Governmental Entity" means any court, arbitral tribunal, administrative agency or commission or other governmental or other regulatory authority or agency, or foreign, federal, state, local or supranational entity.

2.9.7. To IDI's knowledge, there are no published patents, patent applications, articles or other prior art references that would reasonably be expected to adversely affect the validity or enforceability of any issued Patents. None of the IDI Intellectual Property Rights have been declared invalid or unenforceable, in whole or in part, by any Governmental Entity, and there are no ongoing interferences, oppositions, reissues, reexaminations or other proceedings involving any of the Patents including ex parte and post-grant proceedings, before any Governmental Entity, the representations in this section being to IDI's knowledge in the case of Patents jointly owned with other Persons for which such Persons have responsibility.

2.9.8. IDI has met its duty of candor as required under 37 C.F.R. 1.56 and complied with analogous laws outside the United States requiring disclosure of references. With respect to IDI Intellectual Property Rights, there have been no material misrepresentations or concealment of any material information to the United States Patent and Trademark Office or other applicable Governmental Entity by IDI, or in connection with the prosecution of any Patents listed in Schedule 2.9.1, in violation of 37 C.F.R. Section 1.56 or similar disclosure requirements.

2.9.9. To IDI's knowledge, IDI Intellectual Property Rights have not been infringed or misappropriated, and are not being infringed or misappropriated, by any third party. There is no claim asserted, threatened or planned to be asserted by IDI that any third party has infringed, misappropriated or otherwise violated any Intellectual Property Rights of IDI.

7

11315168_28.DOC

APPENDIX 162

2.9.10. There are no options, rights, licenses or interests of any kind relating to IDI Intellectual Property Rights licensed or granted to IDI (other than software licenses for generally available software, employee assignment agreements, nondisclosure agreements and material transfer agreements ("MTAs")) ("Inbound Licenses"). With respect to each Inbound License, to IDI's knowledge: (i) no claim is pending or threatened with respect to any Inbound License or that challenges the legality or validity of any underlying item of Intellectual Property Rights subject to the Inbound License; and (ii) no sublicense or similar right has been granted by IDI with respect to any Inbound License.

2.9.11. Schedule 2.9.11 sets forth a true, complete and accurate list of all material agreements or instruments with respect to any options, rights, licenses or interests of any kind relating to Intellectual Property Rights licensed or granted by IDI to any third party (other than software licenses for generally available software, employee assignment agreements, and nondisclosure agreements) ("Outbound Licenses").

2.9.12. Schedule 2.9.12 lists all domain names owned by IDI. IDI owns all the domain names necessary for the conduct of business by IDI as currently conducted.

2.9.13. IDI does not own copies of any third-party software that is used in or is necessary for its business as currently conducted, other than software generally available to the public.

2.9.14. All personally identifiable information and data, including but not limited to health records and personal health information, used by or in the possession of IDI has been collected, stored, maintained, used and disclosed in accordance with all applicable legal requirements. IDI maintains policies and procedures regarding data security, privacy and the protection of personally identifiable information, including but not limited to health records and personal health information, that are commercially reasonable and, in any event, in compliance with all applicable legal requirements. There have been no security breaches relating to, violations of any security policy regarding or any unauthorized access of any data or information used in the business of IDI. To the knowledge of IDI, IDI has given all notices, made all disclosures, and obtained all necessary consents related to collection, storage, maintenance, use and disclosure of all such data or information. The transactions contemplated to be consummated hereunder will not violate any IDI policies or laws relating to collection, storage, maintenance, use or disclosure of any such data or information.

2.9.15. IDI has taken all reasonable precautions to protect the secrecy, confidentiality and value of all Trade Secrets.

2.10. Labor Relations and Employment. There are no union or collective bargaining agreements relating to employees of IDI and with respect to such employees: (a) IDI is in compliance with all applicable laws respecting employment and employment practices, including without limitation, terms and conditions of employment, classification of employees as exempt for overtime purposes, classification of service providers as independent contractors or consultants, and wages and hours; (b) there are no labor troubles (including any arbitrations, grievances, strikes, lockouts, slowdowns, or stoppages) pending or threatened against or

8

APPENDIX 163

affecting IDI, and there have been no such troubles in the past five years; and (c) during the last five years, IDI has not received any written notice that any representation petition respecting the employees of IDI has been filed and no petition or proceedings have been threatened by or on behalf of any employee or group of employees with the National Labor Relations Board or any other labor relations board seeking recognition of a bargaining representative. Additionally, there are no actions pending or threatened by any employee of IDI, no employee of IDI has provided a written claim to IDI, in each case relating to IDI's employment of such employee. During the past five years, there have not been any layoffs, plant closings, reductions in workforce, or other actions that have resulted or triggered or could result or trigger notice requirements or liability under the Worker Adjustment and Retraining Notification ("WARN") Act or under any similar or local plant closing notice law. There is not presently pending, and for the past five years there has not been, any compliance review conducted by the U.S. Department of Labor, Office of Federal Contract Compliance Programs ("OFCCP") that resulted in, or that has the potential to result in (A) any adverse finding with respect to IDI, (B) any corrective or adverse action taken with respect to IDI, (C) any conciliation agreement between the OFCCP and IDI, or (D) the loss of federal contractor status of IDI.

2.11.  Employee Benefits.

2.11.1. Attached hereto as Schedule 2.11.1 is a true and complete list of each deferred compensation, bonus or other incentive compensation plan, program, agreement or arrangement; each severance or termination pay, medical, surgical, hospitalization, life insurance and other "welfare" plan, fund or program (within the meaning of Section 3(1) of ERISA); each profit-sharing, stock bonus or other "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA); each employment, termination, independent contractor, severance, change of control, or similar agreement; and each other material employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by IDI or to which IDI is a party, whether written or oral, for the benefit of any employee, officer or consultant of IDI (the "Plans"). Additionally, IDI has provided to CMCC or its representatives a written statement of IDI's cost related to each employee welfare benefit plan (as that term is defined in Section 3(1) of ERISA) which is a Plan, including information about the portion of such cost which is borne by the employees of IDI through payroll deductions or otherwise. As of the Closing Date the portion of the Plans relating to severance, vacation, and other assorted benefits which have accrued shall not exceed $500,000. All Plans are in material compliance with all applicable provisions of ERISA, as well as with all other applicable federal, state and local statutes, ordinances and regulations. All reports or other documents required by law or contract to be filed with any governmental agency, or distributed to Plan participants or beneficiaries, with respect to the Plans have been timely filed or distributed. Each of the Plans intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service and IDI knows of no event that would cause the Plan to lose its qualified status.

2.11.2. No Plan provides welfare or insurance benefits (whether or not insured) to any participating employee of IDI or their dependents or beneficiaries beyond such participant's termination of employment or termination of service of non-employees, other than coverage mandated by applicable state law or Part 6 of Title I of ERISA, Section 4980B of the Code and

9

APPENDIX 164

the regulations and guidance promulgated and issued thereunder, respectively ("COBRA") and benefits, the full cost of which are borne by such participant (or his or her dependent or beneficiary). IDI has not maintained, or been obligated to contribute to, or incurred any liability with respect to, a Plan that is subject to the provisions of Title IV of ERISA, and IDI has not incurred any liability under Section 4201 of ERISA with respect to any "multi-employer plan" (as such term is defined in Section 4001(a)(3) of ERISA) or any other plan subject to Title IV of ERISA, and the Affiliation and the contemplated merger under Section 6.1.2 will not constitute a complete or partial withdrawal from or with respect to any such "multi-employer plan" or other plan subject to Title IV of ERISA or any collective bargaining agreement to which IDI is a party or by which IDI is bound or otherwise give rise to any liability of IDI in connection therewith. IDI does not have nor has ever had any funding arrangement intended to qualify as a VEBA under Section 501(c)(9) of the Code.

2.11.3. Except as set forth in Schedule 2.11.3 attached hereto, the consummation of the Affiliation and the contemplated merger under Section 6.1.2 will not, either alone or in combination with another event, (i) entitle any current or former employee or officer of IDI to severance pay, unemployment compensation or any other payment or (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any such employee or officer.

2.11.4. IDI has complied with all of its obligations under COBRA, and does not expect to incur any liability in connection with the benefit continuation rights under COBRA with respect to employees of IDI. No Plan is a multiple employer welfare arrangement.

2.11.5. There are no pending, or to the knowledge of IDI, threatened or anticipated claims by or on behalf of any Plan, by any employee of IDI or beneficiary thereof covered under any such Plan, or otherwise involving any such Plan (other than routine claims for benefits). Except as set forth on Schedule 2.11.5 attached hereto, no Plan is or, within the last six years, has been the subject of an examination or audit by any domestic or foreign governmental or regulatory authority, agency, commission, body, court or other legislative, executive, judicial or governmental entity. No Plan is the subject of an application or filing under, or is a participant in, a government-sponsored amnesty, voluntary compliance, self-correction or similar program.

2.12.   Material Agreements. IDI has provided to CMCC or its representatives (a) true and correct copies of each written contract, agreement, license agreement, document, instrument, understanding, and any and all amendments thereto of IDI and (b) all oral agreements and understandings of IDI have been adequately disclosed to the satisfaction of CMCC and its representatives that are material to the operation of IDI or any of its subsidiaries, except for contracts, agreements, documents, instruments, understandings or arrangements with total payments less than $100,000 in the aggregate (each a "Material Agreement"). A list of the Material Agreements is set forth in Schedule 2.12 attached hereto.

2.13.   No Defaults. IDI is not and, to the knowledge of IDI, no other party is in breach or violation of, or default under, in any material respect, any Material Agreement, except such events of default and other events as to which requisite waivers or consents have been obtained.

10

APPENDIX 165

IDI has not received notice of any claim of default under any Material Agreement, and, to the knowledge of IDI, no event has occurred that would result in a breach or violation of, or a default under, in any material respect, any Material Agreement.

2.14.    No Material Claims or Judgments.  As of the date hereof, (a) there are no claims, actions, investigations, or proceedings pending or, to the knowledge of IDI after having made reasonable efforts to investigate or inquire, threatened against IDI by any Governmental Authority; (b) IDI is not subject to any outstanding judgment, rule, order, writ, injunction or decree of any Governmental Authority; and (c) IDI is not subject to any agreement, stipulation or settlement with any person that compromises or settles any action, investigation or proceeding.

2.15.    Consents and Permits.  As of the date hereof, IDI is not and has not conducted business in violation in any material respect of any applicable law or any order, writ, injunction or decree of any court or Governmental Authority.  IDI has all permits, certifications, licenses, approvals, orders, consents and other authorizations of any Governmental Authority necessary to conduct its business as currently conducted (collectively, the "Consents and Permits").  IDI is not in material violation of the terms of any Consent or Permit, nor is the cancellation or suspension of any Consent or Permit threatened in writing.

2.16.    Taxes.  IDI is tax-exempt under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), and is exempt from paying Massachusetts state sales tax and Massachusetts local property tax, and there are no federal, state or local investigations or audits pending with respect to the status thereof.  IDI has timely filed or caused to be filed all federal, state and local tax and information returns which are required to be filed, and has paid or has caused to be paid all taxes as shown on said returns or on any assessment received by it, to the extent that such taxes have become due.  IDI is not obligated to make any "gross-up" or similar payment to any individual on account of any tax under Section 409A of the Code.  IDI does not have nor could reasonably expected to incur prior to or in connection with the Closing, any liability or obligation with respect to tax reporting of or withholding on amounts includable in gross income as a result of Section 409A of the Code.

2.17.    Insurance.  Attached hereto as Schedule 2.17 is a list of current insurance policies maintained by IDI.  There is currently no claim pending by IDI under any insurance policies currently in effect and covering the property, business or employees of IDI and all premiums due and payable with respect to the policies maintained by IDI have been paid to date.  The insurance coverage maintained by IDI provides coverage for all assets of IDI that are of insurable character against risk of liability, casualty and fire and other losses and liabilities customarily obtained to cover comparable entities and assets in amounts, scope and coverage which are consistent with prudent industry practices.  IDI has not made any claims with its insurers other than worker's compensation claims during the 12 months prior to the date hereof.

2.18.    Accounts Receivable.  Except to the extent of the amount of the reserve for doubtful accounts reflected in the Audited Financial Statements or the Unaudited Financial Statements all Accounts Receivable reflected therein and all Accounts Receivable that have arisen since the Audited Financial Statements (except Accounts Receivable that have been collected since such date) are valid and enforceable claims, and constitute bona fide Accounts

11

APPENDIX 166

Receivable resulting from the sale of goods and services in the ordinary course of the business. The Accounts Receivable are subject to no valid defense, offsets, returns, allowances or credits of any kind, and IDI has no reason to believe that the Accounts Receivable are not reasonably collectible except as to the extent of the amount of the reserve for doubtful accounts reflected in the Unaudited Financial Statements. Except for the Accounts Receivable (i) IDI has not made any loan or advance to any person and (ii) IDI has not loaned or advanced any of the Accounts Receivable to any person. For purposes of this Agreement, "Accounts Receivable" is defined as (i) all trade accounts receivable and other rights to payment from researchers of IDI and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of services provided or rendered to researchers of IDI; (ii) all other accounts or notes receivable of IDI and the full benefit of all security for such accounts or notes; and (iii) any claim, remedy or other right related to any of the foregoing.

2.19.   Real Property.

2.19.1. Schedule 2.19.1 attached hereto sets forth all real property owned by IDI ("Owned Property") and each of the leases, subleases, and licenses (the "Leases") of real property, including all amendments and modifications thereto, to which IDI is a party, and each of the Leases is in full force and effect and is legal, valid, binding and enforceable in accordance with its terms. Prior to the date hereof, IDI has delivered to CMCC correct and complete copies of the Leases and any notices of lease and subordination, non-disturbance, and attornment agreements related thereto. There are no defaults by IDI or, to the knowledge of IDI, by any other party thereto, which might with due notice or lapse of time or both curtail the present use by IDI of any of its real property. Subject to obtaining the consent of President and Fellows of Harvard College and Blood Research Institute, Inc. with respect to lease of 200 Longwood Avenue, Boston, the Affiliation and the contemplated merger under Section 6.1.2 will not result in a breach of or default under, the termination of, or any increase of any amounts payable under, any Lease.

2.19.2. Except as set forth on Schedule 2.19.2 attached hereto, IDI has good and marketable title to, and, with respect to the Leases, a valid leasehold interest in, all of its real property free and clear of any mortgages, judgments, claims, liens, security interests, pledges, escrows, charges or encumbrances of any kind or character including encumbrances on the underlying fee to the real property leased pursuant to the Leases (collectively the "Encumbrances"). None of the Encumbrances set forth on Schedule 2.19.2 has, individually or in the aggregate, a material adverse effect on the use or value of the Owned Property or IDI's leased real property as currently operated or as contemplated under the Affiliation and the contemplated merger under Section 6.1.2. Prior to the date hereof, IDI has provided to CMCC a list setting forth the addresses and uses of all real property that IDI owns, leases or subleases, and any liens or Encumbrances on any such owned real property or leasehold interest, specifying in the case of each such lease or sublease, the name of the lessor or sublessor, as the case may be. There are commercially reasonable non-disturbance or recognition agreements for the benefit of IDI from IDI's landlords' lenders or ground lessors with respect to IDI's Leases. There are no pending or, to IDI's knowledge, threatened condemnation proceedings or administrative actions that may adversely affect the business or operations of IDI, the premises leased under the Leases

12

APPENDIX 167

or the buildings in which such premises are located.

2.19.3. To IDI's knowledge, the improvements at the Owned Property and the premises leased pursuant to the Leases are structurally sound, in good condition, free of any material damage or waste and served by all utilities necessary and desirable for the conduct of IDI's business as currently conducted. The equipment and personal property located at the Owned Property and the premises leased pursuant to the Leases and used in connection with the conduct of IDI's business are in good condition and repair (subject to normal wear and tear), and are suitable, adequate and sufficient for the current operation of IDI's business.

2.19.4. The Owned Property has a valid and enforceable right to vehicular access to a public road. No building located at the Owned Property or any appurtenance thereto or equipment thereon, or any improvements planned therefor, or the use or operation thereof, violates in any material respect any restrictive covenant of record (or other private agreement, whether or not recorded) applicable to the Owned Property, and no such building, equipment, or planned improvements encroach upon the easement or real property of another Person, which encroachment is necessary for the business of IDI or could reasonably be expected to have a material adverse effect on such business or the value of such building, equipment, or planned improvements. No Person has any possessory interest in or right to occupy (whether by written or oral agreement or otherwise) any of the Owned Property or IDI's leased real property except IDI.

2.20. Compliance with Laws Relating to Real Property. There is no material violation of any law, regulation or ordinance (including, without limitation, laws, regulations or ordinances relating to zoning, environmental, city planning or similar matters) relating to any real property owned, leased or subleased by IDI.

2.21. Environmental Laws and Regulations. (i) Hazardous Materials (as hereinafter defined) have not been generated, used, treated or stored on, transported to or from or disposed of on, at, under or from any Property (as hereinafter defined) in a manner that could give rise to liability for IDI under Environmental Laws (as hereinafter defined); (ii) there has been no release of Hazardous Materials in any amount or concentration that would require remediation or reporting under Environmental Laws on, at or from any Property for which release IDI may be liable under Environmental Laws; (iii) IDI has been in compliance with all applicable Environmental Laws and the requirements of any permits issued under such Environmental Laws, except where failure to obtain such permits would not be expected to have, individually or in the aggregate, a material adverse effect; (iv) there are no underground storage tanks currently used by IDI, or to IDI's knowledge, other underground storage tanks, polychlorinated biphenyl-containing equipment or asbestos containing materials at any of the Owned Property or IDI's leased real property which could give rise to liability under Environmental Laws; (v) there are no past, pending or, to the knowledge of IDI, threatened environmental claims against IDI; (vi) except as provided in the Leases, IDI has not, either expressly or by operation of law, assumed responsibility for or agreed to indemnify or hold harmless any Person for any liability or obligation, arising under or relating to Environmental Laws, including, but not limited to, any obligation for investigation, corrective or remedial action; (vii) there are no facts or circumstances, conditions or occurrences regarding the current or former business, assets or

13

APPENDIX 168

operations of IDI, or their predecessors, that reasonably could be anticipated to form the basis of an environmental claim against IDI; and (viii) IDI has made available to CMCC complete and accurate copies of all environmental assessments, investigations, reports, studies, audits, tests, reviews and other analyses in the possession of IDI relating to all Property currently owned, leased or operated in connection with the business of IDI. For purposes of this Section 2.2.1, (i) "Environmental Law" means any federal, state, foreign or local statute, law, rule, regulation, ordinance, code or rule of common law and any judicial or administrative interpretation thereof binding on IDI or its operations or property as of the date of this Agreement and Closing Date, including any judicial or administrative order, consent decree or judgment, relating to the environment, Hazardous Materials, or the protection of human health; (ii) "Hazardous Materials" means any petroleum or petroleum products, radioactive materials, asbestos in any form, polychlorinated biphenyls and radon gas, and any chemicals, materials or substances regulated under any applicable Environmental Law; and (iii) "Property" means any real property, plant, equipment, building or facility and improvements (including leasehold improvements), now or heretofore, owned, leased or operated by IDI.

3. REPRESENTATIONS AND WARRANTIES OF CMCC.

Except as set forth in the corresponding section and subsection of CMCC's disclosure schedule attached hereto as Schedule 3 (with such disclosures to qualify any other section and subsection for which the appropriateness of the disclosure is reasonably apparent on its face), CMCC represents and warrants to IDI as follows:

3.1.    Organization. CMCC is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts. CMCC has all requisite power and authority and has taken all necessary action required for the due authorization, execution, delivery and performance by CMCC of this Agreement, and the entry into and consummation of the Affiliation.

3.2.    Authorization; Validity; Company Action. The execution and delivery of this Agreement, the entry into and consummation of the Affiliation and the consummation of the transactions contemplated hereby have been duly and validly authorized by all requisite corporate action, including without limitation the approval of the CMCC Board of Trustees, and no other corporate proceedings on the part of CMCC are necessary to authorize this Agreement or the Affiliation or to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by CMCC, and, assuming due authorization, execution and delivery by IDI, constitutes a valid and binding agreement of CMCC enforceable against CMCC in accordance with its terms, except as may be limited by (i) bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or (ii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

3.3.    Taxes. CMCC is tax-exempt under Section 501(c)(3) of the Code, and there are no federal, state or local investigations or audits pending with respect to the status of CMCC. CMCC has timely filed or caused to be filed all federal, state and local tax and information returns which are required to be filed, and has paid or has caused to be paid all taxes as shown on

14

APPENDIX 169

said returns or on any assessment received by it, to the extent that such taxes have become due, except any such taxes that are immaterial in amount and reserved against or any such taxes, levies, assessments, deficiencies or claims which are being contested in good faith by appropriate proceedings.

3.4.    Consent and Approval; No Conflicts.  Except as set forth on Schedule 3.4 attached hereto, the execution of this Agreement, the entry into and consummation of the Affiliation, the contemplated merger under Section 6.1.2 and the compliance of CMCC with the provisions of this Agreement do not (i) violate or result in any breach of any provision of the articles of organization of CMCC (the "CMCC Articles of Organization") or the bylaws of CMCC (the "CMCC Bylaws"); (ii) require any consent, approval, waiver, filing with or notification to any Governmental Authority; (iii) result in a violation or breach of or default (or give rise to any right of termination, cancellation or acceleration) under, or require any consent, approval, waiver, filing with or notification under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, grant, agreement, lease or other instrument or obligation to which CMCC is a party; or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to CMCC.

3.5    Financial Statements.  Prior to the date hereof, CMCC has furnished to IDI or its representatives (i) the audited consolidated balance sheet of CMCC as of September 30, 2007 and (ii) the related audited consolidated statements of operations and changes in net assets and cash flows for the year then ended (collectively the "Audited Financial Statements") and (iii) comparable unaudited statements as of August 31, 2008 and for the eleven months then ended (collectively the "Unaudited Financial Statements").  The Audited Financial Statements and the Unaudited Financial Statements have been prepared in accordance with generally accepted accounting principles applied on a consistent basis during the relevant periods (except as may otherwise be noted therein), and present fairly, in all material respects, the financial position, results of operations and the cash flows (as appropriate) of CMCC as of the dates, and for the periods, indicated thereon, except for the absence of footnotes and as otherwise noted therein, and subject, in the case of the Unaudited Financial Statements, to normal recurring year-end adjustments which are not material individually or in the aggregate.  There are no material liabilities or obligations (absolute, accrued, contingent or otherwise) of a type that generally accepted accounting principles would require to be on the Audited Financial Statements or the Unaudited Financial Statements which are not fully reflected or reserved against in such statements, except for liabilities and obligations that may have arisen in the ordinary course of business and consistent with past practice since August 31, 2008.  CMCC has maintained its books and records in accordance with generally accepted accounting principles and practices applied on a consistent basis, and such books and records are, and during the periods covered by the Audited Financial Statements and Unaudited Financial Statements were, true, correct and complete in all material respects.

3.6.    Litigation.  There are no Actions pending or, to the knowledge of CMCC, threatened against CMCC which involve any of the transactions contemplated herein or which, if adversely determined against CMCC, would result in any materially adverse change in the business, operations, prospects, properties or assets or in the condition (financial or otherwise) of CMCC or its subsidiaries.  Additionally, CMCC is not in default with respect to any judgment,

15

APPENDIX 170

writ, injunction, decree, rule or regulation of any court or federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which would have a materially adverse effect on the condition (financial or otherwise) of CMCC.

4. PRE-CLOSING COVENANTS.

    4.1.    Between the date hereof and the Closing, IDI shall:

    (a)    conduct its business in the ordinary course consistent with past practice, maintain its corporate existence, preserve intact its organizational structure and use commercially reasonable efforts to (i) keep available the services of its officers and employees, and (ii) maintain its existing relationships and goodwill with researchers, donors, governmental and quasi-governmental agencies with which it is affiliated or does business, or any lenders;

    (b)    amend the Bylaws and Articles of Organization in a manner consistent with this Agreement as of the Effective Time;

    (c)    notify CMCC of any material change in its financial position reflected on its Unaudited Financial Statements;

    (d)    notify CMCC of receipt of any notice from any regulatory authority, including without limitation any state or federal medical oversight body, of any pending or threatened disciplinary action, change of status or any other such notice that would have a material adverse effect on the operations or finances of IDI;

    (e)    notify CMCC immediately of any notice, whether written or oral, from the IRS regarding a change or potential change in its tax status;

    (f)    use its commercially reasonable efforts to (i) obtain all Consents and Permits from any Governmental Authority; (ii) obtain all consents from and/or provide notifications to all third parties required hereunder, including those set forth on Exhibit 5.1.8 hereto, necessary to consummate the Affiliation; and (iii) provide written notice of the Affiliation to the Massachusetts Attorney General in the form attached hereto as Exhibit 4.1 (the "Attorney General Notice");

    (g)    not enter or agree to enter into any membership arrangement with any Person; (ii) terminate any employee or officer of IDI or any of its subsidiaries except in the ordinary course of business consistent with past practice; (iii) sell, transfer or otherwise dispose of any assets with a value in excess of $100,000, individually or in the aggregate; (iv) purchase or otherwise acquire real estate or businesses; or (v) make or commit to make any capital expenditures individually or in the aggregate in excess of $100,000, other than in accordance with its fiscal year 2009 budget or pursuant to an existing HEFA lease facility;

    (h)    except as required by applicable law, not take any action that would prevent the

16

APPENDIX 171

Affiliation or that would prevent a Governmental Authority from granting all necessary Consents and Permits;

(i)    except as required by applicable law or pursuant to contractual obligation in effect as of the date hereof, not (i) execute, establish, adopt or amend, or accelerate rights or benefits under any agreement relating to severance or change in control, any employment or consulting agreement with current or former employees, independent contractors, other service providers, officers or members of either the IDI Board of Trustees or the IDI Board of Overseers; (ii) increase the compensation payable or to become payable to any of its officers, employees, independent contractors or other service providers; (iii) grant or increase any severance or termination pay to any officer, employee, independent contractor or other service provider of IDI; or (iv) amend any existing Plan or adopt any new Plan.

(j)    not change its accountants, fiscal year or accounting policies, practices or methods except as required by generally accepted accounting principles;

(k)    not enter into any agreement with any other Person outside of the ordinary course of business consistent with past practices;

(l)    not waive any of its rights under, or release any other Person from such other Person's obligation under, or amend or terminate any Material Agreement; and

(m)    not enter into any commitments or agreements to do any of the actions contemplated by sections (f)-(l) of this paragraph.

4.2.    Between the date hereof and the Closing, CMCC shall:

(a)    notify IDI of any material change in its financial position reflected on its Unaudited Financial Statements;

(b)    notify IDI of receipt of any notice from any regulatory authority, including without limitation any state or federal medical oversight body, of any pending or threatened disciplinary action, change of status or any other such notice that would have a material adverse effect on the operations or finances of CMCC;

(c)    notify IDI immediately of any notice, whether written or oral, from the IRS regarding a change or potential change in its tax status; and

(d)    direct its representatives and advisors to take all actions necessary to consummate the Affiliation.

4.3.    Prior to and from and after the Closing, IDI shall afford to CMCC and its employees, counsel, accountants and other authorized representatives full access, during normal business hours, upon reasonable advance notice, with due regard to IDI's ongoing operations, to all of the books, records, personnel files, accounts and properties of or relating to (including,

17

11315168_28.DOC

APPENDIX 172

without limitation, all work papers of IDI's accountants) IDI and to all officers, employees, independent contractors, and other service providers of IDI, for any reasonable purpose whatsoever.

4.4.    Prior to the Closing, CMCC shall afford to IDI and its employees, counsel, accountants and other authorized representatives full access, during normal business hours, upon reasonable advance notice, with due regard to CMCC's ongoing operations, to all of the books, records, accounts and properties of or relating to (including, without limitation, all work papers of CMCC's accountants) CMCC, for any reasonable purpose related to its due diligence review of CMCC in connection with the Affiliation.

4.5.    Exhibit 4.5 attached hereto sets forth a list of all employees, consultants and independent contractors of IDI who work on a full-time or part-time basis, as well as all other service providers of IDI who work for IDI on a full-time basis, and their respective job titles, benefits and severance arrangements in effect as of the Closing.  IDI shall provide to CMCC a list setting forth the compensation amounts of all individuals listed on Exhibit 4.5.

4.6.    Between the date hereof and the Closing Date, IDI shall maintain in full force and effect its corporate existence, rights, governmental approvals, Consents and Permits, insurance policies, and all licenses and other rights and shall not enter into any employment, consulting, severance or other benefits arrangement or agreement (except such arrangements or agreements as IDI would enter into in the ordinary course of business), and shall operate the business in a manner consistent with past practice.

4.7.    Subject to terms and conditions set forth in this Agreement, IDI and CMCC shall cooperate with each other and use their respective commercially reasonable efforts to take or cause to be taken all actions reasonably necessary or advisable to consummate the Affiliation as soon as practicable, including obtaining all necessary consents, approvals and nonobjections from third parties and Governmental Authorities.

4.8.    From the date of this Agreement until the Effective Time or, if earlier, the termination of this Agreement in accordance with its terms, IDI shall not, and IDI shall cause each officer, trustee, employee, independent contractor, other service provider, agent or representative (collectively, "Representatives") of IDI not to, directly or indirectly, (i) solicit, initiate or knowingly encourage or facilitate (including by way of furnishing non-public information) any inquiries relating to, or the making or submission of, or any inquiry, offer, proposal or indication of interest that constitutes, or would reasonably be expected to lead to, an affiliation, merger or other similar strategic relationship with IDI (an "Affiliation Proposal"), (ii) participate or engage in any discussions or negotiations with, or disclose or provide any non-public information or data relating to IDI or afford access to the properties, assets, books or records or employees of IDI to any Person other than CMCC (any such Person and its Representatives a third party) relating to an Affiliation Proposal, (iii) accept, approve, endorse or recommend an Affiliation Proposal, or (iv) enter into any agreement, arrangement, contract or commitment (including any agreement in principle or letter of intent or understanding) with respect to or contemplating an Affiliation Proposal or enter into any agreement, arrangement, contract or commitment requiring IDI to abandon, terminate or fail to consummate the proposed

18

APPENDIX 173

Affiliation. From the date of this Agreement until the Effective Time or, if earlier, the termination of this Agreement in accordance with its terms, IDI shall promptly (and in any event within 48 hours) notify CMCC of (i) any Affiliation Proposal that IDI receives or of any request for information or inquiry that IDI receives which relates to or reasonably could lead to an Affiliation Proposal, which notification shall include, (ii) the material terms and conditions of such Affiliation Proposal, request or inquiry and (iii) the identity of the Person making such Affiliation Proposal, request or inquiry.

5.      OBLIGATIONS TO CONSUMMATE THE AFFILIATION.

5.1.    The obligation of CMCC to consummate the Affiliation shall be subject to the fulfillment on or prior to the Closing Date of the following conditions, any or all of which may be waived by CMCC, in whole or in part, to the extent permitted by Applicable Law:

5.1.1.  IDI shall have performed in all material respects each of the covenants, obligations and agreements contained in this Agreement required to be performed by it prior to or at the Closing;

5.1.2.  The representations and warranties made by IDI in this Agreement shall be true, complete and accurate in all material respects on and as of the Closing Date as though made on and as of the Closing Date;

5.1.3.  Between the date hereof and the Closing Date, neither IDI nor the business, properties, assets, or condition (financial or otherwise) of IDI has been materially adversely affected whether by fire, casualty, act of God or otherwise, and there shall have been no other changes in the business, properties, assets, condition (financial or otherwise), management or prospects of IDI that would have individually or in the aggregate a material adverse effect on the business, condition or results of operations of IDI, provided that neither of the following shall be taken into account in determining the occurrence of such material adverse effect: (i) a reduction in IDI's National Institutes of Health grant funding consistent with general trends in such funding and (ii) a decline in the market value of IDI's investment portfolio. Notwithstanding the foregoing, IDI agrees that it shall not materially change its portfolio investments between the date hereof and the Closing Date without the prior written consent of CMCC;

5.1.4.  CMCC shall have received a certificate of IDI, dated the Closing Date, signed by the Chief Executive Officer of IDI that the conditions specified in the aforementioned paragraphs shall have been fulfilled;

5.1.5.  CMCC shall have received from Edwards Angell Palmer & Dodge, LLP, counsel to IDI, an opinion, as set forth in Exhibit 5.1.5.

5.1.6.  IDI shall amend its Articles of Organization and Bylaws to read as set forth in Exhibits 1.3(a) and 1.3(b) attached hereto, to among other things (a) name CMCC as its sole member; (b) provide that the Historical Trustees (defined below) shall have the authority to elect three (3) trustees to the IDI Board of Trustees in accordance with Section 5.1.7 herein,

19

11315168_28.DOC

APPENDIX 174

provided that CMCC shall have the authority to object to any such trustee in CMCC's reasonable discretion; (c) provide that CMCC will have the sole authority to appoint all of the trustees on the IDI Board of Trustees (other than the Historical Trustees and the GSK Trustee), and the sole authority to remove any trustees (other than the Historical Trustees and the GSK Trustee) with or without assignment of cause; (d) provide that any Historical Trustee or the GSK Trustee may be removed (i) for cause by agreement of two-thirds of the total number of trustees and (ii) without assignment of cause by agreement of two-thirds of the total number of trustees (provided that in the case of (ii), with respect to the removal of a Historical Trustee, such number shall include a majority of the Historical Trustees eligible to vote); and (e) provide that CMCC shall have the sole authority to amend the Amended and Restated Bylaws or Amended and Restated Articles of Organization, subject to the consent rights of the Historical Trustees as set forth Section 9 of Exhibit 1.3(b). For purposes of this Agreement, the GSK Trustee means the trustee that the parties anticipate will be appointed by GlaxoSmithKline Research & Development Limited ("GSK") to the IDI Board of Trustees pursuant to Section 11 of the Research Collaboration Agreement by and between IDI and GSK, dated May 14, 2008 (the "GSK Agreement").

5.1.7. CMCC and IDI shall have agreed in writing upon the number of trustees to be appointed to the IDI Board of Trustees effective as of the Effective Time, including the number of trustees to be selected by IDI (the "Historical Trustees"), in accordance with Section 5.1.6 herein. Notwithstanding anything in this Agreement to the contrary, no individual shall serve as a Historical Trustee unless and until CMCC shall have determined, in its sole discretion, that each such individual is independent of CMCC for control purposes.

5.1.8. Each of the consents set forth on Exhibit 5.1.8 of this Agreement, in form and substance reasonably satisfactory to CMCC, shall have been obtained;

5.1.9. Neither IDI nor CMCC shall have received any notification from the Attorney General objecting to the Affiliation on any grounds in response to the Attorney General Notice;

5.1.10. No Legal Proceeding or order of any Governmental Authority shall be pending or threatened (i) challenging this Agreement or the transactions contemplated hereby or (ii) seeking to delay, restrain or prohibit the Affiliation or any other action contemplated by this Agreement; and

5.1.11. IDI shall have provided written confirmation of oral notice of the Affiliation to the National Institutes of Health ("NIH") and no notice of objection to said Affiliation shall have been received by IDI or CMCC, provided that an indication that IDI's indirect cost recovery rate may be adjusted as a result of the Affiliation shall not constitute such objection, provided that IDI's indirect cost recovery rate remains at or above eighty-nine percent (89%).

5.2. The obligation of IDI to consummate the Affiliation shall be subject to the fulfillment on or prior to the Closing Date of the following conditions, any or all of which may be waived by IDI, in whole or in part to the extent permitted by applicable law:

20

11315168_28.DOC

5.2.1.  CMCC shall have performed in all material respects each of the covenants, obligations and agreements contained in this Agreement required to be performed by it prior to or at the Closing;

5.2.2.  The representations and warranties made by CMCC in this Agreement shall be true, complete and accurate in all material respects on and as of the Closing Date as though made on and as of the Closing Date;

5.2.3.  Between the date hereof and the Closing Date, neither CMCC nor any of its the business, properties, assets, or condition (financial or otherwise) of either have been materially adversely affected whether by fire, casualty, act of God or otherwise, and there shall have been no other changes in the business, properties, assets condition (financial or otherwise) or management of CMCC or that would have individually or in the aggregate a material adverse effect on the business, condition or results of operations of CMCC;

5.2.4.  IDI shall have received a certificate of CMCC, dated the Closing Date, signed by the Chief Executive Officer or Chief Financial Officer of CMCC that the conditions specified in the aforementioned paragraphs shall have been fulfilled;

5.2.5.  IDI shall have received from Ropes & Gray, LLP, counsel to CMCC, an opinion, as set forth in Exhibit 5.2.5.

5.2.6.  Each of the consents set forth on Exhibit 5.1.8 of this Agreement, in form and substance reasonably satisfactory to IDI, shall have been obtained;

5.2.7.  Neither IDI nor CMCC shall have received any notification from the Attorney General objecting to the Affiliation on any grounds in response to the Attorney General Notice;

5.2.8.  No Legal Proceeding or order of any Governmental Authority shall be pending or threatened (i) challenging this Agreement or the transactions contemplated hereby or (ii) seeking to delay, restrain or prohibit the Affiliation or any other action contemplated by this Agreement; and

5.2.9.  IDI shall have provided written confirmation of oral notice of the Affiliation to the National Institutes of Health ("NIH") and no notice of objection to said Affiliation shall have been received by IDI or CMCC, provided that an indication that IDI's indirect cost recovery rate may be adjusted as a result of the Affiliation shall not constitute such objection, provided that IDI's indirect cost recovery rate remains at or above eighty-nine percent (89%).

6. POST-CLOSING COVENANTS.

6.1.    Corporate Governance Matters.

6.1.1.  Until the merger of IDI into CMCC or a controlled affiliate of CMCC pursuant to Section 6.1.2 below, the Historical Trustees and the GSK Trustee will continue to

21

11315168_28.DOC

APPENDIX 176

serve on the IDI Board of Trustees for terms set forth in the Amended and Restated Bylaws. Any vacancy on the IDI Board of Trustees resulting from the resignation or removal of (i) a Historical Trustee shall be filled by a majority of the Historical Trustees then in office and (ii) the GSK Trustee shall be filled by the GSK Trustee then in office; provided, however, that CMCC shall have the authority to object to any trustee appointed by the Historical Trustees in CMCC's reasonable discretion.

6.1.2.  Anytime on or after October 1, 2012 (or earlier with the mutual agreement of a majority of the Historical Trustees), CMCC shall have the right to merge IDI into CMCC or a controlled affiliate of CMCC and the faculty members of IDI will become employees of the successor to IDI or such CMCC affiliate as customarily employs faculty of the same specialty. Upon any such merger, such faculty members will be entitled to participate in such salary, benefit and compensation programs as are customarily available to CMCC-employed faculty, subject to the requirements of applicable law.

6.1.3.  In the event of a merger pursuant to Section 6.1.2 herein, until the fifth (5th) anniversary of the Effective Time, the Historical Trustees, acting unanimously, shall continue to have the authority to enforce the terms of the Affiliation for the benefit of the IDI Program (defined below). Without limiting the foregoing, the Historical Trustees, acting unanimously, shall have the authority to retain separate legal counsel, at IDI's sole cost and expense, if such trustees reasonably determine that the hiring of such counsel is necessary to enforce the provisions of this Section 6 to the extent such terms are for the express benefit of the IDI Program (defined below).

6.2.   Program Matters.

6.2.1.  As soon as reasonably practical after the Effective Time, CMCC will cause IDI to be recognized as a CMCC multidisciplinary research program (the "IDI Program") with status equivalent to CMCC's existing multidisciplinary research programs in Vascular Biology, Genomics, Bio-Informatics, Stem Cell Biology, and Neuroscience (the "CMCC Existing Programs"). The IDI Program will be named the "Program in Cellular and Molecular Medicine" or such other name as the IDI Board of Trustees may determine from time to time with the approval of a majority of the Historical Trustees, such approval not to be unreasonably withheld or delayed.

6.2.2.  Until the fifth (5th) anniversary of the Effective Time, the IDI Program shall be entitled to all of the rights, and be subject to all of the obligations, that CMCC provides and / or requires of the CMCC Existing Programs, including, without limitation, CMCC's guarantee of CMCC program status for the IDI Program. For the avoidance of doubt, CMCC commitments with respect to CMCC's support of the IDI Program for the five (5) year period beginning at the Effective Time shall continue for such 5-year period in the event IDI is merged into a CMCC affiliate as set forth in Section 6.1.2.

22

APPENDIX 177

6.3.     Personnel / Recruitment Matters.

6.3.1. Dr. Fred Alt will be the Executive Director of the IDI Program (the "IDI Director") until the fifth (5th) anniversary of the Effective Time. If for any reason Dr. Alt should cease to be the IDI Director during the five (5) year period following the Effective Time, a majority of trustees on IDI's Board of Trustees shall appoint a successor to Dr. Alt; provided, that such successor has been approved by a majority of the Historical Trustees, such approval not to be unreasonably withheld or delayed.

6.3.2    Until the fifth (5th) anniversary of the Effective Time, the IDI Director shall report directly to the Chief Executive Officer and the Chief Operating Officer of CMCC. The salary of the IDI Director shall be set and approved jointly by the Chief of the applicable CMCC Department and the Chief Executive Officer of CMCC.

6.3.3.  Until the fifth (5th) anniversary of the Effective Time, the IDI Director shall serve as a member of CMCC's Research Strategy Group ("RSG") and Research, Recruitment, and Resource Committee ("RRRC"), or any such successor committees.

6.3.4.  As soon as reasonably practical after the Effective Time, each faculty member of IDI, a list of whom is set forth on Exhibit 6.3.4, shall become a faculty member of an appropriate department at Children's Hospital Boston. Salaries for such faculty members shall comply with Harvard Medical School Compensation Guidelines and shall be subject to the approval of the Chief of the applicable department at Children's Hospital Boston, in consultation with the IDI Director.

6.3.5.  Until the fifth (5th) anniversary of the Effective Time, the IDI Program shall be entitled to recruit faculty, post doctorates and other personnel in the same fashion as the CMCC Existing Programs. To the extent that any recruitment by the IDI Program requires resources of CMCC, or to the extent that the IDI Program desires to receive resources from CMCC to achieve a recruitment, such recruitment shall be subject to the processes and approvals required of any Program seeking CMCC support (currently, the approval of RRRC and the CMCC Chief Executive Officer ("CEO")). It is the intent of the Parties initially to recruit three (3) additional faculty after the Effective Time and subject to approval by RRRC and the CEO. CMCC will reimburse IDI for fifty percent (50%) of the salary, benefits and customary start up expenses associated with said additional personnel for up to three (3) years for each such individual.

6.3.6.  Until the first (1st) anniversary of the Effective Time, Theodore M. Cronin will be retained as IDI's Chief Executive Officer and Chief Financial Officer, unless he resigns from employment or is otherwise terminated earlier for cause. Until the earlier of (i) the fifth (5th) anniversary of the Effective Time and (ii) merger of IDI into CMCC or a controlled affiliate of CMCC pursuant to Section 6.1.2 above, any successor to Mr. Cronin must be approved by a majority of the Historical Trustees, such approval not to be unreasonably withheld or delayed.

23

11315168_28.DOC

6.3.7.  Until the second (2nd) anniversary of the Closing Date, CMCC will use reasonable efforts to offer comparable employment with a CMCC affiliate to any full-time administrative employee of IDI as of the Closing Date, a list of whom as of December 1, 2008 is set forth on Exhibit 6.3.7, whose employment is terminated after the Closing Date without assignment of cause.  Notwithstanding anything in this Agreement to the contrary, under no circumstances shall any party, including IDI and / or a current or former employee of IDI, have any right or other cause of action to enforce the foregoing obligation against CMCC.

6.4.    Financial Matters.

6.4.1.  In order to provide IDI with the benefit of CMCC's investment management expertise and to effectuate any additional provisions related to the obligations contemplated by Section 6.4.2 herein, the Parties shall as soon as practicable after the Effective Time execute an agreement to transfer management of IDI's endowment (the "IDI Endowment") to CMCC (the "Endowment Investment Agreement") substantially in the form of Exhibit 6.4.1 hereto.  As provided in the Endowment Investment Agreement, CMCC shall allocate $20 million of its existing endowment, which shall remain under the designation and control of CMCC, to be invested along side the IDI Endowment (together the "Combined Funds").

6.4.2.  In the event that, prior to the merger of the IDI Program into a CMCC affiliate as contemplated by Section 6.1.2 herein, CMCC suffers any individual or series of losses, liabilities, obligations, damages, diminution in value, notices, actions, suits, proceedings, claims, demands, assessments, judgments, costs, penalties or expenses (including reasonable attorneys' and other professionals' fees and disbursements) having an adverse financial impact equal to or greater than One Million Dollars ($1,000,000) in the aggregate (individually a "Loss" and, collectively, "Losses") based upon or arising from any breach of any representation, warranty or other obligation made by IDI in this Agreement, CMCC shall provide written notice of such Loss(es) to the Historical Trustees (provided that failure to so notify shall not deprive CMCC of its rights under this Section; and provided further that the $1,000,000 aggregate loss amount shall not apply in the case of Loss(es) arising on the account of IDI's fraud). Notwithstanding anything in this Agreement to the contrary, in the event of any such Loss(es), CMCC shall have the right to access and utilize funds from the IDI Endowment to reimburse CMCC in the amount of such Loss(es), and to the extent the funds available in the IDI Endowment are not available to cover such Loss(s), CMCC may also decrease the amount of financial support that CMCC is obligated to provide to the IDI Program under this Agreement, including, without limitation, the Support Payments (as hereinafter defined) in accordance with Section 6.4.3 herein.  In addition, without limiting the foregoing, and without in any way limiting CMCC's rights under this Agreement generally, CMCC expressly reserves the right to make operational and/or programmatic changes to the IDI Program to the extent the event giving rise to the Loss(es) is recurring or causes ongoing losses to the IDI Program.

6.4.3.  Each of IDI and CMCC agrees that the IDI Program will be subject to the spending rules and oversight of funds established by CMCC, as the same may be amended from time to time.  IDI covenants and agrees that IDI shall use commercially reasonable efforts to manage its financial resources such that IDI's Operating Loss shall not exceed more than

24

APPENDIX 179

$1,000,000 in any fiscal year. For purposes of this Section 6.4.3, "Operating Loss" is defined as (i) IDI's operating revenue, (ii) less IDI's operating expenses, (iii) plus five percent (5%) of the Combined Funds. Until the fifth (5th) anniversary of the Effective Time, CMCC agrees to support any such operating loss up to $1,000,000 in any fiscal year (the "Support Payments"). CMCC agrees that it will not fund any Support Payments from the Combined Funds.

6.4.4. Until the fifth (5th) anniversary of the Effective Time, CMCC will actively engage in fundraising on behalf of and in cooperation with the IDI Program in substantially the same fashion as CMCC does for the CMCC Existing Programs, and CMCC will commit substantially similar resources to the IDI Program in support of this effort. Such fundraising will be conducted so as not to infringe upon existing relationships established by CMCC departments, divisions or programs or use their names without consent of their chair, chief or program director.

6.4.5. Until the fifth (5th) anniversary of the Effective Time, the IDI Program will occupy the space at the Alpert Building and in the Center for Life Science Boston Building. CMCC also agrees that during this period, CMCC will use reasonable efforts to ensure that any adjustments to the IDI Program space will not result in the IDI Program having space in more than two locations.

6.4.6. As soon as reasonably practical after the Effective Time, CMCC and the IDI Program will jointly explore opportunities that will allow the IDI Program to achieve administrative efficiencies and / or benefits; provided that no such efficiencies will be undertaken until the first (1st) anniversary of the Effective Time unless otherwise agreed to by the Chief Executive Officer of IDI or a majority of the Historical Trustees.

6.5. Intellectual Property Matters. All IDI Intellectual Property Rights not previously licensed as of the Effective Time shall at the Effective Time be subject to the policies and procedures established by CMCC with respect to intellectual property of CMCC and/or its affiliates, as the same may be amended from time to time; provided, however, that this section shall not apply to any IDI Intellectual Property Rights subject to the GSK Agreement.

6.6. Trustee and Officer Indemnification and Insurance.

6.6.1. IDI shall indemnify and advance expenses to individuals who were trustees and officers of IDI prior to the Effective Time at least to the extent provided in the Articles of Organization and the Bylaws on the date hereof, regardless of any amendment, repeal or other modification of the Articles of Organization and the Bylaws.

6.6.2. Prior to the Effective Time or as soon as practicable thereafter, IDI shall obtain and fully pay for "tail" insurance policies with a claims period of at least six years from and after the Effective Time from IDI's current director and officer liability insurance ("D&O Insurance") carrier or another carrier with the same or better credit rating, for the persons who, as of the date hereof, are covered by IDI's existing D&O Insurance with terms at least as favorable as IDI's existing D&O Insurance with respect to matters existing or occurring at or prior to the

25

APPENDIX 180

Effective Time (including in connection with this Agreement and the Affiliation), and IDI shall maintain such D&O Insurance in full force and effect for the full term.

6.6.3.   From the Effective Time and until such time as IDI may merge into CMCC or a controlled affiliate of CMCC pursuant to Section 6.1.2, IDI will provide to the trustees and officers of IDI the same indemnification and advance of expenditures rights and CMCC will arrange for IDI to have D&O Insurance coverage consistent with the coverage CMCC provides for its own trustees and officers. CMCC will arrange for IDI to have D&O Insurance coverage consistent with the coverage extended to CMCC and its affiliates provided that IDI recognizes and agrees that such coverage will not be in effect as of the Closing Date if the Closing occurs prior to April 1, 2009; provided further that CMCC reasonably anticipates that the coverage will be made retroactive to the Effective Date.

7.   PUBLIC DISCLOSURE. Each of CMCC and IDI agrees that it shall not make any public announcement or issue any press release in connection with the transactions contemplated hereby, except (i) as provided in this paragraph, (ii) in accordance with the terms of the Confidentiality Agreement (as defined below), and (iii) pursuant to a mutual agreement of the parties hereto; provided, however, that nothing contained herein shall prevent any Party, at any time, from furnishing any information required by any Governmental Authority or from issuing any announcement, press release, public statement or other information to the press or any third party with respect to this Agreement if required by applicable law; provided, further, that to the extent reasonably practical, the Parties agree to consult with each other as to the content of any such disclosure so required and consider in good faith the comments of the other thereon. The Parties will jointly agree upon and approve any press release to be issued by CMCC on or after the date hereof in connection with this Agreement.

8.   TERMINATION.

8.1.   This Agreement may be terminated on or prior to the Closing (a) by the mutual written consent of IDI and CMCC or (b) by either IDI or CMCC if the Closing shall not have occurred on or before six (6) months from the date hereof, unless the terminating party has failed to perform or observe any agreement or condition set forth herein that is required to be observed by such party on or before the Closing.

8.2.   In the event that IDI willfully breaches this Agreement, IDI shall reimburse CMCC for all expenses incurred in connection with the Affiliation, including without limitation attorneys fees, accountants fees, filing fees and any other reasonable fees that CMCC determines directly relate to the Agreement or the Affiliation

8.3.   In the event that CMCC willfully breach this Agreement, CMCC shall reimburse IDI for all expenses incurred in connection with the Affiliation, including without limitation attorneys fees, accountants fees, filing fees and any other reasonable fees that IDI determines directly relate to the Agreement or the Affiliation.

11315168_28.DOC

APPENDIX 181

9. MISCELLANEOUS.

9.1. All notices, requests, consents, reports and demands shall be in writing and shall be hand delivered, sent by facsimile or other electronic medium, or mailed, postage prepaid, to IDI or to CMCC at the address set forth below or to such other address as may be furnished in writing to the other parties hereto:

To IDI:

Theodore M. Cronin
Acting President and Chief Financial Officer
Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

With a copy to:

David R. Pokross, Jr.
Edwards Angell Palmer & Dodge, LLP
111 Huntington Ave.
Boston, MA 02199

To CMCC:

James Mandell, M.D.
Chief Executive Officer
The Children's Medical Center Corporation
300 Longwood Ave.
Boston, MA 02115

With copies to:

Stuart J. Novick
Senior Vice President & General Counsel
Children's Hospital Boston
300 Longwood Avenue
Boston, MA 02115

Michele Garvin
Ropes & Gray, LLP
One International Place
Boston, MA 02110

9.2. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either

27

11315168_28.DOC

APPENDIX 182

Party, including by operation of law without the prior written consent of the other Party. Except for the rights of (i) IDI trustees and officers to indemnification and insurance protection under Section 6.6 and (ii) the Historical Trustees to enforce this Agreement under Section 6.1.3, this Agreement is not intended to confer upon any Person other than the Parties any rights or remedies hereunder.

9.3.     This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies, and IDI and CMCC hereby agree to irrevocably and unconditionally submit to the exclusive jurisdiction of any state or federal court sitting in Suffolk County, Massachusetts over any suit, action or proceeding arising out of or relating to this Agreement.

9.4.     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.5.     This Agreement may be executed in counterparts, including by facsimile, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The Parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any applicable law, regulation, holding or rule of construction providing that ambiguities in an agreement, document or provision will be construed against the party drafting such agreement, document or provision.

9.6.     Definitions in this Agreement shall apply equally to both the singular and plural forms of the terms defined. All Exhibits attached hereto shall be deemed incorporated herein as if set forth in full herein and, unless otherwise defined therein, all terms used in any Exhibit shall have the meanings ascribed to such terms in this Agreement. The words "hereof," "hereinafter," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Unless otherwise expressly provided herein, any statute referred to herein means such statute as may from time to time be amended, modified or supplemented.

9.7.     If for any reason any term or provision of this Agreement is held to be invalid or unenforceable, all other valid terms and provisions hereof shall remain in full force and effect, and all of the terms and provisions of this Agreement shall be deemed to be severable in nature.

9.8.     This Agreement including the Exhibits referred to herein and the Confidentiality Agreement between IDI and CMCC dated February 6, 2008 (the "Confidentiality Agreement") embody the entire agreement and understanding of the parties hereto in respect of the transactions contemplated by this Agreement. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or

28

APPENDIX 183

referred to herein or therein.  This Agreement supersedes all prior agreements and understandings between the Parties with respect to such transactions other than the Confidentiality Agreement.

*[Signature page follows]*

29

11315168_28.DOC

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective, duly authorized officers as of the date first above written.

THE CHILDREN'S MEDICAL CENTER
CORPORATION

By: _____
       James Mandell, M.D.
       Chief Executive Officer


IMMUNE DISEASE INSTITUTE, INC.

By: _____
       Theodore M. Cronin
       Acting President and Chief Financial Officer

APPENDIX 185

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective, duly authorized officers as of the date first above written.

THE CHILDREN'S MEDICAL CENTER
CORPORATION

By:  _____

James Mandell, M.D.
Chief Executive Officer

IMMUNE DISEASE INSTITUTE, INC.

By:  _____

Theodore M. Cronin
Acting President and Chief Financial Officer

APPENDIX 186

EXHIBIT 4.5

## EMPLOYEES AND INDEPENDENT CONTRACTORS

**Immune Disease Institute - Administrative & Facilities Personnel**

| Last | First | Title |
|------|-------|-------|
| **Administration** | | |
| Cronin | Theodore | Acting President & CFO |
| Simmons | Steven | Director of Finance &Operations |
| Majewski | Amanda | Office Manager/Administrator |
| Bradley | Margaret | Chief Scientific Administrative Officer |
| DiPasquale | Zachary | Administrative Assistant |
| Norris | John | Envir. Health & Safety Mgr |
| Boothby | Catherine | Administrative Assistant |
| Rosenbaum | Rachelle | Executive Officer for Institutional Relations |
| Nicholson | Shirley | IACUC Coordinator |
| Viehman | Louise | Administrative Assistant |
| | | |
| **Animal Facility** | | |
| Chenaif | Miriam | Animal Caretaker |
| Sumpf | Sierra | Animal Caretaker |
| Ramirez | Francia | Animal Caretaker |
| | | |
| **Facilities** | | |
| Bono | George | Director of Construction Projects |
| Garcia | Oscar | Facilities Assistant |
| Landry | Peter | Facilities Manager |
| Schmidt | Howard | Sr. Security/Helpdesk SC |
| | | |
| **Accounting, Finance & Grants Administration** | | |
| Carriuolo | Stephen | Controller |
| Hourihan | Helen | Grants Manager |
| Morris | Barbara | Financial Analyst |
| Craig | Nicole | Accountant/Financial Analyst |
| Frank | David | Accountant/Payroll Mgr. |
| Goto-Hardy | Megumi | A/P Clerk |
| Chen | Eva | Accts Payable Coordinator |
| Cheung | Elisa | Accounts Payable Supv. |

**Core Facility**

APPENDIX 187

| Ketman | Kenneth | Cell Sorter Operator |
|---|---|---|
| Barteneva | Natalie | Director Flow Cytometry |
| Leung | Harry | Dir. Microscope Core Fac |

**Human Resources**

| Morgan Williams | Christine | Hum. Resources Generalist |
|---|---|---|
| Wilson | Nicole | H.R. Intern |
| Rosenbaum | Joshua | Human Resources Rep. |
| Santos | Gabriel | Immigration Specialist |
| Donovan | Doreen | HR Director |

**IT Services**

| LaSalle Jr. | Jurvis | IT Manager & Systems Architect |
|---|---|---|
| Lamb | Braden | Jr. Desktop Specialist |
| May | Timothy | Desktop Support Specialist |
| O'Connor | Justin | Systems Administrator |
| Perry | James | Jr Systems Administrator |

**Glass Wash Facility**

| Williams | Ronald | Laboratory Aide |
|---|---|---|
| Garcia | Hector | Laboratory Aide |
| Halhoul | Latifa | Laboratory Aide |
| Hines | Jesse | Supervisor Glasswash |

**Technology Development**

| Hsu | Amy | Admin. Asst. |
|---|---|---|
| Dietz | Ryan | Director of Tech Development |

**Procurement**

| Buchanan, Jr. | Jack | Procurement Manager |
|---|---|---|

**Scientfic Personnel**

**Alper Lab**

| Borotto | Nicholas | Co-op Student |
|---|---|---|
| Garbarino | Kathleen | Co-op Student |
| Jalloh | Yanoh | Co-op Student |
| Kunnenkeri | Sushruta | Co-op Student |
| Tarnacki | Jennifer | Co-op Student |
| Alford | Dennis | Research Scientist |
| Larsen | Charles | Jr. Investigator |
| Trautwein | Michael | Research Technic. |
| Alper | Chester | Sr. Investigator |

**Alt Lab**

| | | Administrative |
|---|---|---|
| Needham | Judith | Assistant |
| Basu | Uttiya | Research Fellow |
| Choi | Vivian | Research Fellow |
| Datta | Abhishek | Research Fellow |
| Franklin | Andrew | Research Fellow |
| Gostissa | Monica | Research Fellow |
| Phan | Ryan | Research Fellow |
| Schwer | Bjoern | Research Fellow |
| Wang | Jing | Research Fellow |
| Zhang | Yu | Research Fellow |
| Zhu | Li | Research Fellow |
| Acquaviva | Lisa | Research Technic. |
| Bianco | Julia | Research Technic. |
| Gallagher | Michael | Research Technic. |
| Hansen | Erica | Research Technic. |
| Patel | Harin | Research Technic. |

**Carroll Lab**

| | | |
|---|---|---|
| Carroll | Elisabeth | Sr. Research Associate |
| Conway | Ryan | Animal Technologist |
| Constantin | Myrna | Research Fellow |
| Tsiftsoglou | Stefanos | Research Fellow |
| Fernandez Gonzalez | Santiago | Research Fellow |
| Kim | Young-A | Research Fellow |
| Kuligowski | Michael | Research Fellow |
| Pitcher | Lisa | Research Fellow |
| Ma | Minghe | Research Assoc. |
| Carroll | Michael | Sr. Investigator |

**Davis Lab**

| | | |
|---|---|---|
| Fernandes | Stacey | Research Technic. |
| Mejia De La Roca | Juan | Research Fellow |
| Lu | Fengxin | Research Fellow |
| Davis | Alvin | Sr. Investigator |

**Goldfeld Lab**

| | | |
|---|---|---|
| Blodgett | Christopher | Admin. Asst. |
| Biglione | Sebastian | Research Fellow |
| Jasenosky | Luke | Research Fellow |
| Haridas | Viraga | Research Fellow |
| Falvo | James | Instructor |
| Ranjbar | Shahin | Jr. Investigator |

| | | |
|---|---|---|
| Tsytsykova | Alla | Jr. Investigator |
| Goldfeld | Anne | Sr. Investigator |

**Hur**

| | | |
|---|---|---|
| Peisley | Alys | Research Fellow |
| Hur | Sun | Jr. Investigator |

**Kirchhausen**

| | | |
|---|---|---|
| Boecking | Till | Research Fellow |
| Rapoport | Iris | Research Assoc. |
| Cocucci | Emanuele | Research Fellow |
| Guan | Rong | Research Fellow |
| McDonald | Catherine | Admin. Asst. |
| Kural | Comert | Research Fellow |
| Lu | Lei | Research Fellow |
| Saffarian | Saviz | Research Assoc. |
| Yu | Anan | Research Fellow |
| Boll | Werner | Research Assoc. |
| Marino | Eric | Imaging Specialist |
| Kirchhausen | Tomas | Sr. Investigator |

**Rossi**

| | | |
|---|---|---|
| Zguro | Dhoksiana | Research Technic. |
| Beerman | Isabel | Research Fellow |
| Warren | Luigi | Research Fellow |
| Gazit | Roi | Research Fellow |
| Rossi | Derrick | Jr. Investigator |

**Winau Lab**

| | | |
|---|---|---|
| Winau | Florian | Jr. Investigator |

**Fraser Lab**

| | | |
|---|---|---|
| Ding | Wei-Zi | Research Technic. |
| Fraser | Patricia | Jr. Investigator |

**Silberstein Lab**

| | | |
|---|---|---|
| Pivarnik | Gregory | Research Technic. |
| Graves | Katherine | Research Technic. |
| Stegner | Joseph | Research Assoc. |
| Waters | Collin | Research Technic. |
| Silberstein | Leslie | Sr. Investigator CHCT Prog. |
| Thostenson | Kari | Administrator |
| Armant | Myriam | Assistant Director |

**Rajewsky Lab**

| | | |
|---|---|---|
| Grundy | Jaclyn | Lab Technician |
| Jensen | Kari | Research Technic. |
| Xia | Junrong | Research Technic. |
| Pellerin | Alex | Research Technic. |
| Zhang | Baochun | Research Fellow |
| Koralov | Sergei | Research Fellow |
| Wang | Jing | Research Technic. |
| Derudder | Emmanuel | Research Fellow |
| Srinivason | Lakshmi | Research Fellow |
| Wang | Donghai | Research Fellow |
| Chakraborty | Tirtha | Research Fellow |
| Thai | To-Ha | Research Fellow |
| Seagal | Jane | Research Fellow |
| Otipoby | Kevin | Research Fellow |
| Ottaviano | Michelle | Admin. Asst. |
| Bamberg | Michael | Lab Manager |
| | | Mgr. |
| Ghitza | Dvora | Con.Mut.MouseFac |
| Rajewsky | Klaus | Sr. Investigator |

**Remold Lab**

| | | |
|---|---|---|
| Stolley | James | Research Technic. |
| Gong | Dapeng | Research Fellow |
| Cooley | Jessica | Lab Manager |
| Benarafa | Charaf | Instructor |
| Remold-O'Donnell | Eileen | Sr. Investigator |

**Shimaoka Lab**

| | | |
|---|---|---|
| Silkworth | Whitney | Research Technic. |
| Morishita | Yoshiyuki | Research Fellow |
| Srinivasan | Charudharshini | Research Fellow |
| Park | Eun Jeong | Research Fellow |
| Peer | Dan | Research Fellow |
| Shimaoka | Motomu | Investigator |

**Springer Lab**

| | | |
|---|---|---|
| Drabek | Andrew | Research Technic. |
| Eng | Edward | Research Fellow |
| Mondal | Subhanjan | Research Fellow |
| Shi | Minlong | Research Fellow |
| Zhang | Qing | Research Fellow |
| Zhou | Yanfeng | Research Fellow |

| Chen | Xing | Research Fellow |
| Zhang | ChengZhong | Research Fellow |
| Kim | Jongseong | Research Fellow |
| Sen | Mehmet | Research Fellow |
| Smagghe | Benoit | Research Fellow |
| Yu | Yamei | Research Fellow |
| Zhu | Jianghai | Research Fellow |
| Schuerpf | Thomas | Research Fellow |
| Grey | Michael | Research Fellow |
| Mi | Li Zhi | Research Fellow |
| Zhu | Jieqing | Research Fellow |
| Pierce | April | Admin. Asst. |
| Xie | Can | Research Fellow |
| Mulligan | Eadaoin | Lab Manager |
| Lu | Chafen | Investigator |
| Springer | Timothy | Sr. Investigator |

**Von Andrian Lab**

| Alton | Jennifer | Admin. Asst. |
| Perdomo Ortiz | Lilia | Short term Research Schol |
| Cheng | Guiying | Research Assoc. |
| Mazo | Irina | Jr. Investigator |

**Wagner Lab**

| Carbo Cots | Carla | Research Fellow |
| Schatzberg | Daphne | Research Technic. |
| Yang | Janie | Research Technic. |
| Canault | Matthias | Research Fellow |
| Duerschmied | Daniel | Research Fellow |
| Cifuni | Stephen | Research Technic. |
| Brill | Alexander | Research Fellow |
| Chauhan | Anil | Instructor |
| Zhao | Bingqiao | Research Fellow |
| Cowan | Lesley | Admin. III |
| Wagner | Denisa | Sr. Investigator |

**Rao Lab**

| Keil | Brittany | Research Technic. |
| Kenney | Grace | Research Technic. |
| Kwon | Hyoung | Research Technic. |
| Pishyareh | Mojgan | Research Technic. |
| Stevanovic | Irena | Research Fellow |
| Gelinas | Curtis | Research Technic. |
| Banfield-Weir | Jake | Admin. Asst. |

| Bandukwala | Hozefa | Research Fellow |
| Ghosh | Srimoyee | Research Fellow |
| Zhou | Yubin | Research Fellow |
| Meraner | Paul | Research Fellow |
| Sundrud | Mark | Research Fellow |
| Koh | Kian Peng | Research Fellow |
| Mueller | Martin | Research Fellow |
| Oberdoerffer | Shalini | Research Fellow |
| Li | Huiming | Research Fellow |
| Ohora | Masatsugu | Instructor |
| Sharma | Sonia | Research Fellow |
| Hogan | Patrick | Investigator |
| Lee | Jung | Lab Manager |
| Lamperti | Edward | Research Assoc. |
| Rao | Anjana | Sr. Investigator |

**Lieberman**

| McKernan | Shannon | Research Technic. |
| Tsai | Perry | Research Technic. |
| Ferrini, II | Roger | Research Fellow |
| Thiery | Jerome | Research Fellow |
| Yan | Nan | Research Fellow |
| Petrocca | Fabio | Research Fellow |
| Wu | Yichao | Research Fellow |
| Ahmed | Fariyal | Research Fellow |
| Navarro Lopez | Francisco | Research Fellow |
| Leonard | Julie | Admin. Asst. |
| Lal | Ashish | Instructor |
| Martinvalet | Denis | Research Fellow |
| Xu | Zhan | Research Assoc. |
| Lieberman | Judy | Sr. Investigator |

**NRSA**

| Pipkin | Matthew | Research Fellow |

**Independent Contractors**
Kathleen Dimino
Robert Forrester
Dr. May S. Jacobson
Sherwin Kevy
Ian Levesque
Patricia McCaffrey, PhD

Piotr Sliz    Agreement dated December 21, 2007

BOS111 12336423.1

APPENDIX 194

SCHEDULE 2.9.1

IDI INTELLECTUAL PROPERTY RIGHTS

I. Patents & Applications

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 00-003 | Japan | 05/04/2001 | 2001-580432 | Colloid Compositions for Solid Phase Biomolecular Analytical Systems | Filed | |
| 00-003 | United States | 11/06/2007 | 11/935,817 | Colloidal Compositions for Solid Phase Biomolecular Analytical, Preparative and Identification Systems | Filed | |
| 00-003 | Canada | 02/14/2003 | 2,408,094 | Colloid Compositions for Solid Phase Biomolecular Analytical Systems | Filed | |
| 00-003 | European | 04/25/2001 | 01932980.4 | Colloid Compositions for Solid Phase Biomolecular Analytical Systems | Filed | |
| 00-003 | PCT | 05/04/2001 | PCT/US01/14373 | Novel Colloid Compositions Useful in the Preparation of Solid Phase Biomolecular Analytical, Preparative and Indentification Systems | Filed | |
| 00-003 | United States | 03/03/2005 | 11/071,674 | NOVEL COLLOIDAL MICROARRAYS | Filed | |
| 00-003 | United States | 05/04/2001 | 09/848,777 | Colloid Compositions Useful in the Preparation of Solid Phase Biomolecular Analytical, Preparative and Identification Systems | Issued | |
| 00-004 | PCT | 08/31/2001 | PCT/US01/27227 | Modified Polypeptides Stabilized in a Desired Conformation and Methods for Producing Same | Filed | |
| 00-004 | United States | 03/15/2005 | 11/080,043 | Modified Polypeptides Stabilized in a Desired Conformation and Methods for Producing Same | Filed | |
| 00-004 | Canada | 08/31/2001 | 2,417,432 | Modified Polypeptides Stabilized in a Desired Conformation and Methods for Producing Same | Filed | |

APPENDIX 195

BOS111 12334986.1

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---|---|---|---|---|---|---|
| 00-004 | European | 08/31/2001 | 01966492.9 | Modified Polypeptides Stabilized in a Desired Conformation and Methods for Producing Same | Filed | |
| 00-004 | Japan | 08/31/2001 | 2002-522490 | Modified Polypeptides Stabilized in a Desired Conformation and Methods for Producing Same | Filed | |
| 00-004 | United States | 08/31/2001 | 09/945,265 | Modified Polypeptides Stabilized in a Desired Conformation and Methods for Producing Same | Issued | |
| 00-004 | United States | 03/15/2005 | 11/080,026 | Modified Polypeptides Stabilized in a Desired Conformation and Methods for Producing Same | Notice of Allowance | |
| 00-006 | European | 05/11/2001 | 01989905.3 | Compositions and Methods for Prolonging Survival of Chilled Platelets | Filed | Yes |
| 00-006 | United States | 11/05/2001 | 10/007,856 | Compositions and Methods for Prolonging Survivial of Chilled Platelets | Filed | Yes |
| 00-006 | United States | 11/05/2001 | 10/007,856 | Compositions and Methods for Prolonging Survivial of Chilled Platelets | Filed | Yes |
| 00-006 | PCT | 11/05/2001 | PCT/US01/46408 | Compositions and Methods for Prolonging Survival of Chilled Platelets | Filed | Yes |
| 00-006 | Canada | 11/05/2001 | 2,431,332 | Compositions and Methods for Prolonging Survival of Chilled Platelets | Filed | Yes |
| 00-007 | United States | 06/08/2001 | 10/297,371 | Methods and Compositions for Inhibiting Immunoglobulin-Mediated Reperfusion Injury | Filed | Yes |
| 00-007 | United States | 06/08/2001 | PCT/US01/18510 | Methods and Compositions for Inhibiting Immunoglobulin-Mediated Reperfusion Injury | Filed | Yes |
| 00-007 | PCT | 06/08/2001 | PCT/US01/18510 | Methods and Compositions for Inhibiting Immunoglobulin-Mediated Reperfusion Injury | National Phase | Yes |
| 00-007 | Japan | 06/08/2001 | 2002-501463 | Methods and Compositions for Inhibiting Immunoglobulin-Mediated Reperfusion Injury | Pending | Yes |
| 00-007 | Australia | 03/01/2005 | 2005219839 | Natural IGM Antibodies and Inhibitors Thereof | Pending | Yes |

APPENDIX 196

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|-----------|--------------|--------|-----------------|
| 00-007 | Canada | 06/08/2001 | 2410458 | Methods and Compositions for Inhibiting Immunoglobulin-Mediated Reperfusion Injury | Pending | Yes |
| 00-007 | United States | 03/01/2005 | 11/069,834 | Natural IgM Antibodies and Inhibitors Thereof | Published | Yes |
| 00-007 | European | 06/08/2001 | 01942082.7 | Methods and Compositions for Inhibiting Immunoglobulin-Mediated Reperfusion Injury | Published | Yes |
| 00-007 | United States | 03/01/2005 | PCT/US05/006276 | Natural IgM Antibodies and Inhibitors Thereof | Published | Yes |
| 00-007 | European | 03/01/2005 | 05723931.1 | Natural Igm Antibodies and Inhibitors Thereof | Published | Yes |
| 00-007 | Japan | 03/01/2005 | 2007-501869 | Natural IGM Antibodies and Inhibitors Thereof | Published | Yes |
| 00-008 | United States | 07/09/2001 | 09/902,481 | Novel Proteins With Integrin-Like Activity | Issued | |
| 00-009 | Canada | 05/17/2001 | 2,408,883 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Filed | |
| 00-009 | Japan | 11/19/2002 | 2001-585806 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Filed | |
| 00-009 | United States | 12/01/2004 | 10/999,477 | (Diagnostic Claims) Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Filed | |
| 00-009 | United States | 02/13/2008 | 12/030,576 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Filed | |
| 00-009 | European | 05/17/2001 | 06075760.6 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Filed | |
| 00-009 | Italy | 05/17/2001 | 01935660.9 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Issued | |
| 00-009 | France | 05/17/2001 | 01935660.9 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Issued | |

APPENDIX 197

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 00-009 | Australia | 05/17/2001 | 2001261735 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Issued | |
| 00-009 | United Kingdom | 05/17/2001 | 01935660.9 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Issued | |
| 00-009 | European | 05/17/2001 | 01935660.9 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Issued | |
| 00-009 | Germany | 05/17/2001 | 01935660.9 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Issued | |
| 00-009 | United States | 02/19/2004 | 10/782,456 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity (Hemophilia and Bleeding Disorder claims) | Published | |
| 00-009 | United States | 05/17/2001 | 09/860,618 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Published | |
| 00-009 | PCT | 05/17/2001 | PCT/US01/16021 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Published | |
| 01-001 | PCT | 01/29/2002 | PCT/US02/02412 | Anergy Regulated Molecules | Published | |
| 01-002 | United States | 02/17/2003 | 2004-0048803 | Compounds and Methods for the Modulation of CD154 | Filed | |
| 01-002 | United States | 02/28/2003 | 2004-0072750 | Compounds and Methods for the Modulation of CD154 | Filed | |
| 01-002 | PCT | 05/03/2002 | PCT/US02/13900 | Compounds and Methods for the Modulation of CD154 | Filed | |
| 01-002 | United States | 11/30/2001 | 10/002,585 | Compounds and Methods for the Modulation of CD154 | Issued | |
| 01-002 | United States | 10/29/2003 | 10/476,237 | Compounds and Methods for the Modulation of CD154 | Notice of Allowance | |
| 01-003 | United States | 03/11/2002 | 10/094,757 | A Multi-Plate Electrophoresis System Having Non-Mechanical Buffer Circulation | Issued | |

APPENDIX 198

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---|---|---|---|---|---|---|
| 02-001 | European | 10/29/2003 | 03781487.8 | Inhibition of Gene Expression Using RNA Interfering Agents | Filed | |
| 02-001 | Japan | 10/29/2003 | 2004-548585 | Inhibition of Gene Expression Using RNA Interfering Agents | Filed | |
| 02-001 | United States | 02/15/2006 | 10/533,621 | Inhibition of Gene Expression Using RNA Interfering Agents | Pending | |
| 02-001 | PCT | 10/29/2003 | PCT/US2003/034424 | Inhibition of Gene Expression Using RNA Interfering Agents | Published | |
| 02-004 | PCT | 06/25/2003 | PCT/US03/20270 | Vacuolins | Filed | |
| 02-004 | United States | 12/23/2004 | 11/021,840 | Vacuolins | Filed | |
| 02-005 | European | 10/30/2003 | 03816740.9 | Methods for Treating and Preventing Apoptosis Related Diseases Using RNA Interfering Agents | Filed | |
| 02-005 | Japan | 10/30/2003 | 2005-507650 | Methods for Treating and Preventing Apoptosis Related Diseases Using RNAi | Filed | |
| 02-005 | United States | 10/30/2003 | 10/533,622 | Methods for Treating and Preventing Apoptosis Related Disease Using RNA | Pending | |
| 02-005 | PCT | 10/30/2003 | WO2005/013886 | Methods for Treating and Preventing Apoptosis Related Diseases Using RNA Interfering Agents | Published | |
| 02-007 | PCT | 10/08/2003 | PCT/US03/31918 | Compounds for Modulation of Cholesterol Transport | Filed | Yes |
| 02-007 | Australia | 04/06/2005 | 2003288925 | Compounds for Modulation of Cholesterol Transport | Filed | Yes |
| 02-007 | European | 10/08/2003 | 03781314.4 | Compounds for Modulation of Cholesterol Transport | Filed | Yes |
| 02-007 | Canada | 10/08/2003 | 2,502,685 | Compounds for Modulation of Cholesterol Transport | Filed | Yes |
| 02-008 | PCT | 03/20/2003 | PCT/US03/08653 | HIV Therapeutic | Filed | Yes |
| 02-008 | United States | 03/20/2003 | 10/393,411 | HIV Therapeutic | Filed | Yes |
| 02-008 | Canada | 03/20/2003 | 2,479,530 | HIV Therapeutic | Filed | Yes |
| 02-008 | Japan | 03/20/2003 | 2003-577602 | HIV Therapeutic | Filed | Yes |
| 03-001 | United States | 10/05/2006 | 12/089,015 | RNAi-Based Treatment Approach for West Nile and Japanese Encephalitis Viruses | National Phase | |

APPENDIX 199

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 03-002 | PCT | 05/21/2004 | US2004016210 | Compounds and Methods for Improving Platelet Recovery and Function | Filed | |
| 03-002 | United States | 05/21/2004 | 10/851,255 | Compounds and Methods for Improving Platelet Recovery and Function | Filed | |
| 03-003 | United States | 05/22/2003 | 09/863,141 | Novel Alkaloids | Issued | Yes |
| 03-005 | United States | 04/13/2006 | 10/575,932 | MODULATION OF ANERGY AND METHODS FOR ISOLATING ANERGY-MODULATING COMPOUNDS | Filed | |
| 03-007 | United States | 02/15/2007 | 10/560,563 | SKN-1 Gene and Protein | Filed | |
| 03-008 | United States | 02/08/2005 | 11/053,285 | CD70 INHIBITION FOR THE TREATMENT AND PREVENTION OF INFLAMMATORY BOWEL DISEASE | Filed | |
| 03-009 | United States | 04/28/2006 | 10/577,814 | Methods for Treating and Preventing Ischemia-Reperfusion Injury Using RNA Interfering Agents | Filed | |
| 03-009 | PCT | 11/01/2004 | US2004/036200 | Methods for Treating and Preventing Ischemia-Reperfusion Injury Using RNA Interfering Agents | Filed | |
| 04-001 | PCT | 01/21/2005 | US/2005/003104 | SYSTEMS AND METHODS FOR INDUCING SHORT RNA EXPRESSION | Filed | |
| 04-001 | United States | 06/25/2007 | 10/585,886 | SYSTEMS AND METHODS FOR INDUCING SHORT RNA EXPRESSION | Pending | |
| 04-002 | United States | 02/05/2007 | 11/659,386 | Methods for Delivering RNA interference and Uses Thereof | Filed | |
| 04-002 | European | 08/15/2005 | 5807329.7 | Methods for Delivering RNA interference and Uses Thereof | Filed | |
| 04-002 | Australia | 08/15/2005 | 2005277547 | Methods for Delivering RNA interference and Uses Thereof | Filed | |
| 04-002 | Canada | 08/15/2005 | 2,576,925 | Methods for Delivering RNA interference and Uses Thereof | Filed | |
| 04-002 | Japan | 08/15/2005 | 2007-527944 | Methods for Delivering RNA interference and Uses Thereof | Filed | |
| 04-002 | PCT | 08/16/2005 | PCT/US2005/029111 | Methods for Delivering RNA interference and Uses Thereof | Published | |
| 04-003 | United States | 12/29/2006 | PCT/US2005/022926 | Gelling Electohporeses Loading Buffer | Published | |

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---|---|---|---|---|---|---|
| 04-005 | United States | 04/24/2006 | 11/409,927 | Methods for the Treatment of Multiple Myeloma | Filed | |
| 04-006 | United States | 03/28/2008 | 12/057,523 | Allele-Specific Silencing of Sickle Cell Anemia and Beta E Thalassemia by Sirnas and Shrnas | Pending | |
| 04-007 | PCT | 04/28/2006 | PCT/US2006/016384 | TREATING GASTROINTESTINAL DISORDERS WITH MODULATORS OF RETINOIC ACID | Filed | |
| 04-007 | United States | 04/28/2006 | 11/413,874 | TREATING GASTROINTESTINAL DISORDERS WITH MODULATORS OF RETINOIC ACID | Filed | |
| 05-001 | PCT | 06/16/2006 | PCT/EP2006/005800 | ADAMTS13-Containing Compositions Having Thrombolytic Activity | Filed | Yes |
| 05-001 | United States | 06/16/2006 | 11/454,615 | ADAMTS13-Containing Compositions Having Thrombolytic Activity | Filed | Yes |
| 05-003 | European | 06/05/2006 | 06772167.0 | RNAI as a Microbicide | Filed | |
| 05-003 | PCT | 06/05/2006 | PCT/US06/21758 | siRNA Microbicides for Preventing and Treating Diseases | Filed | |
| 05-003 | United States | 06/05/2006 | 11/916,334 | RNAI as a Microbicide | Filed | |
| 05-004 | PCT | 12/12/2006 | PCT/US2006/047281 | Novel Integrin AI I Domain Mutants with Unprecedented Affinity and Their Therapeutic Use | Published | |
| 05-007 | PCT | 04/24/2007 | PCT/US2007/10075 | LAYER BY LAYER COATING OF IMMUNOLIPOSOMES | Filed | |
| 05-009 | PCT | 01/05/2007 | PCT/US2007/000280 | Novel Regulators of NFAT | Filed | |
| 06-001 | PCT | 05/22/2007 | PCT/US07/12152 | Delivery Across Blood Brain Barrier | Filed | |
| 06-002 | PCT | 04/25/2007 | PCT/US2007/009980 | TARGETED DELIVERY TO LEUKOCYTES USING NON-PROTEIN CARRIERS | Filed | |
| 06-002 | PCT | 04/25/2007 | PCT/US2007/009975 | TARGETED DELIVERY TO LEUKOCYTES USING PROTEIN CARRIERS | Published | |
| 06-004 | Japan | 02/22/2005 | 2006-554260 | Conformation Specific Antibodies (LFA1) | Filed | Yes |
| 06-004 | PCT | 02/22/2005 | PCT/US2005/005361 | CONFORMATION SPECIFIC ANTIBODIES | Filed | Yes |
| 06-004 | Australia | 02/22/2005 | 2005215024 | Conformation Specific Antibodies (LFA1) | Filed | Yes |
| 06-004 | United States | 02/19/2004 | 60/546,354 | LFA-1 Conformation Specific Antibodies | Filed | Yes |

APPENDIX 201

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 06-004 | United States | 02/22/2005 | 10/589,956 | Conformation Specific Antibodies (LFA1) | Filed | Yes |
| 06-004 | Canada | 02/22/2005 | 2,554,965 | Conformation Specific Antibodies (LFA1) | Filed | Yes |
| 06-004 | European | 02/22/2005 | 05723364.5 | Conformation Specific Antibodies (LFA1) | Issued | Yes |
| 07-001 | PCT | 01/29/2008 | PCT/US08/52086 | Compositions and Methods for Treating Hematapoietic Maligancies | Filed | Yes |
| 07-002 | PCT | 01/31/2008 | PCT/US08/52654 | Let-7 Micro-RNA and Mimetics Therof as Therapeutics for Cancer | Filed | |
| 07-003 | United States | 08/21/2007 | 60/957,023 | Delivery of Hydrophilic and Lipophilic Drugs via Stabilized Nanoparticles Targeting Integrins and Their Ligands | Filed | |
| 07-004 | PCT | 01/25/2008 | PCT/US08/52054 | Targeted Delivery of siRNA | Filed | Yes |
| 07-005 | PCT | 04/30/2007 | PCT/US08/62029 | Diagnosis and Treatment of Type 1 Diabetes | Filed | |
| 07-006 | United States | 10/12/2007 | 60/979,596 | Vaccine Nanotechnology | Filed | Yes |
| 07-008 | United States | 08/15/2007 | 60/964,936 | Methods for Modulating Development and Expansion of IL-17 Expressing Cells | Filed | Yes |
| 07-010 | United States | 12/14/2007 | 61/007,766 | Treatment and Prevention of HIV Infection | Filed | Yes |
| 07-010 | United States | 01/15/2008 | 61/011,157 | Treatment and Prevention of HIV Infection | Filed | Yes |
| 07-011 | United States | 01/04/2008 | 61/018,919 | Treatment or Prevention of Inflammation by Targeting Cyclin D1 | Filed | |
| 08-002 | United States | 05/12/2008 | 61/127,426 | VWF Inhibitors for Treatment of Infarction | Filed | Yes |
| 08-004 | United States | 05/16/2008 | 61/053,769 | Compositions and Methods for Inhibition of Retroviruses | Filed | |
| 08-005 | United States | 07/14/2008 | 61/080,367 | Regulation of CD45 Alternative Splicing and Uses Thereof | Filed | |
| 08-006 | United States | 10/08/2008 | 61/103,628 | Regulators of NFAT and/or Store-Operated Calcium Entry | Filed | |
| 08-007 | United States | 09/26/2008 | 61/100,503 | Selective Oxidation of 5-Methylcytosine by Tet-Family Proteins | Filed | |
| 08-007 | United States | 09/29/2008 | 61/100,995 | Selective Oxidation of 5-Methylcytosine by Tet-Family Proteins | Filed | |
| 08-008 | United States | 09/19/2008 | 61/098,696 | miRNA Targets | Filed | |
| 08-009 | United States | 09/19/2008 | 61/098,707 | Therapeutic and Diagnostic Strategies | Filed | |
| 80-001 | United States | 01/09/1980 | 06/110,592 | Amidinophenylmethylsulfonylfluoride | Issued | |

APPENDIX 202

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---|---|---|---|---|---|---|
| 81-001 | United States | 07/27/1981 | 06/287,139 | Means and methods for purifying Clq, Clr and Cls | Issued | |
| 86-001 | United States | 04/11/1986 | 06/850,759 | Platelet Concentrates | Issued | |
| 86-002 | United States | 09/15/1986 | 06/907,405 | Non-Mechanical Buffer Circulation Apparatus for Electrophoresis | Issued | |
| 89-001 | European | 02/22/1990 | 90904139.4 | Human Elastase Inhibitor | Filed | |
| 89-001 | United States | 05/13/1996 | 29/054344 | Flexible Multiple Compartment Medical Container | Issued | |
| 89-001 | Italy | 02/04/1998 | 90904139.4 | Human Elastase Inhibitor | Issued | |
| 89-001 | Germany | 02/04/1998 | 690302025.6 | Human Elastase Inhibitor | Issued | |
| 89-001 | France | 02/04/1998 | 90904139.4 | Human Elastase Inhibitor | Issued | |
| 89-001 | Japan | 08/23/1991 | 504382/90 | Human Elastase Inhibitor | Issued | |
| 89-001 | United Kingdom | 02/04/1998 | 90904139.4 | Human Elastase Inhibitor | Issued | |
| 89-001 | United States | 09/06/1991 | 07/755,461 | Cloned gene encoding human monocyte elastase inhibitor | Issued | |
| 89-001 | United States | 09/30/1994 | 08/315,831 | Human Monocyte Elastase Inhibitor | Issued | |
| 89-001 | United States | 06/13/1996 | 08/662,318 | Human Monocyte Elastase Inhibitor Antibodies | Issued | |
| 89-001 | PCT | 02/02/1990 | PCT/US90/00920 | Human Elastase Inhibitor | Published | |
| 90-001 | United States | 11/28/1990 | 07/618,286 | Functional derivatives of ICAM-1 which are substantially capable of binding to LFA-1 but are substantially incapable of binding to MAC-1 | Issued | |
| 91-001 | United States | 05/20/1992 | 07/887,444 | Device and Method for Analysis of Blood Components and Identifying Inhibitors and Promoters of the Inflammatory Response | Issued | |
| 91-001 | PCT | 05/29/1992 | PCT/US92/04524 | Device and Method for Analysis of Blood Components and Identifying Inhibitors and Promoters of the Inflammatory Response | Published | |
| 91-002 | Mexico | 06/11/1992 | 92 2804 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Norway | 06/11/1992 | 934491 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Bulgaria | 06/11/1992 | 98287 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |

APPENDIX 203

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---|---|---|---|---|---|---|
| 91-002 | Czech Republic | 06/11/1992 | PV 2702-93 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Hungary | 06/11/1992 | P9303529 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Romania | 06/11/1992 | 93-01672 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Russian Federation | 06/11/1992 | 93058655 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | United States | 06/11/1997 | 08/873,288 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Brazil | 06/11/1992 | 9206142-7 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Slovakia | 06/11/1992 | PV 1395-93 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Republlic of Korea | 06/11/1992 | 93-703828 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | United States | 12/23/1992 | 08/038,990 | Method of identifying agents which modulate ICAM-3 binding to LFA-1 | Filed | |
| 91-002 | United States | 06/11/1991 | 07/712,879 | Intercellular adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | United States | 06/07/1995 | 08/474,087 | Methods of Using Intercellular Adhesion Molecule-3 (ICAM-3), Antibodies Thereto, and Soluble Fragments Thereof | Issued | |
| 91-002 | United States | 06/07/1995 | 08/473,981 | Method of identifying agents which modulate ICAM-3 binding to LFA-1 | Issued | |
| 91-002 | PCT | 06/11/1992 | PCT/US92/04896 | Intercellular Adhesion Molecule-3 and its Binding Ligands | National Phase | |
| 91-003 | United States | 06/12/1992 | 07/899,063 | Plasmodium Infected Erythrocytes Binding to ICAM-1 & CD36 | Filed | |
| 92-001 | PCT | 05/21/1993 | PCT/US93/04956 | A Novel Receptor for Alpha4 Integrins & Methods Based Thereon | Published | |
| 92-002 | United States | 08/22/1995 | 08/517,589 | Antibodies which Bind a Subpopulation of Mac-1 (CD11b/CD18) Molecules which Mediate Neutrophil Adhesion to ICAM-1 and Fibrinogen | Issued | |

APPENDIX 204

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---|---|---|---|---|---|---|
| 93-001 | PCT | 03/11/1994 | PCT/US94/02632 | Asseys/Therapeutic Methods Lymphocyte Chemoattractants | Published | |
| 93-002 | European | 03/23/1994 | 4014206.9 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Examination Requested | |
| 93-002 | Japan | 03/24/1994 | 521367/94 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Filed | |
| 93-002 | Canada | 03/23/1994 | 2,159,005 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Filed | |
| 93-002 | United Kingdom | 03/23/1994 | 94911692.5 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | France | 03/23/1994 | 94911692.5 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | Belgium | 03/23/1994 | 94911692.5 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | European | 03/23/1994 | 94911692.5 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | Germany | 03/23/1994 | 94911692.5 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | United States | 12/18/1995 | 08/525,719 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | Australia | 03/23/1994 | 64150/94 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | Switzerland | 03/23/1994 | 94911692.5 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | PCT | 03/24/1994 | PCT/US94/03189 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Published | |
| 94-001 | Canada | 06/01/1995 | 2,191,577 | Method for Treating and Preventing Atherosclerosis | Filed | |
| 94-001 | Germany | 06/01/1995 | 95921563.3 | Method for Treating and Preventing Atherosclerosis | Granted | |
| 94-001 | France | 06/01/1995 | 95921563.3 | Method for Treating and Preventing Atherosclerosis | Issued | |
| 94-001 | United Kingdom | 06/01/1995 | 95921563.3 | Method for Treating and Preventing Atherosclerosis | Issued | |

APPENDIX 205

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---|---|---|---|---|---|---|
| 94-001 | Italy | 06/01/1995 | 95921563.3 | Method for Treating and Preventing Atherosclerosis | Issued | |
| 94-001 | Germany | 06/01/1995 | 95921563.3 | Method for Treating and Preventing Atherosclerosis | Issued | |
| 95-001 | United States | 02/10/1995 | 08/386,728 | LIL-Stat DNA Binding Sites and Methods for Identifying Inhibitory Binding Agents | Issued | |
| 95-002 | United States | 12/05/1997 | 08/985,499 | Methods for Enhancing Thrombolysis in a Mammal | Issued | |
| 95-004 | United States | 06/07/1995 | 08/474,387 | Use of Functional Derivatives of the Intercellular Adhesion Molecule ICAM-1 in Diagnosis of Viral Infection | Issued | |
| 95-004 | United States | 04/11/1995 | 08/420,720 | Functional Derivatives of the Intercellular Adhesion Molecule ICAM-1 in Anti-viral Therapy | Issued | |
| 95-004 | United States | 06/07/1995 | 08/479,557 | Pharmaceutical Composition of the Intercellular Adhesion Molecule ICAM-1 for Use in Anti-viral Prophylactic Therapy | Issued | |
| 96-001 | United States | 01/29/2003 | 10/353,494 | Purification and Uses of Dendritic Cells and Monocytes | Issued | |
| 96-001 | United States | 07/29/1997 | 08/902,246 | Enrichment of Dendritic Cells from Blood | Issued | |
| 96-001 | United States | 01/31/2001 | 09/774,948 | Enrichment of Dendritic Cells from Blood | Issued | |
| 96-001 | PCT | 07/29/1997 | PCT/US97/13448 | Enrichment of Dendritic Cells from Blood | Published | |
| 97-003 | Japan | 07/23/1999 | 10-532102 | Methods for Diagnosing and Treating Body Weight Related Disorders in Animals | Filed | |
| 97-003 | United States | 01/22/1998 | 09/012,145 | Methods for Diagnosing and Treating Body Weight Related Disorders | Filed | |
| 97-003 | Canada | 01/22/1998 | 2,276,691 | Methods for Diagnosing and Treating Body Weight Related Disorders in Animals | Filed | |
| 97-003 | PCT | 01/22/1998 | PCT/US98/01110 | Methods for Diagnosing and Treating Body Weight Related Disorders in Animals | Published | |
| 97-004 | European | 08/17/1998 | 98942081.5 | Methods for Using Granzymes and Binding Molecules Thereof for Treating Disease Characterized by Abnormal Apoptosis | Filed | |

APPENDIX 206

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|-----------|--------------|--------|-----------------|
| 97-004 | PCT | 08/17/1998 | PCT/US98/17022 | Methods for Using Granzymes and Binding Molecules Thereof for Treating Diseases Characterized by Abnormal Apoptosis | Published | |
| 97-005 | PCT | 08/20/1998 | PCT/US98/17280 | Methods for Diagnosing and Treating Diseases Associated with Abnormal Levels of Myeloid Cells Utilizing Eotaxin and Antagonists and Agonists Thereof | Published | |
| 98-001 | United States | 10/25/2005 | 11/258,620 | Specific Inhibitors of NFAT Activation by Calcineurin and their use in Treating Immune-Related Diseases | Filed | |
| 98-001 | United States | 06/23/2006 | 11/474,218 | Specific Inhibitors of NFAT Activation by Calcineurin and their use in Treating Immune-Related Diseases | Filed | |
| 98-001 | United States | 01/31/2002 | 10/066,151 | Specific Inhibitors of NFAT Activation by Calcineurin and their use in Treating Immune-Related Diseases | Issued | |
| 98-001 | United States | 02/04/2003 | 10/358,052 | Specific Inhibitors of NFAT Activation by Calcineurin and the Use in Treating Immune-Relate Diseases | Published | Yes |
| 98-002 | United States | 02/29/2008 | 12/040,253 | Monocyte Locomotion Inhibitory Factor | Filed | |
| 98-002 | Canada | 06/29/1999 | 2,331,925 | Monocyte Locomotion Inhibitory Factor | Filed | |
| 98-002 | United States | 06/04/2004 | 10/861,123 | Monocyte Locomotion Inhibitory Factor | Filed | |
| 98-002 | Mexico | 06/29/1998 | 985265-21296 | Monocyte Locomotion Inhibitory Factor | Filed | |
| 98-002 | United States | 06/29/1999 | 09/342,956 | Monocyte Locomotion Inhibitory Factor | Issued | |
| 98-002 | United States | 10/03/2002 | 10/263,947 | Anti-Amoebic Vaccine | Issued | |
| 98-002 | PCT | 06/29/1999 | PCT/US99/14877 | Monocyte Locomotion Inhibitory Factor | Published | |
| 99-001 | PCT | 03/31/2000 | PCT/US00/08654 | Modified Dendritic Cells and Uses Therefor | Filed | |
| 99-001 | United States | 03/31/2000 | 09/540,963 | Modified Dendritic Cells and Uses Therefor | Issued | |

APPENDIX 207

# SUMF EXHIBIT 8

## EXHIBIT 17 OF DR. LUIGI WARREN'S NOVEMBER 16, 2018 DEPOSITION

APPENDIX 208

## INTELLECTUAL PROPERTY REVENUE DISTRIBUTION LETTER AGREEMENT

**Effective Date:** November 13, 2017

**CMCC Case 2085:** "Reprogramming to pluripotency and directed differentiation of cell fate using modified RNAs"
**Inventors:** Derrick Rossi
Luigi Warren

The parties hereto agree as follows:

This Letter Agreement serves to change the distribution from the Policy On Intellectual Property and Inventions (attached as Exhibit 1) for license revenue received after the Effective Date indicated above for Boston Children's case CMCC 2085, to the revenue distribution formula set forth herein. All license revenue and equity value received after the Effective Date of this Letter Agreement will be distributed according to the following however it is understood that prior to distribution under this Letter Agreement that certain costs can be recovered by Boston Children's Hospital and payments made as is standard practices, including any outstanding patent and legal expenses and any payments that are owed and made to co-owning organizations of the case listed above including the Harvard Stem Cell Institute.

Revenue shall be distributed in the percentages listed Table 1.

Table 1.

| Stakeholder | Distribution Percent |
|---|---|
| Inventors | 27.50% |
| DOM | 10% |
| PCMM | 12.50% |
| BCH/TIDO | 42.5% |
| Rossi Lab | 7.5% |
| | 100.00% |

Signatures can be found on the following page.

INTELLECTUAL PROPERTY REVENUE DISTRIBUTION LETTER AGREEMENT
CMCC Case 2085: "Reprogramming to pluripotency and directed differentiation of cell fate"

1



Confidential

APPENDIX 209

BCH000241

Agreed to by:

SIGNATURES:

Physician-in-Chief

Gary R. Fleisher, MD                                    Date

Director, Program in Cellular
and Molecular Medicine

Frederick W. Alt, PhD                                   Date

11/24/17

Inventor 1

Derrick Rossi, PhD                                      Date

Nov 15, 2017

Inventor 2

Luigi Warren, PhD                                       Date

Senior Director, Technology and
Innovation Development Office

Irene Abrams                                            Date

Nov. 20, 2017

2

INTELLECTUAL PROPERTY REVENUE DISTRIBUTION LETTER AGREEMENT
CMCC Case 2085: "Reprogramming to pluripotency and directed differentiation of cell fate"

Confidential

APPENDIX 210

BCH000242

Exhibit 1

Policy On Inventions and Intellectual Property

INTELLECTUAL PROPERTY REVENUE DISTRIBUTION LETTER AGREEMENT
CMCC Case 2085: "Reprogramming to pluripotency and directed differentiation of cell fate"

3

Confidential

APPENDIX 211

BCH000243

# SUMF EXHIBIT 9
## EXHIBIT 18 OF RYAN DIETZ
## DECEMBER 6, 2018 DEPOSITION

Dietz

EXHIBIT NO. 18

MCL  12|6|18



Children's Hospital Boston

# Children's Hospital Policy on Inventions and Intellectual Property

## AIMS

The Policy on Inventions and Intellectual Property of Children's Hospital (the "Hospital") is designed to promote the commercial development of the Hospital's research and clinical discoveries in order to benefit the public, to encourage inventorship through financial rewards, and to build the Hospital's research endowment. The Hospital's Office of Technology Transfer shall administer the Policy on behalf of the President and Trustees.

## Ownership and Distribution of intellectual Property

The Hospital owns all research results and intellectual property, whether tangible or intangible, developed by any person on the premises of the Hospital, or through substantial use of the Hospital's resources or facilities, or that relates to the research conducted by such person for the Hospital, or by a person within the scope of his or her employment by the Hospital. This policy applies to the medical and research staff, employees, and students of the Hospital, as well as to fellows, visiting scientists and volunteers and any other persons who may utilize the Hospital's resources and facilities, regardless of such person's obligations to other institutions. For purposes of clarity, such intellectual property includes, but is not limited to, research notebooks, data, databases, photographs, original drawings and diagrams, computer programs, as well as chemical and biological materials such as proteins, genes, gene products, DNA probes, cell lines and transgenic animals. Such intellectual property shall be removed from the Hospital's premises or transferred to other parties only for non-commercial research purposes and only when the receiving party has executed an authorized Proprietary Information Agreement or Material Transfer Agreement, unless under the terms of a license agreement for commercial development.

This policy shall not be interpreted to inhibit the free communication of ideas and research results through teaching, research collaboration and publication; however, inventors are cautioned to communicate research findings only after the rights to commercialize these findings have been protected through disclosure to the Hospital as defined below. In accord with the tradition of academic institutions, the Hospital, while retaining ownership, transfers to the authors all rights to commercialize publications (textbooks, monographs, etc.) authored by faculty members in pursuit of their academic functions of research and training.

## Disclosure of Inventions to the Hospital

Each member of the medical or research staff, employee, student or visitor is required to give the Office of Technology Transfer prompt notice of any invention he or she has made by completing the Hospital's Invention Disclosure Form. An invention is a novel, non-obvious and useful idea relating to processes, machines, manufactures and compositions of matter. Examples of inventions are new and improved devices, systems,

APPENDIX 213

circuits, chemical compounds and mixtures, biological materials, new uses of compounds, diagnostics, immunoassays, therapeutics and software programs. An invention has been made when a definite idea of the complete and operative invention is formed in the mind of the inventor.

Every invention based on the Hospital's intellectual property, as defined above, shall be the property of the Hospital. Within a reasonable period of time following disclosure of his or her invention to the Office of Technology Transfer, the Hospital shall advise the inventor in writing whether rights of ownership to the invention will be retained by the Hospital or released to the inventor, or to a third party if so obligated by a contract or grant.

**Seeking Patents or Copyrights to Protect Inventions**
When the Hospital determines to seek the patenting or copyrighting of any invention which the Hospital owns in whole or in part, (a) the Hospital shall, without expense to the inventor, provide such professional services as it shall deem to be necessary or desirable for such purpose, and (b) the inventor shall cooperate fully in such effort, including execution of all necessary or desirable agreements, applications, assignments and other forms and instruments. If at any time the Hospital shall terminate its effort to seek such patent, it shall promptly give notice thereof to the inventor, who thereupon shall be free at his or her own expense to seek the patent, subject to the prior rights the Federal Government or other funding agency may exercise in inventions developed wholly or in part on funds from such agency. With respect to software programs, the Hospital may elect to rely on unregistered copyright or trade secret protection. Computer programs, data bases, and other data should not be distributed publicly without notice of copyright. The Office of Technology Transfer is available for advice on copyright matters.

To protect patent rights within the United States, a patent application must be filed no later than one year after the invention has been disclosed publicly through oral presentation or printed publication. However, when public disclosure precedes the filing of the patent application, rights to file foreign patents will be lost. Ideally, a patent application should be filed prior to the public disclosure of the invention. When a publication is anticipated, an invention disclosure should be submitted to the Office of Technology Transfer as early as possible, preferably at the same time that an initial manuscript is prepared or sooner. The Office of Technology Transfer is available to discuss this issue with the inventor.

**Proceeds for Inventions**
The Hospital shall act to bring to the public all inventions which the Hospital owns in whole or in part, by such means the Hospital deems appropriate in each case. The cumulative net lifetime revenues received by the Hospital for the sale or licensing of the invention shall be distributed as shown in Table 1 as long as inventors remain in the employ of the Hospital and as shown in Table 2 at such time an inventor may leave the employ of the Hospital. Cumulative net lifetime proceeds includes all income received by the Hospital from the sale or licensing of an invention (not including sponsored research

APPENDIX 214

contracts), less all out-of-pocket costs attributable to patenting, litigation, and marketing incurred by the Hospital.

TABLE 1: Distribution of Proceeds while Inventor is in the Employ of Children's Hospital

| Cumulative Net Lifetime Revenues | Inventor | Inventor's Department | Hospital | TIDO |
|---|---|---|---|---|
| up to $100K | 70% | 0% | 20% | 10% |
| $100K-$500K | 45% | 20% | 25% | 10% |
| above $500K | 25% | 25% | 40% | 10% |

TABLE 2: Distribution of Proceeds if an Inventor Leaves the Employ of Children's Hospital

| Cumulative Net Lifetime Revenues | Inventor | Inventor's Department | Hospital | TIDO |
|---|---|---|---|---|
| up to $500K | 35% | 25% | 30% | 10% |
| above $500K | 25% | 25% | 40% | 10% |

Income shall be distributed for the lifetime of the license according to the terms of the Intellectual Property Policy of the Hospital in effect on the effective date of the license agreement, or on the date of signing if no effective date is stated. In the event the Hospital adopts a new policy and all the parties (Inventors, Department, Hospital) agree, then an existing license may be handled under the terms of a new policy.

The determination that an inventor is to be listed on a patent application is governed by patent law and may differ from academic standards of authorship. If there is more than one inventor, the Inventor's share will be distributed equally among the co-inventors, unless the Hospital has been instructed otherwise in writing by all of the co-inventors.

This policy provides that Children's Hospital pays royalties only to its own inventors. However, when a Children's Hospital inventor makes an invention with a co-inventor in another academic or non-profit institution, and the institutions agree to market the invention jointly, the Director of Research Administration may authorize an agreement whereby each institution pays all inventors according to the terms of its own intellectual property policy.

Royalty shares will be distributed twice per year, in July and January based on revenues

Page 3

APPENDIX 215

from the prior half fiscal year.

The Hospital's share of net license revenues shall be placed in two Funds to support research programs of the Hospital. First, funds from the Hospital's share of annual revenues will be taken "off the top" to establish and maintain a Technology Development Fund, to be managed by the Technology Transfer Office for support of developmental activities that can enhance the marketability of early stage technologies. The Technology Development Fund will be maintained as a revolving fund for expenditures up to $50,000 per year. Following replenishment of the Technology Development Fund, proceeds will be allocated to the General Research Endowment Fund to support Hospital based research and education.

Funds distributed to the Office of Research Administration are intended to finance the Hospital's technology transfer operations, including administrative staff and unreimbursed out-of-pocket expenses.

Notwithstanding the foregoing, all proceeds from any software program that is deemed by the Hospital at any time to be a "work for hire" shall belong to the Hospital and shall not be distributed pursuant to this policy.

**Resolution of Disputes**
Any disputes or problems of interpretation that arise in connection with this policy shall be resolved by the President with the advice of the appropriate Committee of the Board of Trustees.

**Effective Date**
This policy is approved by the Trustees on April 21, 1992 and pertains to all license agreements with effective dates, or signing dates if effective dates are not specified, on or after this date.

Amendment to Intellectual Property Policy approved by Board of Trustees June 15,1993 In some transactions the Hospital may determine that it is appropriate to obtain stock, stock options, warrants or similar financial options("equity" or "stock")in lieu of or in addition to cash in exchange for the transfer of an invention owned by the Hospital. Such transactions shall be governed by the Hospital's Guidelines for Managing Equity Obtained in the Transfer of Hospital Owned Technology ("Guidelines"), as the same may be amended from time to time. Consistent with the Guidelines, the ownership, management and disposition of such equity shall be within the sole discretion of the Hospital. In the event the Hospital decides to sell such equity or to permit an inventor to own directly such equity, the cash proceeds or share of stock, as appropriate, will be distributed to the inventor as follows:

- 25% to the Inventor
- 25% to the Inventor's Department
- 40% to the Hospital

APPENDIX 216

- 10% to the Office of Research Administration

To the extent that cash proceeds of equity are distributed, the amount available for distribution shall be net of out-of-pocket costs attributable to patenting, litigation, marketing, and sale of the stock incurred by the Hospital. To the extent that shares of stock are distributed to an Inventor directly, the Hospital will be entitled to recover a proportionate share of such out-of-pocket costs by either a payment of cash to the Hospital or by retaining a fair percentage of the shares of stock.

APPENDIX 217

# PMOS EXHIBIT 1

## EXCERPTS OF RYAN DIETZ'S DECEMBER 6, 2018 DEPOSITION TRANSCRIPT

PAGES 1-150
EXHIBITS See Index
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Civ. A. No. 17-12472-DLS

LUIGI WARREN,                    )
                                 )
          Plaintiff,             )
                                 )
          vs                     )
                                 )
THE CHILDREN'S HOSPITAL          )
CORPORATION,                     )
                                 )
          Defendant.             )


     DEPOSITION of RYAN DIETZ, a witness called on behalf of the plaintiff, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Marie C. Leonard, Registered Professional Reporter, Certified Shorthand Reporter No. 146799, and a Notary Public in and for the Commonwealth of Massachusetts, at Children's Hospital, Landmark Center, 401 Park Drive, Boston, Massachusetts, on Thursday, December 6, 2018, commencing at 1:03 p.m.



          SHEA COURT REPORTING SERVICES
            15 Court Square, Suite 920
           Boston, Massachusetts 02108
                (617) 227-3097

7

Is that clear?

A.   Yes, that's clear.

Q.   Very good.

I would like to start by asking some questions about your background and experience, Mr. Dietz.  You are currently senior licensing manager at the Technology and Innovation Development office at Boston Children's Hospital; is that correct?

A.   That's correct.

Q.   And you started in that position in 2012 --

A.   Correct.

Q.   -- is that correct?

And were you previous -- was your previous position director of the Office of Technology Development at the Immune Disease Institute --

A.   Correct.

Q.   -- is that correct?

And you were there in that position from 2002 to 2012, for about ten years; is that also correct?

A.   That's not completely accurate, no.

Q.   Can you please clarify that?

8

MR. FOLKMAN: Objection.

A. The title -- the title that I received for director changed at a point in time that I don't recall. And my prior title was technology transfer associate.

Q. Okay. And you had a JD degree, which is a juris doctor, as I understand it, from Suffolk University Law School --

A. That's --

Q. -- is that correct?

A. That's correct.

Q. And is it correct you also have a bachelor's degree in psychology and criminal justice; is that correct?

A. That's correct.

Q. And you studied biotechnology at Boston University; is that correct?

A. That is correct.

Q. All right. And in your position at Immune Disease Institute, you were responsible for the licensing of technology to Moderna Therapeutics; is that correct?

MR. FOLKMAN: Objection.

A. That's correct.

9

Q.  And in your current position at Boston Children's Hospital, is the Moderna license still administered by you; is that correct?

MR. FOLKMAN:  Objection.

A.  I -- I don't necessarily know what the question is.  "Administered" is a little complicated for me to understand.

Q.  Okay.  What is your role with respect to the Moderna licensing agreement at Boston Children's Hospital?

A.  I am the manager of the technology cases and the licenses associated with those cases; and, therefore, the license is something I oversee on behalf of Children's Hospital.

Q.  Okay.  And there are multiple licensing offices at Children's Hospital; is that correct?

A.  That's correct.

Q.  And -- but you are the licensing officer who oversees the Moderna license --

A.  I -- I oversee the cases and the --

Q.  -- is that correct?

A.  -- and the licenses associated with those cases.

25

correct?

A.   I don't know the intent of entering into the agreement.

Q.   In 2012 IDI did merge with Boston Children's Hospital; is that correct?

A.   That is correct.

Q.   And that -- so IDI ceased to exist as an independent entity on October 1, 2012 and became a program within Boston Children's Hospital; is that your understanding?

        MR. FOLKMAN:  Objection, compound, calls for a legal conclusion.

A.   That is my understanding.

Q.   Can you summarize in your own words the differences between Immune Disease Institute and Boston Children's Hospital --

        MR. FOLKMAN:  Objection.

Q.   -- in terms of size and admission?

        MR. FOLKMAN:  Objection.

A.   They are different --

Q.   Is it correct that the -- sorry.

A.   They are different --

Q.   Go ahead.

A.   -- in size significantly.  They are primarily

26

Q. different in their clinical capacity of the hospital versus the Immune Disease Institute having no clinical focus or employees.

Q. Both of these organizations are nonprofit entities; is that correct?

A. I believe so.

Q. The Immune Disease Institute, to restate what you just said, was strictly a research institution, and Boston Children's Hospital does research but it's also -- treats patients and teaches medical students; is that correct?

A. I don't believe I stated that they are strictly one thing or another.  So I don't believe your restatement is accurate.

Q. Is it true that Boston Children's Hospital treats patients, but that it's also a teaching and research institution; is that correct?

A. Yes.

Q. And is it correct that the Immune Disease Institute was solely a scientific institute and not involved in the treatment of patients or the training of medical students?

A. I don't believe that is accurate.

Q. In what respect is it not accurate?

27

A. I understand medical students are trained there, maybe not in clinical, but in research capacity. And there may be people at IDI who had clinical roles somewhere outside of the Immune Disease Institute.

Q. Okay. The licensing agreement involving the technology from Derrick Rossi's lab was -- involved the Immune Disease Institute and Moderna. So the Immune Disease Institute, am I correct, was the licensor, Moderna the licensee?

A. Correct.

Q. And am I correct that the Immune Disease Institute had a written policy regarding the sharing of revenues with employee-inventors --

THE COURT REPORTER: What's --

Q. -- and licensed technology?

MR. FOLKMAN: Dr. -- excuse me. Dr. Warren, I think the court reporter had a little trouble hearing that question. Could you say it again, please.

DR. WARREN: Yes.

Q. The Immune Disease Institute had a written policy regarding the sharing of revenues from

28

license -- licensing of inventions that covered employee-inventors; is that correct?

A. That is correct.

Q. And that's fairly typical for major research institutions; is that correct?

A. That is my understanding.

Q. To have such a policy?

And Boston Children's Hospital has its own written policy for sharing -- governing the sharing of revenue for licensed inventions with inventors and other parties?

MR. FOLKMAN:  Objection.

A. I'm sorry.  That -- that's a question?

Q. Is that correct?

A. Yes, that is correct.

Q. Does Boston Children's Hospital also have its own written policy regarding licensing and revenue sharing?

A. Yes, it does.

Q. Did the Immune Disease Institute take an equity stake in Moderna in partial consideration for the licensing of the technology from Derrick Rossi's lab?

A. Yes, they did.

29

Q. And the equity stake is treated as a royalty for the purposes of distributing -- for the purposes of sharing revenues with employee-inventors; is that correct?

MR. FOLKMAN: Objection.

A. I believe so.

Q. And is that also true of the Boston Children's Hospital policy?

MR. FOLKMAN: Objection.

A. I believe so.

Q. Did the Immune Disease Institute ever during the course of its independent existence reveal publicly that it had accepted equity from Moderna in partial consideration for a license to technology?

A. I don't know.

Q. But you never heard of it during that --

A. I'm not aware of --

Q. You were never aware of such a thing?

A. Could you clarify your question?

Q. Did the Immune Institute ever disclose in a public forum such as a -- an annual report or in academic publication that it had taken an equity stake in Moderna and also consideration

30

for a license?

A. I don't know.

Q. Do you know if according to the IDI policy on inventions, the institution was supposed to do that?

MR. FOLKMAN: Objection.

A. I don't know if we were supposed to do that.

Q. Did the Immune Disease Institute or Boston Children's Hospital ever disclose to either -- sorry. Let me strike that. I'm going to begin again.

The license that IDI granted to Moderna is based on patent applications with two inventors, Derrick Rossi and the plaintiff, in this case, Luigi Warren; is that correct?

MR. FOLKMAN: Objection.

A. That's correct.

Q. And there are no other inventors on those filings?

A. That's correct.

Q. Did the Immune Disease Institute ever reveal, in the course of its existence, the acceptance of equity to either of those two inventors, Dr. Warren or Dr. Rossi?

31

MR. FOLKMAN:  Objection.

A.   I don't know.

Q.   But you're not aware of that happening?

A.   I'm not aware of it, no.

Q.   And you were director of the licensing office
at Immune Disease Institute?

MR. FOLKMAN:  Objection, argumentative.

A.   That's correct.

Q.   And how many individuals worked in that
office?

A.   At what time frame?

Q.   Let's say 2010 to 2012.

A.   One.

Q.   You're referring to yourself?

A.   Correct.

Q.   Sorry.  Could you repeat your answer?

A.   Correct.

Q.   I didn't catch that.

A.   Correct.

Q.   Are you aware of Boston Children's Hospital
ever communicating or ever disclosing in a
public forum that Moderna license -- that IDI
or BCH had taken equity from Moderna?

A.   I'm not aware.

32

Q.   You're not aware of that happening?

A.   Correct.

Q.   Do you know if the Boston Children's Hospital policy on licensing says that that should happen?

A.   I'm not aware of that.

Q.   Are you familiar with Boston Children's Hospital's written policy on inventions and the licensing and technology?

A.   I am familiar with it.

Q.   You are familiar with it?

A.   Correct.

Q.   But you're not aware of any provisions in there that would call for public disclosure of the acceptance of equity in return for a license?

     MR. FOLKMAN:  Objection, asked and answered.

A.   That is correct.

Q.   Let's turn to the plaintiff's contact review in 2017 regarding the Moderna license.  Do you recall being contacted on one thing by Luigi Warren, the plaintiff in this case --

     MR. FOLKMAN:  Objection.

65

DR. WARREN:  All right.

MR. FOLKMAN:  Okay.  Okay.  Go ahead.

Q.   All right.  Let's turn to page 6 of the policy, page 6 being the policy -- original document pagination.

A.   Yes.

Q.   And the second paragraph from the top of the page says, "Each covered person shall sign a participation agreement which the covered person agrees to comply with this policy.  A copy of a participation agreement is attached as Exhibit A.

A.   I see that.

Q.   Do you know from your time at -- as the director of tech transfer in the Immune Disease Institute, whether that practice was followed?

A.   It's my understanding that all new employees went through a process where they were given the policy and they were required to sign it.

Q.   Okay.  Let's turn to page 8 of the document.

A.   Yes.

Q.   And could you please read for me -- you see the Section "H, Distribution of Net Proceeds,"

147

A.   I think it assumes that that is a complete
     description of what went into play, and I
     don't know whether that's the case.

Q.   All right.
          All right.  Can you tell me when the
     first distributions of the licensing revenue
     from the Moderna case took place?

A.   I don't have details of the distributions.

Q.   Can you tell me if any steps were taken by
     IDI or BCH to inform either Dr. Warren or
     Dr. Rossi that license and policy that was
     going to be applied had a different percentage
     for the investors?

A.   I don't recall communications informing --
     informing the inventors of those changes.
     We've talked about a couple -- the description
     earlier of various splits, but I'm not
     familiar with other communications that you
     might be asking about.

Q.   Going back to the IDI technology policy or
     inventions policy, are you familiar with what
     steps were taken to inform IDI employees of
     the contents of that policy?

A.   Can you -- we're just pulling that exhibit up.

148

Are you referring to Exhibit 11?

Q.   Yes.

A.   And your question?

Q.   In the technology policy what steps were taken to make employees or employee-inventors aware of what was in that document?

MS. MacIVER:  Objection.

Q.   So you stated that one aspect was to provide a participation agreement during orientation and have the parties -- have the employee sign your participation agreement; is that correct?

A.   That's correct.

Q.   Are you aware of the technology policy being posted on the corporate Internet for IDI?

A.   I believe it was.

DR. WARREN:  Okay.  Now, I believe I have no further questions at this time; and I will ask Ms. MacIver whether she has any question.

MS. MacIVER:  I just have one.  I'm going to put in front of Ryan -- it's Exhibit 21, and then it was page BCH001106.

* * * * *

151

CERTIFICATE

Commonwealth of Massachusetts

Norfolk, ss.


        I, Marie C. Leonard, Registered

Professional Reporter, Certified Shorthand

Reporter, and a Notary Public in and for the

Commonwealth of Massachusetts, do hereby

certify:

        That RYAN DIETZ, the witness whose

deposition is hereinbefore set forth, was duly

sworn by me and that such deposition is a true

record of the testimony given by the said

witness.

        IN WITNESS WHEREOF, I have hereunto set

my hand and notarial seal this 15th day of

January, 2019.




                        Marie C. Leonard

                        RPR, CSR No. 146799


My commission expires

on June 17, 2022

APPENDIX 234

# PMOS EXHIBIT 2

## EXHIBIT 7 OF RYAN DIETZ'S DECEMBER 6, 2018 DEPOSITION: PLAINTIFF'S LAB NOTEBOOK PAGES

Dietz
EXHIBIT NO. 7
MCL  12/4/18

3 - 74

BOOK    PAGE

TITLE/TITRE/TITEL  IPS Project          PROJECT/PROJET/PROJEKT

Continued From Page/Suite de la page/ Fortsetzung von Seite:

I'm planning a project to see if sustained transient transfection of Yamanaka factor T7 transcripts can induce iPS in MSC or perhaps MEF cultures. I've designed nested primers to make T7 templates for runoff transcription for the four Y factors + eGFP from an IRES2-eGFP Clontech plasmid Rai gave me. Also, I've designed Q primers targeting the 3'UTR of the endogenous transcripts for the Y factors, so we can monitor if the pluripotency circuit is activated during or after transfection. I envision changing the media for the cells every day, using media spiked with the T7 RNA cocktail, and perhaps collecting cells for Q analysis every ~3 days at passage. Mirus TransIT or MDT Transfectan look like the best bets for the

| | |
|---|---|
| GFP-IF | TAATACGACTCACTATAGGGTTTCCTTTGAAAAACACGATGA |
| GFP-IR | CAAATGTGGTATGGCTGATTATG |
| GFP-OF | TCGGTGCACATGCTTTACAT |
| GFP-OR | GGGAGGTGTGGGAGGTTTT |
| KLF-IF | TAATACGACTCACTATAGGGATTAATGAGGCAGCCACCTG |
| KLF-IR | TGTGGGTCACATCCACTACG |
| KLF-OF | GGCTCAGGTACCCCTCTCTC |
| KLF-OR | CTCGTGGGAAGACAGTGTGA |
| KLF-QF | ATGCCCGGACTTACAAAATG |
| KLF-QR | CCCCCAAGCTCACTGATTTA |
| MYC-IF | TAATACGACTCACTATAGGGAGGAGCTCCTCGAGCTGTTTG |
| MYC-IR | TCCAGCTCCTCCTCGAGTTA |
| MYC-OF | GGACAGTGTTCTCTGCCTCTG |
| MYC-OR | AATTCCAGCGCATCAGTTCT |
| MYC-QF | GCATGCTCAAAGCCTAACCT |
| MYC-QR | GGCAGTTAAAATTATGGCTGAA |
| OCT-IF | TAATACGACTCACTATAGGGGAGCCGTCTTTCCACCAG |
| OCT-IR | TGTCTACCTCCCTTGCCTTG |
| OCT-OF | GTCCCTAGGTGAGCCGTCTT |
| OCT-OR | CCACCCCTGTTGTGCTTTTA |
| OCT-QF | GGATGGGGAAAGAAGCTCAG |
| OCT-QR | GAACAAAATGATGAGTGACAGACA |
| SOX-IF | TAATACGACTCACTATAGGGACTATTCTCCGCCAGATCTCC |
| SOX-IR | TCTCCAGTTCGCAGTCCAG |
| SOX-OF | GTCTCGAGCTCCGCTTCC |
| SOX-OR | CCCTCCCAATTCCCTTGTAT |
| SOX-QF | TTAACGCAAAAACCGTGATG |
| SOX-QR | AGTCCCCAAAAAGAAGTCC |

pIRES2-EGFP

GFP-OF
GFP-IF

GFP-IR
GFP-OR

1       1,141       1,993                                              5,308

Diagram Key
- ☐ Hole in contig
- ▨ Single fragment
- ▩ Multiple fragments same direction
- ▤ Both strands
- ▦ Both strands plus

Bumps on fragments show motifs, hollow rectangles show features

← Start codon frame 1
← Stop codon frame 2

gi|171543887|ref|NM_010637.3|

KLF-OF
KLF-IF

KLF-IR
KLF-OR

KLF-QF
KLF-QR

1       546                              2,063       2,430       3,057

Diagram Key
- ☐ Hole in contig
- ▨ Single fragment
- ▩ Multiple fragments same direction
- ▤ Both strands
- ▦ Both strands plus

Bumps on fragments show motifs, hollow rectangles show features

← Start codon frame 1
← Stop codon frame 2

SIGNATURE/UNTERSCHRIFT          Continued To Page/à la page/Fortsetzung bis Seite:

DATE/DATUM  6/27/09

DISCLOSED TO AND UNDERSTOOD BY:
LU ET APPROUVE PAR:
ÜBERPRÜFT UND FREIGEGEBEN DURCH:          DATE/DATUM  5/30/09

PROPRIETARY INFORMATION BELONGING TO
L'INFORMATION DE PROPRIÉTÉ INDUSTRIELLE APPARTENANT À
EIGENE INFORMATIONEN VON:

EXHIBIT 7
APPENDIX 236
BCH001970

3 -112
BOOK  PAGE

TITLE/TITRE/TITEL  iPS Project          PROJECT/PROJET/PROJEKT

Continued From Page/Suite de la page/ Fortsetzung von Seite:

Discussed iPS project with Derrick and got okay to proceed, as long as expenditures remain modest. Idea is to try and convert MEFs into iPS by repeated transfection of Yamanaka factor-encoding synthetic mRNAs over a 10-14 day time course. Plan to PCR up the T7 templates from murine ES RNA using the primers I have already purchased (p.85). I'll use Ambion's MESSAGEmachine to make capped, polyadenylated transcript and (most likely) TransIT to facilitate daily transfection by direct administration of RNA + cationic reagent to culture medium. Will use eGFP mRNA to optimize transfection conditions and probably also to monitor transfection efficiency during experiment. Derrick recommends using eGFP RNA at substantially lower concentration than the Y factor RNA in these trials. Also, he said we should definitely go with MEFs for the initial experiment, not MSCs, since they are a known quantity wrt to iPS generation. If we see ES-like colonies, we should take them to blastocyst injection immediately to validate pluripotency. For this purpose we need reporter cells. I will order a ROSA26 (lacZ) mouse (male, breeding age i.e. 10-12 wks) so we can get appropriate MEFs. As soon as mouse arrives, mate to two B6 females. Check for vaginal plugs (signifying pregnancy) and wait 13 days before recovering embryos to make MEFs. Will need to check for ROSA26 heterozygosity by B-Gal staining of tissue samples — we only want ROSA26+ MEFs for the experiment. Once embryos are recovered, mate the ROSA26 again to produce replacement animals should this mouse die.

Want to try 5-aza-deoxycytidine and Valproic acid as adjuncts to iPS generation in this experiment. Reagents are available from VWR.

Needs:

- Aza deoxycytidine
- Valproic Acid
- MESSAGEmachine Ultra

Continued To Page/à la page/Fortsetzung bis Seite:

SIGNATURE/UNTERSCHRIFT

DISCLOSED TO AND UNDERSTOOD BY:
LU ET APPROUVÉ PAR:
ÜBERPRÜFT UND FREIGEGEBEN DURCH:

DATE/DATUM  7/19/09

DATE/DATUM  1/30/09

PROPRIETARY INFORMATION BELONGING TO
L'INFORMATION DE PROPRIÉTÉ INDUSTRIELLE APPARTENANT À
EIGENE INFORMATIONEN VON

BCH002008



H002351

8 - 57
BOOK    PAGE

| TITLE/TITRE/TITEL | PROJECT/PROJET/PROJEKT |
|---|---|

Continued From Page/Suite de la page/ Fortsetzung von Seite:

wells show dose-dependent brightness relationship. Does look like only about half the cells are expressing significant GFP — similar to MEF experience.

T6 plate: Looks good for B18R. Hasn't been too much change since yesterday. In the B18R+ wells, only the most aggressively dosed (2-4-8-16) well is close to being trashed, and even that has quite a few small clusters. Cell density in the other B18R+ wells is poor, but not terrible. GFP expression still looks fair, esp in the lower dose wells — maybe a 4 or even better in the 2-2-2, 2-2-4 wells. B18R- wells look terrible — huge numbers of floaters (though there are quite a few in the B18R+ wells too); still a few small islands of cells, but with very feeble GFP expression. Minimal photoshift now across the whole plate.

Should take these cultures to FACS tomorrow, if possible.

**12:00 AM** FACSed the BJ plate. By eye, GFP expression looked down by maybe a factor of 2 relative to 16:45 AM check. See p.63 for FACS data.

**4:50 PM** Very faint GFP in B18R+, none in B18R-. We terminated transfections. Looks like we got ~6 days decent GFP expression in B18R+ wells, ~4 days in B18R- (4.5 perhaps). Lot of toxicity all around, but considerably worse in B18R- wells.

**5:30 PM** Set 4 x 12-well plates of HEKn ~10K per well, in HEK media (no Matrigel). Added & thawed vial of cells to 3ml media in a 14 ml tube, used 1ml syringe tip to dispense 40 µl aliquots. (40 µl ÷ (1000 µl/300 µl) x 10^5 = 10^4 cells.)

**FRI 1/30    4:00 PM** Pooled and split BJ; from remaining 10 cm plate and 6-well to 2 x 15 cm dishes

In T6 plate, Wells 1-3 show significant central islands, 4 is pretty trashed. All B18R- wells are trashed except one of the 2-2-4 replicates. All wells show more cellularity at the edge of the well. Phenotypes coherent, reminiscent of earlier, late-stage HEF trials.

Continued To Page/à la page/Fortsetzung bis Seite:

SIGNATURE/UNTERSCHRIFT

DATE/DATUM
1/29/09

PROPRIETARY INFORMATION BELONGING TO
L'INFORMATION DE PROPRIÉTÉ INDUSTRIELLE APPARTENANT À
EIGENE INFORMATIONEN VON

DISCLOSED TO AND UNDERSTOOD BY:
LU ET APPROUVE PAR:
ÜBERPRÜFT UND FREIGEGEBEN DURCH:

DATE/DATUM
4/29/09

BCH002662

# PMOS EXHIBIT 3

## EXHIBIT 5 OF RYAN DIETZ'S DECEMBER 6, 2018 DEPOSITION: RYAN DIETZ'S INVENTION CASE NOTES

## Cases

Dietz

EXHIBIT NO. 5

MCL 12/6/18

| | |
|---|---|
| Case | **2085** |
| LeadInventor | Rossi, Derrick |
| Title | Reprogramming to pluripotency and directed differentiation of cell fate using modified RNAs |
| CM | RD |
| LicenseStatus | Licensed |
| DiscRecdDate | 08/13/08 |
| OutlookFolderID | 00000000FA1D0C14EDEF334D841748FEAD8BAB0D0100A6B721CC0025F34685DD9BD4489D0D68000090AI |
| NotesGeneral | RD and Derrick Rossi spoke about a potential new disclosure around Induced Pluropotency cells which require introduction of 4 genes and this is currently done by adenoviral vectors and the field could move rapidly ahead if there were other ways of doing this. Derrick and Luigi believe that they could use RNA to get the same effects and this would be done through existing transfectants. This would have commercial and signficant scientific implications if it works out. There are likely lots of people working in this area and moving quickly could be important. Patentability will be limited by how enable the technology is at time of filing and the notion that it is based on existing technologies such as transfection and the known genes that induce IPS cells. 8/13/08 - RD. |

RD met with Derrick and Louigi on this new disclosure 1/12/09. This has reagent kit value and potential thereapeutics value. Reagent kit would be specific mRNAs with certain modifications (most/all known in the field) and transfection reagents for creating IPS cells without viral vectors. The therapeutic aspect would be important as the IPS cells need to be produced stabily and with high scale for therapeutic uses. The suggested changes are analagous to the genes that are known to create IPS cells from previous publications. They have an inclination to have a company in this space and we spoke about how that would work regarding reagent vs therapeutic potential. I mentioned the importance of getting revenues on this asap while the therapeutic (newCo) component would be dificult at best based upon the current economic environment. I also mentioned that this would need to be disclosed to GSK based upon thier ROFN. There were no problems with this and it was seen as a benefit.

Met with Derrick and Luigi on this and they are ready to go ahead with the draft provisional. I walked them through the sections of the application and mentioned that the attorneys are best at generating this format and the claims and they should focus on the science and potential embodiments that could arrise. There is lots of science in this area including one reference in a patent to mRNA delivery into iPS cells. We will face significant novelty and obviousness rejections, but the various tricks they are using to get this to work appear to be significant, and the best area for coverage. They mentioned Stemgent is interested, and a CDA has been sent to cover discussions with them. I will also alert David Resnick to work with them on getting this done as soon as they put together the relevent information and data. RD.

2/26/2010 - Met with attorney Mark Fitsgerald, Luigi and Derrick. Good conversation about the draft manuscript, and patentable aspects. Is braoder than just IPS differentiation asi it could also drove cell fate in various directions based upon modified RNA. This has large research reagent implications suplanting the other platforms that use viruses or proteins. Also would be important in regenerative medicine for treating tissue/cells to make them move in one direction or another. Also discussed was direct therapeutic applications that could skip cellular development stages that are disease causing. This area would have the same problems as RNAi, Delivery, but would allow more than knockdown, since you could direct the cell to take different form. Also mentioned was a method for changing cells to express a surface molecule taht would cause them to go to certain parts of the body or target certain tissues (tumors ect....). Other uses would be to create tissue models of disease for drug screening

1

EXHIBIT 5

APPENDIX 241
BCH001307

purposes.  We will try to get composition claims around the cells not having viruses as well as the modified RNAs and uses thereof.  RD.

| | |
|---|---|
| **CaseManagerName** | Ryan Dietz |
| **LeadDept** | Medicine |
| **FundingNotes** | Start-up Funds: 1180, Time Period: Two years |
| **LawFirm** | Nixon Peabody |
| **LeadAttorney** | Resnick, David |
| **PatentStatus** | Patented |
| **DistribInfo** | 5/27/15.  There are $1992.22 in consulting expenses that need to be deducted. Rec'd Luigi W9 he left 06/16/10 |
| **DistTestAmount** | 6580 |
| **PCM_PatAdminNotes** | 5/19/11: Development plan is not great. Going to respond since its licensed <br><br> 6/20/11: licensed to moderna. This has already been handled. filed with previos provisional. <br><br> 2/12/13: was a response to OA being made |
| **NonConfTitle** | Reprogramming to pluripotency and directed differentiation of cell fate using modified RNAs |
| **CreationDate** | 08/13/08 |
| **ModDate** | 04/14/17 |
| **IDICaseNum** | 08-011 |

2

APPENDIX 242 BCH001308

# PMOS EXHIBIT 4

## EXECUTED INVENTION ASSIGNMENTS PLAINTIFF PROVIDED TO THE IDI

**Attorney's Docket No.:** **033393-067440-P**
**U.S. Provisional No. 61/325,003**

## ASSIGNMENT

WHEREAS, I, **Luigi Warren**, a citizen of United Kingdom, residing at 170 Brookline Avenue #612, Boston, MA 02215; have invented certain new and useful improvements in **SUSTAINED POLYPEPTIDE EXPRESSION FROM MODIFIED RNAS AND USES THEREOF**, which can be found in **U.S. Provisional Application No. 61/325,003**, filed **April 16, 2010**, and naming myself as inventor;

AND WHEREAS, **Immune Disease Institute, Inc.**, a Massachusetts corporation, with its principal place of business at CLSB 3rd Floor, 3 Blackfan Circle, Boston, MA 02115, desires to acquire the entire right, title and interest in and to the said improvements and the said Application:

NOW, THEREFORE, for good and valuable consideration, including salary or payment for the making of inventions, or employee benefits, the receipt of which is hereby acknowledged, I, the said inventor, do hereby acknowledge that I have sold, assigned, transferred and set over, and by these presents do hereby sell, assign, transfer and set over, unto the said **Immune Disease Institute, Inc.**, its successors, legal representatives and assigns, the entire right, title and interest throughout the world in, to and under the said improvements, and the said application and all divisions, renewals and continuations thereof, and all Letters Patent of the United States which may be granted thereon and all reissues and extensions thereof, and all rights of priority under International Conventions and applications for Letters Patent which may hereafter be filed for said improvements in any country or countries foreign to the United States, and all Letters Patent which may be granted for said improvements in any country or countries foreign to the United States and all extensions, renewals and reissues thereof; and I hereby authorize and request the Commissioner of Patents of the United States, and any Official of any country or countries foreign to the United States, whose duty it is to issue Patents on applications as aforesaid, to issue all Letters Patent for said improvements to the said **Immune Disease Institute, Inc.**, its successors, legal representatives and assigns, in accordance with the terms of this instrument.

AND I HEREBY covenant and agree that I will communicate to the said **Immune Disease Institute, Inc.**, its successors, legal representatives and assigns, any facts known to me respecting said improvements and testify in any legal proceeding, sign all lawful papers, execute all divisional, continuing and reissue applications, make all rightful oaths and generally do everything possible to aid the said **Immune Disease Institute, Inc.**, its successors, legal representatives and assigns, to obtain and enforce proper patent protection for said improvements in all countries.

Case 1:17-cv-12472-DLC          Plaintiff's Rule 26(a)(1) Initial Disclosures          APPENDIX 244

Attorney's Docket No.:  033393-067440-P
U.S. Provisional No. 61/325,003

The undersigned hereby grant the law firm of Nixon Peabody LLP of 100 Summer Street, Boston, Massachusetts  02110-2131, U.S. the power to insert on this Assignment any further identification which may be necessary or desirable in order to comply with the rules of the U.S. Patent and Trademark Office for recordation of this document.


IN TESTIMONY WHEREOF, I, Luigi Warren, hereunto set my signature this _30_ day of _August_____, 2010.

_____
Luigi Warren

Attorney's Docket No.: 033393-067443-US1; 033393-067442-PCT
U.S. Application Serial No.: 13/088,009
International Application No.: PCT/US11/32679

## ASSIGNMENT

WHEREAS, I, **Luigi Warren**, a citizen of United Kingdom, residing at 157 Sixth Street, #605, Cambridge, MA 02142; have invented certain new and useful improvements in **SUSTAINED POLYPEPTIDE EXPRESSION FROM SYNTHETIC, MODIFIED RNAS AND USES THEREOF**, which can be found in **U.S. Application Serial No. 13/088,009**, filed **April 15, 2011**, and **International Application No.: PCT/US11/32679**, filed **April 15, 2011**, and naming me as inventor;

AND WHEREAS, **Immune Disease Institute, Inc.**, a Massachusetts corporation, with its principal place of business at CLSB 3rd Floor, 3 Blackfan Circle, Boston, MA 02115, desires to acquire the entire right, title and interest in and to the said improvements and the said Application:

NOW, THEREFORE, for good and valuable consideration, including salary or payment for the making of inventions, or employee benefits, the receipt of which is hereby acknowledged, I, the said inventor, do hereby acknowledge that I have sold, assigned, transferred and set over, and by these presents do hereby sell, assign, transfer and set over, unto the said **Immune Disease Institute, Inc.**, its successors, legal representatives and assigns, the entire right, title and interest throughout the world in, to and under the said improvements, and the said application and all divisions, renewals and continuations thereof, and all Letters Patent of the United States which may be granted thereon and all reissues and extensions thereof, and all rights of priority under International Conventions and applications for Letters Patent which may hereafter be filed for said improvements in any country or countries foreign to the United States, and all Letters Patent which may be granted for said improvements in any country or countries foreign to the United States and all extensions, renewals and reissues thereof; and I hereby authorize and request the Commissioner of Patents of the United States, and any Official of any country or countries foreign to the United States, whose duty it is to issue Patents on applications as aforesaid, to issue all Letters Patent for said improvements to the said **Immune Disease Institute, Inc.**, its successors, legal representatives and assigns, in accordance with the terms of this instrument.

AND I HEREBY covenant and agree that I will communicate to the said **Immune Disease Institute, Inc.**, its successors, legal representatives and assigns, any facts known to me respecting said improvements and testify in any legal proceeding, sign all lawful papers, execute all divisional, continuing and reissue applications, make all rightful oaths and generally do everything possible to aid the said **Immune Disease Institute, Inc.**, its successors, legal representatives and assigns, to obtain and enforce proper patent protection for said improvements in all countries.

13430704.2

Attorney's Docket No.:  033393-067443-US1; 033393-067442-PCT
U.S. Application Serial No.: 13/088,009
International Application No.: PCT/US11/32679

The undersigned hereby grant the law firm of Nixon Peabody LLP of 100 Summer Street, Boston, Massachusetts  02110-2131, U.S. the power to insert on this Assignment any further identification which may be necessary or desirable in order to comply with the rules of the U.S. Patent and Trademark Office for recordation of this document.

IN WITNESS WHEREOF, I, Luigi Warren, hereunto set my signature this 25 day of ___APRIL___, 2011.

Luigi Warren

_____
Witness Signature

_____4/25/11_____
Date

Margaret McDonough
Witness Name (printed)

IDI 08-011
APPENDIX 247

Attorney's Docket No.:  033393-067441-P
U.S. Provisional No.: 61/387,220

## ASSIGNMENT

WHEREAS, I, **Luigi Warren**, a citizen of United Kingdom, residing at 170 Brookline Avenue #612, Boston, MA 02215; have invented certain new and useful improvements in **SUSTAINED POLYPEPTIDE EXPRESSION FROM SYNTHETIC, MODIFIED RNAS AND USES THEREOF**, which can be found in **U.S. Provisional Application No. 61/387,220,** filed **September 28, 2010**, and naming me as inventor;

AND WHEREAS, **Immune Disease Institute, Inc.**, a Massachusetts corporation, with its principal place of business at CLSB 3rd Floor, 3 Blackfan Circle, Boston, MA 02115, desires to acquire the entire right, title and interest in and to the said improvements and the said Application:

NOW, THEREFORE, for good and valuable consideration, including salary or payment for the making of inventions, or employee benefits, the receipt of which is hereby acknowledged, I, the said inventor, do hereby acknowledge that I have sold, assigned, transferred and set over, and by these presents do hereby sell, assign, transfer and set over, unto the said **Immune Disease Institute, Inc.**, its successors, legal representatives and assigns, the entire right, title and interest throughout the world in, to and under the said improvements, and the said application and all divisions, renewals and continuations thereof, and all Letters Patent of the United States which may be granted thereon and all reissues and extensions thereof, and all rights of priority under International Conventions and applications for Letters Patent which may hereafter be filed for said improvements in any country or countries foreign to the United States, and all Letters Patent which may be granted for said improvements in any country or countries foreign to the United States and all extensions, renewals and reissues thereof; and I hereby authorize and request the Commissioner of Patents of the United States, and any Official of any country or countries foreign to the United States, whose duty it is to issue Patents on applications as aforesaid, to issue all Letters Patent for said improvements to the said **Immune Disease Institute, Inc.**, its successors, legal representatives and assigns, in accordance with the terms of this instrument.

AND I HEREBY covenant and agree that I will communicate to the said **Immune Disease Institute, Inc.**, its successors, legal representatives and assigns, any facts known to me respecting said improvements and testify in any legal proceeding, sign all lawful papers, execute all divisional, continuing and reissue applications, make all rightful oaths and generally do everything possible to aid the said **Immune Disease Institute, Inc.**, its successors, legal representatives and assigns, to obtain and enforce proper patent protection for said improvements in all countries.

Attorney's Docket No.: 033393-067441-P
U.S. Provisional No.: 61/387,220

The undersigned hereby grant the law firm of Nixon Peabody LLP of 100 Summer Street, Boston, Massachusetts 02110-2131, U.S. the power to insert on this Assignment any further identification which may be necessary or desirable in order to comply with the rules of the U.S. Patent and Trademark Office for recordation of this document.

IN WITNESS WHEREOF, I, Luigi Warren, hereunto set my signature this 27 day of April_____, 2011.

Luigi Warren

Witness Signature

Date

Pedro I. Borrero

Witness Name (printed)

# PMOS EXHIBIT 5

## PLAINTIFF'S 2011 EXCHANGES WITH RYAN DIETZ RE MODERNA

**luigi.warren@outlook.com**

| | |
|---|---|
| **From:** | Ryan Dietz |
| **Sent:** | Thursday, February 10, 2011 2:29 PM |
| **To:** | lwarren@mit.edu |
| **Subject:** | Assignment Document |
| **Attachments:** | 20110210162424129.pdf; 20100928_Application_033393_067441_P.pdf |

⌐⌐| ⌐◧⌐�2

Luigi,

I wanted to provide an update and send along the attached assignment document seeking your signature and return to IDI.

This assignment pertains to a second provisional application which was filed immediately before publication to capture additional data that supports the claims.  We did not alter inventorship or the scope of the inventive subject matter.

Attached please find the assignment document.  Please sign in the presence of one other person who also must sign and date as a witness.  Please return to me by scanned pdf or US mail to the address below.

Please let me know if you have any questions or concerns.

Regards,
Ryan

Ryan M. Dietz
Director, Office of Technology Development
Immune Disease Institute/Program in Cellular and Molecular Medicine at Children's Hospital Boston
CLSB - Third Floor
3 Blackfan Circle
Boston, MA  02115
t:  617.919.3048
c: 617.803.5430
email: dietz@idi.harvard.edu

**luigi.warren@outlook.com**

| | |
|---|---|
| **Sent:** | Sunday, February 13, 2011 3:39 PM |
| **To:** | Ryan Dietz |
| **Subject:** | Re: Assignment Document |

I do have some initial questions. I heard that Flagship has already done a deal with you for a license to this IP. Is this correct? Was there an initial payout?  Should I expect to see any $$$ from this and, if so, what are the details?

-luigi

**luigi.warren@outlook.com**

| | |
|---|---|
| **From:** | Ryan Dietz |
| **Sent:** | Wednesday, February 16, 2011 6:57 PM |
| **To:** | luigiwarren@sprint.blackberry.net; lwarren@mit.edu |
| **Cc:** | Halvorsen; Erik |
| **Subject:** | RE: Assignment Document |
| **Attachments:** | winmail.dat |

Dear Luigi,


I look forward to providing the details of the agreement.


However, I must first receive the assignment document and attached CDA executed and returned.  The CDA is necessary to protect the confidentiality of the terms of the agreement since you are no longer employed by IDI.


Please execute both the assignment document and the CDA and return to my attention as soon as possible.  As previously mentioned when we discussed the prior assignment, you remain obligated to comply with these procedural steps by the policies of your employment with IDI.


Regards,

Ryan



Ryan M. Dietz

Director, Office of Technology Development

Immune Disease Institute/Program in Cellular and Molecular Medicine at Children's Hospital Boston

CLSB - Third Floor

3 Blackfan Circle

Boston, MA  02115

t:  617.919.3048

c: 617.803.5430

email:  <mailto:dietz@idi.harvard.edu> dietz@idi.harvard.edu

From: luigiwarren@sprint.blackberry.net
[mailto:luigiwarren@sprint.blackberry.net]
Sent: Monday, February 14, 2011 10:39 AM
To: Ryan Dietz
Subject: Re: Assignment Document

I do have some initial questions. I heard that Flagship has already done a deal with you for a license to this IP. Is this correct? Was there an initial payout? Should I expect to see any $$$ from this and, if so, what are the details?

-luigi

Sent on the Sprint(r) Now Network from my BlackBerry(r)

_____

From: "Ryan Dietz" <dietz@idi.harvard.edu>

Date: Fri, 11 Feb 2011 09:28:59 -0500

To: <lwarren@mit.edu>

Subject: Assignment Document

Luigi,

I wanted to provide an update and send along the attached assignment document seeking your signature and return to IDI.

This assignment pertains to a second provisional application which was filed immediately before publication to capture additional data that supports the claims.  We did not alter inventorship or the scope of the inventive subject matter.

Attached please find the assignment document.  Please sign in the presence of one other person who also must sign and date as a witness.  Please return to me by scanned pdf or US mail to the address below.

Please let me know if you have any questions or concerns.


Regards,

Ryan




Ryan M. Dietz

Director, Office of Technology Development

Immune Disease Institute/Program in Cellular and Molecular Medicine at Children's Hospital Boston

CLSB - Third Floor

3 Blackfan Circle

Boston, MA  02115

t:  617.919.3048

c: 617.803.5430

email:  <mailto:dietz@idi.harvard.edu> dietz@idi.harvard.edu

APPENDIX 255

**luigi.warren@outlook.com**

| | |
|---|---|
| **Sent:** | Wednesday, February 23, 2011 9:55 PM |
| **To:** | Ryan Dietz |
| **Subject:** | Re: Assignment Document |

Ryan,

I'm sorry I was delayed in getting back to you but I've been very busy of late.  I have some questions about the draft of the CDA and the Assignment.  In the CDA, you state in the first paragraph that it will apply to information provided to me by IDI before the execution of the CDA.  I don't understand what that might refer to and don't think I can agree blindly to such a blanket designation.  In the second paragraph, I don't understand what you are proposing, concerning information acquired or developed by me, when you state that I will "inform IDI of that fact at or before the date its evaluation is complete."  I also do not understand the last sentence of the second paragraph.  Can you please explain?

I also have some questions about the Assignment.  First, can you send me a signed copy of the initial assignment that you refer to in your email so that I can see how it compares with this one?  In addition, can you send me copies of the documents containing the "policies of my employment" with IDI that you also refer to in your email?  I will then get back to you with my comments on this draft Assignment.

As the inventor of the Technology, I am uniquely positioned to assist IDI in the development, refinement, etc. of the Technology.  It is also the case that, as a matter of professional pride, I have much invested personally in the success of the Technology.  However, it's also important to me that I be fairly compensated for all that I have done and am prepared to do in the future to ensure the success of the Technology.  It is for that reason that  I asked in my prior email about what financial return I might expect to see.  It's important that I have some sense of what IDI is contemplating as we go forward.  Please advise.  Thank you.

Regards,

Luigi

P.S. Please note that my address has changed. It is now: 157 Sixth St. #605, Cambridge, MA 02142.

**luigi.warren@outlook.com**

| | |
|---|---|
| **From:** | Ryan Dietz |
| **Sent:** | Sunday, March 06, 2011 9:55 PM |
| **To:** | luigiwarren@sprint.blackberry.net |
| **Subject:** | RE: Assignment Document |
| **Attachments:** | 20100830092843319.pdf; 20110210162424129.pdf; CDA - IDI 08-011 - Luigi Warren (v2).doc |



Dear Luigi,

Attached please find a revised CDA, which I believe addresses your concern.  The language in the second paragraph is designed to ensure you're not limited in the use of information you created or properly accessed from another source.

Also attached are the previous executed assignment and the current document that requires your signature.  As you can see they include the same language.

For your information, I am also attaching the pertinent language in the IDI policy below.

<u>Ownership of Inventions</u>. Each Invention shall be the sole and exclusive property of IDI. I agree to execute an assignment to IDI or its nominee of my entire right, title and interest in and to all Inventions (to which IDI has ownership rights pursuant to the "Research and Technology Development Policy") without additional compensation. I further agree, upon request of IDI and at its expense, to execute such documents as may be necessary or desirable in applying for and obtaining patents on the Inventions in the United States and any foreign country. I further agree, whether or not I am employed by IDI, to cooperate to the extent and in the manner reasonably requested by IDI in the prosecution or defense of any claim involving a patent covering any Invention or any litigation or other claim or proceeding involving any Invention, but all expenses thereof shall be paid by IDI. All records which I shall use or prepare or come into contact with in the course of working for IDI, shall remain IDI's sole and exclusive property and shall be subject to the agreement; except that I may retain for my own personal use one copy of all my scientific work papers customarily retained by researchers at non-profit institutions unless prevented by contractual obligations to third parties pertaining to confidential papers or trade secrets, which obligations prevent such retention of any such papers.

I look forward to receiving the executed CDA and Assignment.  It is important that you return these promptly so that we may proceed with protecting the intellectual property. Further, once these are received I will provide you with additional information regarding licensing the technology.  Please provide the executed CDA and Assignment document by March 21st 2011.

Regards,
Ryan


-----Original Message-----
From: luigiwarren@sprint.blackberry.net [mailto:luigiwarren@sprint.blackberry.net]
Sent: Thursday, February 24, 2011 4:55 PM
To: Ryan Dietz
Subject: Re: Assignment Document


Ryan,

I'm sorry I was delayed in getting back to you but I've been very busy of late.  I have some questions about the draft of the CDA and the Assignment.  In the CDA, you state in the first paragraph that it will apply to information provided to me by IDI before the execution of the CDA.  I don't understand what that might refer to and don't think I can agree blindly to such a blanket designation.  In the second paragraph, I don't understand what you are proposing, concerning information acquired or developed by me, when you state that I will "inform IDI of that fact at or before the date its evaluation is complete."  I also do not understand the last sentence of the second paragraph.  Can you please explain?

I also have some questions about the Assignment.  First, can you send me a signed copy of the initial assignment that you refer to in your email so that I can see how it compares with this one?  In addition, can you send me copies of the documents containing the "policies of my employment" with IDI that you also refer to in your email?  I will then get back to you with my comments on this draft Assignment.

As the inventor of the Technology, I am uniquely positioned to assist IDI in the development, refinement, etc. of the Technology.  It is also the case that, as a matter of professional pride, I have much invested personally in the success of the Technology.  However, it's also important to me that I be fairly compensated for all that I have done and am prepared to do in the future to ensure the success of the Technology.  It is for that reason that  I asked in my prior email about what financial return I might expect to see.  It's important that I have some sense of what IDI is contemplating as we go forward.  Please advise.  Thank you.

Regards,

Luigi

P.S. Please note that my address has changed. It is now: 157 Sixth St. #605, Cambridge, MA 02142.


Sent on the Sprint® Now Network from my BlackBerry®

-----Original Message-----
From: "Ryan Dietz" <dietz@idi.harvard.edu>
Date: Thu, 17 Feb 2011 13:56:55
To: <luigiwarren@sprint.blackberry.net>; <lwarren@mit.edu>
Cc: Halvorsen, Erik<Erik.Halvorsen@childrens.harvard.edu>
Subject: RE: Assignment Document

Dear Luigi,



I look forward to providing the details of the agreement.



However, I must first receive the assignment document and attached CDA

executed and returned.  The CDA is necessary to protect the confidentiality
of the terms of the agreement since you are no longer employed by IDI.


Please execute both the assignme

## luigi.warren@outlook.com

**Sent:** Monday, March 07, 2011 6:39 PM
**To:** Ryan Dietz
**Subject:** Re: Assignment Document

Hi Ryan,

Thank you for sending the materials I requested. I will review the amended CDA. I have a follow-up question for you. Derrick Rossi once outlined to me IDI policies regarding payments to inventors on licensing royalties. Could you please send me the language specifying  those policies?

Regards,

Luigi

## luigi.warren@outlook.com

| | |
|---|---|
| **From:** | Ryan Dietz |
| **Sent:** | Monday, March 07, 2011 10:15 PM |
| **To:** | luigiwarren@sprint.blackberry.net |
| **Subject:** | RE: Assignment Document |

 ⌐◻�q

Luigi,

licensing revenues distributed under the IDI policy are split into thirds as described below. Since there are 2 inventors, the Inventor's share would be split between yourself and Derrick.

Distribution Schedule

| Inventor | Inventor's Laboratory | IDI General Fund |
|---|---|---|
| 33 1/3% | 33 1/3% | 33 1/3% |

Regards,
Ryan

---

**From:** luigiwarren@sprint.blackberry.net [mailto:luigiwarren@sprint.blackberry.net]
**Sent:** Tuesday, March 08, 2011 1:39 PM
**To:** Ryan Dietz
**Subject:** Re: Assignment Document

Hi Ryan,

Thank you for sending the materials I requested. I will review the amended CDA. I have a follow-up question for you. Derrick Rossi once outlined to me IDI policies regarding payments to inventors on licensing royalties. Could you please send me the language specifying those policies?

Regards,

Luigi

Sent on the Sprint® Now Network from my BlackBerry®

---

**From:** "Ryan Dietz" <dietz@idi.harvard.edu>
**Date:** Mon, 7 Mar 2011 16:54:34 -0500
**To:** <luigiwarren@sprint.blackberry.net>
**Subject:** RE: Assignment Document

Dear Luigi,

Attached please find a revised CDA, which I believe addresses your concern.  The language in the second paragraph is designed to ensure you're not limited in the use of information you created or properly accessed from another source.

Also attached are the previous executed assignment and the current document that requires your signature.  As you can see they include the same language.

For your information, I am also attaching the pertinent language in the IDI policy below.

<u>Ownership of Inventions</u>. Each Invention shall be the sole and exclusive property of IDI. I agree to execute an assignment to IDI or its nominee of my entire right, title and interest in and to all Inventions (to which IDI has ownership rights pursuant to the "Research and Technology Development Policy") without additional compensation. I further agree, upon request of IDI and at its expense, to execute such documents as may be necessary or desirable in applying for and obtaining patents on the Inventions in the United States and any for

**luigi.warren@outlook.com**

| | |
|---|---|
| **Sent:** | Monday, March 07, 2011 10:26 PM |
| **To:** | Ryan Dietz |
| **Subject:** | Re: Assignment Document |

Thanks, Ryan. Can you direct me to the document where all the policies are spelled out, or send me a copy?

Luigi

## luigi.warren@outlook.com

| | |
|---|---|
| **From:** | Ryan Dietz |
| **Sent:** | Wednesday, March 09, 2011 8:55 PM |
| **To:** | luigiwarren@sprint.blackberry.net |
| **Cc:** | Halvorsen; Erik; McCarthy; Dianne |
| **Subject:** | RE: Assignment Document |



Luigi,

The IDI policies are not public documents.  Provided below are portions of the document establishing your obligation to assign the application to IDI.

There is no basis for further delays of your duties to provide the assignment.  If you would like to receive the terms of any agreements that have been completed relating to this technology, please also execute and return to me the Confidentiality Agreement.

Please note, IDI has the right to withhold amounts due to inventors if we do not receive cooperation on this matter by the date provided.  I am copying Erik Halvorsen Director of TIDO and Dianne McCarty Chief General Counsel of CHB on this email.

Regards,
Ryan


C. SCOPE
This Policy applies to any invention, discovery, data, writing, and other intellectual property, including trade or service marks, works-for-hire, know-how, computer software and biological materials, whether or not patentable, copyrightable or otherwise entitled to legal protection (collectively "Invention") made, conceived, reduced to practice or generated by a full or part-time professional staff, faculty, employee of, student, trainee, or person or entity otherwise engaged at IDI, such as consultants or agents retained by IDI (collectively **"Covered Person").** Any Invention that (1) either has potential commercial value or is patentable, copyrightable, or otherwise entitled to legal protection, and (2) is made, conceived, reduced to practice or generated by a Covered Person while engaged in activities: (a) for which the Covered Person received financial support from or through IDI; (b) during which the Covered Person made significant use of facilities, materials, equipment, staff, information, ideas, data, computers or other resources of IDI; or (c) which are related to the employment, research or other activities conducted at IDI by the Covered Person is referred to as **"Technology".** Ordinary use of desktop computers, library facilities or personal office space shall not be considered "significant" use for purposes of Section (b) above. Steps taken toward commercialization, such as filing a patent application or seeking other protection of intellectual property, will be interpreted as demonstrating potential commercial value.


E. TECHNOLOGY OWNERSHIP
1. Principles:
a. All Technology is owned by IDI. When an entity other than IDI has also sponsored, financed, or otherwise participated in the invention, the Director will negotiate with the other entity to determine the percentage of the Technology owned by IDI. The Director may consult with the Committee and the Inventor.

4. <u>Ownership of Inventions</u>. Each Invention shall be the sole and exclusive property of IDI. I agree to execute an assignment to IDI or its nominee of my entire right, title and interest in and to all Inventions (to which IDI has ownership rights pursuant to the "Research and Technology Development Policy") without additional compensation. I further agree, upon request of IDI and at its expense, to execute such documents as may be necessary or desirable in applying for and obtaining patents on the Inventions in the United States and any foreign country. I further agree, whether or not I am employed by IDI, to cooperate to the extent and in the manner reasonably requested by IDI in the prosecution or defense of any claim involving a patent covering any Invention or any litigation or other claim or proceeding involving any Invention, but all expenses thereof shall be paid by IDI. All records which I shall use or prepare or come into contact with in the course of working for IDI, shall remain IDI's sole and exclusive property and shall be subject to the agreement; except that I may retain for my own personal use one copy of all my scientific work papers customarily retained by researchers at non-profit institutions unless prevented by contractual obligations to third parties pertaining to confidential papers or trade secrets, which obligations prevent such retention of any such papers.

---

**From:** luigiwarren@sprint.blackberry.net [mailto:luigiwarren@sprint.blackberry.net]
**Sent:** Tuesday, March 08, 2011 5:26 PM
**To:** Ryan Dietz
**Subject:** Re: Assignment Document

Thanks, Ryan. Can you direct me to the document where all the policies are spelled out, or send me a copy?

Luigi

Sent on the Sprint® Now Network from my BlackBerry®

---

**From:** "Ryan Dietz" <dietz@idi.harvard.edu>
**Date:** Tue, 8 Mar 2011 17:15:23 -0500
**To:** <luigiwarren@sprint.blackberry.net>
**Subject:** RE: Assignment Document

Luigi,

licensing revenues distributed under the IDI policy are split into thirds as described below.  Since there are 2 inventors, the Inventor's share would be split between yourself and Derrick.

Distribution Schedule

| Inventor | Inventor's Laboratory | IDI General Fund |
|---|---|---|
| 33 1/3% | 33 1/3% | 33 1/3% |

Regards,
Ryan

---

**From:** luigiwarren@sprint.blackberry.net [mailto:luigiwarren@sprint.blackberry.net]
**Sent:** Tuesday, March 08, 2011 1:39 PM

**To:** Ryan Dietz
**Subject:** Re: Assignment Document

Hi Ryan,

Thank you for sending the materials I requested. I will review the amended CDA. I have a follow-up question for you. Derrick Rossi once outlined to me IDI policies regarding payments to inventors on licensing royalties. Could you please send me the language specifying those policies?

Regards,

Luigi

Sent on the Sprint® Now Network from my BlackBerry®

---

**From:** "Ryan Dietz" <dietz@idi.harvard.edu>
**Date:** Mon, 7 Mar 2011 16:54:34 -0500
**To:** <luigiwarren@sprint.blackberry.net>
**Subject:** RE: Assignment Document

Dear Luigi,

Attached please find a revised CDA, which I believe addresses your concern.  The language in the second paragraph is designed to ensure you're not limited in the use of information you created or properly accessed from another source.

Also attached are the previous executed assignment and the current document that requires your signature.  As you can see they include the same language.

For your information, I am also attaching the pertinent language in the IDI policy below.

Ownership of Inventions. Each Invention shall be the sole and exclusive property of IDI. I agree to execute an assignment to IDI or its nominee of my entire right, title and interest in and to all Inventions (to which IDI has ownership rights pursuant to the "Research and Technology Development Policy") without additional compensation. I further agree, upon request of IDI and at its expense, to execute such documents as may be necessary or desirable in applying for and obtaining patents on the Inventions in the United States and any foreign country. I further agree, whether or not I am employed by IDI, to cooperate to the extent and in the manner reasonably requested by IDI in the prosecution or defense of any claim involving a patent covering any Invention or any litigation or other claim or proceeding involving any Invention, but all expenses thereof shall be paid by IDI. All records which I shall use or prepare or come into contact with in the course of working for IDI, shall remain IDI's sole and exclusive property and shall be subject to the agreement; except that I may retain for my own personal use one copy of all my scientific work papers customarily retained by researchers at non-profit institutions unless prevented by contractual obligations to third parties pertaining to confidential papers or trade secrets, which obligations prevent such retention of any such papers.

I look forward to receiving the executed CDA and Assignment.  It is important that you return these promptly so that we may proceed with protecting the intellectual property. Further, once these are received I will provide you with additional information regarding licensing the technology.  Please provide the executed CDA and Assignment document by March 21st 2011.

Regards,
Ryan

-----Original Message-----
From: luigiwarren@sprint.blackberry.net [mailto:luigiwarren@sprint.blackberry.net]
Sent: Thursday, February 24, 2011 4:55 PM
To: Ryan Dietz
Subject: Re: Assignment Document


Ryan,

I'm sorry I was delayed in getting back to you but I've been very busy of late.  I have some questions about the draft of the CDA and the Assignment.  In the CDA, you state in the first paragraph that it will apply to information provided to me by IDI before the execution of the CDA.  I don't understand what that might refer to and don't think I can agree blindly to such a blanket designation.  In the second paragraph, I don't understand what you are proposing, concerning information acquired or developed by me, when you state that I will "inform IDI of that fact at or before the date its evaluation is complete."  I also do not understand the last sentence of the second paragraph.  Can you please explain?

I also have some questions about the Assignment.  First, can you send me a signed copy of the initial assignment that you refer to in your email so that I can see how it compares with this one?  In addition, can you send me copies of the documents containing the "policies of my employment" with IDI that you also refer to in your email?  I will then get back to you with my comments on this draft Assignment.

As the inventor of the Technology, I am uniquely positioned to assist IDI in the development, refinement, etc. of the Technology.  It is also the case that, as a matter of professional pride, I have much invested personally in the success of the Technology.  However, it's also important to me that I be fairly compensated for all that I have done and am prepared to do in the future to ensure the success of the Technology.  It is for that reason that  I asked in my prior email about what financial return I might expect to see.  It's important that I have some sense of what IDI is contemplating as we go forward.  Please advise.  Thank you.

Regards,

Luigi

P.S. Please note that my address has changed. It is now: 157 Sixth St. #605, Cambridge, MA 02142.


Sent on the Sprint® Now Network from my BlackBerry®

-----Original Message-----
From: "Ryan Dietz" <dietz@idi.harvard.edu>
Date: Thu, 17 Feb 2011 13:56:55
To: <luigiwarren@sprint.blackberry.net>; <lwarren@mit.edu>
Cc: Halvorsen, Erik<Erik.Halvorsen@childrens.harvard.edu>
Subject: RE: Assignment Document

Dear Luigi,

I look forward to providing the details of the agreement.

However, I must first receive the assignment document and attached CDA executed and returned.  The CDA is necessary to protect the confidentiality of the terms of the agreement since you are no longer employed by IDI.

Please execute both the assignment document and the CDA and return to my attention as soon as possible.  As previously mentioned when we discussed the prior assignment, you remain obligated to comply with these procedural steps by the policies of your employment with IDI.

Regards,

Ryan

Ryan M. Dietz

Director, Office of Technology Development

Immune Disease Institute/Program in Cellular and Molecular Medicine at Children's Hospital Boston

CLSB - Third Floor

3 Blackfan Circle

Boston, MA  02115

t:  617.919.3048

c: 617.803.5430

email:  <mailto:dietz@idi.harvard.edu> dietz@idi.harvard.edu

From: luigiwarren@sprint.blackberry.net
[mailto:luigiwarren@sprint.blackberry.net]
Sent: Monday, February 14, 2011 10:39 AM
To: Ryan Dietz
Subject: Re: Assignment Document

I do have some initial questions. I heard that Flagship has already done a deal with you for a license to this IP. Is this correct? Was there an initial payout? Should I expect to see any $$$ from this and, if so, what are the details?

-luigi

Sent on the Sprint(r) Now Network from my BlackBerry(r)

_____

From: "Ryan Dietz" <dietz@idi.harvard.edu>

Date: Fri, 11 Feb 2011 09:28:59 -0500

To: <lwarren@mit.edu>

Subject: Assignment Document


Luigi,


I wanted to provide an update and send along the attached assignment document seeking your signature and return to IDI.


This assignment pertains to a second provisional application which was filed immediately before publication to capture additional data that supports the claims.  We did not alter inventorship or the scope of the inventive subject matter.


Attached please find the assignment document.  Please sign in the presence of one other person who also must sign and date as a witness.  Please return to me by scanned pdf or US mail to the address below.


Please let me know if you have any questions or concerns.


Regards,

Ryan

Ryan M. Dietz

Director, Office of Technology Development

Immune Disease Institute/Program in Cellular and Molecular Medicine at Children's Hospital Boston

CLSB - Third Floor

3 Blackfan Circle

Boston, MA  02115

t:  617.919.3048

c: 617.803.5430

email:  <mailto:dietz@idi.harvard.edu> dietz@idi.harvard.edu

## luigi.warren@outlook.com

| | |
|---|---|
| **From:** | Ryan Dietz |
| **Sent:** | Thursday, March 17, 2011 4:11 PM |
| **To:** | luigiwarren@sprint.blackberry.net |
| **Cc:** | Halvorsen; Erik; McCarthy; Dianne |
| **Subject:** | RE: Assignment Document |
| **Attachments:** | 20110210162424129.pdf |



Luigi,

Please be reminded that you are asked you to provide the executed Assignment document by March 21st (this coming Monday).

I have attached the document for your convenience.

Regards,
Ryan

---

**From:** Ryan Dietz [mailto:dietz@idi.harvard.edu]
**Sent:** Thursday, March 10, 2011 3:55 PM
**To:** 'luigiwarren@sprint.blackberry.net'
**Cc:** Halvorsen, Erik; McCarthy, Dianne
**Subject:** RE: Assignment Document

Luigi,

The IDI policies are not public documents.  Provided below are portions of the document establishing your obligation to assign the application to IDI.

There is no basis for further delays of your duties to provide the assignment.  If you would like to receive the terms of any agreements that have been completed relating to this technology, please also execute and return to me the Confidentiality Agreement.

Please note, IDI has the right to withhold amounts due to inventors if we do not receive cooperation on this matter by the date provided.  I am copying Erik Halvorsen Director of TIDO and Dianne McCarty Chief General Counsel of CHB on this email.

Regards,
Ryan

C. SCOPE
This Policy applies to any invention, discovery, data, writing, and other intellectual property, including trade or service marks, works-for-hire, know-how, computer software and biological materials, whether or not patentable, copyrightable or otherwise entitled to legal protection (collectively "Invention") made, conceived, reduced to practice or generated by a full or part-time professional staff, faculty, employee of, student, trainee, or person or entity otherwise engaged at IDI, such as consultants or agents retained by IDI (collectively **"Covered Person"**). Any Invention that (1) either has potential commercial value or is

patentable, copyrightable, or otherwise entitled to legal protection, and (2) is made, conceived, reduced to practice or generated by a Covered Person while engaged in activities: (a) for which the Covered Person received financial support from or through IDI; (b) during which the Covered Person made signi

APPENDIX 272

## luigi.warren@outlook.com

| | |
|---|---|
| **Sent:** | Thursday, March 17, 2011 10:43 PM |
| **To:** | Ryan Dietz |
| **Cc:** | Halvorsen; Erik; McCarthy; Dianne |
| **Subject:** | Re: Assignment Document |

Ryan,

I apologize for the delay in my response, but I have a full plate and I had to give this matter considerable thought.

I do not see how unpublished IDI policies can obligate me to enter into the proposed assignment contract now, long after I resigned from my at-will employment at IDI. Further, the crucial element of consideration is missing from the contract. Past consideration, viz. salary payments to me during my time at IDI, cannot constitute consideration for a contract entered into in the present. Policies are not promises, especially when referenced only outside a contract and represented divorced from any context defining their discretionary aspects, caveats and limitations. This is particularly relevant in the current instance, owing to the non-conventional approach being adopted for the disposition of the mRNA reprogramming IP (the Flagship/Moderna deal). What if I "open the box" and find that IDI has exchanged control or even ownership of the IP for cash or equity, in lieu of royalties? What would IDI "policies" say about my compensation then? I do not know, and have no way of knowing. Normally, one does not expect to have to sign a contract before one can be allowed to find out the nature of the consideration being proffered, or even if there is any consideration. At this point, and given the history, I do not feel comfortable acceding to your request.

Regards,

Luigi

# PMOS EXHIBIT 6

## PLAINTIFF'S 2011 EMAIL EXCHANGES WITH DIANNE MCCARTHY REGARDING THE IDI POLICY

**luigi.warren@outlook.com**

| | |
|---|---|
| **Sent:** | Wednesday, March 23, 2011 6:53 PM |
| **To:** | McCarthy; Dianne |
| **Subject:** | Assignment agreement |

Dear Ms. McCarthy,

Thank you for sending me the full IDI policy document. On a first reading, it appears helpful on several points. Can you tell me, what is your basis for the assertion that I am obligated by these policies? Is there a contract I have signed which goes to this question? If so, please send me a copy and I will re-evaluate my position.

Thanks,

Luigi

**luigi.warren@outlook.com**

| | |
|---|---|
| **From:** | McCarthy |
| **Sent:** | Wednesday, March 23, 2011 8:39 PM |
| **To:** | luigiwarren@sprint.blackberry.net |
| **Subject:** | RE: Assignment agreement |

Mr. Warren,

You have continued obligations to abide by IDI policies as a condition of employment at IDI.  As I indicated the letter, the policies benefit all inventors as well as IDI.


Dianne McCarthy
Chief Counsel for Research Affairs
Children's Hospital Boston
300 Longwood Avenue
Boston,  MA  02115
617 355 4935
dianne.mccarthy@childrens.harvard.edu

Office of the General Counsel
617-355-6108
fax:  617-730-1952

-----Original Message-----
From: luigiwarren@sprint.blackberry.net [mailto:luigiwarren@sprint.blackberry.net]
Sent: Thursday, March 24, 2011 11:53 AM
To: McCarthy, Dianne
Subject: Assignment agreement

Dear Ms. McCarthy,

Thank you for sending me the full IDI policy document. On a first reading, it appears helpful on several points. Can you tell me, what is your basis for the assertion that I am obligated by these policies? Is there a contract I have signed which goes to this question? If so, please send me a copy and I will re-evaluate my position.

Thanks,

Luigi
Sent on the Sprint(r) Now Network from my BlackBerry(r)

**luigi.warren@outlook.com**

| | |
|---|---|
| **From:** | McCarthy |
| **Sent:** | Sunday, April 24, 2011 8:34 PM |
| **To:** | luigiwarren@sprint.blackberry.net |
| **Subject:** | Out of Office: Assignment of Interest in Certain Stem Cell ResearchTechnologyto IDI |

I am away from the office until Monday, April 25 and will respond to your e-mail when I return.  Thank you.  Dianne

# PMOS EXHIBIT 7

## 2011 EMAIL FROM NIXON PEABODY AND THE ATTACHED DRAFT LAWSUIT

## luigi.warren@outlook.com

| | |
|---|---|
| **From:** | Resnick |
| **Sent:** | Thursday, April 21, 2011 8:02 PM |
| **To:** | luigiwarren@sprint.blackberry.net |
| **Cc:** | Ryan Dietz; McCarthy; Dianne; Rubenstein; Gregg |
| **Subject:** | FW: Assignment of Interest in Certain Stem Cell Research Technologyto IDI |
| **Attachments:** | Complaint.pdf; 033393-067443-US-1 and 033393-067442-PCT Assignment - Warren.pdf; 033393-067441-P Assignment - Warren.pdf; 033393-067443-US Dec and POA.pdf |

⌐⌐  ⌐◘⌐�!

Mr. Warren

My name is David Resnick and I represent your former employer Immune Disease Institute, Inc. ("IDI").  I understand that you are refusing to execute an assignment and power of attorney in favor of IDI concerning certain technology you helped create while employed by IDI.  Your refusal to execute the assignment is in direct contravention of your obligations under IDI's Research and Technology Development Policy that binds all IDI employees, the promises you made in the Assignment you executed concerning the technology on August 30, 2010 and Massachusetts law.  This situation is no longer tolerable.  I therefore urge you to reconsider your position and immediately execute the assignment and power of attorney attached.  Should you persist in your refusal to do so, IDI is prepared to file a public lawsuit against you to enforce its rights.  A copy of IDI's lawsuit is attached and is ready to be immediately filed.  To avoid having to respond to the lawsuit and any publicity attendant to it, execute the attached documents and return them to me.  If you are unable to return the documents to me, I will arrange for a delivery service to pick the documents up from you.

I trust you will give this matter your first attention and seriously consider the consequences of not honoring your promises and obligations to IDI.

David S. Resnick
Partner



100 Summer Street
Boston, MA 02110-2131
P (617) 345-6057
F (866) 947-1613
dresnick@nixonpeabody.com
www.nixonpeabody.com

The preceding e-mail message contains information that is confidential and may be protected by the attorney/client or other applicable privileges. The information is intended to be conveyed only to the designated recipient(s) of the message. If you believe that you are not an intended recipient of this message, please notify the sender at (617) 345-6057. Unauthorized use, dissemination, distribution or reproduction of this message by other than the intended recipient is strictly prohibited and may be unlawful.

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                                             SUPERIOR COURT
                                                       CIVIL ACTION

|  |  |
|---|---|
| IMMUNE DISEASE INSTITUTE, INC., | ) |
|  | ) |
| Plaintiff, | ) |
| v. | )    C.A. NO. _____ |
|  | ) |
| LUIGI WARREN, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

### COMPLAINT FOR INJUNCTIVE RELIEF,
### BREACH OF CONTRACT AND DECLARATORY JUDGMENT

For its Complaint for Injunctive Relief, Breach of Contract and Declaratory Judgment

against defendant Luigi Warren, plaintiff Immune Disease Institute, Inc. ("IDI") alleges as

follows:

### NATURE OF THE ACTION

1.      This action is brought to enforce IDI's contractual and common law rights to

Warren's assignment of his interest in and to inventions he helped create as an IDI employee.

Despite being bound by an IDI policy applicable to all employees concerning assignments of

intellectual property rights and previously recognizing and honoring his obligations under that

policy, Warren now refuses to execute certain assignments necessary for a patent application

based on inventions Warren helped create at IDI's direction while an IDI employee.  Warren's

refusal appears to be based on his desire to extract additional compensation to which he has no

right and/or other recognition to which he is not entitled.

2. By this action IDI seeks, among other things, a preliminary and permanent injunction requiring Warren to execute all assignments, declarations, powers of attorney and other paperwork necessary to transfer ownership of inventions he created while an IDI employee for which Warren received financial support from IDI, made significant use of IDI facilities, materials, equipment, staff or other resources or that are related to Warren's employment, research or other activities on IDI's behalf.  IDI also seeks a declaration that Warren is required to provide IDI with all reasonable future assistance necessary to secure any and all intellectual property rights to which IDI is entitled.

## FACTUAL BACKGROUND

**I.     THE PARTIES, JURISDICTION AND VENUE.**

A.     Immune Disease Institute, Inc.

3. IDI is a Massachusetts non-profit corporation with its principal place of business in Boston, Massachusetts.

4. IDI is a Harvard Medical School affiliate allied with Children's Hospital Boston. IDI's mission is fundamental biomedical research to improve human health, harness inflammation and strengthen immune defenses.

B.     Luigi Warren

5. Upon information and belief, defendant Luigi Warren is a natural person and subject of the United Kingdom.  Warren currently resides in Massachusetts.  During his IDI employment, Warren held the position of Research Fellow.  This Court has general and/or specific personal jurisdiction over Warren as a Massachusetts domiciliary.

C.    Jurisdiction

6.    This court has subject matter jurisdiction over this action pursuant to G.L. c. 212, § 4, in that it is an action for injunctive relief and the value of the underlying rights exceed $25,000.

D.    Venue

7.    Venue in this court is proper based on IDI's principal place of business in Suffolk County, Massachusetts.

## II.    WARREN'S EMPLOYMENT WITH IDI AND AGREEMENT TO BE BOUND BY IDI'S DEVELOPMENT ASSIGNMENT POLICY.

8.    Warren began his IDI employment on or about November 1, 2007 when he was hired as a Research Fellow.

9.    IDI hired Warren for the express purposes of conducting research that could be commercially exploited in the field of stem cell treatments.

10.    As an IDI employee, Warren was subject to certain IDI policies and procedures applicable to all IDI employees.

11.    One of IDI's generally applicable policies is its Research and Technology Development Policy ("Development Policy"), a true and accurate copy of which is attached as Exhibit A.

12.    Copies of the Development Policy are freely available to all IDI employees via the IDI intranet.

13.    It is IDI's standard policy to conduct an HR Orientation with every new IDI employee.

- 4 -

14.     IDI's new hire Orientation includes providing the new employee with a copy of the Development Policy and explaining that acceptance of its terms is a condition of IDI employment.

15.     IDI conducted Warren's HR Orientation on November 19, 2007.  A true and accurate copy of Warren's New Employee/Affiliate Form recording the date of his HR Orientation is attached as Exhibit B.

## III.    IDI'S DEVELOPMENT ASSIGNMENT POLICY.

16.     Generally, IDI's Development Policy addresses the ownership of technology IDI employees create while working for IDI and provides that employees must assign to IDI whatever interests they may have in that technology.

17.     Paragraph C of the Development Policy provides in relevant part that all IDI "full or part-time staff, faculty, employee[s], student[s], trainee[s] or person[s] or entit[ies] otherwise engaged at IDI . . ." are "Covered Persons."

18.     Paragraph C of the Development Policy further provides that any

Invention that . . . (2) is made, conceived, reduced to practice or generated by a Covered Person while engaged in activities: (a) for which the Covered Person received financial support from or through IDI; (b) during which the Covered Person made significant use of facilities, materials, equipment, staff, information, ideas, data, computers or other resources of IDI; or (c) which are related to the employment, research or other activities conducted at IDI by the Covered Person is referred to as "Technology."

19.     Paragraph D of the Development Policy requires all Covered Persons to promptly submit a report of all Technology inventions to IDI.

20.     Paragraph E of the Development Policy provides in relevant part that "[a]ll Technology is owned by IDI."

21.     The obligation to assign Technology to IDI developed while an IDI employee continues after an individual's IDI employment ends.

## IV.   WARREN HELPS CREATE TECHNOLOGY AND EXECUTES FIRST ASSIGNMENT CONSISTENT WITH OBLIGATIONS UNDER DEVELOPMENT POLICY.

22.   Consistent with his position as a Research Fellow hired to conduct research that could lead to commercially exploitable inventions, Warren pursued certain stem cell research for IDI.

23.   While employed by IDI and working in an IDI lab, Warren helped identify improvements in sustained polypeptide expressions from modified RNAs and uses thereof (the "Stem Cell Research").

24.   Consistent with his acceptance of and obligations under the Development Policy, Warren helped prepare a report concerning the Stem Cell Research that was submitted to IDI.

25.   On April 16, 2010, IDI filed a provisional patent application based on the Stem Cell Research listing Warren as a co-inventor.

26.   Consistent with his acceptance of and obligations under the Development Policy, on August 30, 2010, Warren executed an assignment of the Technology (as defined in the Development Policy) encompassing the Stem Cell Research to IDI and his rights under the provisional patent application ("First Assignment").  A true and accurate copy of the First Assignment is attached as Exhibit C.

27.   In the First Assignment Warren specifically acknowledged that his salary and compensation from IDI was "for the making of inventions . . . ."

28.   In the First Assignment Warren specifically assigned to IDI, among other things, "all divisions, renewals and continuations" of the provisional application and "all Letters Patent of the United States which may be granted thereon . . . ."

## V.     WARREN CO-AUTHORS A SCIENTIFIC PAPER DETAILING THE STEM CELL RESEARCH THAT ACKNOWLEDGES IDI'S FUNDING OF THE RESEARCH.

29.     Coincident with performing the Stem Cell Research, Warren helped co-author a scientific article detailing the findings.

30.     The scientific article was published in the November 5, 2010 edition of Cell Stem Cell ("Article").

31.     The Article lists Warren as a co-lead author and IDI as having sponsored and paid for the research.

32.     The Article further details the Stem Cell Research and technology claimed in the provisional patent application.

## VI.    WARREN VOLUNTARILY ENDS HIS IDI EMPLOYMENT.

33.     In June 2010, Warren voluntarily ended his IDI employment.

34.     At no time coincident with terminating his employment did Warren ever raise any concerns about the applicability of the Development Policy to him or his continuing obligations under it after his IDI employment ended.

## VII.   WARREN REFUSES TO EXECUTE A SUBSEQUENT ASSIGNMENT OF THE STEM CELL TECHNOLOGY IN SUPPORT OF IDI'S PATENT APPLICATION.

35.     In March 2011, IDI began the process of applying for a U.S. patent based on the Stem Cell Research and provisional patent application ("Patent Application").

36.     In connection with filing the Patent Application, IDI sent Warren an new assignment and power of attorney to execute.  True and accurate copies of the new assignment and power of attorney are attached as Exhibits D and E.

37.     Despite multiple requests to Warren that he execute the new assignment and power of attorney, he has to date refused to do so.

- 7 -

## COUNT I
### BREACH OF CONTRACT: Breach of Development Policy

38.     IDI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 37 of the Complaint.

39.     Warren, like all other IDI employees, agreed to be bound by the terms of the Development Policy as a condition of his IDI employment.

40.     The Development Policy requires all IDI employees to assign to IDI all interests they have in technology created while employed by IDI and/or using equipment furnished by IDI.

41.     The Patent Application is based on Technology Warren developed while employed by IDI, was funded by IDI and utilized IDI equipment.

42.     Warren has no right to additional compensation (beyond that provided for in the Development Policy) for honoring his obligations under the Development Policy.

43.     Despite demand, Warren has to date refused to execute the new assignment, power of attorney or cooperate in the prosecution of the Patent Application.

44.     Warren's refusal to execute the new assignment and cooperate in the prosecution of the Patent Application are breaches of the Development Agreement.

45.     Warren's breaches of the Development Policy have damaged IDI, will continue to damage IDI and are causing IDI immediate and irreparable harm.

46.     IDI has no adequate remedy at law.

## COUNT II
### BREACH OF CONTRACT: Breach of Initial Assignment

47.     IDI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 46 of the Complaint.

48.     Warren executed the Initial Assignment on August 30, 2010.

49. In the Initial Assignment Warren assigned to IDI all right, title and interest he had to continuations of the provisional patent application and all patents that ultimately issued based on the provisional patent application.

50. The Patent Application is based on the Stem Cell Research identified in the provisional patent application and follow-on research performed subsequent to filing the provisional patent application that Warren helped conduct while employed by IDI.

51. Despite demand, Warren has to date refused to execute the new assignment and cooperate in the prosecution of the Patent Application.

52. Warren's refusal to execute the new assignment and power of attorney and cooperate in the prosecution of the Patent Application are breaches of the Initial Assignment.

53. Warren's breaches of the Initial Assignment have damaged IDI, will continue to damage IDI and are causing IDI immediate and irreparable harm.

54. IDI has no adequate remedy at law.

<div align="center">

**COUNT III**
**BREACH OF IMPLIED-IN-FACT CONTRACT:**
**Breach of Duty Under Hired to Invent Doctrine**

</div>

55. IDI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 54 of the Complaint.

56. Massachusetts common law recognizes that an implied-in-fact contract exists between employers and employees hired for the purpose of inventing goods and/or technology.

57. IDI hired Warren for the purpose of conducting research that would produce technology that IDI could commercially exploit. Accordingly, an implied-in-fact contract between Warren and IDI arose pursuant to the hire-to-invent doctrine.

58. Warren's duties for IDI were to conduct research that could form the basis of technology that IDI could commercially exploit.

59.     Warren acknowledged that IDI hired him to invent in the Initial Assignment where Warren stated that he received "salary or payment [from IDI] for the making of inventions . . . ."

60.     The Stem Cell Research that Warren helped conduct is the basis for both the provisional patent application that IDI filed and the Patent Application.

61.     Having been hired to conduct certain research that in fact resulted in technology that IDI has chosen to commercially exploit, the hired-to-invent doctrine provides that any rights Warren has in the Stem Cell Research are IDI's property.

62.     Despite demand, Warren has to date refused to execute the new assignment and cooperate in the prosecution of the Patent Application.

63.     Warren's refusal to execute the new assignment and power of attorney and cooperate in the prosecution of the Patent Application are breaches of the implied-in-fact contract created pursuant to the hired-to-invent doctrine.

64.     Warren's breaches of his obligations under the implied-in-fact contract created pursuant to the hired-to-invent doctrine have damaged IDI, will continue to damage IDI and are causing IDI immediate and irreparable harm.

65.     IDI has no adequate remedy at law.

## COUNT IV
## DECLARATORY RELIEF

66.     IDI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 65 of the Complaint.

67.     There is an actual and genuine controversy between the parties as to whether Warren's refusal to execute the new assignment and power of attorney and cooperate in the prosecution of the Patent Application is a violation of the Development Policy, Initial

Assignment and/or the implied-in-fact contract created between Warren and IDI pursuant to the hired-to-invent doctrine.

68.     IDI requests a declaration from this court that Warren's refusal to execute the new assignment and power of attorney and cooperate in the prosecution of the Patent Application is a violation of the Development Policy, Initial Assignment and/or the implied-in-fact contract created between Warren and IDI pursuant to the hired-to-invent doctrine that must be enjoined.

WHEREFORE, IDI respectfully requests that the Court:

1.     Enter a preliminary and permanent injunction requiring Warren to execute all assignments and other forms necessary to transfer Warren's rights, if any, concerning the Stem Cell Research to IDI.

2.     Enter a preliminary and permanent injunction requiring Warren to provide all assistance reasonable necessary to prosecute the Patent Application and any subsequent applications based on the Stem Cell Research.

3.     Enter judgment in favor of IDI for costs, attorneys' fees and such other relief as the court deems just and appropriate.

IMMUNE DISEASE INSTITUTE, INC.

By its attorneys,

_____
Gregg A. Rubenstein (BBO #639680)
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
Tel. (617) 345-1000
Fax (617) 345-1300

Date:  April __, 2011

# PMOS EXHIBIT 8

## PAYMENT ADVICE PROVIDED WITH PLAINTIFF'S DISTRIBUTIONS TO DATE



# TECHNOLOGY & INNOVATION
## DEVELOPMENT OFFICE

CHILDREN'S HOSPITAL BOSTON·300 LONGWOOD AVENUE·BOSTON, MA 02115

Phone 617-919-3019 • Fax 617-919-3031 • TIDO@childrens.harvard.edu • www.childrensinnovations.org

September 21, 2015

Luigi Warren
3535 Lebon Dr, Apt. 4311
San Diego, CA 92122

Re:  Royalty Distribution for CMCC Case #:       2085
     CMCC Lead Inventor:  Rossi, Derrick
     Title:  Reprogramming to pluripotency and directed differentiation of cell fate using modified RNAs

Dear Warren:

Congratulations! I am happy to enclose a check in the amount of $20,025.67, which is your share of royalties received on the case identified above.

If you have any questions regarding this matter, please contact me at (617) 919-3019.

Sincerely,

Ms. Lisa Pight
Financial Assistant

## Children's Hospital Boston
*A teaching affiliate of Harvard Medical School*

Case 1:17-cv-12472-DLC

Plaintiff's Rule 26(a)(1) Initial Disclosures

APPENDIX 292

**CMCC 2085**                                         100,000.00

Aug-15
Amount to Received        $ 100,000.00
Legal Fees
Amount to Distribute      $ 100,000.00

Cumulative Amount         $ 100,000.00

HSCI        10%   $   10,000.00
BCH         90%   $   90,000.00

$ 45,000.00

**ROSSI**

| Inv #1 | 70% | $ | 31,500.00 |
| GRE | 20% | $ | 9,000.00 |
| IPO | 10% | $ | 4,500.00 |
| | | $ | 45,000.00 |

$ 45,000.00

**WARREN**

| INV #2 | 35% | $ 15,750.00 |
| DEPT | 25% | $ 11,250.00 |
| GRE | 30% | $ 13,500.00 |
| IPO | 10% | $ 4,500.00 |
| | | $ 45,000.00 |

**Actual**

| INV #1 | 31,500.00 |
| INV #2 | 15,750.00 |
| PCMM | 5,625.00 |
| DEPT | 5,625.00 |
| GRE | 22,500.00 |
| IPO | 9,000.00 |
| | 90,000.00 |

---

**CMCC 2085**
Aug-15                                           >100000.00
Amount to Received        $   29,139.31
                          $    1,992.22
Amount to Distribute      $   27,147.09

Cumulative Amount         $  127,147.09

HSCI        10%   $    2,714.71
BCH         90%   $   24,432.38

$ 12,216.19

**ROSSI**

| Inv #1 | 45% | $ | 5,497.29 |
| Dept | 20% | $ | 2,443.24 |
| GRE | 25% | $ | 3,054.05 |
| IPO | 10% | $ | 1,221.62 |
| | | $ | 12,216.19 |

$ 12,216.19

**WARREN**

| INV #2 | 35% | $ 4,275.67 |
| DEPT | 25% | $ 3,054.05 |
| GRE | 30% | $ 3,664.86 |
| IPO | 10% | $ 1,221.62 |
| | | $ 12,216.19 |

**Actual**

| HSCI | 2,714.71 |
| INV #1 | 5,497.29 |
| INV #2 | 4,275.67 |
| PCMM | 2,748.65 |
| DEPT | 2,748.65 |
| GRE | 6,718.90 |
| IPO | 2,443.23 |
| | 27,147.09 |



**TECHNOLOGY & INNOVATION**
D E V E L O P M E N T   O F F I C E

CHILDREN'S HOSPITAL BOSTON·300 LONGWOOD AVENUE·BOSTON, MA 02115

Phone 617-919-3019 • Fax 617-919-3031 • TIDO@childrens.harvard.edu • www.childrensinnovations.org

April 11, 2016

Luigi Warren
3535 Lebon Dr, Apt. 4311
San Diego, CA 92122

Re:  Royalty Distribution for CMCC Case #:        2085
      CMCC Lead Inventor:  Rossi, Derrick
      Title:  Reprogramming to pluripotency and directed differentiation of cell fate
      using modified RNAs

Dear Luigi:

Congratulations! I am happy to enclose a check in the amount of $3,150.00,
which is your share of royalties received on the case identified above.

If you have any questions regarding this matter, please contact me at (617) 919-3019.

Sincerely,

Ms. Lisa Pight
Financial Assistant

**Children's Hospital Boston**
*A teaching affiliate of Harvard Medical School*

# CMCC 2085 >100k

**CMCC 2085**
**Mar-16**

|  |  |  |
|---|---|---|
| Amount to Received | $ | 20,000.00 |
| Amount to Distribute | $ | 20,000.00 |
| Cumulative Amount | $ | 20,000.00 |

>100000.00

| HSCI | 10% | $ | 2,000.00 |
|---|---|---|---|
| BCH | 90% | $ | 18,000.00 |

| ROSSI | | $ 9,000.00 | | WARREN | | $ 9,000.00 | | Actual | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Inv #1 | 45% | $ | 4,050.00 | INV #2 | 35% | $ 3,150.00 | | HSCI | 2,000.00 | 10% |
| Dept | 20% | $ | 1,800.00 | DEPT | 25% | $ 2,250.00 | | INV #1 | 4,050.00 | 20% |
| GRE | 25% | $ | 2,250.00 | GRE | 30% | $ 2,700.00 | | INV #2 | 3,150.00 | 16% |
| IPO | 10% | $ | 900.00 | IPO | 10% | $ 900.00 | | PCMM | 2,025.00 | 10% |
| | | $ | 9,000.00 | | | $ 9,000.00 | | DEPT | 2,025.00 | 10% |
| | | | | | | | | GRE | 4,950.00 | 25% |
| | | | | | | | | IPO | 1,800.00 | 9% |
| | | | | | | | | | 20,000.00 | 100% |

APPENDIX 2084

Case 1:17-cv-12472-DLC   Plaintiff's Rule 26(a)(1) Initial Disclosures



# TECHNOLOGY & INNOVATION
## DEVELOPMENT OFFICE

CHILDREN'S HOSPITAL BOSTON·300 LONGWOOD AVENUE·BOSTON, MA 02115

Phone 617-919-3019 • Fax 617-919-3031 • TIDO@childrens.harvard.edu • www.childrensinnovations.org

July 8, 2016

Luigi Warren
3535 Lebon Dr, Apt. 4311
San Diego, CA 92122

Re:  Royalty Distribution for CMCC Case #:          2085
     CMCC Lead Inventor:   Rossi, Derrick
     Title:   Reprogramming to pluripotency and directed differentiation of cell fate
              using modified RNAs

Dear Warren:

Congratulations! I am happy to enclose a check in the amount of $270.03, which
is your share of royalties received on the case identified above.

If you have any questions regarding this matter, please contact me at (617) 919-
3019.

Sincerely,

Ms. Lisa Pight
Financial Assistant

Children's Hospital Boston
*A teaching affiliate of Harvard Medical School*

# CMCC 2085 >100k

**CMCC 2085**
**Jun-16**                                              >100000.00

| | | | |
|---|---|---|---|
| Amount to Received | | $ | 1,714.48 |
| Amount to Distribute | | $ | 1,714.48 |
| Cumulative Amount | | $ | 1,714.48 |
| HSCI | 10% | $ | 171.45 |
| BCH | 90% | $ | 1,543.03 |

| ROSSI | | $ | 771.52 | WARREN | | $ | 771.52 | | | Actual | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Inv #1 | 45% | $ | 347.18 | INV #2 | 35% | $ | 270.03 | | | HSCI | 171.45 | 10% |
| Dept | 20% | $ | 154.30 | DEPT | 25% | $ | 192.88 | | | INV #1 | 347.18 | 20% |
| GRE | 25% | $ | 192.88 | GRE | 30% | $ | 231.45 | | | INV #2 | 270.03 | 16% |
| IPO | 10% | $ | 77.15 | IPO | 10% | $ | 77.15 | | | PCMM | 173.59 | 10% |
| | | $ | 771.52 | | | $ | 771.52 | | | DEPT | 173.59 | 10% |
| | | | | | | | | | | GRE | 424.33 | 25% |
| | | | | | | | | | | IPO | 154.30 | 9% |
| | | | | | | | | | | | 1,714.48 | 100% |

Case 1:17-cv-12472-DLC   Document 57-8   Filed 03/08/19   Page 7 of 11

Case 1:17-cv-12472-DLC   Plaintiff's Rule 26(a)(1) Initial Disclosures

APPENDIX 298



**Boston Children's Hospital**



**HARVARD MEDICAL SCHOOL TEACHING HOSPITAL**

300 Longwood Avenue, Boston, MA 02115
617-355-6000 | bostonchildrens.org

January 9, 2017

Luigi Warren
7411 Herschel Avenue, Unit 3C
La Jolla, CA 92037

Re: Royalty Distribution for CMCC Case #:     2085
     CMCC Lead Inventor:   Rossi, Derrick
     Title:    Reprogramming to pluripotency and directed differentiation of cell fate using modified RNAs

Dear Warren:

Congratulations! I am happy to enclose a check in the amount of $1,036.35, which is your share of royalties received on the case identified above.

If you have any questions regarding this matter, please contact me at (617) 919-3019.

Sincerely,

Ms. Lisa Pight
Financial Assistant

# CMCC 2085 >100k

>100000.00

| CMCC 2085 | | |
|---|---|---|
| Dec-16 | | |
| Amount to Received | $ | 6,580.00 |
| Amount to Distribute | $ | 6,580.00 |
| Cumulative Amount | $ | 6,580.00 |
| HSCI | 10% $ | 658.00 |
| BCH | 90% $ | 5,922.00 |

**ROSSI** — $ 2,961.00

| | | |
|---|---|---|
| Inv #1 | 45% $ | 1,332.45 |
| Dept | 20% $ | 592.20 |
| GRE | 25% $ | 740.25 |
| IPO | 10% $ | 296.10 |
| | $ | 2,961.00 |

**WARREN** — $ 2,961.00

| | | |
|---|---|---|
| INV #2 | 35% $ | 1,036.35 |
| DEPT | 25% $ | 740.25 |
| GRE | 30% $ | 888.30 |
| IPO | 10% $ | 296.10 |
| | $ | 2,961.00 |

**Actual**

| | | |
|---|---|---|
| HSCI | 658.00 | 10% |
| INV #1 | 1,332.45 | 20% |
| INV #2 | 1,036.35 | 16% |
| PCMM | 666.23 | 10% |
| DEPT | 666.22 | 10% |
| GRE | 1,628.55 | 25% |
| IPO | 592.20 | 9% |
| | 6,580.00 | 100% |

Case 1:17-cv-12472-DLC   Plaintiffs' (BAYO) Initial Disclosures   APPENDIX 298



## Boston Children's Hospital

Until every child is well"

300 Longwood Avenue, Boston, MA 02115
617-355-6000 | bostonchildrens.org



HARVARD MEDICAL SCHOOL
TEACHING HOSPITAL

November 19, 2018

Luigi Warren
3535 LEBON DR., APT 4311
San Diego, CA 92122

Re: Royalty Distribution for CMCC Case #: 2085
CMCC Lead Inventor: Rossi, Derrick
Title: Reprogramming to pluripotency and directed differentiation of cell fate using modified RNAs

Dear Luigi:

Congratulations! I am happy to enclose a check in the amount of $6,816.69, which is your share of royalties received on the case identified above.

If you have any questions regarding this matter, please contact me at (617) 919-3019.

Sincerely,

Lisa Pight

APPENDIX 299

**Distribution Process**                                    **11/01/18**

**Case #2085 Rossi, Derrick**
*Reprogramming to pluripotency and directed differentiation of cell fate using modified RNAs*

**Distribution Amount:**     $55,084.33

| | |
|---|---|
| *LEGAL* | *$0.00* |
| *POST LEGAL* | *$55,084.33* |
| **INST Harvard Stem Cell Institute 10%** | **$5,508.43** |
| *INST CMCC 90%* | *$49,575.90* |
| **IPO 13.75%** | **$6,816.68** |
| **GRE 28.75%** | **$14,253.07** |
| **DEPT Medicine 10%** | **$4,957.59** |
| **DIV PCMM Program 12.5%** | **$6,196.99** |
| **LAB Rossi, Derrick 7.5%** | **$3,718.19** |
| *INV 27.5%* | *$13,633.38* |
| **INV Rossi, Derrick 50%** | **$6,816.69** |
| **INV Warren, Luigi 50%** | **$6,816.69** |

APPENDIX 300

# PMOS EXHIBIT 9

## EXHIBIT 15 OF RYAN DIETZ'S DECEMBER 6, 2018 DEPOSITION: PLAINTIFF'S 2017 LINKEDIN/EMAIL EXCHANGES WITH RYAN DIETZ



Dietz

EXHIBIT NO. 15

MCL   12|6|18

Electronic exchanges from 2017 between plaintiff and Ryan Dietz regarding the royalty
split issue.

Aug 1

Hi Ryan,

I hope all is well with you and you are enjoying your role at Children's TIDO. I heard while in Boston for ISSCR that Derrick Rossi is closing his lab and moving on to new pastures. At this point I would like to gain an understanding of the terms under which the IP I helped develop in his lab have been commercialized. The last time we communicated on this (several years ago) you indicated that I would need to execute a Non-Disclosure Agreement before you could share the details, and would be happy to do so at this time. Please let me know how we should proceed.

Best regards,

Luigi Warren

Tel: (617) 275-1489

11:59 AM

 Hi Luigi. Thanks for reaching out. I need to contact you about an administrative matter so would suggest we find time for a call. When works for you? Please email me directly at **ryan.dietz@childrens.harvard.edu**

12:17 PM

APPENDIX 303

**luigi.warren@outlook.com**

| | |
|---|---|
| **From:** | Luigi Warren <luigi.warren@outlook.com> |
| **Sent:** | Friday, November 03, 2017 7:18 AM |
| **To:** | Dietz, Ryan |
| **Subject:** | Re: phone call [EXTERNAL] - CMCC 2085 |

We'll have to see what the court decides.

**From:** Dietz, Ryan
**Sent:** Friday, November 3, 2017 6:59 AM
**To:** Luigi Warren
**Subject:** RE: phone call [EXTERNAL] - CMCC 2085

Luigi,

All IP policies are drafted to allow changes to be made by the authorized individuals of the governing boards of the institutions.  Since IDI Board Members approved the merger into BHC, then changing from the IDI policy to the BCH policy was properly approved by IDI and is the governing policy at the time of the Moderna license.

Regards,
Ryan

**From:** Luigi Warren [mailto:luigi.warren@outlook.com]
**Sent:** Thursday, November 02, 2017 4:44 PM
**To:** Dietz, Ryan
**Subject:** RE: phone call [EXTERNAL] - CMCC 2085

Ryan,

My thoughts are that we are not making progress here. Quite the reverse, in fact. The pertinent question for the purposes of the analysis is to ascertain if there was any legally sound basis for IDI to promise to BCH what they had already promised to me as employee-inventor. I believe the answer is 'no.' Again, I will give you another week on this. If the BCH position remains that you are not obligated to honor the promises made me in the IDI policy, I will bring the issue before the courts for resolution.

Regards,

Luigi

**From:** Dietz, Ryan [mailto:Ryan.Dietz@childrens.harvard.edu]
**Sent:** Friday, October 27, 2017 7:23 AM
**To:** Luigi Warren <luigi.warren@outlook.com>
**Subject:** RE: phone call [EXTERNAL] - CMCC 2085

Hi Luigi,

APPENDIX 304

First, after inquiring, we are not able to provide the Moderna license agreement. This is policy based; we do not share agreements with investigators. Please note, your rights to revenue come from the IP policy.

Second, I received the internal analysis recently and have provided details below. This is in line with the history as I understand it and also is my independent opinion. This determination is based on a legal analysis and I have no ability to determine which policy applies.

Factual Understanding:

- The invention described in TIDO's case files as CMCC-2085 was disclosed to TIDO on or around August 13, 2008.
- Children's Medical Center Corporation (CMCC) and IDI entered into an Affiliation Agreement on or around February 20, 2009.
- Section 6.5 of the Affiliation Agreement deals with handling intellectual property and states that all IDI intellectual property not previously licensed as of the Effective Time of the Affiliation Agreement (February 20, 2009) shall be subject to the policies and procedures of CMCC. Licenses entered into at that time and thereafter, would be handled in accordance with CMCC's policies.
- CMCC and Moderna entered into the exclusive license to CMCC-2085 on or around December 21, 2010.

Conclusion: CMCC's intellectual property policy in effect when the Moderna licensed was signed will govern revenue resulting therefrom.

Remember, we are trying to implement a new revenue share that will allow for some revenue to go for lab research, but also will be more advantageous for the inventors (as described in previous letter and explanatory emails).

Please let me know your thoughts.

Regards,
Ryan

**From:** Luigi Warren [mailto:luigi.warren@outlook.com]
**Sent:** Thursday, October 26, 2017 12:31 PM
**To:** Dietz, Ryan
**Cc:** Rossi, Derrick; alt@enders.tch.harvard.edu
**Subject:** FW: phone call [EXTERNAL] - CMCC 2085

Ryan,

I haven't heard from you on the royalty distribution issue or my follow-up email regarding the terms of the Moderna deal. Have gone over this matter with several attorneys now and they all concur BCH is obligated by the promises made in the IDI policies. I'll give you another couple of weeks but if we don't have a resolution by then I will ask the courts to adjudicate the question.

Regards,

Luigi

**From:** Luigi Warren
**Sent:** Thursday, October 12, 2017 11:57 AM

2

APPENDIX 305

To: Dietz, Ryan <Ryan.Dietz@childrens.harvard.edu>
Subject: RE: phone call [EXTERNAL] - CMCC 2085

Hi Ryan,

As it is taking a while to resolve this issue of the exact percentages due to the inventors, could we pick up the original question? You indicated when we spoke back in August that you could share with me the terms of the licensing agreement with Moderna. How should we best proceed to address this?

Best regards,

Luigi

From: Dietz, Ryan [mailto:Ryan.Dietz@childrens.harvard.edu]
Sent: Thursday, September 07, 2017 1:07 PM
To: Luigi Warren
Subject: RE: phone call [EXTERNAL] - CMCC 2085

Luigi,

Thank you.

Diane left BCH a few years ago, but I recall several of these discussions.

To get current legal review on this, I would appreciate if you could forward the letter that Diane sent.

Regards,
Ryan

From: Luigi Warren [mailto:luigi.warren@outlook.com]
Sent: Thursday, September 07, 2017 3:51 PM
To: Dietz, Ryan
Subject: RE: phone call [EXTERNAL] - CMCC 2085

Hi Ryan,

I recall being informed verbally about the 1/3 inventors' share back when I was in Derrick's lab, and you confirmed that split in an email dated Mar 8, 2011 in response to my query, quoting directly from the policy document. Dianne McCarthy, BCH's Chief Counsel for Research Affairs, also sent me a copy of the full IDI R&D Policy giving the split in a letter requesting my execution of an assignment form dated March 22, 2011. I also had several other communications with you and with IDI's external counsel (Nixon Peabody) where the IDI R&D Policy was cited as controlling with respect to IP-related matters.

Best regards,

Luigi

**From:** Dietz, Ryan [mailto:Ryan.Dietz@childrens.harvard.edu]
**Sent:** Thursday, September 07, 2017 12:27 PM
**To:** Luigi Warren <luigi.warren@outlook.com>
**Cc:** Rossi, Derrick <Derrick.Rossi@childrens.harvard.edu>
**Subject:** RE: phone call [EXTERNAL] - CMCC 2085

Luigi,

I am trying to understand what others have communicated to you regarding the IDI policy by IDI/BCH. Can you clarify what information you received so I can know how to proceed here at BCH?

Regards,
Ryan

**From:** Luigi Warren [mailto:luigi.warren@outlook.com]
**Sent:** Monday, August 21, 2017 10:50 AM
**To:** Dietz, Ryan
**Cc:** Rossi, Derrick
**Subject:** Re: phone call [EXTERNAL] - CMCC 2085

Ryan,

Thanks for clarifying the royalty split tiers question on the phone last week. Just to sum up the state of play, the #1 concern I have about signing off on the custom split agreement is that it would in effect ratify an inventor's share which is still significantly lower than the 33 1/3% promised in the IDI Development Policy. For now, I need to better understand the merits of the claim that the 1992 BCH policy overrides those promises. I appreciate your offer to have the BCH lawyers speak to the issue and look forward to those communications. In the meantime thanks again for your help, and enjoy your vacation!

Best regards,

Luigi

**From:** Dietz, Ryan
**Sent:** Thursday, August 17, 2017 12:16 PM
**To:** Luigi Warren
**Subject:** RE: phone call [EXTERNAL] - CMCC 2085

Yes. 2 or 3pm ET tomorrow?

Regards,
Ryan

**From:** Luigi Warren [mailto:luigi.warren@outlook.com]
**Sent:** Thursday, August 17, 2017 1:38 PM
**To:** Dietz, Ryan
**Subject:** RE: phone call [EXTERNAL] - CMCC 2085

Shall we set up another call?

-luigi

**From:** Dietz, Ryan [mailto:Ryan.Dietz@childrens.harvard.edu]
**Sent:** Thursday, August 17, 2017 10:35 AM
**To:** Luigi Warren <luigi.warren@outlook.com>
**Subject:** RE: phone call [EXTERNAL] - CMCC 2085

Luigi,

The policy that covers the Moderna license is actually the BCH policy (detailed in the spreadsheet previously provided) that was in existence at the time of the deal. This is because of certain terms of the IDI/BCH merger agreement executed in 2009. So deals done after 2009 do not use the IDI policy (revenue split 1/3, 1/3, 1/3).

I am happy to chat with you if this is unclear.

The BCH policy does have tiers and differs depending on whether inventors remain employed at BCH. I attached the policy page showing the structure.

Regards,
Ryan

**From:** Luigi Warren [mailto:luigi.warren@outlook.com]
**Sent:** Tuesday, August 15, 2017 1:29 PM
**To:** Dietz, Ryan
**Subject:** RE: phone call [EXTERNAL] - CMCC 2085

Thanks, Ryan. Am I correct in my understanding that under the IDI policy the inventors' share was a straight 33 1/3% and under the current (2015) BCH/TIDO policy it is a straight 30%, with no tiers in either case?

-luigi

**From:** Dietz, Ryan [mailto:Ryan.Dietz@childrens.harvard.edu]
**Sent:** Tuesday, August 15, 2017 10:20 AM
**To:** Luigi Warren <luigi.warren@outlook.com>
**Subject:** RE: phone call [EXTERNAL] - CMCC 2085

Luigi,

Let me know if there are other questions.

Regards,
Ryan

___

1.  The items you list designate internal BCH funds which receive revenue other than the inventors.

- GRE is general research endeavor; PCMM is the program that IDI become when it joined BCH; DEPT is the department with which the PCMM belongs; IPO designates the Intellectual Property Office (now called TIDO) which handles all IP and licensing matters.

2. Regarding the cumulative nature of the revenue, I have attached a scan showing how it functions under the current policy. Basically, there is a drop in the inventor's share from 35% to 25% after cumulative revenues pass $500,000. The proposal we are intending to implement keeps the inventors at 27.5%. Since sizable revenues can be foreseen, 27.5% vs 25% would be significantly better for the inventors.

**From:** Luigi Warren [mailto:luigi.warren@outlook.com]
**Sent:** Monday, August 14, 2017 3:37 PM
**To:** Dietz, Ryan
**Subject:** RE: phone call [EXTERNAL] - CMCC 2085

Ryan,

A couple of immediate questions to help me understand this:

1. What are GRE, PCMM, DEPT, GRE and IPO here?

2. Can you explain what you mean by "provides higher shares for inventors as cumulative revenues rise above ~$800"?

Regards,

Luigi

**From:** Dietz, Ryan [mailto:Ryan.Dietz@childrens.harvard.edu]
**Sent:** Monday, August 14, 2017 12:15 PM
**To:** Luigi Warren <luigi.warren@outlook.com>
**Subject:** RE: phone call [EXTERNAL] - CMCC 2085

Luigi,

Sorry for delays.

I have attached 2 documents. One is the letter that will be signed and the other is an illustration of how the inventors will be better off with these splits. This is because the new revenue sharing model provides higher shares for inventors as cumulative revenues rise above ~$800. Again, the main goal is to allow for a lag share, but the added benefit is that inventors receive more money as revenues rise.

There is a reasonably likelihood that BCH will receive significant value for the equity stake we hold, which could be in the millions of dollars. Therefore, the updated split will be better for you.

I am working on providing the agreement as well. I should know how to proceed on that matter tomorrow or Wednesday.

Please let me know if you have any questions or concerns. I would be happy to have a call to discuss any of the details.

Regards,

APPENDIX 309

Ryan

**From:** Luigi Warren [mailto:luigi.warren@outlook.com]
**Sent:** Friday, August 11, 2017 4:33 PM
**To:** Dietz, Ryan
**Subject:** RE: phone call [EXTERNAL]

Hi Ryan,

Thanks for keeping me posted and have a good weekend!

-luigi

**From:** Dietz, Ryan [mailto:Ryan.Dietz@childrens.harvard.edu]
**Sent:** Friday, August 11, 2017 1:20 PM
**To:** Luigi Warren <luigi.warren@outlook.com>
**Subject:** RE: phone call [EXTERNAL]

Luigi,

I wanted to update you that I will have the letter and example spreadsheet that we discussed for you Monday.

My apologies for the delays.

Regards,
Ryan

**From:** Luigi Warren [mailto:luigi.warren@outlook.com]
**Sent:** Wednesday, August 02, 2017 12:09 PM
**To:** Dietz, Ryan
**Subject:** Re: phone call [EXTERNAL]

2 PM EST / 11 AM PST Friday is good for me. I look forward to speaking with you then. -luigi

**From:** Dietz, Ryan
**Sent:** Wednesday, August 2, 2017 7:11 AM
**To:** Luigi Warren
**Subject:** RE: phone call [EXTERNAL]

Sorry I missed this yesterday afternoon.

Best if we schedule something. How about 12, 1 or 2pm ET Friday?

Regards,
Ryan

**From:** Luigi Warren [mailto:luigi.warren@outlook.com]
**Sent:** Tuesday, August 01, 2017 3:51 PM

Case 1:17-cv-12472-DLC          Plaintiff's Rule 26(a)(1) Initial Disclosures          Page 128 of 188

APPENDIX 310

**To:** Dietz, Ryan
**Subject:** phone call [EXTERNAL]

Hi Ryan,

Anytime this afternoon would be good for a call. I can be reached at (617) 275-1489.

Best regards,

Luigi

**From:** Luigi Warren [mailto:luigi.warren@outlook.com]
**Sent:** Tuesday, August 01, 2017 3:51 PM
**To:** Dietz, Ryan
**Subject:** phone call [EXTERNAL]

Hi Ryan,

Anytime this afternoon would be good for a call. I can be reached at (617) 275-1489.

Best regards,

Luigi

APPENDIX 311

# PMOS EXHIBIT 10

## THE IDI'S MODERNA EQUITY CERTIFICATES



# Children's Medical Center Corporation

300 Longwood Avenue
Boston, Massachusetts 02115

November 17, 2015

James R. Kasinger
General Counsel
Moderna Therapeutics, Inc.
320 Bent Street
Cambridge, MA  02141

*Subject: License and Shares in the name of Children's Medical Center Corporation*

Dear Mr. Kasinger,

Please accept this letter as the formal request to transfer to, and on the stock and unit certificates, in the name of **Children's Medical Center Corporation** all shares/units received under Moderna/IDI license entered on December 21, 2010 and as amended under the Amended and Restated Exclusive License Agreement of March 16, 2012. I note that Children's Medical Center Corporation became the sole corporate member of IDI in February 2009, and then IDI was merged into The Children's Hospital Corporation in October 2012.  The Children's Hospital Corporation is a subsidiary of Children's Medical Center Corporation, which is the not-for-profit parent holding company that manages The Children's Hospital Corporation's investments and conducts fundraising activities for the benefit of The Children's Hospital Corporation. Please also note that we also intend to assign the IDI / Moderna license agreement indicated above to Children's Medical Center Corporation.

Per your request, enclosed please find original common stock certificates 7 and 8, for 272,959 shares and 58,572 shares, respectively, and certificate 2 for 472,966 units. Please forward the revised certificates to the following address:

Bruce Balter, Assistant Treasurer
Children's Medical Center Corporation
1295 Boylston Street, Suite 300
Boston, MA 02215

Please feel free to call me at 857-218-3489 should you have any questions. Thank you for your help with this matter.

Sincerely,

Bruce Balter
Assistant Treasurer

The Parent Corporation of Boston Children's Hospital

APPENDIX 313

BCH003795



State of Delaware

# Moderna Therapeutics, Inc.

**This Certifies that** _____ Immune Disease Institute, Inc. _____ is the

**registered holder of** ** Two Hundred Seventy-Two Thousand Nine Hundred Fifty-Nine (272,959) ** Shares

of Common Stock of Moderna Therapeutics, Inc.

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

**In Witness Whereof,** the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this _____ 31st _____ day of _____ December _____ A.D. 20 10

President

Secretary

APPENDIX 314



State of Delaware

## Moderna Therapeutics, Inc.

Common Stock, $0.0001 par value

**This Certifies that** Immune Disease Institute, Inc. *is the*

*registered holder of* ** Fifty-Eight Thousand Five Hundred Seventy-Two (58,572) ** *Shares*

of Common Stock of Moderna Therapeutics, Inc.

*transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.*

**In Witness Whereof,** *the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this* 29th *day of* March *A.D. 20* 11

President

Secretary

APPENDIX 315

BCH003797



State of Delaware

## Moderna LLC

No Par Value

**This Certifies that**  Immune Disease Institute, Inc.  _is the registered holder of_ ** Four Hundred Seventy-Two Thousand Nine Hundred Sixty-Six (472,966) **  _Shares_

of Common Units of Moderna LLC

_transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed._

**In Witness Whereof**, _the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this_ 7th _day of_ October _A.D. 20_ 13

President

Treasurer

APPENDIX 316

© GOES 720

BCH003798

# PMOS EXHIBIT 11

## EXHIBIT 19 OF RYAN DIETZ'S DECEMBER 6, 2018 DEPOSITION: HOSPITAL "GUIDELINES" RE EQUITY REFERENCED IN THE BCH POLICY

NOTE: DEFENDANT HAS WAIVED "CONFIDENTIAL" STATUS FOR THIS DOCUMENT



Dietz
EXHIBIT NO. 19
MCL 12/6/18

## Appendix B

Guidelines for Managing Equity Obtained

in the Transfer of Hospital Owned Technology

### INTRODUCTION

Children's Hospital increasingly finds that in many cases the most appropriate method to commercialize a technology is to transfer the technology to a young company and to receive stock, stock options, warrants or similar ownership interests (hereinafter "equity" or "stock")! in the company as consideration for the transfer. Taking equity in companies to which the Hospital transfers technology, however, raises serious questions of conflicts of interest. Although the conflicts of interest posed to the Hospital in such arrangements generally are not significantly different from those of the more common industrial relationships. into which the Hospital routinely enters (e.g., sponsored basic research, sponsored clinical trials, and licenses with royalties and milestone payments), there are differences in fact and perception and it is important that the Hospital be particularly sensitive to the potential for such conflicts given the limited experience in such arrangements.

### THE DECISION TO ACCEPT EQUITY

This document is designed to offer a context in which issues relating to equity ownership by the Hospital in exchange for technology can be considered. Because of the complexity and significance of the issues involved, and because of the institution's lack of experience in this area, decisions regarding the taking of equity in exchange for Hospital Technology should be reviewed and approved by the Executive Committee of the Board of Trustees of the Hospital. As the Hospital gains experience in this area, other processes may prove to be more appropriate regarding the decision to take equity.

Once a decision is made in a particular case to take equity, the Hospital is committed to oversight and monitoring of the ensuing relationship. This function may be undertaken by the Executive Committee of the Board itself, or the Executive Committee, in its judgment, may designate a Review Committee to carry out this function.

The guidelines contained in this document are just that - guidelines. It is anticipated that the Hospital will learn

EXHIBIT 19
APPENDIX 318

Confidential

BCH000326

through actual experience and will add to, delete or alter these guidelines as appropriate.

1. The intent of these guidelines is to use the term "equity" in the broadest possible fashion. The decision as to what constitutes "equity" in any given situation is reserved to the Executive Committee of the Board of Trustees.

MANAGEMENT OF EQUITY:

How to distribute: Typically, Children's Medical Center Corporation ("CMCC") will be the title and record owner of all equity obtained as a result of the transfer of Hospital-owned technology2. CMCC will have all shareholder rights and will maintain ownership or sell the equity at its discretion, subject to legal restrictions and the considerations set forth in these guidelines. In accordance with the Hospital's intellectual property policy, cash proceeds from the sale of equity will be distributed as follows: 25% to the investigator, 25% to the department; 40% to the General Research Endowment; and 10% to support the Hospital's technology transfer office.

Inventor's option: At the Hospital's discretion, inventors will have the option to obtain direct ownership of equity at the time the license is executed, if permitted by the company, applicable securities law and the conflict of interest policies of the Hospital and Harvard Medical School (HMS). Under these conditions, the Hospital will transfer ownership to the inventor(s) of 25% of the shares of stock received under the license or cause the company to issue the stock directly to the inventor. Thereafter, the inventor will not benefit from the sale of the stock received by the Hospital. Each inventor, in the case of multiple inventors, may make an election separately from the others.

Who will manage the Hospital's share: Any equity obtained by the Hospital pursuant to the transfer of a Hospital-owned technology generally will be managed in the same way all stock is managed and may be sold when deemed appropriate in the sole discretion of the Hospital. In the discretion of the Executive Committee of the Board, however, the equity obtained in any given case may be managed by whatever mechanism the Committee deems appropriate, including but not limited to an independent financial management fund, a blind trust, or the like. In choosing the appropriate equity management mechanism, the Hospital will endeavor to ensure that the designation is consistent with the protection of its academic principles. To this end, the Hospital will take

Confidential

APPENDIX 319  BCH000327

measures to isolate individuals responsible for equity management from the inventors who have relationships with industry. Further, the Hospital believes that if a decision regarding institutional equity presents a conflict between the objectives of protecting academic principles and making sound financial decisions, the 'p'rotection of academic principles must prevail over the Hospital's opportunity for financial gain.

An inventor may own equity independently from the Hospital: To minimize the possible divergence of the separate interests of the inventor and Hospital, the following will apply. Normally, the Hospital will acquire equity at the time of licensing, and future equity may be received by the Hospital as developmental milestones are achieved by the company. Equity received by the

2. For purposes of this paper the terms "CMCC", "Medical Center", and "Hospital" will be used interchangeably. Hospital, both upon licensing and as milestones are reached by the company, will be distributed to inventors who elect to receive it, in accordance with the Hospital's intellectual property policy. In addition, at the time of or subsequent to licensing, inventors may contract to perform future services to the company and may be compensated in part by receiving additional equity independent of the equity received by the Hospital, if approved by the Hospital and in compliance with Hospital and applicable HMS policies.

MANAGEMENT OF THE INDUSTRIAL RELATIONSHIP TO AVOID CONFLICT

Sponsored research: The Hospital may participate in research sponsored by a company in which the Hospital owns equity. Inventors who elect to receive equity in a company may not conduct or be involved in research at the Hospital, which is sponsored by that company. Where the Hospital owns the stock and the inventor shares in cash proceeds from a sale of the stock under the Hospital's intellectual property policy, the inventor may conduct and otherwise be involved in research sponsored by the company.

When the Hospital takes equity and also receives sponsored research support from the company issuing the equity, the Hospital will be especially sensitive to the possibility of unduly influencing either (a) the appropriate allocation of institutional resources, or (b) the research direction of the investigator concerned.

Clinical trials: The Hospital may participate in clinical trials sponsored by a company in which the Hospital holds

Confidential

BCH000328

stock. Any such clinical trial may not be directed by the inventor of the product, which is the subject of the trial. The principal investigator of the clinical study cannot be directly or indirectly supervised by the inventor. It is expected that confirmatory clinical trials (typically Phase II and Phase III studies) will be conducted as a multi-center study and directed by a principal investigator with no affiliation with the Hospital.

In deciding whether to participate in a clinical trial sponsored by a company in which the Hospital owns equity, the Hospital will consider the following and take steps to ensure (1) patient safety (2) validity and integrity of the data generated from the clinical trial (3) that the Hospital's equity interest is disclosed to its institutional review board (IRB) in order that the IRB can determine, among other things, in what manner and to what extent such information should be shared with patients and *others* (4) that inappropriate preferential access to patient populations is not provided to companies in which the Hospital owns equity.

<u>Medical students, residents and post-doctoral fellows ("trainees")</u>: The education and training of students, residents and post-doctoral fellows is one of the primary missions of the Hospital. The participation of trainees in academic research is a key component of such training. In building relationships with industry, the important concerns are (1) for the inventor of a technology licensed to a company not to direct the trainee to activities that may be of benefit to the interests of the company but are not appropriate for the training and professional development of the trainee; (2) for the trainee to be able to freely communicate the results of the trainee's work; and (3) for the trainee to be able to work in an inventor's laboratory on projects that develop strong professional and academic skills.

The inventor who performs research sponsored by a company that has licensed the technology of the inventor and who also serves as a mentor for trainees must certify in writing to the inventor's department chief and the Director, Research Administration on an annual basis that the trainees under the control of the inventor are either involved in activities independent of the inventor's industrially sponsored research or, if the trainee is funded by the company's research grant, report -the activities that the trainee is performing. The department chief must state in writing that the trainee is involved in research that is an appropriate training assignment, and must send a copy of this report to the Director, Research Administration. Any

Confidential

APPENDIX 321

BCH000329

issues of conflict will be referred to the Research Executive Committee for action and will be reported to the Executive Committee of the Board of Trustees. The inventor must also agree to submit any confidentiality agreement that the trainee may be asked to sign to the Technology Transfer Office for prior review and approval.

The Hospital will exercise great care to ensure that trainees are not involved in research in ways which could taint the integrity of the research or impede the development or advancement of their careers.

Reporting of research results: The openness of the academic environment is fundamental to the pursuit of new knowledge and advancement of scientific discovery. The academic freedoms of publication and collegial discussion are central to this process and must be preserved. A conflict arises where a company in which the Hospital owns equity seeks greater restrictions on publishing research results than the Hospital generally grants in a typical licensing arrangement. The Hospital's position on reporting research results is that the company will receive a manuscript at the time of submission to a journal or, in the case of a description, abstract or of any public oral presentation, a week in advance. The Hospital's position is that the company may only remove from the manuscript company confidential information, revealed to the Author/inventor as such under the terms of a confidentiality clause in a license or sponsored research agreement. The company has no right to alter or otherwise delay the reporting of the research results. To manage the potential conflict, the Hospital will not agree to any more restrictive terms for reporting research results than those outlined here without specific approval of the Executive Committee of the Board of Trustees.

Disclosure: Institutional ownership of equity holds the potential for undermining public trust in the institution and in the pursuit of scientific knowledge. One mechanism to prevent this potential from materializing is to have full disclosure of the institution's equity holdings. In order to be effective, the disclosure needs to be broad and must reach a varied audience - patients, the research community, and the public at large. Disclosure to the patient population will be addressed through the informed consent process (~ section on Clinical Trials). In addition, the Hospital will include a listing in its annual reports of those companies in which it holds equity as a result of technology transfer arrangements. If timely reporting cannot be accomplished through the annual report, the Hospital will

Confidential

APPENDIX 322

BCH000330

consider other means of disclosure, such as a press release.
Finally, authors of articles concerning research reported by
companies in which the Hospital owns equity will be required
to disclose the Hospital's financial interest in the
research in addition to disclosure of the author's personal
interests in the research, if any.

Board membership: A question arises whether the Hospital
will compromise its character as an academic teaching
Hospital if it participates in the direction of a new
company through board membership, exercise of so called
"observer rights", or exercise of contractual rights of
approval of certain corporate matters. The issues of
conflict become more intense if the Hospital holds board
seats because the Hospital then has a fiduciary duty to the
shareholders that potentially differs from the public
interest ordinarily served by the Hospital. Exercise of
"observer rights" and contractual rights also raise
conflicts, but of a less intense nature. In most cases, the
Hospital should be a silent partner and not participate on
the board of new companies. One of the most important assets
the new company brings to the Hospital is the management
team, and the Hospital generally should look to that team
and the financial investors who have been selected to
support that team. The Hospital ordinarily should not take
an active role in managing the company. It is recognized
that the new or young company may make decisions about any
number of business and scientific issues that may not best
serve the Hospital's financial interests and may serve to
decrease the value of the technology or may even undermine
the development of the technology3. In most cases, this is a
risk that the Hospital must assume in order to reduce its
exposure to potential conflicts of interest.

Nevertheless, in some cases the primary focus of the new
company is to manage the early stage development of a broad-
based technology and,. in certain cases, to manage possible
cross- licensing and field of use applications. Such a
company often serves as a "holding company" for the
technology rather than an operating company. Once the
technology has been further developed, the company may
choose to commercialize the technology itself or may pursue
development of the technology through a network of
sublicenses. In these cases it may be appropriate

3. The Hospital in its licenses carefully crafts "due
diligence" clauses to establish objective development
milestones and dates or minimum royalties. The clauses
encourage development of the technology, but these clauses,
in practice, may be difficult to enforce in order to regain

Confidential

APPENDIX 323

BCH000331

control of the technology. Generally, the Hospital uses every other means to stimulate the company to aggressively develop the technology. for the Hospital to participate on the board. The Hospital's role on the board of such a holding company is much the same as its role in the licensing of any technology through the Technology Transfer Office: primarily to assure that the technology is developed appropriately to serve the public good. As the company builds value and as new funding is raised to develop products, the founder's share of equity decreases. When the company becomes an operating company, 0+ when the Hospital's share in the company reduces to 10% or less, the Hospital may wish to relinquish its board membership for the reasons noted above.

The Executive Committee of the Board of Trustees must approve any direct participation on the board of a company.

Multiple licenses to a com an in which Children's owns licensed based equity: One of the conflicts that arises in owning equity in a new company is that the Hospital has an incentive to license related technology to such a company. While often this tendency is desirable, the conflict arises in those technologies where the technology may be best developed or the public interest may best be served by licensing it to a large company or even a competitor or perhaps by licensing non-exclusively to many companies. To assure that the Hospital not license its technologies preferentially to a new or young company in which it owns equity, any additional license to such a company must be specifically reviewed and approved by the Executive Committee of the Board. The exception to this policy shall be any technology which is dominated by the claims of a previously licensed patent or which is discovered in a program of research sponsored-by the company in which the Hospital owns equity.

Oversight and Monitoring: As discussed earlier, once a decision is made in a particular case to take equity, the Hospital is committed to oversight and monitoring of the ensuing relationship. This function may be undertaken by the Executive Committee of the Board, or the Executive Committee may designate a Review Committee to carry out this function. In either case, the oversight and monitoring will involve upholding key aspects of these guidelines and any special conditions imposed by the Executive Committee.

RESOLUTION OF ISSUES CONCERNING THE OWNERSHIP OF EQUITY:

Confidential

APPENDIX 324

BCH000332

In the course or managing institutional equity ownership, unforeseen issues, questions, and allegations of unacceptable behavior inevitably will arise. The Hospital is committed to the thorough investigation and resolution of all serious grievances and allegations relating to or arising from the Hospital's ownership of equity. All such grievances and allegations will be reported to the Executive Committee of the Board of Trustees which will be responsible for overseeing any investigation. To the extent appropriate, the Hospital will inform the Office of the Dean of Harvard Medical School and will share any findings publicly.

Approved by Board of Trustees June 15, 1993

Confidential

APPENDIX 325

BCH000333

# PMOS EXHIBIT 12

## EXHIBIT 4 OF RYAN DIETZ'S
## DECEMBER 6, 2018 DEPOSITION
## LIST OF MEMBERS OF THE BCH BOARD

APPENDIX 326

 


Dietz
EXHIBIT NO. 4
MCL 12/6/18

MENU

GIVE NOW

# Boston Children's Hospital Board

Hospital board members contribute their time and expertise to Boston Children's mission, facilities oversight, hospital policies, medical ethics and hospital budget and finance.

Chair: Stephen R. Karp
Douglas Berthiaume
Allan Bufferd, PhD
Kevin B. Churchwell, MD*
Alex Dimitrief
Sandra L. Fenwick*
Steven Fishman, MD*
Gary Fleisher, MD*
Winston Henderson
Paul R. Hickey, MD*
James Kasser, MD*
Steven Krichmar
Robert Langer, ScD
Harvey Lodish, PhD
Gary Loveman, PhD
Sheila Marcelo
Ralph C. Martin, II
Thomas Melendez
Kathleen Regan
Robert A. Smith
Alison Taunton-Rigby, PhD
Marc Wolpow
Laura Wood*
Greg Young, MD*

EXHIBIT 4

APPENDIX 327

Hospital Board »

Trust Board »

Philanthropic Board of Advisors »

Chairman's Council »

Boston Children's Hospital League »



About Boston Children's Hospital Trust

Event Calendar

Give Now

Contact Us

Sign Up For Newsletter

Privacy Policy

Boston Children's Hospital Main Site

**Boston Children's Hospital Trust**

401 Park Drive, Suite 602

Boston, MA 02215 | 617-355-6890

APPENDIX 328

# PMOS EXHIBIT 13

## EXHIBIT 22 OF RYAN DIETZ'S DECEMBER 6, 2018 DEPOSITION: 2018 CONVELO PRESS RELEASE

Convelo

July 25, 2018  ·  Convelo Press Release

# Convelo Therapeutics to Develop New Regenerative Medicines for Neurological Disease Characterized by Loss of Myelin

CLEVELAND, OHIO — Convelo Therapeutics, Inc. announced today that it has launched from stealth mode with a mission to discover and develop a new class of medicines that regenerate the protective myelin coating around nerve cells that is lost in a wide array of neurological diseases, including multiple sclerosis (MS). Seminal scientific discoveries made in the laboratories of Drs. Paul Tesar and Drew Adams at Case Western Reserve University School of Medicine provide the foundation of Convelo's discovery platform. Their most recent work, published online today in the journals *Nature* and *Nature Methods*, identified a central molecular pathway for stimulating the regeneration of new myelinating cells in the central nervous system.

"The discovery of agents that can restore myelin represents a new therapeutic paradigm for patients with neurodegenerative diseases characterized by loss of myelin," said Derrick Rossi, Ph.D., who has been appointed President and Chief Executive Officer of Convelo Therapeutics. Prior to joining Convelo, Dr. Rossi was faculty at Harvard Medical School and the Department of Stem Cell and Regenerative Biology at Harvard University. He also served as an investigator at Boston Children's Hospital, where his lab was focused on stem cell biology and regenerative medicine. Dr. Rossi has a history of entrepreneurship as co-founder of Moderna Therapeutics, Magenta Therapeutics and Intellia Therapeutics.

"In the case of MS, the most prevalent chronic neurological disease in young adults, patients have been limited to immunomodulatory drugs. These can be effective in slowing the progression of disease but do not halt it. Our thesis is that therapeutics that act directly within the central nervous system to stimulate myelin regeneration may be what is needed to stop or reverse the progressive nature of these types of diseases altogether. I am thrilled to lead the team at Convelo as we translate these remarkable findings of Drs. Tesar and Adams into tangible, life-altering therapies for people living with demyelinating disorders."

**Convelo's Co-Founders**

In addition to Dr. Rossi, Convelo was co-founded by a world class team of academic and scientific founders including:

·  Paul Tesar, Ph.D., Associate Professor of the Department of Genetics and Genome Sciences and the Dr. Donald and Ruth Weber Goodman Professor of Innovative Therapeutics, Case Western Reserve University School of Medicine

·  Drew Adams, Ph.D., Assistant Professor of the Department of Genetics and Genome Sciences, the Thomas F. Peterson, Jr. Professor of Novel Therapeutics, and the Director of Small Molecule Drug Development Core, Case Western Reserve University School of Medicine

·  Steven Landau, M.D., Chief of Development, Convelo Therapeutics

Convelo Therapeutics has named two world-renowned experts in neurology and MS to its Clinical and Scientific Advisory Boards. They are:

·  Jeffrey Cohen, M.D., Director of Cleveland Clinic's Mellen Center for Multiple Sclerosis Treatment and Research

·  Robert H. Miller, Ph.D., Senior Associate Dean for Research at the George Washington University School of Medicine and Health Sciences

**Scientific Approach**

Myelin is a critical component of a functioning central nervous system. Formed by specialized cells called oligodendrocytes, myelin wraps and insulates nerve fibers to enable proper transmission of electrical signals in the nervous system. Convelo Therapeutics is developing brain-penetrant small molecule therapeutics that stimulate oligodendrocyte differentiation and myelin regeneration from oligodendrocyte precursor cells (OPCs). In preclinical studies, the company's approach has demonstrated regeneration of myelin and reversal of paralysis in mouse models of MS.

In addition to MS, myelin loss or dysfunction also underlies several childhood leukodystrophies, including Pelizaeus-Merzbacher disease, and is a common characteristic of spinal cord injury, stroke and traumatic brain injury, as well as age-related dementias such as Alzheimer's disease.

Dietz

EXHIBIT NO. 22

MCL   12/6/18

Page 1

EXHIBIT 22

APPENDIX 330

Convelo    Q

### Financing and Intellectual Property (IP)

A $7.8 million financing was led by a group of private investors managed by Bill Sanford, Chairman of the Board of Directors of Convelo Therapeutics. In conjunction with the financing, Convelo Therapeutics executed an exclusive worldwide license agreement with Case Western Reserve University, which includes an intellectual property portfolio related to stem cell screening systems, remyelination platforms and drug candidates.

"We have a group of investors that believes deeply in the Convelo Therapeutics mission and is fully committed to seeing the company develop important new treatments for patients suffering from severe neurological disorders," said Sanford, Executive Founder and retired Chairman and Chief Executive Officer of STERIS Corporation. "Convelo has an outstanding team and academic partners in place to develop first-in-class remyelinating therapies."

### About Convelo Therapeutics

Convelo Therapeutics is developing a new class of medicines that unlock the regenerative capacity of the central nervous system. Convelo is pioneering approaches to regenerate the protective myelin coating around nerve cells that is lost in a wide array of neurological diseases including multiple sclerosis, pediatric leukodystrophies, traumatic injury and age-related pathologies such as Alzheimer's. Convelo has identified key biological targets and a pipeline of drug candidates to provide novel and meaningful solutions for patients and their families. Convelo Therapeutics is incubated at BioEnterprise, a leader in growing Northeast Ohio bioscience companies. To learn more visit www.convelotx.com.

### Contact:

W2O Group
Lauren Barbiero, 201-259-4791

lbarbiero@w2ogroup.com

**Previous**

**Crain's Cleveland Business: Convelo Therapeutics, founded on discoveries made at Case Western Reserve University School of Medicine, launches publicly**

Convelo in the News



11000 Cedar Avenue
Cleveland, OH 44106



Copyright © 2018 Convelo Therapeutics, Inc. All Rights Reserved.

APPENDIX 331

# PMOS EXHIBIT 14

EMAIL FROM PROF. ROSSI TO BCH
MANAGEMENT RE THE LAB SHARE

**Redaction**

**From:** Rossi, Derrick
**Sent:** Tuesday, October 24, 2017 11:16 AM
**To:** Abrams, Irene; Fleisher, Gary; Alt, Frederick
**Subject:** Re: royalties

Dear Gary, Irene and Fred
I'd like to finalize the agreed upon royalty distribution scheme agreed upon by all (see below). i am contemplating keeping the lab running and the 7.5% for the lab (outlined below) is a critical factor in my decision making process. Please let me know what can be done to finalize this process.
many thanks
derrick

**From:** Rossi, Derrick
**Sent:** Friday, June 09, 2017 10:36 AM
**To:** Abrams, Irene
**Subject:** Re: royalties

Hi Irene
Just following up to see if BCH/TIDO finalized the paperwork associated with the royal structure outlined in your last email?
If you have a chance to connect sometime, let me know.
Cheers
Derrick

1

APPENDIX 333

Derrick J. Rossi
Associate Professor
Department of Stem Cell and Regenerative Biology
Harvard Medical School
Harvard Stem Cell Institute
Program in Cellular and Molecular Medicine
Boston Children's Hospital
200 Longwood Ave
Warren Alpert 149e

Boston MA 02115
Office: 617 713 8900
Fax: 617 713 8910

Abigail O'Neil
Administrative Assistant
Tel: 617-713-8999

On Apr 26, 2017, at 5:48 PM, Abrams, Irene <Irene.Abrams@childrens.harvard.edu> wrote:

| Stakeholder | Rossi Proposal |
|---|---|
| Inventors | 27.50% |
| DOM | 10% |
| PCMM | 12.50% |
| BCH/TIDO | 42.5% |
| Rossi Lab | 7.5% |
| | 100.00% |

Irene Abrams
Senior Director
Technology & Innovation Development Office
Boston Children's Hospital
617-919-3026 I irene.abrams@childrens.harvard.edu
www.childrensinnovations.org

2

APPENDIX 334

BCH001110

# PMOS EXHIBIT 15

## EXHIBIT 6 OF RYAN DIETZ'S DECEMBER 6, 2018 DEPOSITION: USPTO DECLARATIONS RE INVENTION



Dietz

EXHIBIT NO. 6

MCL  12/4/18

Practitioner's Docket No. 033393-067445-C2                                              *PATENT*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| In re application of: | Derrick Rossi | | |
| Application No.: | 13/590,902 | Art Unit: | 1632 |
| Filing or 371 (c) Date: | 08/21/2012 | Examiner: | WILSON, Michael C. |
| Confirmation No.: | 2283 | | |
| For: | KITS AND METHOD FOR SUSTAINED POLYPEPTIDE EXPRESSION USING SYNTHETIC, MODIFIED RNAS | | |

### DECLARATION UNDER 37 C.F.R. 1.131

We, Derrick ROSSI and Luigi WARREN, hereby declare that:

1.  We are the co-inventors of the above-identified patent application.

2.  We have been advised that the following publications have been brought to the attention of the U.S. PTO in this application:

    a.  U.S. Patent Application Publication by Yanik et al. published October 28, 2010 and filed on **April 22, 2009** ("Yanik"), described as "disclosing a kit for making induced pluripotent stem (iPS) cells comprising a linear DNA encoding an OCT4 mRNA, a linear DNA encoding an SOX2 mRNA, a linear DNA encoding an KLF4 mRNA, and a linear DNA encoding an c-MYC mRNA."

    b.  Papapetrou et al. Proc. Natl. Acad. Sci USA 106: 12759-64; published on **August 4, 2009** ("Papapetrou"), described as disclosing "that making induced pluripotent stem (iPS) cells from a fibroblast cell by expressing OCT4, SOX2, KLF4, and c-MYC is most effective when OCT4 is provided in molar excess of at least three times the concentration of the remaining factors"; and

    c.  MEGAscript Kit Product Manual, Ambion/Invitrogen website, http://tools.invitrogen.com/content/sfs/manual/cms_072987.pdf; published on **October 27, 2009** ("Ambion") described as disclosing "art accepted methods for synthesizing mRNAs, and is representative of in vitro transcription kit manuals."

3.  Prior to April 22, 2009, August 4, 2009, and October 27, 2009, we had already conceived a method of using direct RNA delivery to cells to make iPS cells using the Yamanaka transcription factors.

4.  We submit true and accurate copies, with dates redacted, of notebook pages predating April 22, 2009, August 4, 2009, or October 27, 2009, as Exhibit A.

U.S.S.N. 13/590,902
Declaration under 37 C.F.R. 1.131
Page 2 of 2

5.  As shown at page 74 of book 3, we describe that we conceived using direct RNA transcripts to induce iPS cell production. Specifically, the notebook describes a "project to see if sustained transient transfection of Yamanaka factor T7 transcripts can induce iPS."

6.  All the work described herein was performed in the United States.

7.  Therefore, prior to April 22, 2009, August 4, 2009, and October 27, 2009, as evidenced by Exhibit A, we had conceived a method of making iPS cells using direct injection of transcripts of the Yamanaka factors without viral vectors and outlined linear T7 in vitro transcription templates for each of the transcripts.

8.  We worked diligently to reduce the invention into practice.

9.  We hereby declare that all statements made of our own knowledge are true and that all statements made on information and belief are believed to be true, and that willful false statements and the like are punishable by fine or imprisonment, or both (18 U.S.C. §1001) and may jeopardize the validity of the application or any patent issuing thereon.

Signature: _____     Date: _____
Derrick ROSSI

Signature: _____     Date: 4/15/13
Luigi WARREN

APPENDIX 337

Practitioner's Docket No. 033393-067444-C1

PATENT

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| In re application of: | Derrick Rossi | | |
| Application No.: | 13/590,880 | Art Unit: | 1632 |
| Filing or 371 (c) Date: | 08/21/2012 | Examiner: | WILSON, Michael C. |
| Confirmation No.: | 7675 | | |
| For: | SUSTAINED POLYPEPTIDE EXPRESSION FROM SYNTHETIC, MODIFIED RNAS AND USES THEREOF | | |

**VIA EFS WEB**
Commissioner for Patents
P. O. Box 1450
Alexandria, VA  22313-1450

### DECLARATION UNDER 37 C.F.R. 1.131

We, Derrick ROSSI and Luigi WARREN, hereby declare that:

1. We are the co-inventors of the above-identified patent application.

2. We have been advised that the following publication have been brought to the attention of the U.S. PTO in this application:

   a. U.S. Patent Application Publication by Yanik et al. published October 28, 2010 and filed on **April 22, 2009** ("Yanik"), described as "disclosing a kit for making induced pluripotent stem (iPS) cells comprising a linear DNA encoding an OCT4 mRNA, a linear DNA encoding an SOX2 mRNA, a linear DNA encoding an KLF4 mRNA, and a linear DNA encoding an c-MYC mRNA."

3. Prior to April 22, 2009, we had already conceived a method of using direct RNA delivery to cells to make iPS cells using the Yamanaka transcription factors.

4. We submit true and accurate copies, with dates redacted, of notebook pages predating April 22, 2009, as Exhibit A.

5. As shown at page 74 of book 3, we describe that we conceived using direct RNA transcripts to induce iPS cell production.  Specifically, the notebook describes a "project to see if sustained transient transfection of Yamanaka factor T7 transcripts can induce iPS."

6. All the work described herein was performed in the United States.

Page 3

APPENDIX 338

U.S.S.N.: 13/590,880
Declaration under 37 C.F.R. 1.131
Page 2 of 2

7.    Therefore, prior to April 22, 2009, as evidenced by Exhibit A, we had conceived a method of making iPS cells using direct injection of transcripts of the Yamanaka factors without viral vectors and outlined linear T7 in vitro transcription templates for each of the transcripts.

8.    We worked diligently to reduce the invention into practice.

9.    We hereby declare that all statements made of our own knowledge are true and that all statements made on information and belief are believed to be true, and that willful false statements and the like are punishable by fine or imprisonment, or both (18 U.S.C. §1001) and may jeopardize the validity of the application or any patent issuing thereon.

Signature: _____                Date: _____
           Derrick ROSSI

Signature: _____                Date: ___4/15/13___
           Luigi WARREN

Page 4

APPENDIX 339

Attorney Docket No.: 701039-067448-C
U.S. Serial No.: 14/311,545

## DECLARATION UNDER 37 CFR §1.63 FOR UTILITY APPLICATION USING AN APPLICATION DATA SHEET

TITLE OF INVENTION:

### SUSTAINED POLYPEPTIDE EXPRESSION FROM SYNTHETIC, MODIFIED RNAS AND USES THEREOF

As the below named inventor, I hereby declare that:

This Declaration is directed to:

☐  The attached application, or

☒  United States application number 14/311,545 filed on June 23, 2014, and amended on August 8, 2014.

☒  I have reviewed the preliminary amendment filed August 8, 2014.

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, §1.56(a).

Page 1 of 2

APPENDIX 340

Attorney Docket No.: 701039-067448-C
U.S. Serial No.: 14/311,545

I hereby further declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further, that these statements were made with the knowledge that any willful false statements and the like so made in this declaration are punishable by fine or imprisonment of not more than 5 years, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

| LEGAL NAME OF INVENTOR | LAST NAME | FIRST NAME | MIDDLE NAME |
|---|---|---|---|
| | ROSSI | DERRICK | |
| Signature of Inventor – | | Date: | |

| LEGAL NAME OF INVENTOR | LAST NAME | FIRST NAME | MIDDLE NAME |
|---|---|---|---|
| | WARREN | LUIGI | |
| Signature of Inventor | | Date: 12/16/14 | |

Page 2 of 2

Page 6

APPENDIX 341

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LUIGI WARREN,

          Plaintiff

vs.

THE CHILDREN'S HOSPITAL
CORPORATION,

          Defendant

Civ. A. No. 17-12472-DLC

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Plaintiff disputes the following facts in the Statement of Undisputed Material Facts filed with Defendant's motion for summary judgment:[1]

1. Defendant's paragraph 20 is disputed. Dr. Warren did not state in his deposition that he had never seen the IDI Policy until after his employment with IDI ended, only that he had "no recollection" of having seen it at the IDI. It is quite possible he did see the Policy at the IDI given that it was posted on their intranet for employees to peruse and shown to new hires during Orientation as a matter of standard practice and given that all IDI employees executed the associated Participation Agreement according to the 2009 IDI-BCH Affiliation Agreement, which would entail seeing the IDI Policy. (SUMF Ex. 1 at 75:15-76:13, PMOS Ex. 1 at 65:7-20, PMOS Ex. 7 at ¶¶ 12-15 of the draft lawsuit, SUMF Ex. 7 at ¶ 2.9.2 and the employee list at p. 43 of the exhibit).

---

[1] The abbreviation "SUMF" herein refers to the *Defendant's Statement of Undisputed Material Facts* and "PMOS" refers to the *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment*.

1

2. Defendant's paragraph 26 is disputed inasmuch as there is no doubt that Prof. Rossi briefed the IDI's technology transfer office regarding Dr. Warren's invention in August 2008 as this discussion is documented in Ryan Dietz's case notes for the invention. (PMOS Ex. 3).

3. Defendant's paragraphs 30, 32, 51 and 53 are disputed in that there is no evidence to show that BCH's policy on sharing revenues with inventors was adopted at the Effective Time of the Affiliation Agreement in any sense relevant to the issues in this case, i.e., that the IDI adopted the revenue sharing terms for Hospital employees as the applicable terms for the Institute's own employees. The available evidence shows that, to the contrary, the IDI continued to follow the 2004 IDI Policy on revenue sharing terms with respect to its own employee-inventors well after the Affiliation Agreement became effective (into Spring 2011, at least) which is compatible with the provisions of the 1992 BCH Policy in that the latter explicitly states that it regulates payments only to the Hospital's own inventors. (PMOS Ex. 5, SUMF Ex. 5, PMOS Ex. 6, PMOS Ex. 7, SUMF Ex. 9 at page 3 of the BCH policy).

4. Defendant's paragraph 33 is disputed in that the IDI required its inventors to assign their inventions to the Institute and not to the Hospital (as indeed was done for all Dr. Warren's assignments concerning the IP licensed to Moderna). (SUMF Ex. 3 at ¶ 4 of the Participation Agreement on p. 15 of the exhibit, PMOS Ex. 4).

5. Defendant's paragraph 44 is disputed in that Dr. Warren's testimony indicates only that he had, at the time of his deposition in November 2018 (more than seven years after his communications with IDI of 2011 regarding their request for him to execute an assignment), a belief that research institutions generally require invention assignments from employees and establishes nothing about what Dr. Warren "understood" about his actual obligations under the law as an ex-employee of IDI at some unspecified juncture relevant to the current dispute. Indeed, the record of his interactions with IDI in 2011 shows that his ultimate conclusion that he was obligated to execute the assignment was reached only pursuant to his review of the draft lawsuit sent him by the IDI's lawyers which argued that he had a legal duty to assign flowing from the contractual

APPENDIX 343

status of the IDI Development Policy. (SUMF Ex. 1 at 83:12-85:1 and 84:16-22, PMOS Ex. 5, SUMF Ex. 5, PMOS Ex. 6 and PMOS Ex. 7).

6. Defendant's paragraph 45 is disputed. Dr. Warren's first assignment is dated August 30, 2010, which is well after the first application for a patent of April 2010. (PMOS Ex. 4, PMOS Ex. 7 at ¶ 48 of the draft lawsuit).

7. Defendant's paragraph 48 is disputed inasmuch as Mr. Dietz did not respond to Dr. Warren with the "requested language," i.e., the IDI policy document(s), but only with an excerpt from the 2004 IDI Policy relating to the Institute's position regarding assignment, divorced from any context such as the promises on revenue sharing to employee-inventors. (PMOS Ex. 5—see Ryan Dietz email dated March 6, 2011).

8. Defendant's paragraph 54 is disputed to the extent that "after" implies "in response to" with respect to the letter from BCH's general counsel. Dr. Warren replied to Ms. McCarthy's letter by asking for an explanation of the legal status of the IDI Policy and the impasse continued when Ms. McCarthy failed to elaborate in her reply of March 23, 2011. Plaintiff executed the assignment only after receiving an email on April 11, 2011 from the IDI's outside counsel with an attached draft lawsuit which spelled out the IDI's position that the 2004 Development Policy had the force of contract. (SUMF Ex. 1 at 72:2-73:14, PMOS Ex. 6, PMOS Ex. 7 at ¶¶ 38-46).

9. Defendant's paragraph 55 is disputed. To be more precise, Dr. Warren did not say in his deposition testimony that the invention was morally "his," but rather "I feel that the invention is primarily mine, although I certainly don't deny that [Prof. Rossi] had a role in it," nor did he agree that the default 50/50 split was "fair"—whatever that might mean—answering rather, "I don't really know," while also acknowledging that "rank has its privileges" (i.e., "fairness" is not necessarily of overriding concern in regards the split between co-inventors) and that he had never raised any issue with a 50/50 split. (SUMF Ex. 1 at 79:2-22).

10. Defendant's paragraph 56 is disputed. The Hospital has distributed a larger share of revenue to Prof. Rossi to date, as all but the most recent (November 2018) distribution have been done

3

according to the 1992 BCH Policy schedule, which apportions more revenue to inventors employed at the Hospital at the time of the distribution for cumulative licensing proceeds under $500K. In any case, the question of the co-inventor split is immaterial to this case (or tangential at best) as Dr. Warren's percentage is slightly higher than prescribed by the IDI Policy throughout the sub-$500K band in the 1992 BCH Policy schedule: half of 35% instead of half of 33⅓%. His complaint does not involve any issue of injury or prospective injury stemming from unequal apportionment of licensing revenues between Dr. Warren and Prof. Rossi. (PMOS Ex. 8, SUMF Ex. 3 at p. 9 of the IDI Policy, SUMF Ex. 9 at p. 3 of the BCH Policy, Compl., ECF 1 at 6).

11. Defendant's paragraph 67 is disputed inasmuch as the Plaintiff's request for relief includes "such other relief as the court deems just and appropriate," which could reasonably encompass a damages remedy under now foreseeable circumstances, e.g., if the Moderna equity becomes liquid due to the expiration of the post-IPO lockup or is actually liquidated as a result of its sale by the Hospital or a cash buyout of Moderna before the case is resolved (Compl., ECF 1 at 5).

12. Defendant's paragraph 70 is disputed to the extent it elides the time element in the IDI's promise to distribute stock "at the earliest opportunity following receipt," i.e., even if equity and cash proceeds from liquidated equity were absolutely equivalent from a tax treatment standpoint, a promise to distribute equity value at a time of the institution's choosing is materially different from one to deliver equity "at the earliest opportunity following receipt." (SUMF Ex. 3 at p. 10 of the IDI policy, SUMF Ex. 9 at p. 4 of the BCH Policy.)

## PLAINTIFF'S OWN STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Plaintiff states that the following facts are undisputed:

A. The IDI Policy

1. While BCH's mission encompasses patient treatment as well as scientific research, the IDI was purely a research-oriented institution. (PMOS Ex. 1, 25:14-27:5).

4

2.  The 2004 IDI Research and Technology Development Policy (the "IDI Policy") was shown to the IDI's new hires as a matter of standard practice. (PMOS Ex. 1 at 65:7-20 and 148:4-12, PMOS Ex. 7 at ¶¶ 13-14 of the draft lawsuit).

3.  The IDI Policy was posted on the IDI's intranet for employee perusal. (PMOS Ex. 1 at 148:4-15, PMOS Ex. 7 at ¶¶ 12 of the draft lawsuit).

4.  The IDI obtained executed copies of the Participation Agreement attached to the IDI Policy from its employees as a matter of standard practice. (PMOS Ex. 1 at 65:7-20, SUMF Ex. 7 at ¶ 2.9.2.)

5.  The IDI Participation Agreement specifically directs the employee's attention to the revenue sharing terms spelled out within the IDI Policy. (SUMF Ex. 3 at ¶ 11 of the Participation Agreement on p. 17 of the exhibit).

6.  The IDI Policy includes no disclaimer of contractual obligation, highlighted or otherwise, with respect to its provisions for revenue sharing with employee-inventors, though it does specifically disclaim that the Participation Agreement constitutes an employment contract. (SUMF Ex. 3 at p. 5 and p. 16 of the exhibit).

7.  The language in the IDI Policy indicating that the Policy is subject to amendment appears in the section entitled "A. PURPOSE" at the beginning of the document and is not bolded or otherwise emphasized in any way within the document. (SUMF Ex. 3 at p. 4 of the Policy).

8.  The language in the IDI Policy indicating that the Policy is subject to amendment does not assert that amendments can be made without notice or are unlimited in scope. (SUMF Ex. 3 at p. 4 of the Policy).

9.  The IDI Policy includes terms that the IDI intended to be legally enforceable, including a requirement to make invention assignments. (SUMF Ex. 3 at ¶ 4 of the Participation Agreement on p. 15 of the exhibit).

10. Nowhere in the IDI Policies is it stated or suggested that they are only intended as a general guide or overview of the Institute's policies and/or benefits. (SUMF Ex. 3).

APPENDIX 346

11. The draft lawsuit sent to Dr. Warren by the IDI's outside counsel in April 2011 in support of their demand for his execution of certain invention assignments explicitly characterizes the IDI Policy as a contract. (PMOS Ex. 7 at ¶ 38-46).

12. Prof. Rossi told Dr. Warren that IDI's employee inventors were promised one-third of licensing proceeds from their work during Dr. Warren's time as a postdoc at the Institute. (SUMF Ex. 1 at 76:18-77:8).

B. The Invention

13. Dr. Warren conceived of the mRNA reprogramming invention no later than June 2008. (PMOS Ex. 2 at lab notebook p. 3-74, PMOS Ex. 15 at p. 2 of the first declaration.)

14. Prof. Rossi briefed Ryan Dietz, the head of the IDI's tech transfer office, about Dr. Warren's conception of the mRNA invention and his research project in August 2008. (PMOS Ex. 3).

15. In the course of reducing his invention to practice, Dr. Warren had recognized the importance of innate immune responses as a barrier to achieving sustained protein expression from synthetic mRNA and had identified and demonstrated the utility of modified mRNA as a countermeasure to address this, including specifically the use of 5-methylcytidine and pseudouridine ($\psi$), by November 2008 (PMOS Ex 2 at lab notebook p. 6-29).

16. Dr. Warren voluntarily ended his employment at the IDI in June of 2010. (PMOS Ex. 7 at ¶ 33).

17. Dr. Warren's first assignment of IP rights relating to the mRNA reprogramming work was made on or about August 30, 2010. (PMOS Ex. 7 at ¶ 26, PMOS Ex. 4).

18. Dr. Warren cooperated with every request for assistance in prosecuting the licensed IP received subsequent to the resolution of his argument with the IDI over the follow-up assignment of 2011. (PMOS Ex. 4, PMOS Ex. 15).

C. Pattern of Non-Disclosure

19. The IDI Policy calls for the IDI to publicly disclose when it has accepted equity in a company in return for the grant of a license. (SUMF Ex. 3 at p. 10 of the Policy under Receipt of Equity).

APPENDIX 347

20. The IDI never disclosed in any public forum that it had accepted equity from Moderna prior to Dr. Warren's outreach to Ryan Dietz in August 2017. (PMOS Ex. 1 at 29:11-30:7).

21. The IDI never revealed to Dr. Warren that it had accepted equity from Moderna prior to Dr. Warren's outreach to Ryan Dietz in August 2017. (PMOS Ex. 1 at 30:12-31:19).

22. The "Guidelines" on the management of equity referenced in the 1992 BCH Policy calls for BCH to publicly disclose when it has accepted an equity stake as a result of technology transfer arrangements. (SUMF Ex. 9 at p. 4 of the BCH Policy, PMOS Ex. 11 under <u>Disclosure</u>).

23. BCH never disclosed in any public forum that it had accepted equity from Moderna prior to Dr. Warren's outreach to Ryan Dietz in August 2017. (PMOS Ex. 1 at 31:20-32:19).

24. Moderna had three scientific co-founders, Prof. Rossi, Dr. Robert Langer and Dr. Kenneth Chien. (SUMF Ex. 10 at p. 11 of the exhibit).

25. Dr. Robert Langer is a member of the Hospital's senior management. (PMOS Ex. 12).

26. Dr. Langer has received a significant amount of Moderna equity, equivalent to 3.6% of the shares outstanding after the IPO. See Moderna's S-1/A SEC filing of December 4, 2018 at p. 326. https://www.sec.gov/Archives/edgar/data/1682852/000119312518341958/d611137ds1a.htm

D. <u>The 1992 BCH Policy</u>

27. The 1992 BCH Policy states that it provides only for payments to the Hospital's own inventors. (SUMF Ex. 9 at p. 3 of the BCH Policy).

28. It was public knowledge that Moderna had attained a multibillion-dollar private valuation by January 2015, entailing that the Hospital's Moderna equity alone could reasonably be expected to yield licensing proceeds well into the millions of dollars. See Dan Primack, *The $3 billion startup that wants to help you to make medicines in your own body*, Fortune (January 8, 2015). http://fortune.com/2015/01/08/the-3-billion-startup-that-wants-to-help-you-to-make-medicines-in-your-own-cells/

29. The first payment stemming from the Moderna license received by Dr. Warren was issued by BCH in September 2015. (PMOS Ex. 8).

30. Prior to Dr. Warren's outreach to Ryan Dietz in August 2017, BCH never informed Dr. Warren that they were applying the 1992 BCH Policy to his distributions or that, owing to the tiered structure of the distribution schedule in that policy and the high value of the Moderna equity, this would likely entail a significant reduction in the share of the license income he would receive relative to that specified in the IDI Policy. (PMOS Ex. 1 at 147:9-19).

E. The Ad hoc Policy

31. The primary motivation for instituting the *ad hoc* distribution policy of 2017 was to address Prof. Rossi's dissatisfaction with the fact that the application of the 1992 BCH policy to Moderna distributions eliminated the Lab Share, which comprised 33⅓% of Net Proceeds under the IDI Policy. (PMOS Ex. 9—see Ryan Dietz email dated August 14, 2017, PMOS Ex. 14, SUMF Ex. 3 at p. 9 of the IDI Policy).

32. The secondary motivation for the creation of the *ad hoc* distribution policy was to partially meliorate the anticipated de facto reduction in the Inventor's Share under the 1992 BCH rules relative to the flat 33⅓% share specified in the IDI Policy, given the proceeds reasonably expected to flow from the Moderna equity stake would far exceed the $500,000 threshold at which the Inventor's Share falls to 25% under the 1992 BCH Policy. (PMOS Ex. 9—see Ryan Dietz email dated August 14, 2017, SUMF ¶ 66).

33. Barring a collapse in the value of the Hospital's Moderna stake, any unequal treatment of Dr. Warren relative to Prof. Rossi arising from provisions of the 1992 BCH Policy could never affect more than a few percentage points of the revenue that would ultimately be distributed to them had BCH continued to follow that Policy. (SUMF Ex. 9 at p. 3 of the BCH Policy, SUMF ¶ 66).

34. Under the terms of the 1992 BCH Policy, Dr. Warren's share of licensing proceeds is half of 35% throughout the sub-$500K cumulative revenue band where that policy specifies unequal treatment

8

of individual inventors based on whether or not they are currently employed at the Hospital, which is slightly higher than the half of 33⅓% provided for in the IDI policy. (SUMF Ex. 3 at p. 9 of the IDI Policy, SUMF Ex. 9 at p. 3 of the BCH Policy).

35. Dr. Warren has never complained to the IDI or BCH or any of their employees or agents about receiving a lower percentage of Moderna licensing proceeds than Dr. Rossi pursuant to the nuances of the 1992 BCH Policy or for any other reason. (SUMF Ex. 1 at 79:2-14).

F.   Distribution of Equity Value

36. The 1992 BCH Policy and current *ad hoc* policy make no promises to employee-inventors, whether real or illusory, regarding the timeline or circumstances under which the Hospital will distribute the prescribed 25% Inventor's Share of equity directly to inventors or liquidate its equity holdings and distribute the Inventor's Share of the resulting proceeds. (SUMF Ex. 9 at p. 4 of the BCH Policy, SUMF Ex. 8).

Respectfully submitted,

/s/ Luigi Warren
Luigi Warren (Pro Se)
202 S. Raymond Ave, #205
Pasadena, CA 91105
Tel: (617) 275-1489
luigi.warren@outlook.com

Dated: March 8, 2019

9

APPENDIX 350

**<u>CERTIFICATE OF SERVICE</u>**

I, Luigi Warren, hereby certify that, in accordance with Local Rule 5.2(b), the foregoing document was filed through the ECF system on March 8, 2019 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

  /s/ Luigi Warren
Luigi Warren (Pro Se)

APPENDIX 351

1

                        UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS


LUIGI WARREN,                    :      CIVIL ACTION
                                        No. 17-12472-DLC
      Plaintiff,                 :

           v.                    :

THE CHILDREN'S HOSPITAL          :
CORPORATION,
                                 :
      Defendant.
: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

              BEFORE THE HONORABLE DONALD L. CABELL,
                 UNITED STATES MAGISTRATE JUDGE
                        **MOTION HEARING**

APPEARANCES:

For the Plaintiff:            LUIGI WARREN, PRO SE
                             202 S. Raymond Ave, #205
                             Pasadena, CA  91105

For the Defendant:           Pierce Bainbridge
                             BY:  THEODORE J. FOLKMAN, ESQ.
                             One Liberty Square, 13th Flr.
                             Boston, MA  02109


                                 U. S. District Court
                                 1 Courthouse Way
                                 Boston, Massachusetts  02210
                                 Friday, May 3, 2019
                                 11:00 a.m.


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
_____

                    **JANICE RUSSELL TRANSCRIPTS**
                       **1418 Red Fox Circle**
                       **Severance, CO  80550**
                         **(757) 422-9089**
                      **trussell31@tdsmail.com**



                                              APPENDIX 352

2

P R O C E E D I N G S

(Call to Order of the Court)

THE COURTROOM DEPUTY:  The case of Warren versus The Children's Hospital Corporation, Civil Action No. 17-12472, will now be heard before this Court.

Would the parties please identify themselves for the record?

MR. WARREN:  Yes.  Luigi Warren, plaintiff pro se.

THE COURT:  Good morning, Mr. Warren.

MR. WARREN:  Good morning.

THE COURT:  Nice to finally meet you.  We were asking ourselves have we ever had the occasion to actually be face to face with you.  I, I had a image in my mind, but I think it was manufactured solely by virtue of phone calls over the last year and a half.

So nice to finally meet you, yeah.

MR. FOLKMAN:  Good morning, your Honor.  Ted Folkman, Pierce Bainbridge, for the, the Hospital.

THE COURT:  And good morning.  I think we actually have met before.

MR. FOLKMAN:  Yes, we have.

THE COURT:  So nice to see you, again.

MR. FOLKMAN:  You, too, your Honor.

THE COURT:  All right.  So just a couple of ground rules at the beginning, especially, Mr. Warren, somewhat for

your edification since you're pro se.  Here's the way I'm going to go about doing things.  First, whomever is speaking should stand when they are speaking.  I'm going to give each side an opportunity to make their argument.  I'm going to start with Mr. Folkman as the defendant because it's their motion and they carry the burden.  And so we'll begin with them.

And then you'll get an opportunity to respond.

That being said, sometimes when an, a point is being argued or suggested to the Court and it's, and there's an assertion that is being made and it seems to me at that juncture that it may be more beneficial for us to actually hear a direct response to that particular assertion, I may -- don't be surprised if I say to a party, "Okay.  Hold that thought for a minute.  You just said something.  I want to hear what the response is to that point," and then allow the party to resume.

So, you know, everybody should relax.  I will allot up to an hour for this.  So be thinking in maximum terms of 30 minutes per side, although nobody is obligated to use that much time.

I do have some questions and as it seems appropriate to me during argument, I, I will ask those questions.

I want to begin with one that doesn't necessarily involve the merits of this, but given that early June may be of some significance in the context of this case and what can happen with the, with the shares and all and given my, my sense

4

of the case from now having sort of delved into these papers for the last few days, have the parties given any thought to sitting down with a mediator to see whether some agreement can be worked out now?  It just seems to me now there are more ingredients there for possibly resolving this.

THE COURT:  Mr. Folkman?

MR. FOLKMAN:  Your Honor, the, the parties have discussed that.  We have not been able to come to an agreement as to whether mediation would be fruitful.  I know that you have the power to refer us to, for example, court --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- ordered mediation and you may want to consider that.

THE COURT:  Well, I -- I -- in my near five years in this position I've never ordered parties to go to mediation, but I find that as time has gone by I've gotten closer to it because sometimes it just seems to me as I'm looking at things that I can't see why the case can't be resolved, given what, what it seems the respective positions are and, and sometimes given what seems to be, to be not a great distance between the parties.

Let me just put it this way.  The benefit to trying at least one session of mediation through the court is it's no charge to the parties and the matter is presided over and

APPENDIX 355

conducted by another judge, all of whom are, are seasoned litigators and judges, who have no vested interest in the outcome of the case, who will not discuss anything they do with the parties outside of the confines of the mediation.  It would remain confidential in that sense and they would not even talk about it with me.

So there is nothing that could ever be brought out in the course of that mediation that would ever have any precedential or evidentiary value or could ever be used to affect anything that might happen here.

So I, I would strongly urge the parties to consider mediation.  If the parties were interested in doing it, it could be arranged on fairly short notice.  We have a number of judges here who do it as part of their responsibilities.  We have a, a couple of senior judges who do really nothing but mediation.

So, Mr. Warren, I, I do think it's something that you may at least want to consider.

MR. WARREN:  Excuse me.  Your Honor, first, can I clarify?  Are you speaking about any mediation a court would, court appointing mediator?  Because that's not what we, you know --

THE COURT:  Well, yeah.  I --

MR. WARREN:  -- the interactions.

THE COURT:  Yeah.  I mean, I, I was doing that only

6

because -- I mean, parties can do it through whomever they want.  There are a number of organizations that are well known that are made up of commercial lawyers and judges.  JAMS is one of the best known one.  They have offices all over the country and they charge.  And you'll get -- what you'll get to them, depending on what the dynamic is, you may get something close to an arbitration where the parties actually go into it agreeing, "We're going to put this in the hands of somebody else to answer some key factual questions that we dispute and then to decide what the legal significance of those answers are and we'll be bound by it."  Others may say, "Well, we won't be bound by it, but we'll agree that it matters and that we should both really listen to whatever this person has to say."  Here, it's, it's not quite as formalized in the sense of it has no legal binding effect, except that if you reach an agreement, then the case is resolved and it goes away.

But when I speak of it, I'm speaking of it here, but that's because I know the way it operates here.  But if there was a mediator -- I know you're out on the West Coast.  You might say, "I know of some places out here," and, I don't know, maybe it can be conducted out there and make it more convenient for you to participate in.

I -- so I'm not really so much speaking about the mechanics, but about mediation as a way of resolving this. Because the -- if, if the case doesn't resolve at summary

7

judgment, the stage we're at now, you know, it goes on now for, it would be going on for another period of time and it just seemed to me, just given what I know from looking at this stuff, it's not clear to me why it needs to be going on for months and months and months and months and months.

Now the essence of any mediation is compromise. Both parties are going to have to give up a little something to get to a middle. That's, that is the part, I think, parties have to internalize before they agree to go to mediation.

But right now, I just want you to consider it and, and my editorial is from everything I've seen, I think it would be good for you guys to try it. I don't know why you wouldn't try it. I don't see a downside to trying it, all right? Okay.

All right. So with that, Mr. Folkman, let me start with you. I've got questions jotted down all over the place, but, and as your argument implicates them, I'll, I'll pose them.

MR. FOLKMAN: Thank you, your Honor.

I want to really address two points, the estoppel reliance point, which I think is really at the heart of things, and also, the point about the existence of the contract and whether it was amended. I would like to rest on my papers with regard to the tax issues --

THE COURT: That's, that's fine.

MR. FOLKMAN: -- and the delivery-of-stock issues,

unless you have questions in which case, of course, I'll be happy to answer them.

On reliance, what Dr. Warren has to prove is that he did something different --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- from what he otherwise would have done.  That's just the black letter law.  And what is the undisputed evidence about this?  Point No. 1, it's undisputed that he never read the IDI policy while he was an employee of IDI.  There's no evidence to the contrary.  There is evidence that it was posted on the intranet and that  --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- he may have had the opportunity to read it.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  There is evidence that IDI represented to Children's Hospital that all employees, presumably including Dr. Warren, had  --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- signed a participation agreement, which referenced policy.

9

THE COURT:  Right.

MR. FOLKMAN:  So there's evidence that's adjacent to it, but there's no evidence that he actually saw it or read it.

THE COURT:  But that's not the same as affirmative evidence that he did not.

MR. FOLKMAN:  That's, that's correct.  Well --

THE COURT:  Right?  I mean, you're -- so what you're saying is, "We don't know whether he relied on it because we don't have undisputed evidence that he did."  But isn't -- the issue is whether at this juncture there would be undisputed evidence that he did not --

MR. FOLKMAN:  He doesn't --

THE COURT:  -- rely.

MR. FOLKMAN:  He doesn't say he relied on it.  He says he has the opportunity, he had the opportunity to read it.  And really, what's at stake in order to show reliance is some indication that in, in his mind was the --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- policy.  The only thing that was in his mind that's in the record --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- is the statement of Dr. Rossi --

THE COURT:  Right.

APPENDIX 360

MR. FOLKMAN:  -- to him saying, "You're going to get a third" --

THE COURT:  Okay.

MR. FOLKMAN:  -- or, "We're going to get a third."

THE COURT:  Right.

MR. FOLKMAN:  Now Dr. Rossi was not management. Dr. Rossi was in the same position as, as Dr. Warren.  They were both beneficiaries of the policy, sort of acting at arm's-length with respect to the Hospital.

THE COURT:  Right.

MR. FOLKMAN:  The way that you know that is because Dr. Rossi later negotiated against the Hospital to get the *ad hoc* policy --

THE COURT:  Right.

MR. FOLKMAN:  -- what we're calling, adopted.

THE COURT:  Right.

MR. FOLKMAN:  So I don't think that you could say, "A fellow employee told me that I was going to get a third and, therefore, I had a justified understanding that my employer gave me that I can rely on."

THE COURT:  Well, now, now you're qualifying it by putting in the word "justified."

MR. FOLKMAN:  Well, reliance has to be reasonable. That's right.  I don't think there's any reliance in fact --

THE COURT:  Uh-huh (indicating an affirmative

11

response).

MR. FOLKMAN:  -- No. 1.  And that's when I'm talking about the question of did he see the policy.  And I think --

THE COURT:  Right.

MR. FOLKMAN:  -- there's no evidence that he saw the policy.

THE COURT:  Right.

MR. FOLKMAN:  Now if we're talking about the undisputed fact that Dr. Rossi told him --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- that "You might get a third," or that "You will get a third" --

THE COURT:  Right.  Why would you, why would you say that's patently unreasonable?

MR. FOLKMAN:  Well, because Dr. -- you know, the, anybody at the Hospital could have said "you got a third," but he had no --

THE COURT:  But it wasn't, it wasn't anybody.  It wasn't the custodian and it wasn't somebody who works in the cafeteria.  It was the closest thing to somebody in the same situation as him as anybody in the world.  It was his colleague.  It was the person who had the same interest, somebody who's educated, and somebody, it seems to me, at least as we sit here, it's not unreasonable to, to infer that he

APPENDIX 362

12

would understood, he would understand that Dr. Rossi knew what Dr. Rossi was talking about when Dr. Rossi said, "Hey, you'll get a third."

MR. FOLKMAN:  Well, let me make two points about that, your Honor.  I, I would agree with you if the statement were coming from someone within what we call TIDO, the Tech Transfer Office.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  And, in fact, Dr. Warren deposed Ryan Dietz, who was the, the responsible person at TIDO.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  Dr. Rossi, we know, because he ended up proposing the *ad hoc* policy, Dr. Rossi understood that at the time of the merger the 33 percent no longer applied.  That's why, that's why he came up with the compromise policy.

So I don't think that it's fair to say that someone who is sort of similarly situated with respect to management --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  Yes, he was a supervisor, has sort of actual or apparent authority to make statements about what you are or are not entitled to receive on behalf of the institution.

APPENDIX 363

13

THE COURT: I'm not necessarily disagreeing with the sentiment, but I just want to make sure --

MR. FOLKMAN: I understand.

THE COURT: -- we're not talk -- like you're using the terms "apparent" and "actual authority." This is not an argument that legally, you know, he -- he was -- he was getting guidance from somebody and the question is was that person -- were those -- were those words legally binding because this is the person who told him, but, rather, was it reasonable or unreasonable for him to rely on something that Dr. Rossi may have told him about what the potential benefits were.

MR. FOLKMAN: I think it's both, your Honor. I do think we cite a case in our papers that, that says, you know, he wasn't, he didn't have either actual or apparent authority to make those statements.

THE COURT: Well, I, I agree with you. He probably didn't have --

MR. FOLKMAN: Yeah.

THE COURT: -- actual or apparent authority.

MR. FOLKMAN: Yeah.

THE COURT: Okay.

MR. FOLKMAN: So, so I agree with you, then. If, if all we're talking --

THE COURT: Okay.

MR. FOLKMAN: -- about is, is did Dr. Rossi rely on it

APPENDIX 364

14

or -- excuse me -- did Dr. Warren rely on it and was it reasonable --

THE COURT:  Right.

MR. FOLKMAN:  -- that's an issue you're going to have to decide.

THE COURT:  Okay.

MR. FOLKMAN:  Do you have any further questions on that or can I --

THE COURT:  No, no.  No.

MR. FOLKMAN:  Okay.

THE COURT:  Thank you.

MR. FOLKMAN:  So Point No. 1, he never read the policy when he was at IDI.

Point No. 2, he knew he had an obligation to assign and he knew that --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- in a lot of ways.  He knew that because he knew it was the industry practice.  He knew it because he testified that at all the other institutions where he had worked --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- and at IDI that was the policy.  He signed the first assignment --

APPENDIX 365

15

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- which says -- and, you know, I would really refer you to the language of the first assignment --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- which is Tab 4 of Dr. Warren's exhibits -- you know, it goes into detail about his obligation to assign.

THE COURT:  So a question about that.

MR. FOLKMAN:  Uh-huh (indicating an affirmative response).

THE COURT:  You, you say he knew he had an obligation to assign.  Let me ask you, where did the obligation to assign arise from?

MR. FOLKMAN:  There's --

THE COURT:  Or what did it arise from?

MR. FOLKMAN:  There's two, there's really two sources, your Honor.  The first one -- and let me just stick with this document for a minute.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  So it's undisputed that he signs the first assignment well before Mr. Dietz and the counsel made any sort of misrepresentations --

APPENDIX 366

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- to him, right?  And what that first assignment says is that you've assigned to us this particular patent and all continuations and all divisionals and --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- all patents that might flow from this and you agree that you'll execute any documents that we need you to execute in order to sort of paper over your assignment of all additional patent rights.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  So, No. 1, he had an obligation that stems from the first assignment, itself.  And there's no, no real dispute about that and there's no, there's no argument that the first assignment was the product of some sort of misrepresentation.

THE COURT:  Okay.

MR. FOLKMAN:  So that's No. 1.

No. 2, it was just a condition of his employment. That was the policy of the Hospital.  The Hospital required it. If --

THE COURT:  Where -- where -- where does it say that?

MR. FOLKMAN:  Well, the, the IDI policy itself says

17

you, you have an obligation to assign.

THE COURT:  It says that?

MR. FOLKMAN:  Well, the, the participation agreement says it and the partici -- so if you look at how the documents work --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- you will see, if you look, for example, at Exhibit 3 of our exhibits, you'll see that there is the policy and then attached to the policy is the participation agreement, which does say, you know, you have an obligation to assign.

Now the participation agreement -- let me skip ahead a little bit --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- we didn't address it in our main brief.

THE COURT:  Right.

MR. FOLKMAN:  And the reason is because there's no evidence that Dr. Warren ever signed it.  Dr. Warren has no evidence that he signed it.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  If he wants to say affirmatively, as

apparently he does, that he did sign it, well, then that's the, the second source of, of the obligation if you, if you accept without evidence, that, in fact, he did sign it.  Our position is it's not a question that can be decided on summary judgment whether he signed it or not.

THE COURT:  Okay.

MR. FOLKMAN:  So I think those are really the two, the two sort of written places where you'll find it.

The third thing to note, of course, is that Dr. Warren was an employee at will.  And so --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- if he had said, if the Hospital had said to him during his employment or IDI had said to him during his employment, you know, "Assign us your rights" and he had said, "No," they would have said, "You're fired."

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  So --

THE COURT:  Right.

MR. FOLKMAN:  -- those are really the, the, the reasons why I say that he knew he had an obligation --

THE COURT:  Okay.

MR. FOLKMAN:  - to assign.

And the third undisputed fact -- and I've sort of

APPENDIX 369

19

already addressed this -- is that Dr. Warren did assign.  And again, I want to emphasize the fact that in light of the first assignment the second assignment is really just ministerial and a follow-on to what he had already done.  The first assignment was an assignment of this one patent --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- plus all the rights that may come out of it when patent lawyers do their thing.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  And then he agrees also to sign additional documents that may be necessary to effect those.

THE COURT:  Okay.  And, and when you say "he agrees to sign," is, is that coming from the same original source or is that coming, coming from a different source?  'Cause I wanted to talk to you about the second assignment.

MR. FOLKMAN:  So that's coming from --

THE COURT:  You, you say it was ministerial.

MR. FOLKMAN:  That's coming from the first assignment.

THE COURT:  All right.  So it's coming from the first assignment.

MR. FOLKMAN:  Yes.

THE COURT:  All right.  And it's -- and I want to make sure we're all talking about the same thing.  Now when he --

APPENDIX 370

20

'cause I understand he balked at signing the second --

MR. FOLKMAN:  Correct.

THE COURT:  -- initially.

MR. FOLKMAN:  Yes.

THE COURT:  And, and then it seemed the big guns came out.

MR. FOLKMAN:  Yes.

THE COURT:  And said, "You will be breaching a contract" --

MR. FOLKMAN:  Yes.

THE COURT:  -- "if you don't sign."

MR. FOLKMAN:  Yes.

THE COURT:  All right?  And that was the, the IDI contract.  And that's the name we're using.  You may have, may be referring to it differently.  But -- and, and I know you say that, in and of itself, there's this asterisk.  Everybody was relying on that, but, in fact, this was, what, post affiliation/pre-merger.

So it was really the BCH language that everybody should have been referring to.

But you say, though, or at the time the defendants were saying, "Hey, there is a contract between us and you're going to be breaching that contract."  And so forced with the, the threat of a lawsuit, he then signs.

And I'm only bringing this up now, and I know you're

21

still talking about the estoppel, but this sort of then gets into the second part of the contract, which is, you know, curiously, you start out by saying, "Look, there never was a contract.  I mean, there's no contract and at most, it's illusory.  And so I'm not even sure why we're here," and you even go so far as to suggest, if we buy that premise, really everything else you say is just out of an abundance of caution --

MR. FOLKMAN:  Correct.

THE COURT:  -- right?  And so I'm just trying to reconcile those two.

MR. FOLKMAN:  So you make a really good point, your Honor.  There is no question -- and we've said this from Day 1 -- that the Hospital screwed up, made a mistake.

THE COURT:  What was the screwup?

MR. FOLKMAN:  The screwup was to cite the IDI policy --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- and the 33 percent and to give those figures rather than to say The Children's Hospital policy. And, you know, if you ask --

THE COURT:  Okay.  But -- but --

MR. FOLKMAN:  If you were to, if you were to say --

THE COURT:  Well, let me just stop you there.  Because

APPENDIX 372

22

this is --

MR. FOLKMAN:  Yeah.

THE COURT:  -- I think, where the semantics matter.

Now you're using the word "policy."  They were using the word "contract," right?  And you argue there was no contract.  And so I think we need to be precise with the, with the noun.

MR. FOLKMAN:  Yeah.  No.  That's, that's a --

THE COURT:  Okay?

MR. FOLKMAN:  -- fair point.  And what I, what I would say is that the, the real source of the obligation was the first assignment.  Because that's the assignment that says, "You are obligated to -- you already sort of presently assigned us future rights in, in, in divisionals and continuations and other patents that flow from this and you covenant that you're going to, you're going to execute whatever documents we need to effect that."  Now --

THE COURT:  And, and you're saying that obligation to make that first assignment arose by virtue of Mr. Warren's employment --

MR. FOLKMAN:  Correct.

THE COURT:  -- with IDI?

MR. FOLKMAN:  Correct.

THE COURT:  And, and that was based on language that, among other things, said, "Here are kind of the conditions

APPENDIX 373

under which you are working for us and, by the way, we can modify this whenever we want."

MR. FOLKMAN:  Correct.

THE COURT:  All right.

MR. FOLKMAN:  That's right.

THE COURT:  And -- and -- I -- so I guess here's the question.  When, when the defendants threatened a lawsuit for breach of contract -- 'cause I, I always understood that was based on a breach of the IDI contract and not the first assignment, right?  Is that correct?  Like when they said, "Hey, if you don't, if you don't do this, if you don't do this second assignment, you're going to be in breach of contract."

MR. FOLKMAN:  I -- excuse me.  Are you asking Dr. Warren or you're asking me?

THE COURT:  No, I'm asking you.  I'm asking you.

MR. FOLKMAN:  Well, it --

THE COURT:  I'm just try, I'm trying to understand.

So what -- what -- what is it they were saying he was in danger of breaching if he did not effect that second assignment?

MR. FOLKMAN:  Yeah.  So --

THE COURT:  What -- 'cause --

MR. FOLKMAN:  So I agree with you that the -- that the -- that the express threat referred to the IDI policy.

THE COURT:  Okay.  Why is that not --

24

MR. FOLKMAN:  And that that was --

THE COURT:  Why is that not a problem for you here? He took actions --

MR. FOLKMAN:  Yes.  They were --

THE COURT:  -- that he's not happy with.

MR. FOLKMAN:  They were actions that  --

THE COURT:  Because -- because they -- because they said, "You are, you are contractually obligated to do this and if you don't, we're going to sue you."

MR. FOLKMAN:  Well, they were actions that he admits that he was obligated to take, anyway.

THE COURT:  Well -- well, that's -- all right.  That is a response, but in the first instance he wasn't gonna do it.

MR. FOLKMAN:  So --

THE COURT:  And people came to him and said, "We're gonna sue you," and not just anybody --

MR. FOLKMAN:  Yeah.

THE COURT:  -- right?  I mean, we had the General Counsel --

MR. FOLKMAN:  Yeah.

THE COURT:  -- at Boston Children's Hospital.  We also had Nixon Peabody --

MR. FOLKMAN:  Correct.

THE COURT:  -- right?

MR. FOLKMAN:  Right.

THE COURT:  So --

MR. FOLKMAN:  So I -- I think there's really -- I mean, there's really two things.  One is you knew you had to do it.  And so you had to do it, anyway, and there can't be any reliance.

The second point I would just make, your Honor, is that estoppel is equity, right?

THE COURT:  Right.

MR. FOLKMAN:  And, you know, Dr. Warren, I mean, look, there's some equity in his case.  There's no --

THE COURT:  Yeah.

MR. FOLKMAN:  -- question.  From his perspective, he says, "Yeah, I knew I had to do it, but I asked you what was I gonna get and you told me and then I did it and then you didn't give that to me."  So that's -- that has the ring of, of fairness and that's the basis of, I think that's why we're here.

But there's another side of the equitable coin, too, which is --

THE COURT:  Yeah.

MR. FOLKMAN:  -- which is, you know, you are obligated to do something.

THE COURT:  Right.

MR. FOLKMAN:  Someone says, "Okay.  You're obligated to do it.  Please do it."  You say, "I'm not gonna do it unless

26

you tell me what's in it for me."

THE COURT:  Yeah.

MR. FOLKMAN:  And the implicit threat is, you know, "Unless you tell me what I'd like to hear, I'm not gonna do it."  That's not --

THE COURT:  Right.

MR. FOLKMAN:  -- equitable, either.

THE COURT:  Right.

MR. FOLKMAN:  So I would say to you that there's, there's really two things going on.  One is I think we have, we're a hundred percent right on the merits of the reasonable reliance issue, which is an element of any claim of equitable estoppel.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  And, No. 2, I think while there is equity behind his case -- and that's, frankly, why I think your suggestion about the parties trying to resolve it makes sense --

THE COURT:  Yeah.

MR. FOLKMAN:  -- there is equity on both sides.

THE COURT:  Right.

MR. FOLKMAN:  The equity on our side is you had to do this.  Yu knew you had to do it.  You already did it and then you wanted to gum up the works and, and, you know, what's in it

for me beyond what everybody else at the Hospital has gotten.

THE COURT:  Well, but surely you can understand -- and I don't know what came first, the chicken or the egg -- but for somebody from the planet Mars who plops down in the middle of all of this you can, can't you see now in hindsight why somebody in Mr. Warren's position might be uncomfortable with the idea that he can be, he can be bound, he can be told, "You are bound to do all of these things and, by the way, we can unilaterally reduce your interest in this whenever we want.  We can make it zero, if we want."

MR. FOLKMAN:  Yep.  So let me, let me address that in two ways, your Honor.  The first way is if you look at any of the equitable estoppel cases where --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- some employee -- it's -- they're usually employee--employer cases.

THE COURT:  Yeah.

MR. FOLKMAN:  And, you know, someone says, you know, "I wanted to go out on FMLA leave" --

THE COURT:  Right.

MR. FOLKMAN:  -- "and I went to see the HR person and, and they told me," you know, "this is what you have to do and" --

THE COURT:  Right.

MR. FOLKMAN:  -- "and I did that and then it turns out it wasn't the right thing."  All, all of those cases have that equitable element in it, but the plaintiff doesn't always win because without reasonable reliance, you know --

THE COURT:  Right.

MR. FOLKMAN:  -- that's just, that's just the nature of, of the beast.

So I, I agree with you that a lot of these cases have hard facts --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- because there's always an element of equity when someone tells you something and you rely on it or, you know, and then you, you end up losing.  So I get that.

With regard to your other point about, you know, the Hospital could reduce it to zero --

THE COURT:  Right.

MR. FOLKMAN:  -- the point of these policies -- so we talk a little bit about where these policies come from and why they exist.

THE COURT:  Right.

MR. FOLKMAN:  They come out of the, the Bayh-Dole Act. There is no -- in, in a case like this where there was no federal funding --

THE COURT:  Uh-huh (indicating an affirmative

response).

MR. FOLKMAN:  -- there is no obligation by an institution like the Hospital to share revenues with inventors. So why, why do hospitals do it?  Well, I, I mean, they do it for obvious reasons.  They, they want to attract --

THE COURT:  Right.

MR. FOLKMAN:  -- you know, key talent.

THE COURT:  Right.

MR. FOLKMAN:  And, and by the way, there's, there's no question that this was not a, you know, a very significant scientific advance.

THE COURT:  Right.

MR. FOLKMAN:  And Dr. Rossi and --

THE COURT:  Right.

MR. FOLKMAN:  -- Dr. Warren did, did a really amazing thing, no, no question about that.

THE COURT:  Right.

MR. FOLKMAN:  So they want to attract that talent. They want to line up everybody's incentives.

THE COURT:  Right.

MR. FOLKMAN:  So you can say, well, in the abstract, you know -- and it's hypothetical --

THE COURT:  Right.

MR. FOLKMAN:  -- that the Hospital might say, "You get zero" --

30

THE COURT:  Right.

MR. FOLKMAN:  -- but in, in reality, that's not, that's not what happened.

THE COURT:  Well, and that -- and, and obviously, that's a -- I'm exaggerating just to kind of make the point, but I think it's also fair to worry that they might do something that significantly increases their potential benefit when they're -- when -- when the -- when the product is ultimately monetized and at the expense of the inventor. 'Cause that's what happened here.

MR. FOLKMAN:  Well, you can imagine a case where, you can imagine a case with bad facts along those lines where --

THE COURT:  Yeah.

MR. FOLKMAN:  -- where Moderna turns out to be a billion-dollar company --

THE COURT:  Yeah.

MR. FOLKMAN:  -- and then people sit around inside the hospital and figure out how to screw the inventors.

THE COURT:  Right.

MR. FOLKMAN:  And that's not what happened here.  What happened here is there was a merger of institutions --

THE COURT:  Right.

MR. FOLKMAN:  -- and the policies were rationalized --

THE COURT:  Right.

MR. FOLKMAN:  -- because that's how you do a merger.

APPENDIX 381

THE COURT:  Right.

MR. FOLKMAN:  So I think that, you know, yes, it's possible to imagine a case where there's real inequity where they, it's a bait and switch and they make the inventor do his thing --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- and he does his thing and then they pull the rug out from under him.

THE COURT:  Okay.  All right.

So with that, let's turn, if you wouldn't mind -- I mean, I -- if you want to go back and argue this.  I'm, I'm really as interested in the contract.

MR. FOLKMAN:  Sure.

THE COURT:  So let's, let's go to that.  Because by the time of the second assignment it is apparent that Mr. Warren has questions.  He's, he's now paying more attention to this and there comes a point when the defendant says, "We need you to do another assignment.  You must do this.  You are bound to do this.  You have a contract," that is, the idea, IDI contract and maybe they should have said BCH, but they say it's -- but that is the contract.  "There is, there is a contract between us."

How can you argue, then, that there is no contract to have been breached?

APPENDIX 382

MR. FOLKMAN:  Well, I -- so as I've said, I think that the way that the -- you know, the Hospital made mistakes in how it approached that negotiation.

THE COURT:  All right.  Let's, let's just look --

MR. FOLKMAN:  No, no question.

THE COURT:  -- pretend they called it the BCH.  Let's pretend they --

MR. FOLKMAN:  And it's not --

THE COURT:  Let's pretend they were referring to what they would have more correctly referred to and they said, "Here is a draft lawsuit.  Here's an e-mail and here is a draft complaint" --

MR. FOLKMAN:  Yeah.

THE COURT:  -- "in which we allege that you have breached contract and we ask the court for injunctive relief and a declaratory judgment."

MR. FOLKMAN:  Well, so, so I think the main answer to that is one that I've already given, which is what they should have said is, "You promised in the first assignment that you were gonna do this and you're not doing it."  So that, that, I think is, is Answer No. 1 if you're talking --

THE COURT:  Okay.

MR. FOLKMAN:  -- about, well, how can we say on the one hand --

THE COURT:  Okay.

MR. FOLKMAN: -- that these policies are just policies.

THE COURT: Right.

MR. FOLKMAN: And on the other hand, "You had an obligation."

THE COURT: Right. So -- all right. I just want to make sure I understand your argument.

So I get it part of it is they should have been referring to something else. And, and is it that they, they should have been referring to the first assignment, which I'm not sure I have in front of me --

MR. FOLKMAN: It's --

THE COURT: -- but the, the actual assignment --

MR. FOLKMAN: Yes.

THE COURT: -- that was signed.

MR. FOLKMAN: Yes.

THE COURT: That -- if, if there was a contract, that is the contract, is that what --

MR. FOLKMAN: I believe that is the best case for a contract, absolutely.

THE COURT: Okay. You'd certainly have to at least, I hope, acknowledge that from my perspective that creates kind of a conundrum for us. Because -- and maybe you can speak to this -- Mr. Warren in a light most favorable to him did something that he otherwise would not have done. He thought he would be

in a better position if he didn't sign.  And maybe he's wrong on that, but that's what he thought, or in a light most favorable to him.  That's an inference.  And he was threatened with a lawsuit if he did not sign something that, arguably, reduced the value of, of what he thought he had and it was done based on an assertion by the defendant that, "There is a contract and you are obligated to sign it."

It kind of surprises me that you're, you don't at least acknowledge that creates an issue here at, at the summary judgment stage for your client.

MR. FOLKMAN:  Well, I think you have to compare sort of what you're comparing against.  The question isn't -- suppose we say that the, the, the BCH policy --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- you know, had -- had a contract -- had imposed some obligations on him.

THE COURT:  Right.

MR. FOLKMAN:  The question isn't is it that or nothing.  The question is is it that or the IDI policy. Because the whole issue in the case is was the policy amended, or one of the issues in the case --

THE COURT:  Right.

MR. FOLKMAN:  -- was the policy amended.

So we're really talking not about were you obligated

APPENDIX 385

or were you not obligated --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- but, rather, is it 33 percent or is it 27-1/2 percent?

So I just want to put that idea on the table, too.

THE COURT:  Right.

MR. FOLKMAN:  In other words, I suppose that Dr. Warren would say, although he doesn't, there's no affidavit --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- I, I suppose he would say, "If, if you had told me that policy had changed" --

THE COURT:  Right.

MR. FOLKMAN:  -- "and now I'm getting 27-1/2 percent" --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- by the way, just like every other inventor --

THE COURT:  Right.

MR. FOLKMAN:  -- at the Hospital -- "then I wouldn't have, then I wouldn't have signed it."  Now, you know --

THE COURT:  Yeah.

36

MR. FOLKMAN:  -- there's no evidentiary showing on that, but let's assume that that's what he would say.

THE COURT:  All right.

MR. FOLKMAN:  I would say that that has nothing to do with whether or not he's obligated.  They're just fighting about the price.

THE COURT:  All right.  So let's, let's tweak this just one tiny bit just so I can make sure I understand what you're arguing.

Let's say there weren't two assignments.  There was just one.

MR. FOLKMAN:  Yeah.

THE COURT:  And it was at the time of the first assignment --

MR. FOLKMAN:  Yeah.

THE COURT:  -- that Mr. Warren raised the concerns he had.

MR. FOLKMAN:  Uh-huh (indicating an affirmative response).

THE COURT:  And that people did not mistakenly refer to the IDI agreement.  They actually correctly referred to the BCH agreement as governing whatever the, the respective rights of people were to equity and proceeds and everything once the product hit the market.

MR. FOLKMAN:  Uh-huh (indicating an affirmative

APPENDIX 387

37

response).

THE COURT:  And he balked and the defendant went to him and said -- are you saying now the defendant would not have been able to go to him and say, "You are obliged to sign"? 'Cause as I understand your argument now you're saying the obligation to sign arose from the first assignment, but if the first assignment is actually the time when he raises the beef, to begin with -- I understand you, you're not arguing that the IDI or the BCH policy obligated him to do anything.

MR. FOLKMAN:  We're not claiming that the policies themselves are contractual and the reason for that is, you know, woven throughout our brief.  Now the --

THE COURT:  Okay.

MR. FOLKMAN:  -- the reason why this case has come up --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- is that, unlike others, Dr. Warren did not make the move from IDI to the Hospital.  And so everybody who --

THE COURT:  Right.

MR. FOLKMAN:  Everybody who made that move --

THE COURT:  Right.

MR. FOLKMAN:  -- understood, first because they were told, but second, because they signed it, you know.  They --

38

they-- they -- they were told that this is the policy, that the Children's policy was --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- the policy and, "If you don't assign, I suppose you're no longer employed."  And there would be equitable claims, even for former employees, for, for failure to assign.

So, for example, suppose I'm an inventor --

THE COURT:  Yep.

MR. FOLKMAN:  -- and I come up with a, a, a billion-dollar idea and we have the same documents that we have in this case.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  And I quit my job --

THE COURT:  Yes.

MR. FOLKMAN:  -- and, and then I, I make noises.  I -- I -- "I'm going to commercialize this product."  And the employee, the employer comes to me and says, you know, "While you were working here, you had an obligation to assign this to us.  You created this while you were here" --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- right?

APPENDIX 389

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  The employee in that case can't just go out and, and, and sell it.  There's going to be a claim by the employer in equity saying, "This is really ours."  And so what I would suggest to you is that it doesn't matter that his employment had terminated.  He's really equitably --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- in the same situation as if, like everybody else, he had continued to be employed.

THE COURT:  And -- and -- and -- and -- and what is that legal obligation to assign?  What does it -- what does, does it arise from?  You're saying it's equitable.

MR. FOLKMAN:  Well, it arises because while he was an employee, it was --

THE COURT:  Yeah.

MR. FOLKMAN:  -- it was a condition of his employment.

THE COURT:  Right.  And then he left.

MR. FOLKMAN:  Right.  And my point -- and, and so this is exactly my point.  My point is if you leave --

THE COURT:  Yeah.

MR. FOLKMAN:  -- and then you -- you're gonna -- you're gonna try to make some money on work that you did while you were at your employer, your employer is gonna say, "You,

40

you invented that while you were here.  You can't do that."

THE COURT:  Well, and -- all right.  So, and I guess this is kind of what I'm trying to, to figure out.  While I'm working there I understand I have obligations.

MR. FOLKMAN:  Yes.

THE COURT:  And I can be fired if I don't comply with those obligations.

MR. FOLKMAN:  Yes.

THE COURT:  But then I leave.

MR. FOLKMAN:  Yes.

THE COURT:  I'm a co-inventor.  Everybody agrees that I have, I have some equity in this, in this product.  The company then starts to talk with other entities and to, to form other new relationships that require people to assign interests and to do things.  Obviously, you can compel anybody who -- you can do more to compel somebody who is working there --

MR. FOLKMAN:  Yes.

THE COURT:  -- to play along than you can with somebody who's no longer --

MR. FOLKMAN:  Yes.

THE COURT:  -- working there.  And what I guess that I'm trying to figure out is what is the legal obligation?  What -- from what springs the legal obligation of a nonemployee to do something they may not want to do?  You can't threaten to fire them because they're no longer fired.

APPENDIX 391

MR. FOLKMAN:  I think that the obligation arises from the fact that he had an obligation while he was working there to disclose the invention to his, to his employer, right?

THE COURT:  And he did.

MR. FOLKMAN:  Right.

THE COURT:  And, and he did.  And then he left the company.

MR. FOLKMAN:  Right.  Well, in practice, your Honor, what happens in, in that situation is when you disclose, that's when TIDO and whatever it's called --

THE COURT:  Yeah.

MR. FOLKMAN:  -- at the particular institution sort of gears up and starts doing assignments and so forth.

THE COURT:  And I, and I understand that.

MR. FOLKMAN:  Yeah.

THE COURT:  And I -- I'm -- and I -- and I'm -- and I'm not suggesting that working with the company, even if you're not, no longer an employee, wouldn't be the most reasonable thing to do.  It probably would be.

MR. FOLKMAN:  Yeah.

THE COURT:  It would be in your best interest to do that.  It'd probably be self-defeating to just go off and not participate any longer.  I'm trying to figure out where the legal obligation to act comes from.

MR. FOLKMAN:  I guess the only other thing I can say

about it, your Honor, is that if you take Dr. Warren's case --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- that he did sign that participation agreement --

THE COURT:  Yeah.

MR. FOLKMAN:  -- it's in there.  Now you may feel that you can't decide that on summary judgment because, as we say --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- there's no evidence about it, but that's what Dr. Warren says.

THE COURT:  And when you say the "participation agreement," I want to make sure we're talking about -- you're talking about the IDI?

MR. FOLKMAN:  Correct.

THE COURT:  Okay.  All right.

MR. FOLKMAN:  And I'm not talking about --

THE COURT:  And --

MR. FOLKMAN:  -- the policy now.  I'm talking about the participation agreement, which, if you look in the exhibits, is attached to it.

THE COURT:  Okay.  Now you will agree with me before, just so we don't end up on all this all, all day, when BCH went to him and Nixon Peabody went to him and said, "If you don't

sign this, we're going to sue you for breach," they weren't, they weren't relying on the participation agreement.

MR. FOLKMAN:  That's correct.  I, I agree with you --

THE COURT:  They -- they were --

MR. FOLKMAN:  -- a hundred percent that --

THE COURT:  They were relying on the IDI agreement. Okay.

So here's my last question to you on this --

MR. FOLKMAN:  Yeah.

THE COURT:  -- and then you go back to whatever you want to say to me.

MR. FOLKMAN:  Yep.

THE COURT:  What do we make of the fact that they were -- they -- they -- they used a legally unsound argument and invoked the wrong documents out there to induce a former employee to do something the employee suggested he did not want to do?  What should we make of that here?  Why is that not of significance, especially where you start out by arguing he's not entire, he, he's not entitled to make an equitably, an equity-based argument or equitably-based argument here?  I mean, how can you say that when the company basically strong armed him into doing something based on something that you concede was legally incorrect?

MR. FOLKMAN:  Well, I, I have two responses.  The first is that I think, as I've tried to suggest, the equities

44

are on both sides.  So we were trying to strong arm him --

THE COURT:  Okay.

MR. FOLKMAN:  -- and he was trying to strong arm us.

THE COURT:  Sure.  Okay.

MR. FOLKMAN:  So that's Point --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- No. 1.

And, and Point No. 2 -- and I'll just return and I, I won't say it again -- but --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- the, the fact of the matter is no matter how inequitable a situation looks --

THE COURT:  Right.

MR. FOLKMAN:  -- and I don't think it's, it looks that inequitable when you weigh everything --

THE COURT:  Right.

MR. FOLKMAN:  -- no matter how inequitable it looks, without the reasonable reliance you can't have estoppel and there can't be reasonable reliance when you admit you were obligated to do it, anyway.

So that --

THE COURT:  Okay.

MR. FOLKMAN:  -- that's the position.

THE COURT:  Okay.

MR. FOLKMAN:  Let me, let me just turn to the, the question of the existence and the amendment of the contract --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- if there were a contract.  And, and I don't want to belabor it because from, from your questions --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- I, I have the sense that the Court's tentative view, at least, is that you're willing to say that it wasn't a contract and, and that you think that the, the consequences of that may be bad for us, which, which I understand why --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- where that view comes from.

But I just want to say that the, the factors that courts use to look at this, if you tick them off --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- and I'm, I'm not going to tick them off one by one --

THE COURT:  Right.

MR. FOLKMAN:  -- we tick off each and every box.  All

46

of the pierce factors and those factors are derived from the Jackson case.  All of those factors are satisfied here.  And, and so I think under Massachusetts law it's quite, it's quite --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- clear that this is sort of the, the, the example of, of the kind of manual or handbook or policy --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- that employers have that just are not deemed to be contractual.  If you thought it, if you thought it was a contract --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- I would just point you to the undisputed declaration of Ryan Dietz, the TIDO --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- fellow, who says, "At the time of the affiliation we amended that."  And there's no, there's no real dispute about that.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  Dr. Warren's view, I think, is that,

APPENDIX 397

"Well, where, where are the voluminous documents that show this?"

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  There aren't voluminous documents that show it, but that's the, that's what the Hospital did.

THE COURT:  Why didn't, why didn't the company tell people it was reducing their interest?

MR. FOLKMAN:  So --

THE COURT:  That seems --

MR. FOLKMAN:  -- I have to go outside the --

THE COURT:  At best, that was really tone deaf.

MR. FOLKMAN:  Yeah.  So let me, let me just go outside the record, if I may, to sort of tell you what I understand about that.

THE COURT:  Okay.

MR. FOLKMAN:  And I, you know, I don't want to say it's in any kind of evidentiary sense, but I think it's a fair question and --

THE COURT:  Yeah.

MR. FOLKMAN:  -- I think the real answer is that they did tell everybody but since Dr. Warren didn't make the move, he didn't get the message.  I think that's the real answer. Now I, you know, that's not part of this motion.

THE COURT:  Uh-huh (indicating an affirmative

response).

MR. FOLKMAN:  And I understand why you want to know it, but that's the, I think that's the fact of the matter.

The last point I want to make -- well, I have a couple last points.  I do want to acknowledge a, a mistaken citation in our briefs --

THE COURT:  Okay.

MR. FOLKMAN:  -- which was the Nagel (phonetic) case. The citation is fine --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- and the proposition for which we cited it is fine.  We are actually citing Judge Liposis' (phonetic) dissent and we ought to have said that in the, in a parenthetical.

THE COURT:  Okay.

MR. FOLKMAN:  So I don't think it, it, it makes a difference, but I just want to let you know that we're aware of that.  And I apologize to the Court that we didn't indicate that in the, in the parenthetical to the citation.

THE COURT:  Okay.

MR. FOLKMAN:  The, the point of that citation is essentially the same point that we, that we cite the, the, the Railway case for and some of the other estoppel cases, which is to say if you're obligated to do it --

THE COURT:  Uh-huh (indicating an affirmative response).  -

MR. FOLKMAN:  -- you can't claim reasonable reliance when someone makes a misrepresentation to you.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  And, and the last point I want to make -- and, and this is, again, something that is, is outside the record, but it addresses a point that is sort of throughout --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- Dr. Warren's papers -- the Hospital's intent has always been that when the lock-up period ends --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- it's going to sell the stock and it's going to distribute the proceeds.  So I think --

THE COURT:  Okay.

MR. FOLKMAN:  -- there's some suggestion that maybe it would never happen.

THE COURT:  Right.

MR. FOLKMAN:  The fact of the matter is the Hospital is not in the business of speculating on stock.

THE COURT:  Uh-huh (indicating an affirmative

APPENDIX 400

response).

MR. FOLKMAN:  There's a lot of people inside the Hospital that would like to use this money for, you know, important research.  So --

THE COURT:  Are, are you able to make a representation that, you know, within "X" period of time after the stock is able to be sold the Hospital intends to sell it on the market for market price?

MR. FOLKMAN:  I cannot make a representation as to a particular time, but what I can make a representation is that promptly after the expiration of the lock-up date, that's their intention.

THE COURT:  Okay.

MR. FOLKMAN:  And I -- I -- you know, you asked about market price and so forth.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  I didn't actually ask that question before the hearing.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  My assumption is they're not selling it for less than it's worth, but I, you know, I --

THE COURT:  I mean, these are -- is it listed on a market?

51

MR. FOLKMAN:  Yes.  And so --

THE COURT:  All right.

MR. FOLKMAN:  Yeah.

THE COURT:  So it's going to be --

MR. FOLKMAN:  That's right.

THE COURT:  -- in a market --

MR. FOLKMAN:  That's right.

THE COURT:  -- transaction.

MR. FOLKMAN:  Correct.

THE COURT:  It's not a private deal with a --

MR. FOLKMAN:  Correct.

THE COURT:  Okay.

MR. FOLKMAN:  Correct.

THE COURT:  Do you mind?  I just had a couple --

MR. FOLKMAN:  Yes.

THE COURT:  -- of questions.  And actually, that was one of the questions I wanted to ask.  So thank you.  And for the record I was told, "Don't ask that.  He's not going to answer that question."  And, and you offered that.  So thank you.

The other is -- and this is going back to -- and trust me.  I'm not reopening.  I just want to make sure I understand everything.  What is it -- just string it out for me -- if we go back to the first assignment.  I know you say obligations arose from signing the first assignment.

APPENDIX 402

52

MR. FOLKMAN:  Yes.

THE COURT:  But if we're at the time of the first assignment and Mr. Warren is not an employee and Mr. Warren balks, what would have been the consequences of his not signing?  I suppose on one level what could have happened to him?  What, what could the defendant have done to impel him to sign?  But in terms of the, the ability to do anything with the product, how would it have been hampered by his failure to sign the assignment?

MR. FOLKMAN:  Well, so the -- you raise a really important point.  It would have, it would have been very, very significant not to have an assignment from all of the inventors because Moderna wants to be the exclusive licensee.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  And I, you know, I can't speak to exactly what would have happened, but it would have been a very significant problem for the deal --

THE COURT:  Okay.

MR. FOLKMAN:  -- if the, the owner of the patents had not been able to say that they had written assignments from all of the inventors.

Now I think that there would have been legal arguments that the first assignment --

THE COURT:  Uh-huh (indicating an affirmative

APPENDIX 403

53

response).

MR. FOLKMAN:  -- effectively assigned all rights and so that the second assignment, in a sense, is just --

THE COURT:  Right --

MR. FOLKMAN:  -- going to serial --

THE COURT:  --  but -- and I was just tweaking to say if we, if we're at the time of the first assignment --

MR. FOLKMAN:  Yeah.  Yeah.  Yeah.

THE COURT:  -- and somebody was balking then, what could the -- and, and then that -- and let's, like taking out the mistaken reliance on the IDI --

MR. FOLKMAN:  Yeah.

THE COURT:  -- you could go back in time and you were advising them, "Here legally is what you can do to get the person to, to sign this first assignment," what would that have been?

MR. FOLKMAN:  I think the Hospital would have sued Dr. Warren and said, "It was a condition of your employment that you" --

THE COURT:  Right, but he's no longer employed.

MR. FOLKMAN:  "It was a condition of your employment that you do this."

THE COURT:  Right.

MR. FOLKMAN:  And so in equity, equity regards as being done that which ought to have been done.

APPENDIX 404

54

THE COURT: So you would have been suing for a specific performance, I suppose, in a way --

MR. FOLKMAN: Correct. Correct.

THE COURT: -- to -- to -- to perform something you would have been obligated to do had you been an employee?

MR. FOLKMAN: Right. And no one wants to be in that position --

THE COURT: Right.

MR. FOLKMAN: -- but I, I think that that's the, the likely answer. And I would say, also, that depending on how you feel about Dr. Warren's assertion --

THE COURT: Uh-huh (indicating an affirmative response).

MR. FOLKMAN: -- that he signed the participation agreement --

THE COURT: Uh-huh (indicating an affirmative response).

MR. FOLKMAN: -- if, if you think that he did sign it for purposes of this motion, we would also have had a contractual, a contractual cause of action.

THE COURT: Okay. Thank you.

MR. FOLKMAN: Thank you.

THE COURT: All right.

All right, Mr. Warren. Finally, sir.

MR. WARREN: Thank you, your Honor.

55

THE COURT: I, I went over the -- I was trying to do a 30-30 split, but I've done 45 so far. But let's -- let's --

MR. WARREN: Okay.

THE COURT: -- let's see where we go with you.

MR. WARREN: Yes. First of all, I don't just see this as primarily an, an equitable or estoppel based. I, I say "primarily." It's a contract claim.

THE COURT: Uh-huh (indicating an affirmative response).

MR. WARREN: I do believe that I would have valid arguments in estoppel if they're in the contract or in, if there's a contract and it was -- the Court finds that (indiscernible) ultimately bear it.

THE COURT: Uh-huh (indicating an affirmative response).

MR. WARREN: I would, would like to note that there's a recent case in this court, Terrace v. Harvard (phonetic), which had a, involved a similar participation agreement and a royalties policy and in deciding a, on a motion to dismiss the court affirmed that there was a contract. And that case, I infer that they could prove that he signed a participation agreement, which I concede I can't prove that. I asked for my participation agreement and Derrick Rossi's --

THE COURT: Right.

MR. WARREN: -- and they told me they looked high and

APPENDIX 406

56

low and they can't find it.  I -- so I don't know what to make of that.

THE COURT:  Well, you say you signed it.

MR. WARREN:  I'm not -- I don't really assert that.  I don't know.

THE COURT:  Okay.

MR. WARREN:  I do assert that they have asserted that was their standard policy and that that did happen at orientation.

THE COURT:  Right.

MR. WARREN:  And they asserted during the, in the affiliation agreement --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- in their Reps and Warranties that everybody -- and my name and Rossi's name was listed there --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- had signed.

THE COURT:  Okay.

MR. WARREN:  But I don't know.  I -- my -- I would argue that there's a contract and if we didn't sign it, they dropped the ball, whatever.

THE COURT:  Okay.

MR. WARREN:  I also think that a great, everything

APPENDIX 407

becomes much simpler --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- if we just assume that there was a contract and that the representations that were made to me by Ryan Dietz, by the BCH counsel --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- and by Nixon Peabody back in 2011 were correct, both as to the fact that I was obliged, that the policy was a contract.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  I was obliged under.  The policy did provide for deferred compensation and I was obligated to --

THE COURT:  Okay.

MR. WARREN: -- obligated to assign and the IDI percentages ruled.  If we just assume that, our problems go away.

THE COURT:  I'm, I'm just curious.  How, if at all, does any of your sense of, of, of what you think your rights are and what you think they did wrong, how, how does any of that change if we endorse this idea that there was a good faith mistaken reference to the IDI agreement that you kind of entered into and, in fact, everybody really should have been

referring to the agreement that, as it was modified after BCH took over after the affiliation?  And would you still be arguing, "Oh, that wouldn't have made a difference," you know? "I -- I" -- or would you be arguing that that makes a difference?

MR. WARREN:  If they had cited -- and not just in that 2011 interaction -- but a new policy, they could have cited the new policy.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  They could have expressed that to their employees.

THE COURT:  Right.

MR. WARREN:  And they can change a policy.

THE COURT:  Right.

MR. WARREN:  That's --

THE COURT:  Okay.

MR. WARREN:  That's allowed.  I've read through a bunch of these --

THE COURT:  Right.

MR. WARREN:  -- cases.  They could change the policy. It will become effective when they retired the old policy --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- and expressedly -- and they expressed

it to their employees not simply by --

THE COURT:  Okay.

MR. WARREN:  -- whatever happened in that contract, but it would actually have to be expressed to employees to come into effect.  It still would not have, be effective retroactively.  I think Lematra (phonetic) is the obvious case to look at there.

THE COURT:  What, what do you say to this notion that there was language when you were an employee that said the terms, the conditions under which you operated could be modified?

MR. WARREN:  Yes.  I think Lematra and many other cases, but Lematra is a very good one here -- first of all, most of these cases, including all the ones that --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- Mr. Folkman cited --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- in support of his position, involve a default, at will, and presumptively, at-will employment situation --

THE COURT:  Right.

MR. WARREN:  -- and they're about progressive discipline policies.

60

THE COURT:  Right.

MR. WARREN:  And as a number of courts have noted, there's a conundrum there and that weighs against giving contractual weight to those progressive discipline policies.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  That doesn't apply here.  Even, even when it does apply, many courts, and increasingly, courts have found that they do have, have contractual weight.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  That doesn't, doesn't apply here.

So, sorry.

THE COURT:  That, that's okay.

MR. WARREN:  Can you repeat the question --

THE COURT:  Well, no, no. --

MR. WARREN:  -- or refresh my memory?

THE COURT:  It -- it -- it's just that -- right.  'Cause one of the things they are trying to suggest on us, well, there's a few things that are being suggested.  So this actually does get a little muddled and we would have to stop ourselves and go back and, and try to start with one thought and then go in a linear fashion.

But one of the, one of the things they say is, "Well, there was no contract, to begin with."

APPENDIX 411

61

MR. WARREN:  Uh-huh (indicating an affirmative response).

THE COURT:  All right.  It was illusory, at best, and it was illusory, in part, because there was language that every employee on, was, was made aware of and understood, which was that, "What we're really describing here are the, the, the things that we are making available to you as an employee," you know.  "We're going to give you a desk and a chair and we might, we might change the desk at any time.  We might change the chair.  We, we can do these things at our discretion whenever we want."

So that you kind of knew that changes could be made and there's no contract, really, to have been breached.  They were just exercising a right that they always have.

MR. WARREN:  Yes.  And I think a number of courts have found that that's not a valid argument.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  First, one, one reason being that the policy's clearly intended to incentivize, makes promises --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- to incentivize economically beneficial --

THE COURT:  Right.

APPENDIX 412

62

MR. WARREN:  -- behavior.  That's -- many courts have in deciding these cases --

THE COURT:  Right.

MR. WARREN:  -- these handbook cases, have cited that as an important factor.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  It's detailed.  It's not, despite Mr. Folkman's quote about, half a sentence fragment, about guidelines, this is a very detailed explication --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- of what I'm going to get as an employee inventor written in legalistic language with definitions such as "covered persons," etc., etc.

MR. WARREN:  So that --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- supports reasonable reliance that is, that is a binding offer.

THE COURT:  Right, but then you left the company --

MR. WARREN:  Uh-huh (indicating an affirmative response).

THE COURT:  -- right?  So you -- you're -- there were things that -- yeah.  You -- you -- you say, "There was

APPENDIX 413

63

reliance. I signed this. I was an employee and I, as an employee, I was entitled to all these things," and then you leave the company --

MR. WARREN: Yes.

THE COURT: -- right?

So at the time you leave the company and then there's communication with the defendant and they're asking you to, to assign, the argument is is that you concede that you knew you had an obligation to, to sign the assignment, is that -- do -- do you agree with that or you disagree with that?

MR. WARREN: So there, so there was a first assignment, which I signed, which I executed in August after I left.

THE COURT: Uh-huh (indicating an affirmative response).

MR. WARREN: The consideration that's laid out in that assignment is for, basically, for salary and employee benefits.

THE COURT: Okay.

MR. WARREN: I've left the company.

THE COURT: Uh-huh (indicating an affirmative response).

MR. WARREN: If it's just for salary, I don't even know if that would be supportable.

THE COURT: Uh-huh (indicating an affirmative response).

APPENDIX 414

MR. WARREN:  But even if, even if that were supportable -- and they do try and suggest that --

THE COURT:  Right.

MR. WARREN:  -- really, it's only binding on me --

THE COURT:  Right.

MR. WARREN:  -- and they're not promising anything -- but even if that's supportable, that's past consideration.  So it's not consideration.

So it's not a binding --

THE COURT:  Well -- all right.  You're giving me --

MR. WARREN:  -- contract.

THE COURT:  -- a nice legal answer.

MR. WARREN:  Yeah.

THE COURT:  I guess the question I'm asking you is, did you have an understanding you were obligated to sign that?

MR. WARREN:  I understood that there was an arrangement by which I would get a percentage.  I probably didn't even understand what an assignment was at the time I was at the company.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  I think the first time, probably, I ever saw an assignment or ever kind of considered it --

THE COURT:  Uh-huh (indicating an affirmative response).

APPENDIX 415

65

MR. WARREN:  -- was looking at that assignment that I signed in August and I thought, okay.  This is part of our arrangement.  So I'm going to get something.  That's the employee benefits that are mentioned.  And I'm, even though I'm a layman, I know enough about law that past consideration is not consideration.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  But I've heard about, I've been told.  That's been my operating assumption all this time that I've been promised a certain percentage of, of anything that they get.

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  So I signed it.  But, you know, I could have been wrong about either of those things.  I could have been wrong, when we actually come and look at it, that they're not legally bound to, to give me, to give me a percentage and they're not legally bound to assign.  I just -- that's it.  That was my understanding.  That was the level of reliance that I had.  I didn't go over it with a legal fine --

THE COURT:  Okay.  But -- but --

MR. WARREN:  -- tooth --

THE COURT:  But you signed it.  I mean, you're, you're a professional and under law --

APPENDIX 416

66

MR. WARREN:  Yeah.

THE COURT:  -- you're deemed to have read --

MR. WARREN:  And I did.

THE COURT:  -- and accepted the terms of anything you signed.  And I'm asking this, in part, because Mr. Folkman says that first assignment, in and of itself, contractually binds you or binds you --

MR. WARREN:  Yes.

THE COURT:  -- to sign any second or successor assignments.  Maybe not successor, that's not the right word, but any subsequent assignments.

So by the time of the second where you are balking they say, "Well, you were bound to sign that, too."  Now do you agree or disagree with that?

MR. WARREN:  That was the second cause of action giving them --

THE COURT:  Yes.

MR. WARREN:  -- the lawsuit.

THE COURT:  That, that was the one where they threatened you with a lawsuit if you didn't.

MR. WARREN:  Well, the first cause of action is breach of contract, which is I'm happy at that point because they've admitted that it's a contract.  That's --

THE COURT:  Uh-huh (indicating an affirmative response).

APPENDIX 417

67

MR. WARREN: If you look at the communications --

THE COURT: Right.

MR. WARREN: -- in 2011 --

THE COURT: Right.

MR. WARREN: -- that's what I'm trying to elicit.

THE COURT: Right.

MR. WARREN: Am I -- is there a contract here where I help you by giving you the assignment and supporting patent prosecution and you pledge to give me a certain percentage.  So that, that's clear.

Then the second cause of action is that I'm obliged by the first assignment.

THE COURT: Right.

MR. WARREN: Now I can't remember.  I remember having discussions with my lawyer.  I don't know if I was -- I think I probably did recognize that there was a failure of consideration in the first assignment so, that that was at least a weak claim.

And then there was a third claim that I'm obliged and not -- it's not that I didn't want to give them the assignment.

THE COURT: Right.

MR. WARREN: I wanted to give them an assignment, but know --

THE COURT: Right.  You wanted to --

MR. WARREN: -- and have in writing --

APPENDIX 418

68

THE COURT:  -- know what you were getting for it.

MR. WARREN:  -- what the terms were --

THE COURT:  You wanted to know what you --

MR. WARREN:  -- what's my deal.

THE COURT:  Right.

MR. WARREN:  What -- what --

THE COURT:  You wanted to know what you were gonna get.

MR. WARREN:  And this is, you know, you can see reading --

THE COURT:  Right.

MR. WARREN:  -- Dietz's response, responses and, and -- that he was evasive --

THE COURT:  Right.

MR. WARREN:  -- and he didn't want to initially give me the, the, the, the participation agreement --

THE COURT:  Okay.  Now --

MR. WARREN:  -- somewhat.

THE COURT:  -- stop right there.

MR. WARREN:  Sorry.

THE COURT:  Remember -- no, no.

MR. WARREN:  Yeah.

THE COURT:  Remember what I said somebody might say something and then I want to hear from the other side.

MR. WARREN:  Sure.

APPENDIX 419

THE COURT:  So you stay right there.

So, Mr. Folkman, why, if you know, did it seem as though Mr. Dietz was not, ostensibly, more forthcoming about sharing with Mr. Warren what the results of signing that second assignment would be?  It seems like nobody wanted to kind of tell him, "Look, here's, here's how it's going to affect your position."

MR. FOLKMAN:  Yeah.  So I don't believe there's testimony on that, your Honor.  I will say that the e-mails themselves say that the, the policy is not public and I -- I -- you could speculate that because Dr. Warren was no longer an employee --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- he has a institutional or bureaucratic reason not to share the policy outside of the institution.  I -- I --

THE COURT:  Well, but I don't -- but, but I think what he was -- I mean -- and that's a fair response -- but I think his concern was, "I need to know what's in it for me.  I need to know how this affects me," which is not the same as sharing the policy with the outside world, right?

MR. FOLKMAN:  Understood.  Understood.  All I can -- all I can --

THE COURT:  You know?  It might even be, "This is,"

you know, "I hate to say it.  This is actually not so good for you," or, "This is neutral for you," or, "This is actually better for you.  There's risks, but if things go a certain way," I mean, right?  That -- that --

MR. FOLKMAN:  Yeah.  No, no.  You --

THE COURT:  It seems -- seems -- seems fair to, to assume somebody who's being threatened with a lawsuit to sign this would be entitled to have that sort of information, right?

MR. FOLKMAN:  Yeah.  So I, I'm not disagreeing that, that he should have, as he, in fact, ultimately did --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. FOLKMAN:  -- give the figures to Dr. Warren.

THE COURT:  Okay.

MR. FOLKMAN:  I -- your question, I, I understood to be, why didn't he do it in the first place.

THE COURT:  Yeah.

MR. FOLKMAN:  And I, you know.

THE COURT:  Yeah.  And it just seemed from what I could see in the record that it seemed like there was, "Well, why don't you sign it and then" --

MR. FOLKMAN:  Yeah.

THE COURT:  Okay.  All right.  Thank you.

Sorry, Mr. Warren.  Go ahead.

MR. WARREN:  Yes.  I wanted to address something else,

71

which was suggested that it was all very benign that they -- that -- this change in policy.

THE COURT: Uh-huh (indicating an affirmative response).

MR. WARREN: In fact, there was a bitter fight when they announced that the BCH policy was going to apply to Rossi not because of his --

THE COURT: Uh-huh (indicating an affirmative response).

MR. WARREN: -- personal (indiscernible) for this 33-1/3 as an inventor --

THE COURT: Right.

MR. WARREN: -- I think, because he's going to get many times that through his, his, his founder's equity, but his 33-1/3, which looks to be about $20 million --

THE COURT: Uh-huh (indicating an affirmative response).

MR. WARREN: -- disappeared. Now I'm not making a case. They may have, have a, a much better legal case --

THE COURT: Uh-huh (indicating an affirmative response).

MR. WARREN: -- that they have the right to impose that. But essentially, by saying that this language in the affiliation agreement, even though it was never expressed to employees --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- made this the effective policy, they established a tough bargaining position, a --

THE COURT:  Right.

MR. WARREN:  -- zero-based bargaining position --

THE COURT:  Right.

MR. WARREN:  -- and eventually Rossi, looks like, by threatening to quit --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- eventually negotiated an up to 2-1/2 percent and then looked like he settled at 7-1/2 percent.  But in the process, I get squeezed.  Rossi doesn't --

THE COURT:  Right.

MR. WARREN:  -- care, probably, about his personal percentage getting --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- squeezed a few points, but, for me, that's about 20 percent --

THE COURT:  Right.

MR. WARREN:  -- plus I lose another, potentially, more on the tax issues --

THE COURT:  Uh-huh (indicating an affirmative

73

response).

MR. WARREN:  -- plus I've lost all the leverage and they can abuse me.

THE COURT:  So, so why did you execute the second assignment?

MR. WARREN:  Sorry.  Why?

THE COURT:  Why, why did you?

MR. WARREN:  I was satisfied, I thought.

THE COURT:  Okay.  You were satisfied with it.

MR. WARREN:  I -- I --

THE COURT:  Okay.

MR. WARREN:  I also kind of inferred that there wasn't -- I fig, I figured there probably hadn't been an equity deal because it looked like I should have been distributed shares.

THE COURT:  Right.

MR. WARREN:  So I thought there probably wasn't an equity deal, anyway.  So --

THE COURT:  Okay.

MR. WARREN:  -- no big deal.  But also, I'd got what I wanted, which was the IDI participation agreement and their statement that that was a contract.

Now they still, I guess, managed --

THE COURT:  Right.

MR. WARREN:  -- to leave themselves a little bit--

THE COURT:  Right.

APPENDIX 424

74

MR. WARREN:  -- of wiggle room there.

THE COURT:  Right.  Well, you got it in a roundabout --

MR. WARREN:  But, you know.

THE COURT:  You got it in a roundabout way.  You got it in the form of a threatened lawsuit that says there is this contract and you're --

MR. WARREN:  Yes.  I mean --

THE COURT:  -- you're going to be in breach of it if you don't sign it.

MR. WARREN:  -- it would have been nice --

THE COURT:  Okay.

MR. WARREN:  -- if they'd just responded to me with the participation agreement, which I was supposed to have been given --

THE COURT:  Right.

MR. WARREN:  -- and signed --

THE COURT:  Right.

MR. WARREN:  -- at my orientation.  And at the time all this was happening, you know, I was going from a state of naivete or --

THE COURT:  Right.

MR. WARREN:  -- thinking, oh, you know --

THE COURT:  Okay.

MR. WARREN:  -- I can trust these people to, well, and

APPENDIX 425

hearing from other people and seeing things happen that, hey, you gotta watch your back in this situation.  And so that's, that's where that whole interaction came from.

And everything appeared to be okay and, you know, for the next six years and I did research, you know.  Obviously, it came to the fore and it was announced, you know, that, that Moderna's raising all these funds --

THE COURT:  Right.

MR. WARREN:  --  and is likely to exit --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- sometime soon.  Well, what is my position?  So it's only then in 2017 -- and I -- in that period I have --

THE COURT:  Right.

MR. WARREN:  -- by the way, been cooperating with helping them with --

THE COURT:  Right.

MR. WARREN:  -- patent prosecution --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. WARREN:  -- and I think it was some kind of interference proceeding and so on and providing documents there.

THE COURT:  Uh-huh (indicating an affirmative

response).

MR. WARREN:  But then I discover, hey, they've, they've basically squeezed me probably, primarily, to allow them to, to give them a good bargaining position with Rossi and sort of, "Well, that's just a policy.  So" --

THE COURT:  Right.

MR. WARREN:  -- "you get nothing."  Okay.  "Well, if you threaten to leave, we'll give you a bit."  Meanwhile, I'm getting squeezed.  They -- after they threaten me with a lawsuit --

THE COURT:  Right.

MR. WARREN:  -- for not cooperating with them on the basis of this very policy that they are now abrogating.

THE COURT:  So do I understand that, that the net effect of all of this is is that your interest has gone from 33 percent to 27-1/2 percent, is that --

MR. WARREN:  Well, it's half of that.

THE COURT:  Well -- okay.  Those are the --

MR. WARREN:  'Cause I share equally with Rossi.

THE COURT:  To share -- all right.  Okay.

MR. WARREN:  And it went down to, effectively, 25 percent.  It's been more complicated than that.

THE COURT:  Okay.

MR. WARREN:  But for the amount of money that's involved here, it's effectively 25 percent.

THE COURT:  Okay.

MR. WARREN:  And they've put 20, 27-1/2 in a, a *ad hoc* agreement, which I have not yet signed, but the last two checks were under the 27-1/2.

THE COURT:  Okay.

MR. WARREN:  So I'm still down almost 20 percent, plus I have, potentially, still been injured by the failure to distribute stock --

THE COURT:  Well --

MR. WARREN:  -- earlier, but --

THE COURT:  Well, when you say -- let me just make sure I understand.  When you say you're "down 20 percent," what's the 20 percent you're down?

MR. WARREN:  Well, if you go from 33-1/3 down to 27-1/2 --

THE COURT:  Oh, okay.

MR. WARREN:  -- it's about --

THE COURT:  And I'm doing it on a --

MR. WARREN:  -- 18.

THE COURT:  -- basis of a, zero to a hundred, but you say --

MR. WARREN:  Yeah.  That's the --

THE COURT:  -- the, the difference between --

MR. WARREN:  -- fraction.

THE COURT:  -- 33-1/3 --

APPENDIX 428

78

MR. WARREN:  Yeah.  So --

THE COURT:  -- and 27-1/2.

MR. WARREN:  -- I think it's --

THE COURT:  Okay.

MR. WARREN:  -- like --

THE COURT:  But I understand --

MR. WARREN:  -- takes me down --

THE COURT:  Right.

MR. WARREN:  -- from nine million to seven million --

THE COURT:  Okay.

MR. WARREN:  -- of the current stock price.

THE COURT:  Okay.  All right.

MR. WARREN:  So it's not a trivial amount of money.

THE COURT:  No, it's not a trivial amount, but I -- I -- again, I, I guess I'm going to kind of circle back at the end of this now to where I started at the beginning.

This is a business dispute and you are a very intelligent person whose sophistication on the business side has evolved and I think you now have a pretty good understanding of, of the landscape and I think this case is ripe for you folks to sit down with a neutral, put somebody in the middle.  Because there may be elements of mistrust.  There still may be some not, you may not all be working on the same, sharing the same facts.  You, you, you still may be, be looking at some things differently than they are.

APPENDIX 429

Because, I mean, we're now on the cusp of this stuff being able to be sold on the market and it sounds like they plan to sell it as soon as they can. It sounds like you're not adverse to that. What we're really talking about is what should happen with the proceeds. It's kind of an intense window, but it's like a month or so where it seems to me you guys have a chance to sit down and see if you can work something out.

Now I, I don't want to say anything that, that suggests -- nothing I say should suggest any thoughts about the legal issues here in this case, all right? It's not, it's not meant to, but if you, it seems to me that if are willing to internalize that, you might not get back up to the 33, but -- and they were willing to internalize they're going to have to kind of go up from 27-1/2 -- that you guys might be able to come up with something in there, in that range that is mutually agreeable measured against continuing this litigation for another year.

In that regard, what's gonna happen if the, if the stock is sold? Are you gonna just all of a sudden start distributing pursuant to what you understand the present formula to be, is that -- would that be the plan?

MR. FOLKMAN: I'm not sure I can answer that question, your Honor. I think that because the dispute is pending, it would -- I'm not sure exactly what would happen. Up till now

APPENDIX 430

80

in terms of royalties received, we have been paying Dr. Warren 27 and, his one-half of 27-1/2 percent.

And if I may just say a very quick word about that. That is even though, as, as he's just said, he has not agreed to that.  In other words, we're giving him the benefit of it, anyway.

THE COURT:  Right.

MR. FOLKMAN:  So I, I don't know whether the Hospital would treat the proceeds of the sale in precisely the same, or the net proceeds of the sale in precisely the same way that it has treated royalties.  I -- I -- I just can't say.

THE COURT:  Okay.

MR. FOLKMAN:  I assume it would, but I'm not sure.

THE COURT:  And, and if that, if that is how they're going to do it, then I guess we could find ourselves within the span of a couple of months in a potential scenario where you have actually now received proceeds from the disposition of equity, right?  That's -- that's what -- that's what I imagine would happen.  They're going to sell the stuff and you're going to get what they say you get.  You still may say you deserve more.  And then this really does just become a, a lawsuit about the, the money difference between the 33 and the 27-1/2 or the 25, or whatever, right?  Okay.

That -- that -- that just underscores, I think, if you guys can figure out ahead of time.  'Cause otherwise, it

APPENDIX 431

81

becomes spending money for a declaratory judgment for one or the other, either the high range or the low range, right?  And, and, you know, we'll do our best to do it expeditiously, but that's really what this becomes.  Because there would be nothing else left for us to do, just to declare you were right or you were wrong.  And if we say you're right, then I guess you get a little bit more.

So while we go back and start to consider all of this, how do you feel about at least attempting mediation in the short term between now and early to mid-June?  Is that something you'd be willing to do?

MR. WARREN:  I mean, in principle, I'd be willing to do it.  My concerns are it's going to add to my costs and that the other side can go, pile higher and deeper in that mediation and they have no exposure --

THE COURT:  Well -- well, wait.

MR. WARREN:  -- of --

THE COURT:  Well, hang on 'cause I, I just want to make sure you understand.  I -- the whole purpose is designed not to disadvantage one side.

Now you're-- you're -- you're on the West Coast.  I will tell you as a practical matter mediations work best when the parties are there in person, right, for every reason you can think of.  It's easier to deal with people face to face, but it wouldn't be the first time that a mediation occurred

APPENDIX 432

82

where a party was attending remotely.  So it --

MR. FOLKMAN:  Your Honor, if I may interrupt.  We've, we've said, already, that we would be willing to go to LA to, to mediate.

THE COURT:  Okay.  So they would be willing to go out there.

Now then it becomes, okay, what mediation service do you use.  There are a lot of excellent folks out there who do this for money.  That costs.  So sometimes the parties will agree to split the costs.  Sometimes one party will actually say, "We'll bear the cost."  I can't speak to that.  All I can tell you is if you were willing to do it out here in this courthouse under our program, there's no charge to anybody.  It's just their time.

So you don't necessarily lose anything.  You -- you -- you spend a few hours and if it doesn't work, it doesn't work.  But if it works, the case is over.

MR. WARREN:  That option sounds okay to me.

THE COURT:  Right.  And then it --

MR. WARREN:  The option where I --

THE COURT:  And then it's a matter, though, of getting a judge here to agree to allow you to participate remotely.  There are logistics issues.  Because what happens is you may start out with a judge talking to everybody at the same time, but shortly thereafter the judge will talk to one side, then

APPENDIX 433

83

talk to the other side.  So they'd kind of have to hang up the phone and say, "Okay.  I'll call you back."  It can be done.  It can be done.  It can also be done out in LA.  I think Mr. Folkman is looking for a reason to travel out to the West Coast.

But I really think you should consider giving it a shot, all right?  I'm not going to tell you what to do.  And sometimes people say, "I'd rather litigate this to the end and be told the court disagrees with me than compromise."  And if that's how you feel, fine.  But if you're thinking, "Hey," you know, "it's going to be some pretty substantial proceeds here.  I don't think you should get everything you're, you're getting.  I think I should get more" -- and they're willing to give you more -- it can't hurt at least to have that conversation.

MR. WARREN:  Can I ask?

THE COURT:  Ask whatever you want.

MR. WARREN:  To do it, to do it here, what would be the, the step in making that happen?  And we're talking about a limited, several hours --

THE COURT:  Yeah.  Here's what -- here's -- here's how it would happen.  If you guys said you wanted to do it, we would, we would refer it to mediation right away.  It goes right down to the clerk's office.  We have a coordinator who will then immediately reach out to the judges and say, "We have a case.  There's some time sensitivity.  Events are gonna

84

happen in early to mid-June.  The parties would like to, therefore, have a session during the month of May."  If it was important that you attend remotely to, to save costs, we could even note in there, "In this case the plaintiff is pro se," but we would make sure they understood, you know, it just means you don't have a lawyer -- it doesn't mean you don't know your way around a courtroom -- "and, and would like to be able to participate remotely to save costs," you know.

And, and then it just gets referred.  They would reach out to you guys and they could probably get you a session within two to three weeks.  And usually, what they require from the parties is a memorandum that is not draconian.  Usually, it's like five pages, tops, double spaced.  They just need to know what's this case about, really what's, what's the sticking point, what's been the history, if any, of any settlement talks.  And, and these are confidential memos, only for the judge's consumption.  And so the judge will, you know, he may ask you, "Tell me what you think is reasonable here so I kind of have a sense of what," you know.  "And I'll look at theirs and I get, I'll get their sense of what they think is reasonable and what they're willing to do.  I'll get you in and we go up from there."

MR. WARREN:  I would -- if, if it's not gonna drain me financially and it's going to be --

THE COURT:  It's -- there's, there's no --

APPENDIX 435

85

MR. WARREN:  -- the limited --

THE COURT:  -- charge.

MR. WARREN:  -- time

THE COURT:  You will not get a bill from us.  You -- and if you -- and if the judge is amenable to you doing it remotely -- and you can make -- we can make that a condition. Listen, I, I started by telling you I've never ordered anybody to do this, but I am strongly encouraging you to do this 'cause I don't see a downside and I see a huge upside.  The case might go away.

You won't get a bill from us.  The judge won't charge you.  The only cost is going to be what it takes for you to participate and if, and if you're appearing remotely, it's, it's the charge from the telephone call.

MR. WARREN:  And it's ultimately nonbinding?

THE COURT:  It is nonbinding.  If you -- of course, if you resolve the case --

MR. WARREN:  Yeah.

THE COURT:  -- and it results in a settlement agreement, then the case is over.  But otherwise, yeah, I mean, we, we, you know, I think we probably have somewhere between a 60 and 70 percent success rate and if the case doesn't succeed, the parties just go back to litigating the case.  And what I would do in this case is we wouldn't even take it off the trial list.  That's a phrase that normally means sometimes we will

APPENDIX 436

press the pause button on the litigation while the parties try to work the case out through mediation, but not always.  And here, we would, we would actually start to look at this, start to evaluate the summary judgment motion.  So nobody's losing anything in terms of time, all right?  It's going to take us a little while to wade through this, but we'll start that process now.

And in the interim, you guys are just sitting down to see if you can work things out so that by the time the stock is sold there's actually already an express understanding of what's going to happen with the equity and then the proceeds, all right?  And if not, then I imagine -- I don't know for sure.  Mr. Folkman doesn't know for sure -- but looks like you'll get something and then it's, this is just going to be a fight over how much more you should get based on all of the legal arguments that are being raised.

MR. FOLKMAN:  So my understanding, your Honor, after this is that we -- we -- we are agreeing to use the court-sponsored mediation in Boston if, if Dr. Warren --

THE COURT:  Well, he's nodding.  I don't, I don't think he has said yet.  I think he's still --

MR. WARREN:  I -- I --

THE COURT:  -- processing there.

MR. WARREN:  I -- I --

THE COURT:  So we're, we're gonna --

MR. WARREN:  I do need to process it and maybe get some advice, too.

THE COURT:  Okay.

MR. WARREN:  It sounds good.

THE COURT:  Here's the thing.  Whoever you talk to about getting advice, tell them the Judge looked right at you and said, "I strongly encourage you to, to come to a mediation session, to try for mediation whether it's through the courthouse or whether it's through somebody else," right? Okay.

MR. WARREN:  All right.  And assuming that I decide to go for it --

THE COURT:  You just let us know.

MR. WARREN:  So remind me again what would be the --

THE COURT:  Here's -- it's, it's very informal.

MR. WARREN:  We both agree to that?

THE COURT:  It's very -- yeah.  If you guys -- all it takes is one of you, right?  You just send an e-mail to Ms. Russo saying, "Okay, we'll give it a shot," and we take it over from there.  We'll put something out that let's everybody know, "Look, these, these folks need to get in here soon," and then the matter will be referred out and there'll be something on the court docket from the judge who's going to be doing the mediation saying, "Okay.  I need you guys to submit some stuff to me.  Give me some dates."  And you guys actually could even

88

already start the ball rolling by saying, "Here are dates on which we are both available," so that the judge who gets the case already knows and can maybe even already schedule something.

And again, if you, if there's a condition that you be allowed to participate remotely, I think we would want to make that very clear just in case a judge has an issue with that. But I think if they understand you reside in California and that due to the costs that you would like to be able to participate remotely and that you are pro se, you know, we'll just put that out there so they know that ahead of time.

Here's what we don't like and I, I don't mean that like, "Oh, we hate it," but, but here's what makes things difficult, is when a party is participating and at key juncture says, "Okay.  I need to now go consult with somebody."  We like to structure these so that if momentum is generated and progress is being made, there's gonna, there's not going to be anything to stop the parties from actually reaching an agreement in principle such that they can notify the Court, "Okay.  We've worked this thing out and within a few weeks we'll submit the papers that show we, the case has been settled," all right?  I mean, it, it truly is a session that is designed to help the parties negotiate a mutually agreeable resolution to the case in that session, okay?

So let us know sooner rather than later one way or the

APPENDIX 439

89

other and we'll go from there, okay?

MR. WARREN:  Thank you very much, your Honor.

THE COURT:  All right.  Anything else any party want to say before we call it a day?

MR. FOLKMAN:  No, your Honor.

THE COURT:  Okay.

Mr. Warren?

MR. WARREN:  I'm done.

THE COURT:  All right.

Thank you, both.

MR. FOLKMAN:  Thank you, your Honor.

THE COURT:  Have a nice weekend.

THE COURTROOM DEPUTY:  All rise.

(Proceedings concluded at 12:19 p.m.)

CERTIFICATE

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ *Janice Russell*                                    May 10, 2019

Janice Russell, Transcriber                              Date

APPENDIX 440

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LUIGI WARREN,

      Plaintiff

vs.

THE CHILDREN'S HOSPITAL
CORPORATION,

      Defendant

Civ. A. No. 17-12472-DLC

## PLAINTIFF'S MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT

Plaintiff moves this court for an order pursuant to Fed. R. Civ. P. 15(a) for leave to file an amended complaint. A copy of the proposed amended complaint is filed as an attachment to this motion. The grounds for this motion are set forth in the accompanying memorandum.

WHEREFORE, Plaintiff respectfully requests that this court grant Plaintiff's motion for leave to file an amended complaint.

Respectfully submitted,

    /s/ Luigi Warren
Luigi Warren (Pro Se)
202 S. Raymond Avenue, #205
Pasadena, CA 91105
Tel: (617) 275-1489
luigi.warren@outlook.com

Dated: March 3, 2020

APPENDIX 441

2

## **RULE 7.1 CERTIFICATE**

      I, Luigi Warren, hereby certify that, in accordance with Local Rule 7.1, I corresponded by email with defendant's counsel, who stated that defendant would not assent to this motion.

                                    /s/ Luigi Warren
                                Luigi Warren (Pro Se)

2

## **CERTIFICATE OF SERVICE**

I, Luigi Warren, hereby certify that, in accordance with Local Rule 5.2(b), the foregoing document was filed through the ECF system on March 3, 2020 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

> /s/ Luigi Warren
> Luigi Warren (Pro Se)

3

APPENDIX 443

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LUIGI WARREN,<br><br>                 Plaintiff<br><br>vs.<br><br>THE CHILDREN'S HOSPITAL<br>CORPORATION,<br><br>                 Defendant | Civ. A. No. 17-12472-DLC |

[Proposed] PLAINTIFF'S FIRST AMENDED COMPLAINT

THE PARTIES

1. Plaintiff Luigi Warren (Dr. Warren) is an individual having an address of 202 S. Raymond Avenue, #205, Pasadena, CA 91105.

2. On information and belief, defendant The Children's Hospital Corporation (BCH) is a Massachusetts corporation having a principal place of business at 300 Longwood Avenue, Boston, MA 02115.

JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 by virtue of diversity of citizenship of the parties and the amount at stake being more than $75,000.

4. Plaintiff is a citizen of the State of California and defendant is a citizen of the Commonwealth of Massachusetts.

5. Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the

APPENDIX 444

events on which this action is based occurred in the District of Massachusetts.

## NATURE OF THE ACTION

6. There is an actual and genuine controversy between the parties as to defendant's obligation to distribute licensing proceeds to plaintiff in accordance with the employee inventions policy of his former employer, the Immune Disease Institute, Inc. (IDI) of Boston, MA.

7. Plaintiff coinvented intellectual property (IP) on which the license income in issue herein was and continues to be earned. The IDI took control of the IP subject to its "Research and Technology Development Policy" under which revenue was to be shared with plaintiff.

8. The aforementioned IP relates to the uses of synthetic messenger RNA (mRNA).

9. In December 2010 the IDI licensed the IP to Moderna Therapeutics, Inc. (Moderna) for consideration which included, inter alia, an equity stake in the company.

10. On information and belief, the IDI merged with BCH on or about October 1, 2012 and BCH thereby acquired the IP rights assigned by plaintiff to the IDI as well as the Moderna equity and the contract rights that the IDI held as the licensor of that IP.

11. BCH has not honored revenue-sharing obligations that it acquired along with the IP from the IDI with respect to the percentage of net license proceeds due to plaintiff as an employee inventor and the direct distribution of his share of equity "at the earliest opportunity."

12. Plaintiff seeks deficiencies in payments by BCH and interest thereon.

13. Defendant enjoys extraordinary leverage over plaintiff due to its control over the flow of information and the one-way nature of the transaction (plaintiff having already fulfilled his end of the bargain), which impedes the plaintiff 's ability to seek redress.

14. Plaintiff's original complaint (ECF 1) sought a declaratory judgment that defendant is obligated to honor the IDI's terms on revenue sharing with the plaintiff and injunctive relief

APPENDIX 445

directing them to do so for as long as license income is received. At the time the original complaint was filed there had been no measurable economic damage to the plaintiff from the defendant's actions. Further, there was still a prospect that voluntary or court-ordered transfer of his share of the Moderna equity could mitigate future economic injury to the plaintiff and reduce the potential for a time-consuming legal controversy over the calculation of damages.

15. BCH liquidated its stake in Moderna in late 2019 and distributed what it decreed to be Dr. Warren's share of the proceeds to the plaintiff in late December. Consequent to these events, plaintiff has incurred economic injury well in excess of the $75,000 threshold for District Court cases. Defendant's actions have also rendered injunctive relief moot as a remedy with respect to the one-time distribution of equity taken as a royalty. This amended complaint therefore adds an express prayer for money damages.

## FACTUAL BACKGROUND

16. Plaintiff was employed by the IDI, a Harvard-affiliated biomedical research institute housed on the Harvard Medical School campus, from November 2007 to June 2010. Plaintiff was a postdoctoral researcher throughout his tenure at the IDI. His employment there was "at will."

17. In early 2009 the IDI announced it was entering into an affiliation with BCH with a view to an eventual merger. BCH was a much larger institution with a broad mission encompassing patient care as well as research and education. The IDI closed its doors and merged into BCH in October 2012. Plaintiff never worked for BCH as an employee or in any other capacity.

18. Plaintiff conceived a novel technique for using synthetic mRNA to "reprogram" cells in the June 2008 and began practical work on the idea almost immediately. After receiving the approval and support of his laboratory head, Dr. Derrick Rossi, plaintiff moved into high gear on the "mRNA reprogramming" project in July 2008.

3

APPENDIX 446

19. Plaintiff succeeded in fully reducing his invention to practice by the end of 2009.

20. Plaintiff collaborated closely with Dr. Rossi and the IDI's Office of Technology Development and outside lawyers to write expansive patent applications based on his invention, leading to the filing of an initial application in April 2010.

21. Warren and Rossi were named as the co-inventors on the initial patent application and all the related, follow-on USPTO filings.

22. Plaintiff gave his notice to the IDI in May 2010 and left the Institute the following month.

23. Plaintiff executed an initial invention assignment in favor of the IDI pertaining to the April 2010 filing in August 2010, about two months after leaving the IDI's employment.

24. Throughout plaintiff's tenure the IDI promulgated to its employees its "Research and Technology Development Policy" specifying their duties in regard to work-related inventions and the revenue-sharing offered to induce them to pursue and see through commercially valuable research at the Institute and assist the IDI in securing associated patent rights.

25. The IDI Policy specifies that the net proceeds received from licensed inventions are to be distributed in three equal shares between (i) the employee inventor(s), (ii) the laboratory in which the inventive work was done and (iii) the IDI General Fund.

26. The policy directs that the Inventor Share of proceeds be divided equally among named inventors, regardless of active employment status, unless a different apportionment is mutually agreed by the affected parties. It also states that the Laboratory Share reverts to the General Fund in the event that the lab becomes inactive by the time revenue is received.

27. Where licensing proceeds take the form of equity (such as stock in a startup company) the IDI Policy directs the Inventor Share be distributed to the inventor(s) "at the earliest opportunity." It directs that the remaining two-thirds of the equity received is to be retained

4

and managed by the IDI's Investment Committee, with the lab head to be consulted on the timing of the liquidation of the Laboratory Share of this managed equity.

28. Dr. Rossi founded a company called Moderna Therapeutics on the strength of the mRNA work soon after plaintiff left the IDI's employ. Plaintiff learned of this development from reading the Acknowledgements section of a scientific paper he co-authored on the mRNA project (Warren et al., "Highly efficient reprogramming to pluripotency and directed differentiation of human cells with synthetic modified mRNA." Cell Stem Cell, 2010) after it went online in September 2010.

29. The IDI granted an exclusive license to the IP covered by the applications authored by Warren and Rossi to Moderna in December 2010. The consideration in the license deal included an equity stake in the company as well as various cash components. On information and belief, no other IP was licensed to Moderna by the IDI.

30. The IDI never informed Dr. Warren it had taken equity in Moderna and this fact was not disclosed either directly to the plaintiff or in any public forum until 2017. At that time, BCH privately revealed to the plaintiff that equity which might be expected to be worth tens of millions of dollars at an IPO had been taken as partial consideration for the license.

31. In early 2011 the IDI's licensing officer, Ryan Dietz, contacted plaintiff to ask him to execute further assignments in favor of the IDI pertaining to follow-on IP filings. Dr. Warren took the occasion to ensure that he had in writing the full details of his rights as well as obligations in regard to the commercialization of the IP he had developed for the Institute.

32. Plaintiff's information requests prompted a weeks-long series of exchanges in which the IDI initially refused to provide him with a full-text copy of its own employee inventions policy and Dr. Warren, in turn, balked at executing the new assignments.

5

33. In the course of these 2011 exchanges Dietz assured plaintiff in emails copied to BCH's head of licensing, Dr. Erik Halvorsen, and its Chief Counsel for Research Affairs, Dianne McCarthy, that the Research and Technology Development Policy was the source of his obligation to assign and that it also spelled out the share of licensing revenue he would receive. McCarthy sent plaintiff a demand letter on behalf of the IDI citing the controlling authority of the IDI Policy with regard to his obligations and right to a share of licensing proceeds, enclosing a full copy of the policy. Shortly after that, plaintiff received another demand letter from the IDI's outside counsel at Nixon Peabody, again citing the IDI Policy as the source of his obligation. A draft lawsuit attached to this demand charged plaintiff with Breach of Contract for violating the terms of the Research and Technology Development Policy, explicitly characterizing that policy as a contract between the IDI and its employees.

34. After consulting his attorney, plaintiff agreed to execute the assignments. He has fully cooperated with all subsequent requests to assist in the prosecution of the licensed IP.

35. Plaintiff's first Moderna royalty check was issued by BCH in 2015. The terse statement accompanying the payment implied a different formula was being used to figure his share than given in the IDI Policy. It appeared to be slightly more generous than expected, so there seemed no reason for the plaintiff to worry he would be shorted on Moderna distributions.

36. In summer 2017 Dr. Warren heard from a colleague that Dr. Rossi was winding down his lab at BCH. Concerned this might signal trouble and mindful of press reports that a Moderna IPO was on the horizon, plaintiff reached out to Ryan Dietz, who had transitioned to the role of Senior Licensing Manager at BCH, to check the status of his interest in Moderna revenue.

37. In the exchanges with Dietz which ensued, plaintiff was apprised for the first time of the Moderna equity stake. Dietz also explained that the Hospital had been applying an employee

6

inventions policy of its own to the distributions, which they had justified internally based on language in the non-public 2009 affiliation agreement between the IDI and BCH. Owing to its tiered distribution schedule this policy, it turned out, lowered the Inventor Share to 25%, down from IDI's 33⅓%, for all but the first sliver of the Moderna revenue. Significantly, the BCH Policy did not feature an Inventor's Laboratory share.

38. Dietz now proffered a "Letter Agreement" to the plaintiff for his signature, defining a new "Ad Hoc" split for distributions. According to Dietz, this formula had been conceived to address concerns over the surprise disappearance of the Inventor's Laboratory share, which was set at 7.5% in the Ad Hoc split schedule. The Inventor's Share was set at a flat 27.5%.

39. Plaintiff declined to sign the Letter Agreement as it still represented abrogation of the more generous IDI Policy. Dietz said he would have the Hospital's lawyers reach out to justify its position. Months elapsed with no such follow up in spite of the plaintiff's prompting.

40. Since late 2018 BCH has applied the Ad Hoc split to its distributions of Moderna revenue, including a distribution of equity liquidation proceeds which occurred at the end of 2019.

41. On information and belief, a bitter internal dispute between BCH management and Dr. Rossi over the vanishing lab share precipitated Rossi's move to wind down his lab and—as Dietz's 2017 remarks suggested—this was the true impetus for the Ad Hoc arrangement, regardless of misleading narratives to the contrary in the defendant's court filings in this case.

42. Although Dr. Rossi ultimately signed off on the Letter Agreement, on information and belief he has carried through with his plan to close down his laboratory at BCH, and the equity liquidation distribution statement issued in December 2019 shows that the Rossi Lab Share of net proceeds (which would have been roughly $2M) has now reverted to the institution.

43. On information and belief, the vast bulk of Rossi's personal Moderna-related income flows

APPENDIX 450

from his Founder's Equity in the company. This can only render the matter of the inventors' percentage of license proceeds marginal for Dr. Rossi compared to its import to the plaintiff.

44. The Letter Agreement on the Ad Hoc split is silent on the question of how equity should be handled, but there is an important difference between the provisions of the IDI Research and Technology Development Policy and those of the "default" BCH Policy. The IDI's Policy directs that the inventors' share of the equity be distributed directly to employee inventors "at the earliest opportunity." By contrast, the BCH Policy leaves to the institution's discretion whether the Inventor Share is directly distributed or, alternatively, is retained and managed by the Hospital, as well as the timing of the liquidation of equity if it elects the latter option.

45. Plaintiff filed his original complaint in this case with a prayer for declaratory and injunctive relief on December 19, 2017.

46. Moderna had its IPO on NASDAQ on December 7, 2018, raising approximately $600M at a company valuation of $7.5B.

47. On information and belief, the Moderna stock taken in partial consideration for the licensed IP was illiquid unless by special arrangement up until the expiration of the post-IPO lock-up on June 5, 2019.

48. On information and belief, the "earliest opportunity" that the plaintiff's stock could have been distributed to him unless by special arrangement corresponds to the expiry of lock-up.

49. On information and belief, the plaintiff's share of the Moderna stock under the IDI rules had a market value of over $6.2M at the expiry of lock-up on June 5, 2019.

50. BCH did not distribute Dr. Warren's share of the equity directly to the plaintiff at the expiry of the lock-up but instead took it upon itself to manage and dispose of that stock.

51. On December 23, 2019 BCH issued plaintiff a $3.7M payment which it has stated represents

8

his share from its total liquidation of the Moderna license equity proceeds.

52. On information and belief, despite statements by defense counsel to the Court in the May 3, 2019 hearing on its motion for summary judgment that "the Hospital is not in the business of speculating on stock" and intended to liquidate its Moderna position "promptly after the expiration of the lock-up date" (ECF 65 at 49-50), BCH actually held onto the stock for several months after it became liquid and ended up selling it for well below its market value at the lock-up expiration.

53. BCH has not so far responded to an inquiry plaintiff sent in December 2019 asking for details of the stock sale including the number of shares, the timing of the sale and the share price.

54. Plaintiff has incurred substantial economic injury—in the millions of dollars based upon calculations made using the information at his disposal—from the defendant's abrogation of promises made to him as an employee inventor within the IDI Research and Technology Development Policy and unilateral imposition of its own rules for revenue sharing. The injury flows both from BCH's reduction of the percentage of proceeds allotted plaintiff and its failure to distribute stock at the earliest opportunity as promised by the IDI.

## CAUSES OF ACTION

### COUNT I
### Declaratory Judgment – Revenue Sharing Policy

55. Paragraphs 1 – 54 are hereby incorporated by reference as if fully set forth herein.

56. The revenue-sharing terms expressly promised plaintiff as an employee inventor in the IDI Research and Technology Development Policy bind BCH as the IDI's successor in interest.

57. Defendant has unilaterally decided to pay plaintiff a smaller percentage of net proceeds from licensing by reducing his inventor's share from half of 33⅓% to half of 27.5%.

9

58. Defendant's actions have caused damage by virtue of loss of revenue to plaintiff.

59. On information and belief, the royalty obligations of BCH continue into the 2030s and, therefore, plaintiff will continue to be damaged by the loss of revenue.

60. Plaintiff does not have an expectation that defendant will abide by the IDI's terms unless the court declares that the defendant is bound by the express promises within the IDI Policy.

## COUNT II
### Breach of Contract – Inventor's Share of Revenue

61. Paragraphs 1 - 54 are hereby incorporated by reference as if fully set forth herein.

62. Defendant was bound to pay plaintiff in accordance with the IDI Research and Technology Development Policy.

63. By willfully reducing the share of licensing proceeds distributed to plaintiff as an IDI employee inventor relative to that promised in the IDI Policy, defendant has committed a material breach of its obligations to plaintiff.

64. Plaintiff has been damaged financially through payment of a reduced percentage of Moderna license income in the distributions received to date.

## COUNT III
### Breach of Contract – Distribution of Equity

65. Paragraphs 1 - 54 are hereby incorporated by reference as if fully set forth herein.

66. Defendant willfully failed to deliver equity to plaintiff at the earliest opportunity, which in this case would be promptly upon the expiry of the post-IPO lockup, as prescribed by the IDI Research and Technology Development Policy.

67. Defendant instead retained plaintiff's share of the Moderna equity and liquidated it at a time of its own choosing.

68. Defendant's material breach of its obligations has damaged plaintiff financially.

10

APPENDIX 453

## COUNT IV
### Conversion – Distribution of Equity

69. Paragraphs 1 - 54 are hereby incorporated by reference as if fully set forth herein.

70. The IDI Research and Technology Development Policy directs the Inventor Share of any equity received for a license be distributed to the inventor(s) at the earliest opportunity rather than being retained, managed and disposed of at the discretion of the institution.

71. Defendant exercised ownership over plaintiff's share of the Moderna stock inconsistent with plaintiff's right of possession following the expiry of the post-IPO lock-up.

72. Defendant knowingly and willfully concealed the dates of relevant transactions regarding its sale of Moderna stock.

73. Plaintiff has been damaged by defendant's conversion of his rights.

### PRAYER FOR RELIEF

74. WHEREFORE, Plaintiff requests the following relief:

    A. A declaratory judgment that the defendant is bound with respect to plaintiff by the express promises on revenue-sharing with employee inventors made in the IDI Research and Technology Development Policy;

    B. An order for specific performance of defendant's obligations under the IDI Research and Technology Development Policy;

    C. Damages based on underpayments to plaintiff pursuant to the aforementioned declaratory judgment in accordance with the provisions of M.G.L c. 231A, § 5;

    D. Prejudgment interest on the damages award as directed by M.G.L c. 231, § 6C;

    E. An award to plaintiff of its attorneys' fees and costs; and

    F. Such other and further relief as the Court may deem just and proper.

APPENDIX 454

Respectfully submitted,


_____/s/ Luigi Warren_____
Luigi Warren (Pro Se)
202 S. Raymond Avenue, #205
Pasadena, CA 91105
Tel: (617) 275-1489
luigi.warren@outlook.com

Dated: March 3, 2020

12

APPENDIX 455

## <u>CERTIFICATE OF SERVICE</u>

I, Luigi Warren, hereby certify that, in accordance with Local Rule 5.2(b), the foregoing document was filed through the ECF system on March 3, 2020 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

<div align="center">

   /s/ Luigi Warren   
Luigi Warren (Pro Se)

</div>

APPENDIX 456

| Date | Adj Close |
|---|---|
| 12/7/2018 | $ 18.60 |
| 12/10/2018 | $ 18.80 |
| 12/11/2018 | $ 18.01 |
| 12/12/2018 | $ 18.68 |
| 12/13/2018 | $ 18.76 |
| 12/14/2018 | $ 18.32 |
| 12/17/2018 | $ 17.00 |
| 12/18/2018 | $ 17.00 |
| 12/19/2018 | $ 16.18 |
| 12/20/2018 | $ 15.50 |
| 12/21/2018 | $ 14.47 |
| 12/24/2018 | $ 14.03 |
| 12/26/2018 | $ 13.52 |
| 12/27/2018 | $ 14.65 |
| 12/28/2018 | $ 14.15 |
| 12/31/2018 | $ 15.27 |
| 1/2/2019 | $ 15.33 |
| 1/3/2019 | $ 15.50 |
| 1/4/2019 | $ 16.96 |
| 1/7/2019 | $ 16.27 |
| 1/8/2019 | $ 16.95 |
| 1/9/2019 | $ 16.33 |
| 1/10/2019 | $ 16.48 |
| 1/11/2019 | $ 17.00 |
| 1/14/2019 | $ 16.74 |
| 1/15/2019 | $ 16.59 |
| 1/16/2019 | $ 16.26 |
| 1/17/2019 | $ 16.31 |
| 1/18/2019 | $ 16.69 |
| 1/22/2019 | $ 15.56 |
| 1/23/2019 | $ 14.79 |
| 1/24/2019 | $ 14.64 |
| 1/25/2019 | $ 14.91 |
| 1/28/2019 | $ 14.45 |
| 1/29/2019 | $ 14.63 |
| 1/30/2019 | $ 15.13 |
| 1/31/2019 | $ 16.60 |
| 2/1/2019 | $ 16.22 |
| 2/4/2019 | $ 16.27 |
| 2/5/2019 | $ 17.18 |
| 2/6/2019 | $ 18.14 |
| 2/7/2019 | $ 17.05 |
| 2/8/2019 | $ 17.99 |
| 2/11/2019 | $ 18.17 |
| 2/12/2019 | $ 18.69 |
| 2/13/2019 | $ 18.53 |

APPENDIX 457

| Date | | Amount |
|---|---|---|
| 2/14/2019 | $ | 19.66 |
| 2/15/2019 | $ | 21.44 |
| 2/19/2019 | $ | 20.83 |
| 2/20/2019 | $ | 19.92 |
| 2/21/2019 | $ | 19.34 |
| 2/22/2019 | $ | 19.88 |
| 2/25/2019 | $ | 21.65 |
| 2/26/2019 | $ | 23.70 |
| 2/27/2019 | $ | 22.10 |
| 2/28/2019 | $ | 22.60 |
| 3/1/2019 | $ | 22.27 |
| 3/4/2019 | $ | 21.12 |
| 3/5/2019 | $ | 21.37 |
| 3/6/2019 | $ | 20.65 |
| 3/7/2019 | $ | 20.59 |
| 3/8/2019 | $ | 20.93 |
| 3/11/2019 | $ | 20.43 |
| 3/12/2019 | $ | 19.26 |
| 3/13/2019 | $ | 19.97 |
| 3/14/2019 | $ | 20.82 |
| 3/15/2019 | $ | 21.82 |
| 3/18/2019 | $ | 22.18 |
| 3/19/2019 | $ | 20.35 |
| 3/20/2019 | $ | 20.00 |
| 3/21/2019 | $ | 19.34 |
| 3/22/2019 | $ | 19.00 |
| 3/25/2019 | $ | 19.40 |
| 3/26/2019 | $ | 19.90 |
| 3/27/2019 | $ | 19.27 |
| 3/28/2019 | $ | 19.66 |
| 3/29/2019 | $ | 20.35 |
| 4/1/2019 | $ | 20.59 |
| 4/2/2019 | $ | 19.70 |
| 4/3/2019 | $ | 21.33 |
| 4/4/2019 | $ | 23.08 |
| 4/5/2019 | $ | 25.96 |
| 4/8/2019 | $ | 27.23 |
| 4/9/2019 | $ | 26.82 |
| 4/10/2019 | $ | 26.80 |
| 4/11/2019 | $ | 25.73 |
| 4/12/2019 | $ | 24.61 |
| 4/15/2019 | $ | 25.84 |
| 4/16/2019 | $ | 23.78 |
| 4/17/2019 | $ | 23.50 |
| 4/18/2019 | $ | 22.51 |
| 4/22/2019 | $ | 23.63 |
| 4/23/2019 | $ | 24.70 |

APPENDIX 458

| | | |
|---|---|---|
| 4/24/2019 | $ | 25.76 |
| 4/25/2019 | $ | 25.74 |
| 4/26/2019 | $ | 26.26 |
| 4/29/2019 | $ | 25.14 |
| 4/30/2019 | $ | 26.03 |
| 5/1/2019 | $ | 26.40 |
| 5/2/2019 | $ | 28.34 |
| 5/3/2019 | $ | 27.20 |
| 5/6/2019 | $ | 27.10 |
| 5/7/2019 | $ | 24.55 |
| 5/8/2019 | $ | 23.54 |
| 5/9/2019 | $ | 23.26 |
| 5/10/2019 | $ | 24.92 |
| 5/13/2019 | $ | 24.43 |
| 5/14/2019 | $ | 23.59 |
| 5/15/2019 | $ | 23.12 |
| 5/16/2019 | $ | 23.46 |
| 5/17/2019 | $ | 23.08 |
| 5/20/2019 | $ | 22.60 |
| 5/21/2019 | $ | 22.70 |
| 5/22/2019 | $ | 22.00 |
| 5/23/2019 | $ | 21.38 |
| 5/24/2019 | $ | 21.83 |
| 5/28/2019 | $ | 21.54 |
| 5/29/2019 | $ | 21.70 |
| 5/30/2019 | $ | 21.49 |
| 5/31/2019 | $ | 20.78 |
| 6/3/2019 | $ | 19.85 |
| 6/4/2019 | $ | 19.47 |
| 6/5/2019 | $ | 17.70 |
| 6/6/2019 | $ | 17.94 |
| 6/7/2019 | $ | 17.52 |
| 6/10/2019 | $ | 15.67 |
| 6/11/2019 | $ | 16.00 |
| 6/12/2019 | $ | 16.30 |
| 6/13/2019 | $ | 16.16 |
| 6/14/2019 | $ | 15.40 |
| 6/17/2019 | $ | 15.77 |
| 6/18/2019 | $ | 15.74 |
| 6/19/2019 | $ | 15.50 |
| 6/20/2019 | $ | 15.18 |
| 6/21/2019 | $ | 14.70 |
| 6/24/2019 | $ | 14.04 |
| 6/25/2019 | $ | 13.77 |
| 6/26/2019 | $ | 13.70 |
| 6/27/2019 | $ | 14.34 |
| 6/28/2019 | $ | 14.64 |

APPENDIX 459

| | | |
|---|---|---|
| 7/1/2019 | $ | 14.73 |
| 7/2/2019 | $ | 14.40 |
| 7/3/2019 | $ | 15.31 |
| 7/5/2019 | $ | 14.96 |
| 7/8/2019 | $ | 14.29 |
| 7/9/2019 | $ | 14.85 |
| 7/10/2019 | $ | 14.48 |
| 7/11/2019 | $ | 14.44 |
| 7/12/2019 | $ | 14.20 |
| 7/15/2019 | $ | 14.32 |
| 7/16/2019 | $ | 14.14 |
| 7/17/2019 | $ | 14.03 |
| 7/18/2019 | $ | 14.26 |
| 7/19/2019 | $ | 14.11 |
| 7/22/2019 | $ | 14.05 |
| 7/23/2019 | $ | 13.60 |
| 7/24/2019 | $ | 14.47 |
| 7/25/2019 | $ | 13.51 |
| 7/26/2019 | $ | 14.12 |
| 7/29/2019 | $ | 13.69 |
| 7/30/2019 | $ | 13.40 |
| 7/31/2019 | $ | 13.10 |
| 8/1/2019 | $ | 13.01 |
| 8/2/2019 | $ | 12.73 |
| 8/5/2019 | $ | 12.26 |
| 8/6/2019 | $ | 12.29 |
| 8/7/2019 | $ | 12.85 |
| 8/8/2019 | $ | 13.19 |
| 8/9/2019 | $ | 13.33 |
| 8/12/2019 | $ | 13.02 |
| 8/13/2019 | $ | 13.30 |
| 8/14/2019 | $ | 12.74 |
| 8/15/2019 | $ | 12.67 |
| 8/16/2019 | $ | 13.16 |
| 8/19/2019 | $ | 13.40 |
| 8/20/2019 | $ | 14.15 |
| 8/21/2019 | $ | 14.29 |
| 8/22/2019 | $ | 14.16 |
| 8/23/2019 | $ | 13.88 |
| 8/26/2019 | $ | 14.97 |
| 8/27/2019 | $ | 14.51 |
| 8/28/2019 | $ | 14.82 |
| 8/29/2019 | $ | 15.18 |
| 8/30/2019 | $ | 15.73 |
| 9/3/2019 | $ | 14.88 |
| 9/4/2019 | $ | 15.42 |
| 9/5/2019 | $ | 15.53 |

APPENDIX 460

| Date | Amount |
|---|---|
| 9/6/2019 | $ 15.88 |
| 9/9/2019 | $ 16.03 |
| 9/10/2019 | $ 17.09 |
| 9/11/2019 | $ 15.92 |
| 9/12/2019 | $ 16.40 |
| 9/13/2019 | $ 16.71 |
| 9/16/2019 | $ 17.05 |
| 9/17/2019 | $ 17.66 |
| 9/18/2019 | $ 17.78 |
| 9/19/2019 | $ 17.90 |
| 9/20/2019 | $ 18.07 |
| 9/23/2019 | $ 17.83 |
| 9/24/2019 | $ 17.82 |
| 9/25/2019 | $ 17.18 |
| 9/26/2019 | $ 16.34 |
| 9/27/2019 | $ 15.90 |
| 9/30/2019 | $ 15.92 |
| 10/1/2019 | $ 14.81 |
| 10/2/2019 | $ 14.86 |
| 10/3/2019 | $ 15.07 |
| 10/4/2019 | $ 15.51 |
| 10/7/2019 | $ 15.47 |
| 10/8/2019 | $ 15.31 |
| 10/9/2019 | $ 14.20 |
| 10/10/2019 | $ 14.16 |
| 10/11/2019 | $ 14.06 |
| 10/14/2019 | $ 13.93 |
| 10/15/2019 | $ 14.33 |
| 10/16/2019 | $ 14.15 |
| 10/17/2019 | $ 14.54 |
| 10/18/2019 | $ 14.81 |
| 10/21/2019 | $ 15.50 |
| 10/22/2019 | $ 15.92 |
| 10/23/2019 | $ 16.90 |
| 10/24/2019 | $ 16.59 |
| 10/25/2019 | $ 17.01 |
| 10/28/2019 | $ 17.03 |
| 10/29/2019 | $ 16.99 |
| 10/30/2019 | $ 17.14 |
| 10/31/2019 | $ 16.75 |
| 11/1/2019 | $ 15.66 |
| 11/4/2019 | $ 16.80 |
| 11/5/2019 | $ 16.89 |
| 11/6/2019 | $ 16.13 |
| 11/7/2019 | $ 17.50 |
| 11/8/2019 | $ 17.49 |
| 11/11/2019 | $ 17.40 |

APPENDIX 461

| | | |
|---|---|---|
| 11/12/2019 | $ | 17.99 |
| 11/13/2019 | $ | 18.25 |
| 11/14/2019 | $ | 18.34 |
| 11/15/2019 | $ | 19.37 |
| 11/18/2019 | $ | 19.45 |
| 11/19/2019 | $ | 19.36 |
| 11/20/2019 | $ | 20.18 |
| 11/21/2019 | $ | 20.20 |
| 11/22/2019 | $ | 20.69 |
| 11/25/2019 | $ | 20.00 |
| 11/26/2019 | $ | 20.33 |
| 11/27/2019 | $ | 20.37 |
| 11/29/2019 | $ | 20.36 |
| 12/2/2019 | $ | 19.76 |
| 12/3/2019 | $ | 21.28 |
| 12/4/2019 | $ | 21.27 |
| 12/5/2019 | $ | 20.64 |
| 12/6/2019 | $ | 18.94 |
| 12/9/2019 | $ | 18.78 |
| 12/10/2019 | $ | 18.87 |
| 12/11/2019 | $ | 18.65 |
| 12/12/2019 | $ | 18.45 |
| 12/13/2019 | $ | 18.62 |
| 12/16/2019 | $ | 18.52 |
| 12/17/2019 | $ | 18.44 |
| 12/18/2019 | $ | 18.64 |
| 12/19/2019 | $ | 19.41 |
| 12/20/2019 | $ | 19.83 |
| 12/23/2019 | $ | 19.70 |
| 12/24/2019 | $ | 19.75 |
| 12/26/2019 | $ | 19.86 |
| 12/27/2019 | $ | 19.52 |
| 12/30/2019 | $ | 19.05 |
| 12/31/2019 | $ | 19.56 |
| 1/2/2020 | $ | 19.23 |
| 1/3/2020 | $ | 18.89 |
| 1/6/2020 | $ | 18.13 |
| 1/7/2020 | $ | 17.78 |
| 1/8/2020 | $ | 17.98 |
| 1/9/2020 | $ | 18.40 |
| 1/10/2020 | $ | 19.14 |
| 1/13/2020 | $ | 20.26 |
| 1/14/2020 | $ | 20.00 |
| 1/15/2020 | $ | 20.24 |
| 1/16/2020 | $ | 21.01 |
| 1/17/2020 | $ | 20.62 |
| 1/21/2020 | $ | 20.94 |

APPENDIX 462

| | | |
|---|---|---|
| 1/22/2020 | $ | 21.97 |
| 1/23/2020 | $ | 21.47 |
| 1/24/2020 | $ | 21.12 |
| 1/27/2020 | $ | 22.74 |
| 1/28/2020 | $ | 22.36 |
| 1/29/2020 | $ | 20.55 |
| 1/30/2020 | $ | 20.99 |
| 1/31/2020 | $ | 20.51 |
| 2/3/2020 | $ | 20.38 |
| 2/4/2020 | $ | 20.87 |
| 2/5/2020 | $ | 20.05 |
| 2/6/2020 | $ | 19.88 |
| 2/7/2020 | $ | 23.24 |
| 2/10/2020 | $ | 23.65 |
| 2/11/2020 | $ | 21.35 |
| 2/12/2020 | $ | 19.01 |
| 2/13/2020 | $ | 19.05 |
| 2/14/2020 | $ | 19.00 |
| 2/18/2020 | $ | 18.91 |
| 2/19/2020 | $ | 18.92 |
| 2/20/2020 | $ | 18.54 |
| 2/21/2020 | $ | 18.23 |
| 2/24/2020 | $ | 18.59 |
| 2/25/2020 | $ | 23.76 |
| 2/26/2020 | $ | 29.16 |
| 2/27/2020 | $ | 26.16 |
| 2/28/2020 | $ | 25.93 |
| 3/2/2020 | $ | 29.88 |
| 3/3/2020 | $ | 27.91 |
| 3/4/2020 | $ | 27.49 |
| 3/5/2020 | $ | 28.01 |
| 3/6/2020 | $ | 29.61 |
| 3/9/2020 | $ | 24.29 |
| 3/10/2020 | $ | 22.34 |
| 3/11/2020 | $ | 23.61 |
| 3/12/2020 | $ | 22.30 |
| 3/13/2020 | $ | 21.30 |
| 3/16/2020 | $ | 26.49 |
| 3/17/2020 | $ | 28.18 |
| 3/18/2020 | $ | 31.58 |
| 3/19/2020 | $ | 28.27 |
| 3/20/2020 | $ | 28.20 |
| 3/23/2020 | $ | 26.57 |
| 3/24/2020 | $ | 25.82 |
| 3/25/2020 | $ | 27.13 |
| 3/26/2020 | $ | 27.94 |
| 3/27/2020 | $ | 30.05 |

APPENDIX 463

| | | |
|---|---|---|
| 3/30/2020 | $ | 30.48 |
| 3/31/2020 | $ | 29.95 |
| 4/1/2020 | $ | 29.67 |
| 4/2/2020 | $ | 33.20 |
| 4/3/2020 | $ | 34.84 |
| 4/6/2020 | $ | 34.64 |
| 4/7/2020 | $ | 32.02 |
| 4/8/2020 | $ | 32.42 |
| 4/9/2020 | $ | 31.86 |
| 4/13/2020 | $ | 32.90 |
| 4/14/2020 | $ | 34.66 |
| 4/15/2020 | $ | 37.25 |
| 4/16/2020 | $ | 40.60 |
| 4/17/2020 | $ | 46.85 |
| 4/20/2020 | $ | 51.69 |
| 4/21/2020 | $ | 49.26 |
| 4/22/2020 | $ | 51.20 |
| 4/23/2020 | $ | 47.44 |
| 4/24/2020 | $ | 50.50 |
| 4/27/2020 | $ | 48.05 |
| 4/28/2020 | $ | 47.88 |
| 4/29/2020 | $ | 46.37 |
| 4/30/2020 | $ | 45.99 |
| 5/1/2020 | $ | 47.93 |
| 5/4/2020 | $ | 50.50 |
| 5/5/2020 | $ | 49.34 |
| 5/6/2020 | $ | 48.95 |
| 5/7/2020 | $ | 53.19 |
| 5/8/2020 | $ | 59.25 |

APPENDIX 464

file copy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUIGI WARREN,<br><br>         Plaintiff,<br><br>vs.<br><br>THE CHILDREN'S HOSPITAL<br>CORPORATION<br><br>         Defendant | Civ. A. No. 17-12472-DLC |

## PLAINTIFF'S RULE 26(a)(1) INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(a)(1) and the Scheduling Order, plaintiff makes

the following initial disclosures to the defendant in the above-referenced lawsuit. These

disclosures are based on information presently known and reasonably available to plaintiff and

which plaintiff reasonably believes he may use in support of his claims and defenses. Continuing

investigation and discovery may cause plaintiff to amend these initial disclosures, including by

identifying other potential witnesses, documents and by disclosing other pertinent information.

Plaintiff therefore reserves the right to supplement these initial disclosures. By providing these

initial disclosures, plaintiff does not represent that he is identifying every document, tangible

thing or witness possibly relevant to this action.

APPENDIX 465

## I.   INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION THAT MAY BE USED TO SUPPORT PLAINTIFF'S CLAIMS

| Witness | Subject of Information |
|---|---|
| Ryan Dietz<br>BCH TIDO<br>300 Longwood Ave.<br>Boston, MA 02115<br>(617) 919-3019 | As the licensing officer responsible for the Moderna license agreement at both IDI and BCH, Mr. Dietz has information about the deal and about IDI's and BCH's license revenue sharing arrangements as they pertain to this license and more generally. |
| Dr. Derrick Rossi<br>BCH<br>200 Longwood Ave.<br>Boston, MA 02115<br>(617) 713-8900 | As Dr. Warren's co-inventor on the Technology licensed to Moderna in 2010, Dr. Rossi has information about the timeline of the invention, representations made regarding licensing revenue distribution at different times, and efforts that have been made to institute a custom revenue split for Moderna licensing proceeds. |
| Dr. Frederick W. Alt<br>BCH<br>One Blackfan Circle<br>Boston, MA 02115<br>(617) 919-2539 | As Director of the Program in Cellular and Molecular Medicine, (formerly IDI) at BCH, Dr. Alt has general information about the merger of IDI with BCH (and possibly also about royalty distribution arrangements) and should be able to identify past or present officials with more specific, detailed information on these matters. |
| Doreen Donovan<br>Myriant Corporation<br>42 Cummings Park<br>Woburn, MA 01801<br>(781) 569-6250 | As the Director of Human Resources at IDI during the period of the plaintiff's employment, Ms. Donovan has information about onboarding policies and practices there, including as they relate to the IDI Research and Technology Development Policy. |
| Lisa Pight<br>BCH TIDO<br>300 Longwood Ave.<br>Boston, MA 02115<br>(617) 919-3017 | As the Financial Assistant responsible for distributing royalty statements and checks in BCH's Technology and Innovation Development Office (TIDO), Ms. Pight has information regarding the administration of licensing revenue distributions. |
| Dianne McCarthy<br>CHIA<br>501 Boylston Street<br>Boston, MA 02116<br>(617) 701-8100 | As the then-Chief Counsel for Research Affairs at BCH who sent the plaintiff a copy of the IDI Research and Technology Development Policy in 2011, Ms. McCarthy has information about BCH's stance on the applicable inventions policy before the 2012 IDI-BCH merger. |
| David Resnick<br>Nixon Peabody LLP<br>100 Summer Street<br>Boston, MA 02110<br>(617) 345-6057 | As IDI's outside counsel at Nixon-Peabody who sent the plaintiff a draft lawsuit citing the IDI Research and Technology Development Policy in 2011, Mr. Resnick has information about IDI's stance on the applicable invention policy before the 2012 IDI-BCH merger. |

APPENDIX 466

APPENDIX 467

| Witness | Subject of Information |
|---|---|
| Dr. Han Lee<br>AstraZeneca<br>Corporate Development<br>Gaithersburg, MD<br>Han.Lee@astrazeneca.com | As a fellow researcher with whom Dr. Warren consulted in 2008 regarding the practicality of using synthetic mRNA to modulate cell state, Dr. Lee has information regarding the timeline of the invention of the Technology. |
| Dr. Sun Hur<br>BCH<br>3 Blackfan Circle<br>Boston, MA 02115<br>(617) 713-8250 | As a fellow researcher with whom Dr. Warren consulted in 2008 regarding the challenges presented by cellular immune responses to synthetic mRNA, Dr. Hur has information regarding the timeline of the invention of the Technology. |
| Chairman of the IDI Board of Trustees<br>(Needs to Be Identified) | Plaintiff does not know the identity of the Chairman of the IDI Board of Trustees during the run-up to the BCH merger (2008-2012). This individual will have information on IDI's inventions policy and any impact on the policy arising from IDI's affiliation and later merger with BCH. |
| Chairman of IDI's Research and Technology Development Committee<br>(Needs to Be Identified) | Plaintiff does not know the identity of the Chairman of IDI's Research and Development Committee when the Moderna deal was executed. This individual will have information on IDI's inventions policy at the time of the deal and any special issues or treatment pertaining to the Moderna transaction. |
| Chairman of the Equity Subcommittee of IDI's Research and Technology Development Committee<br>(Needs to Be Identified) | Plaintiff does not know the identity of the Chairman of the Equity Subcommittee of IDI's Research and Development Committee when the Moderna deal was executed. This individual will have information on IDI's policies regarding the receipt of equity and the handling of the Moderna case. |

## II. CATEGORIES AND LOCATIONS OF DOCUMENTS

| Attached Item or Category | Location |
|---|---|
| Emails and letters from Dr. Rossi and IDI Human Resources in regards the plaintiff's appointment at IDI, his position there, and his resignation from the Institute. | Attached. |
| Pages from the plaintiff's lab notebook relating to his original conception of the licensed invention and his reporting of that invention to his IDI supervisor, Dr. Rossi. | Attached. |
| Plaintiff's original 2010 invention assignment in respect of the technology licensed to Moderna, and the two follow-on assignments he executed in 2011. | Attached. |
| Electronic exchanges from 2011 between plaintiff and Ryan Dietz in re his request for follow-on assignments and POAs, nature of Moderna deal, plaintiff's rights to royalties, etc. | Attached. |
| Draft CDAs addressing the IDI-Moderna licensing agreement (IDI Case 08-011), sent to the plaintiff by Ryan Dietz in 2011. | Attached. |
| Letter sent to plaintiff by BCH's Chief Counsel for Research Affairs in 2011 and follow-on email exchanges in regards his obligation to execute follow-on assignments. | Attached. |
| Electronic exchanges between plaintiff and IDI's outside counsel at Nixon-Peabody from 2011 re plaintiff's obligation to execute follow-on invention assignments and POAs. | Attached. |
| Draft complaint seeking injunction sent to plaintiff by IDI's lawyers at Nixon-Peabody in 2011 to support their demand for his execution of follow-on assignments and POAs. | Attached. |
| 2013 request from Ryan Dietz for plaintiff's declarations to support IP prosecution. | Attached. |
| Supporting declarations provided by the plaintiff to facilitate prosecution of the IP for the licensed technology. | Attached. |
| Electronic exchange between plaintiff and Ryan Dietz in re info required to prepare the first royalty distribution in 2015. | Attached. |
| Cover letters and statements that accompanied royalty checks issued to plaintiff in 2015 – 2017. | Attached. |

| Attached Item or Category | Location |
|---|---|
| Electronic exchanges from 2017 between plaintiff and Ryan Dietz regarding the royalty split issue. | Attached. |
| Plaintiff's contemporaneous notes from August 18, 2017 call with Ryan Dietz regarding the royalty split issue. | Attached. |
| Proposed custom royalty split agreement dated January 22, 2017, emailed to the plaintiff by Ryan Dietz in August 2017. | Attached. |
| Electronic exchanges from 2017 between plaintiff and Dr. Derrick Rossi regarding the royalty split issue. | Attached. |
| Electronic exchanges in re plaintiff's request to BCH for his IDI personnel records in 2017. | Attached |
| 2004 IDI Research and Technology Development Policy. | Attached. |
| 1992 Children's Hospital Policy on Inventions and Intellectual Property. | Attached. |
| 2015 Intellectual Property Policy of Boston Children's Hospital. | Attached. |
| Partial photographic record of plaintiff's Rossi Lab scientific notebooks, covering approximately 1400 notebook pages with a focus on the mRNA reprogramming project. | Plaintiff has electronic copies. |
| Backups of plaintiff's IDI email account (warren@idi.harvard.edu) made at various times. | Plaintiff has electronic copies. |
| Provisional patent filing. | Plaintiff has paper copy. |
| Press releases, news reports, articles, official filings and other public documents regarding IDI and BCH, Moderna and various pertinent issues of law, taxation and finance. | Plaintiff has electronic copies. |

APPENDIX 470

## III. CALCULATION OF DAMAGES

Not applicable as the plaintiff is seeking equitable relief.


## IV. INSURANCE

Plaintiff has no applicable insurance.




Dated: March 29, 2018 By:___ /s/ Luigi Warren_____


Luigi Warren (Pro Se)
3535 Lebon Dr, Apt. 4311
San Diego, CA 92122

Tel: (617) 275-1489

Email: luigi.warren@outlook.com

APPENDIX 470

CERTIFIED
COPY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

- - -

LUIGI WARREN,                    :    Civ. A. No.
                Plaintiff,       :    17-12472-DLC
                                 :
        vs.                      :
                                 :
THE CHILDREN'S HOSPITAL          :
CORPORATION,                     :
                Defendant.       :

- - -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Friday, November 16, 2018

- - -

Videotaped deposition of LUIGI WARREN, Ph.D., held at VEDDER PRICE, P.C., 1925 Century Park East, Suite 1900, Los Angeles, California, commencing at approximately 9:14 a.m., before Rosemary Locklear, a Registered Professional Reporter, Certified Realtime Reporter and California CSR (#13969).

- - -

APPENDIX 471

CERTIFIED
COPY

LUIGI WARREN, PH.D.

APPEARANCES:


        LUIGI WARREN, Pro Se
        Luigi.Warren@outlook.com
        202 South Raymond Avenue, # 205
        Pasadena, California 91105
        Appearing Pro Se



        MURPHY & KING, P.C.
        BY:   THEODORE J. FOLKMAN, ESQUIRE
        tfolkman@murphyking.com
        One Beacon Street
        Boston, Massachusetts 02108
        (617) 423-0400
        Appearing on behalf of the Defendant


ALSO PRESENT:


        ANIA BILINSKA, Video Operator

        ASHLEY J. STEVENS
        FOCUS IP GROUP, L.L.C.



                        - - -

APPENDIX 472

LUIGI WARREN, PH.D.

(The court reporter read the requested portion of the record.)

THE WITNESS:  Yes.  The only thing I would add to that is it's never been -- the question of whether the policies have ever been changed has obviously come up in the context of this suit, and the only thing that's ever been asserted regarding that has been this claim that the policies were changed through the language in the Affiliation Agreement.

So I guess, by implication, that suggests that a 2004 document was -- was -- was it.  Plus, that was the document they sent me.  So, in that sense, I do have reason to believe that it wasn't changed.

MR. FOLKMAN:  Okay.  So I move to strike the answer, but I'll go on.

BY MR. FOLKMAN:

Q.     **Who were the trustees at the time that you were at IDI?**

A.     I have no idea.

Q.     **Do we agree that neither IDI nor Children's Hospital ever made distributions to you or to Derrick Rossi under the IDI policy, Exhibit 4?**

A.     Yes.

Q.     **I'd like to talk about the damages and remedies that you're claiming in this lawsuit.**

LUIGI WARREN, PH.D.

A.    Uh-huh.

Q.    One element of what you're claiming, as I understand it, is that the percentage of the licensing revenue, the net licensing revenue, that you were entitled to under the IDI policy is higher than the percentage that you were entitled to under the policies that the hospital has actually applied and you're entitled to the difference between those two percentages.

Are you with me?

A.    That's a somewhat strange way of putting it, since it's not a damages case, but I'm asking the judge to rule that the IDI percentage is controlling.

Q.    That's a very fair point.

I mean, you're not claiming damages, you're claiming -- you're seeking a declaratory judgment.  But that's the essence of your point about the percentages; right?

A.    Yes.

Q.    Okay.  And thank you for correcting me about the technicality there.  You're absolutely right.

The other main claim that you're making is that -- as I understand it, is that the hospital and IDI should have distributed -- well, that you should have received stock at or shortly after the time that IDI

LUIGI WARREN, PH.D.

Page 162

STATE OF CALIFORNIA          )

COUNTY OF LOS ANGELES        )

I, ROSEMARY LOCKLEAR, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

LUIGI WARREN, Ph.D., the witness in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said deposition dated the_____ day of _____, 2018.

_Rosemary Locklear_

ROSEMARY LOCKLEAR, RPR, CRR, CSR 13969

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUIGI WARREN,<br><br>         Plaintiff,<br><br>vs.<br><br>THE CHILDREN'S HOSPITAL CORP.,<br><br>         Defendant | Civ. A. No. 17-12472-DLC |

## DECLARATION OF IRENE ABRAMS

I, Irene Abrams, make the following declaration.

1.      I am the Vice President of Technology Development and New Ventures at Boston Children's Hospital ("the Hospital"). I lead the Technology & Innovation Development Office ("TIDO") within the Hospital. TIDO is responsible for commercializing discoveries and innovations developed by research and clinicians at the Hospital.

2.      Prior to joining the Hospital, I was an executive director at Partners Healthcare Innovation, where I was responsible for commercializing technology from Massachusetts General Hospital. Before joining Partners, I was the Associate Provost for Innovation at Brandeis University and a Senior Technology Licensing Officer at the Massachusetts Institute of Technology, where I focused on licensing biotech inventions for MIT, the Whitehead Institute, and the Broad Institute. I am past president of the Massachusetts Association of Technology Transfer Offices, the founder of T3, an organization for technology licensing offices from small New England research institutions, and former vice president of the Association of University Technology Managers. In summary, I have been in the technology licensing field since 1989 and have extensive experience in the field.

1

APPENDIX 476

3.      Attached to this Declaration as Exhibit 1 is a spreadsheet showing the dates of the Hospital's sales of the stock of Moderna, Inc. that it and its predecessor in interest, IDI, had received in consideration of licensing to Moderna an invention created by Dr. Derrick Rossi and Dr. Luigi Warren, and the price per share for each sale. The sales began on July 8, 2019 and continued on a near-daily basis until September 23, 2019. The Hospital sold its shares in lots of an equal number of shares per day, except that on the final day it sold the remaining shares.

4.      The Hospital sold its shares over a period of time rather than on a single day for two reasons. First, when selling a large number of shares, the Hospital seeks to avoid "flooding the market" and decreasing the share price by materially increasing the supply of shares available for purchase. It is the Hospital's practice, and in my experience based on many years in the technology transfer field, industry best practice, to sell shares over time to avoid affecting the share price.

5.      The second reason the Hospital did not sell all its Moderna shares at once is that it is not in the business of trying to time the market or to speculate on the price of stocks. We seek to "smooth out" any day-to-day price changes rather than to try to pick the best day on which to sell blocks of stock. This is the practice at the Hospital and at prior institutions (though there may have been occasional exceptions), and in my experience based on my years in the field, it is the accepted industry best practice.

6.      The reference in the "Description" column of Exhibit 1 to a "preferential rate" is to the preferential rate the Hospital's stockbroker charged it for the transactions. I have no knowledge about how the preferential rate the Hospital paid would compare to the rates Dr. Warren or any other person would pay their own brokers.

APPENDIX 477

I declare under penalty of perjury that the foregoing is true and correct. Executed on May May 18, 2020.

*/s/ Irene Abrams*

Irene Abrams

3

APPENDIX 478

**MRNA SALES for CHILDRENS MEDICAL CENTER 625-019283-636**

| Account | Activity Date | Activity | Description | Symbol/Cusip | Price($) |
|---|---|---|---|---|---|
| 625-019283 | 09/23/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2666I438 SEC ID: E3BR4 | MRNA | 17.9326 |
| 625-019283 | 09/20/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2639I389 SEC ID: E3BR4 | MRNA | 18.0121 |
| 625-019283 | 09/19/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2629I139 SEC ID: E3BR4 | MRNA | 18.0540 |
| 625-019283 | 09/18/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2616I298 SEC ID: E3BR4 | MRNA | 17.6555 |
| 625-019283 | 09/17/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2609M360 SEC ID: E3BR4 | MRNA | 17.4649 |
| 625-019283 | 09/16/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2591M269 SEC ID: E3BR4 | MRNA | 17.1362 |
| 625-019283 | 09/13/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2566U695 SEC ID: E3BR4 | MRNA | 16.7178 |
| 625-019283 | 09/12/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2554K252 SEC ID: E3BR4 | MRNA | 17.0108 |

APPENDIX 479

| 625-019283 | 09/11/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2549N821 SEC ID: E3BR4 | MRNA | 16.4268 |
|---|---|---|---|---|---|
| 625-019283 | 09/10/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2532O346 SEC ID: E3BR4 | MRNA | 16.9716 |
| 625-019283 | 09/09/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2521I974 SEC ID: E3BR4 | MRNA | 15.9140 |
| 625-019283 | 09/06/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2495L120 SEC ID: E3BR4 | MRNA | 15.7818 |
| 625-019283 | 09/05/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2483N662 SEC ID: E3BR4 | MRNA | 15.5234 |
| 625-019283 | 09/04/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2477O580 SEC ID: E3BR4 | MRNA | 15.2561 |
| 625-019283 | 09/03/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2465J976 SEC ID: E3BR4 | MRNA | 14.9509 |
| 625-019283 | 08/30/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2429A460 SEC ID: E3BR4 | MRNA | 15.5841 |

APPENDIX 480

| | | | | | |
|---|---|---|---|---|---|
| 625-019283 | 08/29/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2410I342 SEC ID: E3BR4 | MRNA | 14.9682 |
| 625-019283 | 08/28/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2401G609 SEC ID: E3BR4 | MRNA | 14.7776 |
| 625-019283 | 08/27/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2390K946 SEC ID: E3BR4 | MRNA | 14.6313 |
| 625-019283 | 08/26/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2386G054 SEC ID: E3BR4 | MRNA | 14.8999 |
| 625-019283 | 08/23/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2351J777 SEC ID: E3BR4 | MRNA | 14.0885 |
| 625-019283 | 08/22/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2349G899 SEC ID: E3BR4 | MRNA | 14.1833 |
| 625-019283 | 08/21/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2334M147 SEC ID: E3BR4 | MRNA | 14.1728 |
| 625-019283 | 08/20/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2329G691 SEC ID: E3BR4 | MRNA | 14.1710 |

APPENDIX 481

| 625-019283 | 08/19/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2314H447 SEC ID: E3BR4 | MRNA | 13.2398 |
|---|---|---|---|---|---|
| 625-019283 | 08/16/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2280H184 SEC ID: E3BR4 | MRNA | 12.9869 |
| 625-019283 | 08/15/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2278S718 SEC ID: E3BR4 | MRNA | 12.7321 |
| 625-019283 | 08/14/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2261P600 SEC ID: E3BR4 | MRNA | 12.8332 |
| 625-019283 | 08/13/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2258R239 SEC ID: E3BR4 | MRNA | 13.2028 |
| 625-019283 | 08/12/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2249I613 SEC ID: E3BR4 | MRNA | 13.2504 |
| 625-019283 | 08/09/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2218J855 SEC ID: E3BR4 | MRNA | 13.2051 |
| 625-019283 | 08/08/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2209L336 SEC ID: E3BR4 | MRNA | 12.8877 |

APPENDIX 482

| 625-019283 | 08/07/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2190N611 SEC ID: E3BR4 | MRNA | 13.1181 |
|---|---|---|---|---|---|
| 625-019283 | 08/06/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2185W722 SEC ID: E3BR4 | MRNA | 12.1796 |
| 625-019283 | 08/05/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2171T533 SEC ID: E3BR4 | MRNA | 12.3622 |
| 625-019283 | 08/02/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2149O326 SEC ID: E3BR4 | MRNA | 12.6323 |
| 625-019283 | 08/01/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2139R860 SEC ID: E3BR4 | MRNA | 12.8993 |
| 625-019283 | 07/31/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2126M728 SEC ID: E3BR4 | MRNA | 13.2697 |
| 625-019283 | 07/30/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2113N494 SEC ID: E3BR4 | MRNA | 13.3877 |
| 625-019283 | 07/29/2019 | Sold | MODERNA INC<br>PREFERENTIAL RATE<br>UNSOLICITED TRADE<br>Ref: 2105H882 SEC ID: E3BR4 | MRNA | 13.6945 |

APPENDIX 483

| 625-019283 | 07/26/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 2075E528 SEC ID: E3BR4 | MRNA | 13.7812 |
|---|---|---|---|---|---|
| 625-019283 | 07/25/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 2064L914 SEC ID: E3BR4 | MRNA | 13.8431 |
| 625-019283 | 07/24/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 2052L614 SEC ID: E3BR4 | MRNA | 14.1465 |
| 625-019283 | 07/23/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 2042R015 SEC ID: E3BR4 | MRNA | 13.5330 |
| 625-019283 | 07/22/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 2035S408 SEC ID: E3BR4 | MRNA | 14.0412 |
| 625-019283 | 07/19/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 2009E300 SEC ID: E3BR4 | MRNA | 14.1698 |
| 625-019283 | 07/18/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 1999N647 SEC ID: E3BR4 | MRNA | 14.0841 |
| 625-019283 | 07/17/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 1983Q408 SEC ID: E3BR4 | MRNA | 14.1419 |

APPENDIX 484

| 625-019283 | 07/16/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 1978W135 SEC ID: E3BR4 | MRNA | 14.0923 |
|---|---|---|---|---|---|
| 625-019283 | 07/15/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 1960T468 SEC ID: E3BR4 | MRNA | 14.2045 |
| 625-019283 | 07/12/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 1932F679 SEC ID: E3BR4 | MRNA | 14.2776 |
| 625-019283 | 07/11/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 1928L200 SEC ID: E3BR4 | MRNA | 14.2958 |
| 625-019283 | 07/10/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 19193H05 SEC ID: E3BR4 | MRNA | 14.4516 |
| 625-019283 | 07/09/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 1908L452 SEC ID: E3BR4 | MRNA | 14.5812 |
| 625-019283 | 07/08/2019 | Sold | MODERNA INC PREFERENTIAL RATE UNSOLICITED TRADE Ref: 1894L968 SEC ID: E3BR4 | MRNA | 14.3186 |

APPENDIX 485

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LUIGI WARREN,

       Plaintiff,

v.

The CHILDREN'S HOSPITAL
CORPORATION,

       Defendant.

No. 17-CV-12472-DLC

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT NO. 51) AND PLAINTIFF'S MOTION TO AMEND (DKT NO. 72)**

Cabell, U.S.M.J.

Plaintiff Dr. Luigi Warren sued defendant Children's Hospital Corporation (Children's) for reportedly failing to honor the terms of a revenue and equity policy regarding an invention of Dr. Warren's that is included in a patent Children's owns. Children's demurred and moved for summary judgment. (Dkt. No. 51). Following a hearing, the court denied Children's motion, and Dr. Warren subsequently moved to amend the complaint, which Children's has opposed. (Dkt. Nos. 70, 72, 87). For the reasons explained below, the court vacates its prior order denying Children's motion for summary judgment, and now allows the motion. The court also denies Dr. Warren's motion to amend.

APPENDIX 486

## I.   Factual Background

The facts are taken from the Defendant's Statement of Undisputed Material Facts (Dkt. No. 55), the Defendant's Memorandum of Law in Support (Dkt. No. 52), the Plaintiff's Statement of Material Facts (Dkt. No. 58), the Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Dkt. No. 57), and the exhibits attached to these filings. The facts are undisputed unless otherwise noted.  As always on a motion for summary judgment, the court views the facts in the light most favorable to Dr. Warren as the non-moving party and draws all reasonable inferences in his favor.  *Carlson v. Univ. of New England*, 899 F.3d 36, 43 (1st Cir. 2018).

### A.   *Dr. Warren's Work at the IDI*

In November 2007, Dr. Warren began working at the Immune Disease Institute (IDI) in an at-will capacity as a postdoctoral researcher. (Dkt. No. 55, ¶ 3).  While there, he co-invented, along with Principal Investigator Dr. Derrick Rossi, a breakthrough technique for "reprogramming" cells to induce them to become pluripotent stem cells (the Invention). (Dkt. No. 52, pp. 3-4). The parties quickly recognized the Invention's great medical and commercial potential.

Throughout the early part of 2010, Dr. Warren and Dr. Rossi worked with other IDI personnel to begin the process of securing

2

APPENDIX 487

patents for the Invention.  (Dkt. No. 57, p. 3).  In April 2010, IDI filed for a provisional patent with the United States Patent and Trademark Office.  (*Id.*)  Dr. Warren left his position at IDI shortly thereafter, in June of 2010.  (Dkt. No. 55, ¶ 5).  On December 21, 2010, approximately six months after Dr. Warren left IDI, IDI exclusively licensed the Invention to Moderna Therapeutics, Inc.  (Dkt. No. 55, ¶ 39).[1]

### B.  *IDI's Affiliation with Boston Children's Hospital*

During the patent and licensing process, IDI itself was in a state of change.  In or around 2008, IDI and Children's began exploring the possibility of a merger, executing an Affiliation Agreement on December 24, 2008.  (*Id.* at ¶ 28).  Under that agreement, any IDI intellectual property not licensed before the affiliation was consummated (the "Effective Date") became subject to Children's policies as of the Effective Date, including Children's revenue and equity policies.  (*Id.* at ¶¶ 29, 31).  The parties agree that the Effective Date was February 20, 2009.  (*Id.* at ¶ 31; Dkt. No. 57, p. 2).  In September 2012, IDI dissolved and formally merged into Children's.  (Dkt. No. 55, ¶ 38).

---

[1] At the time, Moderna was a newly founded start-up.  Today, of course, Moderna is best known for its COVID-19 vaccine.  *See About Us*, MODERNA THERAPEUTICS, https://www.modernatx.com/about-us/our-story (last visited Jan. 11, 2023).

APPENDIX 488

C.   *The Two Invention Revenue and Equity Policies*

The were some differences between IDI's and Children's respective revenue policies.  The IDI policy in effect when Dr. Warren was hired, known formally as the IDI Research and Technology Development Policy (IDI policy), provided among other things that all technology was "owned by IDI," (Dkt. No. 55-3, § E(1)(a)), and employee-inventors would "provide technical information, documentation, and all other assistance deemed necessary by IDI, including an assignment of the Inventor's rights in the Technology to IDI."  (*Id.* at § F).  In exchange, IDI would give one-third of its technology-derived licensing revenue to the inventors.  (Dkt. No. 55-3, § H(4)).[2]  Further, if IDI accepted equity from a company in exchange for licensing rights, the inventor's share of the equity would be deemed a "royalty" and "distributed to the Inventors at the earliest opportunity."  (*Id.* at § I(3)).  The IDI policy also provided that IDI's trustees "retain the discretion to amend [the policy] from time to time."  (*Id.* at § A).  The policy required each "Covered Person," including employees like Dr. Warren, to "sign a Participation Agreement in which the Covered

---

[2] Where, as here, an invention had multiple inventors, the policy provided that the one-third inventor share would be divided into equal shares for each inventor absent a contrary agreement among the inventors.  (Dkt. No. 55-3, § H(5)).  Accordingly, under the IDI policy, Dr. Warren would be entitled to 16 2/3 percent of the net proceeds from the Moderna license.

Person agrees to comply with this Policy." (*Id.* at § C). The record is unclear as to whether Dr. Warren ever signed a Participation Agreement. (Dkt. No. 57, p. 16; Dkt. No. 59, p. 5).

In contrast, the Children's Hospital Policy on Inventions and Intellectual Property (Children's policy) contained materially different and slightly more complicated terms regarding revenue payments and equity sharing with employee-inventors. The Children's policy sets out different payment terms for inventors still employed by Children's and those who had left Children's. (Dkt. No. 55-9, p. 3). In the latter case, the inventor's share of license proceeds is 35 percent "up to" $500,000, then 25 percent "above" $500,000. (*Id.*). Like the IDI policy, the Children's policy equally divided this share among all co-inventors. (*Id.*). The parties do not dispute that Dr. Warren would receive a lesser share under the Children's policy than he would under the IDI policy. The Children's policy resembles the IDI policy regarding ultimate ownership of inventions and duties of employee-inventors:

> Every invention based on the Hospital's intellectual property . . . shall be the property of the Hospital . . . . When the Hospital determines to seek the patenting . . . of any invention . . . the inventor shall cooperate fully in such effort, including execution of all necessary or desirable agreements, applications, assignments, and other forms and instruments.

(*Id.* at p. 2).

5

APPENDIX 490

D.   *The Invention Assignments*

In August 2010, after having left IDI, Dr. Warren voluntarily executed an assignment of his "entire right, title, and interest" in the Invention to IDI.  (Dkt. No. 57-4).  In February 2011, Ryan Dietz ("Dietz"), a manager at IDI's technology transfer office, sent Dr. Warren an email asking him to assign his rights a second time.  (Dkt. No. 55-4, pp. 10-11).  The subsequent assignment is variously described in the record as a "follow-up assignment[]," (Dkt. No. 55-1, 68:11-12), an "additional assignment of the same invention," (Dkt. No. 55, ¶ 46), and an "assignment pertain[ing] to a second provisional application."  (Dkt. No. 55-4, p. 10).

Reluctant to execute any further assignments, Dr. Warren requested a copy of the document purporting to require his execution of the assignment.  (Dkt. No. 55, ¶ 47).  In response, Dietz sent Dr. Warren the following excerpt from the IDI policy:

> Ownership of Inventions. Each Invention shall be the sole and exclusive property of IDI. I agree to execute an assignment to IDI or its nominee of my entire right, title, and interest in and to all Inventions (to which IDI has ownership rights pursuant to the "Research and Technology Development Policy") without additional compensation. I further agree, upon request of IDI and at its expense, to execute such documents as may be necessary or desirable in applying for and obtaining patents on the Inventions in the United States and any foreign country. I further agree, whether or not I am employed by IDI, to cooperate to the extent and in the manner reasonably requested by IDI in the prosecution or defense of any claim involving a patent covering any

6

APPENDIX 491

Invention or any litigation or other claim or proceeding involving any Invention . . . .

(Dkt. No. 55-4, p. 7).  Dr. Warren also asked for the relevant policy regarding revenue sharing and licensing royalties.  (*Id.*). Dietz again replied with the IDI policy's revenue-sharing schedule.  (*Id.* at p. 6).

After receiving this information, Dr. Warren declined to execute the subsequent assignment.  (Dkt. No. 55, ¶ 52). Subsequently, Dianne McCarthy, Children's General Counsel, sent Dr. Warren an email with the full IDI policy attached, reiterating that Dr. Warren was obligated to execute the assignment.  (*Id.*). Dr. Warren also received an email from Children's outside counsel threatening a lawsuit if Dr. Warren persisted in his refusal. (Dkt. No. 55-7).  The email indicated that Dr. Warren's "refusal to execute the assignment [was] in direct contravention of [his] obligations under IDI's Research and Technology Development Policy."  (*Id.* at p. 2).  Attached to the email was a draft complaint against Dr. Warren, replete with references to the IDI policy and asserting a breach of contract claim against Dr. Warren for violating said policy.  (*Id.* at pp. 3, 5-6, 9).  Shortly after receiving this email, Dr. Warren executed two additional assignments.[3]  (Dkt. No. 57-4, pp. 4-7).

---

[3] The record is unclear why Dr. Warren executed two assignments instead of one.

7

APPENDIX 492

Six years later, in August 2017, when rumors of an initial public offering for Moderna were circulating, Dr. Warren called Dietz (now officially working for Children's) to inquire about the Moderna licensing agreement.  (Dkt. No. 57, p. 6).  Dietz informed Dr. Warren that the references to the IDI policy back in 2011 were in error and that Dr. Warren's invention was subject to Children's policies on revenue and equity.  (*Id.* at 7).  Dietz offered Dr. Warren the opportunity to sign onto a superior "ad hoc" revenue policy that his co-inventor Dr. Rossi had negotiated with Children's, which Dr. Warren declined.[4]  (Dkt. No. 55, ¶¶ 57-61; Dkt. No. 57, p. 7).  Dr. Warren instead filed this suit, seeking *inter alia* a declaratory judgment that Children's is bound by the IDI policy, and injunctive relief ordering Children's to distribute payments to him according to the IDI policy.  (Dkt. No. 1).

## II.  <u>Discussion</u>

Broadly speaking, the parties appear to agree in their filings that Dr. Warren's complaint includes two claims: one for breach of contract and one for promissory estoppel.[5]  The court also

---

[4] Under the ad hoc policy, the inventors' share of all net revenues would be 27.5 percent.  (Dkt. No. 55, ¶ 60).

[5] While Dr. Warren asserts that he suffered multiple injuries due to Children's failure to abide by the IDI policy, and seeks multiple forms of relief, each of these assertions is predicated on the idea that Dr. Warren is entitled to payment as set out in the IDI policy, either because the IDI policy is a valid

considers, but ultimately rejects, a possible negligent misrepresentation claim.

## A.  *Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality."  *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003).  Once the moving party meets that burden, the opposing party must "show that a factual dispute does exist."  *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (internal quotation omitted).  "Such a showing 'requires more than the frenzied brandishing of a cardboard sword.'"  *Geshke v. Crocs, Inc.*, 740 F.3d 74, 77 (1st Cir. 2014) (quoting *Calvi v. Knox Cty.*, 470 F.3d 422, 426 (1st Cir. 2006)).  "The nonmovant must point to materials of evidentiary quality, . . . and such materials must frame an issue of fact that is more than merely colorable."  *Irobe v. U.S. Dep't of Agriculture*, 890 F.3d 371, 377 (1st Cir. 2018) (internal quotations and omitted).

---

contract or because of Children's representations surrounding the second assignment.

9

When determining whether summary judgment is appropriate, "[t]he court must view the record in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." *Carlson*, 899 F.3d at 43. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (further internal quotation marks omitted).

**B.** *Breach of Contract*

Dr. Warren claims that the IDI policy constitutes an implied contract which Children's breached by failing to honor the IDI terms on profits and equity sharing. Children's contends that the IDI policy is not a contract because IDI could amend it at will, and that, in any event, under the Affiliation Agreement, the Children's policy replaced the IDI policy for intellectual property not licensed by February 20, 2009. Since the Invention was not licensed until December 2010, the Children's policy applies to Dr. Warren, not the IDI policy.

To establish a breach of contract under Massachusetts law, "a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part

of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." *Bulwer v. Mount Auburn Hosp*., 473 Mass. 672, 690 (2016) (citing *Singarella v. City of Boston*, 342 Mass. 385, 387 (1961)).  As the party seeking to enforce the alleged contract, the plaintiff bears the burden of proving a contract existed. *Kauders v. Uber Techs, Inc.*, 486 Mass. 557, 572 (2021); *see Canney v. New England Tel. & Tel. Co.*, 353 Mass. 158, 164 (1967) ("Where the existence of a contract is in issue, the burden is on the plaintiff to show it was made.").  Massachusetts law provides that personnel manuals and other employer policies may form the basis of a contract between an employer and an employee. *O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 691 (1996) (citing *Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 13 (1988)); *see Weber v. Cmty. Teamwork, Inc.*, 434 Mass. 761, 780 (2001) ("Where an employee signs a personnel policy, negotiates specific terms as a condition of beginning or continuing employment, or where an employer calls special attention to the policy, a finding that the terms of the policy form the basis of an implied contract may be justified.").

There is no "rigid list of prerequisites" for determining if an employment policy is an enforceable contract, but there are several factors that inform the analysis. *O'Brien*, 422 Mass. at 692.  Some factors, when present, suggest the existence of a

contract. These include negotiation between the employee and the employer about the policy's terms, the employer calling "special attention" to the policy, and the employee manifesting assent to the policy. *Pearson v. John Hancock Mut. Life Ins. Co.*, 979 F.2d 254, 256 (1st Cir. 1992) (citing *Jackson*, 403 Mass. at 14-15). Factors pointing in the opposite direction include the employer reserving the right to unilaterally modify the policy and a characterization that the policy is meant to provide "guidance" rather than commit the employer to certain conduct. *Id.* The overarching questions are whether the employee believed that the policy "constituted the terms or conditions of employment, equally binding on employee and employer" and whether such belief was "reasonable under the circumstances." *Derrig v. Wal-Mart Stores, Inc.*, 942 F. Supp. 49, 55 (D. Mass. 1996) (describing *O'Brien*, 422 Mass. at 694).

In this case, the parties do not dispute that Dr. Warren earnestly believed that the IDI policy was binding. His pursuit of a breach of contract claim throughout this litigation makes that clear. Whether his belief was reasonable is a more difficult question, with factors supporting both sides. The IDI policy states explicitly that it "is intended to serve as a *guide* for members of the IDI community" and that IDI "retain[s] the discretion to amend [the] Policy from time to time," suggesting

12

APPENDIX 497

that the policy was not binding.  (Dkt. No. 55-3, Preamble and § A) (emphasis added).  At the same time, IDI both called special attention to the policy's terms and induced its employees to manifest assent insofar as it required all covered employees to "sign a Participation Agreement in which the [employee] agrees to comply with this Policy."  (*Id.* at § C).  Ultimately, the court need not decide this issue, as Dr. Warren's breach of contract claim suffers from a separate fatal flaw.

Even assuming *arguendo* the IDI policy was a contract, it was not immutable.  Rather, IDI specifically reserved the right to amend the policy at its discretion.  (*Id.* at § A).  It did just that by entering into the Affiliation Agreement, which provided that any IDI inventions not licensed by the Effective Date would be subject to Children's revenue policy as of that date.  (Dkt. No. 55, ¶¶ 29, 31).  The parties agree that the Effective Date was February 20, 2009.  (*Id.* at ¶ 31; Dkt. No. 57, p. 2).  IDI did not license the Invention until December 21, 2010.  (Dkt. No. 55, ¶ 39).  As such, the Invention was unlicensed as of February 20, 2009, which meant that it became subject to the Children's policy on that date.  By the time IDI licensed the Invention to Moderna, it was the Children's policy that controlled the revenue-sharing terms, not the IDI policy.  As a matter of law, then, Children's did not breach the IDI policy by failing to distribute revenue

13

according to its terms because the IDI policy was no longer the controlling agreement between the parties.

Dr. Warren tries mightily to escape this conclusion. First, he points to the fact that, in February 2011, two senior IDI officials and IDI's outside counsel all pointed him to (and threatened him with) the IDI policy, not the Children's policy. Second, Dr. Warren denies, without any supporting authority, that IDI had the right to unilaterally alter its policy "to abrogate specific promises made to employees." (Dkt. No. 57, p. 15). Finally, Dr. Warren argues that the Children's policy, by its express terms, only applied to Children's employees, not IDI employees. Each of these contentions misses the mark.

Regarding IDI's mistaken reference to the IDI policy in seeking to obtain the plaintiff's signature, lawyers, despite all jokes to the contrary, are human, and sometimes make mistakes. Here, two senior lawyers and an IDI manager all mistakenly informed Dr. Warren that the IDI policy controlled his revenue share in 2011. That mistake was regrettable but it does not in any way alter or abrogate the fact that the Children's policy superseded the IDI policy in February 2009. Regardless of whether their misrepresentations are otherwise legally significant (as discussed below), they do not control when or whether the IDI policy remained effective.

14

APPENDIX 499

As to Dr. Warren's second point, he offers no authority to suggest that IDI did not have the right to unilaterally amend the IDI policy despite its explicit reservation of such right, and the court is aware of no such authority.

Finally, Dr. Warren cites to this provision from the Children's policy for the proposition that the policy does not apply to him:

> This policy provides that Children's Hospital pays royalties only to its own inventors. However, when a Children's Hospital inventor makes an invention with a co-inventor in another academic or non-profit institution, and the institutions agree to market the invention jointly, the Director of Research Administration may authorize an agreement whereby each institution pays all inventors according to the terms of its own intellectual property policy.

(Dkt. No. 55-9, p. 3). Dr. Warren reads this provision to say that because he was never an employee of Children's, the Children's policy commands that he be paid in accordance with his own institution's policy, namely IDI's. But Dr. Warren fails to explain how this provision, which explicitly applies to situations "when a Children's Hospital inventor makes an invention with a co-inventor in another . . . institution," applies here. More significantly, Dr. Warren's contention flies in the face of basic principles of contract interpretation. It is a "cardinal principle of contract construction[] that a document should be read to give effect to all its provisions and to render them consistent with

APPENDIX 500

each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995); *see also* Restatement (Second) of Contracts § 202(5) (Am. Law Inst. 1981) ("Wherever reasonable, the manifestations of intention of the parties to a promise of agreement are interpreted as consistent with each other."). Likewise, "if the principal purpose of the parties is ascertainable it is given great weight." Restatement (Second) of Contracts § 202(1).

The Affiliation Agreement provided that, as of the Effective Date, all unlicensed IDI inventions would become subject to the Children's policy. Under Dr. Warren's reading, applying the Children's policy to IDI inventions (and inventors) would just point right back to the IDI policy, making the entire provision completely frivolous. This clearly was not the parties' intention. Further, maintaining a separate IDI revenue-sharing policy would be contrary to the entire purpose of the Affiliation Agreement, which was to bring IDI and Children's closer together in preparation for a later merger. In short, IDI and Children's can have only intended exactly what they said in the Affiliation Agreement: the Children's policy would apply to IDI inventions and inventors. The court thus rejects Dr. Warren's contrary interpretation.

16

For the foregoing reasons, the court finds that, as a matter of law, the former unlicensed intellectual property of IDI, including the Invention, became subject to the Children's policy on February 20, 2009 by the terms of the Affiliation Agreement. As such, there can be no breach based on the IDI policy.

## C.  *Promissory Estoppel*

Although the IDI policy no longer applied to the Invention as of February 2009, that does not necessarily end this dispute.  When Dr. Warren asked IDI about equity in February 2011, three different individuals referred Dr. Warren to the IDI policy rather than the applicable Children's policy.  These misrepresentations, which the defendant acknowledges, justify an inquiry into whether Dr. Warren is entitled to compensation in line with the IDI policy under a theory of promissory estoppel.

Through promissory estoppel, alternatively called a reliance-based theory in Massachusetts law, a noncontractual promise can be enforceable in whole or in part by virtue of an offeree's reasonable reliance on it.  *Loranger Constr. Corp. v. E.F. Hauserman, Co.*, 376 Mass. 757, 760-61 (1978).  The promise is then in every way a "contract" and enforceable pursuant to "traditional contract theory."  *Treadwell v. John Hancock Mut. Life Ins. Co.*, 666 F. Supp. 278, 286 (D. Mass. 1987) (citing *Loranger Constr. Corp.*, 376 Mass. at 761).  In other words, "[i]n the absence of a

APPENDIX 502

contract in fact, promissory estoppel implies a contract in law where there is proof of an unambiguous promise coupled with detrimental reliance by the promisee." *Malden Police Patrolman's Ass'n v. City of Malden*, 92 Mass. App. Ct. 53, 60 (2017) (citing *R.I. Hosp. Tr. Nat'l Bank v. Varadian*, 419 Mass. 841, 848 (1995)). A promissory estoppel claim can only succeed in the absence of an enforceable contract. *Id.* at 61.

A party seeking to assert promissory estoppel must demonstrate that "(1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise." *Loranger Constr. Corp. v. E.F. Hauserman Co.*, 6 Mass. App. Ct. 152, 154 (1978), *aff'd*, 376 Mass. 757 (1978). Additionally, the promisee's reliance on the promise must be reasonable. *See R.I. Hosp. Tr. Nat'l Bank*, 419 Mass. at 850.

In considering Dr. Warren's breach of contract claim, the court assumed without deciding that the IDI policy (later displaced by the Children's policy) was an enforceable contract. The court will now give Dr. Warren the benefit of the opposite assumption in considering promissory estoppel. Even so, any promissory estoppel

APPENDIX 503

claim fails because Dr. Warren cannot prove that IDI's misrepresentations induced him to act.

A well-settled rule in the field of contracts is that "performance of a pre-existing legal duty that is neither doubtful nor subject to honest and reasonable dispute is not valid consideration where the duty is owed to the promisor." *In re Lloyd*, *Carr & Co.*, 617 F.2d 882, 890 (1st Cir. 1980); *accord* Restatement (Second) of Contracts § 73; *see also Johnny's Oil Co. v. Eldayha*, 82 Mass. App. Ct. 705, 714 (2012) ("Detrimental reliance on an offer or a promise . . . is a substitute for consideration."). "The policy underlying this rule is to discourage parties under such a duty from using the threat of nonperformance to extort greater compensation for doing only that which they were already obligated to do." *In re Lloyd, Carr & Co.*, 617 F.2d at 890. It stands to reason that a promise cannot induce a promisee to act if the promisee already has a clear legal duty to act.

In this case, Dr. Warren had a preexisting legal duty to assign his rights in the Invention to IDI. The "general rule [is] that rights in an invention belong to the inventor." *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 785 (2011) (citations omitted). When, however, an individual is "employed to make an invention, . . . [he] is bound

19

to assign to his employer any patent obtained." *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933); *accord Standard Parts Co. v. Peck*, 264 U.S. 52, 59-60 (1924); *Nat'l Dev. Co. v. Gray*, 316 Mass. 240, 247 (1944); *see Banks v. Unisys Corp.*, 228 F.3d 1357 (Fed. Cir. 2000) ("[W]here an employee is hired to invent something or solve a particular problem, the property of the invention related to this effort may belong to the employer."). IDI hired Dr. Warren to work as a postdoctoral research fellow in the Rossi Lab.  Dr. Warren developed the Invention in an IDI lab, while being paid by IDI, doing exactly the type of work for which IDI hired him.  Per the precedent cited above, these circumstances strongly suggest that Dr. Warren had a common-law duty to assign the Invention to IDI.

And there is more.  Not content to rely on the common law, IDI adopted its own policy on the subject.  No one disputes that this policy was in force when Dr. Warren joined IDI in 2007.  This policy explicitly required Dr. Warren, as an "Inventor," to among other things assign his rights in the Invention to IDI.[6]  (Dkt. No. 55-3, § F).  Under Massachusetts law, such policies are generally valid and binding upon employees, even if the employees

---

[6] Drs. Warren and Rossi did not formally disclose their invention to IDI until May 2010, by which time the Children's policy had supplanted the IDI policy. Because the Children's policy imposes substantially identical obligations on inventors, *see* (Dkt. No. 55-9, p. 2), the result is the same regardless of which policy applies.

20

are not specifically aware of them.  *See Greene v. Ablon*, Civil Action No. 09-10937-DJC, 2012 WL 4104792, at \*14-\*15 (D. Mass. Sept. 17, 2012); *Grocela v. Gen. Hosp. Corp.*, Civil Action No. 11-991-BLS1, 2012 WL 3205616, at \*4-\*5 (Mass. Super. Ct. July 18, 2012).  As such, separate and apart from the common law, Dr. Warren had a legal duty to assign the Invention to IDI pursuant to the IDI policy.[7]  This remained true even after he left IDI.  *See E.I. Du Pont de Nemours & Co*. v. *Okuley*, 344 F.3d 578, 585 (6th Cir. 2003) (obligation to assign invention to employer survives "until fulfilled," even after employee's resignation).

In light of the foregoing, the court finds that Dr. Warren had a preexisting legal duty to assign the Invention to IDI when Dietz and others mistakenly referred him to the IDI policy.  As such, Dr. Warren was not thereby legally induced to execute the subsequent assignments, and there can accordingly be no promissory estoppel.

D.  *Negligent Misrepresentation*

In its previous order denying the motion for summary judgment (Dkt. No. 70), the court contemplated (without so specifying) that this case could survive summary judgment to the extent that the

---

[7] Children's separately argues that Dr. Warren incurred a legal duty to execute the subsequent assignments by executing the first assignment.  The court acknowledges but does not reach this argument.

21

complaint sets forth a claim for negligent misrepresentation based on the misrepresentations IDI officials made to Dr. Warren in 2011. On further reflection, though, the court now finds that any such claim fails for substantially the same reasons discussed above.

In order to recover for negligent misrepresentation, the plaintiff must prove that the defendant: (1) in the course of his or her business, (2) supplied false information for the guidance of others, (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and that the defendant (6) failed to exercise reasonable care or competence in obtaining or communicating the information. *DeLuca* v. *Jordan*, 57 Mass. App. Ct. 126, 136-37 (2003) (quoting Restatement (Second) of Torts § 552(1) (Am. Law Inst. 1977)).

Here, Dr. Warren cannot prove that he suffered any pecuniary loss or that he justifiably relied on the misrepresentations. Dr. Warren's theories of loss in this case are based on Children's compensating him less generously than the IDI policy provides, but the IDI policy no longer applies. In fact, Children's has heretofore provided Dr. Warren *more* generous compensation than what is set out in the controlling Children's policy. Similarly, Dr. Warren cannot have relied on the misrepresentations as a matter of law since he already had a legal duty to assign the Invention

22

to IDI.   These deficiencies are fatal to any negligent misrepresentation claim.

### E.   *Motion to Amend*

Where, as here, a defendant has filed a responsive pleading or a motion for summary judgment, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).  "The court should freely give leave when justice so requires."  *Id.*  The decision to grant or deny such a motion is within the discretion of the district court. *See Steir v. Girl Scouts of the USA*, 383 F.3d 7, 14 (1st Cir. 2004).  The court will deny a motion to amend a complaint where the proposed amendment would be futile, "mean[ing] that the complaint, as amended, would fail to state a claim upon which relief could be granted."  *Rife v. One West Bank, F.S.B.*, 873 F.3d 17, 21 (1st Cir. 2017) (internal quotation omitted); *but see Resolution Tr. Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994) (where motion to amend is not filed until after defendant moves for summary judgment, plaintiff is "required to demonstrate . . . that the proposed amendments [are] supported by substantial and convincing evidence") (internal quotation omitted).

Dr. Warren seeks to amend his complaint to add a conversion claim "based on [his] right to ownership of his share of the Moderna equity at lock-up expiry under the IDI Policy, the

defendant's willful interference with [Dr. Warren's] taking possession of stock over [Dr. Warren's] objection and the economic harm he suffered as a result." (Dkt. No. 73, ¶ 14). As set out in the proposed amended complaint, the new count is specifically based on Children's acting contrary to the terms of the IDI policy. (Dkt. No. 72-1, ¶ 70). As discussed above in detail, however, the terms of the IDI policy do not govern any revenue or equity distributions between Children's and Dr. Warren. As such, the proposed conversion claim, based as it is on the IDI policy, fails to state a claim for which relief can be granted, s*ee Rife*, 873 F.3d at 21, and it is certainly not "supported by substantial and convincing evidence." *See Gold*, 30 F.3d at 253. The proposed amendment is therefore futile.

## III.  Conclusion

For the foregoing reasons, the court VACATES its previous order denying summary judgment (Dkt. No. 70), ALLOWS Children's motion for summary judgment (Dkt. No. 51), and DENIES Dr. Warren's motion to amend (Dkt. No. 72).

So Ordered.                         /s/ Donald L. Cabell
                                    DONALD L. CABELL, U.S.M.J.

DATED:  January 20, 2023

24

APPENDIX 509

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LUIGI WARREN,

      Plaintiff,

v.

The CHILDREN'S HOSPITAL
CORPORATION,

      Defendant.

No. 17-CV-12472-DLC

JUDGMENT

CABELL, M.J.

    In accordance with the court's Memorandum and Order [Dkt. 91] issued on 1/20/23 granting defendant's motion for summary judgment, it is ORDERED:

    Judgment entered for the defendant.

                By the court,

January 20, 2023          /s/ Noreen Russo
Date                   Deputy Clerk

APPENDIX 510

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LUIGI WARREN,

       Plaintiff

vs.

THE CHILDREN'S HOSPITAL
CORPORATION,

       Defendant

Civ. A. No. 17-12472-DLC

## NOTICE OF APPEAL

Luigi Warren appeals to the United States Court of Appeals for the First Circuit from the

final judgment entered on January 20, 2023.

           Respectfully submitted,


            /s/ Luigi Warren
           Luigi Warren (Pro Se)
           155 Cordova Street, #104
           Pasadena, CA 91105
           Tel: (617) 275-1489
           luigi.warren@outlook.com

           Dated: February 14, 2023

APPENDIX 511

## **CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the NEF and paper copies will be sent to those indicated as non-registered participants on February 14, 2023.

/s/ Luigi Warren
Luigi Warren (Pro Se)

2

APPENDIX 512

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2023 I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the Court's appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system.

/s/ Luigi Warren
Luigi Warren (Pro Se)