# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

Case No. 23-1158

LUIGI WARREN,
PLAINTIFF-APPELLANT,

- v. -

THE CHILDREN'S HOSPITAL CORPORATION,
DEFENDANT-APPELLEE.

Appeal from the United States District Court

for the District of Massachusetts

Case No. 1:17-cv-12472-DLC

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

LUIGI WARREN
PLAINTIFF-APPELLANT (PRO SE)
155 CORDOVA ST., #104, PASADENA, CA 91105
TEL: (617) 275-1489

## Table of Contents

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ....................................................................................1

I. CORE ISSUES RAISED BY THE DISTRICT COURT'S OPINION ..................2

   1. Dr. Warren's key arguments against "silent substitution" are conceded. ........ 2

   2. Claiming that IDI's "right to amend" disclaimer is clear misses the point. .... 3

   3. Dr. Warren's secondary arguments against expansive reading stand. ............. 4

   4. Children's efforts to disavow contract are weak, faulty, and diversionary...... 6

   5. Any unfairness in the dealings between the parties is entirely one-sided..... 10

II. OUTSTANDING ISSUES TO BE ADDRESSED ON REMAND ....................15

   1. If Children's was in rightful possession of Dr. Warren's Moderna shares that fact would not render his conversion claim futile. ................................. 16

   2. Children's should not be permitted to drag out or derail a just resolution of this case by overcomplicating the issue of measuring damages. .............. 19

   3. Dr. Warren's amended complaint does not impose a prejudicial burden by necessitating a revamp of trial tactics or the reopening of discovery....... 23

   4. Dr. Warren's amended complaint addresses new circumstances that flowed directly from the gravamen of his original complaint....................... 25

CONCLUSION ...................................................................................26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

<u>Cases</u>

*Abington Nat'l Bank v. Ashwood Homes, Inc.*
19 Mass. App. Ct. 503, 475 N.E.2d 1230 (1985) ....................................17

*Anthony v. Jersey Central Power Light Co.*
51 N.J. Super. 139, 143 A.2d 762 (App. Div. 1958)................................8

*Cahaly v. Benistar*
68 Mass. App. Ct. 668, 864 N.E.2d 548 (2007) ......................................18

*Campbell v. General Dynamics Government Systems Corp.*
321 F. Supp. 2d 142 (D. Mass. 2004) ......................................................6

*Charest v. President & Fellows of Harvard Coll.*
2016 U.S. Dist. LEXIS 18493 (D. Mass. Feb. 16, 2016) .......................... 12, 13, 14

*Children's Hosp. Corp. v. Cakir*
2017 U.S. Dist. LEXIS 147123 (D. Mass. Sep. 12, 2017) .....................18

*Evergreen v. Six Consignments of Frozen Scallops*
4 F.3d 90, 95 (1st Cir. 1993) ...................................................................18

*Ferguson v. Host Int'l, Inc.*
53 Mass. App. Ct. 96, 757 N.E.2d 267 (2001).....................................5, 6

*Gebhard v. Royce Aluminum Corp.*
296 F.2d 17 (1st Cir. 1961) .....................................................................3

*George v. Coolidge Bank and Trust Co.*
360 Mass. 635, 277 N.E.2d 278 (1971) .............................................. 18, 20

*Jackson v. Action for Boston Cmty. Dev., Inc.*
403 Mass. 8, 525 N.E.2d 411 (1988) ................................................. 3, 6, 7

*Johnson v. Oroweat Foods Co.*
785 F.2d 503 (4th Cir. 1986)...................................................................16

*Lee v. Howard Hughes Med. Inst.*
457 F. Supp. 3d 9 (D. Mass. 2020) .........................................................4

*LeMaitre v. Mass. Tpk. Auth.*
452 Mass. 753, 897 N.E.2d 1218 (2008) ...............................................7, 8

*O'Brien v. New England Tel. & Tel. Co.*
422 Mass. 686, 664 N.E.2d 843 (1996) ......................................... 3, 4, 7

*Panto v. Moore Business Forms, Inc.*
130 N.H. 730, 547 A.2d 260 (1988) ....................................................7, 8

*Pine River State Bank v. Mettille*
333 N.W.2d 622 (Minn. 1983) .................................................................4

*Schultz v. Commodity Futures Trading Com'n*
716 F.2d 136 (2d Cir. 1983) ....................................................................21

Statutes

Mass. Gen. Laws ch. 247, § 7 ...............................................................22

Other Authorities

Restatement (Second) of Contracts § 347(a) (1981) ..............................23

Regulations

I.R.C. § 1235 ...........................................................................................24

## INTRODUCTION

This appeal is about whether Children's Hospital, successor in interest to the Immune Disease Institute (IDI), has violated an obligation to honor incentive terms for inventors spelled out in the "IDI Research and Technology Development Policy" propounded to employees throughout Dr. Warren's tenure at the Institute. Children's claims that these terms were silently substituted by reference with less generous terms pursuant to private language in an affiliation agreement it made with IDI when Dr. Warren was halfway through the inventive work which gave rise to this case. The district court hearing the case reversed itself after first finding for Dr. Warren on the Hospital's motion for summary judgment. The court held that, even if the IDI incentive scheme had contractual force, it was in any case tacitly overridden as the IDI Policy was mutable owing to "right to amend" language therein. The court also dismissed Dr. Warren's pending motion to amend his complaint to add a claim for the conversion of stock and prayer for damages on the grounds it would be futile given the court's holding that the IDI incentives were silently retired.

Dr. Warren argued in his opening brief that the only inventor incentive terms to which he assented were IDI's express terms. He maintains that the "right to amend" language in the IDI Policy did not override a reasonable employee's expectation that incentives would not be revised adversely without informing the workforce and while the Institute continued to promulgate the old, superior terms to its employees. On that

1

basis, if the express IDI Policy incentives have contractual force, IDI was bound by the terms it offered to its employees and Children's inherits those obligations. In Dr. Warren's case the infraction of contractual rights is exacerbated by the fact that he was already well advanced on the inventive work which IDI licensed to Moderna at the time that the retrospectively alleged silent substitution occurred.

The district court did not rule on the issue of whether the IDI incentive terms were contractual. In his brief, Dr. Warren argued that there is enough evidence in the record before the Court to decide the contract question and justify directing the lower court to limit proceedings on remand to the issue of computing reasonable damages to redress the injury to Dr. Warren's rights as an inventor under the IDI Policy.

## I. CORE ISSUES RAISED BY THE DISTRICT COURT'S OPINION

### 1. Dr. Warren's key arguments against "silent substitution" are conceded.

Children's has failed to rebut Dr. Warren's central arguments undermining the district court's holding that IDI's obligations to inventors, if contractual, were silently retired when IDI made a private promise to adopt the Hospital's policies. To wit:

- IDI propounded the IDI Policy to its workforce without qualification well after Dr. Warren left its employ and the Moderna license was executed. The "silent substitution" theory purporting to diminish IDI inventors' rights was only developed years later by Children's Hospital. Opening Br., 33.

2

- Nothing in the "right to amend" language of the IDI Policy puts employees on notice of anything beyond an employer's uncontroverted but qualified right to revise its current deal for at-will employees. The interpretation of offered-and-accepted terms is held to a "reasonable employee" standard.

## 2. Claiming that IDI's "right to amend" disclaimer is clear misses the point.

Children's states that Dr. Warren concedes that the IDI Policy's disclaimer—"The Trustees retain the discretion to amend this Policy from time to time to fulfill these purposes"—forewarns employees, "Be aware that we may update these policies to change your rights and duties in the future." Response Br., 22. That is correct: the language is clear and has that meaning—and nothing more. As Dr. Warren pointed out in his brief, the right to amend wages and other offered benefits adheres in the setting of at-will employment whether it is called out or not. "It must be clear that when employment is at will the employer is free to terminate and make a new proposal at any time." *Gebhard v. Royce Aluminum Corp.*, 296 F.2d 17, 18 (1st Cir. 1961). The IDI Policy's bare-bones disclaimer does not change employees' rights relative to the case where the right to amend is not expressed. This was acknowledged by the Massachusetts Supreme Judicial Court (SJC) in its *O'Brien* decision:

> The *Jackson* opinion thought significant, in support of its result, that the employer retained the right unilaterally to modify the terms of the manual because that made any offer in the manual illusory. *Id*. at 14-15. On the other hand, if an employee reasonably believed that the employer was offering to continue the employee's employment on the

3

terms stated in the manual, the employee's continuing to work after receipt of the manual would be in the nature of an acceptance of an offer of a unilateral contract (see *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626-627 [Minn. 1983]), and the promise would not be illusory.

*O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 692-693, 664 N.E.2d 843, 848 (1996).

### 3. Dr. Warren's secondary arguments against expansive reading stand.

The plain meaning of the IDI disclaimer is clear enough—on that the parties agree—and it supports Dr. Warren's position that the language changes nothing from a legal standpoint. In his brief, Dr. Warren brought forward additional grounds drawn from Massachusetts precedent which argue against allowing the Hospital any leeway to develop its own expansive interpretation of the IDI's words. Children's brief tries to chip away at these secondary arguments, but the results are unconvincing.

The first point at issue is the teaching that, to promote "basic honesty" and avoid rewarding attempts by employers to "have their cake and eat it," employee handbooks should call special attention to provisions tending to undercut explicit, detailed and apparently promissory language on rights and benefits. This can be achieved by the conspicuous placement of disclaimers, the use of special typography or callout boxes, the solicitation of employee acknowledgement as to the import and comprehension of disclaiming language, and—as in the example of *Lee v. Howard Hughes Med. Inst.*,

457 F. Supp. 3d 9, 12-13 (D. Mass. 2020) cited by Dr. Warren—by the use of specific, emphatic and unambiguous disclaimers. Opening Br., 25-27.

Children's takes issue with a straw man in claiming that Dr. Warren suggested that IDI's "right to amend" language was "buried in fine print" because it appears at the foot of the "Purpose" section right after the IDI Policy's opening "Preamble." Response Br., 22. But the relevant phrase from the *Ferguson v. Host Intl* decision is the "functional equivalent of fine print," and there is a strong argument that IDI's disclaimer qualifies as exactly that:

> The two clauses in the Host employee manual properly could be viewed by the fact finder as the functional equivalent of fine print. They appear buried in the general, introductory portion of the manual, in a section not as likely to attract the employees' attention as the very specific lists of obligations and benefits set out in the bulk of the manual.

*Ferguson v. Host Int'l, Inc.,* 53 Mass. App. Ct. 96, 103, 757 N.E.2d 267, 272 (2001).

Children's tries to create a bright-line distinction between handbook language disclaiming contractual force and language reserving a right to amend, saying that Dr. Warren has failed to cite a precedent which calls for special emphasis on any reservation of the right of modification. Response Br., 22-25. Taken in context, this is a distinction without a difference. Management's right to amend its offered terms is uncontroverted in the at-will employment setting. The question in this case is whether calling out that inherent right serves as a catch-all that negates reasonable

5

employee expectations concerning the norms of fair dealing (e.g., no retrospective clawback of rights and no adverse changes to offered benefits without informing the workforce.) The "basic honesty" reasoning of *Ferguson* applies just as well where low-profile "right to amend" language is invoked in support of an employer's "having its cake and eating it" by violating such expectations.

In the same vein, citing *Campbell v. General Dynamics Government Systems Corp.*, 321 F. Supp. 2d 142, 149 (D. Mass. 2004), Dr. Warren pointed to the doctrine of *contra proferentum*, which applies to any type of contractual provision, as another reason not to give Children's the benefit of the doubt as regards the import of IDI's disclaimer. Opening Br., 27. Children's does not seriously engage this argument.

### 4. Children's efforts to disavow contract are weak, faulty, and diversionary.

In his brief Dr. Warren listed twelve points in favor of finding contractual obligation in the IDI Policy's offered incentive terms—including the special attention drawn to the Policy and the royalty-sharing incentives therein, IDI's requirement for manifest assent to the Policy, its wide dissemination to employees, the inclusion of terms that are clearly meant to be legally enforceable, the Policy's mandatory and legalistic language, the avowed intent to induce behaviors accruing to the economic benefit of the employer, and the absence of any conflict with at-will employment doctrine. Opening Br., 39-42. Children's attempts to deny the contractual status of the IDI's incentives, once again relying heavily on the "*Jackson* factors" approach

whose misuse was derogated by the SJC in *O'Brien*. Response Br., 28-32. *Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 14-15, 525 N.E.2d 411, 415-16 (1988). *O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 691-94, 664 N.E.2d 843, 847-49 (1996).

The Court can weigh the parties' marshaled arguments for and against a finding of contract on the merits. Dr. Warren here addresses several specific points in the Hospital's treatment of the contract issue that warrant correction or rebuttal:

A. Children's completely misstates the meaning of the language it excerpts from *LeMaitre v. Mass. Tpk. Auth.*, 452 Mass. 753, 754, 897 N.E.2d 1218, 1219 (2008), claiming that it says that courts find it easier to ascribe contractual obligation to handbook terms promising job security than to terms promising monetary benefits. Response Br., 30-31. The correct reading is the opposite—i.e., only job security-related provisions present special difficulties in the setting of at-will employment—as was explained in Dr. Warren's brief. Opening Br., 37-38. See also Justice David Souter's treatment of this issue in *Panto v. Moore Business Forms, Inc.*, 130 N.H. 730, 737-39, 547 A.2d 260, 265-67 (1988). The Hospital seeks to apply reasoning from cases that deny a right to continued employment to at-will employees to a setting where very different considerations apply.

7

B. Children's claims that it does not matter that Dr. Warren was not notified of alleged changes to IDI's inventor incentives that its lawyers purportedly discovered years later as he cannot prove that he was formally notified by reading the IDI Policy in the first place. Response Br., 28. Dr. Warren replies that IDI obligated itself to honor its express incentives because the terms were firmly and authoritatively noticed to the workforce, as he detailed in his opening brief. The terms were not substituted by reference with Children's inferior terms at any time relevant to this case since there was no retirement of the IDI's incentive terms or notice to the workforce of such a maneuver of any kind, firm or otherwise, authoritative or otherwise. See *Panto v. Moore Business Forms, Inc.*, 130 N.H. 730, 741-42, 547 A.2d 260, 268 (1988) and *Anthony v. Jersey Central Power Light Co.,* 51 N.J. Super. 139, 145-46, 143 A.2d 762, 765-66 (App. Div. 1958) for persuasive authority on the applicability of objective standards to contract formation in the setting of at-will employment.

C. Dr. Warren defers to the discussion in his opening brief as to the fact that his inventive work was well underway at the time of the alleged silent change to inventor incentives, raising an issue of retroactive detrimental effect analogous to that involved in *LeMaitre*. Opening Br., 28-30. He points out that the *LeMaitre* case does not hinge on a technical "vesting"

8

issue—the question was only whether corporate bean-counters' employer-friendly interpretation of handbook terms breached contract by violating a reasonable employee's expectation of plain dealing. Similarly, contrary to Children's argument (Response Br., 26-28), no vesting process to establish royalty rights is entailed by the IDI Policy. It only promises that if IDI profits from the licensing of an invention, those profits will be shared with inventors. The "retroactive effect" aspect the two cases share is the inducement of actions and forbearances under incentive terms subsequently unilaterally reinterpreted to the detriment of the offeree.

D. Children's raises a tenuous argument regarding the purported divisibility of the IDI Policy and the Participation Agreement (PA). Response Br., 32-33. It now claims that, even if the evidence tends to show that Dr. Warren signed the PA, this does not prove that Dr. Warren ever saw the IDI Policy. But, in fact, the PA is incorporated as an annex to the IDI Policy and is consecutively paginated with the body of the Policy. Addendum, 39-41. The PA is premised on the IDI Policy and seeks employee affirmation—in the first paragraph and then right above the signature line—that the new hire has reviewed the IDI Policy and has understood the royalty-sharing terms detailed therein. The PA does not point to a copy of the IDI Policy on the intranet or anywhere else, which suggests it was attached to the

Policy or the Policy was physically presented at the time of signing. The IDI's draft complaint against Dr. Warren states that the IDI Policy—not just the PA—is presented to employees at their Orientation. Appendix, 283 at ¶¶ 14-15. This was also stated by Ryan Dietz in his deposition testimony. Appendix, 231 at 65:18-20. Dr. Warren's view is that the issue is tangential to deciding this case as the totality of the evidence makes it clear the inventor incentives detailed in the IDI Policy were sufficiently firmly and authoritatively offered to the workforce to bind IDI. In the alternative, if the Court finds this to be an important question, Dr. Warren should have the right to explore the facts of the matter at trial.

## 5. Any unfairness in the dealings between the parties is entirely one-sided.

Dr. Warren was right to insist on transparency in the dispute with IDI over the second assignment in 2011. Any insinuation his stance was unreasonable (Response Br., 10) should not color the evaluation of this case. The concerns behind Dr. Warren's reluctance to sign without getting his rights in writing are outside the record. In retrospect, though, his caution was fully justified. Indeed, had Dr. Warren been more insistent on his "trust but verify" stand in the spring of 2011 it seems likely that the current litigation would have been unnecessary, and Dr. Warren would now be enjoying the fruits of the original IDI Policy.

Once the Moderna license was a "done deal," IDI and Children's Hospital revealed a strong disinclination to share information regarding the deal and their obligations to Dr. Warren as an inventor, undermining his ability to ensure that his IDI inventor's incentives were honored:

A. They did not proactively disclose to Dr. Warren the fact that his inventive work had been licensed to Moderna in December 2010. Appendix, 252.

B. They imposed preconditions on revealing even basic information such as the fact they had taken Moderna stock—pertinent to Dr. Warren's policing of his rights under the equity provisions of the IDI Policy. Appendix, 253.

C. They violated both institutions' policies on the ethical handling of equity by failing to publicly disclose they had taken Moderna stock for the license until at least 2017, even though a member of Children's senior management (Prof. Robert Langer) accepted Moderna stock worth well over a hundred million dollars at the IPO. Appendix, 347-48 at ¶¶ 19-26.

D. They initially refused to turn over the full text of the IDI Policy, describing all Dr. Warren's rights including those involving equity. Appendix, 264.

E. They threatened to sue Dr. Warren, sending him a draft complaint which could have been filed at any time. The complaint claimed the IDI Policy was a contract and controlled his rights to a share of licensing proceeds.

Children's would later go on to claim it was not a contract and made no specific promises to Dr. Warren. Appendix, 278-89. Response Br., 28-36.

F.  They failed to notify Dr. Warren they were applying a different royalty-sharing policy to the one they had threatened to sue him over when his distributions began in 2015—one which would significantly reduce his share of Moderna equity royalties. Appendix, 349 at ¶ 30.

G.  They indicated at the motion for summary judgment hearing that they planned a prompt sell-off of all their Moderna equity at lock-up expiry, but in fact did a phased liquidation over months, predicated on concerns that would not have applied to Dr. Warren had the stock been distributed to him as per the IDI Policy. Appendix, 401 at 50:5-12, 476-78.

H.  During this case information relevant to understanding Dr. Warren's rights was disclosed reluctantly or not all, including the Moderna agreement's royalty terms and the prices at which shares were sold upon liquidation. Appendix, 4-5 (docket entries 30, 32, 33, 36, 38, 40, 48), 476-85.

Children's takes up at length *Charest v. President & Fellows of Harvard Coll.,* 2016 U.S. Dist. LEXIS 18493 (D. Mass. Feb. 16, 2016), touched on only briefly in Dr. Warren's opening brief. Response Br., 33-36. It seems very keen to distinguish *Charest* from the instant case, perhaps because it suggests a propensity for academic licensors to abuse and short-change early-career employee inventors. The *Charest*

case concerns claims by a former Harvard graduate student that his royalty-sharing percentage on a billion-dollar invention license was unfairly squeezed owing to the machinations of his former PhD advisor, technology licensing officials and other Harvard administrators. The litigation ultimately led to an out-of-court settlement.[1] Dr. Warren cited the *Charest* decision on a defense motion to dismiss regarding two points: (a) its discussion of the inequality between parties and scope for liberty-taking in the relationship between inventors and academic employers under such royalty-sharing arrangements and (b) the finding that a Harvard inventions policy similar to the IDI Policy was contractual. Opening Br., 28, 41.

The Hospital acknowledges that "[t]he *Charest* court did hold that Charest had adequately pleaded that Harvard's IP Policy was a contract." Response Br., 35. Nonetheless, it claims that *Charest* is "far removed from this case and has limited value." Response Br., 36. Children's make much of the fact that the parties' dispute revolved around unfairness in the determination of the split between co-inventors whereas—it is at pains to emphasize—the Hospital's ad hoc policy goes out of its way to be fair by allotting Dr. Warren and Prof. Rossi equal shares. Response Br., 34-

---

[1] Brandon J. Dixon, *Former Ph.D. Student Reaches Settlement with Harvard in Lawsuit over Royalties,* Harvard Crimson, July 29, 2016.
URL: https://www.thecrimson.com/article/2016/7/29/phd-harvard-lawsuit-settlement/

35. This is a red herring argument. The IDI Policy prescribed an equal split between Warren and Rossi, and while the default Children's Policy split favors Rossi owing to his being a Children's employee, in practice the difference is negligible here as the inequality does not apply to equity-based royalties. More importantly, Dr. Warren has never raised an issue over the split with Prof. Rossi—his only concern is that he receives his just deserts under the IDI Policy. Appendix, 349-50 at ¶ 33-35.

*Charest* underscores the pitfalls of being overly trusting in a setting that involves big money, minimal transparency, and a high degree of bureaucratic discretion. Dr. Warren does not allege the level of skullduggery described in Dr. Charest's complaint. His case resembles textbook opportunistic breach—it looks as if his contractual rights as an out-of-sight, out-of-mind former IDI employee were collateral damage in a high-stakes intramural conflict over the IDI Policy's disappearing lab share. Opening Br., 14. Still, it seems worthy of note that the director of Children's invention licensing office at the time Dr. Warren was threatened with a lawsuit was Dr. Erik Halvorsen. Opening Br., 10. Dr. Halvorsen was credibly accused of using extortion tactics against Dr. Charest in 2006 in his role as director of business development at Harvard's Office of Technology Development. See C*harest* at *14-16. According to the trade press, Dr. Halvorsen was dismissed from a subsequent job as director of Texas Medical Center's Innovation Institute in 2018 over a pattern of unprofessional

14

conduct.[2] On that basis, Dr. Warren can hardly be blamed for "watching his back" during the second assignment imbroglio of 2011.

## II. OUTSTANDING ISSUES TO BE ADDRESSED ON REMAND

The district court's dismissal of Dr. Warren's motion to file a first amended complaint is predicated on the court's finding that the IDI Policy's incentive terms were silently retired. Opening Br., 43-45, Addendum 23-24. On that basis, the dismissal should be vacated if the Court rules that the finding is erroneous. Children's raises additional issues with Dr. Warren's motion which were not addressed by the district court's decision. Response Br., 36-40. Litigation of these issues on remand could add significant time, complexity, and cost to the resolution of the case. Given this relatively uncomplicated matter has been at the pre-trial stage for over five years and the Court has discretion to guide or direct the lower court as to the outstanding issues, Dr. Warren now takes up these questions.

Children's proposes that if the case is remanded, instead of reversing the court's dismissal of Dr. Warren's motion to amend, the Court should vacate and remand for further consideration of its arguments in opposition to the motion to amend. It alleges

---

[2] Arundhati Parmar, *Exclusive: Erik Halvorsen out at TMC Innovation Institute. Reports are that he was fired*, MedCity News, December 18, 2018.
URL: https://medcitynews.com/2018/12/exclusive-erik-halvorsen-out-at-tmc-innovation-institute-reports-are-that-he-was-fired/

that: (a) Dr. Warren's new conversion claim is futile because the Hospital was in rightful possession of the Moderna shares; (b) his prayer for damages is futile because it is impossible to predict stock prices so any computation involving lost profits is hopelessly speculative; (c) allowing the amended complaint would be prejudicial because it would require the Hospital to reassess its trial tactics and explore new legal theories to minimize its liability, potentially necessitating the reopening of discovery; and (d) the motion for amendment is procedurally improper as it relates to events that occurred after the filing of Dr. Warren's complaint.

In response, Dr. Warren asserts that these arguments are each fallacious and without merit and represent a continuation of Children's longstanding practice of stalling and pragmatically shifting position (the IDI Policy applies, it doesn't apply— it is a contract, it is not a contract—equity could not be distributed early, it could be distributed early) to avoid honoring promises IDI made to its employee inventors before merging into the Hospital.

## 1.  If Children's was in rightful possession of Dr. Warren's Moderna shares that fact would not render his conversion claim futile.

The Hospital's argument that the new conversion claim is futile (Response Br., 39) is a deflection because it requires evaluation of the claim on its merits. This is not the standard for determining futility. An amendment is only futile "when the proposed amendment is clearly insufficient or frivolous on its face." *Johnson v. Oroweat Foods*

*Co.*, 785 F.2d 503, 510 (4th Cir. 1986) (citations omitted). Children's asserts that conversion claim must fail as the Hospital was in rightful possession of the Moderna stock, citing *Abington Nat'l Bank v. Ashwood Homes, Inc.*, 19 Mass. App. Ct. 503, 507, 475 N.E.2d 1230, 1232-33 (1985). Yet the *Abington* opinion affirms that "[o]ne who intentionally or wrongfully exercises acts of ownership, control or dominion over personal property to which he has no right of possession at the time is liable for the tort of conversion," and acknowledges that possession which is not wrongful can become a conversion upon a demand and refusal to relinquish to another party. *Abington* at 506-07, 475 N.E.2d 1232-33.

Dr. Warren's suit for declaratory and injunctive relief of December 2017 (ECF 1) constituted a standing demand for the transfer of his share of Moderna equity to his ownership and control at the earliest opportunity based on his superior claim of right under the IDI Policy. In turn, the "Demand for Relief" in Children's Hospital's "Answer and Counterclaim" of February 14, 2018 constitutes its refusal to honor the IDI's promise to distribute stock to inventors: "In the alternative, if the CBRI [IDI] Policy governs, BCH demands judgment declaring that Warren is entitled to a percentage of the proceeds of any sale of Moderna stock but not to distribution of Moderna shares in kind." ECF 17 at 6.

While the tort of conversion was once limited to tangible property, its scope has become broader as the law has evolved. Stock and funds deposited in an investment

account are subject to conversion under Massachusetts law. *George v. Coolidge Bank and Trust Co.*, 360 Mass. 635, 641, 277 N.E.2d 278, 283 (1971). *Cahaly v. Benistar*, 68 Mass. App. Ct. 668, 670, 679-80, 864 N.E.2d 548, 552-53, 559 (2007). The Massachusetts District Court recently upheld claims of conversion and replevin on digital copies of deleted files once encoded on a laptop's hard drive. *Children's Hosp. Corp. v. Cakir*, 2017 U.S. Dist. LEXIS 147123 (D. Mass. Sep. 12, 2017) at *7-17.

Dr. Warren's claim of conversion meets the four-point test for the tort which applies in Massachusetts:[3]

> A plaintiff asserting a conversion claim under Massachusetts law must show that: (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

> *Evergreen v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993)

(citations omitted).

---

[3] See also *Conversion* (publication date December 12, 2022) on the Massachusetts Superior Court Model Jury Instructions web page.

Website URL: https://www.mass.gov/guides/superior-court-model-jury-instructions

Document URL: https://www.mass.gov/doc/superior-court-model-civil-jury-instructions-conversion-pdf/download

There is no genuine issue of material fact as to the existence of a conversion if the IDI Policy's terms obligate the Hospital. Thus, there is a strong prima facie case for the Hospital's conversion of Dr. Warren's stock at the time Children's refused his demand in its "Answer and Counterclaim" or as soon as any relevant statutory or contractual impediments to its transfer lapsed thereafter.

**2. Children's should not be permitted to drag out or derail a just resolution of this case by overcomplicating the issue of measuring damages.**

On the face of the matter, Dr. Warren's prayer for damages in his proposed first amended complaint was plainly appropriate and not futile as Children's recent actions had caused actual economic injury to Dr. Warren for the first time, flowing from the disavowal of the IDI Policy's superior inventor share when distributing the equity proceeds. With respect to the component of the economic injury which flowed from the Hospital's refusal to distribute stock and insistence on controlling the liquidation of Dr. Warren's shares, the prayer for damages does not rely on some excessively speculative theory concerning his ability to time the market and maximize his profits. This premise is false and does not appear in Dr. Warren's prayer for relief.

To the contrary, the damages estimate entailed under Dr. Warren's amended complaint is reasonable, grounded in objective criteria (the expiration of lock-up restrictions and the price of the stock at that time), and comports with Massachusetts' standard rule for computing contract damages for non-delivery of stock based on its

value at the time of breach or failure to deliver. *George v. Coolidge Bank and Trust Co.*, 360 Mass. 635, 641, 277 N.E.2d 278, 283 (1971).[4]  It eschews any of the variations courts have at times crafted in an attempt to compensate injured parties for denied opportunities to profit on undelivered or converted stock—and is therefore if anything too generous to the breaching party.

In further considering the question of damages for the non-delivery of stock in this case, it will be helpful to have the stock price of Moderna at certain key dates to hand (**Table 1**). This historical data is readily available on the NASDAQ website.[5]

| Date | Event | Opening Price |
|---|---|---|
| 12/07/2018 | Initial Public Offering | $22.00 |
| 06/05/2019 | Expiration of Lock-up | $19.20 |
| 12/23/2019 | Phased Liquidation Payout to Dr. Warren | $19.79 |
| 08/10/2021 | Historical Peak to Date | $485.50 |
| 07/19/2023 | Time of Writing | $123.49 |

**Table 1: Moderna NASDAQ Share Prices**

---

[4] See also "Failure to Deliver Stock" at p. 9 of *Contract Damages and Other Special Contract Issues* (publication date August 9, 2021) on the Massachusetts Superior Court Model Jury Instructions web page.

Website URL: https://www.mass.gov/guides/superior-court-model-jury-instructions
Document URL: https://www.mass.gov/doc/superior-court-model-civil-jury-instructions-contract-damages-and-other-special-contract-issues-pdf/download

[5] URL: https://www.nasdaq.com/market-activity/stocks/mrna/historical

In Massachusetts the standard measure of damages for a conversion of stock or breach of contract to deliver stock is the fair market value at the time of conversion or failure to deliver, with interest. *Id*. Assuming the Moderna shares could not be transferred until the lock-up expired, the share price at lock-up expiry affords a non-speculative, objective, and reasonable basis for computing damages under both the breach of contract and conversion claims of Dr. Warren's amended complaint.[6]

A computation of damages based on the lock-up expiry price is over-generous to the wrongdoer in this case, at least in principle. Dr. Warren was deprived of the chance to speculate with his Moderna stake that he would have enjoyed under the IDI Policy's terms. His mitigation option after being notified of Children's refusal to deliver stock of "covering" by entering the market at the IPO was unrealistic and would have entailed paying a higher price for the shares. See *Schultz v. Commodity Futures Trading Com'n*, 716 F.2d 136, 139-41 (2d Cir. 1983). Were Dr. Warren to

---

[6] The amended complaint estimates the market value of Dr. Warren's shares at lock-up expiry at $6.2M, as compared to Children's payout of $3.7M. Appendix, 451 at ¶ 49, ¶ 51. For the record, this estimate was calculated based on IDI's possession of 472,966 common units of Moderna LLC, as per its equity certificate of October 7, 2013 (Appendix, 316), the 1:9.9935 common units to common stock conversion at Moderna's 2016 Reorganization and 1-for-2.18 pre-IPO reverse split of common stock documented in its December 4, 2018 S-1/A SEC filing, an uncontested 10% taken "off the top" by agreement with the Harvard Stem Cell Institute in return for funding support of the mRNA work, Dr. Warren's IDI Policy-prescribed inventor's share of one-half of one-third of equity received by the Institute, and the NASDAQ MRNA opening price of $19.20 on June 5, 2019, the lock-up release date.

claim replevin of his shares, or even just those whose value is still being denied him as a consequence of his percentage haircut, Children's liability could be significantly higher than under the lock-up expiry calculation because of the tremendous increases in Moderna share prices that occurred as a result of its COVID-19 vaccine sales.[7]

Children's brief also conjures a scenario where, to minimize liability due to not turning over stock as directed by the IDI Policy, it might change litigation tactics and offer a new theory of the case under which stock might have been transferred to Dr. Warren at an early time point. Response Br., 38. Presumably, this would be premised on the idea of an ad hoc arrangement with Moderna or its IPO underwriters.

Even if Children's can show that it could have distributed shares early after all, Dr. Warren would still not have been able to sell them until the lock-up ended, which makes a strong prima facie case that the lock-up expiry price is the appropriate basis for calculating damages. Perhaps Children's is intimating that it could bring in experts to "model" the fair market value of completely illiquid early-stage startup company stock to support a trial position attributing a low value to Dr. Warren's equity to minimize its liability. This flies in the face of the precept that an award of damages

---

[7] The elements of replevin are satisfied under Massachusetts law where: (1) the goods in question have a value greater than twenty dollars; (2) the goods are unlawfully taken or detained; and (3) the owner or person entitled to possession is deprived of the goods. Mass. Gen. Laws ch. 247, § 7.

should seek to put the injured party in the position they would have been in if the offending party had not breached. Restatement (Second) of Contracts § 347(a) (1981). Such a theory of damages would also be unjust and should therefore be precluded because Dr. Warren could never have had any intent to voluntarily liquidate his Moderna stock before an IPO as it would have been impossible for him to do so.

In light of these considerations, Children's floating of a trial argument premised on a possible early delivery of the shares should be discounted by the Court. It is simply another ploy to distract from the real issues at hand and draw out the litigation in hopes of avoiding a judgment on the merits of the case.

### 3. Dr. Warren's amended complaint does not impose a prejudicial burden by necessitating a revamp of trial tactics or the reopening of discovery.

Regarding Children's claim that the prayer for damages is prejudicial as it could dictate a revamping of trial strategy and motivate bringing in experts to develop a new theory that stock could have been transferred early to minimize damages, the arguments above on the appropriate basis to compute damages would still stand, so a revamp would be pointless. There is no foundation outside of speculation for the proposition that bringing in experts at this stage could undermine the reasonable and customary damages computation entailed by Dr. Warren's amended complaint.

The Hospital also suggests that allowing Dr. Warren's motion to amend would be prejudicial as it would require the reopening of discovery. Dr. Warren responds

that the Hospital already had the opportunity to argue its case for discovery on Dr. Warren's finances, taxes, and investment history, agreed to limit that inquiry to the question of whether he qualified as an accredited investor in the relevant time frame (which was asked and answered in interrogatories) and that there are no new material issues requiring discovery raised by the amended complaint.

Dr. Warren's 2017 complaint (ECF 1) did raise the issue of tax treatment-related economic injury due to the loss of preferential long-term capital gains treatment on stock appreciation resulting from the failure to distribute equity. However, the amended complaint does not raise this issue.[8] Again, Children's brief suggests that Dr. Warren's prayer for damages might motivate it to revive the idea of an early transfer to minimize its liability, although the amended complaint expressly assumes transfer was only possible at the expiration of lock-up. Appendix, 453 at ¶ 66. As discussed above, there is no non-speculative basis for holding that an early-transfer theory or new discovery could change the appropriate damage computation under the proposed amended complaint.

_____

[8] Dr. Warren dropped the tax-related damages issue because in the course of the litigation it emerged that: (a) it was unlikely that Moderna stock could have been transferred to him early, establishing a low tax basis and (b) it appears his Moderna distribution payments should qualify for long-term capital gains treatment under I.R.C. § 1235, despite the fact that Children's 1099-MISC forms report them as "Royalties," which are typically taxed as ordinary income.

**4. Dr. Warren's amended complaint addresses new circumstances that flowed directly from the gravamen of his original complaint.**

Dr. Warren demanded that Children's honor the IDI Policy's express terms on his percentage and right to manage his own stock by filing his original complaint (ECF 1); the Hospital refused to do so in its Answer and Counterclaim (ECF 17) and then proceeded to enact its refusal after the Moderna IPO while the case was still being litigated. The new events and circumstances cited in the amended complaint (ECF 72-1) are integral to the existing record—the Hospital did what Dr. Warren originally complained of and what it said it was going to do, i.e., abrogate IDI Policy's express terms for the sharing of royalties from the Moderna license. As a result, a court order compelling prompt distribution of the appropriate percentage of Dr. Warren's stock became moot, necessitating an alternative remedy for Children's wrongdoing, which the new prayer for damages addresses. Children's standing refusal to distribute stock, effected by its Answer and Counterclaim and its retention of Dr. Warren's stock after the shares came out of lock-up, fulfilled the legal criteria for conversion, the new tort claim in the amended complaint. Stated differently, any new matters referred to in Dr. Warren's proposed first amended complaint were already "baked in the cake" at the outset of the action.

## CONCLUSION

As he argued in his opening brief, Dr. Warren believes the evidence before the Court is sufficient for it to rule on the facts and the law that the IDI Policy's express incentives regulate Dr. Warren's contractual rights as an inventor in this case. He asks the Court to vacate the district court's judgment and instruct the lower court to focus any further proceedings on remand towards an expeditious accounting of the exact damages and interest payable to Dr. Warren using the objective, straightforward, reasonable, and customary approach described above.

Respectfully submitted,

/s/ Luigi Warren
Luigi Warren (Pro Se)
155 Cordova St., #104
Pasadena, CA 91105
Tel: (617) 275-1489
luigi.warren@outlook.com

Dated: July 19, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that the foregoing Reply Brief:

(1) complies with Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface (14-point Times New Roman font); and

(2) complies with Federal Rule of Appellate Procedure 32(a)(7)(b) because it contains 6251 words excluding those parts of a brief listed in Federal Rule of Appellate Procedure 32(f).

/s/ Luigi Warren
Luigi Warren (Pro Se)

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2023 I electronically filed the foregoing

document with the Clerk of the Court for the United States Court of Appeals for the

First Circuit by using the Court's appellate CM/ECF system, and that service will be

accomplished by the appellate CM/ECF system.

/s/ Luigi Warren
Luigi Warren (Pro Se)