**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

No. 23-1158

LUIGI WARREN,

Plaintiff, Appellant,

v.

THE CHILDREN'S HOSPITAL CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Donald L. Cabell, U.S. Magistrate Judge]

Before

Gelpí, Kayatta, and Montecalvo,
Circuit Judges.

Luigi Warren, pro se.
Theodore J. Folkman and Rubin and Rudman, LLP on brief for appellee.

September 8, 2026

**PER CURIAM**. This appeal concerns the royalties owed to Dr. Luigi Warren, the co-inventor of a significant advance in the field of mRNA reprogramming that was subsequently licensed to biotechnology company Moderna. The district court granted summary judgment to defendant The Children's Hospital Corporation ("Children's Hospital") and denied as futile Dr. Warren's motion to amend his complaint. For the reasons that follow, we vacate the award of summary judgment as to Dr. Warren's breach of contract claim and remand to the district court.

**I.**

From 2008 to 2010, while employed by the Immune Disease Institute (IDI),[1] Dr. Warren invented a method for safely reprogramming skin cells into stem cells using synthetic mRNA. At the time, IDI had a royalty-sharing policy that granted one-third of licensing revenue to the inventors of licensed technology and called for the inventor's share of any equity received in exchange for licensing rights to be promptly distributed to the inventor (the "IDI policy"). The IDI policy also provided that IDI's trustees "retain the discretion to amend this Policy from time to time to fulfill [its] purposes."[2]

---

[1] At the time of Dr. Warren's employment, "IDI was an independent, Harvard-affiliated research institution" on the Harvard Medical School campus.

[2] The stated purposes of the IDI policy are to: (1) "benefit the public by facilitating commercial development and utilization of inventions, discoveries and other [t]echnology," (2) "encourage

After Dr. Warren's invention, but before that invention was licensed to Moderna in late 2010, IDI and Children's Hospital executed an Affiliation Agreement in anticipation of an eventual merger. In that Agreement, the parties agreed to apply Children's Hospital's royalty-sharing policy (the "Children's Hospital policy") rather than IDI's to any intellectual property that had not yet been licensed as of the Agreement's effective date of February 20, 2009 -- even if that intellectual property had already been invented. The Children's Hospital policy allocated a different percentage of royalties to inventors and dictated a different treatment of equity than the IDI policy. For example, under the Children's Hospital policy, Children's Hospital would pay an inventor who is no longer employed by Children's Hospital 35% of licensing proceeds "up to" $500,000, then 25% of proceeds "above" $500,000.

---

the creativity and innovation of current staff, and encourage the recruitment and retention of talented and innovative staff," (3) "provide incentive to researchers to be productive and recognize individual accomplishment," (4) "foster scholarly pursuits and principles of academic freedom," (5) "encourage researchers to disclose discoveries in a timely manner in order to protect the intellectual property interests of IDI," (6) "provide guidelines for negotiating, preparing and implementing contracts with outside sponsors, collaborators and licensees," (7) "provide for equitable allocation of responsibilities and financial rewards among inventors, researchers, IDI and any other entity" involved in inventions, discoveries, or technology, and (8) "provide support for IDI's mission of excellence in clinical care, teaching and research."

In 2011, after Dr. Warren had left IDI's employ and assigned his "entire right, title, and interest" in his invention to the company in 2010, IDI employee Ryan Dietz contacted him seeking a second assignment of the same invention. When Dr. Warren asked for the document that required him to make such an assignment, Dietz sent him an excerpt from the IDI policy. When Dr. Warren asked for the relevant policy governing royalties, Dietz again responded with an excerpt from the IDI policy. And when Dr. Warren refused to complete the second assignment, General Counsel for Children's Hospital sent him the full IDI policy and told him he was obligated to execute the assignment. Simultaneously, Children's Hospital's outside counsel threatened to sue Dr. Warren, alleging he had violated his obligations under the IDI policy and attaching a draft complaint asserting a claim for breach of contract, namely, breach of the IDI policy. Shortly thereafter, Dr. Warren executed the second assignment.[3]

Fast forward six years to 2017: With rumors of an initial public offering from Moderna swirling, Dr. Warren -- wondering whether the Moderna licensing agreement for his invention had included equity -- called Dietz, now a Children's Hospital employee, to ask about that licensing agreement. At that point, Dietz informed Dr. Warren, seemingly

[3] The record reflects that Dr. Warren actually executed two assignments in 2011 but is not clear as to why.

for the first time, that the repeated references to the IDI policy in 2011 were in error, and that the Children's Hospital policy -- not IDI's -- governed his royalties and equity in the licensing deal to Moderna. The Children's Hospital policy entitled Dr. Warren to a lesser share of royalties and directed a different, and in Dr. Warren's view, less favorable, treatment of equity than the IDI policy. Displeased, Dr. Warren sued Children's Hospital as IDI's successor in interest.[4] Proceeding pro se, he asserted claims of breach of contract and promissory estoppel, arguing that the IDI policy applies to his invention.

In due course, Children's Hospital moved for summary judgment. The court initially denied that motion without a written order in 2019. When Dr. Warren later learned that Children's Hospital had sold equity in Moderna it had received as part of the licensing agreement and distributed the proceeds to Dr. Warren rather than distributing the equity itself, he moved to amend his complaint to add a cause of action for conversion. But then the court issued a written memorandum and order vacating its prior order, granting Children's Hospital's motion for summary judgment on all claims, and denying as futile Dr. Warren's motion to amend.[5]

---

[4] IDI dissolved in 2012 and merged into Children's Hospital.

[5] In addition to Dr. Warren's claims of breach of contract and promissory estoppel, the court also granted summary judgment to Children's Hospital on a "possible negligent misrepresentation claim."

In so doing, the court held that, even assuming the IDI policy was a binding contract, IDI had exercised its right under that contract to unilaterally amend the policy when it executed the Affiliation Agreement with Children's Hospital; accordingly, the Children's Hospital policy governed the royalties and equity to which Dr. Warren was entitled.[6] The court characterized Dietz's misrepresentations in 2011 as "regrettable" but ultimately legally immaterial. Dr. Warren timely appealed, again proceeding pro se.

**II.**

We review a grant of summary judgment de novo. Salmon v. Lang, 57 F.4th 296, 308 (1st Cir. 2022). Summary judgment is only warranted if "the record shows 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)). "A dispute is 'genuine' if 'a jury can reasonably interpret the evidence in the non-movant's favor,' and a fact is 'material' if it is 'one that might affect the outcome of the suit under governing law.'" Id. at 308 n.6 (quoting Reyes-Orta v. P.R. Highway & Transp. Auth., 811 F.3d 67, 73 (1st Cir. 2016)). In assessing a summary judgment motion, we "evaluate the facts and draw all reasonable inferences from the record in the light most

[6] Dr. Warren only alleges that Children's Hospital breached the IDI policy, not the Children's Hospital policy or any other relevant contract.

favorable to the nonmoving party, but disregard any conclusory allegations, improbable inferences, and unsupported speculation." Id. (citation modified).

Although Dr. Warren's brief is not explicit on this score, it appears that he is challenging the district court's rulings only as to his breach of contract claim and his motion to amend his complaint. His arguments are premised on the notion that the IDI policy's royalty provision was an enforceable contractual obligation that Children's Hospital could not retroactively disavow. And he frames his arguments in response to the two breach-related issues raised by the district court: namely, whether the IDI policy's royalty provision was a contractual obligation and, if so, whether IDI could amend that obligation retroactively.

**A.**

We begin with the initial question of whether the IDI policy's royalty provision was a term of an implied contract governing Dr. Warren's employment at IDI. The district court bypassed this question, which under Massachusetts law has several factual components.[7] The court reasoned that, even if the royalty

[7] As the parties both rely on Massachusetts law in their briefs, "we accept" their implicit, "reasonable agreement" that Massachusetts law controls this diversity case. Klauber v. VMware, Inc., 80 F.4th 1, 10 (1st Cir. 2023); see also In re Newport Plaza Assocs., L.P., 985 F.2d 640, 644 (1st Cir. 1993) ("When opposing parties agree to the source of the substantive law that controls

provision were an implied contractual term, IDI had exercised its right to amend that term when it entered into the Affiliation Agreement with Children's Hospital. Children's Hospital urges this court to affirm on the alternative basis that the IDI policy's royalty provision was not an implied contractual term. On the summary judgment record, however, we think that a reasonable jury could make contrary findings on the factual issues surrounding contract formation.

Under Massachusetts law, the terms of an employee handbook, personnel manual, or the like can form part of an implied contract between employer and employee. DeLia v. Verizon Commc'ns Inc., 656 F.3d 1, 7 (1st Cir. 2011); O'Brien v. New Eng. Tel. & Tel. Co., 664 N.E.2d 843, 847 (Mass. 1996). "There is no explicit test or 'rigid list of prerequisites' to aid in ascertaining if a personnel manual comprises a binding contract." Hinchey v. NYNEX Corp., 144 F.3d 134, 141 (1st Cir. 1998) (quoting O'Brien, 664 N.E.2d at 847). Instead, the question boils down to whether "an employee could reasonably have believed that the 'employment manuals [the employee] was given constituted the terms or conditions of employment, equally binding on employee and employer.'" Id. (quoting Derrig v. Wal-Mart Stores, Inc., 942 F.

their rights and obligations, and no jurisdictional concerns are present, a court is at liberty to accept such an agreement without independent inquiry.").

Supp. 49, 55 (D. Mass. 1996)). To answer this question, the factfinder "must consider" the following factors: (1) whether the "employer retained the right to unilaterally modify terms," (2) whether the terms of the manual were negotiated, (3) whether the "manual stated that it provided only guidance regarding the employer's policies," (4) whether the manual specified a term of employment, and (5) whether the employee "sign[ed] the manual to manifest assent." Id.; see also Day v. Staples, Inc., 555 F.3d 42, 58-59 (1st Cir. 2009); Jackson v. Action for Bos. Cmty. Dev., Inc., 525 N.E.2d 411, 415-16 (Mass. 1988).

The Massachusetts Supreme Judicial Court (SJC) has offered some guidance in applying these factors. First, "while the words used in such handbooks and policies are important, the context of the preparation and distribution of the employment policies is the most persuasive proof as to whether the employee's reliance thereon as a binding and legally enforceable commitment is reasonable." LeMaitre v. Mass. Tpk. Auth. (LeMaitre II), 897 N.E.2d 1218, 1220 (Mass. 2008) (citation modified). Second, the SJC has indicated that a provision in an employee handbook about compensation is more likely to be an implied term of the employer-employee contract than a provision that could be read to modify the employee's at-will status (e.g., a measure of job security or a disciplinary procedure before discharge). See id. at 1219 (stating that "policies that might counsel against too readily

concluding that an employer's unilateral announcement of a personnel policy modifies the at-will relationship" were "largely inapplicable" in the context of an implied term regarding compensation).

Dr. Warren does not dispute that certain factors tilt in Children's Hospital's favor. IDI clearly retained a right to unilaterally modify the IDI policy. And Dr. Warren concedes both that the IDI policy's terms were not negotiated and that he was an at-will employee. That these three factors weigh in Children's Hospital's favor does not, however, definitively resolve whether the terms of the IDI policy were incorporated into an implied contract governing Dr. Warren's employment. See O'Brien, 664 N.E.2d at 848 ("Negotiation of the terms of a company-wide manual for nonunion employees is not likely and is not an essential precondition of the enforceability of the employer's obligations stated in the manual."); LeMaitre v. Mass. Tpk. Auth. (LeMaitre I), 876 N.E.2d 888, 892-94 (Mass. App. Ct. 2007) (holding that sick-leave incentive policies in a series of personnel manuals were contractual offers even though the employee was at-will and the employer "retained an implied right to . . . modify the terms of the incentive program," because "[t]he mere fact that management can make unilateral changes to a personnel manual would not, standing alone, lead an employee to conclude that rights already

obtained would be altered or taken away by such changes"), aff'd, 897 N.E.2d 1218 (Mass. 2008).

Children's Hospital argues that the IDI policy made clear that its terms were provided for guidance only and therefore a reasonable employee would not have believed IDI was making any commitments in that policy. This argument places too much weight on a line in the Preamble that states that the IDI policy "is intended to serve as a guide for members of the IDI community." The line continues as follows: "This policy is intended to serve as a guide for members of the IDI community in structuring their relationships with industry and other outside ventures . . . ." This outward-facing language appears to refer to the terms of the IDI policy that govern, say, consulting agreements and conflicts of interest with third parties.

In contrast, the language in the Preamble most relevant to the royalty provision states that the policy "is also meant to . . . provid[e] for fair and equitable allocation of responsibilities and rewards among inventive researchers, IDI and other collaborators," an aim that is reiterated in the policy's enumerated purpose to "provide for equitable allocation of responsibilities and financial rewards among inventors, researchers, IDI and any other [relevant] entity." That language is not styled as guidance; indeed, the nod to "fair[ness] and equit[y]" might imply that it would be unfair and

inequitable -- and thus contrary to policy -- for IDI to disregard its own policy, or to amend the allocated "responsibilities and rewards" to the fundamental detriment of "inventive researchers" like Dr. Warren. And IDI's retention of "discretion to amend" the policy specifically "to fulfill these purposes" could lead an employee to reasonably believe that IDI lacks discretion to amend its policy in a manner that does not "provide for equitable allocation of responsibilities and financial rewards among inventors."

The final paragraph of the policy contains similar language of mutual commitment: "This Policy shall govern the actions, rights and responsibilities of IDI and Covered Persons regarding all Invention, and Technology, from and after the Effective Date . . . ." This is far from a disclaimer of legally binding promises. And while the absence or presence of a disclaimer is not dispositive, LeMaitre II, 897 N.E.2d at 1220, it is a relevant factor, Day, 555 F.3d at 59.

Turning to the final factor, there is a genuine dispute as to whether Dr. Warren manifested assent to the IDI policy and its royalty provision. On its face, the IDI policy supports an inference that he did: "Each Covered Person," including Dr. Warren, "shall sign a Participation Agreement in which the Covered Person agrees to comply with this Policy. A copy of a Participation Agreement is attached as Exhibit A" to the policy

itself. The Participation Agreement, in turn, asks the Covered Person to "represent and agree" that the person "ha[s] read and . . . understand[s] the terms of IDI's [policy] . . . and agree[s] to comply with [that] polic[y], as amended." The final paragraph of the Participation Agreement avers, in particular, that the Covered Person "ha[s] read and understand[s] the Distribution of Net Proceeds mentioned in the [IDI policy]." It seems unlikely that a person of Dr. Warren's sophistication would have signed the bare Participation Agreement without asking to see the IDI policy referenced therein.

But did he sign it? Lacking the signed document itself, Dr. Warren emphasizes the record evidence that all new hires were given the IDI policy (or at least its incorporated Participation Agreement) and were asked to sign the Participation Agreement; that the IDI policy was posted on the corporate intranet; and that IDI represented in its Affiliation Agreement with Children's Hospital that all of its employees at the time (including Dr. Warren) had executed the Participation Agreement.

For its part, Children's Hospital concedes that it was IDI's practice to have new employees sign the Participation Agreement, and that, from this "circumstantial evidence," this court "should assume that Dr. Warren did sign a Participation Agreement." Children's Hospital also concedes that IDI called the IDI policy to its employees' attention by posting it on the

intranet. What Children's Hospital contests is actual "distribution": whether Dr. Warren in fact saw the IDI policy at the time that he purportedly assented to its terms by signing the Participation Agreement. See LeMaitre II, 897 N.E.2d at 1220 (noting that "distribution" of a policy is "persuasive proof" as to whether an employee's reliance thereon was reasonable (citation omitted)). Children's Hospital claims there is insufficient evidence that the IDI policy was joined to the copy of the Participation Agreement that employees were asked to sign. But the two documents were continuously paginated, and a Children's Hospital employee testified that "all new employees went through a process where they were given the policy and . . . were required to sign it." A reasonable jury may view this evidence as supporting a conclusion contrary to Children's Hospital's assertions: that the IDI policy and the Participation Agreement were distributed to Dr. Warren together.

We therefore conclude that, upon considering the relevant factors laid out by the SJC,[8] a reasonable jury could find that the IDI policy's royalty provision was a term of an implied contract between Dr. Warren and IDI.

---

[8] The fourth factor, whether the policy specified a term of employment, is inapposite here given that Dr. Warren is not claiming that the IDI policy modified his at-will status.

**B.**

We turn next to the question of whether, if the royalty provisions were contractual terms, IDI could amend those provisions retroactively to change the payments due for inventions that had already been completed.

As a threshold matter, Dr. Warren does not argue that the trustees of IDI, who "retain[ed] the discretion to amend" the IDI policy, failed to make that amendment in their execution of the Affiliation Agreement. Doubtful in any event, any such argument has been forfeited. United States v. Delgado-Sánchez, 849 F.3d 1, 6 (1st Cir. 2017) ("[A] party who fails to lodge an objection or raise an argument below is deemed to have forfeited the argument.").

But the fact that the IDI trustees retained the right to amend the IDI policy, and exercised that right by executing the Affiliation Agreement, is not alone enough to entitle Children's Hospital to summary judgment. There remains a genuine factual dispute as to whether the IDI policy permitted the trustees to amend that policy with retroactive effect -- namely, to tell Dr. Warren that he would receive a certain reward if his work had a certain result (licensing) and then reduce that reward after Dr. Warren had completed all of the relevant work for IDI. Children's Hospital points to no provision in the IDI policy asserting any right to retroactive modification. And a reasonable

factfinder could view IDI and Children's Hospital's communications to Dr. Warren -- wherein both entities, years after signing the Affiliation Agreement, represented that the IDI policy continued to govern his invention -- as evidence of how IDI and Children's Hospital themselves read the policy. And if a factfinder concluded that IDI and Children's Hospital both read the IDI policy to only permit forward-looking but not retroactive amendments, then that factfinder could in turn reasonably conclude that this is, in fact, what the policy dictates. That factual dispute is enough to preclude summary judgment in this case.

## III.

For the foregoing reasons, we vacate the district court's grant of summary judgment to Children's Hospital, as well as its denial of Dr. Warren's motion to amend on futility grounds, and remand for further proceedings consistent with this opinion.