# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

Case No. 23-1158

LUIGI WARREN,
PLAINTIFF-APPELLANT,

- v. -

THE CHILDREN'S HOSPITAL CORPORATION,
DEFENDANT-APPELLEE.

Appeal from the United States District Court
for the District of Massachusetts
Case No. 1:17-cv-12472-DLC

## BRIEF FOR PLAINTIFF-APPELLANT

LUIGI WARREN
PLAINTIFF-APPELLANT (PRO SE)

## Table of Contents

TABLE OF AUTHORITIES ........................................................................... iii

JURISDICTIONAL STATEMENT ................................................................1

   A. District Court's Jurisdiction ..................................................................1

   B. Court of Appeal's Jurisdiction ...............................................................1

   C. Timeliness of Appeal ..............................................................................1

   D. Final Judgment ......................................................................................1

STATEMENT OF THE ISSUES ....................................................................2

STATEMENT OF THE CASE ........................................................................2

   A. The Parties................................................................................................2

   B.  Facts of the Case ...................................................................................3

      1.  Dr. Warren works at-will as a researcher at IDI from 2007 to 2010. .......... 4

      2.  The IDI Policy promises to share royalties with employee inventors. ....... 6

      3.  Dr. Warren tangles with IDI and they affirm the Policy is a contract. ........ 8

      4.  Dr. Warren checks status with Children's as a Moderna IPO looms..........11

      5.  Children's disavows IDI's express terms to Dr. Warren's detriment. ....... 12

      6.  Dr. Warren brings suit to enforce his rights under the IDI Policy. ............ 14

      7.  Children's sells its stake in Moderna and distributes the proceeds. .......... 15

   C.  Procedural History..................................................................................16

SUMMARY OF THE ARGUMENT ....................................................................16

STANDARD OF REVIEW ...............................................................................18

ARGUMENT ............................................................................................19

Issue I:    The enforceable, offered-and-accepted terms regulating the royalty-sharing rights of Dr. Warren are the explicit terms of the IDI Policy. ....22

Issue II:   Under Massachusetts law the IDI Policy imparted a contractual duty to IDI to apply the royalty-sharing terms detailed therein. .....................36

Issue III:  If Children's is bound to honor the IDI Policy, there is no reason to dismiss Dr. Warren's motion to amend his complaint.............................43

CONCLUSION .......................................................................................45

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

    January 20, 2023 District Court Order Granting Summary Judgment

    January 20, 2023 District Court Judgment

    The IDI Research and Technology Development Policy

    LeMaitre v. Mass. Tpk. Auth., 452 Mass. 753, 897 N.E.2d 1218 (2008)

# TABLE OF AUTHORITIES

<u>Cases</u>

*Anthony v. Jersey Central Power Light Co.*
51 N.J. Super. 139, 143 A.2d 762 (App. Div. 1958)..................................................42

*Campbell v. General Dynamics Government Sys*
407 F.3d 546 (1st Cir. 2005) ........................................................ 31, 39, 40

*Campbell v. General Dynamics Government Systems Corp.*
321 F. Supp. 2d 142 (D. Mass. 2004) ........................................... 27, 30, 34

*Charest v. President & Fellows of Harvard Coll.*
Civil Action No. 13-11556-DPW (D. Mass. Feb. 16, 2016) ........................... 28, 41

*Cochran v. Quest Software*
Civil Action No. 00-11856-DPW (D. Mass. Aug. 19, 2002)...................................22

*DeCaro v. Hasbro, Inc.*
542 F. Supp. 2d 141 (D. Mass. 2008) ........................................................31

*Derrig v. Wal-Mart Stores, Inc.*
942 F. Supp. 49 (D. Mass. 1996) ........................................... 26, 27, 39, 43

*Ferguson v. Host Int'l, Inc.*
53 Mass. App. Ct. 96, 757 N.E.2d 267 (2001)........................................... 25, 27, 39

*Frith v. Whole Foods Market, Inc.*
38 F.4th 263 (1st Cir. 2022) ........................................................18

*Gebhard v. Royce Aluminum Corp.*
296 F.2d 17 (1st Cir. 1961) ........................................................ 23, 41

*Greene v. Ablon*
794 F.3d 133 (1st Cir. 2015) ........................................................42

*Greene v. Ablon*
Civil Action No. 09-10937-DJC (D. Mass. Sep. 17, 2012)...................................37

*Jackson v. Action for Boston Cmty. Dev., Inc.*
403 Mass. 8, 525 N.E.2d 411 (1988) ........................................... 23, 38, 39, 41

*Lee v. Howard Hughes Med. Inst.*
457 F. Supp. 3d 9 (D. Mass. 2020) ...........................................................26

*LeMaitre v. Mass. Tpk. Auth.*
452 Mass. 753, 897 N.E.2d 1218 (2008) ............................... 26, 28, 38, 42

*LeMaitre v. Mass. Tpk. Auth.*
70 Mass. App. Ct. 634, 876 N.E.2d 888 (2007) ................................... 28, 35, 39, 41

*Marzuq v. Cadete Enters., Inc.*
807 F.3d 431 (1st Cir. 2015). ...................................................................18

*O'Brien v. New England Tel. & Tel. Co.*
422 Mass. 686, 664 N.E.2d 843 (1996) ..................................... 32, 37, 39

*Panto v. Moore Business Forms, Inc.*
130 N.H. 730, 547 A.2d 260 (1988) .................................................. 38, 43

*Pearson v. John Hancock Mut. Life Ins. Co.*
979 F.2d 254 (1st Cir. 1992) ............................................................. 38, 39

*Pine River State Bank v. Mettille*
333 N.W.2d 622 (Minn. 1983) ........................................................... 23, 37

*Salem Laundry v. New England Teamsters*
829 F.2d 278 (1st Cir. 1987) ....................................................................31

*Toussaint v. Blue Cross*
408 Mich. 579, 292 N.W.2d 880 (1980) ............................................ 37, 42

*Troville v. Venz*
303 F.3d 1256 (11th Cir. 2002) ................................................................18

*Woolley v. Hoffmann-La Roche, Inc.*
99 N.J. 284, 491 A.2d 1257 (1985) ............................................. 25, 37, 42

Statutes

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1332 ........................................................................................1

Other Authorities

Fed. R. App. P. 4(a)(1)(A) ..............................................................................1

Fed. R. Civ. P. 15(a)(2) ..............................................................................45

Fed. R. Civ. P. 56(a) ..................................................................................18

Restatement (Second) of Contracts § 45 (1981) .......................................30

## JURISDICTIONAL STATEMENT

### A. District Court's Jurisdiction

The district court had subject matter jurisdiction over this matter under 28 U.S.C. § 1332 which grants the district courts original jurisdiction over a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000.

### B. Court of Appeal's Jurisdiction

The Court has jurisdiction under 28 U.S.C. § 1291 as the judgment below is a final judgment of the United States District Court for the District of Massachusetts.

### C. Timeliness of Appeal

The district court judgment was executed and entered on January 20, 2023. Plaintiff filed the Notice of Appeal on February 14, 2023, which was timely under Fed. R. App. P. 4(a)(1)(A), being within 30 days from the entry of judgment.

### D. Final Judgment

This appeal is from a final judgment that disposes of all parties' claims. The district court's decision that has been appealed is annexed to this brief as per Local Rule 28(a)(1). Addendum, 1-25.

## STATEMENT OF THE ISSUES

1. Did the district court err in holding that IDI diminished its royalty-sharing obligations to employee inventors through an agreement with a third party while continuing to promote more favorable incentive terms to its employees?

2. Did the district court err in abstaining on the question of whether the IDI Policy imparted contractual duties to IDI to share royalties with its employee inventors?

3. Did the district court err in dismissing Dr. Warren's motion to amend as futile on the basis the IDI Policy was implicitly retired and replaced by Children's policy?

## STATEMENT OF THE CASE

### A. The Parties

Plaintiff-appellant Dr. Luigi Warren is the co-inventor of the inventions in United States Patent No. 8,716,465 and United States Patent No. 8,802,438, which have both been assigned to Children's Medical Corporation. He holds a Ph.D. in Biology from Caltech and is a pioneer in the field of mRNA reprogramming.

Defendant-appellee The Children's Hospital Corporation is the successor in interest to Dr. Warren's former employer, the Immune Disease Institute (IDI), a Harvard-affiliated independent biomedical research institute established in 1953.

2

IDI affiliated with Children's Hospital Boston in 2009 and was fully enfolded into its research arm through a corporate merger in 2012.[1]

## B.  Facts of the Case

This lawsuit centers around inventive work carried out by Dr. Luigi Warren at the Immune Disease Institute (IDI) and the royalty-sharing obligations owed him by IDI's successor in interest, Children's Hospital Corporation. The facts of the case are substantially undisputed. During the 2008-2009 period, Dr. Warren conceived and reduced to practice a method for safely converting skin cells into stem cells by applying a relatively overlooked and uncelebrated technology, "synthetic mRNA." Appendix, 235-42, 335-41. Dr. Warren's supervisor, Prof. Derrick Rossi, founded a company, Moderna, on the strength of Dr. Warren's breakthrough work. IDI granted a license in a patent application that Prof. Rossi co-authored with Dr. Warren to the new business on December 21, 2010. *Id.* at 69 ¶ 39. Moderna has since become a household name based on its COVID-19 mRNA vaccine. The dispute between the parties is over whether Children's has a duty to honor the royalty-sharing terms IDI promulgated to employees throughout Dr. Warren's tenure at the Institute, which are more generous to inventors than those Children's has applied in Dr. Warren's case.

---

[1] Craig Douglas, *Immune Disease Institute merges into Children's Hospital Boston*, Harvard Medical School News, October 1, 2012.

**1. Dr. Warren works at-will as a researcher at IDI from 2007 to 2010.**

Dr. Warren started at IDI in November 2007, hired to an at-will position as the first postdoctoral researcher ("postdoc") in Prof. Rossi's brand-new laboratory at the Institute. Appendix, 64 ¶ 3, 283 ¶ 15. Warren and Rossi had both come to IDI directly from Stanford University where they were, respectively, graduate student and postdoc, and where they had already been research collaborators. In June 2008 Dr. Warren approached Prof. Rossi with an idea for a new research project: cellular reprogramming using synthetic mRNA. *Id.* at 236-37. At this time there was great excitement in the scientific community at newly-invented "cellular reprogramming" techniques which could convert ordinary skin cells into induced pluripotent stem cells (iPSCs)—cells resembling the sought-after but controversial embryonic stem cells.[2] Scientists recognized that these iPSCs had a tremendous potential for use in biomedical research and in regenerative medicine. The reprogramming methods available in 2008 generally required using viruses—a serious stumbling block to therapeutic application. The race was on to come up with safer reprogramming techniques.[3] Dr. Warren's mRNA idea addressed this need. The project was off the beaten path for Prof. Rossi, whose research focus was blood cell development, but

_____

[2] Gina Kolata, *Scientists bypass need for embryo to get stem cells*, New York Times, November 21, 2007, at A1.

[3] Rob Stein, *Scientists report advance in stem cell alternative*, Washington Post, September 26, 2008, at A17.

he saw the potential to score a scientific coup if the idea could be made to work. He authorized Dr. Warren to proceed immediately and to use the lab's startup funds to undertake exploratory experiments. *Id.* at 237.

Dr. Warren's early efforts at making mRNA and delivering it to cells evinced rapid progress. Duly encouraged and recognizing the commercial potential of the research, in August 2008 Prof. Rossi set up a meeting with the director of IDI's technology transfer office, Ryan Dietz, to brief him on the mRNA reprogramming project. *Id.* at 241. There followed a few months of slower technical progress, but by November 2008 Dr. Warren had identified a key stumbling block in the form of cellular immune responses to synthetic mRNA and had found a way around it using a neglected technology out of the University of Pennsylvania called "modified mRNA." *Id.* at 347 ¶ 15. This gambit would later be memorialized in the name of Prof. Rossi's startup company, Moderna.[4] With renewed optimism that success was at hand, Warren and Rossi held a meeting with Ryan Dietz on January 12, 2009 to brainstorm ways to commercialize the nascent technology. Appendix, 241.

It took almost a year of further incremental innovation and optimization for Dr. Warren to achieve his goal of making stem cells with mRNA. By early 2010 the focus of practical work had shifted to validation experiments farmed out to

---

[4] Elie Dolgin, *Business: The billion-dollar biotech*. Nature 522, 26–28 (2015).

collaborators, conducted to prove that the stem cells Dr. Warren had made using mRNA were what they appeared to be. Dr. Warren's own efforts were directed to writing a science paper on the mRNA project and collaborating with Prof. Rossi and IDI's outside lawyers on a patent application to be built around this paper. The paper was submitted in March 2010[5] and the patent application was filed in April 2010. Appendix, 284 ¶ 25. Dr. Warren left IDI in June 2010 while the scientific paper was still in the review cycle. *Id.* at 285 ¶ 33. He became aware that Prof. Rossi had founded a company, Moderna Therapeutics, on the strength of the mRNA reprogramming work through a note in the Acknowledgements section of his paper when it was published online by Cell Stem Cell in September 2010. As anticipated, the mRNA breakthrough arrived to considerable acclaim on publication.[6]

## 2.  The IDI Policy promises to share royalties with employee inventors.

Throughout Dr. Warren's time at IDI the Institute promoted to its employees its "Research and Technology Development Policy" of October 28, 2004 ("the IDI Policy"). Addendum, 26-44 and Appendix, 66 ¶ 15. The IDI Policy spelled out the duties of the Institute's employee inventors in areas such as IP assignment and

---

[5] See "Publication History" in Warren et al, *Highly efficient reprogramming to pluripotency and directed differentiation of human cells with synthetic modified mRNA*. Cell Stem Cell 7, 618–630, November 5, 2010.

[6] Rob Stein, *Scientists overcome hurdles to stem cell alternatives*, Washington Post, September 30, 2010.

support of patent prosecution and detailed the royalty-sharing scheme in place to induce researchers to vigorously pursue, perfect and help IDI commercialize licensable inventions to the benefit of the Institute and the wider community. The Policy was posted on the IDI's corporate intranet for all employees to consult and the Institute's onboarding process for new hires included providing every employee with a copy of the Policy and explaining that acceptance of its terms was a condition of employment. Appendix, 233 at 148:4-15, 282-83 ¶¶ 11-15.

The IDI Policy incorporated an "IDI Participation Agreement" that new hires were required to sign. Addendum, 30-31 § C, 39-41 and Appendix, 231 at 65:3-20. Inter alia, its terms included agreeing to abide by the IDI Policy (¶ 1), promising to assist in patent prosecution and defense actions on request even after leaving IDI's employ (¶ 4) and acknowledging the employee had read and understood the royalty-sharing terms for employee inventors spelled out within the IDI Policy (¶ 11.) Addendum, 39-41. Discovery materials show IDI represented in its 2009 Affiliation Agreement with Children's that it had secured signed Participation Agreements from all current employees, including Dr. Warren. Appendix, 161 ¶ 2.9.2, 190.

The IDI Policy directs that proceeds from the licensing of inventions are to be shared equally between the inventor(s), the inventors' laboratory and IDI's general fund. Addendum, 34 ¶ 4. If there are multiple inventors, the one-third Inventor Share is divided equally between them, except by special agreement. *Id.* ¶ 5. In the

Moderna case, Dr. Warren and Prof. Rossi are the only inventors named on the IP so a 50:50 split applies. Appendix, 261. The Policy directs how equity consideration is to be handled in the context of royalty sharing. This is pertinent because the bulk of the consideration which has flowed from IDI's license to Moderna has come in the form of stock. *Id.* at 290-300, 309, 451-52 ¶ 51, 476-78. Under the IDI Policy, the Inventor Share of equity taken as a royalty "shall be distributed to Inventors at the earliest opportunity following receipt." Addendum, 35 ¶ 3. By contrast, the Policy directs that equity allotted to the laboratory and the general fund is to be managed by an institutional investment committee, with the Principal Investigator of the laboratory to be consulted on the timing of any stock liquidations. *Id.*

The body of the IDI Policy starts with a one-page "PREAMBLE," followed by another introductory one-page section entitled "A. PURPOSE" summarizing the rationale behind the creation of the policy. The latter section closes with a one-line paragraph: "The Trustees retain the discretion to amend this Policy from time to time to fulfill these purposes." Addendum, 28-29.

### 3.  Dr. Warren tangles with IDI and they affirm the Policy is a contract.

Dr. Warren executed an initial assignment of the mRNA reprogramming patent application in favor of IDI in August of 2010, two months after leaving the Institute's employ. Appendix, 244-45, 286 ¶ 48, 344 ¶ 6. Ryan Dietz reached out to him in February 2011 to ask for his signature on a second assignment relating to a

follow-up patent filing. *Id.* at 251. Dr. Warren was by now wary of making a move without first ensuring he had his rights as an inventor in writing. He recalled being told by Prof. Rossi while at the Institute about the inventor's one-third share of licensing revenue (*Id.*, 100 at 77:4-8) but he no longer had access to IDI's corporate intranet and possessed nothing tangible spelling out its obligations to him as an inventor. He took the occasion of the request to ask Dietz if Moderna had taken a license and to get clarity on his rights to a share of any proceeds. *Id.* at 252. Dietz acknowledged a deal with Moderna but conditioned disclosure of the details on return of the assignment. *Id.* at 253-57. On the issue of royalty sharing, he provided a snippet excerpted from the IDI Policy confirming the one-third inventor's share, stating: "licensing revenues distributed under the IDI policy are split into thirds as described below.  Since there are 2 inventors, the Inventor's share would be split between yourself and Derrick." *Id.* at 261. Dr. Warren continued to press for the full text of the IDI Policy. Dietz declined, stating "The IDI policies are not public documents" in his reply. *Id.* at 264-65. Dr. Warren balked at signing the assignment, citing his concern at the lack of transparency over the IDI Policy. *Id.* at 273.

Children's Hospital now entered the fray. IDI had affiliated with Children's in February 2009, with a view to merging into it after a multi-year transition period at the option of the larger entity. Appendix, 177 § 6.1.2. Ryan Dietz was running a one-man shop at IDI's tech transfer office at the time of the 2011 exchanges. *Id.* at

229 at 31:5-19. He copied Erik Halvorsen, the director of Children's technology licensing office, and Dianne McCarthy of its Office of General Counsel on several replies in the email thread with Dr. Warren. *Id.* at 253, 264, 271. McCarthy, the Hospital's Chief Counsel for Research Affairs, now sent Dr. Warren a letter on behalf of IDI demanding that he execute the second invention assignment and enclosing a hard copy of the complete 2004 IDI Policy, which she emphasized was controlling. *Id.* at 151-53. Dr. Warren emailed her asking if the IDI Policy was a contract, but McCarthy dodged the issue in her reply. *Id.* at 274-77.

Dr. Warren would soon receive an answer to his "contract" question in the form of a demand letter from IDI's outside counsel, Nixon Peabody LLP, which included a draft lawsuit against him. Appendix, 278-89. The first count in the draft complaint was "BREACH OF CONTRACT: Breach of Development Policy," and it clearly stated that the Policy was a contract. *Id.* at 286. Satisfied that he now finally had the complete text of the IDI Policy in hand along with an unambiguous statement from the horse's mouth affirming its contractual character, Dr. Warren returned the proffered assignment executed in favor of IDI, putting an end to the impasse. Trust having been restored, Dr. Warren fully cooperated with IDI and its patent counsel on all their multiple requests for assistance in prosecuting the Moderna IP over the years which followed. *Id.*, 347 ¶ 18.

**4. Dr. Warren checks status with Children's as a Moderna IPO looms.**

Moderna operated in "stealth mode" in the early years after its founding but by the mid-2010s it was garnering press attention based on impressive capital raises in successive financing rounds.[7] Dr. Warren remained ignorant of the details of IDI's agreement with the company, but he began receiving royalty distributions from Children's in 2015 flowing from Moderna license income. Appendix 349 ¶ 29. The sums involved were modest. Terse statements with the checks included percentages for the royalty split which were different than expected, but slightly above what Dr. Warren anticipated based on the IDI Policy, and hence did not raise any concern he might be shorted relative to his expected royalties. *Id.*, 290-300, 349 ¶ 30.

By 2017 the trade press was openly speculating that a Moderna IPO might be in the offing.[8] For Dr. Warren, this again raised the unanswered question of whether there was an equity component to the licensing deal.[9] That summer Dr. Warren ran into an old Rossi Lab colleague at a scientific conference in Boston. He learned that Prof. Rossi had announced his intention to shut down his laboratory at Children's

---

[7] Elie Dolgin, *Business: The billion-dollar biotech.* Nature 522, 26–28 (2015).

[8] Damian Garde, *Ego, ambition, and turmoil: Inside one of biotech's most secretive startups*, STAT, September 13, 2016.

[9] It appears that both IDI and Children's violated their own respective ethical guidelines on the handling of equity by failing to publicly acknowledge that they had taken stock from Moderna, at least up until 2017. Appendix, 347-48 § C.

Hospital, which had enfolded IDI into its research arm through a 2012 merger. This seemed like a potential red flag to Dr. Warren given the IDI Policy's generous Lab Share provision. He decided to reach out to Ryan Dietz to "check status" on his interest in the Moderna licensing revenues. Appendix, 303. In the ensuing exchanges, Dietz revealed that the licensing deal had involved Moderna stock and that "millions of dollars" of licensing revenue could be expected to flow from a Moderna IPO or buyout. *Id.* at 309. He also sought Dr. Warren's cooperation on an "administrative matter." *Id.* at 303. This turned out to be getting his signature of approval on a "letter agreement" that established special "ad hoc" terms for the sharing of all future Moderna license income. *Id.* at 309, 208-11.

### 5. Children's disavows IDI's express terms to Dr. Warren's detriment.

It subsequently emerged that Children's had never followed the express terms on royalty sharing in the IDI Policy but had until that date adopted its own established inventions policy for Moderna distributions. Appendix, 308, 212-17. That policy incorporated a tiered royalty-sharing formula which was slightly more generous to Dr. Warren with respect to the small, early payouts flowing from the license—half of 35% instead of half of 33⅓%. But under this policy Dr. Warren's share of proceeds flowing from any revenue above $500K and from all equity-based revenues would decrease to half of 25%. *Id.* at 215-16. The policy also gave Children's the right to hold onto the inventors' share of equity consideration for

liquidation at its own discretion rather than prescribing the stocks' transfer to the inventor "at the earliest possible opportunity" as in the more inventor-friendly IDI Policy. *Id.* at 216-17. Significantly, there was no Lab Share in the Children's policy at all, in stark contrast to the one-third share in the IDI Policy. In the context of the heavily equity-based Moderna deal, the terms of the Children's Policy would direct about three-quarters of the total license income to Children's institutional funds (general and departmental) compared to only a third under the distribution schedule spelled out in the 2004 IDI policy. *Id.* at 129, 216-17.

In the ad hoc letter agreement Ryan Dietz sent Dr. Warren the Inventor Share to be split equally between Drs. Warren and Rossi was set at a flat 27.5% and there was a Lab Share of 7.5%. Nothing was stated regarding Children's asserted right to manage the liquidation of the inventor's share of the Moderna equity. *Id.* at 208-11.

Dr. Warren balked at approving the letter agreement as it seemed to him this would forfeit his contractual rights to the more inventor-friendly terms spelled out in the IDI Policy. Appendix, 307. He queried Children's justification for abrogating the express terms of the IDI Policy. Dietz explained that a Children's legal review had determined that, through language in the February 2009 Affiliation Agreement between IDI and Children's, IDI had promised to apply Children's inventions policy to any technology licensed out after the affiliation came into effect. Their review concluded, he went on, that since the 2010 Moderna deal was executed after the

Affiliation Agreement and given there was language in the IDI Policy reserving the right to amend the policy, the applicable terms for royalty sharing were implicitly those of the Children's policy. *Id.* at 304-05.

### 6. Dr. Warren brings suit to enforce his rights under the IDI Policy.

Ryan Dietz offered to have the Hospital's lawyers reach out to expand on this justification. Months passed without a follow-up, despite Dr. Warren's prompting. Appendix, 304-06. Frustrated at this impasse, Dr. Warren contacted Prof. Rossi to get his perspective on the abrogation of the IDI's royalty-sharing terms. Rossi told him there had been an intramural fight over the disappearance of IDI's Lab Share after he transitioned to Children's and his pushback led to the Hospital negotiating upwards from its zero-based position on a lab share. Dietz's own statements to Dr. Warren and internal Children's emails produced in discovery confirm that Rossi threatened to shutter his research program over the vanishing lab share and that the main motivation for the ad hoc agreement was to address his protest. *Id.*, 349 ¶ 31.

Unlike Prof. Rossi, Dr. Warren had never joined Children's Hospital in any capacity. He also had no leverage to counter their unilateral decision to lower his promised share of royalties, having already performed his end of the bargain by inventing the licensed technology and helping IDI secure patent protection. He filed suit in district court in December 2017 to safeguard his contractual rights to the

royalty-sharing incentives explicitly promised to employee inventors in IDI's 2004 Research and Technology Development Policy. *Id.* at 16.

### 7. Children's sells its stake in Moderna and distributes the proceeds.

Children's applied the percentage splits of the unratified 2017 letter agreement to Dr. Warren's Moderna royalty distributions during the pendency of the district court case. This included a multimillion-dollar payout in December 2019 based on the selloff of its entire Moderna stake after the post-IPO lock-up expired on June 5th of that year. Appendix, 450 ¶ 40. The distribution comprised the great majority of the value that has flowed from IDI's license to Moderna. *Id.* at 451-52 ¶ 51, 290-300. Children's phased selloff of equity over several months, expressly designed to avoid "flooding the market" with a large institutional share dump, led to shares being sold at prices substantially lower than Dr. Warren could have obtained had he been allowed to control his own equity as prescribed in the IDI Policy—for example, had he joined other insiders in the stampede of selling which accompanied the June 5th exit from lock-up. *Id.* at 476-85, 457-64 (Children's exhibit tabulating Moderna closing prices by date.) Thus, Dr. Warren's payout for his inventive work was adversely impacted relative to the IDI Policy's terms both by his reduced percentage under the ad hoc terms, and by Children's insistence on managing his share of the Moderna equity. Dr. Warren estimated the total deficit at about $2.5M in his proposed amended complaint of March 3, 2020. *Id.* at 451.

## C. Procedural History

Dr. Warren appeals the district court's Order of January 20, 2023 (Dkt. No. 91). Addendum, 1-25. Dr. Warren sued Children's Hospital Corporation (Dkt. No. 1) in 2017 for failing to honor the terms of a royalty-sharing policy promulgated by IDI, Children's predecessor in interest, in relation to an invention of Dr. Warren's which was licensed to Moderna. Appendix, 2, 11-16. Children's demurred and moved for summary judgment (Dkt. No. 51). *Id.*, 5. After a hearing in 2019, the district court denied Children's motion (Dkt. No.70) and found in favor of Dr. Warren. *Id.* at 7. During the pendency of this case Children's sold off the Moderna equity taken for the license and distributed the proceeds. *Id.*, 476-85. Soon after that, Dr. Warren moved to amend his complaint in view of the new factual situation, which Children's opposed (Dkt. Nos. 72, 87). *Id.* at 7. Over three years later the court reversed itself, vacating its prior order and allowing the motion for summary judgment (Dkt. Nos. 91, 93). The court also denied Dr. Warren's motion to amend. Appendix, 8 and Addendum, 23-25. Dr. Warren now appeals the district court's grant of Children's motion for summary judgment and its denial of his motion to amend the pleadings (Dkt. No. 94). Appendix, 8.

## SUMMARY OF THE ARGUMENT

The district court wrongly held that Children's Hospital Corporation, successor in interest to Dr. Warren's former employer, IDI, was entitled to disavow an existing

16

obligation to him as an inventor of breakthrough technology by claiming years after the fact that royalty-sharing terms spelled out to IDI employees were implicitly amended by reference through wording in an affiliation agreement between IDI and Children's. Originally finding for Dr. Warren on Children's motion for summary judgment, the district court has now reversed itself over three years later.

*First*, the district court erred as a matter of law in uncritically endorsing the defendant's position that the offered-and-accepted royalty-sharing terms of the IDI Policy were replaced by reference with the less inventor-friendly Children's terms on February 20, 2009, given that this change was not noticed to employees in any manner whatsoever and the IDI Policy and its explicit terms were still promulgated to employees well after Dr. Warren left IDI's employ and, indeed, after IDI licensed to Moderna. This finding runs counter to the basic precepts of offer and acceptance as they apply in the setting of at-will employment when considered in the light of Massachusetts authority on the effect of disclaimers in employee handbooks.

*Second*, the district court erred as a matter of law in taking an agnostic position as to the contractual status of the IDI Policy and specifically its royalty-sharing terms. The weight of Massachusetts authority affirms that the IDI Policy is a contract between IDI and Dr. Warren, exactly as the Institute's lawyers forcefully asserted during the 2011 imbroglio after IDI's request for a second assignment, and

just as the district court tacitly accepted by stating "such policies are generally valid and binding" in its discussion of a pre-existing duty to assign.

**Third**, the district court erred in dismissing Dr. Warren's motion to amend his complaint on the grounds that it is futile. This ruling is based purely on the court's finding that IDI's explicit royalty-sharing terms were implicitly overridden through the Affiliation Agreement with Children's. If that theory is incorrect, as Dr. Warren maintains, then there is no reason to dismiss the motion.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of summary judgment. *Marzuq v. Cadete Enters., Inc.*, 807 F.3d 431, 438 (1st Cir. 2015). Summary judgment is appropriate only when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing de novo a district court's grant of summary judgment, this Court "assess[es] the facts in the light most advantageous to [the non-movant] and also draw[s] all reasonable inferences in their favor." *Marzuq*, 807 F.3d at 438.

The dismissal of a complaint for failure to state a claim by a district court is reviewed de novo, and a district court's decision regarding leave to amend for abuse of discretion. *Troville v. Venz*, 303 F.3d 1256, 1259 (11th Cir. 2002). *Frith v. Whole Foods Market, Inc.*, 38 F.4th 263 (1st Cir. 2022).

# ARGUMENT

This case seeks to answer the question of whether a research institution can offer incentives to employee inventors and then reduce them after an inventor has moved on and large royalties are in prospect. Massachusetts employment law provides that an incentive plan detailed in an employee handbook is contractual if the employer instills reasonable belief that its terms are binding. Massachusetts courts are reluctant to let management reap benefit from offered incentives and then avoid promises freely made. Clarifying the protections afforded by Massachusetts law will encourage inventors to bring new technologies to the marketplace while minimizing the scope for powerful institutions to abuse them and the costly disputes which can follow. The instant controversy provides an opportunity to do so.

IDI, an independent biomedical research institute offering relatively generous royalty-sharing incentives to its employee inventors, agreed to affiliate with Boston Children's Hospital, a bigger, more diversified entity with less generous incentives, with a view to merging into it after a few years at the latter's option. IDI continued to propound its generous policy to employees and ex-employees, including Dr. Warren, well after privately promising to adopt Children's policies, evidently with the full knowledge of the most senior relevant officials in Children's IP licensing and legal departments. Years later, after Children's had acquired IDI through the mooted merger, it disclosed a "haircut" to the royalty-sharing terms for Dr. Warren,

justified retrospectively by IDI's agreement to adopt Children's inferior terms, which it claims were silently substituted by reference and implicitly accepted by Dr. Warren based on a "right to amend" disclaimer in the original IDI policy.

In district court, Children's offered a layered defense to excuse its abrogation of the explicit terms of the incentive scheme IDI proffered to inventors during Dr. Warren's tenure. In the first place, its lawyers maintained, the IDI Policy is not a contract and its apparent promise to share royalties is merely gratuitous. But if it is a contract, it is an unenforceable, illusory contract promising nothing specific. Finally, if it is not an illusory contract, it was implicitly but properly amended by management and consequently revised, contemporaneously-unannounced specific terms regulate and diminish the obligations of the corporation to Dr. Warren.

In its decision granting Children's motion for summary judgment, the district court abstained on whether the IDI Policy is an enforceable contract: "Ultimately, the court need not decide this issue, as Dr. Warren's breach of contract claim suffers from a separate fatal flaw." Addendum, 13. The district court holds that the question is obviated by its finding that if, *arguendo*, the IDI Policy is a contract, the offer terms at issue were changed by management through the Affiliation Agreement of February 20, 2009, based on IDI's promise to Children's to adopt the latter's inventions policy for any IP licensed thereafter. In taking this position, the district court recapitulates the justification offered to Dr. Warren by Ryan Dietz back in

2017 after he first queried detrimental changes to his expected royalty rights. As Mr. Dietz did then, the district court points out that "IDI specifically reserved the right to amend the policy at its discretion." *Id.*

Implicitly, then, the district court holds that, if the IDI Policy was a contract between the IDI and its employees, those employees agreed by the "right to amend" language therein to cede to IDI the right to change its explicit royalty-sharing incentive scheme unilaterally without even notifying employees or formally retiring or ceasing to promulgate the old "black letter" terms. In other words, in accepting the terms of the Policy, the IDI's employees agreed that what management says, goes—even if they don't tell their employees.

As the district court has not ruled on the question of whether the IDI Policy established a contract with Dr. Warren, the central issue for this appeal is whether the "right to amend" disclaimer in the Policy renders Dr. Warren's claim moot. That is addressed below as Issue I. If the Court finds for the appellant on this issue, the question of the contractual status of IDI's royalty-sharing incentives still needs to be decided, either by this Court or by the district court on remand. In addressing this as Issue II, below, the appellant argues that the record is clear enough to support a finding of contractual obligation. Finally, the district court denied Dr. Warren's motion to amend his complaint in light of Children's liquidation of Moderna equity on the grounds it would be futile given its finding that the IDI policy was tacitly

replaced by reference with Children's policy.  Straightforwardly, if the Court finds IDI's express royalty-sharing promises to be binding, the dismissal of the motion to amend should also be denied (Issue III.)

**Issue I:     The enforceable, offered-and-accepted terms regulating the royalty-sharing rights of Dr. Warren are the explicit terms of the IDI Policy.**

The "right to amend" is and always has been the central issue of Dr. Warren's complaint. In accepting the defendant's prima facie questionable position on the effect of the Affiliation Agreement clause on IDI employees' rights—a position only taken years after the event and after the "facts on the ground" had changed to Children's advantage—the district court eschews any attempt to unpack how basic contract law principles and legal authority on handbook promises and disclaimers apply. In fact, Massachusetts authority makes it clear that the unadorned "right to amend" disclaimer in the IDI Policy is insufficient to support the claim that its explicit and detailed promissory language on royalty sharing and the attendant obligations to employee inventors were overridden. Any claim to the contrary is only a self-serving, after-the-fact rationalization on the part of the Hospital.

**A.  An at-will employer inherently has the right to amend its offered terms.**

Massachusetts law affirms the well-accepted analysis of how the elements of contract—offer and acceptance with an exchange of consideration—apply in the context of an at-will employment relationship. See *Cochran v. Quest Software*, Civil

Action No. 00-11856-DPW (D. Mass. Aug. 19, 2002). This is a type of unilateral contract: an offer promising consideration is met by the offeree not with another promise, but with performance. The employer offers a promise of consideration in the form of wages and other benefits. An employee both assents to the offer and provides the requisite consideration by showing up for work and carrying out assigned duties. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 630 (Minn. 1983). In the at-will setting each party is free to terminate the agreement and separate at will for any (lawful) reason, or for no reason at all. *Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 9, 525 N.E.2d 411, 412 (1988). An at-will employer therefore has a general right to amend its offered terms for continued performance to its employees, even to their detriment, as they are not bound by a promise to stay on and their employer is not bound by a promise to retain them if they don't like the new terms. *Gebhard v. Royce Aluminum Corp.*, 296 F.2d 17, 18 (1st Cir. 1961). The employer is only obligated by offer terms that have been accepted and recompensed through past performance. *Id.* at 19.

## B.  The IDI Policy's non-specific "right to amend" disclaimer adds nothing.

The terms Children's have applied to Dr. Warren's royalty-sharing rights are worse for him than the terms that were detailed to IDI's employees throughout his tenure and even afterwards when his inventive work was licensed by IDI to Moderna. If the IDI Policy is a contract, the only escape from the straightforward

inference that there has been a breach of offered and accepted terms is to assert that the accepted offer to employees was really: "whatever IDI's management deems it to be," justified by an appeal to the policy's generic "right to amend" disclaimer.

The IDI Policy's disclaimer—"The Trustees retain the discretion to amend these policies from time to time to fulfill these purposes"—could encompass a range of possible meanings. For example: "This is what we currently expect of you and offer you in return but be aware that we may update these policies to change your rights and duties in the future," or: "Take the letter of these policies with a grain of salt—we can change your deal at will without even updating these policies or telling you about it." On the latter, most employer-friendly interpretation, the employee must treat the Policy's contents as an unenforceable snapshot of current management sentiment on topics relating to employee inventors and inventions.

In this light, the assertion that the IDI Policy's royalty-sharing terms were changed by the Affiliation Agreement despite the absence of any notification to offerees is tantamount to saying its explicit royalty-sharing promises are illusory. To say the "right to amend" language granted management the right to change terms without revising the express terms proffered to employees is to say it makes the expressly offered terms illusory, since management has no obligation to live up to them. Mentioning managerial discretion in the disclaimer adds nothing—how else would terms be varied? Nor does referencing the "purposes" of the policy, given the

24

diversity of the purposes listed in "Section A" of the Policy. On the other hand, if the "right to amend" language is interpreted less expansively, acknowledging a duty to notify changes to offered terms—as did not occur here—it is simply a recitation of the employer's uncontroversial right to amend its current deal terms, at least from the standpoint of the at-will employee.

## C.  Disclaimers must be evaluated by the "reasonable employee" standard.

Massachusetts authority takes a skeptical approach to employers' attempts to wriggle out of offers seemingly made by explicit and detailed promissory language in employee handbooks based on low-profile disclaimers. Disclaimers as such are not derogated—management has a right to disavow promissory intent if it is clear about doing so. But courts have found that in the handbook setting it is easy for employers to "have their cake and eat it too" by dangling incentives yet avoiding genuine commitments using ambiguous or inconspicuous disclaimers. In *Ferguson v. Host Int'l, Inc.*, 53 Mass. App. Ct. 96, 98-103, 757 N.E.2d 267, 269-73 (2001), the court ruled an employee handbook's provisions for a progressive discipline procedure could be binding despite multiple strongly worded but inconspicuous disclaimers disavowing contractual effect and reserving the right to amend, cancel or disregard the handbook. Holding that these disclaimers "properly could be viewed by the fact finder as the functional equivalent of fine print," the court approvingly cited *Woolley v. Hoffmann-La Roche, Inc.*, 99 N.J. 284, 309, 491 A.2d

1257, 1271 (1985), modified on other grounds, 101 N.J. 10, 499 A.2d 515 (1985), on an employee's right to be treated fairly with respect to handbook promises:

> What is sought here is basic honesty: if the employer, for whatever reason, does not want the manual to be capable of being construed by the court as a binding contract, there are simple ways to attain that goal. All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing. . . .

Under Massachusetts law, disclaimers intended to have broad effect should be prominent, specific, and not susceptible to benign interpretation by a reasonable offeree. See, *e.g.*, *Lee v. Howard Hughes Med. Inst.*, 457 F. Supp. 3d 9, 12-13 (D. Mass. 2020). The import of disclaimers in handbooks must be weighed in the light of the complete text of the documents and the circumstances of their dissemination to employees: "Neither the wording of disclaimers nor their absence is dispositive." *LeMaitre v. Mass. Tpk. Auth.*, 452 Mass. 753, 756, 897 N.E.2d 1218, 1220 (2008). The standard is what a reasonable employee would take as a binding commitment. *Derrig v. Wal-Mart Stores, Inc.*, 942 F. Supp. 49, 53-55 (D. Mass. 1996).

## D.  The "right to amend" disclaimer does not merit expansive construction.

Below, the appellant poses two substantive questions as to what a reasonable employee would take from the IDI Policy's "right to amend" language: (1) does it allow retroactively detrimental changes to the rights of employees? and (2) does it allow unnoticed detrimental changes relative to the Policy's expressly offered

26

benefits? Before grappling with these issues, though, it should be noted that the following considerations weigh against expansive reading of the disclaimer:

- Massachusetts law counsels against giving too much weight to one initial disclaimer in view of a litany of detailed provisions of mandatory conduct and benefits in the body of a handbook. *Derrig v. Wal-Mart Stores, Inc.*, 942 F. Supp. 49, 56 n.16 (D. Mass. 1996). The IDI Policy's disclaimer is inconspicuous, not highlighted by typography or a call-out box and could be seen as the "functional equivalent of fine print." *Cf. Ferguson v. Host Int'l, Inc.*, 53 Mass. App. Ct. 96, 103, 757 N.E.2d 267, 272-73 (2001).

- IDI made no attempt within the document or outside it to elicit specific acknowledgment of the existence and significance of the disclaimer. By contrast, the Participation Agreement embedded in the IDI Policy draws an employee's specific attention to and seeks acknowledgement of the Policy's explicit royalty-sharing terms. Addendum, 41 ¶ 11.

- The lopsided bargaining power of the parties, the fact that IDI drafted the Policy and decided how it would be distributed, as well as the discretion vested in the Institute to structure license agreements and control related disclosures all argue for construing any residual ambiguity in the language of the Policy against the interest of the drafter. See *Campbell v. General Dynamics Government Systems Corp.,* 321 F. Supp. 2d 142, 149 (D.

Mass. 2004) and *Charest v. President & Fellows of Harvard Coll.*, Civil

Action No. 13-11556-DPW (D. Mass. Feb. 16, 2016) at *64-65.

**E.  Amendments that injure accrued rights breach contract if unforewarned.**

By the nature of the at-will relationship an employer has the right to reduce the wages and benefits it offers to current employees as and when it sees fit, whether it calls out that right in a handbook or not. Still, employees do have the right to assume that detrimental changes to offered terms of employment will be regulated by basic honesty and fair play. In *LeMaitre v. Mass. Tpk. Auth.*, 70 Mass. App. Ct. 634, 876 N.E.2d 888 (2007), the court held an at-will employer's right to amend does not extend to reducing rights to deferred compensation accrued under terms since retired but previously offered and accepted by performance. Here, LeMaitre earned retirement benefits under a policy which induced staff to minimize sick days taken. Successive handbooks issued over the course of his employment announced reduced benefit rates which statedly "superseded" those offered in earlier editions. When LeMaitre retired, his employer interpreted "superseded" to entail clawing back some of his accrued benefits. The court ruled the employer's acknowledged right to amend its incentives did not support application of detrimentally amended terms to rights already earned. The Supreme Judicial Court of Massachusetts (SJC) endorsed this position on further appellate review. *LeMaitre v. Mass. Tpk. Auth.*, 452 Mass. 753, 897 N.E.2d 1218 (2008) (annexed herein at Addendum, 45.)

Transposing the logic of *LeMaitre* to the employee invention setting, it would straightforwardly bar application of deleterious changes to royalty-sharing terms for inventions created under better terms, absent a strong, explicit disclaimer putting would-be inventors on notice of the potential for such retroactive changes. No such disclaimer exists in the IDI Policy. On this basis, IDI did not have the right to bargain away the accrued rights of individual inventors to Children's. Such "boundary cases" could be properly handled by ad hoc arrangements even within the framework of the Affiliation Agreement language promising to adopt Children's policy. Indeed, despite the district court's argument to the contrary (Addendum, 15-16), the fact that the Children's policy expressly limits its scope to the Hospital's own employees affords a suitable carve-out to handle such cases. Appendix, 215.

It might be objected that Dr. Warren's invention was only a work in progress at the time of the alleged change in effective terms (February 2009.) There are two problems with this argument. In the first place, academic royalty-sharing incentives are propounded to induce long-range commitments and forbearances, such as not quitting a low-paid postdoc job and taking promising ideas, findings, and know-how to industry. For that reason, a "fair play" issue arises if those desired behaviors are induced under promises which are later walked back, even when an inventive work has not yet been fully reduced to practice. A reasonable employee's sense that such detrimental changes would be unfair and off-limits finds support in the option

29

contract doctrine in unilateral contract law. Restatement (Second) of Contracts § 45 (1981). The second problem here is that there was no notice to Dr. Warren or indeed anyone else that IDI's plan had been retired and replaced with an inferior one during the entire span of his employment there and work on the licensed invention. Thus, application of deleterious rule changes to his case would be unfair (therefore unjustified on the "reasonable employee" standard) for the same reason it would be unfair to someone who worked entirely under the undisputed IDI rules regime—because the IDI's explicit incentive terms were the ones dangled before employees to induce their performance and retention from start to finish.

## F.  Detrimental amendments must be noticed to be accepted by employees.

That brings us back to the most basic problem with Children's assertion that the "right to amend" language in the IDI Policy negates Dr. Warren's claim to its explicit royalty-sharing terms. Those terms were never retired but instead were continuously propounded to employees throughout his tenure at the Institute. In *Campbell v. General Dynamics Government Systems Corp,* 321 F. Supp. 2d 142, 146, 146 n.2, 148 n.3 (D. Mass. 2004), an at-will employee was denied his right to use a judicial forum, from the standpoint of his employer, through an email blast to employees which obliquely disclosed its institution of an arbitration-only dispute resolution policy. The court ruled the add-on policy was not binding under basic Massachusetts contract law as it was not conveyed to employees in a manner such

that the plaintiff was notified or could be considered to have been notified. *Id.* at 146 n.2. Therefore, "any apparent acceptance of the terms of the Policy that might otherwise be inferable from his continued employment was nugatory." *Campbell v. General Dynamics Government Sys*, 407 F.3d 546, 550 (1st Cir. 2005).

In the instant case not only was there insufficient notice of the alleged policy change to support the acceptance of inferior terms by Dr. Warren, but there was no communication of any kind by which he or his fellow employees could even arguably be considered to be notified in the relevant time frame. There was only a privately-expressed promise by IDI to adopt the Hospital's stingier royalty-sharing scheme, never expressed to employees until long after Dr. Warren could assent by remaining in his position. Under Massachusetts law, parties to an agreement do not become contractually bound until they mutually assent. *DeCaro v. Hasbro, Inc.*, 542 F. Supp. 2d 141, 153 (D. Mass. 2008), citing *Salem Laundry v. New England Teamsters*, 829 F.2d 278, 280 (1st Cir. 1987). The *DeCaro* court noted that "[t]he mere existence of internal, written policies does not support a finding of mutual assent." *Id.* at 153. Here we have even less.

Supposing, *arguendo*, we adopted the position that the IDI Policy's disclaimer "speaks for itself." That is to say, we discount the considerations that weigh against expansive reading—to wit, the disclaimer is inconspicuous, there is no attempt to confirm the offeree's cognizance of its import, and the circumstances support using

the rule of *contra proferentum* to resolve ambiguity. Suppose, further, we discount the issue of unfair, retroactive effect in this instance. On these highly employer-friendly assumptions, we would still be left with the following:

- Even taken at face value, the IDI Policy's minimalistic "right to amend" language does not put the reasonable employee on notice of anything beyond the at-will employer's acknowledged yet not unbridled right to amend its offered terms to its employees. See *O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 692-93, 664 N.E.2d 843, 848 (1996).

- There was no change to the terms detailed on the IDI intranet or in the understanding of its licensing director, Ryan Dietz, its outside counsel at Nixon Peabody, Children's Chief Counsel for Research Affairs, Dianne McCarthy, or Children's licensing director, Erik Halvorsen, nor was any notice given its employees that those terms were retired or replaced by reference during the period in which Dr. Warren might have assented to inferior terms, nor did he assent to inferior terms at any time thereafter.

On the second point, the appellant draws attention to representations made by Children's counsel in the May 2019 hearing on the motion for summary judgment. Appendix, 398-399 at 47:7-48:3. The court poses the question: "[W]hy didn't the company tell people it was reducing their interest?" Counsel, speaking "outside the record," responds: "I think the real answer is that they did tell everybody but since

32

Dr. Warren didn't make the move [to Children's], he didn't get the message." All the evidence presented in connection with Children's motion for summary judgment points to the continued unqualified promulgation of the IDI Policy well after Dr. Warren's departure and, for that matter, after his execution of the first invention assignment in favor of IDI and the execution of IDI's license agreement with Moderna. That is the import of the 2011 exchanges documented in the district court case,[10] and yet the court's opinion grants them little significance (Addendum, 14):

> Regarding IDI's mistaken reference to the IDI policy in seeking to obtain the plaintiff's signature, lawyers, despite all jokes to the contrary, are human, and sometimes make mistakes. Here, two senior lawyers and an IDI manager all mistakenly informed Dr. Warren that the IDI policy controlled his revenue share in 2011. That mistake was regrettable but it does not in any way alter or abrogate the fact that the Children's policy superseded the IDI policy in February 2009.

The claim of "mistake" is a position taken long after the fact, based on the dubious theory that the IDI Policy gave management the right to privately revoke explicit royalty-sharing incentives for inventors without informing affected parties until years later. The question of noticing inventors of detrimental changes to their rights is hardly a mere formality. A hypothetical will make the point. Consider what would have happened had IDI adopted an "amend and take the consequences" approach to honoring the Affiliation Agreement clause by announcing revised,

---

[10] Affirmed by the text of the draft lawsuit and by the fact an "internal analysis" was the basis for the implied substitution-by-reference theory. Appendix, 282 ¶ 12, 305.

inferior incentives in 2009. Principal investigators would have been taken aback by the disappearance of IDI's generous 33⅓% "Lab Share," which offered enterprising researchers a chance to escape the grant-writing treadmill. They could have used their strong bargaining position to try and get the changes reversed or postponed. In fact, this is precisely what Prof. Rossi did when Children's sprang the news on him—years later, after his negotiating position was weakened by IDI's merger and his transition to their employ. The impact on employee retention and on attitudes towards the mooted takeover by the Hospital could only have been negative. Dr. Warren might have lobbied with Prof. Rossi for an ad hoc agreement preserving IDI's better terms for an inventive work already well in hand, or he might have quit, taking his mRNA idea with him to industry. Those were all foreseeable risks of announcing a change in terms for the worse for IDI's most creative employees.

We can see why both IDI and Children's might have been hesitant to put an agreed-on harmonization of policies into practice by announcing inferior terms to IDI employees in the transition years before the merger. On that basis, the motive behind the "mistake" is questionable. In any case, the absence of such notification, whether viewed subjectively or objectively, should be fatal to any claim that Dr. Warren accepted the revised terms. *Cf. Campbell v. General Dynamics Government Systems Corp.*, 321 F. Supp. 2d 142, 148, 149 n.7 (D. Mass. 2004) (regarding the analogy between IDI's potential motive for keeping silent on its pledge to cut

34

royalty sharing and General Dynamics' potential motive for sneaking its imposition of a mandatory arbitration policy by its workforce in a cryptic email blast.)

In the final analysis, would a "reasonable employee" reading the promissory language in IDI's Policy take "right to amend" to encompass changing incentives detrimentally without any notification even while continuing to propound the better terms to employees just as before? This is the key problem the district court elided in its ruling. Unless there is some compelling reason to suppose a barely asserted "right to amend" is stronger than the right to amend inherent in the at-will employment relationship, the answer must be "no."

Absent a clear forewarning, if an employer reduced its promised retirement benefits for at-will employees based on an undisclosed side agreement with a third party without affording them a chance to accept or reject its new terms, *prima facie* it would be in breach. The same would be true if the employer applied amended policies to claw back earned benefits, as in *LeMaitre*. In both settings, breach might be avoided by expressing an unequivocal disclaimer in advance, but that disclaimer would have to do more than call out the employer's uncontroversial right to amend its offered terms. The same reasoning applies in the instant case. Of course, an honest disclaimer rendering terms illusory would make the employer's offered deal less attractive to employees—and that is exactly as it should be, because the deal on offer would be objectively worse for the employees.

35

**Issue II:   Under Massachusetts law the IDI Policy imparted a contractual duty
to IDI to apply the royalty-sharing terms detailed therein.**

In weighing whether the IDI Policy is a contract the district court summarizes
landmark Massachusetts decisions on the status of employee handbook promises
and touches on how their rulings might bear on the case. In the end the court holds
Dr. Warren's breach-of-contract claim can be rejected without deciding the issue,
based on the Policy's "right to amend" disclaimer. Addendum, 10-14.

If the First Circuit agrees with the appellant's rebuttal of the district court's
"right to amend" analysis, the foundational question of "contract" or "no contract"
must still be resolved, either by the Court itself or by the lower court on remand. Dr.
Warren maintains that the evidence before this Court is sufficient to show that the
IDI Policy is a contract between the Immune Disease Institute and its employees.
Ironically, IDI itself aggressively asserted this position in 2011, making "BREACH
OF CONTRACT: Breach of Development Policy" the first count in the draft suit it
threatened to file against Dr. Warren. Appendix, 280-289. Children's lawyers have
since done their best to muddy the waters. Appendix, 371-388 at 20:8-37:12. The
district court tacitly endorsed the pro-contract position in arguing that a preexisting
legal duty to assign undermines promissory estoppel or negligent misrepresentation
claims arising out of the 2011 imbroglio. Addendum, 20-21. The court stated:
"Under Massachusetts law, such [academic IP] policies are generally valid and

36

binding upon employees, even if the employees are not specifically aware of them," and goes on to cite authority which makes it clear the reason why "such policies" are "generally valid and binding" is their contractual status under legal analysis. See *Greene v. Ablon*, Civil Action No. 09-10937-DJC (D. Mass. Sep. 17, 2012) at *28.

It is now firmly established in Massachusetts law that an employee handbook can impart contractual obligations to an employer. See, *e.g.*, *Pine River State Bank v. Mettille,* 333 N.W. 2d 622, 627 (Minn. 1983), cited approvingly by the SJC in *O'Brien v. New England Tel. & Tel. Co.* at 693, 664 N.E.2d 848: "personnel handbook provisions, if they meet the requirements for formation of a unilateral contract, may become enforceable as part of the original employment contract." Massachusetts is in line with the national trend: "The idea that an employer may ignore promises made in a personnel manual is in increasing disfavor in this country." *O'Brien* at 691, 664 N.E.2d 847. The trend was heralded by landmark out-of-state decisions such as *Toussaint v. Blue Cross*, 408 Mich. 579, 292 N.W.2d 880 (1980), and *Woolley v. Hoffmann-La Roche, Inc.*, 99 N.J. 284, 491 A.2d 1257 (1985)—both cited approvingly by the *O'Brien* court—which framed much of the analysis now used to evaluate handbook-related contract claims.

Importantly, the caselaw on handbook promises has developed mainly in the context of disputes in which a discharged employee alleges a job security-related provision such as a prescribed progressive discipline procedure trumps the common

37

law presumption of at-will status. Such cases present the special difficulty of reconciling a handbook's apparent promise of rights relating to dismissal with the settled right of an at-will employer to terminate employees without cause. Courts have stressed that finding obligation in handbook promises is easier where fringe benefits or deferred compensation are at issue. See *LeMaitre v. Mass. Tpk. Auth.*, 452 Mass. 753, 754, 897 N.E.2d 1218, 1219 (2008) and *Panto v. Moore Business Forms, Inc.*, 130 N.H. 730, 739, 547 A.2d 260, 266-67 (1988).

In the district court case Children's relied heavily on two early Massachusetts handbook decisions to argue that the IDI Policy is not a contract, both involving at-will employees claiming a breach of job security-related provisions. In *Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 13-15, 525 N.E.2d 411, 415-16 (1988), the plaintiff alleged he had not been given the benefit of a promised grievance procedure when he was fired. In its ruling against Jackson, the SJC reviewed a set of six probative factors in weighing the contractual status of the handbook terms at issue. In *Pearson v. John Hancock Mut. Life Ins. Co.*, 979 F.2d 254 (1st Cir. 1992), the plaintiff claimed handbook language imposed a duty on his ex-employer to make a diligent effort to rehire him after an extended leave of absence. The First Circuit applied a "*Jackson* factors" analysis in finding against Pearson, while cautioning that the factors should be seen as tools to focus the lens of inquiry rather than as an "exclusive" list of prerequisites. *Id.* at 256 n.3.

*Jackson* and *Pearson* lend themselves to use by corporate defendants to poke holes in employee handbook-related claims. But the SJC went out of its way to clarify its *Jackson* teaching in *O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 664 N.E.2d 843 (1996), emphasizing that the factors are not magic bullets to escape responsibility for offers extended in handbooks. *O'Brien* augured notable decisions according contractual status to handbook terms, including *Derrig v. Wal-Mart Stores, Inc.*, 942 F. Supp. 49, 53-55 (D. Mass. 1996), *Ferguson v. Host Int'l, Inc.*, 53 Mass. App. Ct. 96, 98-103, 757 N.E.2d 267, 269-73 (2001) and *LeMaitre v. Mass. Tpk. Auth.*, 70 Mass. App. Ct. 634, 638-39, 876 N.E.2d 888, 892 (2007).

All employee handbooks are not created equal. The enforceability of their provisions depends upon a host of considerations, including their overall content and the circumstances of their distribution. *Campbell v. General Dynamics Government Sys*, 407 F.3d 546, 558-59 (1st Cir. 2005). A review of the text of the IDI Policy and the conditions of its distribution should make it clear the Policy is a contract between the Institute and its employees and that, specifically, its royalty-sharing terms for inventors have the force of contract:

A. Special attention was drawn to the IDI Policy. It was handed out to new hires at Orientation and explained that acceptance of its terms was a condition of IDI employment. Appendix, 283 ¶ 14, 346 ¶ 2.

B.  IDI sought manifest assent to the Policy, requiring new hires to execute the incorporated Participation Agreement promising to comply with the IDI Policy and acknowledging review and comprehension of its royalty-sharing terms. Appendix, 346 ¶ 4.

C.  The Policy was widely disseminated, being posted on the corporate intranet for the perusal of all IDI employees. Appendix, 346 ¶ 3.

D.  There is not even a perfunctory effort to disavow contractual status or legal effect with respect to the royalty-sharing promises within the four corners of the IDI Policy. Appendix, 346 ¶ 6.

E.  The IDI Policy's language is mandatory and detailed. It features defined terms such as "Covered Person" and "Net Proceeds." Addendum, 30-33. This shows unequivocally that the Policy is not merely hortatory or a "guide." The IDI Policy also uses the language of acceptance in ways that typically distinguish legally significant communications from non-binding policies. Addendum, 39-41. See *Campbell v. General Dynamics Government Sys*, 407 F.3d 546, 558 (1st Cir. 2005).

F.  The Policy includes terms which are intended to be legally binding and enforceable upon the employee. Addendum, 39 ¶ 4.

G.  The royalty-sharing scheme is avowedly crafted to induce acts and forbearances redounding to IDI's economic benefit. Addendum, 28-29.

H.  In another recent case involving a university allegedly "squeezing" an employee inventor's percentage, a similar inventions policy was ruled to be contractual by the Massachusetts District Court. *Charest v. President & Fellows of Harvard Coll.*, Civil Action NO. 13-11556-DPW (D. Mass. Feb. 16, 2016) at *28-33, *33 n.5, *57.

I.  IDI's own conduct supports the conclusion that the Policy is a contract. Its lawyers characterized the Policy as such when they threatened to sue Dr. Warren for breach of contract for failing to comply with its terms during the 2011 impasse over the second IP assignment. Appendix, 347 ¶ 11. *Cf. Charest v. President & Fellows of Harvard Coll.* at *31-32.

J.  As discussed under Issue I, any claim that the Policy's promises are illusory due to a minimally asserted right to amend must fail. The right of an employer to unilaterally amend its offered terms is uncontroversial in an at-will setting. *Gebhard v. Royce Aluminum Corp.*, 296 F.2d 17, 19 (1st Cir. 1961). The practice of making such amendments does not undermine each standing offers' binding effect up until a revised offer is appropriately noticed to employees. See *LeMaitre v. Mass. Tpk. Auth.*, 70 Mass. App. Ct. 634, 639-40, 876 N.E.2d 888, 892-893 (2007).

K.  Any claim rooted in *Jackson* that the Policy's failure to specify a term of employment (and disavowal of such intent in ¶ 7 of the Participation

41

Agreement) argues against contractual status is off point as job security-related rights are not at issue. *LeMaitre v. Mass. Tpk. Auth.*, 452 Mass. 753, 754, 897 N.E.2d 1218, 1219 (2008). Indeed, no benefit promised by the Policy is in tension with at-will employment doctrine.

L.  The fact that the IDI Policy is not the product of negotiation between the parties is unremarkable in an at-will employment setting and does not vitiate contractual status. See *O'Brien* at 692, 664 N.E.2d 844: "Negotiation of the terms of a company-wide manual for nonunion employees is not likely and is not an essential precondition of the enforceability of the employer's obligations stated in the manual."

A "meeting of minds," subjective reliance, or contemporary awareness on the part of an employee of specific terms are not required to establish contractual rights and duties in the handbook context. See *Greene v. Ablon*, 794 F.3d 133 (1st Cir. 2015) at 147, *Toussaint* at 613, 292 N.W.2d 892 and *Woolley* at 301-05, 491 A.2d 1266-68. *Woolley* endorses the cogent analysis in *Anthony v. Jersey Central Power Light Co.*, 51 N.J. Super. 139, 145-46, 143 A.2d 762, 765-66 (App. Div. 1958) (an at-will employee's reliance on a company-wide incentive plan is presumed from both the contractual nature of their employment and from the continuation of their employment.) Any other position would create a host of evidentiary problems, lead to non-uniform treatment of offerees and invite "hide the ball" abuses on the part of

employers. An objective approach should be applied to ascertain the obligations incurred by an employer based on how a reasonable employee would understand the handbook in the context of its distribution. *Derrig v. Wal-Mart Stores, Inc.*, 942 F. Supp. 49, 55, 55 nn.13-14 (D. Mass. 1996). See also *Panto v. Moore Business Forms, Inc.*, 130 N.H. 730, 741-742, 547 A.2d 260, 268 (1988) (analyzing the enforceability of handbook promises relating to deferred compensation, including the application of objective standards to the issue of contract formation.)

## Issue III: If Children's is bound to honor the IDI Policy, there is no reason to dismiss Dr. Warren's motion to amend his complaint.

Dr. Warren's original 2017 complaint against Children's claimed breach of contract for its disavowal of IDI's express royalty-sharing terms as to the inventor's promised percentage of licensing proceeds and IDI's commitment to distribute the inventor's share of any equity received at the "earliest opportunity," letting inventors manage and dispose of their equity as they see fit. The complaint sought a declaratory judgment that the IDI rules applied and injunctive relief directing Children's to follow the IDI Policy's terms in Dr. Warren's case.  Appendix, 9-16.

In 2017 Dr. Warren could not be sure the Moderna equity would ever become liquid or, if it did, whether the company's shares would end up being publicly traded or (for example) cashed out in an acquisition. Children's had not disclosed anything about the instruments involved or any contractual or statutory constraints

that might regulate transfers. During the district court proceedings, it emerged that the shares IDI received for the license might not have been transferable before the expiry of the post-IPO lock-up on June 5, 2019. Appendix, 400-401 at 49:13-50:12. If that is correct, it would have been possible for Children's to avoid harming Dr. Warren's interests if it had transferred the IDI-prescribed percentage of stock promptly upon the expiry of the lock-up. After the distribution of liquidated equity proceeds in late December 2019, Dr. Warren had enough information to determine conclusively that he had been economically injured by the Hospital's abrogation of the IDI terms, both because of his reduced percentage and because Children's had sold shares at prices well below their value at the exit from lock-up. Dr. Warren moved to amend his complaint to address the new factual situation on March 3, 2020. Appendix, 441-56. His proposed amended complaint still asked for a declaratory judgment, but now sought money damages to address the realized losses stemming from the reduced inventor's percentage and the low sale price of the stock relative to its value at the lock-up expiry. It also added a new claim for conversion as the Hospital had indisputably retained Dr. Warren's share of stock to liquidate at its own discretion even though the IDI Policy expressly directs that any inventors' equity be distributed in kind "at the earliest opportunity."

The district court dismissed Dr. Warren's motion to amend his complaint without much ado, focusing solely on the fact that the added claim of conversion

must fail on the court's finding that the IDI terms do not regulate his rights owing to IDI's Affiliation Agreement promise to adopt Children's policy. Straightforwardly, if the Court finds that the IDI's terms are contractually binding, the argument for dismissing the amended complaint cannot stand. Under the Fed. R. Civ. P. 15(a)(2), if a party moves to amend a pleading before trial, "The court should freely give leave when justice so requires." On that basis, the Court should require the district court to enter Dr. Warren's first amended complaint.

## CONCLUSION

As articulated above, the facts and the applicable law show that Children's Hospital is contractually bound to honor IDI's express royalty-sharing terms to Dr. Warren because those are the only terms that he ever accepted by his continued performance. Dr. Warren therefore respectfully requests that this Court reverse the judgment of the district court and remand for further proceedings. Remand should be directed to the declaratory relief prayed for and the determination of damages under Dr. Warren's first amended complaint.

Respectfully submitted,

/s/ Luigi Warren
Luigi Warren (Pro Se)
155 Cordova St., #104
Pasadena, CA 91105
Tel: (617) 275-1489
luigi.warren@outlook.com

Dated: May 23, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(5)(A) and 32(a)(7)(B)(i)(f). This brief contains 11,093 words, excluding those portions exempted by Fed. R. App. P. 32(f), as calculated by the word count feature of Microsoft Word. This brief was prepared in a proportionally spaced font, using Microsoft Word, in 14-point Times New Roman.

/s/ Luigi Warren
Luigi Warren (Pro Se)

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2023 I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the Court's appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system.

/s/ Luigi Warren
Luigi Warren (Pro Se)

<u>ADDENDUM</u>

January 20, 2023 District Court Order Granting Summary Judgment ......................**1**

January 20, 2023 District Court Judgment .............................................................**25**

The IDI Research and Technology Development Policy........................................**26**

LeMaitre v. Mass. Tpk. Auth., 452 Mass. 753, 897 N.E.2d 1218 (2008) ..............**45**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LUIGI WARREN,

      Plaintiff,

v.                                                    No. 17-CV-12472-DLC

The CHILDREN'S HOSPITAL
CORPORATION,

      Defendant.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT NO. 51) AND PLAINTIFF'S MOTION TO AMEND (DKT NO. 72)

Cabell, U.S.M.J.

      Plaintiff Dr. Luigi Warren sued defendant Children's Hospital Corporation (Children's) for reportedly failing to honor the terms of a revenue and equity policy regarding an invention of Dr. Warren's that is included in a patent Children's owns. Children's demurred and moved for summary judgment. (Dkt. No. 51). Following a hearing, the court denied Children's motion, and Dr. Warren subsequently moved to amend the complaint, which Children's has opposed. (Dkt. Nos. 70, 72, 87). For the reasons explained below, the court vacates its prior order denying Children's motion for summary judgment, and now allows the motion. The court also denies Dr. Warren's motion to amend.

ADDENDUM 001

I. <u>**Factual Background**</u>

The facts are taken from the Defendant's Statement of Undisputed Material Facts (Dkt. No. 55), the Defendant's Memorandum of Law in Support (Dkt. No. 52), the Plaintiff's Statement of Material Facts (Dkt. No. 58), the Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Dkt. No. 57), and the exhibits attached to these filings. The facts are undisputed unless otherwise noted. As always on a motion for summary judgment, the court views the facts in the light most favorable to Dr. Warren as the non-moving party and draws all reasonable inferences in his favor. *Carlson v. Univ. of New England*, 899 F.3d 36, 43 (1st Cir. 2018).

A. ***Dr. Warren's Work at the IDI***

In November 2007, Dr. Warren began working at the Immune Disease Institute (IDI) in an at-will capacity as a postdoctoral researcher. (Dkt. No. 55, ¶ 3). While there, he co-invented, along with Principal Investigator Dr. Derrick Rossi, a breakthrough technique for "reprogramming" cells to induce them to become pluripotent stem cells (the Invention). (Dkt. No. 52, pp. 3-4). The parties quickly recognized the Invention's great medical and commercial potential.

Throughout the early part of 2010, Dr. Warren and Dr. Rossi worked with other IDI personnel to begin the process of securing

2

patents for the Invention.  (Dkt. No. 57, p. 3).  In April 2010, IDI filed for a provisional patent with the United States Patent and Trademark Office.  (*Id.*)  Dr. Warren left his position at IDI shortly thereafter, in June of 2010.  (Dkt. No. 55, ¶ 5).  On December 21, 2010, approximately six months after Dr. Warren left IDI, IDI exclusively licensed the Invention to Moderna Therapeutics, Inc.  (Dkt. No. 55, ¶ 39).[1]

### B.  *IDI's Affiliation with Boston Children's Hospital*

During the patent and licensing process, IDI itself was in a state of change.  In or around 2008, IDI and Children's began exploring the possibility of a merger, executing an Affiliation Agreement on December 24, 2008.  (*Id.* at ¶ 28).  Under that agreement, any IDI intellectual property not licensed before the affiliation was consummated (the "Effective Date") became subject to Children's policies as of the Effective Date, including Children's revenue and equity policies.  (*Id.* at ¶¶ 29, 31).  The parties agree that the Effective Date was February 20, 2009.  (*Id.* at ¶ 31; Dkt. No. 57, p. 2).  In September 2012, IDI dissolved and formally merged into Children's.  (Dkt. No. 55, ¶ 38).

---

[1] At the time, Moderna was a newly founded start-up.  Today, of course, Moderna is best known for its COVID-19 vaccine.  *See About Us*, MODERNA THERAPEUTICS, https://www.modernatx.com/about-us/our-story (last visited Jan. 11, 2023).

**C.    *The Two Invention Revenue and Equity Policies***

The were some differences between IDI's and Children's respective revenue policies.  The IDI policy in effect when Dr. Warren was hired, known formally as the IDI Research and Technology Development Policy (IDI policy), provided among other things that all technology was "owned by IDI," (Dkt. No. 55-3, § E(1)(a)), and employee-inventors would "provide technical information, documentation, and all other assistance deemed necessary by IDI, including an assignment of the Inventor's rights in the Technology to IDI." (*Id.* at § F).  In exchange, IDI would give one-third of its technology-derived licensing revenue to the inventors.  (Dkt. No. 55-3, § H(4)).[2]  Further, if IDI accepted equity from a company in exchange for licensing rights, the inventor's share of the equity would be deemed a "royalty" and "distributed to the Inventors at the earliest opportunity." (*Id.* at § I(3)).  The IDI policy also provided that IDI's trustees "retain the discretion to amend [the policy] from time to time." (*Id.* at § A).  The policy required each "Covered Person," including employees like Dr. Warren, to "sign a Participation Agreement in which the Covered

---

[2] Where, as here, an invention had multiple inventors, the policy provided that the one-third inventor share would be divided into equal shares for each inventor absent a contrary agreement among the inventors.  (Dkt. No. 55-3, § H(5)).  Accordingly, under the IDI policy, Dr. Warren would be entitled to 16 2/3 percent of the net proceeds from the Moderna license.

4

Person agrees to comply with this Policy." (*Id.* at § C).  The record is unclear as to whether Dr. Warren ever signed a Participation Agreement.  (Dkt. No. 57, p. 16; Dkt. No. 59, p. 5).

In contrast, the Children's Hospital Policy on Inventions and Intellectual Property (Children's policy) contained materially different and slightly more complicated terms regarding revenue payments and equity sharing with employee-inventors.  The Children's policy sets out different payment terms for inventors still employed by Children's and those who had left Children's. (Dkt. No. 55-9, p. 3).  In the latter case, the inventor's share of license proceeds is 35 percent "up to" $500,000, then 25 percent "above" $500,000.  (*Id.*).  Like the IDI policy, the Children's policy equally divided this share among all co-inventors.  (*Id.*). The parties do not dispute that Dr. Warren would receive a lesser share under the Children's policy than he would under the IDI policy.  The Children's policy resembles the IDI policy regarding ultimate ownership of inventions and duties of employee-inventors:

> Every invention based on the Hospital's intellectual property . . . shall be the property of the Hospital . . . . When the Hospital determines to seek the patenting . . . of any invention . . . the inventor shall cooperate fully in such effort, including execution of all necessary or desirable agreements, applications, assignments, and other forms and instruments.

(*Id.* at p. 2).

ADDENDUM 005

**D.  *The Invention Assignments***

In August 2010, after having left IDI, Dr. Warren voluntarily executed an assignment of his "entire right, title, and interest" in the Invention to IDI.  (Dkt. No. 57-4).  In February 2011, Ryan Dietz ("Dietz"), a manager at IDI's technology transfer office, sent Dr. Warren an email asking him to assign his rights a second time.  (Dkt. No. 55-4, pp. 10-11).  The subsequent assignment is variously described in the record as a "follow-up assignment[]," (Dkt. No. 55-1, 68:11-12), an "additional assignment of the same invention," (Dkt. No. 55, ¶ 46), and an "assignment pertain[ing] to a second provisional application."  (Dkt. No. 55-4, p. 10).

Reluctant to execute any further assignments, Dr. Warren requested a copy of the document purporting to require his execution of the assignment.  (Dkt. No. 55, ¶ 47).  In response, Dietz sent Dr. Warren the following excerpt from the IDI policy:

> Ownership of Inventions. Each Invention shall be the sole and exclusive property of IDI. I agree to execute an assignment to IDI or its nominee of my entire right, title, and interest in and to all Inventions (to which IDI has ownership rights pursuant to the "Research and Technology Development Policy") without additional compensation. I further agree, upon request of IDI and at its expense, to execute such documents as may be necessary or desirable in applying for and obtaining patents on the Inventions in the United States and any foreign country. I further agree, whether or not I am employed by IDI, to cooperate to the extent and in the manner reasonably requested by IDI in the prosecution or defense of any claim involving a patent covering any

6

> Invention or any litigation or other claim or proceeding
> involving any Invention . . . .

(Dkt. No. 55-4, p. 7).  Dr. Warren also asked for the relevant policy regarding revenue sharing and licensing royalties.  (*Id.*).  Dietz again replied with the IDI policy's revenue-sharing schedule.  (*Id.* at p. 6).

After receiving this information, Dr. Warren declined to execute the subsequent assignment.  (Dkt. No. 55, ¶ 52).  Subsequently, Dianne McCarthy, Children's General Counsel, sent Dr. Warren an email with the full IDI policy attached, reiterating that Dr. Warren was obligated to execute the assignment.  (*Id.*).  Dr. Warren also received an email from Children's outside counsel threatening a lawsuit if Dr. Warren persisted in his refusal.  (Dkt. No. 55-7).  The email indicated that Dr. Warren's "refusal to execute the assignment [was] in direct contravention of [his] obligations under IDI's Research and Technology Development Policy."  (*Id.* at p. 2).  Attached to the email was a draft complaint against Dr. Warren, replete with references to the IDI policy and asserting a breach of contract claim against Dr. Warren for violating said policy.  (*Id.* at pp. 3, 5-6, 9).  Shortly after receiving this email, Dr. Warren executed two additional assignments.[3]  (Dkt. No. 57-4, pp. 4-7).

---

[3] The record is unclear why Dr. Warren executed two assignments instead of one.

Six years later, in August 2017, when rumors of an initial public offering for Moderna were circulating, Dr. Warren called Dietz (now officially working for Children's) to inquire about the Moderna licensing agreement. (Dkt. No. 57, p. 6). Dietz informed Dr. Warren that the references to the IDI policy back in 2011 were in error and that Dr. Warren's invention was subject to Children's policies on revenue and equity. (*Id.* at 7). Dietz offered Dr. Warren the opportunity to sign onto a superior "ad hoc" revenue policy that his co-inventor Dr. Rossi had negotiated with Children's, which Dr. Warren declined.[4] (Dkt. No. 55, ¶¶ 57-61; Dkt. No. 57, p. 7). Dr. Warren instead filed this suit, seeking *inter alia* a declaratory judgment that Children's is bound by the IDI policy, and injunctive relief ordering Children's to distribute payments to him according to the IDI policy. (Dkt. No. 1).

## II. **Discussion**

Broadly speaking, the parties appear to agree in their filings that Dr. Warren's complaint includes two claims: one for breach of contract and one for promissory estoppel.[5] The court also

---

[4] Under the ad hoc policy, the inventors' share of all net revenues would be 27.5 percent. (Dkt. No. 55, ¶ 60).

[5] While Dr. Warren asserts that he suffered multiple injuries due to Children's failure to abide by the IDI policy, and seeks multiple forms of relief, each of these assertions is predicated on the idea that Dr. Warren is entitled to payment as set out in the IDI policy, either because the IDI policy is a valid

8

considers, but ultimately rejects, a possible negligent misrepresentation claim.

### A. *Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). Once the moving party meets that burden, the opposing party must "show that a factual dispute does exist." *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (internal quotation omitted). "Such a showing 'requires more than the frenzied brandishing of a cardboard sword.'" *Geshke v. Crocs, Inc.*, 740 F.3d 74, 77 (1st Cir. 2014) (quoting *Calvi v. Knox Cty.*, 470 F.3d 422, 426 (1st Cir. 2006)). "The nonmovant must point to materials of evidentiary quality, . . . and such materials must frame an issue of fact that is more than merely colorable." *Irobe v. U.S. Dep't of Agriculture*, 890 F.3d 371, 377 (1st Cir. 2018) (internal quotations and omitted).

---

contract or because of Children's representations surrounding the second assignment.

When determining whether summary judgment is appropriate, "[t]he court must view the record in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." *Carlson*, 899 F.3d at 43. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (further internal quotation marks omitted).

**B.  *Breach of Contract***

Dr. Warren claims that the IDI policy constitutes an implied contract which Children's breached by failing to honor the IDI terms on profits and equity sharing. Children's contends that the IDI policy is not a contract because IDI could amend it at will, and that, in any event, under the Affiliation Agreement, the Children's policy replaced the IDI policy for intellectual property not licensed by February 20, 2009. Since the Invention was not licensed until December 2010, the Children's policy applies to Dr. Warren, not the IDI policy.

To establish a breach of contract under Massachusetts law, "a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part

10

of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 690 (2016) (citing *Singarella v. City of Boston*, 342 Mass. 385, 387 (1961)).  As the party seeking to enforce the alleged contract, the plaintiff bears the burden of proving a contract existed. *Kauders v. Uber Techs, Inc.*, 486 Mass. 557, 572 (2021); *see Canney v. New England Tel. & Tel. Co.*, 353 Mass. 158, 164 (1967) ("Where the existence of a contract is in issue, the burden is on the plaintiff to show it was made."). Massachusetts law provides that personnel manuals and other employer policies may form the basis of a contract between an employer and an employee. *O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 691 (1996) (citing *Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 13 (1988)); *see Weber v. Cmty. Teamwork, Inc.*, 434 Mass. 761, 780 (2001) ("Where an employee signs a personnel policy, negotiates specific terms as a condition of beginning or continuing employment, or where an employer calls special attention to the policy, a finding that the terms of the policy form the basis of an implied contract may be justified.").

There is no "rigid list of prerequisites" for determining if an employment policy is an enforceable contract, but there are several factors that inform the analysis. *O'Brien*, 422 Mass. at 692.  Some factors, when present, suggest the existence of a

11

contract.  These include negotiation between the employee and the employer about the policy's terms, the employer calling "special attention" to the policy, and the employee manifesting assent to the policy.  *Pearson v. John Hancock Mut. Life Ins. Co.*, 979 F.2d 254, 256 (1st Cir. 1992) (citing *Jackson*, 403 Mass. at 14-15).  Factors pointing in the opposite direction include the employer reserving the right to unilaterally modify the policy and a characterization that the policy is meant to provide "guidance" rather than commit the employer to certain conduct.  *Id.*  The overarching questions are whether the employee believed that the policy "constituted the terms or conditions of employment, equally binding on employee and employer" and whether such belief was "reasonable under the circumstances."  *Derrig v. Wal-Mart Stores, Inc.*, 942 F. Supp. 49, 55 (D. Mass. 1996) (describing *O'Brien*, 422 Mass. at 694).

    In this case, the parties do not dispute that Dr. Warren earnestly believed that the IDI policy was binding.  His pursuit of a breach of contract claim throughout this litigation makes that clear.  Whether his belief was reasonable is a more difficult question, with factors supporting both sides.  The IDI policy states explicitly that it "is intended to serve as a *guide* for members of the IDI community" and that IDI "retain[s] the discretion to amend [the] Policy from time to time," suggesting

12

that the policy was not binding. (Dkt. No. 55-3, Preamble and §
A) (emphasis added). At the same time, IDI both called special
attention to the policy's terms and induced its employees to
manifest assent insofar as it required all covered employees to
"sign a Participation Agreement in which the [employee] agrees to
comply with this Policy." (*Id.* at § C). Ultimately, the court
need not decide this issue, as Dr. Warren's breach of contract
claim suffers from a separate fatal flaw.

Even assuming *arguendo* the IDI policy was a contract, it was
not immutable. Rather, IDI specifically reserved the right to
amend the policy at its discretion. (*Id.* at § A). It did just
that by entering into the Affiliation Agreement, which provided
that any IDI inventions not licensed by the Effective Date would
be subject to Children's revenue policy as of that date. (Dkt.
No. 55, ¶¶ 29, 31). The parties agree that the Effective Date was
February 20, 2009. (*Id.* at ¶ 31; Dkt. No. 57, p. 2). IDI did not
license the Invention until December 21, 2010. (Dkt. No. 55, ¶
39). As such, the Invention was unlicensed as of February 20,
2009, which meant that it became subject to the Children's policy
on that date. By the time IDI licensed the Invention to Moderna,
it was the Children's policy that controlled the revenue-sharing
terms, not the IDI policy. As a matter of law, then, Children's
did not breach the IDI policy by failing to distribute revenue

according to its terms because the IDI policy was no longer the controlling agreement between the parties.

Dr. Warren tries mightily to escape this conclusion. First, he points to the fact that, in February 2011, two senior IDI officials and IDI's outside counsel all pointed him to (and threatened him with) the IDI policy, not the Children's policy. Second, Dr. Warren denies, without any supporting authority, that IDI had the right to unilaterally alter its policy "to abrogate specific promises made to employees." (Dkt. No. 57, p. 15). Finally, Dr. Warren argues that the Children's policy, by its express terms, only applied to Children's employees, not IDI employees. Each of these contentions misses the mark.

Regarding IDI's mistaken reference to the IDI policy in seeking to obtain the plaintiff's signature, lawyers, despite all jokes to the contrary, are human, and sometimes make mistakes. Here, two senior lawyers and an IDI manager all mistakenly informed Dr. Warren that the IDI policy controlled his revenue share in 2011. That mistake was regrettable but it does not in any way alter or abrogate the fact that the Children's policy superseded the IDI policy in February 2009. Regardless of whether their misrepresentations are otherwise legally significant (as discussed below), they do not control when or whether the IDI policy remained effective.

14

ADDENDUM 014

As to Dr. Warren's second point, he offers no authority to suggest that IDI did not have the right to unilaterally amend the IDI policy despite its explicit reservation of such right, and the court is aware of no such authority.

Finally, Dr. Warren cites to this provision from the Children's policy for the proposition that the policy does not apply to him:

> This policy provides that Children's Hospital pays royalties only to its own inventors. However, when a Children's Hospital inventor makes an invention with a co-inventor in another academic or non-profit institution, and the institutions agree to market the invention jointly, the Director of Research Administration may authorize an agreement whereby each institution pays all inventors according to the terms of its own intellectual property policy.

(Dkt. No. 55-9, p. 3). Dr. Warren reads this provision to say that because he was never an employee of Children's, the Children's policy commands that he be paid in accordance with his own institution's policy, namely IDI's. But Dr. Warren fails to explain how this provision, which explicitly applies to situations "when a Children's Hospital inventor makes an invention with a co-inventor in another . . . institution," applies here. More significantly, Dr. Warren's contention flies in the face of basic principles of contract interpretation. It is a "cardinal principle of contract construction[] that a document should be read to give effect to all its provisions and to render them consistent with

15

each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514
U.S. 52, 63 (1995); *see also* Restatement (Second) of Contracts §
202(5) (Am. Law Inst. 1981) ("Wherever reasonable, the
manifestations of intention of the parties to a promise of
agreement are interpreted as consistent with each other.").
Likewise, "if the principal purpose of the parties is ascertainable
it is given great weight." Restatement (Second) of Contracts §
202(1).

The Affiliation Agreement provided that, as of the Effective
Date, all unlicensed IDI inventions would become subject to the
Children's policy. Under Dr. Warren's reading, applying the
Children's policy to IDI inventions (and inventors) would just
point right back to the IDI policy, making the entire provision
completely frivolous. This clearly was not the parties' intention.
Further, maintaining a separate IDI revenue-sharing policy would
be contrary to the entire purpose of the Affiliation Agreement,
which was to bring IDI and Children's closer together in
preparation for a later merger. In short, IDI and Children's can
have only intended exactly what they said in the Affiliation
Agreement: the Children's policy would apply to IDI inventions and
inventors. The court thus rejects Dr. Warren's contrary
interpretation.

ADDENDUM 016

For the foregoing reasons, the court finds that, as a matter of law, the former unlicensed intellectual property of IDI, including the Invention, became subject to the Children's policy on February 20, 2009 by the terms of the Affiliation Agreement. As such, there can be no breach based on the IDI policy.

### C. *Promissory Estoppel*

Although the IDI policy no longer applied to the Invention as of February 2009, that does not necessarily end this dispute.  When Dr. Warren asked IDI about equity in February 2011, three different individuals referred Dr. Warren to the IDI policy rather than the applicable Children's policy.  These misrepresentations, which the defendant acknowledges, justify an inquiry into whether Dr. Warren is entitled to compensation in line with the IDI policy under a theory of promissory estoppel.

Through promissory estoppel, alternatively called a reliance-based theory in Massachusetts law, a noncontractual promise can be enforceable in whole or in part by virtue of an offeree's reasonable reliance on it.  *Loranger Constr. Corp. v. E.F. Hauserman, Co.*, 376 Mass. 757, 760-61 (1978).  The promise is then in every way a "contract" and enforceable pursuant to "traditional contract theory."  *Treadwell v. John Hancock Mut. Life Ins. Co.*, 666 F. Supp. 278, 286 (D. Mass. 1987) (citing *Loranger Constr. Corp.*, 376 Mass. at 761).  In other words, "[i]n the absence of a

17

contract in fact, promissory estoppel implies a contract in law where there is proof of an unambiguous promise coupled with detrimental reliance by the promisee." *Malden Police Patrolman's Ass'n v. City of Malden*, 92 Mass. App. Ct. 53, 60 (2017) (citing *R.I. Hosp. Tr. Nat'l Bank v. Varadian*, 419 Mass. 841, 848 (1995)). A promissory estoppel claim can only succeed in the absence of an enforceable contract. *Id.* at 61.

A party seeking to assert promissory estoppel must demonstrate that "(1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise." *Loranger Constr. Corp. v. E.F. Hauserman Co.*, 6 Mass. App. Ct. 152, 154 (1978), *aff'd*, 376 Mass. 757 (1978). Additionally, the promisee's reliance on the promise must be reasonable. *See R.I. Hosp. Tr. Nat'l Bank*, 419 Mass. at 850.

In considering Dr. Warren's breach of contract claim, the court assumed without deciding that the IDI policy (later displaced by the Children's policy) was an enforceable contract. The court will now give Dr. Warren the benefit of the opposite assumption in considering promissory estoppel. Even so, any promissory estoppel

18

claim fails because Dr. Warren cannot prove that IDI's misrepresentations induced him to act.

A well-settled rule in the field of contracts is that "performance of a pre-existing legal duty that is neither doubtful nor subject to honest and reasonable dispute is not valid consideration where the duty is owed to the promisor." *In re Lloyd, Carr & Co.*, 617 F.2d 882, 890 (1st Cir. 1980); *accord* Restatement (Second) of Contracts § 73; *see also Johnny's Oil Co. v. Eldayha*, 82 Mass. App. Ct. 705, 714 (2012) ("Detrimental reliance on an offer or a promise . . . is a substitute for consideration."). "The policy underlying this rule is to discourage parties under such a duty from using the threat of nonperformance to extort greater compensation for doing only that which they were already obligated to do." *In re Lloyd, Carr & Co.*, 617 F.2d at 890. It stands to reason that a promise cannot induce a promisee to act if the promisee already has a clear legal duty to act.

In this case, Dr. Warren had a preexisting legal duty to assign his rights in the Invention to IDI. The "general rule [is] that rights in an invention belong to the inventor." *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 785 (2011) (citations omitted). When, however, an individual is "employed to make an invention, . . . [he] is bound

ADDENDUM 019

to assign to his employer any patent obtained." *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933); *accord Standard Parts Co. v. Peck*, 264 U.S. 52, 59-60 (1924); *Nat'l Dev. Co. v. Gray*, 316 Mass. 240, 247 (1944); *see Banks v. Unisys Corp.*, 228 F.3d 1357 (Fed. Cir. 2000) ("[W]here an employee is hired to invent something or solve a particular problem, the property of the invention related to this effort may belong to the employer."). IDI hired Dr. Warren to work as a postdoctoral research fellow in the Rossi Lab. Dr. Warren developed the Invention in an IDI lab, while being paid by IDI, doing exactly the type of work for which IDI hired him. Per the precedent cited above, these circumstances strongly suggest that Dr. Warren had a common-law duty to assign the Invention to IDI.

And there is more. Not content to rely on the common law, IDI adopted its own policy on the subject. No one disputes that this policy was in force when Dr. Warren joined IDI in 2007. This policy explicitly required Dr. Warren, as an "Inventor," to among other things assign his rights in the Invention to IDI.[6] (Dkt. No. 55-3, § F). Under Massachusetts law, such policies are generally valid and binding upon employees, even if the employees

---

[6] Drs. Warren and Rossi did not formally disclose their invention to IDI until May 2010, by which time the Children's policy had supplanted the IDI policy. Because the Children's policy imposes substantially identical obligations on inventors, *see* (Dkt. No. 55-9, p. 2), the result is the same regardless of which policy applies.

are not specifically aware of them. *See Greene v. Ablon*, Civil Action No. 09-10937-DJC, 2012 WL 4104792, at *14-*15 (D. Mass. Sept. 17, 2012); *Grocela v. Gen. Hosp. Corp.*, Civil Action No. 11-991-BLS1, 2012 WL 3205616, at *4-*5 (Mass. Super. Ct. July 18, 2012). As such, separate and apart from the common law, Dr. Warren had a legal duty to assign the Invention to IDI pursuant to the IDI policy.[7] This remained true even after he left IDI. *See E.I. Du Pont de Nemours & Co. v. Okuley*, 344 F.3d 578, 585 (6th Cir. 2003) (obligation to assign invention to employer survives "until fulfilled," even after employee's resignation).

In light of the foregoing, the court finds that Dr. Warren had a preexisting legal duty to assign the Invention to IDI when Dietz and others mistakenly referred him to the IDI policy. As such, Dr. Warren was not thereby legally induced to execute the subsequent assignments, and there can accordingly be no promissory estoppel.

D.  *Negligent Misrepresentation*

In its previous order denying the motion for summary judgment (Dkt. No. 70), the court contemplated (without so specifying) that this case could survive summary judgment to the extent that the

---

[7] Children's separately argues that Dr. Warren incurred a legal duty to execute the subsequent assignments by executing the first assignment. The court acknowledges but does not reach this argument.

21

complaint sets forth a claim for negligent misrepresentation based on the misrepresentations IDI officials made to Dr. Warren in 2011. On further reflection, though, the court now finds that any such claim fails for substantially the same reasons discussed above.

In order to recover for negligent misrepresentation, the plaintiff must prove that the defendant: (1) in the course of his or her business, (2) supplied false information for the guidance of others, (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and that the defendant (6) failed to exercise reasonable care or competence in obtaining or communicating the information. *DeLuca* v. *Jordan*, 57 Mass. App. Ct. 126, 136-37 (2003) (quoting Restatement (Second) of Torts § 552(1) (Am. Law Inst. 1977)).

Here, Dr. Warren cannot prove that he suffered any pecuniary loss or that he justifiably relied on the misrepresentations. Dr. Warren's theories of loss in this case are based on Children's compensating him less generously than the IDI policy provides, but the IDI policy no longer applies. In fact, Children's has heretofore provided Dr. Warren *more* generous compensation than what is set out in the controlling Children's policy. Similarly, Dr. Warren cannot have relied on the misrepresentations as a matter of law since he already had a legal duty to assign the Invention

to IDI. These deficiencies are fatal to any negligent misrepresentation claim.

### E. *Motion to Amend*

Where, as here, a defendant has filed a responsive pleading or a motion for summary judgment, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* The decision to grant or deny such a motion is within the discretion of the district court. *See Steir v. Girl Scouts of the USA*, 383 F.3d 7, 14 (1st Cir. 2004). The court will deny a motion to amend a complaint where the proposed amendment would be futile, "mean[ing] that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Rife v. One West Bank, F.S.B.*, 873 F.3d 17, 21 (1st Cir. 2017) (internal quotation omitted); *but see Resolution Tr. Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994) (where motion to amend is not filed until after defendant moves for summary judgment, plaintiff is "required to demonstrate . . . that the proposed amendments [are] supported by substantial and convincing evidence") (internal quotation omitted).

Dr. Warren seeks to amend his complaint to add a conversion claim "based on [his] right to ownership of his share of the Moderna equity at lock-up expiry under the IDI Policy, the

defendant's willful interference with [Dr. Warren's] taking possession of stock over [Dr. Warren's] objection and the economic harm he suffered as a result." (Dkt. No. 73, ¶ 14). As set out in the proposed amended complaint, the new count is specifically based on Children's acting contrary to the terms of the IDI policy. (Dkt. No. 72-1, ¶ 70). As discussed above in detail, however, the terms of the IDI policy do not govern any revenue or equity distributions between Children's and Dr. Warren. As such, the proposed conversion claim, based as it is on the IDI policy, fails to state a claim for which relief can be granted, s*ee Rife*, 873 F.3d at 21, and it is certainly not "supported by substantial and convincing evidence." *See Gold*, 30 F.3d at 253. The proposed amendment is therefore futile.

### III. <u>Conclusion</u>

For the foregoing reasons, the court VACATES its previous order denying summary judgment (Dkt. No. 70), ALLOWS Children's motion for summary judgment (Dkt. No. 51), and DENIES Dr. Warren's motion to amend (Dkt. No. 72).


<u>So Ordered</u>.                    /s/ Donald L. Cabell
                                DONALD L. CABELL, U.S.M.J.

DATED:  January 20, 2023

ADDENDUM 024

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LUIGI WARREN,

      Plaintiff,

v.                                                    No. 17-CV-12472-DLC

The CHILDREN'S HOSPITAL
CORPORATION,

      Defendant.

JUDGMENT

CABELL, M.J.

      In accordance with the court's Memorandum and Order [Dkt. 91] issued on 1/20/23 granting defendant's motion for summary judgment, it is ORDERED:

      Judgment entered for the defendant.

                       By the court,

January 20, 2023                          /s/ Noreen Russo
Date                                      Deputy Clerk

ADDENDUM 025



# Immune Disease Institute

# RESEARCH AND TECHNOLOGY DEVELOPMENT POLICY

Approved by the ID I Board of Trustees
October 28, 2004



# Table of Contents

|  | page |
|---|---|
| Preamble | 3 |
| A. Purpose | 4 |
| B. Research and Technology Development Committee | 5 |
| 1. Committee Membership | 5 |
| 2. Responsibilities | 5 |
| C. Scope | 5 |
| D. Technology Reporting and Disclosure | 6 |
| 1. Reporting to OTD | 6 |
| 2. Disclosure Outside IDI | 6 |
| E. Technology Ownership: | 6 |
| 1. Principles | 6 |
| 2. Process | 7 |
| F. Protecting Intellectual Property Rights | 7 |
| G. Marketing and Commercialization | 8 |
| H. Distribution of Net Proceeds: | 8 |
| 1. Net Proceeds | 8 |
| 2. Equity | 8 |
| 3. IDI General Fund | 9 |
| 4. Distribution Schedule | 9 |
| 5. Multiple Inventors | 9 |
| 6. No Active Research Program | 10 |
| 7. Death or Departure from IDI | 10 |
| 8. Postponement of Distribution | 10 |
| I. General Equity Provisions: | 10 |
| 1. Decision to Accept Equity | 10 |
| 2. Receipt of Equity | 10 |
| 3. Distribution of Equity | 11 |
| 4. Monitoring | 11 |
| 5. Clinical or Other Sponsored Research | 11 |
| 6. Governing or Scientific Board Membership | 11 |
| J. Conflicts of Interest Policies | 12 |
| K. Consulting Agreements | 13 |
| L. Other Arrangements | 13 |
| M. Former Policies | 13 |
| **APPENDIX** |  |
| Exhibit A - Participation Agreement | 15 |
| Exhibit B – Standard Consulting Agreement Provisions | 18 |

## IMMUNE DISEASE INSTITUTE
## RESEARCH AND TECHNOLOGY DEVELOPMENT POLICY

### - Preamble -

The collaboration between Immune Disease Institute and its physicians and researchers is critical to IDI's successful fulfillment of its mission of providing a high level of excellence in research. Over the last several years, a variety of relationships with industry have brought new resources to the support of science that facilitates translation of knowledge from the laboratory to the bedside. These relationships have great potential to benefit the public as well as research institutions, their faculty and staff, and their industrial partners. The Trustees of Immune Disease Institute are strongly committed to the continued growth in these innovative and mutually beneficial relationships, while realizing their paramount responsibility to safeguard the principles of academic freedom and timely dissemination of information about important new scientific developments.

This policy is intended to serve as a guide for members of the IDI community in structuring their relationships with industry and other outside ventures in view of their academic responsibilities for teaching, research and patient care. In addition, the policy encourages creativity and innovation of researchers, with incentives for productivity and opportunities to gain recognition for individual accomplishments.

In addition, this policy is also meant to encourage researchers to disclose discoveries in a timely manner in order to protect the intellectual property rights of IDI, while providing for fair and equitable allocation of responsibilities and rewards among inventive researchers, IDI and other collaborators who may have contributed in whole or in part to inventions, discoveries or Technology.

Finally, the policy supports the goal of bringing to the public important new discoveries, which, through commercialization, address unmet medical needs and alleviate human suffering.

**IMMUNE DISEASE INSTITUTE
RESEARCH AND TECHNOLOGY DEVELOPMENT POLICY**

## A. PURPOSE

The mission of Immune Disease Institute (IDI) is to provide the highest level of excellence in medical research. To further this mission, the Trustees of IDI (the "Trustees"), who are responsible for the overall allocation of resources to accomplish this objective, have adopted this Research and Technology Development Policy (the "Policy") to:

benefit the public by facilitating commercial development and utilization of inventions, discoveries and other Technology;

encourage the creativity and innovation of current staff, and encourage the recruitment and retention of talented and innovative staff;

provide incentive to researchers to be productive and recognize individual accomplishment;

foster scholarly pursuits and principles of academic freedom;

encourage researchers to disclose discoveries in a timely manner in order to protect the intellectual property interests of IDI;

provide guidelines for negotiating, preparing and implementing contracts with outside sponsors, collaborators and licensees;

provide for equitable allocation of responsibilities and financial rewards among inventors, researchers, IDI and any other entity, which may have developed, sponsored or financed in whole or in part, such invention, discoveries or Technology; and

provide support for IDI's mission of excellence in clinical care, teaching and research.

The Trustees retain the discretion to amend this Policy from time to time to fulfill these purposes.

## B. RESEARCH AND TECHNOLOGY DEVELOPMENT COMMITTEE

1. <u>Committee Membership</u>. The Trustees, in consultation with the President of IDI, the Executive Vice President and the Director of the Office of Technology Development ("Director") will appoint members of the Research and Technology Development Committee (the **"Committee")**. Membership may consist of the President of IDI or designee, the Executive Vice President, the Director for Development, the Director of the Office of Technology Development (OTD); two Senior Investigators, active in research at IDI; and at least five members of the Board of Trustees. All members of the Committee shall have the right to vote on matters that come before the Committee. All members of the Committee shall serve at the pleasure of the Board of Trustees. Members of the Committee shall serve at the discretion of the Chairman of the Committee. A quorum shall consist of at least two thirds (2/3) of the membership with at least three (3) Trustees, one (1) Faculty member and either the Director or the Chairman included in that number.

The Chairman of the Committee shall be designated annually by the Chairman of the Trustees. The Director, or designee, shall be responsible for scheduling all meetings of the Committee and keeping the minutes for such meetings. The President and Chief Financial Officer of IDI shall have the right to attend all meetings, and the Director shall be responsible for notifying them of all meetings.

2. <u>Responsibilities</u>. The Committee shall oversee and advise the Director on the interpretation and application of this policy, and may grant exceptions to the Policy in special cases. The Chairman shall act on or recommend to the Board, as appropriate, any motions on matters that are brought to a vote in the Committee and agreed to by a majority of those present. From time to time; the Committee may recommend to the Trustees amendments and/or additions to this Policy.

## C. SCOPE

This Policy applies to any invention, discovery, data, writing, and other intellectual property, including trade or service marks, works-for-hire, know-how, computer software and biological materials, whether or not patentable, copyrightable or otherwise entitled to legal protection (collectively "Invention") made, conceived, reduced to practice or generated by a full or part-time professional staff, faculty, employee of, student, trainee, or person or entity otherwise engaged at IDI, such as consultants or agents retained by IDI (collectively **"Covered Person")**. Any Invention that (1) either has potential commercial value or is patentable, copyrightable, or otherwise entitled to legal protection, and (2) is made, conceived, reduced to practice or generated by a Covered Person while engaged in activities: (a) for which the Covered Person received financial support from or through IDI; (b) during which the Covered Person made significant use of facilities, materials, equipment, staff, information, ideas, data, computers or other resources of IDI; or (c) which are related to the employment, research or other activities conducted at IDI by the Covered Person is referred to as **"Technology".** Ordinary use of desktop computers, library facilitities or personal office space shall not be considered "significant" use for purposes of Section (b) above. Steps taken toward commercialization, such as filing a patent application or seeking other protection of intellectual property, will be interpreted as demonstrating potential commercial value.

In keeping with principles of academic tradition, IDI claims no ownership interest in scholarly publications, such as textbooks, that do not embody or disclose any Technology and were not prepared with significant use of IDI resources.



Each Covered Person shall sign a Participation Agreement in which the Covered Person agrees to comply with this Policy. A copy of a Participation Agreement is attached as **Exhibit A.**

## D. TECHNOLOGY REPORTING AND DISCLOSURE

1. Disclosure of Technology to IDI. Each Covered Person who makes, conceives, reduces to practices or generates Technology (the **"Inventor")** should promptly submit a completed Report of Invention to IDI's Office of Technology Development ("OTD") when Technology is identified. Report of Inventions are available from the OTD. If the Covered Person is a consultant engaged by an employee or staff member of IDI, then the employee or the staff member is responsible for ensuring that the Report of Invention is completed and submitted. The description of the Technology in the disclosure form should provide enough detail to determine the most appropriate steps, if any, to protect and commercialize the Technology.

2. Disclosure Outside IDI. If Technology is disclosed outside IDI, such as in a publication or oral presentation, by use, or by public sale, before appropriate steps are taken to protect the intellectual property rights in the Technology, such as filing a patent application, then those rights may be lost. Therefore, prior to any proposed publication of Technology or other disclosure of the Technology outside IDI, the Inventor should contact the OTD to coordinate the disclosure with steps IDI may take to protect rights in the Technology. If Technology is to be disclosed to a third party for commercial evaluation or other IDI purposes, in most cases an appropriate, signed Confidential Disclosure Agreement should be obtained from the recipient of the information. For Reports of Invention, Confidential Disclosure Agreements, and information about the appropriate use of each, contact the OTD or log on to the IDI website.

## E. TECHNOLOGY OWNERSHIP

1. Principles:

   a. All Technology is owned by IDI. When an entity other than IDI has also sponsored, financed, or otherwise participated in the invention, the Director will negotiate with the other entity to determine the percentage of the Technology owned by IDI. The Director may consult with the Committee and the Inventor.

   b. The ownership of Technology made in whole or in part in connection with activities conducted under a grant from or other agreement with the U.S. Government is subject to the retained rights of the U.S. Government.

   c. The ownership of Technology made in whole or in part in connection with activities conducted pursuant to any industrially sponsored or otherwise sponsored research agreement between IDI and the sponsor will be in accordance with this Policy.

ADDENDUM 031

2. Process:

    a. The Director: will make the initial determination of ownership. Decisions of the Director about whether an Invention is within the definition of Technology and other issues of ownership may be appealed to the President by an Inventor in writing within one (1) month of notification to the inventor of the Director's decision The President will convene a subcommittee of IDI consisting of the Director and the Executive Committee whose decision will be final.

    b. Subject to obligations to third parties (such as a sponsor or the Government), IDI may waive ownership and release, in whole or in part, any Technology and its related patent, copyright or other legal protection, to the Inventor. The terms of the release may include appropriate compensation to IDI for its out-of-pocket expenses associated with the Technology. IDI may also elect to retain the non-exclusive right to use any released Technology for IDI's non-commercial research.

    If IDI has not taken steps to obtain legal protection of Technology within three (3) months after the filing of a completed Report of Invention or the Effective Date of this Policy, whichever is later to occur, then the Inventor may submit a written request to the Director for the release of the Technology to the Inventor(s). Within three (3) months of receiving the request, the Director will present the request to the Committee for approval and inform the Inventor of whether or not the request is approved, and the reasons for the decision. If the request is approved, then IDI will provide appropriate documentation releasing the Technology to the Inventor(s).

## F. PROTECTING INTELLECTUAL PROPERTY RIGHTS

The Director or designee, working with the Inventor, will decide whether to seek legal protection of technology. If IDI seeks patent, copyright or other legal protection of Technology, in whole or in part, then the Inventor and IDI will work together to protect the Technology. IDI will provide professional services at its expense. The Inventor will provide technical information, documentation, and all other assistance deemed necessary by IDI, including an assignment of the Inventor's rights in the Technology to IDI. The OTD will retain Participation Agreements, invention disclosures, inventorship declarations, and assignments. IDI is not obligated to pay for professional services that are not authorized in advance by the Director.

## G. MARKETING AND COMMERCIALIZATION

The Director and the Inventor, working together, will decide what measures are to be taken to commercialize the Technology, taking into account the principles of academic freedom while optimizing the utility of the Technology to the public and its commercial value to IDI. This may include, but are not limited to, agreements with third parties for the development, patenting, promotion, marketing, licensing and manufacturing of Technology. Transfers of any interest in Technology to third parties are to be by license, rather than assignment, unless otherwise decided by the Director in consultation with the Committee. The license should provide IDI the right to reduce or terminate the license if the third party does not make a diligent effort to make a product developed from the Technology available to the public. If necessary, the Director will expend reasonable efforts to locate Inventors who are no longer at IDI although primary responsibility for keeping address information current will reside with the Inventor. If an Inventor is no longer employed or otherwise engaged at IDI, then the Director may independently decide what measures are to be taken to commercialize the Technology.

Only approved agreements signed by an authorized representative of IDI shall be valid and binding upon IDI. The Director or designee is authorized to negotiate agreements for the development or transfer of Technology with commercial and non-commercial third parties. The President of IDI is authorized to approve and sign Exclusive License Agreements. The Director, and, in the case of agreements for clinical research, the Director or designee, is authorized to approve and sign all other Technology development and transfer agreements.

## H. DISTRIBUTION OF NET PROCEEDS

1. Net Proceeds. The term "Net Proceeds" as used in this Policy shall mean the amount actually received by IDI from the sale, license or other commercialization of Technology owned in whole or in part, by IDI, including, but not limited to, royalties, fees, milestone payments, and Equity (as defined below), less all costs and expenses reasonably attributable to obtaining intellectual property protection and commercialization of the Technology. These costs and expenses may include, without limitation, attorney fees, and out-of-pocket administrative and other costs and expenses of contract negotiations and administration, and any out-of-pocket cost or expense of patent or copyright prosecution, litigation, marketing, licensing and/or negotiation. Research funding and contributions of equipment received by IDI from the sale, licensing or other commercialization of any Technology, shall be the property solely of IDI and shall not be included within Net proceeds.

2. Equity. The term **"Equity"** as used in this Policy shall include stocks, options, warrants and/or other financial instruments convertible to equity in an entity that has rights to Technology.

3. IDI General Fund. IDI General Fund supports initiatives generally of IDI. This fund is hereinafter referred to as the **"General Fund"**.

4. Distribution Schedule. IDI may receive Net Proceeds for the license, sale or other transfer of Technology. If the Inventor arranges to receive Equity from the company to which the Technology is transferred, the guidelines for Conflict of Interest and Commitment of the Faculty Policies on Integrity in Science of Harvard University Faculty of Medicine shall apply. The Net Proceeds actually received by IDI for its interest in Technology, excluding works for hire and trade or service marks, shall be periodically distributed by IDI as provided in the following schedule:

### Distribution Schedule

| Inventor | Inventor's Laboratory | IDI General Fund |
|----------|----------------------|------------------|
| 33 1/3% | 33 1/3% | 33 1/3% |

All distributions to Inventors shall be considered miscelaneous income and will be reported on Internal Revenue Service form 1099.

5. Multiple Inventors. In the event there are joint Inventors, distributions made to the Inventors under the Distribution Schedule shall be divided equally among the Inventors, except as may be otherwise directed by the Inventors and approved by the Director. If the Inventors' work is in different Laboratories, the distributions allocated to each of their respective Research Programs and Departments shall be in direct proportion to the amounts allocated to each Inventor.

6. No Active Research Program. If the Inventor does not have an active research program at the time of commercialization, the Inventor's Laboratory share shall be distributed to the General Fund.

7. Death or Departure from IDI. If the Inventor dies or ceases to be employed by or otherwise engaged at IDI, then IDI will distribute the Inventor's individual share (as distinguished from that of the Inventor's Laboratory) to the Inventor or the Inventor's estate. It shall be the responsibility of the Inventor or the executor or legal representative of the Inventor's estate to notify IDI's OTD in writing, as to where future payments should be sent. Under these circumstances, the Inventor's Laboratory share shall be distributed to the General Fund.

8. Postponement of Distribution. Notwithstanding all of the foregoing, the Committee may postpone distribution of Net Proceeds when extraordinary future expenses, such as an infringement suit, relating to the applicable Technology are reasonably anticipated by the Committee. In such event, the amounts received shall be segregated by IDI, and Net Proceeds will be distributed in accordance with this Policy after actual expenses have been reimbursed to IDI.

I.   GENERAL EQUITY PROVISIONS

1. <u>Decision to Accept Equity</u>. In certain cases of Technology transfer, IDI may have the opportunity to acquire Equity in the licensee's or buyer's company in exchange for IDI's interests in Technology. Decisions regarding ownership of Equity by IDI or an individual Inventor shall be guided by the policies of IDI, and the Harvard Faculty of Medicine policies concerning conflicts of interest and conflicts of commitment together with the purposes and objectives of this Policy.

   The Director will make an initial determination as to whether IDI should accept Equity for the transfer. If the Director determines that an equity transaction meets the objectives of this Policy, then the Executive Vice President will make a written recommendation to a subcommittee of the Committee, designated by the chair of the Committee, to confirm the acceptance of equity and address issues relating to equity ownership (the "Equity Subcommittee").

2. <u>Receipt of Equity</u>. Unless otherwise approved by the Equity Subcommittee, Equity is to be received at the time the Technology is transferred to the company, and not structured as a series of future payments linked to financing milestones or unit sales. However, IDI may accept additional shares in order to maintain IDI's relative Equity percentage interest without additional approval of the Equity Sub-Committee.

   Managers of the Equity account will not have access to any insider knowledge of publicly traded securities. The Investment Committee shall hold Equity in accounts separate from other investment accounts of IDI so that they can be monitored in accordance with this Policy.

   IDI shall disclose its Equity interest in IDI's sponsored publications or presentations regarding associated research and in other situations where the public or where IDI patients would reasonably expect a disclosure. IDI shall also report these interests in its annual report or, if the annual report would not be timely, through appropriate news releases.

3. <u>Distribution of Equity</u>: Equity received by IDI in lieu of a Licensing Fee shall be deemed to be a royalty. The Inventor's share of equity taken as a royalty shall be distributed to Inventors at the earliest opportunity following receipt. The Laboratory and IDI General Fund shares shall be transferred to and disposed of by the Investment Committee. The Principal Investigator of the Laboratory shall be consulted by the Investment Committee about the timing of liquidation of the Laboratory share of an equity transaction.

4. <u>Monitoring</u>. In all circumstances in which IDI receives Equity from a licensee or assignee of Technology, IDI shall closely monitor such relationships to materialize any real or perceived potential conflicts of interest that may arise from that relationship. The Executive Vice President is responsible for overseeing the research implications of Equity arrangements, and will periodically interview appropriate researchers regarding their work and its relationship to the company in which IDI and/or researchers hold Equity.

5. <u>Clinical or Other Sponsored Research</u>. If IDI plans to participate in Clinical Research (as defined by the Harvard University Faculty of Medicine's Policy on Conflicts of Interest and Commitment) sponsored or otherwise financed by a company in which either (a) IDI holds Equity and the company has a market capitalization of less than $10 billion; or (b) IDI holds an Equity interest of at least 5% in the company, regardless of the market capitalization of that company, then IDI shall give due consideration to conflict of interest and commitment concerns that may exist as a result of IDI's holdings in the company. IDI shall take appropriate action, including selling its Equity share in that company, in order to manage, reduce or eliminate conflicts of interests.

Inventors may only hold Equity during the course of Sponsored Research as defined in and to the extent provided for in Harvard University Faculty of Medicine Policy on Conflicts of Interest and Commitment and the Conflict of Interest and Related Policies for IDI and its Affiliates. If the Inventor desires to avoid Equity in order to obtain research funding from a company, the Inventor may request that IDI also avoid taking Equity through a license agreement so as to allow the sponsored research. IDI normally shall not accept Equity under such circumstances; provided, however, that IDI will require in its license or other Technology transfer agreement that the Inventor will not obtain Equity at a later date without the consent of IDI.

6. <u>Governing or Scientific Board Membership</u>. Without the prior consent of the Equity Subcommittee, neither IDI nor any non-faculty employee shall accept a board seat of a company or a seat on a company's Scientific Advisory Board if either (a) IDI holds Equity in the company and the company has a market capitalization of less than $10 billion; or (b) IDI holds an Equity interest of at least 5% in the company, regardless of the market capitalization of that company. No Faculty member may accept a voting seat on a Governing Board of a company if either (a) IDI holds Equity in the company and the company has a market capitalization of less than $10 billion; or (b) IDI holds an Equity interest of at least 5% in the company, regardless of the market capitalization of that company

## J. CONFLICT OF INTEREST POLICIES

1. All financial or compensation arrangements between Covered Persons and third-parties are subject to the *Conflict of Interest and Related Policies for IDI and its Affiliates* and also the *Harvard University Faculty of Medicine Policy on Conflicts of Interest and Commitment* to the extent provided for in those policies and as may be amended by the appropriate authorized governing committee or board.

2. Conflicts of Interest arising from Technology transfer to a company in which a Trustee of IDI or a member of their immediate family holds significant or controlling interest, shall be resolved according to the following guidelines:

   • assign oversight of the transaction to a committee of disinterested Trustees, and require approval by the committee or the full board before a Trustee transaction may occur;

- follow carefully the Intermediate Sanctions rebuttable presumption requirement that the Trustee fully recuse himself or herself from the deliberations and decision making;

- include within the committee's responsibilities the question of whether to sell the Technology at this time or whether to wait;

- conduct sufficient market outreach to establish whether there is a market, other than a Trustee transaction, for the Technology (for example, conduct at least the same market outreach that IDI would conduct before selling Technology in a non-Trustee transaction);

- if a Trustee transaction is under consideration, make sure that the committee or board has sufficient information to determine that the transaction will provide fair value to IDI;

- in deciding whether to enter into a Trustee transaction, factor into the decision any potential adverse publicity that might result for IDI from the fact of entering into a Trustee transaction;

- in determining the minimum amount of consideration to be received in a Trustee transaction, ensure that the consideration will be sufficient to counter criticism of the fact that the transaction is a Trustee transaction;

- if equity or debt of the acquiring entity are proposed as a part of the consideration to be received by IDI, do not accept a higher percentage of such non-cash consideration than IDI would accept in a non-Trustee transaction (non-cash consideration should be viewed from the perspective of IDI's total investment portfolio, avoiding an imprudent percentage of investment in a single non-seasoned company, and avoiding an imprudent overall percentage of high risk investments for the total portfolio) -- here again, ensuring that the mix of non-cash and cash consideration will be adequate to counter criticism of the fact that the transaction is a Trustee transaction;

- before entering into a Trustee transaction, make sure that due diligence is conducted with at least the same level of intensity and sophistication as would be conducted for a non-Trustee transaction;

- as required for the IRS rebuttable presumption, carefully document the basis for the determination concurrently with making the determination.

## K. CONSULTING AGREEMENTS

All consulting arrangements between any Covered Person and any third-party are subject to IDI review pursuant to IDI's applicable Policy on *Consulting Relationships, and Other Financial Arrangements between IDI Staff and Outside Organizations*. Consulting

arrangements between a Covered Person and a third party are subject IDI's Standard Provision's for Consulting, appended to this document as Exhibit B.

## L. OTHER ARRANGEMENTS

Should there be any conflict between this Policy and (a) the terms or conditions of a proposed or existing agreement between IDI and a sponsor, or (b) the policies of another organization to which an Inventor is obligated by agreement, joint appointment, or other affiliation, the conflict shall be resolved by the Director in consultation with the Committee.

## M. FORMER POLICIES

This Policy shall replace all existing policies regarding Technology transfer, effective upon the approval of this Policy by the Trustees. This Policy shall govern the actions, rights and responsibilities of IDI and Covered Persons regarding all Invention, and Technology, from and after the Effective Date, regardless of the date of conception or disclosure of said Invention or Technology.

APPROVED BY THE BOARD OF TRUSTEES
October 28, 2004



## Exhibit A

### IMMUNE DISEASE INSTITUTE
### PARTICIPATION AGREEMENT

Name: _____

Department or Laboratory: _____

In consideration of my employment by or association with Immune Disease Institute (IDI), and/or being afforded an opportunity to work on projects being carried out by IDI, or substantive use of IDI resources, I hereby represent and agree as follows:

1. Compliance with IDI Policies. I have read and I understand the terms of IDI's "Research and Technology Development Policy" and IDI's Policy on Consulting Relationships between IDI Staff and Outside Organizations, and agree to comply with these policies, as amended by the appropriate authorized governing committee or board.

2. Compliance Pursuant to Contracts and Grants. I shall comply with every obligation of IDI that applies to me pursuant to any contract, grant or commitment relating to research or other work covered by the Research and Technology Development Policy.

3. Disclosure of Inventions. Each Invention (meaning all discoveries, concepts, ideas, processes, methods, formulas, and techniques, whether or not patentable) and further including trademarks and copyright rights conceived or reduced to practice by me solely, jointly, or with others in the course of my employment by IDI shall be promptly disclosed to IDI by me utilizing a written Report of Invention. Report of Invention forms are available from the Office of Technology Development. Such report shall be sufficiently complete in technical detail and appropriately illustrated by sketch or diagram to convey understanding of the nature, purpose, operation, and to the extent known, the physical, chemical and biological characteristics of the Invention.

4. Ownership of Inventions. Each Invention shall be the sole and exclusive property of IDI. I agree to execute an assignment to IDI or its nominee of my entire right, title and interest in and to all Inventions (to which IDI has ownership rights pursuant to the "Research and Technology Development Policy") without additional compensation. I further agree, upon request of IDI and at its expense, to execute such documents as may be necessary or desirable in applying for and obtaining patents on the Inventions in the United States and any foreign country. I further agree, whether or not I am employed by IDI, to cooperate to the extent and in the manner reasonably requested by IDI in the prosecution or defense of any claim involving a patent covering any Invention or any litigation or other claim or proceeding involving any Invention, but all expenses thereof shall be paid by IDI. All records which I shall use or prepare or come into contact with in the course of working for IDI, shall

remain IDI's sole and exclusive property and shall be subject to the agreement; except that I may retain for my own personal use one copy of all my scientific work papers customarily retained by researchers at non-profit institutions unless prevented by contractual obligations to third parties pertaining to confidential papers or trade secrets, which obligations prevent such retention of any such papers.

5. <u>Filing Copies of Agreements with OTD</u>. I will file with the OTD a final copy of every consulting agreement to which I am a party or become a party (a) that is connected to work which I have done, am doing, or expect to do within the scope of my employment by, appointment with, or education at IDI or (b) for which I have made, am making, or expect to make use of facilities, materials, equipment, staff, information, ideas, data or other resources furnished by or through IDI.

6. <u>Ownership of Notebooks and Data.</u> I agree that all notebooks and other data generated in research and other activities associated with or funded through IDI (whether in paper, electronic or other media) shall belong to IDI. The originals of such data are to remain with IDI. In accordance with the policies of IDI and Harvard Medical School, I may obtain a copy of such data. At the request of IDI, I shall deliver promptly to IDI copies of all written, electronic, or other records describing or referencing Technology as defined in IDI's "Research and Technology Development Policy", whether or not I am still employed by or otherwise engaged at IDI.

7. <u>No Employment Contract.</u> I understand that this Agreement does not constitute an employment contract and that, if I am otherwise an employee of IDI, this Agreement does not constitute any representation that my employment will continue for any definite period of time nor does this Agreement affect my employment status in any other way.

8. <u>Prior Inventions Excepted</u>. Descriptions of all Inventions, whether or not patented, which I conceived or reduced to practice prior to my employment by IDI, are attached hereto as Schedule A, and those Inventions shall be excluded from this agreement. I represent that the absence of any Invention from Schedule A shall indicate that I own no such Invention at the time of signing the Agreement.

9. <u>Publication or Disclosure of Confidential Matter</u>. I agree that I will not at any time, whether or not I am employed by IDI, except as properly required in the conduct of the business of IDI, or except as authorized in writing by IDI, publish, disclose, or authorize anyone else to publish or disclose, any Invention or any other secret or confidential matter relating to any aspect of the operations or business of IDI or its related companies, business clients or associates with which my employment may in any way acquaint me. However, in all cases where not prevented by contractual agreement with third parties, I shall have an absolute right to make scientific publication of my work.

10. <u>Limitation on Authority</u>. I understand and agree that I am not authorized by IDI to sign, and I will not sign, any agreement or document on behalf of IDI that may commit, restrict, or otherwise affect Inventions that I create, including confidentiality agreements, license agreements, material transfer agreements, and research agreements. I shall not sign individually any document or agreement (other than one solely involving an Academic

Work) unless specifically approved or requested to do so by an authorized representative of IDI and I understand and agree that all such documents must be submitted to the OTD.

11. <u>Distribution Policy</u>. I have read and understand the Distribution of Net Proceeds mentioned in the IDI's "Research and Technology Development Policy".


Signature: _____

Date: _____


## Exhibit B

The following example document, Standard Provisions for Consulting, is provided for informational purposes. Any IDI personnel who are asked to consult for an outside company, should present a copy of this document to the company and ask that it be appended to the Consulting Agreement. The provisions contained in this agreement protect the rights of the consultant and IDI and are generally accepted without any changes by the companies. Executable versions of this form may be downloaded from the IDI website or obtained from the Office of Technology Development.

 **Immune Disease Institute**

## Exhibit B

### IMMUNE DISEASE INSTITUTE
### STANDARD CONSULTING AGREEMENT PROVISIONS

Attachment to Consulting Agreement between _____ and _____

1 It is the policy of The Immune Disease Institute (IDI) that these Standard Consulting Agreement Provisions ("Standard Provisions") must be attached to any written agreement ("Agreement") to provide consulting services between an employee, student, or member of the professional staff ("Consultant") of IDI and any organization ("Company") and must be signed by both parties to the Agreement. By signing these Standard Provisions, the parties to the Agreement agree to abide by these Standard Provisions, and further agree that if anything in the Agreement is inconsistent with these Standard Provisions, these Standard Provisions shall govern.

2 Nothing in the Agreement shall limit or be construed to limit the right of Consultant to use or publish information which (a) is or becomes available to the public through no breach of the Agreement by Consultant, (b) was known to Consultant before the consulting services were performed, (c) is acquired by Consultant from a third party has the legal right to disclose the information to the Consultant, or (d) Consultant is required to disclose by law, government regulation, or court order. In addition, information generated by Consultant pursuant to the Agreement shall be proprietary to the Company only if (a) such information is generated as a direct result of the performance of consulting services under the Agreement and (b) is not generated in the course of the Consultant's activities as a IDI employee.

3 Consulting services shall not involve any use of the funds, personnel, facilities, materials, or other resources of IDI, provided that Consultant may use the library and the Consultant's office.

4 Neither the name of the Consultant nor that of IDI, nor any variation thereon, nor adaptation thereof may be used in any advertising, promotional or sales literature, or other publicity without the prior written approval of the party whose name is to be used.

5 Consultant's rights, title and interest in inventions, discoveries and developments conceived or reduced to practice in the performance of Company funded consulting services made solely or jointly with Company employees or agents ("Consulting Inventions") may be assigned to the Company, so long as the provisions in Paragraph 6 below are not applicable. Consultant shall disclose to IDI's Office of Technology Development, in confidence, all Consulting Inventions which are related to Consultant's research, clinical, or educational activities at IDI in order to provide IDI an opportunity to assess, together with Company, whether the invention is subject to the provisions of Paragraph 6 below.

6 Not withstanding Paragraph 5 above, Company agrees and understands that Consultant has

ADDENDUM 043

a pre-existing obligation to assign to his or her employer, IDI, all of Consultant's rights in intellectual property which arise or are derived from Consultant's employment at IDI or which utilize the funds, including funding from any outside source awarded to or administered by IDI, personnel, facilities, materials, or other resources of IDI including resources provided in-kind by outside sources. Company has no rights by reason of this Agreement in any publication, invention, discovery, improvement or other intellectual property, whether or not publishable, patentable or copyrightable that is subject to Consultant's obligations to IDI. Company also acknowledges and agrees that it will enjoy no priority or advantage as a result of the consultancy created hereunder in gaining access, whether by license or otherwise, to any proprietary information or intellectual property of IDI.

7  Consultant shall not disclose to Company any unpublished results of research performed at IDI by Consultant or any other IDI employee, student, or member of the professional staff. Other than the inventions assigned to Company pursuant to Paragraph 5 above, Company shall have no rights or interests in any other inventions, discoveries or developments owned by or assignable to IDI.

8  Nothing in the Agreement shall be construed to restrict or limit the duties Consultant is performing or may perform in the course of, or incidental to, Consultant's employment at IDI, including but not limited to research sponsored by a third party commercial entity nor shall anything in the Agreement be construed to restrict or limit Consultant's right to serve as an advisor to any hospital, or to any governmental or not-for-profit organization.

9  Each party to the Agreement acknowledges (i) that the Consultant is entering into the Agreement, and providing services to the Company, in the Consultants individual capacity and not as an employee or agent of IDI, (ii) IDI is not a party to this Agreement and has no liability or obligation hereunder, and (iii) IDI is intended as a third party beneficiary of this Agreement and certain provisions to this Agreement are for the benefit of IDI and are enforceable by IDI in its own name.

10 The Standard Provisions shall be and hereby are in force and effect for the entire term of any Agreement between Consultant and Company.


ACCEPTED:


_____        _____
Authorized Officer of Company                   Date


_____        _____
Consultant                                      Date

**1218** Mass.      **897 NORTH EASTERN REPORTER, 2d SERIES**

452 Mass. 753

**Robert H. LeMAITRE**

v.

**MASSACHUSETTS TURNPIKE
AUTHORITY.**

Supreme Judicial Court of Massachusetts,
Hampshire.

Argued Sept. 3, 2008.

Decided Dec. 10, 2008.

**Background:** Retired employee brought action against former employer to recover for breach of contract in amount it paid employee for unused sick leave. The Superior Court Department, Hampshire County, Judd J. Carhart, J., 2005 WL 4927101, entered summary judgment in favor of employee. Employer appealed. The Appeals Court, 70 Mass.App.Ct. 634, 876 N.E.2d 888, Rapoza, C.J., affirmed and employer appealed.

**Holding:** The Supreme Judicial Court, Cordy, J., held that program of employer paying for unused sick leave could not be lowered to lesser amount that was retroactive.

Vacated and remanded.

Officers    and    Public    Employees
⟜101.5(1)

Incentive program of government employer paying cash and other benefits to employees for each unused day of sick leave, payable at retirement, could not be lowered to a lesser amount of compensation that was retroactive and applied to sick days accumulated before the date of lowering the amount; program's benefits were a form of compensation contingent on continued employment and services rendered while the program's provisions were in effect, and employer bound itself to pay benefits it promised for the performance it sought and secured.

————

Michael B. Keating, Boston (David A. Kluft with him) for the defendant.

Nicole B. Caprioli, Worcester, for the plaintiff.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.[1]

CORDY, J.

|₇₅₃At issue in this case is the enforceability of an incentive program offered and implemented by the Massachusetts Turnpike Authority (authority), which "encourage[d] employees to use their sick leave credit only when absolutely necessary, and reward[ed] employees who ha[d] unusually good attendance records." The program was described in the authority's employee handbooks and was more specifically detailed and updated in |₇₅₄its personnel policy and procedure bulletins (authority policies). The program was revised on several occasions between 1975 and 1996, but essentially provided cash and other benefits to employees for each unused day of annual sick leave allotted to them, payable at their retirement. In 1996, the benefits provided under the program were substantially reduced. LeMaitre retired in 2002, and received the reduced benefit for all of the sick days he had accumulated during the term of his employment, including those days that he had accumulated under the program before its benefits were reduced in 1996. A judge in the Superior Court, relying primarily on the reasoning of *O'Brien v. New England Tel. & Tel. Co.,* 422 Mass. 686, 664 N.E.2d 843 (1996) (*O'Brien* ), and *Jackson v. Action for Boston Community Dev., Inc.,* 403 Mass. 8,

————

1.  Justice Greaney participated in the delibera-            tion on this case prior to his retirement.

525 N.E.2d 411 (1988) (*Jackson*), granted summary judgment to LeMaitre on a breach of contract claim, and awarded him the value of the program benefits applicable to each of the time periods during which he accrued the unused sick days. The Appeals Court affirmed, in an opinion with which we largely agree. *LeMaitre v. Massachusetts Turnpike Auth.*, 70 Mass. App.Ct. 634, 876 N.E.2d 888 (2007).

1. *Facts.* The undisputed facts are set out in detail in the opinion of the Appeals Court, *id.* at 635–637, 876 N.E.2d 888, and are not repeated here.

2. *Discussion.* Employee handbook cases characteristically arise when at-will employees seek to enforce the provisions of an employer issued handbook indicating that an employee will be accorded either some measure of job security or some particular disciplinary process before discharge. *Panto v. Moore Business Forms, Inc.*, 130 N.H. 730, 737, 547 A.2d 260 (1988). See, e.g., *O'Brien, supra* at 687, 695, 664 N.E.2d 843 (dismissal of at-will employee alleged to violate terms of personnel manual providing for progressive discipline); *Jackson, supra* at 8–9, 525 N.E.2d 411 (dismissal of at-will employee

alleged to violate company grievance procedure). This is not such a case, and policies that might counsel against too readily concluding that an employer's unilateral announcement of a personnel policy modifies the at-will relationship it has with its employees, are largely inapplicable here. See *Panto v. Moore Business Forms, Inc., supra* at 739, 547 A.2d 260 (company's unilaterally announced deferred compensation plan enforceable regardless of at-will status of employees it covered).

$|_{1255}$We agree with the Appeals Court that the program's benefits are essentially "a form of employee compensation contingent on continued employment and services rendered while the provisions [of the program] were in effect." *LeMaitre v. Massachusetts Turnpike Auth., supra* at 642, 876 N.E.2d 888. We also agree that through the application of the principles stated in *Jackson* and further explained in *O'Brien*, the authority bound itself to paying the benefits it promised for the performance it sought and secured.[2]

In reaching this conclusion, we need not (and do not) decide whether any other of the authority policies (or its personnel poli-

2. This conclusion is also compelled in the circumstances of this case by the application of the principles of estoppel. In *Sullivan v. Chief Justice for Admin. & Mgt. of the Trial Court*, 448 Mass. 15, 27–28, 858 N.E.2d 699 (2006), quoting *Bongaards v. Millen*, 440 Mass. 10, 15, 793 N.E.2d 335 (2003), we held that "[c]ircumstances that may give rise to an estoppel are (1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." See also Restatement (Second) of Contracts § 90(1) (1981) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the

promise. The remedy granted for breach may be limited as justice requires").

"Some typical situations where the doctrine has been applied involve ... an employee's reliance on his employer's promise to pay a pension or other fringe benefit ...." H.J. Alperin, Summary of Basic Law § 5.19, at 692–693 & n. 12 (4th ed. 2006), citing *Rooney v. Paul D. Osborne Desk Co.*, 38 Mass.App.Ct. 82, 83–84, 645 N.E.2d 50 (1995) (employee entitled to 554 shares of stock because he detrimentally relied on employer's promise to provide stock as compensation when employee changed positions within company), *Van Hook v. Southern Cal. Waiters Alliance, Local 17*, 158 Cal.App.2d 556, 570–572, 323 P.2d 212 (1958) (union officer entitled to retirement benefits on promissory estoppel theory), and *Feinberg v. Pfeiffer Co.*, 322 S.W.2d 163, 169 (Mo.Ct.App.1959) (employer bound by promissory estoppel where employee retired

**1220** Mass.    **897 NORTH EASTERN REPORTER, 2d SERIES**

cies in their entirety) became terms of employment for LeMaitre or his similarly situated at-will colleagues. Nor do we find it necessary to decide whether an employer must utilize a specific set of words in its employee handbooks or personnel policies in order to avoid their legal enforceability.[3] We remain of the view that while the words used in such handbooks and policies are important, "the context of the ... preparation and distribution [of the employment policies] is ... the most persuasive proof" as to whether the employee's reliance thereon as a binding and legally enforceable commitment is reasonable. *O'Brien, supra* at 694, 664 N.E.2d 843, quoting *Woolley v. Hoffmann–La Roche, Inc.,* 99 N.J. 284, 299, 491 A.2d 1257, modified on other grounds, 101 N.J. 10, 499 A.2d 515 (1985). Neither the wording of disclaimers nor their absence is dispositive.

3. *Conclusion.* LeMaitre's motion for summary judgment on his breach of contract claim was properly allowed, and the authority's motion for summary judgment properly denied. However, substantially for the reasons set forth in the decision of the Appeals Court, judgment is vacated and the matter remanded solely for a determination of damages owed to LeMaitre. LeMaitre's request for costs is allowed. See Mass. R.A.P. 26(a), as amended, 378 Mass. 925 (1979).

*So ordered.*



---

452 Mass. 796

### In the Matter of Ernest B. MURPHY.

Supreme Judicial Court of Massachusetts, Suffolk.

Argued June 10, 2008.

Decided Dec. 18, 2008.

**Background:** Judicial disciplinary action was instituted.

**Holdings:** The Supreme Judicial Court held that:

(1) judge's conduct in writing inappropriate letters to newspaper publisher on Superior Court letterhead concerning libel suit in which he was personally involved as plaintiff violated judicial disciplinary rules, and

(2) judge's misconduct warranted public reprimand.

Public reprimand ordered.

**1. Judges ⟐11(2)**

Judge's conduct in writing letters to newspaper publisher on official Superior Court letterhead concerning libel suit in which he was personally involved as plaintiff, appearing to demand in settlement a premium on jury verdict, appearing to opine as to newspaper's likelihood of success on appeal, and urging publisher to keep newspaper's regular attorneys in the dark about the letters, violated judicial

---

in reliance on employer's promise to pay $200 monthly pension check).

**3.** In its opinion, the Appeals Court stated that if the Massachusetts Turnpike Authority had ''intended to make no legally binding promises, it should have included in the personnel manuals 'in a very prominent position ... an appropriate statement that there is no prom-

ise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing.' '' *LeMaitre v. Massachusetts Turnpike Auth.,* 70 Mass.App.Ct. 634, 641, 876 N.E.2d 888 (2007), quoting *Ferguson v. Host Int'l, Inc.,* 53 Mass.App.Ct. 96, 103, 757 N.E.2d 267 (2001).