No. 23-1158

—

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

—

**LUIGI WARREN,**

Plaintiff-Appellant,

vs.

**THE CHILDREN'S HOSPITAL CORPORATION,**

Defendant-Appellee

—

On Appeal from a Judgment of the
United States District Court for the District of Massachusetts

—

**BRIEF OF THE APPELLEE,
THE CHILDREN'S HOSPITAL CORPORATION**

—

Theodore J. Folkman (No. 81828)
RUBIN AND RUDMAN, LLP
53 State Street
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com

*Appellees' Counsel*

Dated: June 29, 2023

## DISCLOSURE STATEMENT

The appellee, The Children's Hospital Corporation, states that its parent corporation is The Children's Medical Center Corporation, and that no publicly held corporation owns 10% or more of its parent's stock.

# TABLE OF CONTENTS

Disclosure Statement ..................................................i

Table of Authorities....................................................iv

Jurisdictional Statement ............................................1

Issues Presented For Review .....................................1

Statement of the Case.................................................2

    A. Dr. Warren Comes to the Rossi Lab. ..................2

    B. Dr. Warren and Dr. Rossi Invent A New mRNA Technique.3

    C. The IDI Policy..................................................4

    D. IDI Affiliates, And Then Merges, With the Hospital. .........7

    E. The Dispute About The Assignment .................9

    F. The License and the Ad Hoc Policy.................. 11

    G. The Moderna IPO and the Sale of Stock........... 12

    H. Procedural History........................................ 12

Summary of Argument ............................................ 17

Argument................................................................ 20

    A. Standard of Review ....................................... 20

    B. IDI Could And Did Amend Its Policy............................ 20

        1. The Language Of The Policy Is Clear. ...........................22

        2. The Power to Amend Was Not Buried In Fine Print.......22

        3. The Policy Should Not Be Construed Against IDI. ........25

4. Dr. Warren Had No Vested Rights.................................25

5. Since Dr. Warren Had No Notice of the IDI Policy, A Failure To Give Notice of the Hospital's Policy Was Immaterial. .......................................................................28

C. The IDI Policy Did Not Bind IDI Or The Hospital.............28

D. If There Is A Remand, The Court Should Vacate The Decision on the Motion to Amend With Instructions To Consider The Arguments The Hospital Made Against Amendment..........................................................................36

Conclusion.............................................................................. 40

Certificate of Compliance ........................................................ 41

# TABLE OF AUTHORITIES

## Cases

*Abington Nat'l Bank v. Ashwood Homes, Inc.,* 19 Mass. App. Ct. 503, 475 N.E.2d 1230 (1985)..........................................39

*Abraham v. Woods Hole Oceanographic Inst.,* 553 F.3d 114 (1st Cir. 2009) ....................................................... 20

*Acosta-Mestre v. Hilton Int'l of P.R., Inc.,* 156 F.3d 49 (1st Cir. 1998) .................................................................38

*Block Island Fishing, Inc. v. Rogers,* 844 F.3d 358 (1st Cir. 2016) ...................................................................... 20

*Campbell v. Gen. Dynamics Gov't Sys. Corp.,* 321 F. Supp. 2d 142 (D. Mass. 2004) ....................................25, 30

*Charest v. President & Fellows of Harvard Coll.,* 2016 U.S. Dist. LEXIS 18493 (D. Mass. Feb. 21, 2016) .............................. 25, 33, 34, 35, 36

*Chilton v. Comm'r of Internal Revenue,* 40 T.C. 552 (1963) ..... 13

*Cortés-Ramos v. Martin-Moralis,* 2020 U.S. App. LEXIS 11545 (1st Cir. Apr. 13, 2020) ....................................................... 40

*Derrig v. Wal-Mart Stores, Inc.,* 942 F. Supp. 49 (D. Mass. 1996) .................................................................................25

*Ferguson v. Host Int'l, Inc.,* 53 Mass. App. Ct. 96, 757 N.E.2d 267 (2001) ..................................................23, 25

*Greene v. Ablon,* 794 F.3d 133 (1st Cir. 2015) ..........................32

*Jackson v. Action for Boston Cmty. Dev., Inc.,* 403 Mass. 8, 525 N.E.2d 411 (1988).............................. 20, 29, 30

*Kane v. Shearson Lehman Hutton, Inc.,* 916 F.2d 643 (11th Cir. 1990) ..................................................................39

iv

*Lee v. Howard Hughes Med. Inst.,* 457 F. Supp. 3d 9
(D. Mass. 2020)............................................................23, 24

*LeMaitre v. Mass. Tpk. Auth.,* 452 Mass. 753, 897
N.E2d 1218 (2008)...................................................26, 30, 31

*LeMaitre v. Mass. Tpk. Auth.,* 70 Mass. App. Ct. 634,
876 N.E.2d 888 (2007) ....................................................... 26

*LG Capital Funding, LLC b. 5barz Int'l,* 307 F. Supp. 3d 84
(E.D.N.Y. 2018) ...................................................................39

*O'Brien v. New Eng. Tel. & Tel. Co.,* 422 Mass.
686, 664 N.E.2d 843 (1996) .............................20, 23, 29, 30

*Patterson v. Tenet Healthcare, Inc.,* 113 F.3d 832 (8th Cir.
1997) ...................................................................................30

*Pearson v. John Hancock Mut. Life Ins. Co.,* 979 F.2d 254
(1st Cir. 1992) .................................................................... 20

*Vanderbeek v. Vernon Corp.,* 50 P.3d 866 (Colo. 2002)............39

## Statutes

26 U.S.C. § 1235(a) ............................................................ 13

28 U.S.C. § 1291 .................................................................. 1

28 U.S.C. § 1332(a)(1) ......................................................... 1

35 U.S.C. § 202(c)(7) ............................................................5

## Rules and Regulations

26 C.F.R. § 1.1235-1(c)(2) ................................................. 13

Fed. R. Civ. P. 15(d) .......................................................... 40

## Treatises

3 *Eckstrom's Licensing in Foreign & Domestic Operations*
§§ 11:2-11:8 ........................................................................4

3 *Moore's Federal Practice* § 15.30[1] .................................. 40

## JURISDICTIONAL STATEMENT

The plaintiff, Dr. Warren, was a citizen of California. The defendant, The Children's Hospital Corporation, was a Massachusetts corporation with its principal place of business in Massachusetts. The amount in controversy, exclusive of interest and costs, exceeded the sum or value of $75,000. The district court had jurisdiction under 28 U.S.C. § 1332(a)(1).

This is an appeal from a final judgment of the district court that disposed of all parties' claims. The Court has jurisdiction under 28 U.S.C. § 1291. The judgment entered on January 20, 2023. The notice of appeal was filed on February 14, 2023. The appeal is timely.

## ISSUES PRESENTED FOR REVIEW

The appellant, Dr. Luigi Warren, was employed by the Immune Disease Institute. He and a colleague invented a new technique using mRNA to induce cells to become pluripotent stem cells. They assigned their rights to IDI and its successor-in-interest, Boston Children's Hospital. IDI licensed the patent rights in the invention to Moderna, and the Hospital has shared royalties received from Moderna with Dr. Warren under an ad hoc policy that is more favorable to Dr. Warren than the Hospital's ordinary

policy on revenue–sharing. Dr. Warren has claimed that the Hospital should have instead shared revenues with him under the IDI Research and Technology Policy that IDI applied until it amended its policies when it affiliated with the Hospital in 2008. The old IDI Policy provided that inventors would receive one-third of net licensing revenue rather than the 27.5% they are receiving under the Hospital's ad hoc policy. The questions presented are:

1.    Did the court err in holding that IDI had and exercised a power to amend its policies on revenue sharing?

2.    Did the Research and Technology Policy impose contractual obligations on IDI and the Hospital?

## STATEMENT OF THE CASE

### A.    Dr. Warren Comes to the Rossi Lab.

The plaintiff, Dr. Luigi Warren, a biologist, was a postdoctoral researcher in the Rossi Lab at the Immune Disease Institute, an independent, Harvard-affiliated research institution. Before coming to IDI, Dr. Warren worked at several labs at Caltech, and then at a lab at Stanford. He joined the Rossi Lab at IDI in about 2007 and stayed until 2010. Due to professional differences between himself and Dr. Derrick Rossi, Dr. Warren left to Rossi lab to work at the Yakin lab at MIT. (A. 79-80, 88, 100).

### B.    Dr. Warren and Dr. Rossi Invent A New mRNA Technique.

In the early 2000s, scientists were working on techniques to induce cells to become pluripotent stem cells—cells that can develop into any kind of cell in the body. The techniques known at the time had risks. For example, Dr. Shinya Yamanaka, a Japanese scientist and Nobel laureate, had developed a technique that injected the cell with a virus carrying genes associated with the embryonic state. The virus integrated those genes with the cell's genome. After a few weeks, the cell expressed the proteins coded by the injected genes, causing the cell to "regress to [the] embryonic state." But Dr. Yamanaka's technique carried with it a risk of cancer, because the genes injected into the cell's genome could continue to produce the proteins even after they were no longer needed. (A. 81-85).

At IDI, Dr. Warren and Dr. Rossi made an important advance over Dr. Yamanaka's technique by using synthetic mRNA to cause the cells to express the proteins that would in turn cause them to regress, rather than modifying the cells' genomes. Because mRNA is short-lived, scientists could simply stop injecting it into the cell after the cell had become a pluripotent stem cell. Thus there was no risk of cancer. (*Id.*).

Dr. Warren was at IDI from 2007 to June 2010 (A. 16). He and Dr. Rossi conceived their invention by April 22, 2009, August 4, 2009, and October 27, 2009 (A. 336). Although there is no admissible evidence in the record of the date they reduced the invention to practice, the Hospital does not dispute that the inventors had reduced the invention to practice by the end of 2009, as Dr. Warren alleged in his proposed first amended complaint. (A.447). Dr. Rossi and Dr. Warren made their written invention disclosure to IDI on or about May 20, 2010 (A. 87, 117), though Dr. Rossi and Ryan Dietz, who worked in the IDI Office of Technology Development, orally discussed a "potential new disclosure around induced Pluripotency cells" in August 2008 (A. 241).

C.     **The IDI Policy.**

Hospitals and universities that do basic research typically lack the capacity to turn their scientists' research into drugs or other products that can be sold in the market. They therefore typically license their intellectual property to commercial firms that are in a better position to bring to market products that result from scientists' inventions. *See generally* 3 *Eckstrom's Licensing in Foreign & Domestic Operations* §§ 11:2-11:8.

Under the Bayh-Dole Act, 35 U.S.C. §§ 200 *et seq.,* even intellectual property rights resulting from federally funded research

(much basic science research is federally funded) can be licensed to private companies in this way. The Act requires that when the research is federally funded, research institutions must "share royalties with the inventor," 35 U.S.C. § 202(c)(7), though the law does not require any particular sharing formula.

Dr. Warren and Dr. Rossi's research was not federally funded (A. 41), and thus IDI had no duty to share royalties with them. Still, IDI's policy was to share royalties with all inventors, whether or not their research was federally funded. (A. 41).

IDI's policy was embodied in the Research and Technology Policy dated October 28, 2004. (A. 41). The policy provided that IDI would share one-third of licensing revenue with inventors. (A. 129).[1] It made it clear that all inventions made by IDI staff or employees using IDI resources were owned by IDI, not the inventors. (A. 125-126). It provided that the inventor would assign his or her rights in inventions to IDI and give other assistance to allow IDI to obtain patent protection. (A. 127). And it provided that IDI's trustees "retain the discretion to amend this policy from time to time." (A. 124).

---

[1] It also provided that "[e]quity received by IDI in lieu of a Licensing Fee shall be deemed a royalty," and that equity "taken as a royalty" should be distributed to inventors "at the earliest opportunity following receipt." (A. 130).

There is no evidence that Dr. Warren ever saw, was shown, or read the IDI Policy while he was an IDI employee. (App. 98-99).

It was IDI's policy to have new employees sign a Participation Agreement (A.126). The Participation Agreement does not contain the IDI Policy's text, but it does acknowledge the signing employee's agreement that he or she has to comply with the policy, including any amendments to the policy. (A. 134). It also contains the employee's acknowledgment that inventions created by the employee at IDI are IDI's exclusive property, and the employee's agreement to assign all IP rights to IDI or its nominee. (*Id.*). The Participation Agreement states that it is not an employment contract and that it does not "constitute any representation that my employment will continue for any definite period of time nor does this Agreement affect my employment status in any other way." (A. 135). Finally, it contains the employee's acknowledgment that he or she has read and understands the IDI Policy's provisions on the distribution of licensing revenues. (A. 136). It was signed only by the employee, not by IDI, and does not expressly bind IDI to do anything.

Although Dr. Warren does not squarely assert in his brief that he signed a Participation Agreement, IDI's policy of requiring

new employees to sign was circumstantial evidence that he did. Although neither Dr. Warren nor the Hospital had any direct evidence that Dr. Warren had or had not signed a Participation Agreement, in this procedural posture, the Court should assume that Dr. Warren did sign a Participation Agreement.

### D.    IDI Affiliates, And Then Merges, With the Hospital.

On December 24, 2008, IDI entered into an Affiliation Agreement with the Children's Medical Center Corp. in contemplation of an eventual merger. The Affiliation Agreement provided:

> All IDI Intellectual Property Rights not previously licensed as of the Effective Time shall at the Effective Time be subject to policies and procedures established by CMCC with respect to intellectual property of CMCC and/or its affiliates, as the same may be amended from time to time; provided, however, that this section shall not apply to any IDI Intellectual Property Rights subject to the GSK Agreement.[2]

The "Effective Time" was February 20, 2009, the date on which IDI filed its amended and restated articles of organization. (A. 57, 157). IDI adopted the Hospital's intellectual property policies at the Effective Time. (A. 42).

---

[2] The "GSK Agreement" was an unrelated intellectual property agreement with no effect on this case.

The Hospital's policy was broadly consistent with IDI's policy. Both policies provided that the institutions, not the inventors, owned the inventors' inventions. (A. 213). Both policies provided that the institutions would share licensing revenue with the inventors. (A. 214-15). But the sharing percentages were different. The IDI Policy provided that the inventors would receive one-third of the Net Proceeds, which were defined to include the amount actually received, including royalties and equity, less the costs and expenses reasonably attributable to obtaining IP protection and commercialization. (A. 128-129). The Hospital's policy had a more complicated percentage system that depended on whether the inventor was a Hospital employee at the time of the distribution. If the inventor was an employee, he or she would receive 70% of the first $100,000 in net revenues, 45% of the next $400,000 in net revenues, and 25% of any remaining net revenues. (A. 215). If the inventor was no longer an employee, then he or she would receive 35% of the first $500,000 of net revenues, and 25% of any remainder. (*Id.*). The Hospital Policy also had special provisions for equity. In case the Hospital received and decided to sell equity, the inventor would receive 25% of the cash proceeds. (A. 216). The proceeds of the sale would be net of the Hospital's costs attributable to patenting, litigation, marketing, and selling the stock. (A.

217). Neither policy is always more favorable to inventors than the other. That depends on how much net revenue results from the licenses, whether the license includes an equity component, and on whether the inventor remains a Hospital employee—matters that are unknowable at the time an inventor makes an invention.

###    E.    The Dispute About The Assignment

Dr. Warren knew from his experience at other institutions that the requirement that inventors assign their patent rights was standard practice at universities and research institutions. (A. 102). Assuming that he signed a Participation Agreement, Dr. Warren expressly agreed that he would assign his rights. (A. 134). The IDI Policy that he says governs provided that he had a duty to assign his rights. And he did assign his rights in the patent applications that resulted from his and Dr. Rossi's invention by signing a written assignment in August 2010. (A. 244). In that assignment, Dr. Warren agreed to execute later assignments and other documents as necessary:

> AND I HEREBY covenant and agree that I will communicate to the said **Immune Disease Institute Inc.,** its successors, legal representatives and assigns, any facts known to me respecting said improvements and testify in any legal proceeding, sign all lawful papers, execute all divisional, continuing and reissue applications, make all rightful oaths and generally do everything possible to aid the said **Immune**

> **Disease Institute, Inc.,** its successors, legal representatives and assigns, to obtain and enforce proper patent protection for said improvements in all countries.

(A. 244).

But when the Hospital asked him to sign a second assignment (a typical request in patent prosecution practice), he balked. Although he knew he had an obligation to execute the assignment, and although he had already expressly agreed to cooperate with IDI and its successors in patent prosecution, he refused to sign until the Hospital explained the applicable revenue sharing policy to him. (A. 43). The Hospital has acknowledged since the beginning this case began that at this point, its technology transfer staff and its general counsel's office made a mistake by referring Dr. Warren, in written correspondence in 2011, to the IDI Policy rather than to the Hospital Policy. (A. 43, 141-150, 152-53). Citing the IDI Policy was a mistake because after the affiliation, the Hospital Policy became effective. (A. 43). In any event, after the correspondence between Dr. Warren and the Hospital, Dr. Warren did what he knew he already had a duty to do: he executed the second assignment. (A. 43).

### F.    The License and the Ad Hoc Policy

In December 2010, after the invention and after Dr. Warren left IDI, the Hospital entered into a license agreement with Moderna (ECF 55-6). Most details of the license agreement, which was filed under seal in the district court, are immaterial to the appeal. The license did involve an equity component. (A. 451).

In November 2017, Dr. Rossi worked out an arrangement with the Hospital for an increased share of net licensing revenues for the inventors. (A. 43). They agreed on a new "Ad Hoc Policy," under which inventors would receive 27.5% of the net licensing revenues. (A. 43, 209-10). This was more favorable for the inventors than the Hospital Policy, given the likelihood that the license would yield very significant revenues. (A. 43). It was more favorable for Dr. Warren in particular, because it set a fixed percentage that was the same for current Hospital employees as for former employees or people such as Dr. Warren who had never been employees of the Hospital. All the stakeholders—the Hospital, Dr. Rossi, and the relevant Hospital programs—agreed to the Ad Hoc Policy, except for Dr. Warren. (A. 210). Even so, the Hospital has been giving Dr. Warren the benefit of the Ad Hoc Policy and paying him in accordance with it. (A. 44).

### G.     The Moderna IPO and the Sale of Stock.

Moderna made its initial public offering on December 6, 2018. (A. 74). The Hospital sold all the Moderna stock it had received under the license between July 8 and September 23, 2019. (A. 477).

The Hospital shared with Dr. Warren $3.7 million from the proceeds, per the Ad Hoc Policy—more than it would have shared with him had it applied the Hospital Policy. (A. 451-52). This payment was, of course, on top of the ordinary royalties based on sales that the Hospital has shared and will share with Dr. Warren under the Ad Hoc Policy. The amount of those royalties to date does not appear in the record on appeal.

### H.     Procedural History.

Dr. Warren sued in December 2017. His *pro se* complaint contained a one-paragraph statement of his claim that did not specify the legal theories on which he was proceeding, though he was apparently asserting a breach of contract. (A. 16). He sought "a declaratory judgment that the defendant is bound by the express promises in the Net Proceeds section of the IDI inventions policy, an injunction "requiring the defendant to distribute licensing proceeds in accord with these obligations in a timely and well-documented fashion," and "costs, attorneys' fees, and such other

12

relief as the court deems just and appropriate." (A. 15). The claim for an injunction rested on Dr. Warren's claim that the Hospital should transfer Moderna shares to him rather than transfer the proceeds of its eventual sale of the stock; he claimed he could suffer an adverse tax consequence otherwise. (A. 14). That claim has been moot since 2019, when the Hospital sold its stock.[3]

Throughout the litigation, Dr. Warren made it abundantly clear that he was not seeking damages. Thus, for example, in his initial disclosures, he provided no damages calculation, writing: "Not applicable as the plaintiff is seeking equitable relief." (A. 470). He also disclaimed any damages remedy in his testimony and said that he was seeking only declaratory relief. (A. 474). Accordingly, the Hospital did not demand a trial by jury, took no discovery on damages, and did not retain an expert on damages.

---

[3] Nor did the claim have any merit before it became moot. Under federal tax law, Dr. Warren would receive long-term capital gain treatment whether the Hospital gave him shares and he sold them or the Hospital sold the shares and gave him the proceeds. *See* 26 U.S.C. § 1235(a); 26 C.F.R. § 1.1235-1(c)(2); *see also Chilton v. Comm'r of Internal Revenue,* 40 T.C. 552 (1963). Dr. Warren later acknowledged that his tax theory was likely wrong. (ECF 57 at 18-19).

Because Dr. Warren was proceeding *pro se* below (as he has throughout this case, except for a one-month period during this appeal), the Hospital, when it moved for summary judgment, addressed not just the claim Dr. Warren had made—breach of contract—but also the claim that a lawyer representing Dr. Warren might well have made, promissory or equitable estoppel. (ECF 52 at 12-14; ECF 59 at 10-11). Dr. Warren picked up on the concept of estoppel in his opposition to the motion. (ECF 57 at 16-17).

The Hospital moved for summary judgment on February 15, 2019. (A. 6). The Court denied the motion for summary judgment without a written decision on September 30, 2019. (A. 7). Dr. Warren moved to amend his complaint in March 2020, thirteen months after the motion for summary judgment and six months after the judge initially denied that motion. (A.7). Until then, Dr. Warren's claim about the stock had been that the Hospital should be required to give him stock instead of the proceeds from the stock sale. But because that claim for an injunction became moot in 2019, after the Hospital sold its shares, and because he had acknowledged that his tax arguments were likely incorrect, Dr. Warren advanced a new theory. He claims damages for the failure to deliver the stock to him, measured not by a tax theory but by the difference in price between the dates the Hospital sold its

14

shares and the date Dr. Warren should have received the shares. In the alternative, he claims that the Hospital waited too long to sell its shares, causing him to suffer a loss. (A. 453-54).

In January 2023, the judge issued an order vacating his prior order on summary judgment, granting the motion for summary judgment, and denying the motion for leave to amend. The judge explained that when he initially denied the motion for summary judgment, he had "contemplated (without so specifying) that this case could survive summary judgment to the extent that the complaint sets forth a claim for negligent misrepresentation based on the misrepresentations IDI officials made to Dr. Warren in 2011." (A. 506-07). But "[o]n further reflection," the judge concluded that he had erred on that point. (A. 507).

The judge held that Dr. Warren's contractual claims could not succeed even assuming the IDI Policy was a contract. Under the contract, IDI had and exercised the power to amend the contract following the affiliation with the Hospital, and the Hospital's Policy, not the IDI Policy, therefore applied. (A. 498-502). Dr. Warren has challenged this holding on appeal. The judge did not decide whether the IDI Policy *was* a contract that imposed obligations on IDI and the Hospital (A. 497-98), and Dr. Warren has asserted on appeal that it was.

The judge also rejected any claim for promissory estoppel. He reasoned that Dr. Warren had a preexisting legal duty to assign to IDI his intellectual property rights in the inventions he made while employed by IDI. Therefore, he could not say that he relied on the Hospital's misrepresentation about which policy applied when he signed the second assignment. The judge also noted that since there was no dispute that the IDI Policy applied to Dr. Warren's employment when he was hired, and since the IDI Policy itself made it clear that Dr. Warren had a duty to assign, Dr. Warren was bound by the IDI Policy to assign, whether or not he ever saw or read it. (A. 502-506). Dr. Warren has not appealed from these holdings or challenged any of the judge's findings or reasoning on promissory estoppel.

Last, the judge considered, sua sponte, whether Dr. Warren could prevail on a theory neither party had raised, negligent misrepresentation. He held that the theory failed for the same reason the contract and promissory estoppel theories failed: the Hospital Policy, not the IDI Policy, governed, and in any event Dr. Warren had a preexisting legal duty to assign. (A. 506-08). Again, Dr. Warren has not appealed from this holding.

16

## SUMMARY OF ARGUMENT

The district court decided the case on the assumption that the IDI Policy was a contract that bound IDI and the Hospital, and this Court can do likewise. Even if the IDI Policy were a contract, it gave IDI a unilateral power to amend, which IDI exercised when it affiliated with the Hospital by adopting the Hospital's IP policies. None of the reasons Dr. Warren gives to explain why the power to amend should not be enforced as written has merit.

First, the contract's provision on amendment is clear. Dr. Warren has cited no cases suggesting that such language does not mean what it says, and his argument about the meaning of the language concedes that the language can be construed to give IDI the power to amend.

Second, the power to amend is not buried in the "fine print" of the IDI Policy, but appears on the first page following the preamble, in ordinary type. In any event, the cases Dr. Warren cites address the question whether a power to amend buried in the "fine print" is relevant to contract formation. There is no reason why a power to amend has to be made extraordinarily conspicuous, if arguendo a contract exists. For similar reasons, the IDI Policy, if it is a contract, should not be construed narrowly or against IDI, but should be given its plain, ordinary meaning.

17

Third, Dr. Warren had no vested rights at the time IDI amended its policy and cannot complain that IDI or the Hospital failed to pay compensation he had earned. At the time he made the invention, and at the time IDI amended its policy, no one could know whether the IP would be licensed, or if it were to be licensed, whether the license would lead to a commercial product that would generate royalties. And although Dr. Warren and his collaborator had a preliminary discussion about their idea with a representative of IDI's technology transfer office before the amendment, they did not reduce the invention to practice or make their official invention disclosure until after the amendment, even though the IDI Policy that Dr. Warren characterizes as a contract requires inventors to disclose the invention "promptly" after conception or reduction to practice (A. 134).

Fourth, Dr. Warren has no argument to make about a supposed lack of notice regarding the amendment. Because he did not recall ever seeing the IDI Policy until the Hospital sought the second assignment (A. 99), he can hardly have been misled by the later adoption of the new policy without notice.

The Court can also affirm the judgment on the alternate ground that the IDI Policy was not a contract that bound IDI or the Hospital to do anything. The factors that courts consider when

18

deciding whether an employer policy or handbook binds the employer strongly favor the Hospital's arguments. The IDI Policy and the Participation Agreement gave IDI the unilateral power to modify the policy. The IDI Policy uses words that emphasize its non-contractual character (e.g., characterizing itself as a "guide"). There was no negotiation about the IDI Policy's terms. Dr. Warren was an employee at will. And while IDI posted the IDI Policy on its intranet, there is no evidence that anyone, including Dr. Warren, used the intranet or read the policy there, and no evidence that it was attached to the Participation Agreement employees were asked to sign (though the Participation Agreement contains an acknowledgment that employees had read the policy).

If the Court does remand the case, it should not reverse the denial of Dr. Warren's motion for leave to amend his complaint but should vacate and remand for further consideration of the arguments the Hospital made in opposition to the motion. Those arguments are strong. Leave to amend would be prejudicial because it would require reopening discovery and perhaps a change in trial strategies even though the case was ready for trial. Leave to amend would also be futile, because the new claims Dr. Warren wants to bring are impermissibly speculative and, in his claim for conversion fails to state a claim on which relief can be granted. (To prove

conversion, Dr. Warren would have to prove that the Hospital was not in rightful possession of the Moderna stock certificates, which he could never do). Finally, the motion to amend was procedurally improper, because the amendment arises out of events that happened after Dr. Warren filed his complaint.

## ARGUMENT

### A.    Standard of Review

The Court reviews a decision to grant summary judgment de novo, reviewing the record in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor. *See Block Island Fishing, Inc. v. Rogers,* 844 F.3d 358, 360 (1st Cir. 2016). It reviews a decision denying a motion for leave to amend a complaint for abuse of discretion. *See Abraham v. Woods Hole Oceanographic Inst.,* 553 F.3d 114, 117 (1st Cir. 2009).

### B.    IDI Could And Did Amend Its Policy.

Much of Dr. Warren's brief is taken up with the question whether, under cases such as *Jackson v. Action for Boston Community Development, Inc.,* 403 Mass. 8, 525 N.E.2d 411 (1988), *O'Brien v. New England Telephone & Telegraph Co.,* 422 Mass. 686, 664 N.E.2d 843 (1996), and *Pearson v. John Hancock Mutual Life Insurance Co.,* 979 F.2d 254 (1st Cir. 1992), the IDI Policy was a contract that bound IDI and the Hospital. Many of those

cases feature policies, handbooks, or manuals that reserve to the employer the power to make unilateral modifications. In many cases, there was no suggestion that the employer *had actually* modified its policies. The question was whether the mere existence of the unilateral power to modify the policy, among other factors, leads to the conclusion that no contract exists.

This case is different. The IDI Policy expressly states that IDI had the power to amend the policy, *and IDI actually did amend the policy* by adopting the Hospital Policy when it affiliated with the Hospital. So it is possible and maybe preferable to decide the case, as the judge did, on the assumption that the IDI Policy was a contract that IDI had the power to modify.

Dr. Warren argues that IDI did not have the right to amend its policy as it did here. He gives five reasons: the IDI Policy's provision on amendment does not, even on its own terms, give IDI the power to amend the Policy (Br. at 23-25); the language on amendment was too inconspicuous to be enforceable (Br. at 25-26); the Policy should be construed against the drafter (Br. at 26-27); Dr. Warren's rights had vested before the amendment. (Br. at 28-30); and IDI never notified him of the amendment. (Br. at 30-35). None of these arguments have merit.

21

### 1.   The Language Of The Policy Is Clear.

As Dr. Warren acknowledges (Br. at 22-23), employers have the right to amend the terms of employment for at-will employees. The IDI Policy (assuming it is a contract) makes this clear: it provided that IDI would "retain the discretion to amend this policy from time to time." (A. 124).

Dr. Warren does not cite even one case to support his view that the IDI Policy does not mean what it says. He concedes that the clause on amendments should be read to mean: "Be aware that we may update these policies to change your rights and duties in the future." (Br. at 24). In short, he seems to acknowledge that the IDI Policy can be given its plain meaning. There can be no real dispute, based on the language, that the IDI Policy means what it says.

### 2.   The Power to Amend Was Not Buried In Fine Print.

The power to amend is printed in the IDI policy in easily readable, conspicuous type. (A. 124). It appears on the first page of the Policy after the preamble. There is no real argument that the language was somehow "buried in the fine print."

Dr. Warren's cases are not on point. They go to whether a contract existed, not to whether the employer had the power to amend the contract. In *Ferguson v. Host International, Inc.,* 53

Mass. App. Ct. 96, 757 N.E.2d 267 (2001), a retail employee was fired after a customer complaint. The employer had a comprehensive employment manual, which it gave to the employee when he was hired. *Id.* at 98, 757 N.E.2d at 269. Under the heading, "ABOUT THIS BOOK," the fourth paragraph provided that the employer "reserves its rights to modify, change, disregard, suspend or cancel at any time without written or verbal notice all or any part of the handbook's contents as circumstances may require." *Id.* at 99 n.5, 757 N.E.2d at 270. The manual also had detailed provisions on progressive discipline. *Id.* At 99-100, 757 N.E.2d at 270.  The employer claimed that the employee had no rights to be treated per the progressive discipline policy because the manual was not a contract. *Id.* at 101, 757 N.E.2d at 271. The court, citing *O'Brien*, held that that the power to amend was not conspicuous enough to deprive the manual of its contractual force. *Id.* at 101-03, 757 N.E.2d at 271-73.

Similarly, in *Lee v. Howard Hughes Medical Institute,* 457 F. Supp. 3d 9 (D. Mass. 2020), Lee was a scientist at MGH whose work was funded by the Institute, which had appointed her an "HHMI Investigator." It reappointed her several times, but when she was not reappointed for a fourth term, Lee sued, claiming that

the Institute had not complied with its Investigator Administrative Handbook. *Id.* at 11. The Institute denied that the Handbook was a contract, pointing among other things to language allowing it "unilaterally, at any time and in its discretion," to "amend, supplement, modify, or eliminate any or all policies described in this Handbook ..." *Id.* at 12. The court granted the Institute's motion to dismiss, finding that on the facts alleged, Lee could not prove a contract. *See id.* at 12-13.

There is a real issue about whether reserving the unilateral power to amend, taken with other factors, undercuts an at-will employee's claim that he had a contract with his employer. And it is clear from the cases that the mere reservation of a power to amend, without more, does not necessarily make employer's policy non-contractual. The amount of attention the employer calls to its power to amend may be relevant to whether a contract exists. The Hospital discusses these issues below. But Dr. Warren has cited no authority to support the view that if an employer's written policy constitutes a contract, a power to amend in the contract has to be in highly conspicuous print or given special and unusual attention. (None of that would have helped Dr. Warren, who could not testify that he had ever read or seen the IDI Policy during his employment).

### 3. The Policy Should Not Be Construed Against IDI.

Similar considerations apply to Dr. Warren's argument that the IDI Policy should be construed narrowly and against IDI. Again, he cites cases that go to contract existence, not to the construction of a term giving the employer a power to amend. *See Derrig v. Wal-Mart Stores, Inc.,* 942 F. Supp. 49, 55 n.16 (D. Mass. 1996);[4] *Ferguson, supra; Campbell v. Gen. Dynamics Gov't Sys. Corp.,* 321 F. Supp. 2d 142 (D. Mass. 2004);[5] *Charest v. President & Fellows of Harvard Coll.,* 2016 U.S. Dist. LEXIS 18493, at *32-38 (D. Mass. Feb. 21, 2016).

### 4. Dr. Warren Had No Vested Rights.

Dr. Warren argues that the royalties he claims a right to receive were deferred compensation that he had earned when IDI amended its policy. (Br. at 28-30). He relies mainly on *LeMaitre v. Mass. Turnpike Authority,* 70 Mass. App. Ct. 634, 876 N.E.2d 888

---

[4] *Derrig* is also distinguishable because it involved two employee manuals, one of which disclaimed contractual obligations and the other of which did not. *Derrig,* 942 F. Supp. at 55 n.16.

[5] *Campbell* is distinguishable on another ground: it involves whether an email sent to employees imposing a new arbitration requirement was binding in a civil rights action; but "the waiver of the right to a judicial forum for civil rights claims in exchange for continued employment" is judged under a separate body of precedents, not under general rules applicable to employment contracts applicable in this case. *See Campbell,* 321 F. Supp. 2d at 146-47.

(2007) [*LeMaitre I*], *on further app. rev.,* 452 Mass. 753, 897 N.E2d 1218 (2008) [*Lemaitre II*]. He did not frame his argument in terms of deferred compensation below.

In *LeMaitre,* the employee, LeMaitre, had notice of the Turnpike Authority's incentive policy on sick leave and good attendance credits. He accumulated unused sick leave over more than twenty years, and the Authority then amended its policy to reduce the benefit employees would receive at retirement. *LeMaitre I,* 70 Mass. App. Ct. at 635-36, 876 N.E.2d at 890-91. The SJC held that the sick time and attendance benefits were employee compensation that the employee was entitled to receive using the formula in place at the time his right accrued.[6] 452 Mass. at 755, 897 N.E.2d at 1219.

But this case differs from *LeMaitre* in two crucial respects. First, unlike LeMaitre, in 2009, Dr. Warren could not argue that he had a vested right to receive anything. His right to receive royalties turned on IDI licensing the intellectual property rights to a third party. But IDI did not license the intellectual property to

---

[6] The court also noted that LeMaitre would prevail on a reliance theory. *See LeMaitre II,* 452 Mass. at 755 n.2, 897 N.E.2d at 1219. Again, that argument is unavailable to Dr. Warren, who could not have relied on a policy that he could not show that he had ever read or seen.

Moderna until December 2010, after Dr. Warren had left IDI. (A. 42).[7] It might never have licensed the IP.

Dr. Warren's right to receive royalties also turned on the successful commercialization of the invention. Today we know that mRNA technology has made Moderna a lot of money (though the record is silent about the connection, if there is one, between Dr. Rossi and Dr. Warren's invention and the mRNA technology used in Moderna's COVID-19 vaccines, or about the cash royalties the Hospital has received). But until well after Dr. Warren left IDI, no one could know whether any revenue, and thus any royalties based on revenues, would ever result from a license of rights in Dr. Warren and Dr. Rossi's invention.

Second, Dr. Warren concedes that his invention was not reduced to practice until late 2009, months after the Hospital Policy became effective (ECF 57 at 11), and he and Dr. Rossi did not make their invention disclosure until 2010—again, long after the Hospital's policy became effective. (A. 117-18). Under the IDI Policy, the invention disclosure had to be made "promptly" after conception or reduction to practice. (A. 126), and that disclosure was the

_____

[7] The 2012 Amended and Restated Exclusive License Agreement referenced in the Declaration of Ryan Dietz amended the earlier license agreement dated December 21, 2010.

27

trigger for IDI to consider seeking patent protection. (A. 127). The bargain Dr. Warren claims existed, remember, was an exchange of his IP rights so that IDI could obtain a patent, in return for a share of the royalties. So things had not progressed to the point where Dr. Warren could credibly claim that he had vested rights under the IDI Policy until long after.

> ### 5. Since Dr. Warren Had No Notice of the IDI Policy, A Failure To Give Notice of the Hospital's Policy Was Immaterial.

If Dr. Warren had read and relied on the IDI Policy, then he might have an argument that a failure to notify him that the policy had changed could be relevant to the effectiveness of the change. But Dr. Warren cannot recall that he ever saw the policy until after he left IDI. If the IDI Policy is binding (as he claims) whether or not Dr. Warren could prove that he saw it, then there is no reason why its replacement, the Hospital Policy, should not bind, too, even though he never saw it.

## C.    The IDI Policy Did Not Bind IDI Or The Hospital.

Under Massachusetts law, an employer's policy, stated in a personnel manual or a similar document, may "form the basis for an express contract," for example, when the parties "agree in advance of employment or during the course of employment that the

28

manual will set forth relative rights and obligations of employer and employee." *O'Brien,* 422 Mass. at 691, 664 N.E.2d at 847. The SJC has outlined factors that "might make a difference in deciding whether the terms of a personnel manual were at least impliedly part of an employment contract." *Id.* These factors include the employer's right to modify the manual unilaterally, the use of words like "guidance" or "policies" as distinguished from mandatory contractual language, whether there was any negotiation between the parties over the manual's terms, whether the employment was at will or for a specified term, whether the employer called special attention to the manual, and whether the employee signed the manual or in any other way manifested assent to it. *See Jackson,* 403 Mass. at 14-15, 525 N.E.2d at 415-16. These factors are not a "rigid list of prerequisites." *O'Brien,* 422 Mass. at 692, 664 N.E.2d at 847. But they are instructive. Both parties have focused on them. And they favor the view that the IDI Policy was not a contract.

- As explained above, IDI did have a unilateral power to modify its policy. That power is expressed not just in the IDI Policy itself (A. 124), but in the Participation Agreement (A. 134).

- The IDI Policy's text uses words that emphasize its non-contractual character. The "policy is intended to serve as a

29

guide for members of the IDI community." (A. 123). Even stronger language, such as a statement that a policy is "an essential element of [the] employment relationship," cannot show an intent to make a contractual obligation. *See Campbell,* 407 F.3d at 558 (citing *Patterson v. Tenet Healthcare, Inc.,* 113 F.3d 832, 835 (8th Cir. 1997)). When the question is the *employee's* obligation (in *Campbell,* the employee's obligation to arbitrate disputes), words such as "I agree," "I accept," or "condition of employment" may help distinguish between mere policies and contracts. *Id.* Here, it is the *employer's* obligation that is in question, and nothing in either the IDI Policy or the Participation Agreement suggests that IDI was committing itself in the way such words could suggest.

•    There is no evidence of negotiation between the parties, or between IDI and anyone else, about the IDI Policy's terms. While the lack of negotiation itself is not conclusive, *see O'Brien,* 422 Mass. at 692, 664 N.E.2d at 844, it is a relevant factor, *see Jackson,* 403 Mass. at 14-15, 525 N.E.2d at 415-16.

•    Dr. Warren was an employee at will. Dr. Warren suggests that under *LeMaitre,* this factor should be deemphasized, because Dr. Warren's tenure is not at issue in the case. (Br. at 41-42). In fact, *LeMaitre II* makes it clear that the policies that favor treating employer policies as contracts are stronger in cases involving

30

job security and termination, and weaker in cases like *LeMaitre* and this case, where the employee's claim is not for protection from termination or discipline, but for money owed:

> Employee handbook cases characteristically arise when at-will employees seek to enforce the provisions of an employer issued handbook indicating that an employee will be accorded either some measure of job security or some particular disciplinary process before discharge. This is not such as case, and policies that might counsel against too readily concluding that an employer's unilateral announcement of a personnel policy modifies the at-will relationship it has with its employees, are largely inapplicable here.

*LeMaitre II,* 452 Mass. at 754, 897 N.E.2d at 1219 (citations omitted).

- •   IDI called employees' attention to the IDI Policy by posting it on the Institute's intranet. (A. 233).[8] But nothing in the record suggests that any IDI employee ever saw or read it or used the intranet. Dr. Warren testified that he might have looked but that he does not recall looking at the intranet or seeing the policy during his onboarding. The first time he ever recalled seeing the

---

[8] Dr. Warren asserts that IDI gave copies of the IDI Policy to new employees at their orientations and explained that accepting it was a condition of employment. The testimony refers to signing the Participation Agreement. (A. 233). And as already noted, Dr. Warren cannot testify that *he* was given a copy of the IDI Policy at any time during his employment with IDI.

policy was in 2011. (A. 75-76). As already explained, there is some circumstantial evidence that he signed the Participation Agreement. But the IDI Policy was not an attachment to the Participation Agreement. To the contrary, the Participation Agreement was an attachment to the IDI Policy. (A.126). Even assuming that Dr. Warren signed the Participation Agreement, there is no evidence that he was shown or given the IDI Policy at that time.

- While there is no direct evidence that Dr. Warren signed the IDI Policy or that he signed the Participation Agreement, there is circumstantial evidence that could show that he signed the Participation Agreement, which does acknowledge his obligation to follow the IDI Policy. *See Greene v. Ablon,* 794 F.3d 133, 147 (1st Cir. 2015) (employee who signed employment agreement that incorporated IP policy held bound by policy). But the Participation Agreement is expressly framed as a unilateral agreement by the employee to comply with IDI's policies as amended "in consideration of [his or her] employment by or association with [IDI]." (A. 136). It does not provide that IDI had to do anything. It references the IDI Policy on licensing revenue sharing, but not in language that suggests any obligation on IDI's part: "I

32

have read and understand the Distribution of Net Proceeds mentioned in the IDI's 'Research and Technology Development Policy'." (A. 136).

In short, the factors that are relevant to deciding whether an employer's policy contractually binds the employer strongly favor the Hospital's position that neither it nor IDI had a contractual obligation to share licensing revenue with Dr. Warren.

Although Dr. Warren did not cite it below, he relies now on *Charest v. President & Fellows of Harvard College,* 2016 U.S. Dist. LEXIS 18493 (D. Mass. Feb. 16, 2016), an unreported case with superficial similarities to this case. Charest, a doctoral student, helped to invent a new class of antibiotics while a student in Harvard's organic chemistry department. *Id.* at *2-3. He had signed a participation agreement acknowledging he was bound by Harvard's equivalent of the IDI Policy, which provided for a percentage of revenue for inventors and also made provisions for multiple inventions licensed in a single license and for allocating shares among inventors. *Id.* at *7. Harvard's policy was amended over time, but the amendments' validity was not at issue (though the policy's status as a contract was at issue). *Id.* at *8. The case was decided on a motion to dismiss rather than a motion for summary judgment. The allegation was that although the policy called for

33

an equal allocation among inventors unless the inventors agreed otherwise, Harvard informed Charest that the more senior researcher would be receiving 50%, while he and the other junior researchers would be receiving smaller percentages. *Id.* at *15. Charest alleged that when he raised the issue with the senior researcher, Myers, he was told to "tread lightly" and to "be careful," which he took as threats, and the senior research punished Charest by refusing to give him a good reference for a job. Myers also threatened to reduce Charest's royalties by allocating 50% of the license royalties to another patent on which Charest was not an inventor if he did not agree to the reduced allocation, even though that patent had never been issued and had been effectively abandoned. *Id.* at *16-17. Charest alleged that Harvard refused to pay him even the undisputed portion of his royalties unless he agreed to accept Harvard's position on the applicable percentages. *Id.* at *25-26.

Dr. Charest's situation contrasts strongly with Dr. Warren's. Dr. Charest's allegation was that Harvard treated him unfairly by not giving him a share of the revenue equal to what the more senior inventor got, contrary to the University's policy. In this case, Dr. Warren got precisely what Dr. Rossi got. He got it notwithstanding his lawsuit against the Hospital. And both he and

34

Dr. Rossi got more than they would have gotten under the Hospital's usual policy. Under the Ad Hoc Policy, the percentage of revenue allocated to the inventors was higher, and there was no reduction in percentage for former employees. So this case has none of the unfairness that permeated the complaint in *Charest.* The Hospital has gone above and beyond to treat Dr. Warren with entire fairness, just as it has treated Dr. Rossi, even though Dr. Warren has refused to agree to the Ad Hoc Policy the Hospital agreed to for his and Dr. Rossi's benefit.

The *Charest* court did hold that Charest had adequately pleaded that Harvard's IP Policy was a contract. But the Hospital did not move to dismiss this case for failure to state a claim, and *Charest* has limited value given the evidentiary record here. For example, in *Charest,* given the procedural posture, Harvard could hardly argue that the employee could not prove that he had seen the policy on which his claim rested. Moreover, in *Charest,* the University's insistence to the employee that its policy governed came when it was asserting to the employee that he was bound by the University's resolution of his internal complaint about the allocation of royalties. *Id.* at *36. And one of Charest's claims was that Harvard had breached its policy in the way it handled his internal complaint, which preceded Harvard's final decision about

35

what percentage to award him. *Id.* at *48- 53. But the Hospital's misstatement about which policy governed came after Dr. Warren had done all his inventive work, and indeed, after every relevant event in the case except Dr. Warren's execution of the second assignment. And as the judge concluded and Dr. Warren has conceded by not challenging the conclusion on appeal, Dr. Warren had a preexisting duty to sign that assignment and could not make a claim that he reasonably relied on the Hospital's misstatement.

In short, even if *Charest* were correctly decided (the case was dismissed by stipulation after the decision on the motion to dismiss and never tested on appeal), it is far removed from this case and has limited value.

> **D.    If There Is A Remand, The Court Should Vacate The Decision on the Motion to Amend With Instructions To Consider The Arguments The Hospital Made Against Amendment.**

For all the reasons already argued, the Court should bring this case to an end by affirming the summary judgment for the Hospital. If there is a remand, though, the Court should not simply reverse the decision to deny the motion for leave to amend the Complaint. The judge held that the proposed amended complaint was futile because even his new claims depended on showing that the IDI Policy applied (A. 508-09); he did not engage with the

Hospital's other arguments against amendment. Because a motion for leave to amend is committed to the judge's discretion, the Hospital does not ask this Court to remand with instructions to deny the motion. But the arguments against amendment that the judge did not consider were strong, and the judge should consider them in deciding whether to allow Dr. Warren's amendment.

Dr. Warren's new theory is that he was injured because the Moderna stock was worth less on the dates that the Hospital actually did sell the stock than on the dates that he claims the Hospital should have sold (A. 453), or that he was injured by the Hospital's refusal to convey stock to him on a date that he claims the Hospital should have conveyed them (A. 454). The Hospital argued (ECF 87 at 12-14) that the new claims would be prejudicial because they would require more discovery on issues the parties had never explored, including by way of example Dr. Warren's finances, tax situation, and investment history. The new claims would likely also require expert testimony on the tax and timing issues.

Amendments that require new discovery, after a case has passed through summary judgment and is ready for trial, are the archetypical form of prejudice that courts note when denying motions to amend. In *Acosta-Mestre v. Hilton International of Puerto*

*Rico, Inc.,* 156 F.3d 49, 51-53 (1st Cir. 1998), for example, the motion to amend came "near the close of discovery"—not, as here, long after discovery ended. By the time the plaintiff filed its motion, "nearly all of the case's pre-trial work was complete." Here, all the pretrial work except the pretrial conference and motions in limine is complete.

Moreover, the proposed amendment in *Acosta-Mestre* would have led the defendant to a "likely major alteration in trial strategy and tactics." The same is true here. Without the amendment, the Hospital would want to emphasize the difficulties in transferring pre-IPO shares to Warren at or near the time the shares were received. Indeed, the Hospital took no steps to explain how restricted shares could have been transferred pre-IPO, and instead emphasized that Dr. Warren had developed no evidence to show that they could have been transferred. (A. 112-13). But with the amendment, the Hospital might, depending on the opinions of experts not yet retained, want to emphasize the possibility of making the transfer, to minimize the possible measure of damages. In *Acosta-Mestre,* these factors justified denying the motion for leave to amend, and the same conclusion applies here a fortiori.

Along with prejudice, the Hospital also argued that the proposed new claims were futile. (ECF 87 at 6-11). The Hospital's

38

main argument on futility was that the damages claim was hopelessly speculative because Moderna's stock price is volatile and because it is impossible to predict the stock's performance to time a sale to maximize profit. Dr. Warren's claim for lost profits depends on what he would have done had he received the stock, and courts reject such claims based on the amount of speculation involved. *See Vanderbeek v. Vernon Corp.,* 50 P.3d 866, 874 (Colo. 2002); *LG Capital Funding, LLC b. 5barz Int'l,* 307 F. Supp. 3d 84, 103 n.14 (E.D.N.Y. 2018); *Kane v. Shearson Lehman Hutton, Inc.,* 916 F.2d 643, 647 (11th Cir. 1990). Dr. Warren's claim for conversion is futile for another reason: the Hospital was rightfully in possession of the Moderna stock certificates when it received them, and therefore, no claim for conversion lies. *See Abington Nat'l Bank v. Ashwood Homes, Inc.,* 19 Mass. App. Ct. 503, 507, 475 N.E.2d 1230, 1232-33 (1985). Dr. Warren never owned the Moderna stock; his claim is that the Hospital breached a supposed promise to deliver the Hospital's stock to him, not that the Hospital wrongfully possessed Dr. Warren's own shares.

Finally, the Hospital argued (ECF 87 at 5-6) that because the amendment related to matters that occurred after the filing of the complaint, it would be procedurally improper. To raise such

39

matters, Dr. Warren should have moved for leave to file a supplemental pleading under Fed. R. Civ. P. 15(d). *See generally Cortés-Ramos v. Martin-Moralis,* 2020 U.S. App. LEXIS 11545, at *13 (1st Cir. Apr. 13, 2020); 3 *Moore's Federal Practice* § 15.30[1]. If Dr. Warren were to make such a motion, the Hospital would oppose it on the grounds that the case is ready for trial and the Court should not allow further delays by introducing new claims arising out of facts occurring long after the start of the action and requiring additional discovery.

## CONCLUSION

For these reasons, the Court should affirm the judgment.

Respectfully submitted,
THE CHILDREN'S
HOSPITAL CORPORATION

By its attorney:

*/s/ Theodore J. Folkman*

Theodore J. Folkman (No. 81828)
RUBIN AND RUDMAN LLP
53 State St.
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8,788 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Supra.

*/s/ Theodore J. Folkman*

Theodore J. Folkman
*Appellee's Counsel*

Dated:        June 29, 2023